UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JACQUES DESROSIERS and

YOLETTE L. DESROSIERS

Plaintiffs,

v.                                            CA No.:

SIG SAUER, INC.

Defendant.

## COMPLAINT AND JURY DEMAND

## SUMMARY OF ACTION

1.      Plaintiff, Jacques Desrosiers, ("Officer Desrosiers"), resides in the Commonwealth of Massachusetts and is a police officer with approximately twenty-four years of service with the Cambridge Police Department ("CPD").  He has not returned to active duty following the incident described below.

2.      Officer Desrosiers began his employment with the CPD in April of 1995 and served as a patrol officer, community police officer, and hackney officer with CPD.

3.      Officer Desrosiers took a leave of absence with the CPD in 1998 for one year to work with the United Nations as a peacekeeper officer in Haiti. When he returned he continued his duty with CPD.

4.      This action seeks actual, compensatory, and punitive damages, as well as equitable relief, relating to defendant SIG Sauer, Inc.'s ("SIG Sauer's") negligence, defective design, breach of warranties and unfair and deceptive marketing practices regarding a semi-automatic gun known as the P320 (the "P320") that fired on Officer Desrosiers without a

triggerpull on or about October 10, 2019.

5.      The P320 is a striker-fired,[1] semi-automatic pistol that was introduced to the market in 2014. Its trigger weight ranges between 5.5 and 7.5 pounds. It is the first striker-fired pistol SIG Sauer manufactured.

6.      In January 2014, the SIG Sauer P320 was introduced in North America. Since its inception, there have been at least fifty-two reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and citizens. Approximately thirteen lawsuits brought by individual plaintiffs and three class actions have been filed against SIG Sauer alleging that the P320 is defective and dangerous.



---

[1] A striker-fired pistol differs from the traditional "hammer-fired." It has no external hammer to be pulled back by the thumb; rather, it has an internal "striker" that is held back under spring pressure like a bow and arrow. Once the slide is moved or "racked" backward, the weapon is fully cocked and ready to fire. The only component holding the striker back is the weapon's "sear."  In this illustrative photo of a typical striker-fired pistol, the striker, in red, is held back by the sear, in blue.



7.      In October 2019 Officer Desrosiers is a police officer for the CPD. At this time, the CPD were using P320 Sig Sauer firearm models. On October 10, 2019, Officer Desrosiers was on active duty with the CPD. Upon coming back from his lunch while on duty, Officer Desrosiers parked his car across the street from the CPD building.

8.      While walking toward the Cambridge Police Department, Officer Desrosiers had his department-issued P320 service firearm securely under his department issued belt when the gun unintentionally discharged.

9.      At no time did Officer Desrosiers touch the trigger, and no other item touched the trigger when the gun discharged. The bullet impacted Officer Desrosiers's scrotum, left inner thigh , and exited his right knee causing devastating injury.

10.    Officer Desrosiers's SPD issued P320 should not have discharged without a trigger pull. Indeed, SIG Sauer warranted that it would never do so. In its "Safety Without Compromise" marketing materials for the P320, SIG Sauer states:



## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

11.    Despite this express representation, which SIG Sauer has made for approximately seven years, and despite a "voluntary upgrade" program announced in 2017, Officer Desrosiers's P320 fired without the trigger being pulled.

12.    Before the sale of the P320s to the SPD, SIG Sauer knew or should have known that, due to three internal defects, the P320 could fire, and, in fact had a long history of firing, without a trigger pull.

13.    For many years since the P320 was first introduced in 2014, SIG Sauer has recklessly failed to recall it, despite knowing of defective discharges throughout the United States and abroad between at least 2016 and 2021, many of which occurred before Desrosiers' P320 discharged in October 2019.

14.    Many of these defective discharges have inflicted severe physical and emotional wounds on law enforcement officers and civilians.

15.     SIG Sauer's negligence has been the direct and proximate cause of substantial economic and non-economic harm to Officer Desrosiers and his wife, Yolette L. Desrosiers.

## JURISDICTION

16.     Jurisdiction over SIG Sauer is proper pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332 as the parties are citizens of different states.  Plaintiff is a citizen of Massachusetts. Defendant Sig Sauer, Inc. is a Delaware corporation with a principal place of business in Newington, New Hampshire.  The amount in controversy exceeds $75,000.

## VENUE

17.     The claims asserted in this action arose within this district and the allege damage occurred in this district. Venue is therefore proper pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1391(b)(2) and (3).

## PARTIES

18.  Defendant SIG Sauer, f/k/a "SIGARMS," has a principal place of business in Newington, New Hampshire. It markets and distributes its products in 88 countries, according to one of its own press releases. "SIG Sauer" is also the brand name used or formerly used by several sister companies involved in the design and manufacture of firearms.

19.     Plaintiff, Jacques Desrosiers is a Cambridge police officer with significant firearms experience.

## FACTUAL ALLEGATIONS

**I.      October 2019 Discharge Incident**

20.      In October 2019 Officer Desrosiers is a police officer for the CPD. At
this time, the CPD were using P320 Sig Sauer firearm models. On October 10, 2019
Desrosiers was on duty with CPD. During an on-duty lunch break, Officer Desrosiers
was walking across the street to the Cambridge Police Department.

21.      Officer Desrosiers had his P320 service firearm securely held in his department
issued belt. As Officer Desrosiers walked towards the police department, with the firearm held in
his department issued belt his P320 discharged without a trigger pull.

22.      At no time did Officer Desrosiers touch the trigger, and no other item touched
the trigger. The bullet impacted Officer Desrosiers's scrotum, left inner thigh, and caused
devastating injury.

**II.      Marketing of the P320**

23.      Years before the October 2019 Discharge Incident occurred, SIG
Sauer expressly warranted that the weapon could not fire without a trigger pull. In
its marketing materials, SIG Sauer states:



SAFETY WITHOUT
COMPROMISE

We've designed safety elements into every necessary
feature on this pistol. From the trigger, to the striker and
even the magazine, the P320 won't fire unless you want
it to.

24.     Additional SIG Sauer marketing materials provide:



25.     At the same time, SIG Sauer contradictorily warned in the original version of the owner's manual for the P320 that the weapon could fire if dropped:

26.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the U.S. Secret Service, the Federal Bureau of Investigation, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, including the Cambridge Police Department, to require their agents and officers to carry pistols with a chambered round.

27.     SIG Sauer was aware that law enforcement officials are routinely required to carry pistols with a chambered round when it sold its defective P320s to U.S. law enforcement agencies and departments, including the Cambridge Police Department.

28.     It is widespread practice among civilians who "conceal carry" their pistols to do so with a round in the chamber.  This practice is consistent with the rules of firearm safety, as

Pistols should not be vulnerable to un-commanded discharges under any circumstances.

29.     SIG Sauer's advertisements for the P320 stress the military and law-enforcement lineage of its firearms and focus on highlighting the modularity, safety, and functionality of the P320 for civilians and law enforcement alike.

30.     Military and law enforcement sales are a significant source of profit for SIG Sauer and are also a powerful marketing tool that SIG Sauer uses to spur additional sales to U.S. law enforcement and civilian markets, as demonstrated in these SIG Sauer marketing materials:





31.     As demonstrated in these marketing materials, SIG Sauer advertised that the P320 would function in a safe manner.

32.     These representations were contained within SIG Sauer's advertisements, packaging, package inserts, and website, and were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to purchasers.

20

### III.     Early Problems with the P320 and the August 2017 "Voluntary Upgrade Program"

33.     The P320 is the first striker-fired pistol SIG Sauer ever manufactured. SIG Sauer assembled it using the same frame and fire control unit from an earlier hammer-fired model, the P250.

34.     In early 2016, while competing for a $580,000,000 contract to supply the U.S. Army with a new service pistol, SIG Sauer's prototype P320s exhibited 200 malfunctions or more during Army testing.  These defects included failure to eject spent casings, firing upon impact with the ground, and failing to fire.

35.      In 2016, the Department of Defense notified SIG Sauer of more than 200 malfunctions with P320 prototypes.  It demanded that SIG Sauer fix all design problems associated with the P320.

36.     In early 2016, SIG Sauer was also warned by a Florida police department that the P320 was capable of firing without a trigger pull.

37.     SIG decided not to publicly disclose the 2016 warnings it had received about the P320's defects.

38.     As early as 2016, if not years before, members of SIG Sauer's management and design teams began a concerted effort to conceal defective discharge events.

39.     This effort involved SIG Sauer employees visiting local law enforcement agencies that had reported defective discharge events and seizing the weapons for inhouse "testing" in New Hampshire.

40.     Rather than seek to learn about P320's tendency to fire without a trigger pull, SIG Sauer actively avoided learning the details of defective discharge events, and instead

recharacterized and concealed them, blaming items such as keys, articles of clothing, seatbelt buckles, foreign objects, and holsters for the discharge events.

41.     In one email exchange, for example, a SIG Sauer employee claiming to investigate a February 2017 defective discharge event in Roscommon, Michigan refrained from even viewing an incident report or a bodycam video, stating in an email that he "did not want to see anything [the police department] did not want me to see."

42.     The SIG Sauer employee sent to Roscommon, Thomas Mechling, eventually watched the bodycam video and noted that the officer in question exclaimed "tell me how a gun would fire still in the holster" after the discharge. This discharge did not involve the weapon being dropped.

43.     SIG Sauer has since falsely claimed that the Roscommon Police Department "investigated" the incident, and "found" that the officer's seat belt buckle (i) plunged from its normal retracted position into the officer's holster; (ii) worked its way down to the trigger guard; (iii) wrapped itself around the trigger; and (iv) fired the gun as the officer was exiting his vehicle with no trailing seatbelt in sight.

44.     This explanation was suggested and developed by SIG Sauer employees, including Al Larochelle.

45.     SIG Sauer has also provided items of value to officers and police departments with knowledge of P320 defective discharges, claiming internally that the endangered officers showed no distrust in the P320, and currying favor with them by leaving SIG Sauer trinkets such as hats, pins and handcuff keys.

46.     The disconnect between SIG Sauer's public representations and its private knowledge shows a conscious disregard for the lives and safety of members of law enforcement

officers and the public. At all times relevant to this Complaint, SIG Sauer employed a skillful

public relations campaign, internet marketing, and in-person reassurances of the P320's alleged

safety that was designed to maximize profit at the expense of safety.

47.     At the same time, SIG Sauer has privately struggled to find an engineering

solution that would prevent the P320 from unintentionally firing on civilians and law

enforcement officers without trigger pulls.

48.     On August 4, 2017, a Stamford, Connecticut SWAT officer sued SIG Sauer in the

United States District Court for the District of Connecticut (hereinafter, "the Connecticut Suit")

for damages relating to a P320 that shot him in the knee when it fell from a distance of less than

three feet and hit the ground.

49.     The Stamford discharge resulted in a wave of national negative media publicity

and attention regarding the safety of the P320, including on television and the internet.

50.     Four days later, SIG Sauer issued a press release stating that the P320 could fire

without a trigger pull under certain conditions but "reaffirmed" the "safety" of the P320 to all

users:

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when
> the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g.
> shock, vibration, heavy or repeated drops) may have a negative effect on these safety
> mechanisms and cause them to not work as designed. This language is common to owner's
> manuals of major handgun manufacturers.



PR Contact:
Jordan Hunter
SIG SAUER, Inc.
603-610-3293
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

### SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** — In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement units as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG in

**SIG 000177**

51.    SIG Sauer's claim that its new warnings regarding the capability of the P320 to

fire without a trigger pull upon "shock" or "vibration" were similar to language in other

manufacturers' product manuals was not true.  In fact, it is critical safety requirements that firearms only fire when the trigger is pulled.

52.     On August 14, 2017, SIG Sauer announced a Voluntary Upgrade Program (the "VU Program") for the P320.

53.     The VU Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while adding a mechanical "disconnector," allegedly to make the P320 even "better" than it already was.

54.     According to the SIG Sauer website, many of these changes had "nothing to do with drop safety."

55.     The VU Program was intended to correct a defective firing assembly within several hundred thousand P320s, while also denying to consumers, law enforcement, and the general public any dangers inherent in the "non-upgraded" P320-platform firearms.

56.     According to SIG Sauer, these VU Program "changes" represented an "alternate design" of the P320 and attempted to fix design problems.

57.     SIG Sauer declined to label the VU Program a "recall" and expressly stated that all P320s in circulation were safe.

58.     When the VU Program was announced in August 2017, days after the Connecticut Suit was filed, SIG Sauer knew of numerous defects with the firing control unit in the P320 for almost two years, if not longer.

59.     At the time the VU Program was announced, SIG Sauer had also just recently obtained the $580,000,000 U.S. Army contract.

60.     A mandatory recall would have been a public relations calamity for SIG Sauer in light of the recent U.S. Army contract.

61.    The Department of Defense submitted an urgent May 10, 2017, Engineering Change Proposal (the "DoD Engineering Change Proposal") for the prototype of the military version of the P320.  The DoD Engineering Change Proposal provides further corroboration that SIG Sauer well knew of numerous defects with the P320 prior to the VU Program's announcement.

62.    The DoD Engineering Change Proposal demanded that the entire internal firing system for the P320 be replaced. SIG Sauer complied and made all requested engineering changes.

63.    To avoid the extraordinary costs of a mandatory recall, SIG Sauer continued to assure end users of approximately 500,000 commercial versions of the P320 that they were safe. The commercial versions of the P320 were used by law enforcement agents and civilians.

64.    SIG Sauer has never recalled the P320, despite having recalled other products known to have defects.

65.    SIG Sauer's former German sister company, SIG GMBH, sustained $35 million in financial losses after describing the VU Program it in tax filings with the German government as a "recall."

**IV.    Changes to the P320 Manual**

66.    Sometime after January 2017, SIG Sauer removed the warning from the user manual referenced in paragraph 60 regarding a chambered round, and replaced it with the following dramatically different language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

67.     SIG Sauer had never previously represented that mere "vibration" could cause the weapon to discharge, a statement directly at odds with its warranty that the weapon would only fire if the trigger was pulled.

68.     SIG Sauer had also expressly represented since the P320's manufacture and distribution in 2014 that the weapon possessed a "robust safety system."

69.     In fact, SIG Sauer's original design and manufacture of the P320 in 2014 (or earlier) rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat.

70.     Specifically, the P320 possessed an inadequate sear-striker connection, an inadequate internal striker safety, and far too much horizontal and vertical "play" with internal parts inside the slide. In addition, massive amounts of mold injected metal "rollover" on the surfaces of critical internal connecting parts rendered them unstable, and the P320 lacked any external safety or tabbed trigger safety.

## V.    Chronological History of Other Defective Discharges of the P320

71.    There have been many prior incidents of defective discharges involving the P320 caused by the weapon merely being handled, accidentally dropped, or holstered or un-holstered.

72.    In February 2016, a holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer motioned to exit the vehicle during a snowstorm.  The incident was captured on the officer's body cam video which shows that no object entered the officer's holster prior to or during the discharge.

73.    In 2016, the police department of Surprise, Arizona, complained to SIG Sauer of two separate incidents of P320s firing without trigger pulls.

74.    In October 2016, a P320 fired un-commanded on retired New York Police Department officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

75.    In November 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

76.    On January 5, 2017, a P320 shot un-commanded, hitting a Stamford SWAT team member in his left knee when the pistol fell to the ground, while fully holstered, from less than three feet.

77.    On February 28, 2017, a P320 discharged un-commanded while in use by the University of Cincinnati Police Department.

78.    On June 14, 2017, a P320 discharged un-commanded in Wilsonville, Oregon.

79.    113. On June 20, 2017, a P320 discharged un-commanded while in use by the Howell Townhship Police Department in New Jersey.

28

80.    In June 2017, SIG Sauer shipped approximately 800 P320s to the Sheriff's Department of Loudoun County, Virginia, privately assuring its leadership, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to use the weapon as it was. As noted below, three P320s within this shipment, including two "upgraded" versions, later fired without trigger pulls on three Loudon County deputy sheriffs, severely injuring each of them.

81.    On July 28, 2017, a P320 discharged un-commanded in Tarrant County, Texas.

82.    On August 7, 2017, SIG Sauer's Chief Executive Officer ("CEO") released a statement that "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market." This statement was false. SIG Sauer knew, at the time of the statement, that an officer in Connecticut had been shot by a so-called "drop fire" with the commercial version of the P320 some eight months earlier.

83.    On August 8, 2017, SIG Sauer announced the VU Program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety." This statement was false, or at least intentionally misleading, as there are no federal government standards for gun safety, a fact well known to SIG Sauer when it issued this press release.[3]

84.    The VU Program was presented to the public as purely optional and not urgent or mandatory. The stated reason for the upgrade was to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges.

---

[3] No federal agency oversees how firearms are designed or built. Congress exempted firearms from any federal regulation when it created the Consumer Product Safety Commission in 1972 due to Second Amendment concerns.

85.     On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

86.     In October 2017, a P320 discharged un-commanded in a public place in Georgia when an officer fell to the ground in pursuit of a suspect. The officer's weapon, which was holstered, fired without a trigger pull when the officer hit the ground.

87.     On November 12, 2017, a P320 discharged un-commanded in Tyler, Texas.

88.     In January 2018, a P320 discharged un-commanded in Dallas County, Texas.

89. On February 7, 2018, Loudoun County Virginia Deputy Sheriff Marcie Vaidnais 's ("Sheriff Vadnais") P320 fired on her un-commanded in Virginia, severing her right femur and causing catastrophic skeletal injury and deformity. The resulting injuries necessitated four general anesthesia surgeries, caused severe emotional distress and trauma, and ended her lawenforcement career.

90.     Computer tomography scanning of Sheriff Vadnais's P320 identified both a design defect and a manufacturing defect – to wit, crossed sear springs that apply upward spring pressure to the sear to keep it from falling and releasing the striker. This defective spring installation, among other defects, resulted in unequal spring pressure and caused a precarious engagement between the striker foot and the sear, thereby rendering Sheriff Vadnais's P320 susceptible to un-commanded discharge.

91.     In April 2018, SIG Sauer issued a second "voluntary upgrade" notice to all users orowners of the P320.  SIG Sauer did not recall the weapon.

92.     In May 2018, civilian Gunter Walker reported to SIG Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

93.    In June 2018, a police officer in Williams County, Ohio, reported that his P320

discharged un-commanded twice in one moment as he was attempting to move the slide

backward.  One round grazed the officer's arm; the other blew through his patrol car's driver

side door.

94.    In May 2018, a police officer in Rancho Cucamonga, California, reported that his

P320 fired un-commanded while he was walking inside his department locker room. The casing

of the round did not eject, as it should have if the firearm were operating properly.

95.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in

Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

96.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded,

causing severe tunneling wounds to his right leg.

97.    On May 19, 2019, Lieutenant Thomas Ahern was performing a routine function of

his P320 when it fired at him without any force towards the trigger, resulting in the bullet

impacting his left thigh.

98.    On July 23, 2019, Somerville Police Officer Walter Collette Jr.'s service issued

P320 fired on him un-commanded without a trigger pull while wrapped in his personal gym bag

causing serious injuries to his left leg.

99.    On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United

States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in

permanent nerve damage to his leg.

100.   In August 2019, Philadelphia Transit Officer Craig Jacklyn's ("Officer Jacklyn")

P320 fired un-commanded while holstered, nearly hitting a bystander in the subway.

101.   The incident was captured on video, and Officer Jacklyn was returned to duty the

next day, with no discipline. The Philadelphia transit authority replaced all P320s, and fully

exonerated Officer Jacklyn of any alleged wrongdoing.

102.   On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County, Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg.

103.   On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection, it was found that the spent casing did not eject. The discharge was investigated by Major Peter J. Villani ("Major Villani") of the United States Veterans Affairs police agency, who is a SIG-certified armorer.

104.   Major Villani's report noted that, due to the design of the P320, "it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear]."

105.   On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette ("Officer Gardette") of the police department in Manteca, California, as he was preparing for work. The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt around his waist.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

106.   On December 2, 2019, a P320 fired un-commanded while in the possession of CPD Detective David Albert as he was in the process of putting on his duty belt.

107.    In January 2020, a fully holstered P320 fired un-commanded on an Army veteran in Utah, penetrating his leg and impacting his femur bone.

108.    On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, causing catastrophic bone damage to his lower left leg.

109.    In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg. This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

110.    In June 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster, and resulting in a broken bone in the civilian's foot.

111.    On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury.

112.    On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement ("ICE") agent at a firing range in Maryland, striking him in the leg and causing serious injury.  The weapon discharged when the ICE agent placed his hand on the grip to the draw gun.

113.    On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm. In a press release, SIG Sauer blamed the discharge on the weapon's holster.

114.    In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee.  The bullet resulted in a tunnel wound to her right thigh.

115.    On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas.  The bullet entered millimeters

away from her vagina and exited her rear end, leaving inoperable shrapnel near and around her sciatic nerve.

116.     In January 2021, a P320 fired un-commanded on a gun shop manager in Three Rivers, Texas as he cleared the weapon, blowing off one of his fingers.  The weapon was out of battery when it fired.

117.      On May 12, 2021, a P320 fired un-commanded on a second Homeland Security agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled.  The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula.

118.     On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh.

119.     In June 2021, the Pasco County, Florida, Sherriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs and causing significant injuries.

120.     In June 2021, a P320 fired un-commanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

121.     On April 6, 2022, a fully holstered P320 fired un-commanded on police officer Ashley Catatao on duty in Somerville, Massachusetts, causing severe injury to her right leg.

122.     Upon information and belief, employees at SIG Sauer's training academy in New Hampshire have admitted to defective discharges causing injury in both 2016 and 2017.

## COUNT I

## NEGLIGENCE

123.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 122 of the Complaint, as though fully set forth herein.

124.     At all relevant times, SIG Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon him merely placing his hand on the weapon's grip before selling the gun and placing it into the stream of commerce.

125.     At all relevant times, SIG Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon gripping the weapon before selling the gun and placing it into the stream of commerce.

126.     At all relevant times, SIG Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, SIG Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

127.    SIG Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

    ii.      By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    iii.      By failing to issue a mandatory recall of the P320 as SIG Sauer had done in the past with other defective products;

    iv.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    v.      By negligently failing to unambiguously warn purchasers and end users of the gun, including Plaintiff, of said defective, hazardous, and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    vi.      By failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG Sauer, and during which times employees, servants or agents of SIG Sauer had an opportunity to inspect, service and work on the gun;

    vii.      By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual, referenced in Paragraph 60, for the gun after several incidents of accidental discharges;

    viii.      Other negligent acts and omissions to be developed in the course of discovery.

128.    SIG Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

129.    The gun's defective condition was not visible and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

130.    SIG Sauer's negligence as alleged in this Count directly and proximately caused the October 2019 Discharge Incident and Plaintiff's injuries resulting from the accident.

131.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

132.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 131 of the Complaint, as though fully set forth herein.

133.    At all relevant times, SIG Sauer was in the business of marketing, selling, and distributing weapons, including the gun causing Plaintiff's injuries.

134.    SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

135.    At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

    i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

    iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.    Negligently failing to unambiguously warn purchasers and end users of the gun, including Desrosiers, of said defective, hazardous and unreasonablydangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

    vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

136.    Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG Sauer's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident and Plaintiff's injuries.

137.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

138.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 137 of the Complaint, as though fully set forth herein.

139.    By its actions, SIG Sauer knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled. Yet it presented to CPD, Plaintiff, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

140.    SIG Sauer's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

141.    SIG Sauer knew or should have known that the P320 was defective and that it had a history of, and was prone to, firing without a trigger pull. SIG Sauer knew or should have known that the P320 therefore posed a danger to CPD police officers, their families, and the citizens of Cambridge.

142.    SIG Sauer's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

143.    SIG Sauer's conduct was the direct and proximate cause of Plainitff's injury, an open wound to his midsection and emotional distress.

144.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, and loss of the capacity for the enjoyment of life.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

145.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 144 of the Complaint, as though fully set forth herein.

146.    Upon information and belief, SIG Sauer had knowledge of the various defects with the commercial version of the P320 firearm years before the October 2019 Discharge Incident.

147.    Despite having such knowledge, SIG Sauer failed to issue a mandatory recall of the P320, despite the ability to do so, which would have prevented Plaintiff's emotional distress.

148.    Had SIG Sauer acted responsibly and repaired the defects in the commercial version of the P320 before the October 2019 Discharge Incident, Plaintiff's P320 never would have discharged un-commanded.  The round discharged from Plaintiff's weapon easily could have taken Plaintiff's life or the life of a fellow officer or civilian, or caused severe injuries to Plaintiff,

a fellow officer, or a civilian.

149.    SIG Sauer knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the P320 instead of a mandatory recall.

150.    SIG Sauer's conduct was self-serving, deceptive, reckless, intolerable, and outrageous.

151.    SIG Sauer's conduct was the direct and proximate cause of plaintiff's  physical injury, an open wound to his midsection, and s emotional distress.

152.    The emotional distress sustained by Plaintiff was severe.

153.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, and loss of the capacity for the enjoyment of life..  These injuries are either permanentor continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V

## Violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, §§ 2, 11

154.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 153 of the Complaint, as though fully set forth herein.

155.     At all relevant times, SIG Sauer was engaged in trade or commerce within the Commonwealth of Massachusetts, including the trade or commerce of selling, or causing to be sold, the subject firearms within the Commonwealth of Massachusetts and to the City of Cambridge.

156.     The SIG Sauer firearms used by Plaintiff, including the P320 firearm that malfunctioned on or about October 10, 2019, was sold or caused to be sold by SIG Sauer within theCommonwealth of Massachusetts.

157.     When Plaintiff used the SIG Sauer firearms in question, including the P320 that malfunctioned on or about October 10, 2019, he was acting as an agent or employee of the City of Cambridge.

158.     As a result of SIG Sauer's actions, and in connection with SIG Sauer's sale of firearms within the District of Massachusetts, Plaintiff was harmed and suffered emotional distress due to his SIG Sauer firearm malfunctioning on or about October 10, 2019

159.     SIG Sauer engaged in unfair or deceptive acts or practices in connection with its sale of firearms to the City of Cambridge.

160.     SIG Sauer is liable to Plaintiff for up to three times the damages that Plaintiff incurred, together with all related court costs, attorneys' fees, and interest.

.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costsof suit, and all other claims available by law.

## COUNT VI – PLAINTIFF YOLETTE DESROSIERS LOSS OF CONSORTIUM AGAINST DEFENDANT

161.   Plaintiff realleges and reavers the allegations set forth in paragraphs 1 through 161.  Plaintiff Yolette Desrosiers seeks loss of consortium

162.   On October 10, 2019 and at all times mentioned in this Complaint Jacques Derosiers and Yolette Desrosiers are husband and wife

163.   On October 10, 2019, Jacques Desrosiers was severely and permanently injured due to Defendant's negligence.

164.   As a direct and proximate result of the Defendant's negligent conduct Jacques Desrosiers has been rendered disabled since the date of accident

165.   Before suffering these injuries, Jacques Desrosiers was able to and did perform all duties of husband and did perform all these duties, including assisting in maintaining the home and providing love, companionship, affection, society, sexual relations, moral support, and solace to Plaintiff Yolette Desrosiers.

166.   From date of injury to present time Jacques Desrosiers is unable to perform the duties of a Husband and Yolette Desrosiers is deprived of his spouse's consortium.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.       Assume jurisdiction over this case;

2.        Empanel a jury and, after trial, find Defendant liable for all causes of action herein;

3.        Award Plaintiff damages for his economic losses

4.        Award Plaintiff compensatory damages, including but not limited to damages for emotional distress, mental anguish, inconvenience and loss of enjoyment of life, including interest;

5.        Double or treble the award to Plaintiff of his actual damages pursuant to Mass. Gen. Laws Ch. 93A, §§ 2, 11;

6.        Order Defendant SIG Sauer to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 that the weapon can fire without a trigger pull;

7.        Retain jurisdiction over this case until Defendant has complied with all orders of the Court;

8.        Award Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

9.        Award such equitable, injunctive, or other relief as the Court may deem just and proper.

Plaintiff demands a trial by jury on all counts.

Respectfully submitted,

*/s/* Stephen Semenza
Stephen Semenza (BBO #694675)
Kelly and Associates
83 Atlantic Avenue Suite 202
Boston, MA  02110
(617) 807-0855
 Stephen@1800lawguys.com

*/s/* John R. Bita III
(BBO #667886)
Kelly and Associates
83 Atlantic Avenue Suite 202
Boston, MA  02110
(617) 807-0855
 john@1800lawguys.com


Counsel for Plaintiffs Jacques Desrosiers and Yolette Desrosiers

Dated:  October 3, 2022