**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JACQUES DESROSIERS and<br>YOLETTE L. DESROSIERS<br><br>     *Plaintiffs,*<br>v.<br><br>SIG SAUER, INC.<br><br>     *Defendants.* | Case No. 1:22-cv-11674-FDS |

**PLAINTIFFS JACQUES DESROSIERS  AND YOLETTE DESROSIERS
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SIG SAUER, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**SALTZ MONGELUZZI & BENDESKY P.C.**
ROBERT W. ZIMMERMAN (*pro hac vice*)
RYAN D. HURD (*pro hac vice*)
SAMUEL A. HAAZ (*pro hac vice*)
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 496-8282 (Telephone)
(215) 496-0999 (Facsimile)
rzimmerman@smbb.com
rhurd@smbb.com
shaaz@smbb.com

***Attorneys for Plaintiffs, Officer Jacques Desrosiers and Yolette Desrosiers***

i

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 1

  A.   The Incident ................................................................................................... 1

  B.   Evidence of Design Defect ............................................................................ 3

    1.    Mr. Tertin and Dr. Vigilante's Design Defect Opinions ............................... 5

    2.    The Objective Data Further Demonstrates the P320 Is Unreasonably Susceptible to Unintended Discharges .......................................................... 10

    3.    Admissible Other Similar Incident Videos Further Prove the Defect ................... 13

III.  LEGAL STANDARD ........................................................................................ 23

  A.   Summary Judgment ..................................................................................... 23

IV.   ARGUMENT ..................................................................................................... 24

  A.   Plaintiffs' Negligence (Count I), Breach of Implied Warranty (Count II), and Violation of the Massachusetts Consumer Protection Act (Count V) Claims Must Be Determined by the Factfinder. ............................................. 25

    1.    Plaintiffs' Experts Have Established the P320's Design Defects Were the Likely Cause of Plaintiffs' Injuries ................................................................ 25

    2.    Plaintiffs' Expert's Testimony is Admissible ................................................. 28

    3.    Even if Plaintiffs' Experts' Causation Opinions are Excluded, Summary Judgment Must Be Denied Because Causation is a Question for the Jury. .................. 30

    4.    The Lack of a Tabbed Trigger is a Defect That Provides No Safety Advantage and not a "Feature" ...................................................................................... 32

  B.   Plaintiffs' Failure to Warn Claims Must Be Decided by the Jury ............................. 34

  C.   Intentional Infliction of Emotional Distress and Punitive Damages. ........................ 36

  D.   Plaintiffs' Negligent Infliction of Emotional Distress and Loss of Consortium Claims ........................................................................................................... 37

V.    CONCLUSION .................................................................................................. 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmed v. Johnson*,
    752 F.3d 490 (1st Cir. 2014) ................................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 ...........................................................................................22

*Catatao v. Sig Sauer, Inc.*,
    No. CV 22-10620, 2024 WL 4012002 (D. Mass. July 9, 2024) ....................*Passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...............................................................................23

*Costa v. FCA US LLC*,
    No. 20-CV-11810-ADB, 2022 WL 18910359 (D. Mass. Sept. 30, 2022)
    (Burroughs, J.) .......................................................................................29

*Cousins v. Higgins*,
    No. 18-1832, 2019 WL 11234276 (1st Cir. Aug. 13, 2019) ......................32

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ......................*passim*

*Davis v. Sig Sauer, Inc.*,
    126 F.4th 1213 (6th Cir. 2025) ..................................................30, 31, 33

*Ellis v. Fid. Mgmt. Tr. Co.*,
    883 F.3d 1 (1st Cir. 2018) ......................................................................23

*Enrich v. Windmere Corp.*,
    416 Mass. 83, 616 N.E.2d 1081 (1993) .................................................31

*Goffredo v. Mercedes–Benz Truck Co., Inc.*,
    402 Mass. 97, 520 N.E.2d 1315 (Mass.1988) .......................................31

*Guay v. Sig Sauer, Inc.*,
    610 F. Supp. 3d 423 (D.N.H. 2022) ......................................................30

*Hayes v. Douglas Dynamics, Inc.*,
    8 F.3d 88 (1st Cir. 1993) ........................................................................27

*Hoffman v. Houghton Chem. Corp.*,
    434 Mass. 624, 751 N.E.2d 848 (2001) .................................................34

*Hunt v. Covidien LP*,
    No. 22-cv-10697-RGS, 2024 WL 2724144 (D. Mass. May 28, 2024)...................................33

*Kearney v. Philip Morris, Inc.*,
    916 F. Supp. 61 (D. Mass. 1996) ..........................................................................................25

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
    729 F. Supp. 3d 84 (D. Mass. 2024) .....................................................................................36

*Lang v. Sig Sauer*,
    Opinion Denying Summary Judgment...............................................................................29, 30

*Lawes v. Municipality of San Juan*,
    No. CV 12-1473 (DRD), 2016 WL 9460615 (D.P.R. Feb. 10, 2016) ..............................24, 29

*Lubanski v. Coleco Indus., Inc.*,
    929 F.2d 42 (1st Cir. 1991).....................................................................................................34

*Moulton v. Rival Co.*,
    116 F.3d 22 (1st Cir. 1997)......................................................................................................17

*Pérez-Cordero v. Wal-Mart P.R., Inc.*,
    656 F.3d 19 (1st Cir. 2011)......................................................................................................23

*Robert Lang v. Sig Sauer, Inc.*,
    No. CIV 1:21-CV-04196 (N.D.G.A.) ......................................................................25, 28, 29

*Santos v. Chrysler Corp.*,
    430 Mass. 198, 715 N.E.2d 47................................................................................................17

*Taite v. Bridgewater State Univ., Bd. of Trs.*,
    999 F.3d 86 (1st Cir. 2021)................................................................................................23, 32

*Torres v. Skil Corp.*,
    No. CIV.A. 11-11232-MBB, 2013 WL 3105815 (D. Mass. June 17, 2013)..........................31

**Statutes**

Massachusetts Consumer Protection Act.........................................................................................24

Rule 26(a)(2)(B).............................................................................................................................30

Plaintiffs, Officer Jacques Desrosiers and Yolette Desrosiers, by and through their undersigned counsel, submit this Memorandum of Law in Opposition to Defendant Sig Sauer, Inc.'s ("Sig Sauer" or "Defendant") Motion for Summary Judgment.

## I.    <u>INTRODUCTION</u>

Defendant's Motion for Summary Judgment fails for three reasons.  First, Plaintiff's evidence consisting of its experts' testimony, their analysis and testing, the admissions and internal documents from Sig Sauer, and the subpoenaed videos and police records, all demonstrate that the P320 is defectively designed rendering it unreasonably susceptible to unintended discharge. Second, Plaintiff's experts properly set forth their design defect opinions and causation opinions specific to this incident, which are admissible and raise genuine issues that can only be resolved by the factfinder.  Third, even if this Court were to limit Plaintiffs' expert's opinions, causation here is straightforward.  Whether Officer Desrosier's P320 was actuated from a graze or side-pull that an external safety would have prevented is a question of fact for the jury.  For these reasons, Defendant's Motion for Summary Judgment must be denied and Plaintiffs must have their day in court.

## II.    <u>FACTUAL BACKGROUND</u>

### A.    The Incident.

On October 10, 2019, Officer Desrosiers was working as a Cambridge Police Officer when his duty-issued Sig Sauer P320 pistol discharged without his intent.  He was an accomplished officer who emigrated to the Untied State from Haiti, and put himself through law school at night while working as a police officer.  *See* Exhibit 9, Desrosiers Dep., 31:2-17.  He had been working for the Cambridge Police Department ("CPD") for 24 years.  *Id.* at 34:3-7.  He had never had an unintended discharge before this incident.

On October 10, 2019, Officer Desrosiers was assigned to work a shift in police bookings. Officer Desrosiers left the CPD headquarters, located at 125 Sixth Street, Cambridge MA, purchased lunch, and returned. He parked approximately one-block from headquarters. Because Officer Desrosiers was working the booking area, he did not need his duty belt or gun. In fact, CPD officers working in the booking room were required to lock their duty gun in a small gun locker immediately outside the booking area. Rather than carry his entire duty belt and gun to his post, Officer Desrosiers left his duty belt locked in his car, and carried his gun in his waistband the one-block to CPD headquarters. He explained why he had his gun in his waistband and not holstered for the one-block walk to the CPD headquarters booking area as follows:

> I would just walk into the building and go lock the gun up. And that was the intent. My intent was to go in because I was working inside. I was booking at the time. We cannot have a firearm in the booking area. So my intent was to walk in and then go to the gun lock and lock the gun before I enter the booking area.

Ex. 9, Desrosiers, Dep., 85:13-19.

Officer Desrosiers was wearing his full uniform which consisted of a police polo/golf shirt and his duty police pants, with a Velcro inner belt for his pants. Officer Desrosiers testified that in his left hand was his keys, radio and lunch. *Id.* at 108:10-18;117:11-21; 119:21-120:1.. His P320 was in his waistband around his right hip area angled forward. *Id.* at 104:3-15; 186:2-12. There was a CPD policy that required Officer Desrosiers use a holster, however Officer Desrosiers did not consider walking one block with his duty pistol in his waistband to be unsafe. *Id.* at 86:17 – 87:2.

Officer Desrosiers adjusted the P320 in his waistband. Afterwards, he heard a bang, smelled gunpowder and looked around to see if there was any one around him shooting. He felt a sharp pain in his groin and stated, "this fucking thing just shot me." *Id.* at 105:6-11. Officer Desrosiers does not know what caused the gun to discharge. *Id.* at 87:4. His finger did not contact

the trigger and was not anywhere near the trigger at the time of discharge. *Id.* at 87:16. His pistol was halfway in his waistband, and he was unsure whether anything could have contacted his trigger. *Id.* at 87:19-20.

Officer Desrosiers suffered direct penetrating trauma to the right scrotal and penile skin, subcutaneous tissues, and a ruptured right testicle, requiring emergent surgery to salvage his right testicle and a gunshot wound to his left thigh. The long-term urologic injuries he suffered are permanent and include neuropathy, scarring, erectile dysfunction, and hypogonadism.

There was security video of the incident, recovered from a nearby building, that is grainy and does not show where Officer Desrosier's pistol was located or where his hands were located at the time of discharge. *See* Exhibit 10, Desrosiers Incident Video. Officer Desrosiers has always maintained that he did not pull the trigger. He was trained, like all Cambridge Police Officers, to never to put his finger on the trigger unless he was ready to shoot. *See* Exhibit 12, Lt. Sabbey Deposition, 33:18-34:8. Officer Desrosiers was one of four unintended discharges among CPD officers after the department switched to the P320. Prior to that, the CPD did not have a single unintended discharge in the prior 28 years.

### B.    Evidence of Design Defect[1]

In well over 100 incidents known to Plaintiffs, the P320 has discharged when the user either did not pull the trigger, or where the trigger was not knowingly and intentionally depressed. Sig Sauer recently acknowledged it is aware of at least 350 such incidents. *See* Exhibit 13, Chris Meyers Deposition, *Cole v. Sig Sauer*, 24:8-25:4. Plaintiff has obtained videos of more than fifteen incidents of P320s discharging without the user touching the trigger and obtained sworn testimony

---

[1] In Sig Sauer's Motion for Summary Judgment, ECF No.70, it did not include a statement of material facts in numbered paragraphs required under local rule 56.1. As such, there were no individually numbered paragraphs for Plaintiffs to respond to. Plaintiffs state the factual basis upon which Summary Judgment should be denied herein.

from many of them; many more have been attested to under penalty of perjury that were unfortunately not captured on video. *See* Exhibit 22, Other Similar Incident Videos; Exhibit 23, Other Similar Incident Affidavits; Exhibit 28, Plaintiff's Motion to Allow OSI Evidence, *Catatao v. Sig Sauer,* ECF. 122. The vast majority of the victims of the P320 have been highly trained police officers, federal law enforcement agents and/or military veterans who respect firearms and handle them with care.

In response to the growing number of incidents, police departments from Wyoming to Philadelphia are replacing the P320 as their standard sidearm since the departments and officers have lost confidence in the defective gun.[2]  Some state-wide law enforcement agencies that do not even carry the P320 have tested the gun and banned its use entirely, even for off-duty carry, citing safety concerns.[3] Others have formed work groups to study the P320 and have concluded that the repeated reports of law enforcement officer's P320's unintentionally discharging without their finger touching the trigger are exclusively attributed to the P320.[4]

---

[2] *Milwaukee police will stop using gun that keeps going off by mistake*. VICE. (November 3, 2022). Retrieved February 23, 2024, from https://www.vice.com/en/article/epzkkj/milwaukee-police-sig-sauer-pistol ;  *WYO Highway Patrol got rid of Sig Sauer pistols after Trooper's gun discharged accidentally* Cowboy State Daily. (December 7, 2022). Retrieved February 23, 2024, from https://cowboystatedaily.com/2022/12/07/wyo-highway-patrol-got-rid-of-sig-sauer-pistols-after-troopers-gun-discharged-accidentally/ ; *SEPTA Transit Police replace SIG Sauer pistols after service weapon fires while in holster*. PhillyVoice. (September 12, 2019). Retrieved February 23, 2024, from https://www.phillyvoice.com/septa-transit-police-sig-sauer-p320-pistols-gun-accidentally-fires-holster-philadelphia/ ; *Wis. FOP recommends police across the state stop using the Sig Sauer P320*. WISN. (September 14, 2022) Retrieved February 23, 2024, from https://www.wisn.com/article/wis-fop-recommends-police-across-the-state-stop-using-sig-sauer-p320/41202525

[3]    The Pennsylvania State Police banned any officer from ever carrying a P320, even while off-duty, after extensively testing the gun, due to reliability, safety and function concerns.  *See* Exhibit 32, Pennsylvania State Police Personal Carry/Off Duty Carry Bulletin.

[4]    Recently, the Washington State Criminal Justice Training Commission (WCJTC) assembled a work group to study the P320 and banned the gun, finding that "there remains an

The objective data available demonstrates that the P320 is uniquely susceptible to unintended discharges because of its dangerously defective trigger system. Sig Sauer designed the P320 to have an extraordinarily short single-action trigger pull.  *See* Ex. 1, Vigilante Report, p. 5-6.  Double-action triggers, on the other hand, will both cock and release the striker or hammer, resulting in a longer pull with more resistance.  *Id.*  For comparison, Glock, Sig Sauer's largest competitor for law enforcement contracts, requires a longer trigger-pull length that both cocks and discharges the striker.  *Id.*  These incidents (which Sig Sauer admits are *increasing* in frequency) prompted the National Fraternal Order of Police to send a November 21, 2024, letter to Sig Sauer's CEO, Ron Cohen, "to address a pressing concern regarding the reported safety issues with the Sig Sauer P320 firearm." *See* Exhibit 31, National Fraternal Order of Police Letter, Nov. 21, 2024.

### 1. Mr. Tertin and Dr. Vigilante's Design Defect Opinions

First, the P320 was designed with an extremely short displacement trigger.  Dr. Vigilante inspected the subject gun in this case and measured the trigger travel distance from rest to sear release (discharge) to be 6.8 mm, and an exemplar Glock 19's trigger travel distance of 11.5 mm. *See* Ex. 1, Vigilante Report, p. 17.  Sig Sauer does not dispute that its trigger requires far less movement to actuate then its competitors, and markets the short trigger as an advantage. Sig Sauer's firearms expert, Derek Watkins, admitted that "the SIG Sauer P320 takes approximately 38% less trigger displacement to discharge than the Glock 19 Gen 4." *See* Ex. 19, Watkins Report, *Herman v. Sig Sauer,* p. 38.  Dr. Vigilante and Mr. Tertin both opined the short trigger travel

---

abundance of allegations of **un-commanded discharges occurring around the country and world attributed nearly exclusively to the Sig Sauer P320**, M17, and M18 platforms*.*"  *See* Sig Sauer P320 Pistol Report, February 2025. *See* Exhibit 35, Washington State Criminal Justice Training Commission, February 2025 Report.

distance, in conjunction with the P320's other design features, render it more prone to unintended discharge. *See e.g.,* Ex. 1, Vigilante Report, pp 36-37; Ex. 5, Tertin Report, p. 9.

Second, Mr. Tertin's testing confirmed that the P320 functions as a single-action gun. The two images below, taken from Mr. Tertin's videos, depict how the Sig Sauer P320 (tan gun) has a striker which is tensioned and cocked prior to trigger being pulled; and how the Glock (black gun) has a striker which is neither tensioned nor cocked prior to the trigger being engaged. The Glock's trigger pull serves to both cock and release the striker (double-action), resulting in a much longer pull under full pressure throughout; compared to Sig Sauer's shorter trigger pull which just serves to release the pre-cocked striker.



*Sig Sauer P320 (top) and Glock (bottom)*

Sig Sauer has not publicly acknowledged that the P320 is a single-action pistol; despite a close competitor, Taurus, with a nearly identical design acknowledging its gun is single-action. *See* Ex. 5, Tertin Report, p. 8. Mr. Tertin was able to test his hypothesis and confirm that the P320 is a single-action pistol. Mr. Tertin's conclusions were further confirmed by Sig Sauer's own

expert witness, Derek Watkins, who admitted that the P320 was single-action. *See* Exhibit 18, Deposition of Derek Watkins, *Slatowski v. Sig Sauer,* 101:14-19; (Q: What [action] is the P320? A: It's single.  Q: Okay.  Meaning it is a cocked trigger?  A: It is nearly 100% cocked); *see also*, Ex. 1, Vigilante Rep., p. 6.  No law enforcement agency in the United States has ever authorized the use a pistol without an external safety that the manufacturer acknowledged was single-action. Notably, Sig Sauer's website does not include any pistol without a manual safety that it publicly acknowledges functions as single-action gun.[5]

Third, the P320 has no external safeties to prevent unintended discharges—no manual safety, thumb safety, grip safety, or trigger safety. A trigger safety, the most widely used type of safety for striker fired guns like the P320 is a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon.  Mr. Tertin opined that "trigger safeties are able to effectively and efficiently prevent accidental discharges because they require a user's finger to be placed squarely on the center of the trigger prior to the pistol being discharged", required a deliberate trigger pull.  *See* Ex. 5, Tertin Report, p. 17.  Mr. Tertin's research indicated that trigger safeties are found on all Glock striker-fired pistols, the Springfield Hellcat series, the Springfield XD series, the Walther PDP series, the Walther PPQ series, the Walther Q5 series, the Taurus GX4 series, the CZ P-10 series, the M&P 2.0 series, the Ruger Max-9 (also equipped with a thumb safety), and the H&K VP9 series among others*. Id.*  Dr. Vigilante also conducted a comparative analysis to demonstrate how the P320 is an outlier among striker-fired guns for having

---

[5] The Sig Sauer 1911 and P322 are both single-action only pistols and are both only offered with a manual safety.  The Sig Sauer P226 is offered in both double-action and single-action only ("SAO") and, for all SAO P226 pistols, Sig Sauer only offers them with a manual safety which is confirmed on Sig Sauer's website.  The same is true for the Sig Sauer P229, another pistol offered in both double action and SAO, and another pistol where the SAO variant is only sold with a manual safety.  *See* https://www.sigsauer.com/p226-legion-full-size.html, (last visited on March 27, 2025)

no tabbed trigger safety.  *See* Ex. 1, Vigilante Report, p. 43.[6]  Indeed, Scott Berube, a Strategic Account Manager for Sig Sauer, testified that he was not aware of *any other gun sold in America* or by Sig Sauer that came with an option to have no external safeties.  *Id.*

Mr. Tertin and Dr. Vigilante both opined that trigger safeties are effective in preventing unintended discharges from lateral pressure applied to the top, tip, sides, and any area of the trigger that would not disengage the tab.  Dr. Vigilante identified Glock's Safe Action Trigger product material which provides that a "trigger safety is designed to prevent the pistol from firing if it's dropped **or if the trigger is subjected to any pressure that isn't a direct firing pull**."  *See* Ex. 1, Vigilante Report, p. 34. (emphasis added). Dr. Vigilante and Mr. Tertin also performed testing to prove their design defect opinions.

Mr. Tertin performed testing to determine whether a tabbed trigger is effective to prevent unintended discharges from side-pulls, or rearward pressure applied to the edge of the trigger.  *See* Tertin Report, p. 21.  He video recorded the testing of an exemplar P320 with an articulating arm at various angles to simulate clothing or an object applying pressure to the sides of the trigger at, and performed the same testing on the Glock with a tabbed trigger.  *Id.*  This testing demonstrated that a tabbed trigger is effective in preventing an unintended trigger actuation from rearward pressure applied to the sides of the trigger.  *Id; See also* Ex. 8, Tertin Testing Videos.

Dr. Vigilante performed testing with a holstered P320 and Glock to determine whether the tabbed trigger was effective in preventing unintended trigger actuation by a foreign object

---

[6] As Dr. Vigilante explained in his report: "Springfield Armory uses a tab trigger safety in its XD and Hellcat line of handguns.  Walther  Arms uses a tab trigger safety in its PDP, Q4, PPQ, PPS, and Q5 match line of handguns.  Ruger also uses a tab trigger safety in its Security-9, EC9, Max-9, and 5.7 line of handguns.  Canik uses  a tab trigger safety in all of its handgun lines.  Taurus USA also uses a tag trigger safety in all of its striker fired, center fired handguns.  S&W also moved to a tab trigger safety in its M&P Shield Plus, M2 Metal Series handguns, and polymer framed M&P 2.0 handguns.  Scott Berube testified that he is not aware of any other striker fired gun sold in America that does not come either standard or with the option of no external safety

contacting the sides of the trigger. *See* Ex. 1, Vigilante Report, p. 30-31.  Dr. Vigilante used an exemplar Sig P320 Carry and a full-size Glock 17 seated in a Safariland Level 3 holster.  *Id.*  The testing involved using a metal socket extension bar and a typical brass house key.  *Id.*  Using the end of the socket extension bar and key, he attempted to reach into the gaps along the right and left of the holster and actuate the trigger of both handguns.  *Id.*

  

***Dr. Vigilante's Testing on the Exemplar Glock and P320***

Dr. Vigilante was able to actuate the P320 seated in the holstered with both implements with ease from all sides of the holster.  He was not able to do the same with the holstered Glock with the tabbed trigger.  *Id.*  Dr. Vigilante also made demonstrative videos showing rearward pressure applied to the sides of a P320 trigger and a Glock trigger. *See* Ex. 4, Vigilante Testing Videos.

Dr. Vigilante and Mr. Tertin both reached the conclusion that the P320's unique design with its short displacement trigger, single-action trigger, and the absence of any external safeties (or trigger safety) to prevent unintended discharges rendered the P320 uniquely susceptible to unintentional discharge, defectively designed and unreasonably dangerous. These opinions are based upon their respective knowledge and skill, are the product of reliable principles, methods and testing, and supported by the available data and real-world evidence showing the P320 is, in fact, uniquely susceptible to unintended discharge.

9

### 2. The Objective Data Further Demonstrates the P320 Is Unreasonably Susceptible to Unintended Discharges.

A substantial body of objective evidence and data proves that the P320 is defective because it is uniquely susceptible to unintended discharges at an alarming rate. Sig Sauer's director of law enforcement sales, Matt Farkas, testified that ***Sig Sauer has seen more reports of unintended discharges from the P320 than any other gun sold by Sig Sauer***. *See* Exhibit 15, Matt Farkas Dep., *Powers v. Sig Sauer,* 73:10-17. At a different deposition, Farkas confirmed that he did not recall ever seeing a documented report of an unintended discharge from a law enforcement officer using the Sig Sauer P220, P226, P229, or P365. *See* Ex. 14, Matt Farkas Dep., *Cole v. Sig Sauer,* 80:13 – 81:19.

Multiple law enforcement agencies have confirmed a substantial increase in unintended discharge when switching to the P320. In 2019, ICE began a transition from the Glock to the P320.[7] Shortly after beginning the transition, ICE officials noticed an increase in unintended discharges. In 2020, the ICE Office of Professional Responsibility Investigations Division drafted a memorandum entitled "Increase in ICE Unintentional Discharges." *See* Exhibit 29, ICE Memorandum.

The ICE memorandum notes a significant increase in unintended discharges following the introduction of the P320. The report also includes a list of the unintended discharges within the agency between June 4, 2019 and October 1, 2020, with three of the incidents involving an "unknown" weapon. In fact, each of those three incidents involving an "unknown" weapon

---

[7]     As described *supra,* Glock produces the P320's most significant competitor. The guns are both "striker-fired" pistols. However, the Glock is a double-action pistol with a tabbed trigger safety, while the P320 is a single-action pistol without a tabbed trigger safety.

actually involved a P320 discharging when the agent swore, they did not pull the trigger[8]; bringing the total number of incidents involving the P320 during that 17-month period to 15 (compared to five in 2017 and two in 2018).

ICE has produced an additional list of discharges between December 2020 and November 2022 showing 27 confirmed unintentional discharges involving a P320 and 11 unintentional discharges involving an "unknown" weapon. *See* Ex. 30, Supplemental ICE Data. Comparing the seven combined unintended discharges in the two years prior to ICE's introduction of the P320 to the 26-39 in the 23-month span included in ICE's data most recent data production shows **the P320 is 3.8-5.5x more prone to unintended discharges than the tabbed trigger-equipped Glock.**[9]

Other law enforcement agencies have experienced similar increases in unintended discharges after switching to the P320. CPD officer Joseph DeSimone testified that he started at the CPD in 1989 and did not recall a single unintended discharge among CPD officers from 1991 until Cambridge switched to the P320.[10]  *See* Ex. 11, Officer DeSimone Deposition, 115:17 – 117:9.  Lieutenant George Sabbey from the CPD also could not recall a single unintended discharge from 1995 when he started until the department switched to the P320.  *See* Ex. 12, Lt. Sabbey Deposition, 20:15-19.  In 2019 alone, there were three unintended discharges by CPD

---

[8]    Each of the three incidents involves an ICE agent who has filed a lawsuit against Sig Sauer and is represented by the undersigned counsel.

[9]    This calculation assumes all five incidents referenced in the ICE memorandum 2017 involved a Glock, which may not be the case. In the event any of the 2017 incidents involved another firearm, the relative number of incidents involving a P320 would be even greater.

[10]    Prior to the P320, the CPD used the Sig Sauer P228 and P229. Both pistols are hammer-fired guns with the first trigger-pull being a double-action, meaning it both cocks and releases the hammer.  This results in a much heavier trigger pull.  *See* Ex. 12, Sabbey Dep., 17:5-11.

officers using the P320. *See* Ex. 11, DeSimone Dep.*,* 116:23 – 117:4. There was a fourth in 2024 with a CPD school resource officer. *See* Ex. 12, Sabbey Dep., 21:8-10.

The stark increase in unintended discharges upon implementation of the P320 is not unique to the CPD. The Puerto Rico Police department responded to a subpoena in another matter and provided all known unintended discharges from 2020 – March 2024.  There were 84 unintended discharges. 77 were from pistols, including the Glock, Smith and Wesson M&P, and the Sig Sauer P320.  Of those 77 unintended discharges, 68 were associated with the Sig Sauer P320.[11]  *See* Exhibit 33, Puerto Rico Police Department Unintended Discharge Report. Sig Sauer's testimony strongly suggests these incidents are *increasing* in frequency.  For example, Sig Sauer claimed it was only aware of 55 unintended discharge incidents from 2016-2021 and is now aware of over 350 such incidents.  *See* Ex. 13, Chris Meyer Dep., 24:15-21 (Q: so those 300 reports are just from July of '21 -- I'm sorry --July 21st, 2021 to present? A: That would be my understanding.).

In response to the dramatic increase in unintended discharges experienced by law enforcement agencies nationwide, many agencies have switched from the P320 or banned the gun entirely.  *See* Fn. 1, *supra*; Ex. 32, PA State Police Personal/Off Duty Carry Bulletin; Ex. 35, WCJTC Report. Recently, in February 2025, the Washington State Criminal Justice Training Commission assembled a work-group and published a report on the P320.  *See* Ex. 35, WCJTC Report. The workgroup was initiated in response to an October 9, 2024 unintended discharge where, during a training session a "[r]ecruit drew their firearm (Sig Sauer P320) to engage the

---

[11]    Chris Meyer, Sig Sauer's corporate designee, could not confirm whether this addition 68 unintended discharge in a dingle law enforcement agency was included in the over 350 incident Sig Sauer was aware of.  *See* Ex. 13, Chris Meyers Dep., p. 55:4-16.

course of fire [and] their gun immediately self-discharged." *Id.* at p. 4.[12]  Notably, the workgroup members included five Sig Sauer representatives.  *See Id.* at p. 3. Based on the WCJTC's investigation, there was "an abundance of allegations of un-commanded discharges occurring around the country and world **attributed nearly exclusively to the Sig Sauer P320**, M17, and M18 platforms."[13]

The available data and information demonstrate that the issue with the P320 discharging without the user touching the trigger is unique to the P320.  Officer Desrosier's is but one of hundreds of victims of the design flaws with this gun.

### 3.  Admissible Other Similar Incident Videos Further Prove the Defect

The available video evidence proves that the P320 can and will discharge, even when the user's finger is not touching the trigger.  This phenomenon has been captured on video multiple times and confirms what Plaintiff experienced—his P320 appearing to discharge spontaneously, without this finger on the trigger.  Plaintiff has uncovered over fifteen such videos, some of which are detailed below.  *See* Ex. 22, Other Similar Instance Videos.

On July 24, 2022, Officer Daniel Witts, of the Montville, Connecticut Police Department, experienced his P320 discharging while secured in its holster as he was bent over with his arms wrapped around a suspect's leg and nowhere near his gun.  A still image of the discharge can be

---

[12]    The report also identified three other Washington police agencies who have banned the P320 (Vancouver Police Department,  Clark County Sheriff's Office, and Pierce County Sheriff). *See Id.,* p. 7.

[13]    Additionally, on March 20, 2025, Plaintiffs' counsel received a subpoena response from the Barlett Police Department (TN) after an October 2024 unintended discharge involving an on-duty uniformed officer, Gustavo Tudon.  That officer's body-worn camera footage depicts his P320 discharging in its retention holster when both his hands can be seen holding a suspect, showing yet another example of video evidence showing the P320 discharging without the user's finger near the trigger.

seen below.  Officer Witts was deposed and his testimony, confirming he did not touch the trigger, is attached. *See* Exhibit 24.



*Officer Daniel Witts, Montville, CT*

On March 28, 2022, Officer Marvin Reyes, of the Houston Police Department, also experienced his P320 discharging while secured in its holster when he was reaching into his truck with arms extended and his hands nowhere near the gun.  The muzzle flash from the discharge he experienced can be seen below.  Officer Reyes was deposed and confirmed his P320 discharged when his finger was not on the trigger.  *See* Exhibit 25.

14



*Officer Marvin Reyes, Houston, TX*

On May 4, 2022, Detective David Cole of the Somerset County, Maine, Sheriff's Department was walking to his truck after serving a search warrant when his P320 that was secured in its holster discharged into his right leg. Body camera footage immediately after his discharge showed his gun was fully holstered at the time (see below). The Somerset County Sheriff's Office banned that P320 afterwards. Detective Cole was deposed, and the relevant portions of his testimony are attached as Exhibit 26.

 

*Officer David Cole, Piscataquis, ME*

15

On August 3, 2021, in St. Clair, Minnesota, Officer Robert Greene was adjusting his P320 with his trigger finger clearly visible on the slide of his gun and <u>not</u> on the trigger, when his P320 discharged.  Officer Greene was deposed, and the relevant portions of his testimony are attached as Exhibit 27.

 

In yet another video, a Galveston County Sheriff, Officer John Bocquet's P320 discharged while his finger is outside of the trigger guard the entire time.  The discharge incident is caught on video and the screen shots in the moments before and after the discharge are identified below.



These incidents, like Officer Desrosier's incident, demonstrates the P320 can discharge without the user's finger on the gun, when inadvertent contact is made by a foreign object contacting the trigger.

Evidence of other similar incidents is admissible to establish that a product is defective or that the manufacturer had notice of a product's defect. *Moulton v. Rival Co*., 116 F.3d 22 (1st Cir. 1997). To be admissible, other incident evidence needs to be similar, it does not need to be identical. *See, Santos v. Chrysler Corp*., 430 Mass. 198, 203, 715 N.E.2d 47, 53. In both *Abrahams v. Sig Sauer, Inc.* trial, Case No. 220601213, (Philadelphia Comm. Pl., Oct. 2024) and in *Catatao v. Sig Sauer, Inc.*, No. 22-10620, Dkt. No. 197 (Saris, J.), the court permitted Plaintiff to introduce to the jury other similar unintended discharge incidents to prove design defect and notice. Plaintiff has attached its motion to include other similar incidents in the *Catatao* matter to demonstrate the sheer number and factual detail regarding each incident that Plaintiff has been made aware of. *See* Exhibit 28. This is "real-world" evidence that further support Plaintiffs' expert's opinions that the P320 is defectively designed, unreasonably dangerous, and did not meet consumer's expectations as to its safety.

C.    **The Defective Design of the P320 Was the Proximate Cause of Plaintiffs' Unintended Discharge**

Plaintiff has established that the proximate cause of his injuries was Sig Sauer's defectively designed P320 that lacked necessary safety features that would have likely prevented his injury. Plaintiffs' experts each rendered a causation opinion, based upon this specific circumstance of Officer Desrosier's unintended discharge, that the defectively designed P320 was the likely cause of his injuries.

Dr. Vigilante opined that that Officer Derosier's incident would likely not have occurred "had Sig Sauer integrated a tab-trigger safety into the design of the Sig P320." *See* Ex. 1, Vigilante Report, p. 48. Dr. Vigilante's causation opinion is based upon his inspection of the subject gun, the physical evidence, the security video, Officer Derosier's sworn testimony, and Dr. Vigilante incident specific testing. Dr. Vigilant "assessed and demonstrated the relative risk of the Sig P320 trigger versus a tab-trigger safety utilizing an exemplar pair of duty pants worn by Ofc. Desrosiers." *Id.* at 32. This testing consisted of Dr. Vigilante wearing an identical pair of subject pants, inserting an exemplar Sig P320 carry and a full-size Glock 17 into the waistband while attempting to actuate the trigger. *Id.* at p. 31. When inserting the Sig P320 into the waistband, Dr. Vigilante was able to readily actuate the trigger with both my trigger (index) and middle finger located on the outside of the pants (with the frame and trigger inside the pants). *Id.* However, he was not able to actuate the trigger on the Glock when inserting the handgun into the waistband. *Id.* at 31-32. To actuate the trigger on the Glock he had to fully insert the handgun into the waistband and then purposefully and forcefully dig into the pants, using either finger, while bending at the waist to get enough pressure on the front of the trigger to engage the tab and actuate the trigger. *Id.* Dr. Vigilante video recorded his testing of an exemplar P320 and Glock in an identical pair of

exemplar pants and shirt to Officer Desrosier's subject pants—same make, model, and size—which were provided by Officer Desrosiers.

These videos were provided to Defendant prior to Dr. Vigilante's deposition, and he was cross-examined regarding his methodology, testing, and results. *See* Ex. 3, Vigilante Dep., p. 91, 127 – 146. Dr. Vigilante explained that he performed his testing to determine whether the tabbed trigger would have likely prevented his discharged under the scenario where "the gun in his pants, [and] his finger inadvertently contact[ing] the trigger." *Id.* at 91:3-5. Vigilante's testing showed a P320 in Officer Desrosier's pants could "easily result in the discharge of the P320 in comparison to a firearm with a tab-trigger safety like the Glock." *Id.* at 91:5-10. He performed his testing at various insertion depths and recorded those tests. *Id.* at 128:19-20.

Further support for Dr. Vigilante's causation opinion is his measurements of the size of the tab on a Glock trigger that would need to be contacted and disengaged to unlock the trigger and allow it to fire. Dr. Vigilante measured the Glock tab trigger system, with the tab itself only 1 mm wide, as well as the subject P320 trigger which is 9.6mm. *See* Ex. 1, Vigilante Report, p. 21. Vigilante concluded that a finger or foreign object has to reach farther into the Glock trigger guard to engage the tab and allow the trigger to be pulled. *Id.* Said another way, the Glock requires a finger (or object) to depress a 1 mm tab whereas the P320 has 9.6mm of available width for a finger (or object) to actuate the trigger. *Id.*

Mr. Tertin also opined that the defective design of the P320 was the likely cause of Officer Desrosier's unintended discharge. Through objective testing, Mr. Tertin's confirmed that a P320 would actuate, but not a Glock with a tabbed trigger, when those triggers were subjected to rearward pressure from the sides. Mr. Tertin was able to fire the SIG pistol at three different positions on that trigger at angles of 20, 30, and 40 degrees, and could go beyond 40 degrees, by touching the edge of the trigger and applying a rearward force. And on the Glock, by touching the

19

edge of the trigger, he noted, "At the angles, as demonstrated above, where the articulating arm only contacted the edge of the trigger, lateral pressure caused the P320 trigger to actuate but not the Glock trigger." *See* Ex.5, Tertin Report, at p. 21.

Had the P320 been tucked in Officer Desrosier's waistband, and his finger did not wrap around the front face of the trigger and pull it, as Officer Desrosier's testified, then a tabbed trigger would have made Officer Desrosier's discharge highly improbable. Mr. Tertin's causation opinion is not based upon his say-so, but based upon his research, testing, design defect opinion, and the specific facts of this incident. Importantly, both Mr. Tertin and Dr. Vigilante have a sound basis to conclude that Officer Desrosier's trigger was contacted and pulled without his finger touching the gun, as the both reviewed multiple examples of video-recorded evidence showing the P320 can and will fire in situations when the user doesn't have their finger on the trigger.

> **D.     It Was Feasible for Sig Sauer To Design the P320 in a Non-Defective Way and Include an External Safety on Every Gun Sold**

Sig Sauer's marketing materials from its launch of the P320 in 2014 demonstrates Sig Sauer was aware that a "***tabbed safety trigger***" offered a safety benefit beyond a "standard trigger." Despite planning on offering this safety feature in its 2014 marketing materials, Sig Sauer inexplicably decided against it.[14]

---

[14] *See* www.all4shooters.com/en/shooting/pistols/SIG-Sauer-P320-semiautomatic-pistol-eurostatory-2014/SIG-Sauer-4.jpg (last visited on, February 23, 2024).



Though it was entirely feasible to design one of these safety mechanisms into the P320, the P320 chief design engineer, Sean Toner, testified that, to his knowledge, Sig Sauer has never produced a Sig P320 with a tab trigger safety. *See* Ex. 1, Vigilante Report, p. 16; *see also* Ex. 16, Toner Dep. *Slatowski v. Sig Sauer*, 28:16-30:11. Sig Sauer's decision to forgo a tabbed trigger safety, grip safety, or thumb safety left its users, like Officer Desrosiers, severely exposed to the kinds of unintended discharges which are being experienced by trained professionals across the country.

Unintended discharge by law by a finger or foreign object inadvertently contacting the trigger was foreseeable to Sig Sauer and should have prompted them to include necessary safeties to mitigate against that risk. In 2017, Sig Sauer conducted a Failure Modes Effects and Criticality Analysis ("FMECA") and identified unintended trigger actuation by a foreign object as a foreseeable risk to users of the P320.[15]  *See* Ex. 38, FMECA. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[15]     Plaintiffs' counsel propounded requests in several matters that required Sig Sauer produce this document. It nonetheless withheld its FMECA document until it was specifically referenced in a deposition in another matter and Plaintiff demanded its production. The FMECA was first provided to Plaintiffs' counsel on January 6, 2025.



Sig Sauer was repeatedly made aware of the P320 discharging, often in its holster due to unintended contact with the trigger by a foreign object.  They did nothing about it, did not change the design or notify their other users, and failed to warn users that the P320 was actually a single-action pistol with no external safeties.

### E.     Sig Sauer Failed to Warn Its Customers that the P320 Was A Single-Action Gun With No External Safeties and Failed to Warn of the Increased Risk of Unintended Discharge.

The P320 is the only single-action firearm to be commercially produced without any external safety to prevent the trigger from depressing when the user does not intend for it to do so. *See* Ex. 5, Tertin Report, p. 9. Sig Sauer has refused to publicly acknowledge that the P320 is a single-action firearm, despite its experts admitting under oath in other P320 litigation that it is. Sig Sauer's misleading marketing has kept consumers and police departments in the dark about how dangerous the gun is relative to its competitors. Sig Sauer's director of law enforcement sales, Matt Farkas testified:

> Q.  And obviously the customers, generally speaking, don't know that, right, whether it's a pre-tensioned spring or a spring that is tensioned during the trigger pull.
> A.  Right.
> Q.  Do you provide that in writing to your customers in any method?
> A.  Whether the spring is tensioned or not?
> Q.  Yes.
> A.  No.

*See* Exhibit 15, Matt Farkas Dep., *Powers v. Sig Sauer* 67-7-68:16. The P320's lead design engineer, Sean Toner testified that:

> Q.   Does SIG manufacture guns in a way that would allow the user to know whether it is a cocked design or cocking design?
> A.   No. Ours is not – looking from the outside, you can't tell.
> Q.   Do you tell people in any materials, website, pamphlets, safety sheets, user manual whether you designed this gun as a cocked trigger or a cocking trigger?
> A.   I've never seen any language that we've published that has that in it.

*See* Exhibit 16, Sean Toner Dep., January 10, 2023, 61:13-23.

Despite admissions at depositions and trials, Sig Sauer refuses to acknowledge the P320 functions as a single-action gun and does not warn its users that they are carrying pre-cocked gun.

## III.   <u>LEGAL STANDARD</u>

### A.     Summary Judgment

Summary judgment is warranted only where "the pleadings, depositions answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247(1986)(*citing* Fed.R.Civ. 56(c)).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted).

A dispute is "genuine" if the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party" *Ellis v. Fid. Mgmt. Tr. Co*., 883 F.3d 1, 7 (1st Cir. 2018) (citation omitted), and a fact is "material" if it "has the potential of affecting the outcome of

the case," *Pérez-Cordero v. Wal-Mart P.R., Inc*., 656 F.3d 19, 25 (1st Cir. 2011) (citation omitted).

When determining if a genuine dispute of material fact exists, a district court "look[s] to all of the

record materials on file, including the pleadings, depositions, and affidavits" without evaluating

"the credibility of witnesses [ ]or weigh[ing] the evidence." *Ahmed v. Johnson*, 752 F.3d 490, 495

(1st Cir. 2014).

Under the summary-judgment standard, the record must be construed in the light most

favorable to the non-moving party, with all reasonable inferences drawn in its favor. *Taite v.

Bridgewater State Univ., Bd. of Trs*., 999 F.3d 86, 92 (1st Cir. 2021).

## IV. **ARGUMENT**

Defendant's Motion for Summary Judgement must be denied because genuine issues of

disputed facts must be resolved by the factfinder. Defendants advance two reasons why this Court

should grant summary judgment, both of which fail. First, Defendant's argues that summary

judgment is appropriate because Officer Desrosiers pulled his own trigger and was responsible for

the discharge. *See* ECF No. 70, p. 1-2. Yet, this is a disputed fact in the case and Officer

Desrosier's testified he did not touch the trigger when the pistol discharged. Officer Desrosier's

testimony about the discharge is supported by videos of other discharge incidents where, like him,

the user's finger was not on the gun. To the extent Defendant alleges Officer Desrosier was the

negligent party, a jury must make that determination, and such arguments are not a basis for

summary judgment. *See Lawes v. Municipality of San Juan*, No. CV 12-1473 (DRD), 2016 WL

9460615, at *7 (D.P.R. Feb. 10, 2016) ("contributory negligence claim, the factfinder, the jury,

must apportion fault.")

Second, Defendant argues that, in this case involving a "battle of the experts", Plaintiffs'

expert opinions as to design defect and causation should be excluded under *Daubert.* But *Daubert*

cautioned against district courts being "overly pessimistic about the capabilities of the jury and of

the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993). Here, Plaintiffs' design defect and causation opinions are helpful to the trier of fact, supported by Mr. Tertin and Dr. Vigilante's analysis, measurements, testing, and research, and the available data further supports their causation and design defect opinions. Because Mr. Tertin and Dr. Vigilante's opinions are admissible, Sig Sauer's motion for summary judgment fails.

A.    **Plaintiffs' Negligence (Count I), Breach of Implied Warranty (Count II), and Violation of the Massachusetts Consumer Protection Act (Count V) Claims Must Be Determined by the Factfinder.**

Plaintiffs have developed a fulsome record with and can prove both that the P320 is defectively designed, and the defect was the likely cause of Officer Desrosier's incident. Plaintiff will prove these elements at trial through Officer Desrosier's testimony, through video evidence of his incident, through videos evidence and testimony of other police officers experiencing similar P320 discharges without their pulling the trigger, through Sig Sauer's own documents and admissions, and through Plaintiffs' admissible expert testimony. There is overwhelming evidence that the P320 is defectively designed, and multiple juries have returned verdicts that determined the defectively designed P320 caused the plaintiffs' injuries under similar circumstances.[16]

1.    **Plaintiffs' Experts Have Established the P320's Design Defects Were the Likely Cause of Plaintiffs' Injuries.**

Plaintiffs' causation opinions are based upon the specific facts and circumstances of this incident and are admissible. While Defendant's *Daubert* motions, ECF Nos. 71 and 72, seek to

---

[16] In both *Robert Lang v. Sig Sauer, Inc.*, No. CIV 1:21-CV-04196 (N.D.G.A.) and in *Abrahams v. Sig Sauer, Inc.* trial, Case No. 220601213, (Philadelphia Comm. Pl., Oct. 2024), the juries returned verdicts against Sig Sauer in favor of the Plaintiff under the same design defect theory here.

exclude Plaintiffs' design defect and causation opinions, Defendant motion for summary judgement focuses on the Plaintiffs' expert's causation opinions. *See* ECF No. 70, p. 8-10. Defendant argues that because Plaintiff cannot explain "why the pistol discharged", they cannot explain why an external safety would have likely prevented it. *Id.* at p. 9. But Plaintiff and Defendant agree that the discharge was caused by unintended trigger actuation from contact be a finger or foreign object. Plaintiff and Defendant disagree on how that trigger contact occurred— a factual dispute that can only be resolved by a factfinder.

In breach of warranty and negligent design cases, "in order to succeed under Massachusetts law plaintiff must show that a defect attributable to the manufacturer's negligence was a cause of the injury." *Kearney v. Philip Morris, Inc.,* 916 F. Supp. 61, 65 (D. Mass. 1996)

Officer Desrosier's testified that his finger was not on the trigger when the pistol discharged. *See* Ex. 9, Desrosiers Dep., 38:1-3. Plaintiffs' experts performed testing to assess two different possible scenarios to explain his discharge incident consistent with his testimony, the physical evidence and circumstances of his discharge. Both Mr. Tertin and Dr. Vigilante tested a foreign-object scenario, in which contact was made to a P320 trigger and Glock trigger to determine whether the tabbed trigger was effective in preventing unintended discharges from contact by foreign object. Their testing demonstrated that a tabbed trigger was an effective external safety in preventing unintended trigger actuation when contact is made to any part of the trigger that would not disengage the tab. Dr. Vigilante measured the tab on Glock to be 1mm wide, compared against the trigger on a P320 which was 9.6 mm wide. *See* Ex. 1, Vigilante Report, p. 21. These measurements and the experts' testing demonstrate that a tabbed trigger substantially reduces the available surface area to actuate a trigger by a foreign object, and, when the tab is not disengaged, the trigger is locked and will not fire. This is a key dispute in this case, as Sig Sauer and boldly argued in its Motion that "tabbed trigger do not protect against unintended discharges

26

from foreign objects." *See* ECF No. 71, p. 5, Fn. 3.  Plaintiffs' expert's testing and analysis proves otherwise.

Additionally, Dr. Vigilante tested a second scenario where Officer Desrosier's finger inadvertently grazed his trigger when the P320 was in his waistband.  To do this, Dr. Vigilante attempted to replicate the circumstances of the discharge by wearing a pair of exemplar pants that were identical to the subject pants, and placed an exemplar P320 in his waistband at different heights. He video recorded his testing to document his results. *See* Ex. 4, Vigilante Testing Videos. Dr. Vigilante was able to easily actuate the trigger on the P320, but not the Glock when inserting the handgun into the waistband. *Id.*; Ex. 1, Vigilante Report, p. 31-32.  To actuate the trigger on the Glock he had to fully insert the handgun into the waistband and then purposefully and forcefully dig into the pants, using either finger, while bending at the waist to get enough pressure on the front of the trigger to engage the tab and actuate the trigger. *Id.*

Plaintiffs' expert's testing proves that a tabbed trigger would have likely prevented Officer Desrosier's discharge and would have substantially reduced the risk.  Defendants argue that Plaintiffs cannot prove causation because they cannot say with certainty whether the "trigger was actuated on the top, bottom, or side." *See* ECF No. 70, p. 10.  This argument is flawed for several reasons.  First, if this were the standard, nearly every victim of the P320 would never have their day in court.  Juries decided key factual disputes such as a precise location of trigger contact—a fact with neither Plaintiffs' nor Defendant's experts can testify to with certainty. Second, "[a] plaintiff need not prove the exact cause of the accident or disprove every possible cause, but he must show that there is a greater likelihood that the accident resulted from the defendant's negligence than that it did not." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir. 1993); *citing Enrich v. Windmere Corp.,* 416 Mass. 83, 616 N.E.2d 1081, 1084 (1993). In order to proceed with their claims, the plaintiffs "must be able to show that there is **a greater probability**" that the

design defects caused Officer Desrosier's injury.  *Hayes,* 8 F.3d 88, 90 (1st Cir. 1993) (emphasis added).  Here, Plaintiffs have done so.

The evidence also demonstrates that **not one** of Sig Sauer's competitors offer striker-fired or single action pistols without any external safeties.  "[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Uloth*, 376 Mass. at 881, 384 N.E.2d 1188. Plaintiffs' evidence shows that Sig Sauer initially designed the P320 with an available "tabbed safety trigger", an alternative feasible safer design, that Sig Sauer never manufactured.  Plaintiffs' evidence establishes the elements of negligence, breech of warranty, and their 93A claims and summary judgment must be denied

### 2.  Plaintiffs' Expert's Testimony is Admissible.

The identical arguments made in Sig Sauer's motion were soundly rejected by other courts, including recently by another court in this District.  *See Catatao v. Sig Sauer, Inc.,* No. CV 22-10620, 2024 WL 4012002 (D. Mass. July 9, 2024) (denying summary judgment and allowing Vigilante and Tertin at trial)[17]; *see Robert Lang v. Sig Sauer, Inc.*, No. CIV 1:21-CV-04196 (N.D.G.A.) (denying summary judgment and allowing Mr. Tertin and Vigilante to testify at trial) and in *Abrahams v. Sig Sauer, Inc.* trial, Case No. 220601213, (Philadelphia Comm. Pl., Oct. 2024).[18] The *Lang* and *Catatao* opinions are attached hereto for the Court's reference as Exhibit 41 and 43, respectively.

*Catatao* was another unintended discharge case involving a Somerville, Massachusetts police officer, Ashley Catatao, whose P320 discharged in its holster without her touching the gun.

---

[17]     Dr. Vigilante's opinion was limited to causation.  Mr. Tertin's testimony was not limited.
[18]     Dr. Vigilante testimony was admitted at trial as to design defect and causation. Mr. Tertin was not retained as an expert witness in the *Abrahams* case.

Sig Sauer claimed that a key on Officer Catatao's bag caused the discharge, and Dr. Vigilante and

Mr. Tertin whether a tabbed trigger would have likely prevented the discharge by performance

incident-specific testing. Judge Saris denied Sig Sauer's motion to exclude Dr. Vigilante, reasoning

that:

> Catatao also has raised a genuine issue of fact regarding causation. A plaintiff pursuing a design-defect claim need only prove "that his or her injury was, <u>more probably than not</u>, caused by a defect in the product." *Kearney*, 916 F. Supp. at 64 (emphasis added) Tertin testifies a tabbed trigger would have made a key actuating Catatao's P320 in its holster "highly improbable," and "would certainly have helped prevent" her injuries.   Similarly, Plaintiff's second expert, William Vigilante, concludes that if a key caused Catatao's P320's trigger to depress, "it is more likely than not that a tabbed trigger safety would have prevented" Catatao's injuries. Both Tertin and Vigilante conducted experiments to support their opinions. A reasonable jury could decide based on this evidence that it is "more probabl[e] than not" Catatao's P320's lack of a tabbed trigger caused her injuries. Thus, Sig Sauer's motion for summary judgment misses the mark.

*Catatao* WL 4011973, at *3 (D. Mass. July 9, 2024).

To the extent Sig Sauer criticized Dr. Vigilante's methodology or testing, Judge Saris

concluded those were matters "affecting the weight and credibility of the testimony," not its

admissibility.  *Id., citing Rodríguez v. Hosp. San Cristobal, Inc.,* 91 F.4th 59, 70 (1st Cir. 2024)

(cleaned up) (*quoting Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir.

2011)).

Defendant's argument that Mr. Tertin and Dr. Vigilante's opinions fail to establish

proximate cause because they state the absence of a tabbed trigger "likely" caused the unintended

discharge in this case has been soundly rejected within this District.  *See Costa v. FCA US LLC,*

No. 20-CV-11810-ADB, 2022 WL 18910359, at *3 (D. Mass. Sept. 30, 2022) (Burroughs, J.)

(denying motion to strike report and testimony of human factors expert, acknowledging that risk

analysis is a question of possibility and probability).  In *Costa,* the Court rejected the argument

that an expert's opinion should be rejected as "theoretical possibilities" and explained that

"[c]ourts have acknowledged that there are often no reliable methodologies that allow experts to testify with certainty and, as such, a 'lack of absolute certainty on the part of the expert does not render her opinion unreliable under *Daubert*.'" *Id., citing  United States v. Monteiro*, 407 F. Supp. 2d 351, 372 (D. Mass. 2006); *Lawes*, 963 F.3d at 109 (lack of certainty in an expert opinion goes to weight and not admissibility).  Here, Plaintiffs' expert's opinions are admissible, and summary judgment must be denied.

The *Lang* Court similarly disagreed with Sig Sauer's argument that the experts must identify precisely what caused the P320 to discharge to be allowed to offer opinions that a tabbed trigger safety (which prevents firing absent contact "squarely on the trigger") would have prevented the incident.  *See* Ex. 41, *Lang v. Sig Sauer*, Opinion Denying Summary Judgment, at 26. The Court reasoned that "Mr. Tertin and Dr. Vigilante's opinions regarding the relationship between the lack of a tabbed trigger safety on the Gun and the Incident are sufficiently reliable because each expert adequately explained the basis for his opinions in his Rule 26(a)(2)(B) report, deposition, or both." *Id.* at 27.[19]

### 3. Even if Plaintiffs' Experts' Causation Opinions are Excluded, Summary Judgment Must Be Denied Because Causation is a Question for the Jury.

On January 27, 2025, the Sixth Circuit issued an order in the case *Davis v. Sig Sauer, Inc.*, reversing the grant of summary judgment remanding for trial. 126 F.4th 1213 (6th Cir. 2025).  The 6th Circuit held that the admissible design defect opinions of Davis's experts, James Tertin and Dr. William Vigilante, were sufficient for a jury to determine causation even without admissible expert testimony regarding causation.  *Id.*  The *Davis* Opinion is attached hereto as Exhibit 42.

---

[19]    Another Court within this Circuit also rejected Sig Sauer boilerplate *ipse dixit* arguments in P320 litigation that it advances here.  *See Guay v. Sig Sauer, Inc.,* 610 F. Supp. 3d 423, 430 (D.N.H. 2022) (denying Sig Sauer's motion to exclude Plaintiff's expert).

Davis involved another individual whose P320 inadvertently discharged when he was exiting his truck, without his pulling the trigger. Sig Sauer filed motions to exclude Plaintiffs' experts, Mr. Tertin and Dr. Vigilante's, and the district court granted Defendant's *Daubert* motions as to causation only, and granted summary judgment. In *Davis,* unlike here, Mr. Tertin and Dr. Vigilante did not perform testing to prove the effectiveness of a tabbed trigger in preventing unintended discharges and had not performed incident-specific testing or analysis, which was the district court's basis for excluding their causation opinions.

The 6th Circuit reversed the grant of summary judgment and remanded for trial, holding that Mr. Tertin and Dr. Vigilante's design defect opinions were admissible and helpful to the trier of fact who could ultimately determine causation with the benefit of Mr. Tertin and Dr. Vigilante's explanation of the design defects and inner-workings of the P320. *Id.* at 1223. The 6th Circuit explained their reasoning as follows:

> Both experts provide reliable and helpful testimony in explaining the intricacies of the P320 and reasonable alternative designs that Sig Sauer could have implemented to make the P320 less susceptible to inadvertent actuation. In this case, the question of causation is straightforward: Did Davis actuate his P320 from a side-pull or graze that an external safety would have prevented? Both Tertin and Vigilante help the trier of fact answer this question by explaining how the P320 works, what makes it unreasonably susceptible to inadvertent actuation, and how reasonable alternative designs could have prevented Davis's injury if it was in fact actuated from a side-pull or graze.

*Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1223 (6th Cir. 2025).

The Court went on to explain that, under Kentucky law, expert testimony is typically required in cases in which the question is of a complex and technical nature. *Id.* at 1231. However, "the only complex issue in this case that falls outside the realm of the lay juror is whether there is any defect in the design of the P320 and whether any reasonable alternative safer designs exist, and Tertin and Vigilante fulfill Davis's obligation in this regard." *Id.* at 1232. The 6th Circuit reasoned that a jury can determine whether "Davis inadvertently pulled the trigger through either

a side-pull or a graze, and whether any of the safety mechanisms described by Tertin and Vigilante would have prevented the gunshot" because those "are not complex questions that require expert testimony." *Id.*

Mr. Tertin and Dr. Vigilante's causation opinions are admissible here, but not required for a jury to determine the proximate cause of Officer Desrosier's unintended discharge.[20] *See Torres v. Skil Corp.*, No. CIV.A. 11-11232-MBB, 2013 WL 3105815, at *6 (D. Mass. June 17, 2013) (The relevant inquiry is whether "the jury could have found, of its own knowledge, that the defendant had improperly designed [the product].") *see also Goffredo v. Mercedes–Benz Truck Co., Inc*., 402 Mass. 97, 520 N.E.2d 1315, 1318 (Mass.1988); *Enrich v. Windmere Corp.,* 616 N.E.2d at 1084 (acknowledging that, in "rare situations", no expert testimony is needed to prove a product is defective.); *See Cousins v. Higgins*, No. 18-1832, 2019 WL 11234276, at *1 (1st Cir. Aug. 13, 2019) (where the defect is "sufficiently obvious as to lie within common knowledge" of a juror, no expert testimony is needed).

### 4. The Lack of a Tabbed Trigger is a Defect That Provides No Safety Advantage and not a "Feature"

In its Motion, Sig Sauer argues that the Court should grant summary judgement in its favor because it contends that the design defect of a single-action pistol with a short trigger and no external safeties is actually a "feature", not a defect. *See* ECF No. 70, p. 12. This is a heavily contested fact and Plaintiffs' have produced vast evidence that demonstrates that absence of *any* external safeties renders the P320 unique among its competitors and uniquely dangerous. This

---

[20] Tertin and Vigilante performed extensive testing in support of their design defect and causation opinions, not present in *Davis,* and performed incident specific testing based upon Officer Desrosier's testimony, inspected the physical evidence and clothing, reviewed the police paperwork and security video, and tested plausible unintended discharge scenarios with a P320 and Glock—none of which were present in *Davis.* Their design defect and causation opinions satisfy *Daubert.*

alone defeats Defendant's argument at this stage. *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92 (1st Cir. 2021) (at summary-judgment, the record must be construed in the light most favorable to the non-moving party, with all reasonable inferences drawn in its favor.).

Sig Sauer relies upon dicta in a distinguishable case where summary judgment was granted on other grounds.  In *Wasylow v. Glock,* the plaintiff was in his bedroom at his parents' home, when he pointed a Glock pistol towards his abdomen and intentionally pulled the trigger, believing it to be unloaded.  975 F. Supp. 370, 373 (D. Mass. 1996).  Plaintiff asserted a veritable kitchen sink of claims, including "negligence in design, manufacturing, testing, inspection, distribution, marketing, and in failure to warn regarding both the Glock pistol and the storage case." *Id.* at 376. The district court granted summary judgement, finding that "Wasylow fails to set forth *any* facts to support his claims."  *Id.* at 377, (emphasis original).  In dicta, that is neither binding nor applicable to this case, the court described how adding a manual safety affect the functional capabilities of the gun.

Here, the evidence demonstrates that the inclusion of a tabbed trigger is a safety feature that has no negative effect on the functional capabilities of the gun.  Dr. Vigilante squarely addresses this in his report.  *See* Ex. 1, Vigilante Report, p. 42-43 ("The common use of handguns with trigger tab safety in conjunction with my own experience using such a trigger confirms the fact that a properly designed tab trigger safety integrated into the design of the Sig P320 would not affect the utility of the handgun."). This fact was further confirmed by CPD Lieutenant George Sabbey who testified that he owned two Glocks as personal weapons.  *See* Ex. 12, Sabbey Dep., 37:4.  He confirmed that the Glock had a tabbed trigger, and it had no effect on his ability to shoot the gun.  *Id.* at 37:16-38:2.

Sig Sauer cites to no authority for the proposition that a manufacturer's failure to include a safety feature, like an external safety on a gun, cannot be a defect as a matter of law.  Indeed,

court have soundly rejected this proposition.  *See* Ex. 42, *Davis v. Sig Sauer*, Opinion reversing and remanding district court's grant of summary judgment applying Kentucky law; Ex. 43, *Catatao v. Sig Sauer*, Opinion denying Sig Sauer's motion for summary judgment applying Massachusetts law.  The only cases cited by Sig Sauer in support of its flawed argument, *Colter v. Barber-Greene Co.,* stands for the exact opposite proposition than what Sig Sauer claims. 403 Mass. 50, 65, 525 N.E.2d 1305, 1315 (1988) (holding that the Plaintiff's alleged unreasonable use of the defective product "after becoming aware of its defective condition ***does not bar recovery on his negligence claim as a matter of law.***"); *compare* ECF No. 70, Fn. 6.

### B.    Plaintiffs' Failure to Warn Claims Must Be Decided by the Jury

A product may be defective and unreasonably dangerous because of a "failure reasonably to warn of the product's foreseeable risks of harm." *Hunt v. Covidien LP*, No. 22-cv-10697-RGS, 2024 WL 2724144, at *8 (D. Mass. May 28, 2024).  Under Massachusetts law, where the plaintiffs' allegations for negligence and breach of warranty are based upon a failure to warn theory, the "negligent failure to warn and failure to warn under breach of warranty are to be judged by the same standard: the reasonableness of the defendant's actions in the circumstances." *Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 637, 751 N.E.2d 848 (2001). Under either standard, the Plaintiffs must show that the failure to warn proximately caused the plaintiff's injuries. *See Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 48 (1st Cir. 1991).

Here, the relevant audience for Sig Sauer's duty to warn of the known risk of unintended discharges were the individuals at the CPD with whom it had direct contact.  Those were the individuals deciding whether to purchase the P320 and place them in the hands of CPD officers. Lt. George Sabbey contacted Atlantic Tactical, its P320 supplier, expressing concerns over language in the P320 manual.  *See* Ex. 36, Lt. George Sabbey Emails to P320 Supplier. By email dated November 26, 2017, Lt. Sabbey stated included the below photograph and stated: "I came

across this photo of the Sig Sauer manual. Our policy indicates the pistol is required to have a round chambered.  Is this picture accurate?"  *See Id.*



*See Id.*

Lt. Sabbey was then contacted by Sig Sauer's law enforcement sales representative, Don Boulerice.  *See* Ex. 37, Lt. George Sabbey Emails with Dan Boulerice. Boulerice was deposed and indicated that the content of his email response to Lt. Sabbey was based upon talking points he received from Sig Sauer's legal department.  *See* Boulerice Dep., at 58:3-22.  Nowhere in Boulerice's email does he indicate that the P320 functions as a single-action gun.  Nowhere in Boulerice's emails does he notify Lt. Sabbey that Sig Sauer had been made aware of multiple instances of the P320 discharging in its holster without the user touching the gun, despite it being aware of such instances.  *See* Exhibit 13, Chris Meyers Deposition, *Cole v. Sig Sauer*, 24:8-25:4.

Lt. Sabbey was already expressing concerns about the safety of the P320 in November 2017.  *See* Ex. 36, Lt. George Sabbey Emails to P320 Supplier; Ex, 12, Sabbey Dep., 27:1-20. Lt. Sabbey testified that he was in charge of purchasing the P320.  *See* Ex. 12, Sabbey Dep., 14:5.  He testified that he did not know whether the P320 operated as a double-action or single-action gun, and would not doubt the accuracy of Sig Sauer's product literature.  *Id.* at 19:4-19.  In the user

manual applicable at this time, Sig Sauer affirmatively stated that the P320 functioned as a double

action only gun.  *See* Ex. 40, Sig Sauer Owners Manual.

> **The P320 pistol is a double-action only (DAO) design.**
> The P320 is offered with an optional ambidextrous manual safety.
> _____
> 12                      **www.sigsauer.com**

Had Sig Sauer not provided deceptive information, and warned Lt. Sabbey about the true

function of the P320 as a single-action gun with no external safety, Lt. Sabbey would not have

purchased the P320.  Lt. Sabbey expressed concerns about the P320 in 2017, and trusted that Sig

Sauer would be truthful in its product catalogue and in the information it provided in response to

his inquiries.  Yet, Sig Sauer failed to provide him truthful information, failed to warn him that the

P320 was a single action gun, and failed to warn him of the increased risks of unintneded

discharges after Sig Sauer had been repeatedly made aware of other unintended discharges by law

enforcement officers whose guns remained holstered without their touching the gun.  Had Sig

Sauer warned Lt. Sabbey, the person responsible for deciding what guns to purchase for the CPD,

he would have made a different choice and Officer Derosier's unintended discharge would never

have happened.

There is certainly sufficient evidence that a reasonable jury could determine that Sig

Sauer's deceptive marketing and failure to warn Lt. Sabbey, after he had direct contact with Sig

Sauer regarding his safety concerns with the gun, would have resulted in his purchase of a different

gun, namely the Glock which the CPD was testing.  *See* Ex. 12, Sabbey Dep., 13:15:23.  Plaintiffs'

failure to warn claim must be decided by the jury.

**C.     Intentional Infliction of Emotional Distress and Punitive Damages.**

Plaintiffs do not have argument regarding their Intentional Infliction of Emotional Distress claim.  Regarding punitive damages, Plaintiff has not pled an independent cause of action for punitive damages and therefore summary judgement as to punitive damages is not before the Court and must be denied.  Further, Plaintiff has pled a Section 93A claim which allows for the "Court, in its discretion, assesses punitive 'double' damages" for violations of Section 93A.  *See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 117 (D. Mass. 2024), judgment entered, No. 21-CV-10572-MRG, 2025 WL 438735 (D. Mass. Feb. 7, 2025) (Guzman, J.).  As such, Defendant's motion with respect to summary judgment on punitive damages must be denied.

### D.    **Plaintiffs' Negligent Infliction of Emotional Distress and Loss of Consortium Claims.**

Defendant Sig Sauer did not seek summary judgment on Plaintiffs' negligent infliction of emotional distress claim (Count III) or Yolette Desrosier's loss of consortium claim (Count VI). Because those claims were not placed at issue in Sig Sauer's motion, those claims necessarily survive summary judgment.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully request this Court deny Defendant's motion for summary judgment.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

/s/:*Robert W. Zimmerman*
ROBERT W. ZIMMERMAN (*pro hac vice*)
RYAN D. HURD (*pro hac vice*)
SAMUEL A. HAAZ (*pro hac vice*)
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103

37

(215) 496-8282 (Telephone)
(215) 496-0999 (Facsimile)
rzimmerman@smbb.com
rhurd@smbb.com
shaaz@smbb.com

***Attorneys for Plaintiff, Officer Ashley Catatao***

March 28, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Robert W. Zimmerman, hereby certify that the foregoing document and all attached exhibits referenced therein, if any, were filed on the Court's ECF system, where they are available for viewing and download by all counsel of record, and the filing of this document automatically generates a notification to all counsel of record by email, which constitutes good service under the rules of this Court.

March 28, 2024

/s/: *Robert W. Zimmerman*
Robert W. Zimmerman