# EXHIBIT 28

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETS**

| | |
|---|---|
| **ASHLEY CATATAO,** | |
| _Plaintiff,_ | |
| | **Case No. 1:22-cv-10620** |
| **v.** | |
| | |
| **SIG SAUER, INC.,** | |
| _Defendant._ | |

**PLAINTIFF ASHLEY CATATAO'S MOTION IN LIMINE**
**TO ALLOW EVIDENCE OF OTHER SIMILAR INCIDENTS AND**
**PRECLUDE EVIDENCE OF THE LACK OF OTHER INCIDENTS**

Plaintiff, Ashley Catatao ("Plaintiff"), by and through her undersigned counsel, files this Motion in Limine to admit evidence of Other Similar Incidents ("OSI") involving the Sig Sauer P320 and to Preclude evidence of the Lack of OSIs.

## I.   INTRODUCTION

This case is about a police officer with experience with guns, who was injured by the Sig Sauer P320; a gun that by its specific design is different, and less safe, than every other similar gun sold by any other gun manufacturer in the world. Every other single-action gun sold commercially by any other gun manufacturer in the world has at least one external safety to prevent unintended discharges. _See_ Expert Reports of William Vigilante, Ph.D. at Exhibit A and James Tertin at Exhibit B.

On April 6, 2022, at approximately 3:50 p.m., Officer Catatao left roll call to begin her shift for the Somerville Police Department as a patrol officer.  Video surveillance recorded her walking from police headquarters through a parking lot towards her assigned police cruiser.  She was in full uniform with her full-sized, Sig Sauer P320 duty pistol

1

secured in a Safariland holster.  *See* Catatao Deposition at Exhibit C, 42:1-4.  Officer
Catatao was carrying a black duty bag and a small cooler bag.  As she was approaching her
assigned cruiser and went to take her duty bag off her shoulder, she heard a loud bang and
a shooting pain in her leg.  *Id.,* at 99:5-10.

Officer Catatao testified to the events immediately before the unintended discharge
as follows:

> 5         So as I'm walking, I'm holding my strap, holding
> 6    my stuff.  And as I get to the front of the cruiser, I
> 7    start to -- I knew I slipped my hand down the strap
> 8    because I was going to take my bag off to put it down
> 9    on the ground to get my cruiser keys.
> 10        And as I did that motion, I heard a loud bang,

*Id.*  She described a searing pain in her thigh and immediately thought she had been
shot.  *Id.,* at 99:10-12.  Indeed, it was her own P320, that remained at all times secured in
her duty holster with a trigger guard, which discharged without her ever touching the
trigger.  A true and correct copy of the video of  Officer Catatao's discharge in this case is
attached hereto as Exhibit U.

On September 28, 2022, the Somerville Police Department's Office of Professional
Standards issued its 20-page report regarding the unintended discharge of the P320 issued
to Officer Catatao. *See* Ex. T. The report concluded that Officer Catatao handled her firearm
appropriately at all times. *Id.,* at p. 20. **<u>Unfortunately, Officer Catatao's experience with
the P320 is shared with many, many other users of the Sig Sauer P320.</u>**

In Officer Catatao's immediate action against Sig Sauer, Officer Catatao asserted
claims related to the defective condition of Sig Sauer's P320 and Sig Sauer's conduct in

designing, distributing, failing to recall, and failing to warn users of the defect. (See Complaint at Exhibit D).  In addition to compensatory damages, Officer Catatao also seeks the imposition of punitive damages against Sig Sauer.

The foundational principle of Plaintiff's case is that the P320's trigger-pull is too short and light to lack any sort of external safety.  Simply put, it is too easy for the gun to fire under any circumstance; whether the gun is fully holstered, in the process of being holstered or unholstered, in the users hand or somewhere else. **Therefore, the P320 should have been equipped with an external safety just like every single other similarly designed gun in world history**.

Sig Sauer promised users of the P320 that "the P320 won't fire unless you want it



to."

> ## SAFETY WITHOUT COMPROMISE
>
> We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

Yet, like many, many other P320 users, Officer Catatao's P320 did fire when she didn't want it to.  Sig Sauer was aware of these many other similar incidents ("OSIs"). Yet, Sig Sauer did nothing to fix the problem.

## II.  OTHER SIMILAR INCIDENTS

Evidence of OSIs is admissible to establish that a defect or dangerous condition existed or that the defendant had knowledge of the defect. The relevant operative facts in the immediate case against which the similarity of OSIs should be measured are: (1) The user's P320 discharged; (2) The discharge was unintended;  (3) The user's finger did not enter the trigger guard in a manner which would have made flush contact with the face of the trigger.

Throughout this and other litigation against Sig Sauer, and despite the significant flaws in Sig Sauer's accident reporting system, Plaintiff's counsel was able to uncover at least 145 other similar incidents of the P320 discharging when the user did not knowingly and intentionally depress the trigger. Plaintiff intends to use these OSIs through expert

4

testimony, actual incident videos, and testimony of individuals who experienced an OSI to prove that the P320 is defective due to the lack of any external safety and its propensity to discharge unintended, and to prove that Sig Sauer had notice of this hazard.

At least 67 OSIs involving the P320 were documented by Sig Sauer. (SIG-OAI 000001-002474). Sig Sauer had notice of many OSIs, 47 of which are described below, before Officer Catatao experienced her unintended discharge. The OSI's which predate Officer Catatao's are not limited to these 47, however.

Several incidents of P320s discharging were caught on video and quite clearly depict P320s discharging without the user's finger being on the trigger. These videos are discussed below. A compilation of the OSI videos are available the following link and will be available for the Court during Motion in Limine arguments:

**https://smb.filev.io/r/s/5dc3sZa7ZkUb6DwhNeGeWV3C5PfsAg3n8zXwrzFItVovYE hDNtZU2U3H**

Plaintiff took the video recorded trial testimony of twenty-three individuals who experienced an OSI. Each of these individuals testified under oath about their OSI and that they did not knowingly and intentionally depress the trigger. Several of these were recently played for the jury in the *Abrahams v. Sig Sauer, Inc.* trial, Case No. 220601213, in Philadelphia (which resulted in a $1,000,000 compensatory verdict and $10,000,000 punitive damages verdict). Plaintiff also learned of 63 OSIs by subpoenaing and/or sending Right to Know requests to government agencies.[1]

---

[1] There is some overlap in the OSI categories above. Some, albeit not many, of the 67 OSI documented by Sig Sauer include individuals represented by Plaintiffs.

5

Plaintiff intends to present evidence of these OSIs through Sig Sauer's own documents, through the videos, recorded and live OSI witness testimony, and expert testimony as evidence of both the defect and Sig Sauer's knowledge of the defect of the P320.

## A. SIG SAUER WAS AWARE OF THE P320'S RISK OF UNINTENDED DISCHARGE TO ITS USERS.

Before Plaintiff's incident on April 6, 2022, Sig Sauer was aware of many incidents of unintended discharges. Through discovery, Sig Sauer produced information related to numerous similar incidents. The documents produced by Sig Sauer came in a variety of different forms, including Sig Sauer incident reports, images of incident notes from Sig Sauer's Oracle system[2], police incident reports, emails from individuals involved in the incidents, inspection reports and civil complaints. Several of these incidents, which are evidence of the defective nature of the P320 and Sig Sauer's knowledge of the issue, are described below.[3]

1. Michael Richardson (February 4, 2016) – Roscommon, Michigan sheriff's deputy whose P320 discharged as he was exiting his patrol vehicle. The incident was captured on Deputy Richardson's bodycam, which is described in greater detail below. Sig Sauer produced a police incident report and two affidavits related to this incident. (SIG OAI 00001-000013). An excerpt of a report is provided below.

---

[2] Sig Sauer's corporate designee on the issue of other similar incidents, Chrisopher Meyer, testified that Sig Sauer uses a system called "Oracle" to track incidents of unintended discharges.

[3] At Sig Sauer's request, the parties entered into a Stipulated Protective Order in this litigation deeming certain documents as confidential. The parties agreed that such documents will not be filed with the Court except under seal. Images contained below were not confidential. Plaintiff will bring a copy of the confidential OSI documents to Court to allow the Court to review these at a Motion in Limine hearing or at any time before at the Court's request.

```
Page  1 of 2            ROSCOMMON COUNTY SHERIFF DEPT.        Report  16-0000373
                             Incident Report                   Date    02/04/16
                          PO BOX 206, 111 SO. 2ND ST.          Time    6:10 PM
Phone:(989)275-5101          ROSCOMMON MI 48653
─────────────────────────────────────────────────────────────────────────────
Narrative:

INFORMATION:
     U/S Officer was handling a vehicle in the ditch on N/B 127 south of the
201 mile marker.  As I exited the patrol vehicle my weapon discharged while
being completely in the Holster.  The round went through the driver's seat,
and exited through the bottom of the floor pan.

OFFICER'S INJURIES:
     Officer received a red welt on my upper left thigh from either the
muzzle blast, holster coming apart or both.

OFFICER'S ACTIONS:
     Officer, along with Witness checked Officer for injury.  Officer
removed the magazine from the weapon, cleared the weapon, removing the empty
shell casing from the chamber of the weapon and placed all three on the
passenger side floorboard of the patrol vehicle.  Officer advised Sgt Maeder
of the incident, returned to the office and turned over the weapon,
magazine, and shell casing to Lt Tatrai.
```

(SIG OAI 00002).

2. Unnamed Police Officer (July 1, 2016) – Surprise, Arizona police officer whose fully holstered P320 discharged as he was exiting his vehicle. Sig Sauer produced a Word document incident report related to this incident. (SIG OAI 000014-000017). An excerpt is copied below.

---

**Date:  July 1, 2016**

**Location:  Surprise, AZ**

**Incident:  On or around July 1, 2016, a Surprise, AZ Police Officer's P320 pistol allegedly discharged as he was exiting his vehicle.  The officer was left-handed with his pistol holstered on his left-hip.  An inspection of the pistol showed marks consistent with contact with a seat belt buckle.  The subject holster had a large opening at the trigger guard location which could allow a seat belt to enter the trigger area and allow a trigger pull. Additionally, the holster had gouging consistent with a seat belt buckle getting into the holster in the trigger guard area.  An investigation by the Surprise, AZ Police Department confirmed that the discharge was caused by the seatbelt buckle getting into the trigger area and pulling the trigger.**

---

(SIG OAI 000014).

3. Thomas Frankenberry (October 11, 2016) – Myrtle Beach, South Carolina resident and retired New York Police Department officer who was shot when his fully holstered P320 discharged in a restaurant. Sig Sauer produced a civil complaint which was filed September 16, 2019 related to this incident. (SIG OAI 00018-00034).

4. Cody Hoefs (November 23, 2016) – Tacoma, Washington resident who was shot by his P320 as he was holstering it into a Sig Sauer holster. Sig Sauer produced a civil complaint which was filed February 26, 2020 related to this incident. (SIG OAI 00035-00078).

5. Kevin Powers (November 19, 2016) – Holmes Beach, Florida police officer who suffered career ending injuries when his P320 discharged while he was in the process of clearing it. Sergeant Powers swore under oath that he did not pull the trigger of the firearm. Sig Sauer produced the civil complaint filed June 3, 2020 and police reports for this case.  (SIG OAI 00079-00182). This case was fully litigated by the undersigned and Sig Sauer's counsel and it resolved just before trial.

6. Anoka County Deputy (January 4, 2017) -  Sig Sauer produced an email to a Sig Regional Manager for law enforcement sales. The email memorialized information received from Jeff Barrett at the Anoka Sherriff's Department in Minnesota. There, a deputy was carrying his P320 in the holster that was provided with the gun. He attempted to remove the holstered P320 off his belt and the gun discharged into his leg.  He reported that his hand was over the holster and he does not believe he touched the trigger.  Residue inside the holster indicated that the muzzle was in the holster at the time of discharge. (SIG OAI 002052-002954). An excerpt of the email is copied below.

> I met him today at 4:00 PM at his house.  He told me that he had just received the gun as a gift for Christmas.  The gun had been purchased by his wife at Cabellas and had never been fired.  He told me that he was carrying the gun in the Sig holster provided with the gun.  He said when he was standing in his kitchen, he was attempting to take the gun and holster off of his waist/belt when it discharged.  He said he did know what happened and thought his wife dropped something.  His wife asked him if he shot himself and that's when he noticed that the gun fired and he was hit in the leg.  He said he had his hand over the holster and was taking it off of his belt and doesn't believe he touched the trigger.
>
> He said he is familiar with Striker fire pistols and carries a Glock as a duty weapon.  He told me that he noticed that there was residue from the gun being fired inside of the holster, indicating that the muzzle was inside of the holster.  After the gun was fired, it landed on the floor separate from the holster.  I showed him the safety features of the P320 and we couldn't figure out how the gun could have fired.  He agreed that I could send the gun to the factory to be examined.  I have and will sent the pistol, magazine and holster.  I do not have the case.  Val sent me an RMA and I will send it back for him.  He was very cooperative and appeared the knowledgeable about guns.

(SIG OAI 002052-53)

7.  David O'Conner (May 10, 2017). Sig Sauer produced notes from its "Oracle" intake system related to a discharge in Riverdale, Georgia where an officer tripped and fell on his gun side, causing his holstered P320 to discharge. The weapon stove-piped, further confirming that the gun discharged from within the holster.



**SIG OAI-00184, "Oracle" notes related to the Riverdale discharge**

8.  Michael Stanziola (February 4, 2018) - Hazleton, Pennsylvania resident who was shot when his P320 discharged as he was attempting to place the pistol in his holster. Sig Sauer produced an internal word document incident report related to this incident. (SIG OAI 00208; This document is marked as confidential and can be produced to the court as a hard copy).

9.  Marcie Vadnais (February 17, 2018) – Loudon County, Virginia sheriff's deputy who was shot when she was removing her fully holstered P320 from her duty belt. Sig Sauer produced a civil complaint, forensic documents, correspondence between the Loudon County Sheriff's Department and Sig Sauer, and expert reports, among other documents, related to this incident. The narrative of the letter sent by the Loudoun County Sherrif's Office to Sig Sauer on March 30, 2018 is copied below. This letter was produced by Sig

Sauer, bate stamped SIG-OSI-209 and demonstrates that Sig Sauer was aware of this incident long before Plaintiff's purchase and discharge.



(SIG OAI 00209)

10. Jamie O'Ryan (March 27, 2018) – Wallingford, Connecticut resident whose P320 discharged as he was racking his slide to chamber a round. Sig Sauer produced an internal word document incident report and Oracle notes. Sig Sauer was aware of this incident by April 19, 2018. SIG-OSI-399; SIG-OAI-00400, SIG-OAI-00401

11. Zachary Sandoval (March 30, 2018) – Wellington, Colorado resident whose P320 discharged while he was cleaning it. He was certain his fingers never touched the trigger. Sig Sauer produced a demand letter from Mr. Sandoval's attorney dated March 11, 2020 which demonstrates Sig Sauer was aware of this incident before Plaintiff's incident.

12. Gunter Walker (precise date unclear, appears to be in May, 2018) – Alabama resident whose holstered P320 discharged when he placed it on his bedside table. Sig Sauer produced emails from Mr. Walker and Oracle notes related to this incident. SIG-OAI-00409. Sig became aware of this incident on May 7,

10

2018 when Mr. Walker directly emailed Sig Sauer.  SIG-OAI-00406.  This email is marked "confidential" by SIG and can be produced to the court as a hard copy.

13. Unnamed Rancho Cucamonga Texas Sheriff's Deputy (May 18, 2018) – Rancho Cucamonga, Texas sheriff's deputy was seriously injured when his holstered P320 discharged, seemingly after making contact with his keys. Sig Sauer produced an email from the sheriff's office as well as an internal investigation report demonstrating that Sig Sauer was aware of this incident as of June 21, 2018.  SIG-OAI-00411. The email dated June 21, 2018 is depicted below.

> The following pistol was sent to the factory for Evaluation for Unintentional Discharge P320-9-BSS-TACOPS. This pistol is not upgraded Serial #58B109270
>
> **From:** Janowicz, Joseph [jjanowicz@sbcsd.org]
> **Sent:** Thursday, June 21, 2018 12:32 PM
> **To:** Tony Levatino
> **Subject:** Sig Sauer P320
>
> Good afternoon Tony,
>
> On Friday, May 18, 2018, a Deputy from Rancho Cucamonga Sheriff's Station was seriously injured when his Sig Sauer P320 discharged while in his duty holster. The Deputy had completed his shift and walked to the locker room. He was in full uniform with his personally-owned Sig Sauer P320 duty pistol secured in his duty holster. The firearm discharged while in the holster and the bullet struck the Deputy's leg.
>
> The investigation is on-going, but it appears the Deputy had a bag slung on his shoulder (gun side) as he walked into the locker room. Clipped to the outside of the bag was a set of keys. Based on preliminary information, it is suspected the key(s) may have slipped between the gun and the holster, catching the trigger as the Deputy walked. Due to the seriousness of the Deputy's injuries, and in the interest of thoroughness of our investigation, the Department requests a manufacturer's inspection of the firearm to rule-out any potential mechanical failures.

(SIG OAI 00411).

14. Paul Lorring (June 7, 2018) – Reno, Nevada Court Officer whose P320 discharged as he was practicing drawing his weapon in the courthouse. Sig Sauer produced an internal word document incident report and Oracle notes related to this incident, which provide that Sig Sauer replaced the pistol with a Sig Sauer 226 double-action pistol. The Oracle notes prove Sig Sauer was aware of this incident as of June 13, 2018.  (SIG-OAI-00414-00415). These

11

documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

15. John Mascaro (September 12, 2018) – Kingston, New Hampshire resident was injured when his P320 discharged without him pulling the trigger. Sig Sauer only provided a demand letter from the victim's attorney, without any additional details related to the incident.

16. Shannon Hayes (October 13, 2018) – Riverdale, Georgia police officer who was shot by his P320 was he was holstering it. Sig Sauer produced a police incident report and civil complaint related to this incident. (SIG OAI 000419-000455) These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

17. Stephen Mayes (October 30, 2018) – Franklin County, Kentucky resident who was also a competitive shooter and former law enforcement officer was shot by a fully holstered P320 while his hands were off of the firearm. Sig Sauer produced a civil complaint related to this incident.(SIG OAI 00456-00472).

18. Michael Berkoff (precise date unclear, believed to be November 5, 2018) – was  shot in the hand and claimed the gun off without him pulling the trigger. Sig Sauer produced "Oracle" notes related to this incident demonstrating they were aware of the incident on November 5, 2018. (SIG-OAI-00473 to 00477). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

19. Robert Bryan Lang (December 11, 2018) – Fulton County, Georgia resident who was shot by his holstered P320 as he was attempted to remove his holstered P320 from his belt. This incident resulted in litigation handled by the undersigned in the United States District Court for the Northern District of Georgia. (Case 1:21-cv-04196-ELR). This case concluded with a jury finding that the P320 was defective, Sig Sauer was negligent and Sig Sauer failed to warn its users of its defect, and each of these was a cause of the harm caused to Mr. Lang.  See Jury verdict at Exhibit E.

20. David Duff (December 11, 2018) – Pasco County, Florida sheriff's deputy who was shot by his holstered P320 while in the process of putting on his duty belt. Mr. Duff maintained that he never touched the gun, never removed it from his holster, and did not hit his duty belt on anything at the time of discharge. The casing did not eject. Mr. Duff was cleared of any wrongdoing following an investigation by the Pasco County Sheriff's Office. Sig Sauer produced the Pasco County Sheriff's investigative file. (SIG OAI 01472-

01574). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

21. Justin Schneider (December 22, 2018) – Rocky Ford, Kentucky resident who handed his P320 to his wife, and it discharged during the exchange, striking her in the neck. (SIG OAI 00490-01171)

22. Unnamed Walkerton, Indiana Police Officer (January 11, 2019) – Officer's holstered weapon discharged as he was exiting his vehicle, with the weapon in a Level 3 retention holster with the strap up. Sig Sauer produced inspection notes, emails, and Oracle notes related to the incident. (SIG OAI 002055-002065). The email from Walkerton Assistant Chief Charles Kulp to Sig Sauer employee Thomas Mechling is depicted below.

On Jan 13, 2019, at 11:53, "ckulp@walkerton.org" <ckulp@walkerton.org> wrote:

Thomas,
Friday night I had an officer climbing out of the passenger side of a 2017 Dodge Charger. As he was climbing out of the car the butt of his gun hit the A pillar of the car. The weapon discharged, narrowly missing his leg and blowing a hole in the floorboard of the police car. The officer driving the car looked over as it happened and stated that the officers hand was nowhere near the firearm at the time of the discharge. The firearm was in a level 3 retention Safariland holster. The firearm was unable to cycle due to the strap being up and shell casing was still in the weapon. I'm told he was wearing nothing with any form of hanging straps or

..

anything down into the holster that could have activated the trigger. I'm on my days off and I'm emailing you from my phone. I'll attach a few files for your review, however these are not high definition files. Any guidance for me?


Asst. Chief Charles Kulp
Walkerton Police Dept.

(SIG OAI 002056-2057)

23. Brandon Watson (March 30, 2019) – Tarrant County, Texas sheriff's deputy who was shot after his P320 discharged while he was unholstering it. Mr. Watson claimed he did not touch the trigger and that something must have caught the trigger. Sig Sauer produced a civil complaint and the sheriff's department report related to this incident. (SIG OAI 001172-001211). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

24. Sergeant J. Bocquet (March 13, 2019) – Bayou Vista Police officer experienced an unintended discharge as he removed the holstered P320. Sig Sauer produced emails and Oracle notes which indicated that "[a]s [Sgt. Bocquet] was removing the holstered weapon from his side to place it in the gun box the weapon fired." Chief Jimmie Gillane viewed the video from the Sheriff's Office and could "plainly see Sgt. Bocquet's finger is indexed along the outside of the holster." (Sig OAI 002066-2072).



(SIG OAI --2070)

25. Jonathan Cross (April 30, 2019) – Pasco County, Florida school resource officer who was shot while he was practicing holstering and re-holstering his P320. Sig Sauer produced an internal word document incident report related to this incident. (SIG OAI 001219).

26. Thomas Ahern (May 19, 2019) – Cambridge, Massachusetts SWAT member whose P320 discharged while he was performing a function check of the weapon. At the time of the discharge, Officer Ahern's right index finger was along the frame of his weapon and he did not have his finger on the trigger of the gun. Sig Sauer produced a civil complaint related to this incident. (SIG OAI 01220-01279).

27. Jack Williams (May 25, 2019) – New Bern, North Carolina resident who was shot while on his motorcycle when his holstered P320 in his back pocket discharged. Sig Sauer produced a civil complaint related to this incident. (SIG OAI 01278)

28. Grant Fujimoto (July, 2019) – User whose firearm discharged while holstering. He reported that he did not touch the trigger. Sig Sauer produced Oracle notes. (SIG OAI 02073-02076).

29. Walter Collette (July 23, 2019) – Somerville, Massachusetts police officer whose pistol discharged while it was wrapped in a towel in his backpack or gym bag. Sig Sauer produced an internal Word document incident report with minimal details related to this incident. (SIG OAI 0001280). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

30. Jimmy Jinn (July 24, 2019) – New York, New York-based ICE agent who was shot when his P320 discharged while he was conducting qualification exercised. Jinn placed his hand on his pistol's grip while it was still holstered, and the pistol discharged. Sig Sauer produced a civil complaint related to this incident. (SIG OAI 001281-001310).

31. Craig Jacklyn (August 26, 2019) – Southeastern Pennsylvania Transportation Authority (SEPTA) police officer whose P320 discharged from within his holster while he was riding a golf cart through a police station. The incident was investigated and Officer Jacklyn was cleared of any wrongdoing. In response to this incident, the SEPTA police replaced all of the P320s in its arsenal with safer Glock pistols. Sig Sauer produced the SEPTA police and Philadelphia District Attorney's office investigative file related to this

incident. (SIG OAI 001311-001391). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

32. Jacques Derosiers, (October 10, 2019) – Cambridge Police Officer's P320 discharged as he was exiting his vehicle. Sig Sauer only produced a brief word document incident report related to this incident. (SIG OAI 001392).

33. Frank Kneski (October 11, 2019) – East Orange, New Jersey-based Department of Veterans Affairs police officer was attempting to withdraw his pistol from his holster, the weapon discharged, causing burn injuries. Sig Sauer produced a demand letter from Mr. Kneski's attorney to Sig Sauer, an email exchange between a Department of Veterans' Affairs armorer and Sig Sauer, and a video of the incident. (SIG OAI 001396-1402)

34. David Albert (December 2, 2019) – Cambridge, Massachusetts police officer whose P320 discharged when he hung the pistol on a bathroom stall hook. Sig Sauer produced a word document incident report related to this incident. (SIG OAI 001422). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

35. Unknown Oklahoma Highway Patrol Officer (date unknown) – Oklahoma Highway Patrol Officer's holstered P320 discharged, allegedly after a foreign object entered the holster. An inspection by Sig Sauer revealed scratches on the side of the trigger, which Sig Sauer implies caused the incident. Contact with the scratched side area of this trigger would not have caused a discharge if a tabbed trigger was used. (SIG OAI 001404).

36. Ryan Nolan (November 2019) –Mr. Nolan's P320 discharged as he was deactivating a flashlight mounted to his P320. Sig Sauer only produced "Oracle" notes related to this incident. (SIG OAI 001405-1407). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

Inspected pistol and found that it appears a foreign object entered the holster causing the pistol to discharge. There are a lot of scratches and gouges on the right side grip module running from the trigger guard to the beaver tail. There is a scratch on top of slide. See Pictures Below

**SIG–OAI 01404, unilateral inspection report from Oklahoma Highway Patrol incident**

37. Matthew Gardette (date unknown, likely Fall 2020) – Manteca, California police officer whose fully holstered P320 discharged as he was putting on his gun belt. Sig Sauer produced "Oracle notes," correspondence between Sig Sauer and the Manteca Police Department, photographs, and results of Sig Sauer's unilateral inspection of the subject pistol, and a witness statement from a fellow officer. (SIG OAI 001408-1421).

During our conversation, I noted Ofc. Gardette was wearing his patrol pants and patrol shirt with no LBV on yet. Ofc. Gardette reached into his locker with his right hand and I watched him pull his duty belt out from within his locker while gripping it by the right buckle. As I saw Ofc. Gardette holding his duty belt, I could see he was single handedly gripping his duty belt by the right side buckle. I watched Ofc. Gardette swing his belt around the right side of his body with his right hand while gripping the buckle in efforts of wrapping it around his waist, when suddenly his firearm discharged. Ofc. Gardette's left hand was free and he had not gripped anywhere around the holster.

Ofc. Gardette immediately dropped his belt on the floor after the discharge. After ensuring no one was injured, I picked the belt up to inspect it and noticed there was a hole in the end of the holster as a result of the discharge, but I did not see any other blockage or damage surrounding the holster that would be reason for it discharging.

I handed the belt to Sgt. Casquiero, who arrived only a few seconds after the discharge. Ofc. Ryan Smith was also in the locker room during the time of the incident.

It should be noted, I was only a couple feet away from Ofc. Gardette when this occurred. Normally, I would not believe the firearm discharged without the trigger being pulled. However, I can say I personally witnessed the entire incident from start to finish and I did not observe any negligence or actions by Ofc. Gardette that would have caused for the firearm to have suddenly discharged.

Respectfully,

Primitivo Cruz
Police Detective
Manteca Police Department

1001 W. CENTER ST.   MANTECA, CA 95337   (209) 456-8210   FAX (209) 923-8938
WWW.CI.MANTECA.CA.US

**Letter from eyewitness to Gardette incident, produced without a Bates label**

18

38. Unnamed Fulton County Ohio Sheriff's Deputy (January 2, 2020) – Fulton County, Ohio sheriff's deputy whose holstered P320 discharged while training with a K-9. Sig Sauer performed a unilateral inspection of the pistol and holster and found that the holster could be bent into the trigger housing, pressing against the trigger and causing it to move rearward. Sig Sauer produced emails between the office and Sig Sauer, "Oracle" notes, and a Sig



Sauer unilateral inspection report. (SIG OAI 1423-001432).

(Image of Oracle Note - SIG OAI 02077).

39. Kyle Guay (January 28, 2020) – New Hampshire resident whose P320 discharged from within his holster while walking his dog. Sig Sauer produced a civil complaint related to this incident.  This matter led to litigation in which the Court concluded that Mr. Guay's P320 did discharge without him pulling the trigger. (D.NH 1:20-CV-007365-AJ).

40. Tanner Larse (January, 2020) – accidental discharge involving a P320 in a Sig Sauer-provided holster. The notes produced by Sig Sauer state "more information and pictures will be provided." No additional notes were provided beyond the Oracle notes. (SIG OAI 02077).

41. Matthew Levine (March 25, 2020) – Maine resident who was shot by his P320 while he was attempting to holster it. Mr. Levine told police he did not have his finger on the trigger at the time of discharge. Sig Sauer produced the police report related to this incident. (SIG OAI 001684-001687). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

42. Chris Campbell (May 20, 2020) – Missouri resident who was shot when he was walking with his P320 fully holstered. Sig Sauer produced a civil complaint and photographs of Mr. Campbell's injuries. (SIG OAI 001688-001707).

43. Unnamed Elkhart, Indiana Police Officer (May 21, 2020) – Elkhart, Indiana police officer whose P320 discharged while in a small satchel with several other items. Sig Sauer produced an email from the Elkhart, Indiana police department to Sig Sauer and Sig Sauer's unilateral inspection report which concluded that an object entered the holster. (SIG OAI 001708-001717).

44. Officer Cushman (first name not listed) (June 2, 2020) – Union City, California police officer whose P320 discharged while fully holstered, within his duty belt, while the belt was hanging inside of his locker from its designated hook. Sig Sauer produced email correspondence between Sig Sauer and the Union City, California police department about the incident, and a report from Sig Sauer's unilateral inspection of the subject pistol. (SIG OAI 001720-001721). These documents are marked "confidential" by SIG and can be produced to the court as a hard copy.

45. Blake Thomas (June 8, 2020) – Birmingham, Alabama resident who experienced an unintended discharge of his P320 when it fired after he placed

---

**From:** Blake Thomas <bthomas@southpace.com>
**Sent:** Monday, June 8, 2020 4:31 PM
**To:** Ryan Dome <Ryan.Dome@sigsauer.com>
**Subject:** Re: SIG SAUER

Ryan,

I am in real estate. I was going inside a property with my demolition guy who was inspecting a property I recently purchased. We knew the property had a history of "housing" people on drugs and many homeless folk. I thought someone was in the house when I arrived so I wanted to make sure my gun was on my side. I got out of the car and pulled out my gun from underneath the seat. I pulled the slide back to confirm that there was a bullet in the chamber. I confirmed the gun was loaded with a bullet in the chamber. When I slid the gun into the plastic SIG case/holster, the gun fired. At the time the gun misfired, I was holding the handle and made sure my finger was not on the trigger. The gun fired while I was leaning over into my car. The gun shot through my seat and my car keys that were lying on the seat and the bullet is still lodged somewhere in my car. I have attached a few pictures. My ears were ringing for days and I am fortunate I was not sitting down or else I probably would've been shot. There were hollow points in the gun at the time so getting shot short range with hollow points would've been devastating. I consider myself lucky to be alive.

Let me know if you have any other questions.

the P320 in the Sig Sauer holster as he was leaning over into his car. Mr. Thomas is certain his finger was not on the trigger. Sig Sauer produced emails with Mr. Thomas and photographs. (SIG OAI 002095-002102). The email report from Mr. Thomas is copied above.

(SIG OAI 002095-002102).

46. Adam Maritato (July 14, 2020) – Milwaukee, Wisconsin police officer who was shot by his partner's holstered P320 while his partner bent over to inspect a vehicle. Sig Sauer produced the Milwaukee police department file.

47. Josh Cantu (April 4, 2021) – Laredo, Texas police officer whose holstered P320 discharged while the officer was indoors and watching footage of a crime. Sig Sauer produced an incident report which provided that this was the *third* incident of a Laredo, Texas police officer's firearm going off without the officer touching the pistol. The pertinent section of the incident report is below:

---

**Circumstances Surrounding the UD (In uniform or plain clothes – Effecting an arrest, if so was there a struggle – Sitting in a vehicle affixing a seatbelt – Etc.)** Below is an email that I received from David Casarez after our initial phone conversation. This email is cut and pasted in its entirety:

On April 4th approximately 2am. One of the officers duty firearm (Sig P320) discharged inside his holster. The officer was kneeling, watching video camera footage of a burglary that had just occurred. He stated that as he was getting up, the firearm discharged inside his holster, his hands were In front of his body and never by the firearm. Prior to that incident he and two officers had cleared the residence so their body camera was on. The incident was caught on video from one of the officer body camera.

I spoke to our Chief of Police today who reviewed the video and confirmed that the video show's the gun discharging inside the holster on its own. He did mentioned that it appeared the officers forearm might have touch the holster when it went off. The firearm did not cycle and was not removed from the holster. A CSI arrived to recovered the holster and firearm. The firearm was never removed the from the holster. The firearm and holster were sent to Bexar County lab this morning and I believe the firearm was removed from the holster. There was no foreign object inside the holster. It appears the firearm just fired on its own.

This is the 3rd time a Sig P320 discharges inside a holster within our department. All officers have claimed their hands never touched the firearm when it was off.

---

**SIG-OAI-01861, Sig Sauer internal incident report**

This list of OSIs which are based on Sig Sauer's own documents demonstrates that long before Plaintiff was injured by her P320, Sig Sauer was aware of at least 47 incidents of unintended discharges where users reported that they did not intentionally pull the trigger. The list of OSI's which occurred before Officer Catatao's unintended discharge is actually longer that the 47 listed here.  Plaintiff intends to introduce evidence of the number of OSIs through Sig Sauer's witnesses as well as through Plaintiff's experts.

### B. VIDEOS OF UNINTENDED DISCHARGES ARE EVIDENCE OF THE P320'S DEFECT

Several unintended discharges have been inadvertently captured by surveillance cameras and body cameras worn by law enforcement. These videos can be viewed at the link below and will be supplied to the Court as Exhibit F.

**https://smb.filev.io/r/s/5dc3sZa7ZkUb6DwhNeGeWV3C5PfsAg3n8zXwrzFItVovYE hDNtZU2U3H**

Plaintiff intends to introduce these videos at trial to demonstrate to the jury that the P320 is prone to discharge without the user intending to or without the user themselves touching the trigger.

### 1. Officer Michael Richardson, Roscommon, MI, February 4, 2016

Plaintiff intends to show the jury the bodycam footage depicting an incident on February 4, 2016 involving Officer Michael Richardson of the Roscommon Sherriff's Department. The video depicts Officer Richardson's holstered P320 discharging as he is getting out of the car. Officer Richardson's hands are in plain view.  He exclaims on video that his gun was holstered. The video depicts the fact that the spent shell casing did not eject from the pistol. This video was previously admitted as OSI evidence in a similar case

in federal court, *Guay v. Sig Sauer*, Civil No. 20-cv-736 (D.N.H. 2020)(See Trial Order at Exhibit G). The video is evidence of the susceptibility of the P320 to fire without user intent as well as evidence that Sig Sauer was on notice of the issue as Sig Sauer learned of this incident before Plaintiff's subject discharge.

The Roscommon Sheriff's Department investigated the incident and claimed that a seatbelt slipped into the holster and caused the weapon to discharge. Sig Sauer possessed the video and those records, and Sig Sauer produced the same at bates SIG-OAI 00001-00013. Plaintiff intends to present these records as evidence of Sig Sauer's knowledge that objects can enter the tiny gap between the holster and the firearm, and with further manipulation can cause the weapon to fire.

## 2. Officer Daniel Witts, Montville, Connecticut, July April 24, 2021

Perhaps the most compelling OSI video which Plaintiff intends to show the jury comes from a surveillance camera at the Montville, Connecticut police department in July, 2023. This video depicts Officer Witts detaining a suspect along with other officers. Officer Witts was highly experienced with the P320. He attended the Sig academy to become an armorer of the P320. (Officer Witts Deposition at Exhibit H, 8:12-23). Officer Witts' P320 was in a triple retention holster, with a hood over the top, secured to his duty belt on his right hip. As he bent over to grab the suspect's legs, the P320 discharged without him touching it. The bullet narrowly missed a fellow officer.



Discharge Blast

This incident resulted in significant media attention. Shortly after the incident, and long before discovery closed in the instant case, Sig Sauer released a video purportedly debunking the claim of unintended discharge and suggested that the P320 was not secure in its holster. Officer Witts testified and refuted Sig Sauer's claim. (Ex. H, 26:1-34:4). His P320 discharged while it was properly seated in his holster and he did not touch it. Like the instant case, his casing failed to eject. (Ex. H, 22:16-17).

Plaintiff intends to play Officer Witts' recorded deposition testimony along with the OSI surveillance video for the jury. The video and Officer Witt's testimony is relevant

24

evidence of the susceptibility of the P320 to unintentionally discharge and Plaintiff's defect theory. Although Sig Sauer was aware of this incident and released a statement about it days later, Sig Sauer did not update its OSI discovery responses to disclose this incident to Plaintiff. Plaintiff discovered it on her own. Regardless, Sig Sauer participated in the depositions of Officer Witts and the Chief of his police department.

### 3. Officer Aaron Roth, Milwaukee, WI, January 2, 2022

Plaintiff also intends to show the jury the parking lot security footage depicting Milwaukee, Wisconsin Police Officer Aaron Roth's unintended discharge on January 2, 2021. The video shows Officer Roth getting out of a vehicle with items in both hands. As Officer Roth steps out of the vehicle, his fully holstered P320 discharged. The shell casing did not eject. (See Officer Roth's Deposition Transcript at Exhibit I, 17:11-13). The incident video is available to view at the OSI Video Compilation link above, beginning at 3:02. (Exhibit F). Sig Sauer has long possessed the video, as well as the report from Milwaukee Police Department produced by Defendants at bates SIG-OAI 01825-01828.

The video of the incident was authenticated and described by Officer Roth when he was deposed on video, February 2, 2023. Plaintiff intends to play Officer Roth's video recorded deposition testimony about the incident to the jury. The video of his testimony includes the incident video, picture-in-picture. Plaintiff intends to have the video edited for brevity to include testimony which corresponds to limited deposition designations at Exhibit I, 6:4-14:2; 16:25-20:4; 23:7-24:6. The video and Officer Roth's testimony is relevant evidence of the susceptibility of the P320 to unintentionally discharge and Plaintiff's defect theory.

4. **Officer Donald Thatcher, Honesdale, PA, February 7, 2022**

Plaintiff intends to show the jury the parking lot security footage depicting Honesdale Pennsylvania Police Officer Donald Thatcher's unintended discharge as he exited his vehicle on February 7, 2022.  Officer Thatcher's duty-issued P320 was holstered on his left hip.  He had a phone in his left hand. The video very clearly shows the P320 discharging from within its holster. As in this case, the shell casing did not eject.  (See Officer Thatcher Deposition at Exhibit J, 41:10-18).  The video is available at the link above.

The video of the incident was authenticated and described by Officer Thatcher when he was deposed on video, October 21, 2022.  Plaintiff intends to play Officer Thatcher's video recorded deposition testimony about the incident to the jury.  The video of his testimony includes the incident video, picture-in-picture.  Plaintiff intends to have the video edited for brevity to include testimony which corresponds to limited deposition designations at Exhibit J, 7:20-17:11; 23:8-14; 40:5-41:3; 41:10-18; 41:23-42:18.  The video and Officer Thatcher's testimony is relevant evidence of the susceptibility of the P320 to unintentionally discharge and Plaintiff's defect theory.

5. **Officer Robert Greene, St. Clair, MN, August 3, 2021**

Plaintiff intends to show the jury the surveillance video captured at the St. Clair County Jail, Minnesota on August 3, 2021. In the video, ICE Officer Robert Greene removes his P320 from a gun locker and, with his right hand, he places his P320 in the department issued Sig Sauer holster on his right hip. As he places the P320 in the holster, his finger is visibly located on the outside of the holster as one would when safely handling

a gun. The gun discharged, clearly without Officer Greene's intent, while his finger was outside of the holster. The shell casing did not eject. The video is available at the OSI Video Compilation link above beginning at 2:43. (Exhibit F).

The video of the incident was authenticated and described by Officer Greene when he was deposed on video, May 24, 2023.   (See deposition transcript at Exhibit K). In response to a Touhy request, ICE also produce documents from its internal investigation into the incident.[4] It was concluded that Officer Greene's finger was clearly off the trigger when the pistol discharged. (See Ex. L, p. 63-66 of 66). Further, the shell casing did not eject.  (Ex. L, p. 54-55 of 55).  Plaintiff intends to play Officer Green's video recorded deposition testimony about the incident to the jury. Plaintiff intends to have the video edited for brevity to include testimony which corresponds to limited deposition designations.  The video and Officer Greene's testimony is relevant evidence of the susceptibility of the P320 to unintentionally discharge and Plaintiff's defect theory.

### 6. Sergeant Marvin Reyes, Houston, Texas, March 28, 2022

Yet another was memorialized by home security camera footage depicting Houston, Texas Police Department Sergeant Marvin Reyes loading bags into the backseat of his car on March 28, 2022 with his P320 holstered on his right hip. The video shows Sergeant Reyes's holstered P320 discharging with his hand clearly off of the trigger. Plaintiff will also play for the jury Sergeant Reyes' sworn testimony about the incident.

---

[4] The ICE documents are stamped "further dissemination not authorized".  In an abundance of caution, a redacted copy of these documents is attached at Exhibit J.  Plaintiff will supply the Court with a hard copy of these documents.

### 7. **Special Agent Mary Doffeny, Louisiana, December 5, 2021**

Plaintiff intends to show the jury security camera footage of an OSI depicting ICE special agent Mary Doffeny at the St. Rose Casino in Louisiana on December 5, 2021. In the video, Agent Doffeny is in "standby duty" status, meaning that she is off-duty but was required to have her duty-issued firearm with her. Agent Doffeny had her P320 inside of a purse, which was in its own dedicated, zippered pocket. The video shows Ms. Doffeny's P320 discharge from within the purse after the purse makes extremely minimal contact with the side of a slot machine. Agent Doffeny was deposed on October 21, 2022 and confirmed that the weapon was safely stored in a pocket by itself.  Plaintiff will also play for the jury Agent Doffeny's sworn testimony about the incident.

### 8. **Officer Craig Jacklyn, Philadelphia, Pennsylvania, April 24, 2021**

Yet another OSI video which should be played for the jury comes from body cam footage from Southeastern Pennsylvania Transportation Authority. On August 26, 2019, Southeastern Pennsylvania Transportation Authority police officer, Craig Jacklyn, experienced an unintended discharge similar to Plaintiff's. Officer Jacklyn explained the circumstances of his discharge at his video recorded deposition on April 14, 2021.

On August 26, 2019, Officer Jacklyn was patrolling an area while driving a police cart with his partner.  (Deposition Transcript at Exhibit M, 26:3-27:15).  He was carrying a Sig Sauer P320 which was fully holstered and strapped to his right thigh. (Ex. M, 27:18-28:16; 31:10-32:15; 43:14-44:3).  Officer Jacklyn's hands were on the steering wheel of the police cart. (Ex. M, 38:1-7).  He brought the police cart to a stop, and readied to exit the cart.  (Ex. M, 38:8-23).  As Officer Jacklyn raised up out of the seat, his P320

unintendedly discharged. Id. He heard a muffled pop. He was not struck. Id. The bullet discharged through a bottle sitting in a cup holder in the dash of the cart and impacted the ground behind a woman walking in the area. (Ex. M, 38:8-39:22; 42:3-16). The spend shell casing did not eject. (Ex. M, 39:15-22). He only realized what happened when he reached down and felt his holster was warm to the touch. (Ex. M, 38:8-39:22). He then turned his body camera on. Id. Mr. Jacklyn is heard in the immediate aftermath of the incident telling fellow officers that the weapon was holstered at the time of the discharge.

## C. TESTIMONY FROM P320 USERS WHO EXPERIENCED AN OSI IS EVIDENCE OF THE P320'S DEFECT.

More than 23 victims of the P320, and individuals who experienced an OSI but were not injured, have given sworn deposition testimony which provides details to prove that the incidents were similar and will be admissible. See, for example, Deposition of Kevin Powers at Exhibit N, 57:20-60:8; Deposition of Robert Bryan Lang at Exhibit O, 48:7-60:13; Deposition of Johnny Davis at Exhibit P, 9:24:12-2; Deposition of Mathew Breedon, Esq. at Exhibit Q, 8:5-10:18. Each of these individuals discussed how their P320 discharged while in the holster. Several had experiences which are nearly indistinguishable from Plaintiff's and provide relevant evidence that the P320 is defective.

### 1. Sergeant Johnny Davis, Puerto Rico, June 2, 2020

On November 16, 2022, Puerto Rico State Police officer, Sergeant Johnny Davis, experienced an unintended discharge like Plaintiff's. Sergeant Davis explained the circumstances of his discharge at his video recorded deposition on October 20, 2023. (See deposition transcript attached at Exhibit P). On the date of the incident, Sergeant Davis

visited a friend's house and placed his holstered P320 in a safe. After a few hours, when he decided to leave, he took his P320 which was still in his duty-issued retention holster, and he placed the holstered P320 in his waistband.  (Ex. P, 9:24-12:21). He then took a few steps outside of his friend's house and the holstered P320 discharged. (Ex. P, 11:7-12:5). He testified that the P320 was in the holster at all times, and he did not put his finger on the trigger.  Id.  He did not intend for the discharge. The shell casing did not eject. (Ex. P, 14:1-9). The bullet struck Sergeant Davis. Each of the operative facts of this discharge are substantially similar to Plaintiff's. Plaintiff intends to play Sergeant Davis' video recorded deposition testimony about the incident to the jury or bring Sergeant Davis in live to testify.

## 2. Michael Lingo Discharge, Three Forks, MT, January 7, 2023

On January 7, 2023, competitive shooter, Michael Lingo, experienced an unintended discharge like Plaintiff's.  Mr. Lingo explained the circumstances of his discharge at his video recorded deposition on October 20, 2023. (See deposition transcript attached at Exhibit R).   On the date of the incident, Mr. Lingo was training for competition at a shooting range in Three Forks, Montana.  He was carrying his Sig Sauer P320 and triple retention Safariland holster for the P320.  (Ex. R, 11:20-12:11). The holster was mounted on his thigh. Id. He loaded the magazine into the P320, placed it in his holster and walked forward approximately ten yards.  Id.  When he reached the shooting area, he repositioned his feet on the ground and the holstered P320 discharged into his right leg below his knee. Id. His hands were at his mid-chest. (Ex. R, 12:5-9). The spent casing did not eject from the gun.  (Ex. R, 22:23-24).   He did not touch the gun or intend for the discharge to occur. Each of the operative facts of this discharge is substantially similar to Plaintiff's. Plaintiff

intends to play Mr. Lingo's October 20, 2023, video recorded deposition testimony about the incident to the jury.

### 3. Agent Joseph Halase, Milwaukee, WI, July 27, 2020

On July 27, 2020, ICE Agent, Joseph Halase, experienced an unintended discharge similar to Plaintiff's. Agent Halase explained the circumstances of his discharge at his video recorded deposition on July 21, 2023. (See Deposition transcript attached at Exhibit S). On the date of the incident, Agent Halase was preparing to perform an enforcement operation with his team. Before the team meeting, he used a restroom in a retail store. He entered the stall of the restroom, removed his duty-issued P320 from his holster and placed it on the back side of the toilet so the gun would not be visible to the general public, sitting on the floor in the holster attached to his pants. (Ex. S, 9:10-10:17). After he was finished, Agent Halase pulled up his pants, and placed the P320 in the holster fastened to his belt on his right hip. (Ex. S, 10:13-11:16). When he felt the P320 fully seat in the holster, it discharged. (Ex. S, 10:11-24). Agent Halase does not believe his finger touched the trigger. (Ex. S, 11:1-11). The spent casing did not eject from the gun. (Ex. S, 12:13-17). Each of the operative facts of this discharge are substantially similar to Plaintiff's. Plaintiff intends to play Agent Halase's July 21, 2023 video recorded deposition testimony about the incident to the jury.

### 4. ADDITIONAL OSI TESTIMONY

Including the more than 20 victims who have already given sworn testimony about their OSI, Plaintiff's counsel represents more than 50 individuals who have active lawsuits against Sig Sauer related to unintended discharges. Plaintiff's counsel included each of

these individuals on their witness list and may seek to call them at trial. A list of these individuals that were not previously mentioned in this brief is provided below. Several of the incidents these individuals also predate Officer Catatao's.

1. Zachary Brown (January 15, 2022) – Connecticut citizen who was shot while removing his still-holstered P320 holster from his pants.

2. Catherine Chargualaf (December 8, 2020) – ICE agent who was shot by a fully holstered P320.

3. William Clegg (November 7, 2022) – Oklahoma resident who was shot when his holstered P320 discharged after making contact with a small wooden paddle.

4. Dionicio Delgado (February 12, 2022) – Virginia resident and former military small arms instructor who was shot by a fully holstered P320.

5. David Duff (February 15, 2020) – Pasco County Sheriff's Deputy whose P320 discharged from within its holster as he was adjusting his duty belt.

6. Juan Duran (February 26, 2022) – Texas resident who was by his fully holstered P320.

7. Kyla Ellis (June 15, 2021) – Massachusetts resident who was shot while transferring her holstered P320 from her right hand to her left hand.

8. James Garth (August 18, 2021) – Richmond County, Georgia sheriff's deputy who was shot while holstering his P320.

9. Amy Hendel (May 12, 2021) – Homeland Security agent who was shot by a fully holstered P320.

10. Nathan Henyan (April 15, 2020) – Yakima, Washington police officer who was shot by his fully holstered P320.

11. Dwight Jackson (May 25, 2022) – Georgia resident who was shot by a fully holstered P320.

12. Adam Maritato (July 14, 2020) – Milwaukee, Wisconsin police officer who was shot by his partner's holstered P320 as the partner leaned into a car.

13. Michael Parker (November 2, 2021) – Florida resident who was shot by his fully holstered P320 while removing his holster from his pocket.

14. Jerry Wyche (November 9, 2020) – Tampa police officer who was shot by his fully holstered P320 while he was exiting his car.

15. Brian Tennant (January 1, 2020) – Colorado resident whose fully holstered P320 suddenly and unexpectedly discharged while in his home.

16. Russell Dykema (November 29, 2022) – ICE agent in Milwaukee who was shot by his holstered P320 as he was exiting his car.

17. Erin Cooper (May 17, 2021) – Washington, D.C. police officer whose fully holstered P320 discharged while she was putting on her duty belt.

18. Rodney Gaston (November 10, 2022)- Texas resident who's P320 was in his right athletic short's pocket when the pistol discharged as he was walking. The bullet struck his right calf and right ankle.

19. Marcos Hernandez (January 24, 2023)- Virginia resident that was walking into his office building when his holstered P320 discharged as he was attempting to open a door. The bullet struck his right thigh.

20. Charles Laskey-Castle (September 10, 2022)- Law Enforcement Officer in Wisconsin, who was at a crime scene for a hit and run with his partner. As they were documenting the crime scene, his partners holstered P320 discharged striking his femur.

21. Christian Wuollet (April 14, 2022)- Minnesota resident who attempted to holster his P320 when the pistol discharged striking him in his right buttock.

22. Timothy Rzasa (July 31, 2021)- Virginia State Police Sergeant for 25 years who was placing his P320 into his holster as the pistol discharged striking him in his right thigh and right knee.

23. Cody Higgins (November 13, 2022) – Oregon resident and Army veteran who was shot while holstering his P320.

24. David Cole (May 4, 2022) – detective in Maine and competitive shooter who was shot by his fully holstered P320 while walking to his vehicle after executing a search warrant.

25. George Abrahams (June 19, 2020) – civilian in Philadelphia who was shot by his fully holstered P320 which was in his pocket as he was walking down stairs and not touching the gun or holster.

Sig Sauer has been well aware of these incidents involving its P320 as early as 2016. Plaintiff must be permitted to offer at trial evidence of these other accidents establishing the susceptibility of the P320 to discharge without the users' intent and Sig Sauer's knowledge of this issue.

## III.  ARGUMENT

### A. PLAINTIFF SHOULD BE PERMITTED TO INTRODUCE EVIDENCE OF OTHER SIMILAR INCIDENTS OF P320 UNINTENTIONAL DISCHARGES.

Each of the incidents Plaintiff plans to offer into evidence involve substantially the same instrumentality (user's Sig Sauer P320 single-action pistol with no external safeties) and circumstances at issue Plaintiff's incident: (1) The user's P320 discharged; (2) The discharge was unintended; and (3) in each situation, the user's finger did not enter the trigger guard in a manner which would have made flush contact with the face of the trigger.

Evidence of other similar incidents is admissible to establish that a product is defective or that the manufacturer had notice of a product's defect. *Moulton v. Rival Co.*, 116 F.3d 22 (1st Cir. 1997).  In the instant case, the P320's defect is that it is unreasonably susceptible to discharging without the user's intent because of its extremely short, light trigger pull length combined with its lack of an external safety to prevent unintended trigger depression. Plaintiff must be able to admit evidence of any incident where a P320 discharged without the user's intent because each incident proves how the trigger system's

design renders it unreasonably susceptible to being unintentionally depressed. The dozens of incidents which pre-date Plaintiff's will also be used to establish that Sig Sauer was aware of this defect prior to Plaintiff's incident.

Evidence of prior accidents or occurrences is admissible if the proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar. *Moulton v. Rival Co.*, 116 F.3d 22. Although the other incident evidence needs to be similar, it does not need to be identical. *See*, *Santos v. Chrysler Corp.*, 430 Mass. 198, 203, 715 N.E.2d 47, 53 (1999)(affirming admission of testimony from six Chrysler minivan owners regarding incidents involving their minivans as well as NHTSA questionnaires from the owners to establish notice and defect, despite the circumstances of the plaintiff's incident not being identical to those of individuals who testified). "The differences between the other incidents and the plaintiff's [incident] could be considered by the jury in terms of weight of the evidence. *Id. at 203 (citing, Wheeler v. John Deere Co.,* 862 F.2d 1404, 1408 (10th Cir.1988)).

In *Moulton v. Rival Co.*, a one-year-old boy sustained severe, disabling burns when he was left alone in a room where a Rival Company electric potpourri pot was operating on the floor. 116 F.3d 22. The plaintiff's mother purchased the Rival potpourri pot which heated water and dried flowers or scented liquid and wax and allowed the liquid to evaporate to perfume the air. *Id.* The potpourri pot was a modified version of a Rival kitchen product, a one-quart slow cooker. *Id.* The cover of the potpourri pot could not be secured to the pot and had a hole in its center, approximately one and three-quarters inches

in diameter, to allow fragrance to escape. *Id.* The date Rival sold this particular potpourri pot was not known. Id.

"No one [knew] exactly how the accident happened." *Id.* at 24. The plaintiff's mother found her son sitting on the floor in a pool of liquid with the cover off the pot. Id. The First Circuit Court of Appeals indicated that "[it was] reasonable to conclude either that the pot tipped over, spilling the heated liquid, or that the child took the cover off. In any event, the lid came off the pot, and the hot liquid came into contact with the child's arm and hand." Id. at 24.

After the potpourri pot had been on the market for a short time, Rival began to receive reports of young children who were burned by accidental contact with the heated potpourri mixture. *Id.* Over the defendant's objection, the plaintiff put in evidence eight accidents in which young children sustained burns after coming into contact with the heated contents of a Rival potpourri pot. *Id.* at 26. After the jury found the defendant liable on a strict liability theory as well as on a negligence theory, Rival appealed, in part challenging the admission of the other similar incidents. "The defendant argue[d] that there is insufficient similarity between the earlier accidents and plaintiff's accident, because the circumstances surrounding the spills were different. For example, in one of the earlier accidents, a child knocked over the table where the potpourri pot was located; in four others, a child became entangled in the cord and pulled the pot over. Furthermore, two of the accidents involved the Model 3206, a smaller pot with no cover at all." *Id.* at 27

In affirming the lower court's decision to admit the evidence, the First Circuit Court of Appeals reasoned that evidence of prior accidents is admissible if the proponent of the

evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar. *Id.* Substantial similarity is a function of the theory of the case. *Id.* The function of the theory of the case in *Moulton* was that "the plaintiff was burned by a large quantity of hot liquid escaping from a potpourri pot without a locking lid [and the] Plaintiff sought the introduction of the evidence of the other accidents to show that the product as designed allowed the rapid escape of a significant amount of extremely hot liquid and was thus defective." *Id.* at 27. Consequently here, even when the plaintiff could not identify how the incident occurred, the First Circuit Court of Appeals held that there was no abuse of discretion in admitting eight examples of other children being burned by the defendant's product.

The case of *DiFrancesco v. Excam*, although from the Pennsylvania Superior Court, is remarkably on point regarding the admissibility of other similar instances and persuasive on this issue. There, the plaintiff sued defendants, a gun manufacturer and gun store, for the injuries he sustained after a handgun he was carrying in his sweater pocket accidentally discharged after he struck the hammer spur on a box.[5] 642 A.2d 529 (Pa. Super. 1994). The plaintiff's expert offered evidence that other guns on the market were equipped with safety features which reduced the risk of accidental discharge. Id. at 532. The DiFrancesco court defined the instrumentality at issue as a handgun with an exposed hammer and a capacity to accidentally fire when its hammer was bumped while in the discharge position. Id. The

---

[5] Notably, the jury concluded that the single-action pistol which did not have an external safety to prevent the hammer from moving forward when bumped was defectively designed. DiFrancesco at 531.

37

court held that evidence concerning other accidents may be used to prove the defective character of the instrumentality which caused plaintiff's harm. Id. at 535.

In the instant case, Plaintiff is in possession of OSI evidence establishing that P320's trigger system renders it unreasonably susceptible to being unintentionally depressed. The evidence meets the criteria for admission to prove that the P320's trigger system is defective. For the incidents which pre-date Plaintiff's April 6, 2022 incident, they are also admissible to prove that Sig Sauer was on notice of the P320's susceptibility to unintentionally discharge.

Each of the other similar incidents provided above involve the Sig Sauer P320. While they involved several different models of the P320, every single model uses the same single-action trigger system and did not include an external safety like a tabbed trigger-characteristics which combine to form the product's defective instrumentality.

Further, the incidents are each substantially similar because they involved unintentional trigger depression- many of which occurred while the P320 was either in a holster or in the process of being holstered or unholstered.  Each incident proves that the single-action trigger system combined with a lack of external safety to prevent unintentional trigger depression can cause even a highly trained and experienced user to suffer an unintentional discharge. As demonstrated in *Moulton v. Rival Co.*, and *DeFrancisco*, when determining whether an incident is "substantially similar", the analysis must be driven by the definition of the allegedly defective instrumentality in the product.

The critical question when considering the admissibility of other discharge incidents as evidence of whether the P320's single-action trigger system without a manual safety

38

renders it defective is whether the user, in the course of routine and foreseeable use, intended for their pistol to fire. The collection of incidents described above, which surely represent only a fraction of those which have occurred throughout the P320's user population, reinforces the fact that the P320 is unreasonably susceptible to the trigger being depressed. In every incident, whether the gun was fully holstered, in the process of being holstered or unholstered, or somewhere else, the P320's involved in those incidents discharged because of their exceptionally short and light trigger pulls combined with their lack of external safety. Such OSIs should be admitted.

### B. DEFENDANT SHOULD NOT BE PERMITTED TO ARGUE OR INTRODUCE EVIDENCE OF A LACK OF OTHER SIMILAR INCIDENTS OF P320 UNINTENTIONAL DISCHARGES RELATIVE TO THE NUMBER OF P320'S SOLD.

It is anticipated that Sig Sauer will seek to argue or introduce evidence of a lack of OSIs or that the number of unintended discharges Plaintiff will present is insignifint relative to the number of P320s that Defendant has sold since 2014. Plaintiff seeks to preclude such argument or evidence because the absence of OSIs which Defendant will seek to establish cannot be conclusively determined, and the true number of OSIs is certainly higher than those which have been reported or otherwise discovered. Such evidence and argument are unreliable, misleading and prejudicial.

Plaintiff learned of the OSIs identified above through a variety of means and obtained evidence of those incidents in different forms. The evidence of OSIs can be broken down into several categories:

1. Incidents disclosed by Sig Sauer, which mainly consists of internal Sig Sauer documents related to the incidents;

2.  Incidents captured on video discovered by Plaintiff;

3.  Incidents discovered by Plaintiff where the individual involved has sued Sig Sauer or intends to sue Sig Sauer;

4.  Incidents discovered by Plaintiff by subpoenaing and/or sending Right To Know requests to government agencies, but the individuals involved have not been deposed or sat for deposition; and

5.  Incidents discovered by Plaintiff where no one was injured, but the party involved prepared an affidavit or was deposed.

As a real and practical example of the limitation of Sig Sauer's accident reporting system or ability to capture the full extent of other incidents, Plaintiff's counsel learned of another similar incident while handling *Powers v. Sig Sauer, Inc.*, No. 2020-CA-1741, a similar matter in the Circuit Court for the Twelfth Judicial Circuit in and for Manatee County, Florida. Prior to Sergeant Powers's incident, the Holmes Beach Police Department experienced another unintended discharge with the P320. See Exhibit V, Deposition of William Tokajer at 13:1-18. In that incident, an officer's P320 discharged while it was in its holster without the officer pulling the trigger with his finger. Id. Sig Sauer did not disclose the incident to Plaintiff. This is just one of many examples wherein Plaintiff learned of an OSI that Sig Sauer was unaware of or did not disclose.

Sig Sauer cannot argue at trial that there have been "only these accidents" since the inception of the P320 in 2014, or present evidence about the alleged infrequency incidents because such extrapolation would be based on a limited and incomplete number, resulting from the deficiencies in Sig Sauer's reporting system. Sig Sauer's corporate designee, Chris Meyer, admitted that Sig Sauer's current reporting format came into existence in 2021:

Q. So we're looking at SIG-OAI 1860 to 1862, and this format is the one that you all typically use?

A. Correct.

Q. Do you know why there's a different one that is used, or at least was used in the incident in Connecticut in 2021 marked OAI 1853?

A. I do not.

Q. The document that we see as 1860 to 1862, is that the form that has been used for unintentional discharges since you started in customer service?

A. That's the form that we've been using since I've been a manager.

Q. And you became a manager -- would that be as a -- that was what you just got into last year, right?

A. Correct.

Deposition of Chris Meyer, at Exhibit W, 32:3-21.

Q.  Before you became a manager, was there a written type of report that outlined the types of information you needed to get for any unintended discharge call?

A.  Not for customer service.

Q. Okay. Was there any document other than the One Note document you talked about earlier, that informed the customer service reps what questions to ask, what information to get?

A. Not a specific document, no.

Deposition of Chris Meyer, at Exhibit W, 33:10-33:19.

Mr. Mayer was unable to determine whether law enforcement unintended discharges

went into the tracking system they used for other unintentional discharges:

Q. And so I'll ask a follow up again, do you know, as the corporate designee for Sig Sauer, whether the LE department has the same requirement to create an Oracle entry whenever there is a report of an incidental or unintended discharge?

A. I do not know that definitively in 2016.

Q.  And same question for the FFL inside sales team?

41

A. In 2016 I couldn't say definitively. Currently, yes, if someone made a report and had a – then it would be notated to some degree.

Deposition of Chris Meyer, at Exhibit W, 143:20-144:9.

Sig Sauer's incident tracking system is not even searchable, and as a result it is unclear whether the 55 incidents produced by Sig Sauer in discovery make up the full extent of P320 discharges in its system:

Q. Can you search Oracle by using search terms? For example, is there some way where you can search the words unintentional discharge, or unintentional alone, and come up with entries that are contained within Oracle?
A. You can search by serial number or customer information.

Q. So is the answer no? Can you search by terms? If I were to say search Oracle or the word unintentional, would you be able to search Oracle for unintentional, and come up with all the times that unintentional appears?
A. No, you would not be able to search by words like that.

Q. So fair to say unless the person retrieving the information that's been provided to me knows which Oracle accounts have unintended discharge claims, there would be no ability for him to search that information out otherwise, fair?
A. There would be no way for him to search for those word terms, but as -- as explained before, every -- every unintentional discharge would be -- would go to his attention any time it's brought to our attention.

Q. On the customer service side?
A. Correct.

Q. Do you know if that's the case on the LE side?
A. That is my understanding.

Q. Since when?
A. I'm not sure.

Q. Has that always been the case, or is it just now the case?

A. I'm not aware of when that case -- of when that was the case.

Q.  I appreciate your answer, but I don't know if it answered my question, so my question was if the person retrieving the Oracle notes on unintended discharges cannot search Oracle for key words, they would essentially have to know which accounts have the unintentional discharges within them to be able to produce it, right?

A. They would -- they would have to know which ones were produced, which were produced to them from each department.

Deposition of Chris Meyer, at Exhibit W, 220:16-222:19.

Courts should only allow a defendant to admit a lack of other similar accidents where the court can be satisfied that the defendant's reporting mechanism for cataloging other accidents is a "<u>comprehensive record of all reports of claims or problems which the [defendant] had received from any source.</u>"[6] See *Spino v. John S. Tilley Ladder Co.*, 671 A.2d 726, 737, aff'd, 548 Pa. 286, 696 A.2d 1169 (1997) (emphasis added).

As recognized in *Forrest v. Beloit Corp.*:

> The importance of the foundation requirement is underscored by the potential for unfair prejudice that may result from such evidence....First, the mere fact that a witness does not know of any prior accidents does not prove that no such accidents occurred. **Second, generalized assertions concerning an alleged absence of accidents over an extended period of time can be directly rebutted only with specific evidence of prior occurrences, but <u>such evidence may be difficult or impossible for a plaintiff to obtain in cases where the defendant has not kept records concerning the safety history of its products</u>**. Third, the absence of prior accidents may simply mean that the plaintiff was the first to be injured; there is always a first victim. Fourth, **<u>testimony concerning the absence of prior accidents "does not tell us how many</u>**

---

[6] Pennsylvania's OSI admissibility test is substantively the same as Federal law. As such, Plaintiff cites Pennsylvania caselaw on the allowance of OSI evidence and/or lack of other similar incidents.

> near-accidents, nor how many fortuitous escapes from
> injury, may have occurred." *Forrest v. Beloit Corp.*, 424
> F.3d 344, 357 (3d Cir. 2005)(citations omitted)(disallowing
> evidence of a lack of similar incidents where the defendant
> failed to maintain records concerning the safety history of its
> own products).

Thus, the court must determine the comprehensiveness and accuracy of a party's reporting

system for OSIs. "[T]he defendant must show that it would likely have known of prior

accidents had they occurred." *Id.* at 358.

Here, Defendants' accident reporting system is utterly deficient. As discussed

above, Plaintiff's counsel has uncovered more unintended discharge incidents than those

provided in discovery by Sig Sauer. The list continues to grow, and through additional

subpoenas to law enforcement departments, the numbers presented to a jury today will be

a fraction of those presented in 12 months.

In *Spino*, a product liability defendant sought to introduce evidence of a lack of OSIs

to rebut plaintiff's claim that the defective ladder at issue caused plaintiff's injuries. The

court only allowed the lack of accidents evidence after "conducting an *in camera* review

of a chronological log, maintained by [the defendant], of reported claims covering the

[defendant's] products...and satisfying itself that the log was a contemporaneous and

comprehensive record of all reports of claims or problems which the [defendant] had

received from any source." *Id*. at 737. In affirming *Spino*, the Supreme Court recognized

that the onus is on the plaintiffs to challenge the reliability of the defendant's cataloging

system for other incidents, as Plaintiff here has done ad nauseum. *Spino*, 696 A.2d at 1174.

The *Spino* plaintiffs failed to raise any issues related to the reliability of defendant's logs and accordingly had little ground to challenge its efficacy on appeal. *Id.*

In its affirmance, the Supreme Court further recognized the trial court's discretion in deciding not to admit such evidence: "...the issue here addressed defies pronouncement of a *per se* principle since it remains for the trial judge in each case, as the offer of proof is considered, to weigh all of the attendant factors in an assessment of the relevancy and probative value of the proffered evidence." *Id.* at 1174-75. The court noted several relevant instances in which evidence of lack of accidents was excluded. *See e.g., Balsley v. Raymond Corporation*, 232 Ill.App.3d 1028, 175 Ill.Dec. 493, 600 N.E.2d 424 (1992), *appeal denied*, 147 Ill.2d 625, 180 Ill.Dec. 147, 606 N.E.2d 1224 (1992)(defendant provided insufficient foundation regarding admission of lack of prior accidents since defendant's expert failed to provide testimony that the product at issue contained no variables and was used in substantially the same manner, and therefore, other machines were not used in substantially similar manner); *Klonowski v. International Armament Corporation*, 17 F.3d 992 (7th Cir.1994) (since manufacturer failed to lay the proper foundation that all of the shotguns it sold since 1980 employed a trigger mechanism substantially identical to the shotgun at issue, trial court properly refused to allow defendant's expert to testify as to the number of shotguns sold without report of injury).

Sig Sauer is unable satisfy the requisite foundational standard to allow it to offer evidence of the lack of OSIs because its reporting mechanism for documenting other incidents is **<u>not</u>** "a contemporaneous and comprehensive record of all reports of claims or problems which the [defendant] had received from any source." *Spino*, 671 A.2d at 737.

Few of the more than 50 victims represented by the undersigned firm, who have already sued Sig Sauer their injuries from unintended discharges of the P320, were contained within the "OSI" documents produced in discovery.

Because the limitation of OSIs cannot be conclusively determined, this Court must preclude any evidence, argument, or testimony regarding a limitation of OSIs relative to the number of P320 units sold because such an argument would be inadmissible as unreliable, unfairly prejudicial and of no probative value pursuant to the Federal Rules of Evidence. Sig Sauer must not be permitted to be the beneficiary of its own inability and/or unwillingness to keep track of the users who have experienced unintended discharges with the P320 – the pistol with the greatest susceptibility to unintended discharges ever sold in the United States.

## IV.  CONCLUSION

Plaintiff respectfully requests that this Honorable Court enter an Order allowing Plaintiff to admit evidence of other similar incidents involving Sig Sauer's P320, through Sig Sauers' own documents identifying similar incidents, videos of similar incidents, experts and testimony of users who experienced similar incidents, and preclude Sig Sauer from making offering argument or evidence of a lack of OSIs relative to the number of P320's sold.


Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

By: /s/ *Robert W. Zimmerman*
    ROBERT W. ZIMMERMAN (*pro hac vice*)
    RYAN D. HURD (*pro hac vice*)
    SAMUEL A. HAAZ (*pro hac vice*)
    One Liberty Place, 52nd Floor
    1650 Market Street
    Philadelphia, PA 19103
    (215) 496-8282 (Telephone)
    (215) 496-0999 (Facsimile)
    rzimmerman@smbb.com
    rhurd@smbb.com
    shaaz@smbb.com

**LAW OFFICES OF STEVEN SEMENZA**

By: /s/ *Stephen Semenza*
    Stephen Semenza
    100 Pier 4 Blvd, #1511
    Boston, MA 02210
    617-275-8191 (t)
    stephen@ssemenzalaw.com

***Attorneys for Plaintiff, Officer Ashley Catatao***

Dated: December 20, 2024

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date a true and correct copy of the enclosed document was filed and served upon all counsel of record via the electronic filing system and by e-mail.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

By: /s/ *Robert W. Zimmerman*
ROBERT W. ZIMMERMAN
(*pro hac vice*)
RYAN D. HURD (*pro hac vice*)
SAMUEL A. HAAZ (*pro hac vice*)
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 496-8282 (Telephone)
(215) 496-0999 (Facsimile)
rzimmerman@smbb.com
rhurd@smbb.com
shaaz@smbb.com

## CERTIFICATE OF CONFERRAL

Plaintiff certifies it conferred with the Defendant on December 20, 2024, via telephone in accordance with rule 7.1(a)(2) and 31.7.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

By: /s/ *Robert W. Zimmerman*
ROBERT W. ZIMMERMAN
(*pro hac vice*)
RYAN D. HURD (*pro hac vice*)
SAMUEL A. HAAZ (*pro hac vice*)
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 496-8282 (Telephone)
(215) 496-0999 (Facsimile)
rzimmerman@smbb.com
rhurd@smbb.com
shaaz@smbb.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETS**

| |
|---|
| **ASHLEY CATATAO,** |
| *Plaintiff,* |
| **v.** |
| **SIG SAUER, INC.,** |
| *Defendant.* |

**Case No. 1:22-cv-10620**

## ORDER

AND NOW, this ____ day of December 2024, upon consideration of Motion in Limine of Plaintiff, Ashley Catatao to Allow Evidence of Other Similar Incidents and Preclude Evidence of the Lack of Other Incidents and any response thereto, **IT IS HEREBY ORDERED** that the motion is **GRANTED**.

**BY THE COURT:**

_____

# EXHIBIT A

# VIGILANTE FORENSIC
## Human Factors | Ergonomics Consulting

---

**Report of:**        William J. Vigilante, Jr., PhD, CPE

**Date:**             October 10, 2023

**Case Caption:**     Ashley Catatao
                      v.
                      Sig Sauer, Inc.

**VF Case Number:**   22-055

**Prepared for:**     Robert W. Zimmerman, Esq.
                      Saltz Mongeluzzi & Bendesky
                      1650 Market Street
                      51st Floor
                      Philadelphia, PA 19103

                      Phone: (215) 575.3898
                      Email: rzimmerman@smbb.com

---

## A.   INTRODUCTION

Ashley Catatao is a sworn officer employed by the City of Somerville, MA Police Department. On the afternoon of April 6, 2022, Officer Catatao was walking to her squad car when her duty-issued Sig P320 handgun discharged while secured in her holster.  The Sig P320 discharged without the trigger being deliberately manipulated and with her hands and finger not on the trigger based upon incident video and testimony.  Officer Catatao was injured as a result of the unintentional discharge.

The Sig P320 handgun is manufactured and sold by Sig Sauer, Inc.  Sig Sauer has been made aware of many incidents of unintentional discharges of its Sig P320 pistol without manual and/or intentional manipulation of the trigger.  Sig Sauer has confirmed through deposition testimony that it has received complaints of unintended discharges of the P320 more than any other gun it has recently sold.  The Sig P320 is a striker fired pistol without an exposed hammer. Sig Sauer sells its Sig P320 without an external manual safety such as a trigger tab safety, thumb safety, and/or grip safety.  The vast majority of Sig P320 models are sold without the option to include a thumb safety, which is the only external safety offered on a small percentage of models.  External manual safeties are designed into competitor striker fired handguns (e.g., Glock, S&W M&P) as well as traditional hammer fired handguns with comparable trigger-pulls (e.g., 1911s).  *See* SIG_EXPRT_00492.  External manual safeties on striker fired handguns reduce the risk of an unintentional discharge.

The purpose of this investigation was to determine if:

- The Sig P320 has an elevated risk of unintentional discharge.
- The elevated risk of unintentional discharge was foreseeable to Sig Sauer.
- Sig Sauer should have included a manual external safety on its Sig P320.
- Sig Sauer's failure to include a manual external safety was a cause of the subject unintentional discharge.

## B.   QUALIFICATIONS

I graduated with a Doctoral of Philosophy and a Master's of Science in Ergonomics (Human Factors) Psychology and a Bachelor of Science degree in Psychology (Cognitive track).  I am also a Certified Professional Ergonomist by the Board of Certification in Professional Ergonomics (#2019).  I have more than 25 years of experience in psychological and human factors research with a focus on human-machine interaction, control-display design, product design, hazard identification and mitigation, risk perception, situational awareness, perception-reaction time, and the design and testing of warning systems.

Prior to entering the field of forensic consulting, I worked for the IBM Corporation as a Human Factors Engineer in the design and development of consumer and commercial products.  In that time frame, I led multi-disciplinary development teams in the design and testing of the user



interface, including controls and displays, for a variety of different types of products. Part of my responsibilities included identifying hazards associated with the products we were designing as well as potential sources of user error and misuse that could lead to unsafe system states. I also worked within multi-disciplinary design teams to identify and implement design and guarding solutions to protect users from the hazards associated with the foreseeable uses and misuses of the products. My responsibilities also included the design and testing of end-user information for consumer and commercial products including installation instructions and inserts, operator/user manuals, and the warnings placed on the products and within the manuals.

Throughout my professional career I have authored and participated in numerous scientific research studies and presented my work at multiple professional conferences. I am also called upon to peer review the work of other researchers for inclusion in scientific journals, professional conferences, and textbooks. I am the past Program Chair for the Human Factors and Ergonomics Society's (HFES) Product Design and Safety Technical Groups. I am currently the HFES's alternative representative on the ANSI Z535 Safety Alerting Standards committee.

I am a National Rifle Association (NRA) certified firearms instructor and Range Safety Officer with instructor ratings and experience in teaching: Basic Pistol, Basic Rifle, Personnel Protection in the Home, Personnel Protection Outside the Home, and Concealed Carry Weapon (CCW). I am an International Defensive Pistol Association (IDPA) Chief Safety Officer (CSO) and the IDPA Match Director (MD) at the Lower Providence Rod and Gun Club (LPGRC). I am also a certified Range Officer (RO) for the International Confederation of Revolve Enthusiasts (ICORE). As an NRA instructor, IDPA MD/CSO, and ICORE RO, I work with and train both members of law enforcement and the military as well as civilians in the use and safety of handguns. I continue actively participating in multiple practical shooting[1] related sports including IDPA, ICORE, the United States Practical Shooting Association (USPSA), and 3-Gun (rifle, shotgun, and pistol). I am five-gun Master level shooter in the following IDPA divisions: stock service pistol, enhanced service pistol, custom defensive pistol, concealed carry pistol, and carry optics. Additionally I continue to attend both handgun and long gun training from internationally and nationally recognized instructors.

My methods of evaluation and analysis are based on reliable scientific principles and industry standards as set forth in:

- ANSI Z690.2-2011. American National Standard: Risk Management Principles and Guidelines.
- ISO (1999 & 2007). 14121: Safety of machinery – Risk assessment – Part 1: Principles;

---

[1] Practical shooting or action shooting is typically characterized by courses of fire (COF) requiring multiple target engagements from multiple positions and/or postures and/or while moving. COF typically start with a holster handgun. Scoring is a function of time and accuracy plus potential penalties for rules violations.



- National Safety Council (2001 & 2009). Accident Prevention Manual for Business and Industry (12th and 13th Editions);
- Seiden (1984). Product Safety Engineering for Managers;
- Handbook of Warnings (2006). Edited by Michael S. Wogalter;
- Woodson, Tillman, & Tillman (1992). Human Factors Design Handbook (2nd Edition).

As prescribed within these references, the development and use of risk assessment principles has reached a stage where they are commonly accepted and practiced for the safe design and development of products. These references:

- Establish the general principles for implementing a product safety management program to address product safety at every stage of the product life cycle;
- Establish the general principles for conducting risk assessments to assess and mitigate the hazards associated with the use of a product during its expected life;
- Provide guidance on the information required to allow risk assessment to be carried out in an effort to ensure the safety of those using and exposed to a product; and
- Provide guidance on how to design and effectively communicate warning and safety instructions to alert users to the potential dangers associated with the use of products and how to avoid those hazards.

I applied these widely accepted risk assessment principles to my evaluation of the data considered in formulating my opinions in this case.

My current CV, outlining my professional experience, scientific publications and presentations, and published patents are attached to the appendix section of this report.


C.      AVAILABLE MATERIAL

- Station Report of Ofc. Priscilla Ribeiro, dated 4/6/2022
- Cataldo Atantic Ambulance Service trip report, dated 4/6/2022
- Amended Complaint and Jury Demand
- Deposition transcripts of:
    - Ashley Catatao, dated 6/06/2023
    - Christopher Meyer, dated 2/23/2022 (Slatowski matter)
    - Derek Watkins, dated 1/10/2023 (Slatowksi) and 8/29/2023 (Herman)
    - Sean Toner, dated 4/20/2022 and 1/10/2023 (Slatowski)
    - Scott Berube, dated 8/26/2022 (Slatowski)
- Discovery document production from Sig Sauer, including:
    - Expert reports of Derek Watkins and Sean Toner in other matters
- Medical records for Ashley Catatao:
    - Beth Israel Lahey Health
    - Cambridge Health Alliance, Occupational Health



- - o  MA General Hospital
- Other P320 unintended discharge incidents (OSI)
- Digital copies of:
  - o  1 surveillance video of the incident
  - o  2 inspection videos of exemplar Sig P320/M17/M18
  - o  1 inspection video of an exemplar Glock 19 handgun
  - o  5 videos of unintended discharges dated 12/5/2021 and 3/28/2022
- Exemplar P320 Compact Black Nitron, M17/M18 FCU and frame, and P320 X-Series grip
- Data collection on 8/13/2022, 8/16/2022, 8/23/2022, and 9/10/2022
- Report of Samuel Romirowsky, PhD, dated 6/7/2023
- Report of Arvind von Keudell, MD
- My inspection of the subject Sig Sauer P320 and holster on 9/29/2023


**D.    FIREARM DESCRIPTION**

Officer Ashley Catatao was injured when her service pistol unintentionally discharged.  Officer Catatao was issued and using a full size Sig P320 handgun (serial no. 58A79892) manufactured and sold by Sig Sauer, Inc.  The Sig P320 is a polymer frame, striker fired handgun.

The Sig P320 was designed as a modular handgun with a serialized fire control unit (FCU) that could be installed into different size and style polymer grips.  Different size slides can then be used with compatible grips.  The advantages of the P320 modular design include:

- The ability to select a grip size (large, medium, small) that best fits the user's hands.
- The ability to purchase a single FCU and use it on different handgun configurations (e.g., a compact handgun for concealed carry or a full size handgun for competition).

The Sig P320 FCU contains the trigger assembly for the handgun as well as the take down lever (the lever is engaged to remove the slide from the frame) and slide stop (the slide stop holds the slide open when the magazine runs empty).  The P320 grip is a single piece of polymer that encompasses the grip and frame.  The frame has cut outs for the trigger, take down lever, and slide stop.  The FCU is inserted into the top of the frame.

A handgun frame is traditionally the central component of the firearm.  The action parts of the firearm (e.g., fire control parts such as the trigger) are integrated into the frame.  As such, the frame of the traditional style semiautomatic handguns is serialized.

The Sig P320 is a striker fired handgun that functions like a single-action (SA) handgun.  Sig Sauer's corporate designee denied it was a SA handgun until Sig Sauer's retain expert (i.e., Derrick Watkins) admitted that it was (ST, 4/20/22: 119; ST, 1/10/23: 10,11).  Sig Sauer's marketing materials also falsely referred to the P320 as a double action pistol (e.g., see Sig Sauer 2015 product catalog).  The Sig P320 uses a spring tensioned striker enclosed in the slide



rather than an external hammer.  When the cartridge is chambered the striker is fully tensioned and charged for a shot. (SIG-EXPRT_00533 and SIG_EXPRT_00493).  Pulling the trigger causes the striker to move forward until it makes contact with the primer at the back end of the cartridge, causing a spark which ignites the powder (propellant) creating the gases that propel the bullet (projectile) through and out of the barrel.

In a traditional hammer fired double action (DA) handgun (e.g., Sig P220, P226, and P229[2]), pulling the trigger both cocks and releases the hammer which falls on the firing pin which is then pushed forward into the primer.  In a single action (SA) handgun (e.g., a 1911), pulling the trigger releases the hammer which is pre-cocked.  DA triggers tend to be heavier and require a longer trigger pull compared to SA triggers to allow for both cocking and then releasing the hammer.

The striker fired, polymer handgun design was popularized by Glock in the 1980s (ST, 47).  The Glock's popularity set off competitors including the popular Military and Police (M&P) line from Smith and Wesson (S&W) in 2005 (ST, 47).  Springfield Armory also introduced its XD line of striker fire, polymer pistols in 2001[3].  Sig introduced the Sig P320 line of striker fired, polymer frame handguns in 2014 (ST, 30).  Figure 1 is a photograph of an exemplar Sig P320 full size handgun copied from Sig Sauer's January 19, 2018 website[4].  Figure 2 is a photograph of the subject Sig Sauer P320 taken during my inspection of the firearm on September 29, 2023.



Figure 1. Exemplar Sig P320.

---

[2] Sig P220, P226, and P229 are technically DA/SA handguns where after the first round is fired, the slide re-cocks the hammer and subsequent triggers pulls are SA.  Sig's DA/SA also have a manual thumb safety which allows the handgun to be carried "cocked and locked" allowing the first trigger pull to be SA.

[3] Accessed 9/14/2022: https://www.springfield-armory.com/xd-series-handguns/xd-handguns

[4] https://web.archive.org/web/20180119194105/https://www.sigsauer.com/





Figure 2.  Catatao's issued Sig P320.

## E.    INCIDENT DESCRIPTION

Ashley Catatao began working for the City of Somerville, Massachusetts, Police Department (SPD) as a sworn officer in 2010 (AC, 34).  When she started working for the SPD, Officer Catatao was issued a Sig 229, 40 caliber, DAK[5] handgun (AC, 34).  In the 2016/2017 time frame, the SPD transitioned to Sig P320 chambered in 9mm (AC, 45).  Officer Catatao was issued a new Sig P320 at that time (AC, 45,46).

Officer Catatao was also issued a Safariland Level 3 retention holster (model No. 7360) to carry the Sig P320 on her duty belt (AC, 42,69).  A Safariland Level 3 retention holster has a hood that covers the back of the Sig P320's slide when properly holstered (AC, 41).  To draw the firearm from the holster, the hood must be pushed forward with the strong hand thumb before depressing an additional thumb lever to release the handgun from the holster (AC, 41).  Officer Catatao is right handed and carried the holstered Sig P320 on her duty belt off of her right hip (AC, 95).  Figure 3 is a photograph of the Catatao's issued Sig P320 holstered in her issued Safariland Level 3 retention holster taken during my September 29, 2023 inspection.  The holster's hood behind the back of the firearm's slide is in its retention possession in Figure 3.

---

[5] Double Action Kellerman (DAK) is a Sig Sauer proprietary double action trigger design.  The P229 DAK has an external hammer that is cocked and released by the DAK trigger system.





Figure 3. Catatao's issued P320 in her issued holster.

At approximately 3:53 PM on April 6, 2022, Officer Catatao was walking out to her squad car in the back parking lot of the SPD station (AC, 98).  Officer Catatao was carrying her duty bag and wearing her police issued (ballistic) vest and jacket (AC, 97).  Officer Catatao had her duty-issued Sig P320 fully holstered on her duty belt (AC, 93).  As Officer Catatao approached her squad car, the holstered Sig P320 discharged without her hands being on or near the holstered firearm.

With respect to the incident, Officer Catatao testified (AC, 98,99):

> So roll call ended.  Got up.  We walked out of the roll call room.  And then we walked through the fire department parking lot to get to the back lot.

> So I went to my personal car, opened the truck.  I grabbed my duty bag, put it on my right shoulder, grabbed my lunch bag, which I put on my left shoulder.  And then I grabbed my water bottle and my blender bottle.  And I was carrying those in my left hand and started walking down the lot.

> Turned -- like, made the corner around the vehicles to get to the cruiser I wanted to take, which was the same cruiser I had taken the night before, so I knew exactly where I had parked it.



So as I'm walking, I'm holding my strap, holding my stuff.  And as I get to the front of the cruiser, I start to -- I knew I slipped my hand down the strap because I was going to take my bag off to put it down on the ground to get my cruiser keys.

And as I did that motion, I heard a loud bang, and I felt a searing pain in my thigh and immediately I thought someone shot me.

A surveillance camera located in the SPD back parking lot captured the incident on video.  The surveillance video depicts what Officer Catatao described:

- Officer Catatao is walking to toward a squad car.
- She is carrying a bag strapped over her right shoulder.
- Her right hand appears to be holding on to the front of the bag's shoulder strap.
- She is also carrying a smaller bag (lunch cooler) by its strap in her left hand.
- The holstered Sig P320 discharges without her hands touching the holster.

Ashley Catatao suffered injury to her right leg as a result of the unintentional discharge.  Sig Sauer was aware of multiple incidents involving the unintentional discharge of its Sig P320 handgun prior to Ashley Catatao' injury.


## F.    ANALYSIS

### F.1.  Was the elevated risk of unintended discharge of the P320 foreseeable to Sig Sauer?

**Standard of care**

A standard of care existed at the time that Sig Sauer designed, manufactured, and sold the subject Sig P320 handgun that required it to identify, evaluate, and address the safety related risks associated with the uses and foreseeable misuses of its products (1-9).  The National Safety Council[6] (NSC) publishes its *Accident Prevention Manual for Business and Industry: Administration and Program* (*APM*) as a reference and guidebook for implementing safety programs to prevent injuries (1).  Within the *APM*, the NSC notes (1):

> Products should be reasonably safe during (1) normal use; (2) normal service, maintenance, and adjustment; (3) foreseeable uses for which the product is not intended; and (4) reasonably foreseeable misuses.  Courts have stated that a

---

[6] The NSC is a nonprofit federally chartered organization founded in 1913 and is the premier source of safety and health information in the U.S.  The mission of the NSC is to educate and influence society to adopt safety, health, and environmental policies, practices, and procedures that prevent and mitigate human suffering and economic losses arising from preventable causes.



VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting

manufacturing company is responsible for ensuring that its products are safe for any reasonably foreseeable use or misuse to which the customer might put them.

Sanders and McCormick note the need to identify and mitigate the hazards associated with the reasonably foreseeable uses of products in their textbook *Human Factors in Engineering and Design* (7th Ed.) (2):

> Products must be designed for reasonably foreseeable use, not solely intended use. This requires that an analysis be made to determine the types of uses and misuses a product could be subjected to; …

In their textbook *Human Factors Design Handbook* (2nd Ed.), Woodson et al. also provide the following design consideration for product designers and manufacturers (3):

> Analyze the potentially hazardous interactions between the naïve user and the various product elements to make sure that every means possible of precluding misuse has been designed into the product, that misuse has been warned against, and/or that the potential severity of the hazard has been minimized.

Product safety does not happen by happenstance. Product safety requires the initiation, implementation, and evaluation of a product safety program that is integrated into each part of a product's life cycle from initial design through end of life (1-9). For example, the NSC notes in its *APM* (1):

> Preventing harm from incidents with products involves a design and marketing approach that will consistently emphasize safety. The safety of a product should be "built from the ground up" by careful attention to design. …

And

> Although no one can completely prevent product misuse by customers, the producer or manufacturer can do a great deal to minimize or defend against product liability claims. The principal way to achieve this goal is to sell only reasonably safe products and, when necessary, to include instructions for their proper use and to warn about known misuse and foreseeable misuse. The key to achieving a reasonably safe and reliable product and, at the same time, reducing a company's product liability exposure is to incorporate product safety into all aspects of the design, manufacturing, and marketing of the product. This is done by establishing and auditing an effective product safety management (PSM) program.

With respect to product safety, Matthew Seiden notes in his *textbook Product Safety Engineering for Managers*: *A Practical Handbook and Guide* (4):

> There is only one body of knowledge in the safety engineering field and the fundamental rules of practice for safe design are elegantly simple and universally applicable. They have been developed by cost-conscious, socially responsible safety



practitioners and businesspeople over many years.  The rules have endured because they make business sense-that is, they are profitable to industry as well as profitable and beneficial to society.

In a sense, safety engineering is the conscience of the engineering profession, if not of industry.  It is an essentially humanistic and humane science that is as much qualitative, descriptive, and practical as it is quantitative, mathematical, or theoretical.  Safety engineering deals with the identification, evaluation, and control of hazards and risks.  On one level or another, all products, workplaces, job tasks, systems, and environments are amenable to disciplined analysis by safety engineering methodology.

Risk assessment is a key process toward protecting users from the hazards associated with the use and reasonably foreseeable misuses of a product (1-9).  For example, ISO 14121-1999, *Safety of machinery – principles of risk assessment*, was published to establish (7):

… general principles for the procedure known as risk assessment, by which the knowledge and experience of the design, use, incidents, accidents and harm related to machinery is brought together in order to assess the risks during all phases of the life of the machinery [see 3.11 a) of ISO/TR 12100-1:1992].

This International Standard gives guidance on the information required to allow risk assessment to be carried out.  Procedures are described for identifying hazards and estimating and evaluating risk.  The purpose of the International Standard is to provide advice for decisions to be made on the safety of machinery and the type of documentation required to verify the risk assessment carried out.

Risk assessment is a series of logical steps conducted to systematically identify, assess, and mitigate the hazards associated with the use of a product (1,7-9).  ANSI/ASSE Z690.3-2011, *Risk Assessment Techniques,* notes that (8):

Risk assessment is the overall process of risk identification, risk analysis and risk evaluation.  Risks can be assessed at an organizational level, at a departmental level, for projects, individual activities or specific risks.  Different tools and techniques may be appropriate in different contexts.

Risk assessment provides an understanding of risks, their causes, consequences and their probabilities.

And

Risk assessment provides decision-makers and responsible parties with an improved understanding of risks that could affect achievement of objectives, and the adequacy and effectiveness of controls already in place.  This provides a basis for decisions about the most appropriate approach to be used to treat the risks. The output of risk assessment is an input to the decision making processes of the organization.



Risk assessment is the overall process of risk identification, risk analysis and risk evaluation.

Similarly, ISO 14121-2007 notes (9):

Risk assessment is a series of logical steps to enable, in a systematic way, the examination of the hazards associated with machinery.  Risk assessment is followed, whenever necessary, by risk reduction as described in clause 5 of ISO/TR 12100-1:1992.  When this process is repeated it gives the iterative process for eliminating hazards as far as possible and for implementing safety measures.

Risk assessment includes (see Figure 1):
- risk analysis
  1) determination of the limits of the machinery (see clause 5);
  2) hazard identification (see clause 6);
  3) risk estimation (see clause 7);
- risk evaluation (see clause 8)

Risk analysis provides the information required for the risk evaluation, which in turn allows judgements to be made on the safety of machinery (see 3.4 of ISO/TR 12100-1:1992).

Risk assessment starts with hazard identification (1-9).  Hazard analysis is a formal, documented process that identifies the hazards associated with the foreseeable uses and misuses of a product (1-9).  As noted in Annex B of ISO 14121-1999 and ANSI Z690.3, there are multiple techniques used to identify and assess potential product hazards including inductive methods such as reviewing the design, operation, and use of the product and at each step formulating and answering questions related to the effects of a component failure or error in the operation of the product (e.g., a failure mode and effects analysis (FMEA)) (1,7,8).  Deductive approaches, such as fault trees, are also available that consider a potential hazard (e.g., unintentional discharge) and determine how it can occur (e.g., dropping firearm, unintentional contact with trigger) (1,7,9).   Risks are also identified through field data, customer complaints, and/or incident reports (1,7,9).

Risk analysis should also consider the human factors that can affect the safety of the product and take into account the knowledge, beliefs, and characteristics of the product's user population (1-9).   Human factors that should be identified for the use of a product include (1-9):

- Who will use the product, where it will be used, and under what circumstances (e.g., holster while carrying other objects);
- How the user will use the product (e.g., line of duty);
- The environments the product will be used in (e.g., low light, inclement weather, confined space);



- The user's knowledge and understanding of how the product works and the hazards or risks associated with its use and misuse (e.g., potential for firearm to discharge if dropped or jarred);
- The errors and mistakes users can foreseeably commit during product use (e.g., unintentional contact with trigger); and
- The warnings needed to use the product safely.

A proper risk assessment allows a product designer and manufacturer to identify (1-9):

- Unsafe product designs (e.g., relatively heavy trigger mass with a relatively short trigger pull distance, lack of disconnector);
- Unsafe conditions and situational hazards associated with the product (e.g., dropped, jarred);
- Exposure and physical factors that contribute to injury and damage (e.g., struck by a person or object);
- Hazards that have been overlooked in the original design of a product (e.g., increased risk of unintentional discharge); and
- Inadequate preparation and review of end user warnings.

Sig Sauer was responsible for designing, manufacturing and selling the subject Sig P320 handgun. As the product designer, manufacturer and seller, Sig Sauer, just like its competitors who chose to use external safeties, had a responsibility to assess the performance of its products both during development and while in the field and identify the safety risks associated with the use and misuses of its product.

**Unintended discharge**

Sean Toner is a Sig Sauer design engineer and team lead for the Sig P320 platform (ST, 43). Sean Toner was assigned to the Sig P320 project in the 2012/2013 time frame (ST, 45). Sean Toner testified that "unintentional discharge" is defined as the "a weapon firing without a purposeful trigger pull" (ST, 8). Sean Toner testified that unintended discharges can occur as a result of:

- The unintended activation of the trigger by the user (ST, 8,10,11).
- The interaction between a foreign object, other than the finger, and the trigger that causes the gun to fire (ST, 9-11).
- The gun falling and landing in certain orientations (ST, 10,11).

The unintentional discharge of a firearm is a known risk associated with the use of handguns. However, the risk of unintentional discharge is a function of the design of the firearm and its intended use. Sig Sauer intended its Sig P320 for use by law enforcement, defensive civilian purposes, and competition. Sig Sauer also intended its Sig P320 to be used by both novice and



experienced handgun users.  Sig Sauer's January 21, 2014 website for the introduction of its Sig P320 states[7]:

> Introducing the P320, a polymer-framed service pistol designed from the ground up with the input of law enforcement officers.  The result is the most operator-safety focused striker duty pistol on the market today.

And

> Whatever the requirement, patrol duty, competition, time at the shooting range, or concealed carry, the P320 brings SIG SAUER legendary reliability, durability, and quality to the polymer-framed, striker-fired duty pistol.

Additionally, as of at least the 2017/2018 time frame, Sig Sauer stated in its Sig P320 marketing material[8]:

> SAFETY WITHOUT COMPROMISE
> We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

Given the types of uses and users in conjunction with the design of the firearm, there was sufficient information for Sig Sauer to identify the increased risk of unintentional discharge associated with the use and misuse of its Sig P320 handgun.

**Trigger design**

When it introduced its Sig P320 handgun, Sig Sauer marketed its trigger design as a benefit over other striker fired pistols.  With regard to trigger performance, Sig Sauer's P320 January 21, 2014 website notes:

> With a partially pretensioned striker, the P320 has a short, crisp trigger pull with a quick, pronounced reset right out-of-the-box.

Consistent with its website, Sig Sauer's P320: Performance Built (Episode 2) video published on February 3, 2016 (available on YouTube[9]), Robby Johnson, Sig Sauer VP of defense strategies group, stated that the first thing people tell him when he brings his P320 out to the range is (ST, 151):

---

[7] https://web.archive.org/web/20140121011820/http://www.sigsauer.com:80/CatalogProductList/pistols-p320.aspx

[8] https://web.archive.org/web/20170121195650/https://www.sigsauer.com/edu/meet-the-p320/
https://web.archive.org/web/20180127083946/https://www.sigsauer.com/edu/meet-the-p320/

[9] https://youtu.be/9Es6HFkgmVA



"Oh you got a match trigger or you had trigger work done."

Sig Sauer discovery documents note that the trigger pull weight for the Sig P320 is 7 lbs. +/- 1 lbs. with a trigger travel distance of 4.2 mm (0.17") from rest to sear release and a total travel distance of 6.9 mm (0.27") from rest to stop (SIG-SLATOWSKI 01058). My inspection of the subject Sig P320 indicated a trigger pull weight of approximately 6 lbs. I also found that the subject Sig P320 has a trigger pre-travel distance of approximately 8 mm (0.3 inches) from rest to break (sear release). In comparison, a Glock 17 Gen 5 (full size 9mm handgun) has a published average trigger pull weight of 5.8 lb. (26 N)[10]. An exemplar Generation 5, Glock 19 I inspected also has an approximately 11.5 mm (0.45 inches) trigger pre-travel distance.

The Sig P320 trigger is significantly more sensitive than competitor striker-fired guns because of the substantially reduced movement required to fire the gun, and as a result is more prone and susceptible to unintentional discharge than other striker-fired guns. Consistent with the Sig P320's increased susceptibly to unintended discharge associated with its trigger design, Sean Toner, Sig Sauer's corporate designee, testified that he would be unwilling to have a holstered Sig P320 on his person with a round in the chamber (ST, 85-87). Sean Toner's testimony is inconsistent with the NRA's recommended practice for concealed carry and the department policies of many police departments across the country (10).

Scott Berube, Sig Sauer strategic account manager for federal agencies, testified that when a round is chambered in the Sig P320 (i.e., the slide is racked) that striker is pre-tensioned and held in place until the trigger is pulled (SB, 32,33,57,58). Scott Berube also testified that "the trigger essentially is not tensioning the [striker] spring, it is at some point just releasing the spring" (SB, 58). Consistent with Berube's description, Sean Toner provides the following description of the Sig P320 in his August 2, 2021 report in the Kyle Guay (SIG-EXPERT_00530 to 0533):

- The firing cycle of the P320 model firearm begins with a rearward pull of the trigger.
- As the trigger is moved rearward, it imparts a forward motion on the trigger-bar.
- As the trigger-bar moves forward as a result of the trigger being pressed to the rear, the trigger-bar comes into contact with the sear - the component of the firearm which holds the striker pin in a charged position when the slide is in the forward position. The forward motion of the trigger-bar also acts to rotate the safety lever upward, disengaging the striker safety lock (further described below).
- The continued forward trigger-bar motion acts to rotate the sear downward, thereby releasing the striker pin, allowing it to move forward under force of the striker spring.
- As the striker pin moves forward, it impacts the primer of a chambered cartridge, discharging the firearm.
- The projectile leaving the barrel as a result of this discharge creates a rearward impulse on the slide assembly of the firearm, retracting the slide to the rear, which ejects the fired cartridge.

---

[10] Accessed 9/14/2022: https://us.glock.com/en/pistols/g17-gen5-fs-us



- Once reaching its rearward limit, the slide is returned to its forward position under force of the recoil spring. This forward motion causes the sear and striker pin to re-engage, leaving the striker [sic] pin charged for the next shot, and loads another round into the chamber of the firearm. The firearm is now ready to be fired again.

Given the design of the Sig P320 action, it acts similar to the cocking action of a 1911 hammer. As such, the Sig P320 trigger design is similar to a SA trigger where the trigger's function is simply to release the hammer. The combination of the SA type action in conjunction with the relatively short trigger pull helps the Sig P320 have a "short, crisp trigger pull" and "match trigger" compared to other striker fired guns. However, it also means the trigger is significantly more sensitive than competitor double action only (DOA) striker fire guns in that less movement of the trigger is needed to fire the gun. For example, Sig Sauer's expert Derek Watkins described the Sig P320 as "employing a short displacement trigger system" in his August 2, 2021 report in the Kyle Guay matter (SIG-EXPERT_00491). Derek Watkins also noted that (SIG-EXPERT_00492):

> The short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market. Up to the 1980s, hammer fired pistols dominated the handgun market, with the most prolific model being the Colt 1911 and its clones. The hammer fired 1911 employs a short displacement trigger and was the US Army's standard issue sidearm from 1911 to 1985.

However, contrary to competitor striker, fired polymer handguns, Sig Sauer did not incorporate a trigger tab safety (e.g., Glock), hinged trigger safety (e.g., S&W), or grip safety (Springfield XD) into the design of its standard Sig P320. Sig Sauer's January 21, 2014 website notes that it offered a "tabbed safety trigger for specific law enforcement clients." However, Sean Toner testified that, to his knowledge, Sig Sauer has never produced a Sig P320 with a tab trigger safety (ST, 28,29).

Sean Toner testified that Glock and S&W (i.e., M&P handguns) are Sig Sauer's two main competitors in the striker fired, polymer handgun market (ST, 41). Glock designed its striker fired, polymer handguns with a tabbed trigger safety. The tabbed trigger is an external manual safety intended to reduce the risk of unintentional discharges. Glock describes its tab trigger safety as follows[11]:

> The trigger safety is a lever incorporated into the trigger. When the trigger safety is in the forward position it blocks the trigger from moving rearward. Both the trigger safety and the trigger must be fully depressed at the same time to fire the pistol. If the trigger safety is not depressed, the trigger will not move rearward and allow the pistol to fire. The trigger safety is designed to protect against firing if the pistol is dropped or if the trigger is subjected to lateral pressure.

---

[11]https://web.archive.org/web/20121117022225/http://us.glock.com:80/confidence/university#



Consistent with Glock's website, Sean Toner testified that the purpose of the tab trigger safety is to ensure that when the trigger is pulled, it is being pulled flush or center rather from the very tip or from the side (ST, 213). Consistent with Sean Toner's testimony, Glock's February 8, 2012 "Safe Action System" website notes[12]:

> GLOCK's revolutionary SAFE ACTION® System provides a consistent trigger pull from the first to the last round. The three automatic independently-operating mechanical safeties are built into the fire control system of the pistol.

And

> The trigger safety is the first safety in the firing sequence. It's incorporated into the trigger in the form of a lever and when it is engaged blocks the trigger from moving rearward. To fire the pistol, the trigger safety and the trigger itself must be deliberately depressed at the same time. If the trigger safety is not depressed, the trigger will not move rearwards and allow the pistol to fire.

> The trigger safety is designed to prevent the pistol from firing if it's dropped or if the trigger is subjected to any pressure that isn't a direct firing pull.

A tab trigger safety requires the tab located at the center of the trigger face to be depressed before the trigger itself can be actuated. Applying forces to the sides or tip of the trigger will not result in the trigger actuating. Conversely, on the Sig P320, the trigger can be actuated with pressure applied to one side, both sides, and/or very tip of the trigger lever.

The tab safety is also located at the center of the trigger. On a Glock the tab itself is approximately 1 mm (0.04 inches) wide, while the trigger is approximately 11 mm (0.42 inches) wide and the trigger guard is approximately 16 mm (0.62 inches) wide at the bottom. In comparison the trigger on the subject P320 is approximately 9.6 mm (0.38 inches) wide and the trigger guard is approximately 15 mm (0.59 inches) along the bottom. As such, the trigger finger or other object has to reach farther into the Glock trigger guard to engage the tab and allow the trigger to be pulled and the round discharged. The lack of a tab trigger safety in conjunction with the short trigger pull and relatively light trigger weight results in the Sig P320 being at an increased risk of unintentional discharge when pressured is applied off-center or to the side(s) of the trigger even when holstered in a holster such as the Safariland level 3 holster issued to Catanao.

S&W also designed its M&P handguns with a hinged trigger that functions as an external manual safety to prevent the risk of unintentional discharge when dropped. The hinged trigger also reduces the risk of side forces actuating the trigger. The S&W hinged trigger design requires the user to first actuate the lower part of the trigger (i.e., push it straight back) before the trigger can move the trigger-bar.

---

[12] https://web.archive.org/web/20180824105736/https://us.glock.com/learn/glock-pistols/safe-action-system



Compared to striker fired pistols, 1911 style pistols are known for having short, crisp and light triggers. A typical trigger pull weight on a quality 1911 pistol is approximately 5 lbs. My personal 1911 firearms have trigger pull weights between four and six pounds with trigger travel distance to release of the hammer more closely related to the Sig P320 than a Glock.

Similar to the Sig P320, 1911 triggers are SA only. As such, the trigger only releases the cocked hammer reducing the force and distance needed to pull the trigger. In comparison, a traditional DA trigger is heavier and with a longer pull to both cock and then release the hammer or a tradition striker fire design that completes the tensioning of and then release the striker.

The short 1911 SA trigger pull comes with an increased risk of unintentional discharge. Relatively less force and movement of the trigger, whether intentional or unintentional, results in the firing of the gun compared to a stock Glock or S&W M&P. To alleviate the risk, 1911s are designed and produced with a manual thumb safety and a grip safety. When engaged the manual thumb safety prevents the trigger from being pulled. Additionally, the grip safety must be engaged for the trigger to actuate. As such, to discharge a 1911 the user must disengage the manual thumb safety and engage the grip safety. The two external manual safeties allow users to confidently carry a 1911 "cocked and locked."

Sean Toner testified that a manual thumb safety when properly engaged serves multiple purposes:

1. It essentially locks out the gun to prevent the trigger from moving backwards and in turn makes it so that the handgun should not discharge (ST, 37,170).
2. It prevents unintentional discharges due to the user inadvertently pulling the trigger (ST, 201-203).
3. It makes it "highly unlikely" that the handgun would inadvertently discharge when holstering or drawing (ST, 97,98).
4. It would lockout the trigger to prevent it from moving backwards in the event of a drop or jarring (ST, 37,38).
5. It makes it improbable that the handgun would accidently discharge (ST, 169).

Since its introduction, Sig Sauer's has marketed the fact that the Sig P320 does not need an external safety. For example, Sig Sauer's January 21, 2014 P320 website notes[13]:

> Featuring the SIG SAUER internal safety system, the P320 has no external safety or decocking lever to snag or hang up on the draw.

Sig Sauer's website does not explain why or how a well-designed external safety will get snagged or hung up on the draw. Drawing from concealment for over 10 years with numerous 1911s, 2011s, CZ 75s with manual thumb safeties, as well as multiple striker fired polymer

---

[13]Ibid.

**VIGILANTE FORENSIC**
Human Factors | Ergonomics Consulting

frame guns with manual thumb safeties (including M&P 9, M&P Shield, Sig P320, and Sig P365) using various garments from light weight shirts (e.g., t-shirts, button down and polo shirts) to heavier garments (e.g., vests, sweatshirts, jackets), I cannot recall a single instance where my draw has been hampered, caught, or snagged by the manual thumb safety.  Nor can I recall any situation in over 10 years of competitive shooting where I have seen or heard of a manual thumb safety snagging or hanging up on a shooter's cover garment while drawing[14].  Sig Sauer has not produced any information or testing that I am aware of that discusses or analyzes this issue.  On the contrary, Sig Sauer provides a manual thumb safety on the Sig P320 variant it sells to the military (e.g., M17/M18 platform) as well as on its civilian versions of its military service pistol, the P320-M17 and P320-M18.  Sig Sauer also offered a manual thumb safety on its full size Sig P320 and currently offers a manual thumb safety on its Nitron Compact Sig P320 (model No. 320C-9-BSS-MS-MA).

Given the lack of an external manual safety, such as a tab trigger safety, in conjunction with its relatively crisp and short trigger, it was reasonably foreseeable to Sig Sauer that without an external manual safety the Sig P320 was at an increased risk of an unintentional discharge compared to other striker fired handguns.

**Intended use and user population**

As noted above, Sig Sauer markets its Sig P320 for use in law enforcement, civilian defense, and competition.  In all three usages scenarios the Sig P320 is holstered and/or stored (e.g., in a purse) with a loaded chamber.  For example, Officer Ashley Catatao testified that they were trained to carry their service pistol with a loaded chamber (i.e., "one in the chamber") and that is what they did (AC, 65,66).  All three usage scenarios also result in dynamic movement and/or action that increases the risk of an inadvertent discharge due to inadvertent contact with the trigger, jarring, or dropping of the firearm compared to a traditional bench rest position and/or non-loaded storage of the firearm.  The intended use and user population of the Sig P320 in conjunction with its relatively short and crisp trigger pull and lack of a manual external safety significantly increases the risk of an unintentional discharge.

<u>Objects contacting trigger</u>

Firearm safety guidelines and rules have been established to help reduce the risk of objects inadvertently coming into contact with and/or applying force to the trigger.  The NRA was founded in 1871 and is the premier organization in the US for civilian firearms training, education, and marksmanship.  The NRA offers multiple training courses related to handgun use and safety.  The NRA's CCW course not only recommends using a holster when carrying a firearm but also a holster that covers the handgun's trigger (10).  For example, the NRA's CCW comment for its "Concealed Carry Requirements" PowerPoint (PPT) slide notes (10):

---

[14] Most IDPA stages require the use of a concealment garment (e.g., shooting vest) that covers the holstered handgun.



While other elements of holster design are discussed at length later in this lesson, to ensure safety all pistol carry devices should cover the pistol's trigger while it is in the holster. This helps prevent the shooter from inadvertently pulling the trigger during presentation or any other object (such as the fabric of the shirt or blouse) from contacting and pulling the trigger**.**

Consistent with the above guidance, the NRA also recommends that holsters are used when carrying a handgun in a purse or bag that do not have a dedicated slot or pocket to retain the firearm (10). For pocket carry, it is recommend that no other objects be carried in the same pocket.

NRA instruction for drawing and re-holstering also reflect the potential for objects to catch the trigger or get stuck in the trigger guard leading to an unintended discharge. For example, the NRA's CCW comments for its "Drawing From a Holster - Continued Steps" PPT slide notes (10):

Emphasize that care must be taken not to entangle the gun in the fabric of a shirt, blouse or jacket lining while it is being holstered. Such entanglement could interfere with the fit of the gun in the holster and prevent a proper draw. Additionally, fabric that wraps around the trigger as the gun is being holstered could cause an unintentional discharge.

The potential for unintentional discharge of a firearm is also acknowledged in most action shooting sports. Consistent with the NRA guidelines, IDPA equipment rules for holsters requires (11):

8.5.1.5 Must completely cover the trigger guard and prevent activation of the trigger while holstered. (2022 rulebook)

And

8.5.C. Must prevent activation of the trigger while holstered. (2017 rulebook).

Similarly, the 2020 and 2022 ICORE Rule Book notes (12):

ICORE requires a holster that will securely hold the firearm. The holster must cover the trigger guard area. …

USPSA has the same requirement regarding holsters (13):

5.2.7    Competitors must not be permitted to commence a course of fire wearing:

5.2.7.4 A holster which does not completely prevent access to, or activation of, the trigger while holstered.



Firearm manufacturers echo the NRA rules regarding firearm safety. For example, S&W notes on its October 15, 2016 "Product Safety Information" website[15]:

> NEVER PLACE YOUR FINGER INSIDE THE TRIGGER GUARD OR ON THE TRIGGER UNLESS YOU INTEND TO FIRE.
> You should also take care to ensure that other objects do not touch the trigger.

The goal of the above guidelines and rules is to help ensure the trigger is not accessed and the handgun is not discharged until the user is ready and purposefully actuates the trigger.

Sig Sauer is aware of situations where its Sig P320s have experienced unintentional discharges as a result of impact, jarring, and/or striking while holstered or stored. For example, the subject Sig P320 discharged while holstered as Officer Ashley Catatao was walking out to her squad car while carrying her duty bag. Video of another incident depicts a holstered Sig P320 discharging while the user is placing bags in a vehicle with his hands. A second video depicts a Sig P320 discharging when the purse it was in was knocked against a chair. At the time, the Sig P320 was inside of a dedicated zipped pocket within the purse. A third video depicts a Sig P320 discharging while a police officer is exiting his vehicle. In this video, the officer repeatedly states that the gun was fully holstered at the time of the discharge. A forth video depicts a Sig P320 discharging while a federal agent is holstering the pistol, with his finger clearly outside of the trigger well of the holster. A fifth video again shows a holstered Sig P320 discharging when the officer exits the vehicle holding a radio in his strong hand. In a recent incident in Connecticut, a sixth video shows an officer's holstered P320 discharge while attempting to restrain a suspect[16]. The video depicts the officer's P320 fully retained in a Level 3 holster with a hood similar to Officer Catatao's holster. The P320 discharges while the officer is bending over and holding onto the suspects legs with both hands. In December 2020, Bridge City, TX Police Depart Officer Brittany Hilton claims she experienced a similar incident where her holstered Sig P320 service pistol discharged while stored in her purse[17].

Sig Sauer markets its P320 to law enforcement agencies across the country. Law enforcement agencies typically require their duty officers to carry their department issued Sig P320 in a Level 3 retention holster[18]. A Level 3 or "enhanced" retention holster requires the use of two retention devices to secure the handgun in the holster. For example, the Safariland Level 3 holster issued to Catatao requires the user to push the hood forward (Self Locking System-SLS

---

[15] https://web.archive.org/web/20161015065312/http://www.smith-wesson.com/safety/product-safety-information

[16] Accessed 8/4/2023: https://www.police1.com/police-products/firearms/articles/conn-police-department-to-replace-all-officers-handguns-due-to-safety-concerns-shVuKA0s4AIcvJze/

[17] Accessed 9/14/2022: https://abc7news.com/sig-sauer-lawsuit-p320-pistol-brittney-hilton-accidental-discharge/10974219/

[18] Safariland is generally credited for defining different "Levels" of retention based on the number of methods used to secure the firearm in the holster.



VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting

rotating hood retention device) to access the grip and then push another button to release the Automatic Locking System (ALS) locking the gun in the holster.

Level 3 retention holsters typically rely on mechanisms to secure the handgun in the holster. Whereas, typically retention holsters rely solely on friction to secure the handgun in the holster. As such, a properly fitted retention holster tends to be more form fitting to the handgun's trigger guard and frame leaving little to no access to the trigger area of the holster. However, Level 3 retention holsters, such as the popular Safariland models marketed to and used by law enforcement departments across the country, do not utilize a similar form fitting design. Rather Level 3 retention holsters typically utilize a rigid shell that often leaves small gaps around the back of the trigger guard area, the top of the grip, and the back of the slide.

Figures 4 and 5 are photographs of the subject Sig P320 secured in the duty holster that Officer Catatao was using at the time of the subject incident.  Figures 6 and 7 are a photographs of an exemplar Sig P320 compact in a Safariland 7385-7TS Level 3 duty holster.  Figure 8 is a photograph from Sig Sauer's 2018 product catalog depicting its Sig P320 based US Army issued M17 in a similar type of duty holster.  Figures 4 to 8 depict the small gaps that often exists around the back of the trigger guard, top of the grip, and back of the slide when using Level 3 retention holsters.



Figure 4.  Subject Sig P320 in Catatao's duty holster.





Figure 5.  Subject Sig P320 in Catatao's duty holster.





Figure 6.  Exemplar Sig P320 compact in a Safariland Level 3 duty holster.

Figure 7.  Exemplar Sig P320 compact in a Safariland Level 3 duty holster.





Figure 8. Sig Sauer product catalog.

The small gaps that often exist in Level 3 duty holsters present the possibility of a foreign object getting into and/or around the trigger area of the secured firearm. As noted above, the design of the Sig P320 trigger allows activation of the trigger with pressure applied to the sides and/or very tip of the trigger. Whereas, on a Glock pressure has to be applied straight back onto the tab trigger safety located at the center of the trigger face to actuate the trigger reducing the risk that a foreign object inserted into the holster can and/or will result in an inadvertent discharge.

The risk of unintended discharge associated with an object inadvertently and/or unknowingly contacting the trigger, even when securely holstered, was reasonably foreseeable to Sig Sauer. Given its intended use and user population, the increased risk of an object inadvertently contacting the trigger of a Sig P320, even when securely holstered, was reasonably foreseeable to Sig Sauer.

<u>Finger inadvertently on trigger</u>

The 2009 *NRA Guide to The Basics of Pistol Shooting* notes (14):

> Unintentional discharges can be caused when the trigger of a loaded gun is inadvertently pressed by a finger left in the trigger guard instead of being positioned straight along the side of the gun's frame.

To help prevent unintentional discharges, the NRA provides the following fundamental rule for safe gun handling in its pistol shooting safety classes (10,14):

> Always keep your finger off the trigger until ready to shoot.



The potential for unintentional discharge of a firearm is also acknowledged in the rules for most action shooting sports. The above rules and guidelines are in place to help prevent the unintentional manipulation of the trigger in an effort to reduce the risk of an unintentional discharge.

The risk of unintended discharge associated with a user's finger inadvertently and/or unknowingly contacting the trigger was reasonably foreseeable to Sig Sauer. Given its intended use and user population, the increased risk of a user's finger inadvertently contacting the trigger of a Sig P320 was reasonably foreseeable to Sig Sauer.

Dropped firearm

As the name implies, handguns are intended to be handled by the user. The handling of the firearm introduces the risk that it can be dropped. The chances of a drop increases for users drawing the firearm, holstering the firearm, and/or moving with the firearm compared to bench rest or traditional stationary bullseye shooting.

With respect to the potential to drop the firearm while drawing from a holster, the NRA's CCW comments for its "Drawing From a Holster – Grip-Chest" PPT slide notes (10):

> Obtaining the proper firm grip on the pistol is critical for two reasons. First, the initial grip you obtain is usually difficult to adjust during the draw. Second, obtaining a firm grip is essential to prevent dropping the gun or otherwise losing control of it during the draw.

The NRA CCW PPT also notes that when using a handgun in self-defense one of the commands that should be yelled at an attacker to control the encounter is "Drop Your Weapon!" (10).

The potential for users to drop their handgun while drawing, moving, and re-holstering is also reflected in the IDPA, ICORE, and USPSA rules. The dropped firearm rules are in place because inevitably users drawing, holstering, and/or moving with a handgun are at an increased risk of dropping it. I have personally had to disqualify multiple shooters for dropping a handgun during a match over the years.

Firearm manufacturers are keenly aware of the potential for users to drop their handguns. In the 1980s Colt introduced its series 80 1911 design which included a firing pin safety (16). The firing pin safety is a plunger that is pushed up and out of the way when the trigger is pulled completely to the rear allowing the firing pin to move forward. The firing pin safety is intended to prevent the risk of unintentional discharge if the handgun is dropped and is a common feature on most modern 1911s[19].

---

[19] Some competition model 1911s do not have a firing pin safety.



Glock designed its "Safe Action System" to prevent unintentional discharges in the event of a dropped gun.  For example, Glock's February 8, 2012 "Safe Action System" website notes[20]:

> GLOCK's revolutionary SAFE ACTION® System provides a consistent trigger pull from the first to the last round. The three automatic independently-operating mechanical safeties are built into the fire control system of the pistol.
>
> This safe, simple, and fast system allows the user to concentrate fully on shooting without having any additional actions to disengage and reengage safeties. This means it is safe if it's dropped, and additionally it functions at temperatures from -40° to 122° Fahrenheit.

And

> The trigger safety is the first safety in the firing sequence.  It's incorporated into the trigger in the form of a lever and when it is engaged blocks the trigger from moving rearward.  To fire the pistol, the trigger safety and the trigger itself must be deliberately depressed at the same time.  If the trigger safety is not depressed, the trigger will not move rearwards and allow the pistol to fire.
>
> The trigger safety is designed to prevent the pistol from firing if it's dropped or if the trigger is subjected to any pressure that isn't a direct firing pull.

And

> The second safety, the firing pin safety, mechanically blocks the firing pin from moving forward in the ready-to-fire condition. As the trigger is pulled rearward, the trigger-bar pushes the firing pin safety up and frees the firing pin channel. If you decide not to fire and release the trigger, the firing pin safety automatically reengages.

And

> Drop Safety
> The final safety involves the trigger-bar, which rests on the safety ramp within the trigger mechanism housing. The trigger-bar engages the rear portion of the firing pin and prevents the firing pin from moving forward. As the trigger is pulled rearward the trigger-bar lowers down the safety ramp and allows the release of the firing pin. After firing, the trigger-bar moves upward and re-engages the firing pin. As the trigger is released, all safeties automatically reengage.

Sig Sauer has also been aware of the risk of an unintended discharge should a Sig P320 be dropped.  As of at least the fall of 2017, Sig Sauer instituted a voluntary upgrade program to address the risk of unintentional discharge if the Sig P320 was dropped.  Sig Sauer's September 21, 2017 "P320 Voluntary Upgrade Program" website notes[21]:

---

[20] https://web.archive.org/web/20180824105736/https://us.glock.com/learn/glock-pistols/safe-action-system
[21] https://web.archive.org/web/20170921000605/https://www.sigsauer.com/support/p320-voluntary-upgrade/



**Why is this upgrade happening?**
Through additional testing above and beyond standard American National Standards Institute (ANSI)/Sporting Arms & Ammunition Institute (SAAMI), National Institute of Justice (NIJ), Department of Justice (DOJ), Massachusetts, California, and other global military and law enforcement protocols, we have confirmed that usually after multiple drops, at certain angles and conditions, a potential discharge of the firearm may result when dropped. Although it is a rare occurrence, with very specific conditions, SIG SAUER is offering an upgrade to all of its current P320 owners.

Sig Sauer's voluntary upgrade program website also provides the following information regarding the changes it made to the Sig P320 to reduce the risk of an unintentional discharge when dropped[22]:

**What is the P320 Voluntary Upgrade Program?**
SIG SAUER is offering a voluntary program for P320 pistols. This will include an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector.

And

**What is different about the updated assembly?**
The new design has a physically lighter trigger, sear, and striker assembly with the addition of a mechanical disconnector.

With regard to the drop fire issue related to the Sig P320, Christopher Meyer, Sig Sauer customer service manager, testified that (CM, 22,75,76):

There is an instance for drop fire, why we did the voluntary upgrade program, where if you dropped it in a specific way, that the trigger would pull based on its -- on its own inertia.

Given the increased risk of dropping a handgun when dynamically handling it, especially when drawing, user are instructed to let the gun fall to the ground rather than attempt to grab it out of the air. The instruction is given to prevent the user from inadvertently contacting and/or actuating the trigger as they attempt to grab the loose gun. The instruction is also a reflection of the modern design of handguns that incorporate safeties to prevent the gun from firing without the actuation of the trigger (e.g., Glock's Safe Action System, 1911 firing pin safeties). Sig Sauer was aware of the risk of unintentional discharge associated with a dropping a Sig P320. Given its intended use and user population, the increased risk of dropping a Sig P320 when holstering, drawing, and/or moving with a Sig P320 was also reasonably foreseeable to Sig Sauer.

---

[22] Ibid.


VIGILANTE FORENSIC
Human Factors | Ergonomics Consulting

Case 1:22-cv-10670-PBS   Document 82-2   Filed 03/28/24   Page 80 of 439

Sig Sauer knowingly falsely advertised that its Sig P320 will not fire unless the user wants it to despite being aware of the risk of unintentional discharges. As noted above, Sig Sauer's marketing for its Sig P320 line of pistols stated[23]:

> SAFETY WITHOUT COMPROMISE
> We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

Contrary to its marketing, Sig Sauer's Owner's Manual for the Sig P320 notes (SIG_SLATOWSKI-00698):

**ABUSIVE HANDLING**

All SIG SAUER firearms incorporate effective mechanical safeties. However, like any mechanical device, exposure to abusive conditions may have a negative effect on these safety mechanisms and cause them to fail to work as designed. Do not subject your SIG SAUER firearm to any type of abusive handling. This includes the firearm being dropped, impact to the firearm, or the firearm being struck by another object. Make sure you always maintain control of your firearm at all times. If your firearm does suffer an abusive event, as previously described, do not attempt to use the firearm. Keep the firearm pointed in a safe direction, unload and clear the firearm immediately, and have it inspected by a certified SIG SAUER armorer or gunsmith prior to using the firearm.

What Sig Sauer describes as "abusive conditions" are all real world experiences for handguns intended for law enforcement, concealed carry, and competition use including being dropped, hitting the gun against an object, being impacted by another object, and/or the potential to lose control of the firearm.

Given the lack of an external manual safety, such as a tab trigger safety, in conjunction with its trigger design and its intended use and user population, it was reasonably foreseeable to Sig Sauer that the Sig P320 was at an increased risk of an unintentional discharge even when securely holstered.

**F.2. Should unintentional discharge have been ranked relatively high in a proper risk assessment of the Sig P320?**

Risk assessment does not stop at hazard identification (1,7-9). Proper risk assessment also includes evaluating and ranking risk (1,7-9). Risk estimation is based on the severity of the consequences, exposure, and the probably of an adverse event occurring (1,7-9). Hazards

---

[23] https://web.archive.org/web/20170121195650/https://www.sigsauer.com/edu/meet-the-p320/



ranked higher in the risk evaluation should receive higher priority and greater resources to properly address them (1,7-9).

With regard to the risk associated with unintentional discharge of a Sig P320, the consequences can be catastrophic with loss of life and/or permanent injury. Exposure is related to the number of users as well as the number of use times where an unintentional discharge of a handgun can occur. Other non-users in the vicinity of the handgun can also be at risk.

Christopher Meyer testified that Sig Sauer has sold over two million P320s (CM, 89). As noted above, Sig Sauer intended and marketed the Sig P320 for use by law enforcement, civilian self-defense, and competition. Given the number of Sig P320s in the market and their intended use, the potential exposure to the risk of unintended discharge is high.

Probability is affected by the nature of the hazard and how it occurs as well as the difficulty, complexity, and stressfulness associated with its uses (e.g., law enforcement action, self-defense, competition) (1). As noted above, there are multiple ways in which unintended discharge of a Sig P320 can occur: inadvertent trigger placement, object contacting the trigger, external forces due to jarring or contact, and/or dropping the pistol. Sig Sauer intended and marketed the Sig P320 for dynamic and stressful environments that increase the likelihood of error. Additionally Sig Sauer designed a trigger system that was at increased risk of unintended discharge compared to competitor striker fired handgun due to its short, crisp trigger pull. Given the nature of the hazard, its intended uses, and the design of the trigger system, there is an increased risk of unintentional discharge associated with the use of Sig P320.

Given the severity of the consequences, the high exposure rate, and the relatively high probability of occurrence, the risk of unintentional discharge of the Sig P320 should have been ranked high in its risk assessment. Given a relatively high risk estimation, Sig Sauer should have taken pro-active and positive steps to control the risk of unintentional discharge associated with its Sig P320 handgun.

**F.3. Would it have been reasonable for Sig Sauer to have included a manual external safety on its Sig P320?**

**Design Safety Hierarchy**

An unintentional discharge of a firearm increases the risk of serious injury or death to both the user and/or bystanders. Sig Sauer knew or should have known of the increased injury risk associated with unintentional discharges of its Sig P320 handgun.

Once a hazard is identified, the product designer and manufacturer has the responsibility to address it by using one of the means defined in the widely recognized and utilized design safety hierarchy (1-7,9):



1. Eliminate the hazard through design;
2. Provide safety feature to control or guard the hazard at its source;
3. Provide adequate warnings regarding the hazards associated with the use and reasonable foreseeable misuse of the product.
4. Provide training on the proper and safe operation of the product.

The design safety hierarchy dictates that if the hazard can be reasonably designed-out or eliminated from the product, the manufacturer has the responsibility to do so and not rely upon a lower step (1-7,9). Similarly, if the hazard cannot be eliminated through design but can be controlled through guarding (e.g., manual external safeties), warnings and/or training should not be relied upon as the sole hazard mitigation strategy (1-7,9).

The safety hierarchy is predicated on the reliability of the control mechanism and its effect on either the hazard and/or exposure (1-7,9). For example, if a hazard is eliminated by the product's design there is no danger. If a safeguard is relied upon to prevent exposure to the hazard (e.g., a tab trigger and/or manual thumb safety) the danger is reduced. Both hazard elimination and safeguarding places the emphasis of safety control on the design and/or safeguard and eliminates or reduces reliance on the operator.

Product warnings, instructions, and training should only be used as a means of mitigating hazards that cannot be eliminated by design or mitigated through the use of safeguards (1-7,9). For example, in their introductory chapter to the textbook *Warnings and Risk Communication*, Laughery and Hammond recognize the appropriate utilization of warnings in the scheme of product safety (5):

> First, warnings are a means of shifting or assigning safety responsibility to the people in the system, the product user, the worker, etc. in situations where hazards cannot be designed out or adequately guarded.

When design features or safeguards are provided to address a hazard but do not completely eliminate it or require user interaction, warnings, instructions, and/or training should be used to supplement the safeguarding and/or design feature. In these instances the warnings, instructions, and/or training are used to inform the user how to properly use the safeguard and/or design feature, the hazard the safeguard or design feature was intended to address, and the potential consequences of failing to use the safeguard or design feature or attempting to defeat it.

**Manual Safety**

ISO 14121-2: 2007, *Safety of Machinery – Risk Assessment*, provides the following examples of safeguarding devices used to reduce the risk of an adverse event (e.g., fire) occurring (9):



When risk is reduced with the use of safeguards such as those listed under c), d) and e) below, there is little, if any, impact on the severity of harm. The greatest impact is on the occurrence of a hazardous event, with little impact on exposure:

  d)  devices associated with safety-related functions of the control system of the machine (e.g. enabling device, limited movement control device, hold-to-run control device);

An external manual safety on a handgun is a safeguarding device that is used to limit the movement of the trigger (i.e., the control). For example, the tab trigger safety on a Glock prevents the trigger from being pulled rearward. To pull a Glock trigger the tab trigger safety has to be deliberately depressed at the same time. As noted above, Glock's tab trigger safety is designed to prevent unintentional discharge if dropped or "subjected to any pressure that isn't a direct firing pull."[24] Contrary to the design of the tab trigger safety, the Sig P320 can discharge as a result of indirect pressure applied to the sides and/or tip of the trigger. Similarly, a manual thumb safety prevents the trigger from being pull while engaged reducing the risk of unintentional discharge (ST, 37,38,97,98,169,170,201-203).

External manual safeties (e.g., tab trigger safety) are safety devices used to reduce the risk of unintentional discharge associated with the use of striker fired handguns such as the Sig P320. Risk reduction is through the reduced probability of and exposure to an unintended discharge occurring with the use of an external manual safety.

Safety devices (e.g., tab trigger safety, manual thumb safety) are safeguards that should be designed into a product as standard features (1-7,9). Safety devices are not optional and should not be left to the discretion of a customer to determine if the device is needed or worth the extra cost (1-7,9). Also, safety cannot be delegated to the user of the product but should be designed into the product (1-7,9). In his textbook, "Product Safety for Managers," Matthew Seiden provides product designers and manufacturers "Eight Rules of Practice for Safe Design" (4). Seiden's seventh principle states that safety should be built into a product at the design stage (4). Seiden explains in his textbook (4):

  It [safety] should not be delegated to some downstream owner or user in the product life cycle, such as the ultimate consumer. It is assumed that the original equipment manufacturer is in the best and earliest position to incorporate the most functional, durable, economical, and efficient safeguards. Delegating safety to the customer or consumer will frequently result in makeshift, cumbersome, expensive, and utility-impairing safeguards that cause headaches and hazards assuming that, in fact, the customer or consumer actually recognizes the hazard and is in a position, or of a mind, to modify or retrofit the product.

---

[24] https://web.archive.org/web/20180824105736/https://us.glock.com/learn/glock-pistols/safe-action-system



With respect to safety features, Seiden explains (4):

> There is, again, the derivative issue concerning availability of safety features or superior safeties as options or accessories.  Or, they may be offered as standard features of higher-priced or "deluxe" models in the product line.  This design and marketing philosophy or strategy is unsatisfactory and, itself, engenders accidents.  Either a product is safe or unsafe "as sold."

and

> The designer-manufacturer-marketer cannot reasonably delegate responsibility for safety-in-use to the customer or user with the deceptive argument that the unsafe or less safe model is cheaper and, therefore, represents a legitimate and reasonable alternative buying decision.  We cannot delegate safety into a product.

> In short, safety is not merely a luxury but a bona fide, essential ingredient of any product.  From the safety engineering viewpoint, the reasonably safe product will prove to be more economical on an evaluated basis over the long run.  On balance, all parties benefit through the design, production, marketing, and utilization of the safer product.

Seiden's basic tenants of prudent product design and manufacturing are reflected in the NSC's recommendations for the design and establishment of a company's Product Safety Management (PSM) Program (1).  For example, the NSC notes that a PSM program includes a formal and systematic review and evaluation of the product design to ensure all identified safety issues have been addressed in the design of the product (1).

The use of an external manual safety (e.g., a tab trigger safety, manual thumb safety) is a prudent and reasonable method to safeguard users from the risk associated with the unintentional discharge of the Sig P320.

**Functionality**

The use of a tab trigger on a striker fired pistol does not significantly affect the utility of the handgun.  Glock is the leader in striker fired pistol and it has used a tab trigger safety since its introduction in the 1980s.  Glocks are sold to law enforcement and militaries around the world.  Glocks continue to be one if not the most popular handguns for civilian use at my local gun club.

Glocks were the top firearm used during the 2019 IDPA World Championship at 27% (17).  At the 2020 USPSA Nationals, Glock was the third most popular pistol (14%) used behind CZ and Tangfolios/EAA[25] (45% and 15%, respectively).  The preferred CZ model used in USPSA is the Shadow 2 which has ambidextrous manual thumb safeties but is typically run with the hammer down in Production class.  With the hammer down, the CZ Shadow 2 has a significantly longer trigger pull than the Sig P320.  Tangfolios/EAA are very similar to CZs.

---

[25] Accessed 9/14/2022: https://s3.uspsa.io/media/Survey_Results.pdf



Case 1:22-cv-10620-PBS    Document 132-2    Filed 03/20/24    Page 85 of 439

22-055: Ashley Catatao                                               Page 33 of 39

Multiple other striker fired polymer handgun manufacturers also us a tab trigger safety. Springfield Armory uses a tab trigger safety in its XD and Hellcat line of handguns. Walther Arms uses a tab trigger safety in its PDP, Q4, PPQ, PPS, and Q5 match line of handguns. Ruger also uses a tab trigger safety in its Security-9, EC9, Max-9, and 5.7 line of handguns. Canik uses a tab trigger safety in all of its handgun lines. Taurus USA also uses a tag trigger safety in all of its striker fired, center fired handguns. S&W also moved to a tab trigger safety in its M&P Shield Plus and M2 Metal Series handguns. Scott Berube testified that he is not aware of any other striker fired gun sold in America that does not come either standard or with the option of no external safety (SB, 64).

Some of the best action pistol shooters in the world use handguns with tab trigger safeties. For example, Nils Jonasson won the 2022 USPSA Carry Optics National as well as the 2022 IDPA National Championship using a Canik Arms SFx Rival handgun with a tab trigger safety[26]. Bob Vogel is an IPSC (International Practical Shooting Confederation) World Champion, two time IDPA World Champion, and IDPA and USPSA National multiyear champion in production class[27]. Bob Vogel uses a Glock with tab trigger safety. I have personally competed in IDPA and USPSA shooting a handgun with a tab trigger safety. The common use of handguns with trigger tab safety in conjunction with my own experience using such a trigger confirm the fact that a properly designed tab trigger safety integrated into the design of the Sig P320 would not affect the utility of the handgun.

Sean Toner testified that Sig Sauer started developing a tab trigger safety for the Sig P320 (ST, 28,29). Sig Sauer's 2014 website notes that it can provide a tab trigger safety version of the Sig P320 (ST, 31)[28]. Sean Toner also testified that they could develop a tab trigger safety for their Sig P320 (ST, 34,39). Given Sean Toner's testimony in conjunction with the prolific use of tab trigger safeties on competitor striker fired polymer handguns there were no cost or technology constraints preventing Sig Sauer from integrating a tab trigger safety into the design of its Sig P320 line of handguns. Indeed, Sean Toner testified that he personally did not feel comfortable keeping a P320 sans tab trigger safety holstered with a round in its chamber. As noted above, Sean Toner's testimony is inconsistent with the recommendations for concealed carry and policies of law enforcement departments across the country which is carrying the firearm with a round chambered.

Manual thumb safeties are also common on defensive and competition style handguns. As noted above, 1911s have a manual thumb safety. Sig Sauer currently sells models of its P2220, P226, and P229 Legion models with a thumb safety. As of 2017/2018, Sig also sold versions of

---

[26] Accessed 9/14/2022: https://www.ssusa.org/content/nils-jonasson-back-to-back-uspsa-championship-titles/

[27] Accessed 9/14/2022: http://www.vogeldynamics.com/accomplishments/

[28] https://web.archive.org/web/20140121011820/http://www.sigsauer.com:80/CatalogProductList/pistols-p320.aspx



Sig P220 with a manual thumb safety[29].  Sig Sauer offers its P320 Nitron Compact with an optional manual thumb safety.  As noted above, Sig Sauer offered its full size P320 with an option manual thumb safety in 2014.  Sig Sauer also designed and developed the M17/M18 handgun system for the U.S. Military.  The P320-M17 and P320-M18 are the civilian versions of those handguns.  Both the military and civilian versions of the M17 and M18 come standard with ambidextrous manual thumb safeties.  Sean Toner testified that a manual thumb safety engaged will prevent unintentional discharges (ST, 37,38,97,98,169,170,201-203).

I had the opportunity to collect data on the time it took for 17 shooters with various skill levels to present and fire one round using a Sig P320 with and without a manual thumb safety.  A P320 Nitron Compact slide and an X-compact frame was used for the non-safety condition.  A Sig P320-M17 frame with the same Nitron Compact slide was used for the manual thumb safety condition.

An IDPA standard target with an 8" down zero circle mounted with a 5' shoulder height was used for all participants.  Participants were positioned seven yards from the target.  15 of the participants started at the rotate position of the NRA's drawing from concealment technique.  Using an electronic timer, at the beep signal participants joined, extended the pistol, acquired their sights on the target and fired.  The other two participants started at low ready.  For these participants, the beep signal required them to raise the gun, sight the target and fire.  Each participant fired both pistols five times after having the opportunity to take five dry fire practices.  The order of use between the Sig frame with (M17 frame) and without the manual thumb safety (X-compact frame) was varied between participants.

Most of the participants used handguns for competition and concealed carry that did not have a manual safety.  The results from the raw time found an average difference of approximately 0.14 seconds between shots fired without the thumb safety versus with the thumb safety.  However, participants had on average more points down (outside the down zero) when using the X-compact frame versus the M17 frame (1.29 vs. 1.24, respectively).  As a result, the total of raw time plus points down lessened the difference between the non-safety, X-Compact frame vs. the manual thumb safety M17 frame first shots to approximately 0.09 seconds.  Consistent with the US Military's testing and acceptable of the M17/M18 platform and the 100 plus year history of the 1911 pistol, the data collected indicate a manual thumb safety integrated into the design of the Sig P320 does not affect the utility of the handgun.

Given the increased risk of unintentional discharge associated with the design of the Sig P320 trigger, its intended use and user population, along with its own knowledge of the frequency of

---

[29]

https://web.archive.org/web/20170126105346/https://www.sigsauer.com/products/firearms/pistols/p220/
and
https://web.archive.org/web/20180330112810/https://www.sigsauer.com/products/firearms/pistols/p220/



unintended discharges that were not comparatively known to users and customers, Sig Sauer should have integrated an external manual safety (e.g., a tab trigger safety and/or manual thumb safety) into the design of the handgun.

Had Sig Sauer integrated an external manual safety into the design of the Sig P320 it would have significantly reduced the risk of an unintentional discharge without adversely affecting the utility of the handgun.   The time, money and effort to integrate an external manual safety into the Sig P320 was not cost prohibited.

The subject unintentional discharge occurred while the subject Sig P320 was securely holstered and Officer Catatao's finger and hand were off of the handgun and trigger.  There is no evidence that any object was inserted into or caught up in Catatao's holster.  Had Sig Sauer integrated a trigger tab safety into the design of the subject Sig P320 any jarring the pistol experienced would not have engaged the tab trigger safety therefore prevented the trigger from being actuated.  For example, Sean Toner testified that the Sig P320 will not discharge unless the trigger is pulled or activated (ST, 6).

Having inspected the subject Sig P320 and Ashley Catatao's duty holster and taken measurements, though Plaintiff may not be able to say definitively what actuated the trigger, the space available for an object to interfere with the trigger while the gun is seated in the holster is limited.  As such, the addition of a tabbed trigger safety would make it highly unlikely that a foreign object invading the holster gaps could cause a discharge by working its way into the area in front of the trigger face depressing the tab and allowing the actuation of the trigger.

While Defendant's expert Derek Watkins has suggested in other cases that an object in the holster or inside the trigger guard could activate the trigger when holstering the firearm (DW, 36,37), one would expect the trigger actuation to occur at the time the Sig P320 was being inserted into the holster.  In these instances the object, in contact with the trigger, does not move or gets stuck while the firearm continues to be pushed down, thereby inadvertently activing the trigger.

However, in Ms. Catatao's case her gun was fully holstered and she was on her way from roll call to her police cruiser.  As such, it is unlikely that a foreign object was inserted into the holster at the time the Sig P320 was secured in the holster.  Furthermore, due to Ms. Catatao's incident occurring on police headquarters grounds the response was immediate and attended by multiple officers.  There was no evidence that any "strap" or other object was caught within the trigger guard to support Mr. Watkin's theory.  As such, if the trigger was actuated by a foreign object it was more likely due to the foreign object being inserted in the small gap between the side wall of the holster and the side of the trigger and exerting pressure on the side of the trigger not the face after the Sig P320 was holstered.  If the inadvertent discharge was a result of the actuation of the trigger by a foreign object, it is more likely than not that a tabbed trigger safety would have prevented this incident.



Sig Sauer's failure to integrate an external manual safety into the design of the Sig P320 was improper and unreasonably dangerous, rendered the firearm defective and unreasonably dangerous, and was most likely a cause of the subject unintentional discharge and Ashley Catatao's injury.

Had Sig Sauer integrated a tab trigger safety into the design of the Sig P320, the subject unintentional discharge would most likely not have occurred and Ashley Catatao would not have been injured.

Sig Sauer made design choices that no other striker fired gun manufacturer has made, combining a single action pistol design without an external safety to reduce and/or eliminate the risk of unintentional discharges.


## G.    FINDINGS

Within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. Sig Sauer had a responsibility to assess the performance of its products both during development and while in the field and identify the safety risks associated with the use and misuses of its product.
2. Given the types of uses and users in conjunction with the design of the firearm, there was sufficient information for Sig Sauer to identify the increased risk of unintentional discharge associated with the use and misuse of its Sig P320 handgun.
3. Given the lack of an external manual safety, such as a tab trigger safety, in conjunction with its relatively crisp and short trigger, it was reasonably foreseeable to Sig Sauer that without an external manual safety the Sig P320 was at an increased risk of an unintentional discharge compared to other striker fired handguns.
4. Sig Sauer was aware of the risk of unintentional discharge associated with a dropping a Sig P320.
5. Sig Sauer knowingly falsely advertised that its Sig P320 will not fire unless the user wants it to despite being aware of the risk of unintentional discharges.
6. Given the lack of an external manual safety, such as a tab trigger safety, in conjunction with its trigger design and its intended use and user population, it was reasonably foreseeable to Sig Sauer that the Sig P320 was at an increased risk of an unintentional discharge even when securely holstered.
7. Given the severity of the consequences, the high exposure rate, and the relatively high probability of occurrence, the risk of unintentional discharge of the Sig P320 should have been ranked high in its risk assessment.
8. Given a relatively high risk estimation, Sig Sauer should have taken pro-active and positive steps to control the risk of unintentional discharge associated with its Sig P320 handgun.



9. External manual safeties (e.g., tab trigger safety, manual thumb safeties) are safety devices used to reduce the risk of unintentional discharge associated with the use of striker fired handguns such as the Sig P320.

10. The use of an external manual safety (e.g., a tab trigger safety, manual thumb safety) is a prudent and reasonable method to safe guard users from the risk associated with the unintentional discharge of the Sig P320.

11. Given the increased risk of unintentional discharge associated with the design of the Sig P320 trigger, its intended use and user population, along with its own knowledge of the frequency of unintended discharges that were not comparatively known to users and customers, Sig Sauer should have integrated an external manual safety (e.g., a tab trigger safety and/or manual thumb safety) into the design of the handgun.

12. Had Sig Sauer integrated an external manual safety into the design of the Sig P320 it would have significantly reduced the risk of an unintentional discharge without adversely affecting the utility of the handgun.   The time, money and effort to integrate an external manual safety into the Sig P320 was not cost prohibited.

13. If the inadvertent discharge was a result of the actuation of the trigger by a foreign object, it is more likely than not that a tabbed trigger safety would have prevented this incident.

14. Sig Sauer's failure to integrate an external manual safety into the design of the Sig P320 was improper and unreasonably dangerous, rendered the firearm defective and unreasonably dangerous, and was a cause of the subject unintentional discharge and Ashley Catatao's injury.

15. Had Sig Sauer integrated a tab trigger safety into the design of the Sig P320, the subject unintentional discharge would most likely not have occurred and Ashley Catatao would not have been injured.

16. Sig Sauer made design choices that no other striker fired gun manufacturer has made, combining a single action pistol design without an external safety to reduce and/or eliminate the risk of unintentional discharges.

_____

William J. Vigilante Jr., Ph.D.



## H.    REFERENCES

1. NSC (2009). Accident Prevention Manual for Business and Industry: Programs and Administration (13th Edition). Pgs. 153-159, 608-619.
2. Sanders and McCormick (1993). Human Factors in Engineering and Design (7th Edition). Pgs. 680-687,691.
3. Woodson, Tillman, & Tillman (1992).  Human Factors Design Handbook.  Pgs. 352,383,384,711,714-718,789.
4. Seiden (1984). Product Safety Engineering for Managers: A Practical Handbook and Guide. Pgs. 2-11,15-24,92-95,104-106,151,152.
5. Laughery and Hammond (1999).  Chapter 1: Overview. Warnings and Risk Communication. Pgs. 3-9.
6. Wogalter (2006). Chapter 1: Purposes and Scope of Warnings. Handbook of Warnings. Pg. 3-9.
7. ISO (1999). 14121: Safety of machinery – principles of risk assessment.
8. ANSI (2011).  ANSI/ASSE Z690.3: Risk Assessment Techniques.
9. ISO (2007). ISO 14121-2: Safety of Machinery – Risk Assessment.
10. NRA (2019).  NRA CCW, Instructor PowerPoint Presentation.
11. IDPA (2017 & 2022).  Competition and Equipment Rules of the International Defensive Pistol Association, Inc. (ver 2017.3).
12. ICORE (2020 & 2022).  International Confederation of Revolver Enthusiasts (ICORE) Rule Book.
13. USPSA (2021).  USPSA Competition Rules.
14. NRA (2009).  NRA Guide to the Basics of Pistol Shooting. Pgs.3,4.
15. Wickens and Hollands (2000).  Engineering Psychology and Human Performance. Pgs. 10-14,69-71,245-247,252,253,260,261,493,494.
16. Cambpell (2011). Colt History: A Look Back at the 1911.  American Rifleman. March.
17. IDPA (2020). 2019 IDPA Equipment Survey. Tactical Journal. Spring. Pg. 24.



**I.      APPENDIX**

EXHIBIT B

# JAMES TERTIN

## Director of Research and Development, Magnum Research

October 11, 2023

Mr. Robert W. Zimmerman
Saltz Mongeluzzi & Bendesky, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103

Re: Catatao v. Sig Sauer, Inc.

Dear Mr. Zimmerman:

Pursuant to your request, I have reviewed and analyzed the materials you have provided to me in connection with the above-captioned matter. In addition, I reviewed the subject incident video of Officer Catatao's P320 firing without her hand on the weapon, and received measurements from William Vigilante who performed an inspection and measurements of the subject gun and holster. Further, I examined exemplar Sig Sauer P320s in my review of the Sig Sauer P320 litigation that involves this and other cases. Finally, I reviewed several competitor pistols, including the Glock 19, as well as the literature for 39 base models of commercially available pistols, with a full list being provided below in Section I of this report. These 39 base models and their clones represent over 300 pistols sold in the United States. As a result of my analysis, I have formulated certain opinions, which are memorialized within the body of this report. I reserve the right to modify or append my opinions as additional discovery becomes available.

All review and analysis, as well as the formulations and hypothesis and conclusions, have been performed in accordance with generally accepted gunsmithing practices and using scientifically sound methodologies. All opinions contained herein are held to a reasonable degree of engineering and gunsmithing certainty.

## I.    MATERIALS REVIEWED:

Plaintiff's Complaint
Defendant's Answer
Defendant's Responses to Plaintiff's Interrogatories

1

Defendant's Responses to Plaintiff's Requests for Production of Documents
Defendant's Document Production
Depositions in the above captioned matter including: Ashley Catatao & Lieutenant Vivolo
Expert Report of Derek Watkins in Guay v. Sig Sauer,
Expert Report of Sean Toner in Guay v. Sig Sauer
Expert Report of William Vigilante in this matter, Catatao v. Sig Sauer
Video of Ashley Catatao's Incident
Photos and measurements from William Vigilante's Inspection of Subject Firearm
Video of February 2, 2016 Incident in Roscommon, MI
Video of August, 2021 Incident in Port Huron, MI
Video of December 5, 2021 Incident in St. Rose, LA
Video of February 7, 2022 Incident in Honesdale, PA
Videos of March 28, 2022 Incident in Houston, TX
Video of 2022 Incident in Somerville, MA
Video of 2023 Incident in Montville, CT
Sporting Arms and Ammunition Manufacturers Institute Literature
Product Literature for the Following Pistols:

- Sig Sauer: P320, M17, P210 Target, M11-A1, P229, P928, P220, P322, P365XL, P238, P226, 1911, and CZ75.
- Glock: 17, 19, 20, 21, 22, 34, 26, 43
- Smith and Wesson: M&P Shield Plus, M&P 2.0, Shield EZ, Bodyguard, SD, Rimfire, CSX
- Taurus: Gx4, TH, Spectrum, G2, G3XL
- Kahr: All models
- Springfield Armory: Hellcat, XD
- Kimber: Micro 9
- CZUB: CZ75
- Magnum Research: MR9

## II.    SCOPE OF REPORT:

The purpose of this report is to analyze the adequacy and sufficiency of the safety mechanisms on Ashley Catatao's Full Size SIG P320 department-issued handgun.

## III.    EXPERIENCE AND QUALIFICATIONS:

I am currently the director of research and development for Magnum Research, a firearms manufacturer based in Pillager, Minnesota. In that role, I am responsible for designing and developing new firearms for the company.

I have been a professional gunsmith since graduating in 1972 from the Gunsmithing School at Trinidad State College in Colorado; the oldest gunsmithing school in the United States. Over the past fifty years, I have been awarded seven firearm design patents.

## IV.    INCIDENT SCENARIO:

2

On April 6, 2022, Officer Ashley Catatao, employed by the Somerville, MA Police Department, was walking to her squad car when her duty-issued Sig P320 handgun discharged. Video of the incident shows that her gun was secured in her department-issued holster.  The Sig P320 discharged without the trigger being deliberately manipulated and while her hands were neither on the gun nor holster.  Officer Catatao was injured as a result of this unintentional discharge.

## V.      INSPECTION OF THE SUBJECT FIREARM AND HOLSTER:

I understand that the subject P320 was inspected by Dr. William Vigilante. My opinions in this matter relate to the design of the P320 model line and the full-sized P320 "subject" pistol involved in this incident. I have received no evidence that there were modifications to the incident gun from its manufactured condition. I also understand the subject holster was inspected and is a Safariland Level 3 retention holster (model no. 7360). I have reviewed photos of the subject pistol and holster, I have also had occasion to personally inspect exemplars of the P320 and holsters of the same design.

The subject pistol was not equipped with any external safeties. There was no manual thumb safety, no grip safety, and no trigger safety.

## VI.     ANALYSIS

### A.  SINGLE ACTION VS. DOUBLE ACTION PISTOLS

For a pistol to fire a round, a cocked firing mechanism must release the firing pin to make contact with the primer of a cartridge. The two types of firing mechanisms available are hammers and strikers. These pistols are referred to as "hammer-fired" or "striker-fired," respectively. Every gun is designed so that the pull of the trigger releases the firing pin mechanism so that it can strike the cartridge.

Prior to the firing mechanism being able to be released, it must first be cocked. Once a firing mechanism is cocked, it is in position to be released.

In a "single-action" gun, the firing mechanism is cocked prior to the trigger being pulled by some action other than pulling the trigger. The trigger serves the sole (i.e., "single") purpose of releasing the firing mechanism.

In a "double-action" gun, the firing mechanism is un-cocked prior to the trigger pull. The pull of the trigger in a double-action gun serves to both (i.e., "double") cock <u>and</u> release the firing mechanism. Accordingly, the pull of the trigger of a double-action gun is significantly longer and requires more consistent pressure over the length of the longer trigger pull than the trigger pull of a single-action gun.

Single-action guns have trigger-pulls that are substantially shorter than double-action guns in terms of the trigger pull being under full weight.

The terms "single-action" and "double-action" were first used to describe hammer-fired pistols. However, the terms are equally applicable to striker-fired pistols, and are used by other manufacturers, because the same distinctions exist in striker-fired pistols; namely, some are designed so the trigger both cocks and release the striker, while others have a trigger that only releases the striker.

### B. THE P320 FUNCTIONS AS A SINGLE-ACTION STRIKER-FIRE PISTOL

The Sig Sauer P320 functions as a single-action pistol. The striker is cocked by the forward motion of the slide. Once the slide has been moved fully rearward and reset in the forward position, the striker is fully cocked and ready to be fired before any trigger movement. The trigger pull only serves to drop the sear so that the striker can be released. This is confirmed by Sig Sauer in witness testimony. *See Deposition of Scott Berube at 57:22-58:8.* The trigger-pull does not cock the striker in any meaningful way.

In addition to being clear from the design of the weapon that the trigger only serves to release the striker, I also performed a test of an exemplar P320 which proves this to be the case. On May 22, 2022, I used a Bridgeport Mill to cut out a piece of the slide of a P320, making the striker visible during the normal operation of the gun.



*Exposed striker on a P320 (M17 model with manual safety included)*

I filmed the striker before, during, and after several trigger-pulls. The videos are attached to this report in Appendix B. The videos establish that the striker is fully charged by the forward motion of the slide or by fully articulating the slide, and that the trigger pull serves only to release the striker.

The trigger-pull does cause a negligible amount of rearward movement in the striker, but that is due to the rearward angulation of the sear.[1] This movement is not a means to cock, or tension, the spring, but is merely a byproduct of the design of the sear lowering.  I measured this rearward movement to be twelve thousandths of an inch – which is approximately 2.5% of the total rearward movement of the striker (.461"). Comparatively, the Glock has .362" of rearward movement and the trigger movement clearly cocks, and then releases, the striker.

The single-action nature of the pistol was further confirmed in the expert report Mr. Toner in another matter related to the Sig Sauer P320. Mr. Toner's report is attached as Appendix C. Mr. Toner's report provides a detailed explanation of the mechanics of the P320. In the report, he confirms that the striker is "charged for the next shot" by the movement of the slide, not the trigger.



***Sean Toner Expert Report in Guay v. Sig Sauer, Inc. at Pg. 7 (SIG-EXPRPT_00533)***

Mr. Toner testified under oath that the P320 operates as a double action. Sig Sauer also included the "Double Action" notation in early versions of the P320 purchasing catalogs. The fact that the striker is fully under tension prior to the trigger being pulled was confirmed by Sig Sauer expert witness Derek Watkins in his report in the Guay v. Sig Sauer, Inc. matter. Mr. Watkins report is attached as Appendix D.

First, Mr. Watkins refers to the P320 trigger as a "short displacement trigger system." Mr. Watkins notes that the Colt 1911 is the prototypical example of a "short displacement trigger system." *See* Watkins Report at Pg. 6 (SIG-EXPRPT_00492). The 1911 is universally known as a single-action pistol and is also equipped with an external safety.

---

[1] The sear is angled slightly. As the sear travels down, the striker is pushed back slightly due to the angle of the sear.

Mr. Watkins notes that the "short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market." *See* Watkins Report at Pg. 6 (SIG-EXPRT_00492).

Second, Mr. Watkins confirms that movement of the slide on the P320 places the striker under tension so that it is ready to fire another round.

As the trigger bar is displaced, it first contacts the safety lever, causing the safety lever to rotate counterclockwise, displacing the striker safety lock and unlocking the striker pin. When the striker safety lock is in the down position, as shown in Figure 3.2, the striker pin is blocked from traveling forward and detonating the cartridge loaded in the chamber of the barrel (Figure 3.1). Once the striker safety lock has been displaced, the trigger bar contacts and rotates the sear counterclockwise, causing the sear to lose its engagement with the striker pin. When the striker pin is no longer restrained by the sear and the striker safety lock is in the unlocked position, the striker pin – which is under spring tension – is propelled forward and impacts the primed cartridge causing the pistol to discharge. Each time the pistol discharges and the pistol fully cycles, the striker safety lock will re-engage, blocking/locking the striker pin until the trigger is once again pulled. The sear also resets, catching the striker and re-energizing it under spring tension and making it ready to fire another round. If the sear does not rise back up and catch the striker foot, the P320 pistol is not cocked and is unable to fire.

*Derek Watkins Expert Report in Guay v. Sig Sauer, Inc. at Pg. (SIG-EXPRPT_00493)*

Mr. Watkins twice confirms that the P320 is cocked before the trigger is pulled, by opining on Pg. 6 of his report that: "The P320 also employs a passive safety system, meaning the safety is engaged at all times **when the pistol is cocked and the trigger is not being pulled**."

Sean Toner, Sig Sauer's lead engineer for the P320, incorrectly testified that the P320 has a "double action-style trigger." *Toner Deposition at 111:2-7.* Mr. Toner testified that "when you move the trigger, you're actually – you're cocking the striker to its final cocking point." *Toner Deposition at 111:3-5.* This testimony is contradicted by Mr. Toner's and Mr. Watkins's reports and examinations of the pistols. As provided above, the negligible rearward movement caused by the trigger pull is caused by the angulation of the sear, and does not serve the purpose of cocking the

striker in any meaningful way. Once the slide has gone through its progression, the striker is fully cocked and ready to be released with an extremely short trigger-pull under trigger pull-weight.



*Exposed striker on a P320 (M17 model) with the striker under tension*

As further evidence that the P320 is a single-action gun, the undersigned disassembled a Taurus GX4 (which includes an external safety) and found that it operates in a substantially similar manner as the P320; insofar as the striker is fully cocked by racking the slide, and the trigger serves only to release the striker. *See* Appendix E. Taurus acknowledges that this design is a "single action only" (SAO) design.[2]

| THE BASICS | | |
|---|---|---|
| **ITEM NUMBER**<br>1-GX4MP931 | | **UPC**<br>7-25327-93551-3 |
| **CALIBER**<br>9MM LUGER | | **CAPACITY**<br>13 Rounds |
| **FRONT SIGHT**<br>Fixed | | **REAR SIGHT**<br>Drift Adjustable |
| **MAGAZINES INCLUDED**<br>2 | | **ACTION TYPE**<br>SAO |

Screenshot of Taurus's Website
https://www.taurususa.com/pistols/taurus-gx4/taurus-gx4-tm-t-o-r-o-black-9mm-luger-micro-compact-11-rds

## C.  REQUIREMENT FOR EXTERNAL SAFETIES ON SINGLE ACTION GUNS

All engineers must follow the design hierarchy when considering the safe design of a product.  A manufacturer should first try to eliminate the hazard through design. Then, if it can't, it must implement the necessary safeguards to minimize the risk of such hazards or, as a last resort, provide warnings to the end-user.

---

[2] Additionally, unlike the Sig Sauer P320, every Taurus GX4 is equipped with a trigger safety.

Even though many double-action guns on the market also contain at least one of the three primary types of external manual safeties, discussed in detail below, it is even more imperative that single-action guns have a manual external safety that prevents the trigger from being moved without intent. Simply put, the trigger travel distance of a single-action gun makes it very easy for the trigger to be inadvertently actuated by a part of a user's body or a foreign object. For that reason, to the best of the undersigned's knowledge, there is no single-action firearm on the market without an external safety other than a Sig Sauer.

As Mr. Watkins notes in his report, the Colt 1911 is single-action pistol. Every version of the 1911 on the market, including every model of the Sig Sauer 1911, is equipped with some type of manual safety. In fact, every Sig Sauer pistol that Sig Sauer acknowledges is a single-action only pistol is equipped with an external safety. The only two striker fired guns on the market with no external manual safety that I have found are the Sig Sauer P320 and the P365. Despite marketing the effectiveness of the internal safety features, those features do nothing to prevent unintended trigger movement and do not even remain engaged until the set point.

Mr. Toner testified during his deposition that the only purpose of a manual safety on a single-action gun is to prevent the exposed hammer from being struck and causing the gun to discharge. *Deposition of Sean Toner at 121:2-21*. While preventing the cocked hammer on a single-action pistol is one reason why manual safeties are required on those guns, it is not the only reason. This point is proven by the fact that one of Sig Sauer's newest pistols, the P322, is a single-action pistol with an internal (unexposed) hammer that is only available with a manual safety. Notably, Mr. Toner testified that he would not personally feel comfortable carrying a P320 with a round in the chamber. *Deposition of Sean Toner at 89:4-91:1.*

### D. DESIGN DEFECT OF THE INTERNAL SAFETIES

Lacking any sort of external safety to prevent inadvertent trigger pulls, the P320 relies exclusively on internal safeties to prevent inadvertent discharges. Mr. Watkins refers to this as a "passive safety system." *See* SIG_EXPRT_00492. Sig Sauer routinely claims the internal safeties are sufficient to prevent unintended discharges. An analysis of the internal safeties establishes they are disengaged with exceptionally little manual effort, and are disengaged during the pre-travel and before the trigger is actuated. Unfortunately, once the internal safeties are disengaged, the pistol becomes susceptible to discharging without user's intent and without complete trigger actuation. Further, these internal safeties are not visible to the user; who cannot be reasonably expected to understand how they function and if they are functioning as intended.

According to Mr. Toner, the P320 incorporates two major internal safety features which act to prevent the P320 from discharging without actuation of the trigger mechanism. *See* SIG-EXPRT_00533. Those two features are the striker-sear engagement and the striker safety lock. *Id.* Mr. Toner provides the following description of the striker-sear engagement safety feature:

8

## Sear/Striker Engagement

The first safety feature is the positive connection between the sear and striker pin when the firearm is at rest in a charged condition. This connection holds the striker pin under tension imparted by the striker spring, which provides the energy required to launch the striker pin forward and impact a chambered cartridge. In order for the firearm to discharge, the sear must move in a downward direction, allowing the striker pin to move forward under this tension and impact the primer of a chambered cartridge (see description of firing cycle above). If these two components are not disengaged, the firearm cannot discharge.

The design of these two components, and how they interact with each other, act to keep the components in positive connection until a sufficient force is applied to the sear to break the connection (specifically through actuation of the trigger mechanism). This is accomplished by the presence of a closing moment between the two components when they are engaged. The effect of this closing moment is to always pull the sear upward as long as the striker pin is charged. This closing moment leads the two components to always seek full engagement. The image below further illustrates this closing moment and the interaction of these two components. (See FIG. 9)



FIG. 9

Without a counteracting force being exerted on the sear to overcome this closing moment (namely the forward motion of the trigger bar rotating the sear in the opposite direction of the closing moment), the sear and striker pin will remain in engagement and the striker pin will not be released to impact a chambered cartridge.

*SIG-EXPRT_00534*

The striker-sear engagement on the subject pistol is only .040", which for comparison is less than the thickness of a dime. For the striker to disengage from the sear without the striker safety block engaged, it would only need to move approximately one-twenty-fifth of one inch. Such a disengagement can be caused by vibration, jostling, or contact with the P320.

Sig Sauer acknowledges in its safety manuals for the P320 that contact such as the "firearm being dropped, impact to the firearm, or the firearm being struck by another object" can cause safety mechanisms to "fail to work as designed." *See* SIG-SLATOWSKI 00698. While Sig Sauer describes this type of contact as "abusive handling," the situations described by Sig Sauer (i.e.

9

firearm being dropped, impact to the firearm, firearm being struck by another object) are commonplace occurrences. By Sig Sauer's own admission, the mechanical safety systems (including the .040" striker-sear engagement) can fail when the weapon is exposed to contact. Even minimal contact, as evidenced in videos of other incidents, can cause a hazardous unintended discharge.

**ABUSIVE HANDLING**

All SIG SAUER firearms incorporate effective mechanical safeties. However, like any mechanical device, exposure to abusive conditions may have a negative effect on these safety mechanisms and cause them to fail to work as designed. Do not subject your SIG SAUER firearm to any type of abusive handling. This includes the firearm being dropped, impact to the firearm, or the firearm being struck by another object. Make sure you always maintain control of your firearm at all times. If your firearm does suffer an abusive event, as previously described, do not attempt to use the firearm. Keep the firearm pointed in a safe direction, unload and clear the firearm immediately, and have it inspected by a certified SIG SAUER armorer or gunsmith prior to using the firearm.

*SIG_SLATOWSKI 00698*

The second major internal safety described by Mr. Toner is the striker safety lock. The striker safety lock serves to block the striker pin from moving forward and impacting a chambered cartridge in the event the striker-sear engagement is lost. Mr. Toner describes the striker safety lock feature accordingly:



The striker safety lock system consists of two main components: the safety lock and the safety lever. The safety lock is a sheet metal component which, when at rest, rides along a shelf formed on the striker pin body. The safety lock is held in this at rest position by force of the safety lock spring (removed from images for clarity). (See FIG. 10)

**Striker Pin Safety Notch**

FIG. 10

**Safety Lock**    **Striker Pin**

If the striker pin of the firearm is released without the safety lock being raised out of this at rest position, the safety lock will come into contact with the striker pin safety notch, preventing the forward movement of the striker pin into a chambered cartridge. (See FIG. 11)

**Striker Pin**

**Safety Lock**

**Sear**

**Safety Lever**

FIG. 11

*SIG-EXPRT_00535*

Given the very minimal trigger movement within the pre-travel phase and before trigger actuation required to disengage the internal safeties, a foreign object or pressure against the holster can leave the gun unacceptably vulnerable to a discharge without an intentional trigger pull; without the finger being on or near the trigger, or even without full actuation of the trigger. I have reviewed several videos and analyzed myself the conditions that would permit the trigger to be grazed and allow the gun to fire that would be prevented by a tabbed-trigger. Glock also advertises that the

11

purpose of the tabbed trigger is to prevent the gun from drop-firing **or firing unintentionally.** (see below screenshots from https://us.glock.com/en/learn/glock-pistols/safe-action-system)



### E. TYPES OF MANUAL SAFETIES

There are three primary types of manual safeties that can be equipped on a striker-fired pistol: thumb safeties, grip safeties, and tabbed trigger safeties. All three help prevent unintended discharges by manually blocking the trigger from being pulled until the user decides they are ready to fire. Any of the three could have been designed into the P320 with minimal added cost or disruption to the pistol's functionality, as evidenced by the fact that a manual thumb safety was included on the military version of the P320, and the fact that Sig even advertised the tabbed trigger safety as an option despite not following through with it.

A thumb safety is a switch on the side of the pistol that can be flipped on or off with the user's thumb. Typically, the thumb safety is flipped up to put the gun in "safe mode," and down to place it in "fire mode." Unless and until the thumb safety is flipped down, the trigger cannot be actuated. A thumb safety takes a user a small fraction of a second to flip into "fire mode." Without question, the added fraction of a second that the manual safety takes a user to flip is well worth the massive safety benefit of preventing unintended discharges in a single-action pistol. This safety feature does not prevent military personnel equipped with the P320 from performing their duties. Further, the M-17's thumb safety is ambidextrous to accommodate both right and left handed shooters.

12

While nearly every P320 sold to law enforcement and private consumers is not equipped with a thumb safety, the military version of the P320 is equipped with an ambidextrous thumb safety. The thumb safety makes the military version of the P320 substantially safer for our men and women serving in uniform.



*P320 M17 with a thumb safety*

A grip safety is a lever on the grip of the pistol that must be depressed for the trigger to be able to actuate and fire the gun. A grip safety requires virtually no extra effort on the part of the user, because their hand would naturally depress the safety as they were holding the pistol. Sig Sauer employs a grip safety on several of its 1911 models. Sig Sauer's competitor, Springfield Armory, uses a grip safety in its striker-fired XD series. Another top Sig Sauer competitor, Smith and Wesson, employs a grip safety on their popular M&P Shield EZ series.



*Sig Sauer 1911 Fastback Nightmare Carry with Grip Safety*

13



*Springfield Armory Striker-Fired XD Series with Grip Safety*

A trigger safety, the most widely used type of safety for striker fired guns, is a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon. Trigger safeties are able to effectively and efficiently prevent accidental discharges because they require a user's finger to be placed squarely on the center of the trigger prior to the pistol being discharged. Therefore, the user is required to more deliberately place their finger on the trigger to fire the weapon. Trigger safeties are found on all Glock striker-fired pistols, the Springfield Hellcat series, the Springfield XD series, the Walther PDP series, the Walther PPQ series, the Walther Q5 series, the Taurus GX4 series, the CZ P-10 series, the M&P 2.0 series, the Ruger Max-9 (also equipped with a thumb safety), and the H&K VP9 series among others. It is important to note that a tabbed trigger safety was permitted under the ICE contract with Sig Sauer.



*Glock tabbed trigger safety*

14

Additionally, there are two forms of safeties that are less common, but still effective means of preventing accidental discharges. The first of which is a "hinged trigger," which is similar to a tabbed trigger because it prevents the trigger from being pulled if it not deliberately pulled squarely. The second of which is a "de-cocker," which releases striking mechanism from being in a single-action position to being in a double-action position. A weapon that has been "de-cocked" will have a much longer, heavier double-action trigger pull on its first shot, making an unintentional trigger-pull much less likely.

The fact that nearly every Sig Sauer P320 sold to law enforcement and the general public is sold without any type of manual safety makes the P320 unique among single-action pistols; and uniquely dangerous.

The distinctively dangerous characteristics of the Sig Sauer P320, along with the internal design decisions discussed below, explain the sheer number of incidents of unintentional discharges across the country; especially among highly trained and skilled firearms users. I have been made aware of close to 100 other incidents of the P320 discharging when a user believes they did not pull the trigger. On several of these occasions, Sig Sauer claimed the trigger was pulled by a foreign object like a seatbelt. I have also reviewed several videos of P320 unintended discharges where the user does not pull the trigger.

Taking Sig Sauer's explanation for some of these discharges as true for the sake of argument, it is not acceptable for a firearm to discharge with a passing graze from a foreign object like a seatbelt. However, the Sig Sauer P320 is uniquely capable of such a discharge because of its short, lightweight trigger pull along with its complete lack of any sort of safety which can block the trigger from being inadvertently depressed.

## F. LACK OF WARNINGS

The danger posed by a single-action pistol without a safety can be mitigated by carrying the pistol without a round in the chamber. A user carrying the P320 when it is not "locked, loaded, and ready to fire" is protected against an accidental discharge caused by the pistol's extremely short trigger travel distance.

Upon review of the Sig Sauer P320 manuals provided to me (BATES Nos.) I found that some manuals have added a warning that appears to caution against carrying with a round in the chamber, but other manuals do not. Based on revision number of the manuals, it appears that Sig Sauer *removed* the warning from their manuals.

15



*Sig Sauer P320X Manual, SIG-SLATOWSKI 00577 (with warning)*
*P/N 8501909-01 REV 01*



*Sig Sauer P320X Manual, SIG-SLATOWSKI 00656 (without warning)*
*P/N 8501909-01 REV 02*

Despite Sig Sauer warning against the practice, Mr. Toner testified that Sig Sauer is aware that some users would carry their P320s with a round in the chamber. *Deposition of Sean Toner at 116:6-117:1.* Mr. Toner testified that it would not be "wrong" for a user to carry with a round in the chamber, despite the manual warning against it. *Deposition of Sean Toner at 117:2-20.* Sig Sauer was clearly aware that the practice of carrying the P320 with a round in the chamber was dangerous, but manufactured the single-action pistol without manual safeties anyway.

Additionally, the manuals fail to warn users that the P320 is functionally a single-action pistol. In my fifty years of experience in the firearms industry, I have reached the opinion that the average consumer does not understand the complicated internal mechanisms of a pistol. An ordinary consumer can be expected to know how to operate and care for their weapon, but not fully understand the way the component pieces work together to make the gun fire. For that reason, an average P320 user likely would not appreciate the fact that the P320 is functionally a single-action pistol rendered unreasonably dangerous by the lack of manual safeties.

Finally, Sig Sauer offers no warnings or instructions related to the types of holsters appropriate for use with a Sig Sauer P320.

16

## G. THE GLOCK STRIKER FIRED SYSTEM

Mr. Toner confirmed during his deposition that Sig Sauer's biggest competitor in the striker-fired pistol market is Glock. *Deposition of Sean Toner at 46:22-48:6*. Glock produces a series of striker-fired pistols that are extremely popular both in the consumer market and with law enforcement. Glocks notably do not have a manual or grip safety. However, Glocks are substantially safer than P320s because their "Safe Action" design serves to prevent accidental discharges.

First, unlike the P320, all Glock pistols are functionally double-action pistols. The trigger pull on a Glock serves to both cock and release the striker. *See* Appendix G. This results in a much longer trigger pull, which in turn makes the pistol far more difficult to accidentally discharge. On March 24, 2022, I measured the trigger travel distance of an exemplar Glock 19. The trigger travel distance to discharge the pistol was .223 inches under full weight for the length of the pull; roughly four times longer than the P320 trigger pull under full weight.

Second, all Glock pistols are equipped with a trigger safety. As provided above, the trigger safety is a highly effective tool to prevent unintended discharges.

For those reasons, a Glock is a far safer striker-fired pistol than the P320.

Notably, Glock produces the standard sidearms for the Federal Bureau of Investigation, the U.S. Navy Seals, U.S. Customs and Border Control, the U.S. Secret Service, the New York City Police Department, the Los Angeles Police Department, the Philadelphia Police Department, the Washington D.C. Police Department, the Atlanta Police Department, the Boston Police Department, the Miami-Dade Police Department, the Baltimore County Police Department, and the British Army, among others.

## H. CONCLUSIONS:

1. The Sig Sauer P320 is functionally a single-action pistol because the striker is under full tension prior to the trigger pull.

2. The P320's trigger pull does not meaningfully cock the striker, and only serves to release the striker.

3. Single-action pistols must have an external safety that blocks the trigger from being inadvertently discharged because the extremely short distance the trigger must travel to release the firing mechanism creates a high risk of accidental discharge.

4. The Sig Sauer P320, as designed, is generally not equipped with any manual safeties.

5. The subject P320 was not equipped with any manual safeties.

6. The inclusion of a manual thumb safety on the military model of the P320 proves that it is possible for P320 to be equipped with a manual thumb safety.

7. Sig Sauer could have easily included a manual thumb safety, grip safety, or tabbed trigger safety on the P320.

8. The P320 is the only single-action firearm on the market that does not come equipped with any sort of manual safety.[3]

9. The P320 is unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated.

10. An ordinary user of the P320, without detailed knowledge of the internal mechanics of the pistol, would likely not recognize how dangerously defective and out of the ordinary the P320's design is.

11. Sig Sauer was aware that some users would carry the pistol with a round in the chamber, despite acknowledging in some manuals that the practice was dangerous.

*James Tertin*

JAMES TERTIN

Dated: October 10, 2023

---

[3] This opinion is rendered based upon the undersigned's over fifty years' of experience working in the firearms industry, as well as extensive market research performed in preparation of this report. To the extent the undersigned is made aware of a single-action firearm available without any sort of manual safety, the undersigned reserves the right to amend this report and/or issue a supplemental opinion.

EXHIBIT C

**Page 1**

1        UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4    ASHLEY CATATAO,

5            Plaintiff,

6    v.                    Case No.  1:22-CV-10620-PBS

7    SIG SAUER, INC.,

8            Defendant.

9

10

11        DEPOSITION OF ASHLEY CATATAO, called as a

12    witness for examination, taken pursuant to the

13    provisions of the Code of Civil Procedure and the

14    Rules of the Supreme Court of the State of

15    Massachusetts pertaining to the taking of depositions

16    for the purpose of discovery, before RAYMOND DOAN,

17    Digital Reporter and Notary Public for the State of

18    Massachusetts on JUNE 06, 2023 at 9:00 A.M.

19

20

21

22

23

24

**Page 2**

1            APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4        SALTZ MONGELUZZI BENDESKY, P.C.
         Attorneys at Law

5        One Liberty Place
         52nd Floor

6        Philadelphia, Pennsylvania 19103
         215-496-8282

7        BY:  DANIEL L. CEISLER, ESQUIRE

8

     On behalf of the Defendant:

9

         LITTLETON PARK JOYCE UGHETTA & KELLY, LLP

10       Attorneys at Law
         201 King of Prussia Road

11       Suite 220
         Radnor, Pennsylvania 19087

12       484-254-6220
         BY:  JONATHAN T. WOY, ESQUIRE

13

14   Also Present:

15

         Marissa Demonte, Videographer

16

17

18

19

20

21

22

23

24

**Page 3**

1            INDEX TO EXAMINATION

2

3    EXAMINATION                                  PAGE

4    Examination by Mr. Woy                         5

5    Examination by Mr. Ceisler                   169

6

7            INDEX OF EXHIBITS

8

9    DEFENDANTS'S        DESCRIPTION             PAGE

10   Exhibit 1 - Photos bag                       101

11   Exhibit 2 - Screenshot surveillance          113

12   Exhibit 3 - Screenshot vid (digital)         118

13   Exhibit 4 - Photos wound (digital)           129

14   Exhibit 5 - Ambulance report                 141

15   Exhibit 6 - Emergency record                 143

16   Exhibit 7 - Cambridge Health Doc             147

17   Exhibit 8 - Beth Israel Doc                  162

18

19   (Exhibits 1 through 8 were not provided to the

20   reporter at the time of certification and are,

21   therefore, not attached to the original transcript.)

22

23

24

**Page 4**

1        (On the record at 9:00 a.m.)

2        THE VIDEOGRAPHER:  We are now on the record.

3    This begins media unit number 1 in the deposition of

4    Ashley Catatao in the matter of Ashley Catatao versus

5    Sig Sauer, Inc. Filed in the United States District

6    Court, District of Massachusetts, case number

7    1:22-CV-10620-PBS.

8        Today is June 6th, 2023 and the time is 8:58

9    a.m.  This deposition is being held at 745 Boylston

10   Street, Boston, Massachusetts.  The videographer is

11   Marissa Demonte.  The court reporter is Ray Doan.  We

12   represent Esquire Deposition Solutions.

13       Will Counsel please state their appearances

14   and who they represent?  After which the court

15   reporter will swear in the witness.

16       MR. WOY:  Jonathan Woy for the defendants,

17   Sig Sauer, Inc.

18       MR. CEISLER:  Daniel Ceisler for the

19   plaintiff, Ashley Catatao.

20       THE REPORTER:  Thank you.  Ms. Catatao,

21   please raise your right hand to be sworn.

22            ASHLEY CATATAO

23   having been first duly sworn, testified as follows:

24       THE REPORTER:  Thank you.  Counsel, you may



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
5–8

Page 5

1  begin.
2             EXAMINATION
3  BY MR. WOY:
4      Q.  Good morning, Ms. Catatao.
5      A.  Good morning.
6      Q.  We met briefly off the record, but my name's
7  Jonathan Woy.  I'm the defendants' attorney, here for
8  Sig Sauer today.
9      I have a number of questions to ask you about the
10 accidental discharge that occurred back on April of
11 2022.
12     But before we get to that, I just want to go over
13 some ground rules just to make sure things go smoothly
14 today, okay?
15     A.  Uh-huh.
16     Q.  Have you been deposed before?
17     A.  Not like this.  No.
18     Q.  Okay.  When you say not like this, what type
19 of -- have you given some sort of formal interview in
20 connection with your work that was stenography or
21 recorded by a stenographer or something similar?
22     A.  Yes.  I've testified in court before.
23     Q.  Okay.  Have you ever testified in connection
24 with a civil matter?

Page 6

1      A.  I don't believe so.  No.
2      Q.  Okay.  So we'll just go over all the ground
3  rules, just to make sure we're on the same page.
4      The first one is, because there's a court
5  reporter here, and also a videographer, the
6  videographer is obviously making a video record of
7  everything that's said and done here today.  So when
8  we watch the video, we'll be able to see you nodding
9  your head, shaking your head, using your hands.  But
10 when we read the transcript, we won't be able to
11 interpret any of that.  So for that reason, we just
12 need you to keep your answers verbal.
13     So, you know, we'll be able to see if you nod
14 your head, but the court reporter won't be able to
15 take that down.  So I would just say yes.  Something
16 like that.  Or no.  Whatever it may be, okay?
17     And because everything is being recorded by the
18 court reporter, we're going to be able to look at a
19 book later with everything that's said here today.
20 Just to make his job easier and our lives easier when
21 we go back and look at it later, you're doing a good
22 job of this already, but just make sure you wait for
23 me to finish asking my question before you start your
24 answer.  And I'll do my best to let you finish your

Page 7

1  answer before I start my next question.  We can try
2  and avoid talking over each other, okay?
3      A.  Okay.
4      Q.  Now, if at any point in time today you want
5  to take a break, whether it's to talk to your
6  attorney, use the restroom, make a phone call,
7  whatever you need to do, that's completely fine by me.
8  Just let me know.  Happy to take a break.  All I ask
9  is that you answer the questions pending and then we
10 can go off the record and take a break for whatever
11 you need, okay?
12     A.  All right.
13     Q.  If at any point in time you're confused by
14 any of my questions or not sure what I'm asking, just
15 let me know.  I'm not trying to trip you up
16 intentionally.  And I want to make sure we're on the
17 same page and you understand what I'm asking.  So feel
18 free to tell me, "I don't understand," "Can you
19 rephrase?"  I'm happy to do that, okay?
20     A.  Okay.
21     Q.  I don't want you to guess, so if I ask you a
22 question and you're thinking back and you aren't quite
23 sure, you don't really have a reasonable factual basis
24 for providing an answer to that question, just let me

Page 8

1  know you don't recall, don't remember.  And that's
2  fine.  We don't want you to just kind of pull
3  something out of thin air just because you feel like
4  you need to give an answer, okay?
5      A.  Okay.
6      Q.  All right.  In preparation for your
7  deposition, did you speak with anybody other than your
8  attorney about the substance of your testimony?
9      A.  No.
10     Q.  Did you review any documents in preparation
11 for your deposition testimony?
12     A.  Yes.
13     Q.  What did you review?
14     A.  I reviewed the internal investigations
15 report.  And you said just for documents, right?
16     Q.  Yes.
17     A.  The internal investigations report.
18     Q.  Did you review any videos or audio recordings
19 or anything like that in preparation for your
20 deposition?
21     A.  Yes.
22     Q.  What did you review?
23     A.  I watched the video of the incident that was
24 caught on the security camera.  And I listened to the



Case 1:22-cv-11060-PBS   Document 83-28-4   Filed 03/28/24   Page 114 of 439

Page 9

1  audio recording of my interview the Lieutenant
2  Perrone.
3      Q.  When you listened to that audio recording,
4  was there anything that stood out to you as you
5  thought you'd like to correct or misspoke or that you
6  think, as you're sitting here today, was inaccurate?
7      A.  No.
8      Q.  Did you review any kind of emails that you
9  sent with anybody other than your attorney or his
10  office in connection with your preparation for the
11  deposition?
12      A.  I forwarded -- yes.  I forwarded an email to
13  my attorney.
14      Q.  Was that the email that related to your
15  request to transfer to Cambridge PD?
16      A.  Yes.
17      Q.  Did you review any other emails?
18      A.  Emails?  No.
19      Q.  Okay.  How about text messages or Facebook
20  messages?
21      A.  Yes.
22      Q.  What did you review in that regard?
23      A.  I forwarded screenshots of a brief
24  conversation I had with Brittany.  I don't recall her

Page 10

1  last name, but she was another victim.  I
2  screenshotted those and sent them to my attorney.
3      Q.  The screenshots of your conversation with
4  Brittany Hilton, is that the only written reflection
5  of conversations or communications that you had with
6  her?
7      A.  That I can recall.
8      Q.  Did you ever send any text messages with her?
9      A.  I don't recall.
10      Q.  Did you review anything else, other than what
11  we've already discussed, whether it be communications
12  of some kind, video, audio, documents, anything like
13  that in preparation for your deposition?
14      A.  Just what I mentioned.
15      Q.  Okay.  All right.
16          So before we really jump into talking about the
17  incident, I just need to get some background
18  information about you.  And we have some of that from
19  your answers to interrogatories, but I just want to
20  make sure things are good to fill up some holes, okay?
21      A.  Okay.
22      Q.  All right.  What's your current height and
23  weight?
24      A.  Current height is 5'1".  And my current

Page 11

1  weight is 145.
2      Q.  And I'm sorry to pry in that regard, but --
3      A.  It's okay.
4      Q.  -- you know, sometimes we get into
5  depositions and you know, officers or whoever will
6  say, "Well, you know, I've been laid up.  I haven't
7  been able to work out."  And they put on 80 pounds or
8  whatever.  And so that's just explained to you I don't
9  mean to pry.
10      A.  No worries.
11      Q.  Have you had any kind of significant weight
12  change that you attribute to injuries that you
13  sustained as a result of this incident?
14      A.  No.
15      Q.  Did you have any kind of significant medical
16  conditions that preexisted the April 2022 accidental
17  discharge?
18      A.  Significant?  I mean, I have asthma.  Had
19  that my entire life.  Medical.  Just medical.  Just
20  asthma.
21      Q.  Okay.  How about physical limitations or
22  anything like that?  Did you have any kind of physical
23  limitations or restrictions prior to April 2022?
24      A.  Limitations or restrictions?  No.

Page 12

1      Q.  Were you on any kind of medications prior
2  to -- well, at the time of the discharge?
3      A.  I don't recall.  I don't think so.
4      Q.  Have you ever been known by any names other
5  than Ashley Catatao?
6      A.  Legally, no.
7      Q.  Other than legally, have you been known by
8  anything other than just kind of nicknames that your
9  friends might call you?
10      A.  No.
11      Q.  What's your date of birth?
12      A.  November 6th, 1987.
13      Q.  How old does that make you today?
14      A.  Thirty-five.
15      Q.  Where were you born?
16      A.  Cambridge, Massachusetts.
17      Q.  Have you always lived in Massachusetts?
18      A.  Yes.
19      Q.  What's your current address?
20      A.  It's 4 Poplar, P-O-P-L-A-R Street,
21  Wilmington.
22      Q.  What was the town name?
23      A.  Wilmington.
24      Q.  Wilmington.  Okay.



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
13–16

Page 13

1    Just to give me some frame of reference, how far
2  is that from the Somerville PD headquarters?
3    A. I believe it's 15 to 17 miles.  About a 20,
4  30 minute drive.
5    Q. How long have you lived at that address?
6    A. I moved there in November of 2022.
7    Q. Where did you live at the time of the
8  discharge?
9    A. Tewksbury.
10    Q. Did the move from Tewksbury to Wilmington
11  have anything to do with injuries you sustained as a
12  result of this incident?
13    A. No.
14    Q. What type of a home do you live in now?  Is
15  that a single-family home of some kind?
16    A. It's -- yeah.  It's considered a
17  single-family home.  There's two -- two homes on
18  the -- on the property.  I live in one of them.  My
19  family lives in the other.
20    Q. Do you live with anybody else?
21    A. My son and two dogs.  And a leopard gecko.
22    Q. Okay.  How old is your son?
23    A. He'll be nine in August, so he's eight and a
24  half.

Page 14

1    Q. And then you said your family lives at that
2  same property with you, but it sounds like in a
3  different house?
4    A. Yes.
5    Q. Who is included when you say your family?
6    A. My mother, my father, my sister, and my
7  niece.
8    Q. Do you have any kind of responsibility for
9  upkeep of that house, like mowing the grass, taking
10  care of flower beds; anything like that?
11    A. Yeah.  I help here and there.
12    Q. Has your ability to do any of the upkeep
13  that's required of you at that property been impacted
14  by any of the injuries you sustained as a result of
15  the accidental discharge?
16    A. No.
17    Q. Do you drink alcohol?
18    A. Socially.  Occasionally.  Yes.
19    Q. Do you smoke?
20    A. No.
21    Q. Have you ever been married?
22    A. No.
23    Q. And you said you have one son that lives with
24  you.  Do you have any other children?

Page 15

1    A. No.
2    Q. Did you ever serve in the military?
3    A. No.
4    Q. Where did you graduate from high school?
5    A. Matignon High School.
6    Q. Would that have been about 2010; is that
7  right?  Oh.  Wait.  No.
8    A. No.  That was college.
9    Q. I was trying to think back from when I
10  graduated.  So that would be 2006-ish, then?
11    A. Yes.
12    Q. Okay.  And then it sounds like you went to
13  college after that?
14    A. Yes.
15    Q. Where did you go to college?
16    A. Suffolk University.
17    Q. Did you graduate from Suffolk?
18    A. I did.
19    Q. When did you graduate?
20    A. 2010.
21    Q. What degree did you graduate with?
22    A. I have a B.S. in sociology with a
23  concentration in crime and justice.
24    Q. Do you have any other formal higher education

Page 16

1  beyond your 2010 degree?
2    A. Yes.
3    Q. What would that include?
4    A. I have a master's degree in criminal justice
5  from UMass Lowell.  And I'm currently in school at
6  Cambridge College getting my master's in mental health
7  counseling with a concentration in trauma studies.
8    Q. When did you earn that master's in criminal
9  justice from UMass Lowell?
10    A. I believe it was 2017.  I believe.  Yes.
11    Q. Did you go part-time while you worked at the
12  Somerville PD?
13    A. Yes.
14    Q. All right.  And the program that you're
15  currently in, when did you start that program at
16  Cambridge College?
17    A. I believe 2021.  Spring of 2021 maybe.
18    Q. Do you have an anticipated graduation date
19  for that?
20    A. No.  I'm going part-time, so I'm going
21  slower.
22    Q. Okay.  Does that wrap up all the higher
23  education that you have?
24    A. Yes.



Case 2:22-cv-01060-PBS Document 83-28-4 Filed 03/28/24 Page 16 of 39

Page 17

1    Q.  Okay.  Did you ever go to a trade school of
2  any kind?
3    A.  No.
4    Q.  Did you ever take any courses in mechanical
5  engineering or anything similar?
6    A.  No.
7    Q.  Do you have any education or experience
8  related to firearm design or manufacturing?
9    A.  No.
10    Q.  You ever been certified as an armorer on any
11  firearm?
12    A.  No.
13    Q.  Have you ever taken an armorer's course of
14  any kind?
15    A.  No.
16    Q.  Have you ever been certified as a gunsmith?
17    A.  No.
18    Q.  All right.  So I just want to go through your
19  work history a little bit.
20      I assume you didn't have any full-time jobs prior
21  to graduating from Suffolk University in 2010; is that
22  right?
23    A.  Full-time?  No.
24    Q.  I can't recall if I wrapped this in with the

Page 18

1  question I asked you about the firearms experience and
2  training, but have you ever worked in any job of any
3  kind relating to firearm design or manufacturing?
4    A.  No.
5    Q.  Okay.  So when you got out of Suffolk
6  University in 2010, did you start working full-time at
7  that point?
8    A.  No.  I was part-time still with the United
9  States Coast Guard as an intern, which I had gotten
10  through school.  And they kept me for a few months
11  after graduation.
12    Q.  What did that internship with the coast guard
13  entail?
14    A.  So I was assigned to the -- they changed
15  names.  So it used to be the field -- used to be
16  called a FIS.  So it was a field intelligence
17  something team.  I forget what it stood for.  And then
18  they changed to the TSS, which was the tactical
19  support section.
20      So my duties were to kind of do a lot of the
21  administrative stuff in the office, do some open
22  source searching for them.  I would attend boardings
23  with them.  I would go to trainings or, like, meetings
24  with them and just kind of take notes.  Document

Page 19

1  things.  Pretty much just simple stuff around the
2  office.
3    Q.  I figure you didn't have any kind of firearm
4  issued to you in connection to working at the coast
5  guard?
6    A.  Not with that position.  No.
7    Q.  Did you at any point in time have a firearm
8  issued to you from the coast guard?
9    A.  Not from the coast guard.  It was from the
10  security company that they hired to work on the base.
11  I was doing that position part-time once I was
12  relieved from my internship.  So I started working on
13  the base doing armed security.
14    Q.  What base was that?
15    A.  It's the coast guard -- I think it's called
16  Sector Boston in the north end.
17    Q.  What was the name of the security company you
18  worked through?
19    A.  Oh, boy.  T&S, I believe it was.
20    Q.  TNS?
21    A.  T and S.
22    Q.  T and S.  Okay.
23    A.  Yeah.  Like the and sign.
24    Q.  Okay.

Page 20

1    A.  I believe it's T&S.
2    Q.  How long did you work doing armed security
3  for that company?
4    A.  Several months, possibly.  Because then I got
5  hired by Somerville.
6    Q.  Okay.  When did you get hired by Somerville?
7    A.  My official start day was February of 2011.
8    Q.  Okay.  When you were doing armed security at
9  the base, what type of firearm were you carrying at
10  that time?
11    A.  I believe it was a Beretta 92FS maybe.  It's
12  a Beretta 92, I believe.
13    Q.  Was that the only firearm that you carried in
14  connection with that work?
15    A.  Yes.
16    Q.  Was that issued to you by your employer?
17    A.  Yes.
18    Q.  Did that firearm have an external manual
19  safety on it?
20    A.  I don't recall.
21    Q.  Do you recall if that was striker-fired,
22  hammer-fired, something else?
23    A.  I don't recall.
24    Q.  Was it a semi-automatic?



Case 1:22-cv-11009-PBS Document 83-28-4 Filed 03/28/24 Page 117 of 439

Page 21

1    A. Yes.
2    Q. Did that firearm have a tap trigger or hinge
3  trigger, anything like that on it?
4    A. I -- I don't know.
5    Q. So when I use the term tap trigger, do you
6  know what I'm referring to?
7    A. I don't.
8    Q. Okay. Have you ever shot a Glock?
9    A. No. I have not.
10   Q. Have you ever shot a pistol of any kind that
11  had, on the trigger, some sort of a either piece that
12  you had to push in or something else that you had to
13  manipulate on the trigger as you pull it?
14   A. No.
15   Q. And just so we're clear for the record, when
16  I say external manual safety, do you know what I'm
17  referring to with that term?
18   A. Like, the little switch on the side?
19   Q. Yeah. So when I use it, I'm referring to a
20  switch that you would have to turn on and off with the
21  tip of your thumb to be able to pull the trigger,
22  okay? We're on the same page?
23   A. Yes.
24   Q. Okay. Did you have any problems with that

Page 22

1  Beretta 92 that you carried?
2    A. I don't think so.
3    Q. Did you keep that after your employment, or
4  did you turn that back in when you left?
5    A. I turned it back in.
6    Q. Did you have to go through any kind of
7  firearms training with that security company to be
8  able to carry a weapon?
9    A. Yes.
10   Q. What did that training entail?
11   A. Basically, I just went to the range with them
12  I think once or twice because I had to go out.
13   Q. Did you have any kind of classroom training
14  or safety courses? Ever anything like that?
15   A. I did a safety course prior to that to get my
16  LTC.
17   Q. What's an LTC?
18   A. License to carry.
19   Q. Is that something that's issued by the State
20  of Massachusetts?
21   A. The State issues it and you go through the
22  local -- what are they called? Issuing authority, I
23  guess, you would call it. So it'd be like the local
24  police department.

Page 23

1    Q. What police department issued you the LTC?
2    A. Somerville.
3    Q. So the LTC, is that something that, say, any
4  civilian if they wanted to carry a firearm, would have
5  to get?
6    A. Yes.
7    Q. Okay. So that wasn't something that was
8  specific to that security company employer?
9    A. No.
10   Q. All right. What did the safety -- well, let
11  me ask you this first.
12      Where did the safety course take place that you
13  had to take for the LTC?
14   A. I don't remember. It was so long ago.
15   Q. Okay. Fair enough.
16      Do you recall approximately how long that safety
17  course was?
18   A. I think it was one day.
19   Q. Was the LTC course, the safety course,
20  focused on handguns?
21   A. Yes.
22   Q. What do you recall about what was taught to
23  you with respect to safety with handguns during that
24  LTC course?

Page 24

1    A. Don't point at anything unless you intend to
2  shoot at it. And keep your finger off the trigger
3  unless you intend to pull the trigger.
4    Q. Did that course address whether or not some
5  pistols are equipped with external manual safeties and
6  some aren't?
7    A. I don't recall.
8    Q. Did that course address anything to do with
9  holstering or carrying a holster pistol?
10   A. I'm sure it addressed it. I just can't
11  recall specifics.
12   Q. Okay. Did that course address anything
13  related to whether a firearm would be expected to
14  discharge if something got down into a holster and
15  pulled the trigger inadvertently?
16   A. I don't recall.
17   Q. All right. So you take the LTC one day-ish
18  course, and then you said you went to the range once
19  or twice?
20   A. With T&S. Yes.
21   Q. With T&S. Yeah.
22   A. I believe it was maybe once.
23   Q. Okay. And then I think you said you had to
24  qualify during that range session on the Baretta?



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
25–28

Page 25

1    A. Yes.

2    Q. And I take it that the qualification would

3  just be proficiency-based, as far as being able to get

4  rounds on target and show that you can safely handle a

5  pistol?

6    A. Yes.

7    Q. Were you issued a holster for that Beretta?

8    A. Yes.

9    Q. What type of holster were you issued?

10    A. I don't recall.

11    Q. Did you have to do anything other than get

12  your LTC and qualify in order to be able to carry that

13  pistol for the security company?

14    A. No.

15    Q. Did you ever have to use your pistol while

16  you were working for the security company?

17    A. No.

18    Q. Just kind of generally, what was your

19  responsibility as an armed security guard?

20    A. It was to maintain secure access to the base.

21  We would do rounds on the base to make sure there were

22  no security threats, to make sure there was no

23  trespassers, and just to make sure everything was

24  basically safe and okay.

Page 26

1        We did strict access control at the gate.  We

2  would only let people in if they had the proper

3  credentials to be on base.  Occasionally, we would do

4  car searches, random car searches.  And that's pretty

5  much it.

6    Q. Did you have any employment between the time

7  you worked for that security company and the time you

8  started at Somerville?

9    A. No.

10    Q. How did you get the job at Somerville Police

11  Department?  Is it something you sought out and

12  applied for?

13    A. Yes.

14    Q. Is Somerville the only police department

15  you've worked for?

16    A. Yes.

17    Q. Other than Somerville and the T&S security

18  company, have you ever carried a firearm in connection

19  with any other employment?

20    A. No.

21    Q. Since joining Somerville in 2010, have you

22  worked for any other employers?

23    A. I did get a part-time job with Holy Family

24  Hospital as a mental health counselor, but there was

Page 27

1  some turnover and I kind of got lost in the shuffle,

2  so I haven't actually worked there.  I did training

3  there, but I didn't start there.  So just kind of --

4    Q. Was that something fairly recent?

5    A. Yes.  Within the last year.

6    Q. Was that in connection with your current

7  schooling?

8    A. Yes.

9    Q. Any other part-time or other jobs since you

10  joined Somerville Police Department?

11    A. I just got accepted into an internship

12  with -- what are they called?  It's a -- it's like a

13  therapy center in Connecticut, that I just got an

14  internship with.  I should know the name.  I'm

15  blanking on it.  The Hope Wellness Center.  Hope

16  Wellness Center.  I'm pretty sure that's it.

17    Q. Do you know when you started there?

18    A. In July.

19    Q. Is that something that'll require you to leave

20  your current employment?

21    A. No.

22    Q. So that'll become a part-time, fit it in when

23  your schedule allows?

24    A. Yes.

Page 28

1    Q. Just kind of generally, what do you expect

2  your duties to be in that internship role?

3    A. So in the beginning it'll be mostly observing

4  the therapist working with clients that she sees.

5  I'll be doing case notes, case management.  And as my

6  training progresses, I'll eventually start

7  participating in the sessions and running them myself.

8    Q. Is that an outpatient mental health provider

9  of some kind?

10    A. Yes.

11    Q. Do you know if that facility focuses on any

12  specific types of mental health concerns?

13    A. It does.  It's -- it's specifically for first

14  responders, military members, correctional officers,

15  dispatchers.  Anyone that's kind of in that field and

16  their immediate family members.

17    Q. All right.  So have we covered all your

18  post-graduation from Suffolk University employment so

19  far?

20    A. Yes.

21    Q. Did that concentration in crime and justice

22  at Suffolk University include any kind of training on

23  safe handling of firearms?

24    A. No.



Page 29

1    Q. I take it there was no kind of firearms
2  training provided in connection with that degree?
3    A. No.
4    Q. Okay. How about your master's in criminal
5  justice from UMass Lowell? Did that address any kind
6  of firearms training of any kind?
7    A. No.
8    Q. The mental health counseling degree that
9  you're currently working on, what type of a role are
10  you working towards with that degree? Is it an
11  outpatient therapist type of role?
12    A. Yes. I want to be a licensed mental health
13  counselor.
14    Q. All right. I may circle back to this a
15  little bit depending on, you know, when we get to
16  damages in this case, and maybe get into a little more
17  detail, some of what you've learned there. We may
18  come back to that a little bit.
19    A. Okay.
20    Q. When you joined Somerville, what did you join
21  as rank-wise?
22    A. Patrol officer.
23    Q. How long were you a patrol officer?
24    A. Technically, I'm -- I still am, so 12 years

Page 30

1  and counting.
2    Q. When you say technically, why do you kind of
3  couch that as technically?
4    A. Because my title now is detective, but I
5  still do work in patrol from time to time.
6    Q. When did you get that title as detective?
7    A. So I was asked to fill in back in 2021 when
8  one of the detectives in family services were -- was
9  going out on maternity leave and they were
10  short-staffed. They asked if I wanted to fill in. I
11  accepted. So I was in the detective bureau as a
12  detective for eight months. Then I was assigned back
13  to patrol.
14      And then in November of 2022, I was selected
15  unanimously by a selection board to go back into that
16  role as a permanent detective.
17    Q. You said that was November of 2022?
18    A. Yes.
19    Q. So since then, since November of 2022, have
20  you still worked out on patrol or has it all been
21  detective work?
22    A. I've still been working in patrol.
23    Q. What kind of a percentage split, if you had
24  to break it down, would you say, is patrol versus

Page 31

1  detective?
2    A. Percentage-wise? Majority detective. Eighty
3  percent, I guess.
4    Q. Okay. Good enough. Yeah. I was just kind
5  of looking for an idea of -- well, and that's --
6    A. Okay.
7    Q. So as a detective, what are your day-to-day
8  responsibilities?
9    A. So I'm assigned to the family services unit.
10  So we handle all the sexual assault cases, the
11  domestic violence cases, child and elder abuse cases,
12  and neglect cases. We manage the sex offender
13  registry for the city. And we also handle hate
14  crimes. And recently, they have been having me take
15  on more juvenile cases. So kind of do all that.
16    Q. And I take it your responsibilities as a
17  detective would be to investigate those crimes?
18    A. Yes.
19    Q. Do you work kind of hand-in-hand with the
20  prosecutor's office?
21    A. Yes.
22    Q. Other than your time as a detective and time
23  as a patrol officer, have you had any other titles,
24  ranks, or duties that we haven't discussed at

Page 32

1  Somerville PD?
2    A. I mean, I had, like, a chief's pick in the
3  traffic department -- traffic unit, and then I had a
4  chief's pick as the chief's aide.
5    Q. What's a chief's pick?
6    A. A chief's pick is basically a -- a job pick
7  that the chief can pick anyone he wants to fill that
8  position.
9    Q. Did you have to submit for those or was it
10  just based on, you know, the chief's familiarity with
11  your work and he wanted to put you in one of those
12  positions?
13    A. It's just based on the chief wanting to put
14  whoever he wants in that position.
15    Q. Who's the chief?
16    A. Right now it's Charlie Femino. Charles
17  Femino.
18    Q. And what did the chief's pick for the traffic
19  unit entail?
20    A. So I was assigned to the traffic unit as a
21  traffic officer. So basically, I handled hiring the
22  crossing guards, maintaining their training and their
23  supplies. I would do traffic enforcement from time to
24  time. I would respond to traffic accidents when



ASHLEY CATATAO                                                  June 06, 2023
ASHLEY CATATAO vs SIG SAUER                                         33–36

Page 33

1   asked. And then I would do, like, administrative
2   stuff, like entering the citations into the system,
3   delivering tow tickets and all that loveliness to the
4   traffic department.
5       Q. How long did you work in that position?
6       A. For the traffic pick, I think it was three
7   months. And then I went back into traffic, I think,
8   for about a year on another chief's pick.
9       Q. When did those traffic unit chief's picks
10  take place?
11      A. Oh. I don't remember. It was after my son
12  was born, so 2015, 2016 maybe.
13      Q. Were they both before the discharge?
14      A. Yes.
15      Q. You also mentioned that you had a chief's
16  pick as the chief's aide. What did that entail?
17      A. I was kind of like the secretary for the
18  chief.
19      Q. When was that?
20      A. 2016 maybe. It was around the same time.
21      Q. Was that Chief Charles Femino at the time, or
22  was it someone else?
23      A. No. It was Dave Fallon, F-A-L-L-O-N.
24      Q. Did you have any other chief's picks other

Page 34

1   than those two?
2       A. Just the detective position in 2021 for eight
3   months.
4       Q. Oh. Okay. Gotcha.
5          And was the chief then Dave Fallon or Charles
6   Femino?
7       A. It was Charles.
8       Q. Have you held any other job titles or roles
9   that we haven't talked about?
10      A. I don't believe so.
11      Q. As a patrol officer, just kind of generally,
12  what were your duties or are your duties in that role?
13      A. If you were on the road you would respond to
14  calls for service. You would conduct direct patrols.
15  Basically, just becoming a high visibility at certain
16  locations. Provide medical aid when needed. Enforce
17  traffic laws. Engage with the community. Things like
18  that.
19      Q. Okay. All right. When you were first hired
20  by Somerville in 2010, what pistol or firearm were you
21  issued?
22      A. It was a Sig Sauer 229 Dak, I believe it was.
23  A Dak. I think they called it a Dak, D-A-K. It was a
24  40 caliber.

Page 35

1       Q. Did you have that 229 up until the point that
2   the department switched to the 320?
3       A. Yes.
4       Q. Have you ever been issued any other pistols
5   by Somerville Police Department?
6       A. No.
7       Q. Okay. So far, overall, in all your work
8   experience, we have the Beretta that you were issued
9   by T&S security. We have the Sig Sauer 229 and the
10  Sig Sauer P320 that you've been issued. Have you been
11  issued any other firearms by any other employer?
12      A. No.
13      Q. The 229 that you were issued, did that have
14  an external manual safety on it?
15      A. No.
16      Q. Did it have a trigger of any kind?
17      A. Just a normal one. Just the one single
18  trigger.
19      Q. So if you looked at the trigger face, it
20  would just be a flat piece of plastic or metal?
21      A. Yes.
22      Q. Are you aware of any accidental discharges at
23  the Somerville PD involving the 229?
24      A. The 229? No.

Page 36

1       Q. Did you ever have any problems with the 229
2   that you had to raise with superiors or anybody else
3   in the department related to the 229's safety?
4       A. No.
5       Q. Were you comfortable carrying the 229?
6       A. Yes.
7       Q. Do you feel like the 229 was a safe firearm
8   for you to use as an officer?
9       A. Yes.
10      Q. Do you know why the Somerville Police
11  Department selected that 229 without an external
12  manual safety?
13          MR. CEISLER: Objection.
14  BY MR. WOY:
15      Q. You can answer if you know.
16      A. I don't.
17      Q. Did you ever ask to be issued a alternative
18  pistol to that 229 that had an external manual safety?
19      A. No.
20      Q. Did the fact that that 229 did not have an
21  external manual safety concern you at all?
22      A. No.
23      Q. How about the fact that that 229 did not have
24  a tap trigger? Did that concern you at all?



Page 37

1    A.  No.
2    Q.  So I assume that when you were issued that
3  229, you had to go through some safety courses and
4  some training; is that right?
5    A.  Yes.
6    Q.  Were those safety courses and training
7  provided by Somerville PD?
8    A.  So we started firearms training in the
9  academy.
10    Q.  All right.  So I jumped over that.
11       So let's talk about the academy, then.
12    A.  Okay.
13    Q.  So I take it when you were hired by
14  Somerville PD, you went straight into the academy?  Is
15  that how it worked?
16    A.  Yes.
17    Q.  How long was the academy?
18    A.  It was about 21 or 22 weeks, I believe.
19    Q.  Who ran the academy?
20    A.  The State.  The Municipal Police Training
21  Council.
22    Q.  Where was that academy located?
23    A.  My academy that I attended was located at
24  Camp Curtis Guild in Reading.  So it was the Reading

Page 38

1  Municipal Police Training Academy.
2    Q.  Did you have to -- well, where is Reading in
3  relation to Somerville?
4    A.  About 20 minutes, I'd say.  On the highway.
5    Q.  So I take it you lived at home when you went
6  to that academy?
7    A.  Yes.
8    Q.  While you were at the academy, you received
9  some firearms training; it sounds like?
10    A.  Yes.
11    Q.  What did the firearms training that you
12  received at the academy include?
13    A.  So we did five days at the -- I forget which
14  range it was, but we were going to the range five days
15  in a week.  Well, so one straight week at the range.
16  We did firearms training for eight hours a day.
17    Q.  And was that firearms training on the Sig
18  229, or was it on something else?
19    A.  It was on the Sig 229.
20    Q.  Did all the other, I guess, academy attendees
21  or officers at the academy also have the 229?
22    A.  No.  So we all carried whatever our
23  department was carrying.
24    Q.  Do you recall what other pistols other people

Page 39

1  at the academy were training with?
2    A.  I know some others had Glocks.
3    Q.  Do you recall any others?
4    A.  No.
5    Q.  Are you familiar with whether Glock pistols
6  have external manual safeties?
7    A.  I don't.
8    Q.  Have you ever carried or shot a Glock?
9    A.  I have not.
10    Q.  Was the training that was provided to you
11  with respect to firearms safety specific to the 229 or
12  was it just general pistol safety?
13    A.  General.
14    Q.  Did any of the training that was provided to
15  you at the academy address any specific care you
16  needed to take with regard to carrying a pistol
17  without an external manual safety?
18    A.  I don't recall.
19    Q.  Do you recall whether any of the training
20  highlighted the fact that the pistol you had didn't
21  have an external manual safety?
22    A.  I'm sure they addressed it, but I don't
23  recall exactly.
24    Q.  Fair enough.  Do you know whether anybody at

Page 40

1  the academy when you were there had a pistol with an
2  external manual safety on it?
3    A.  I don't recall.
4    Q.  Now, you mentioned that you were five days on
5  the range.  Was there also a classroom safety
6  component or classroom component of any kind?
7    A.  I believe we did do a classroom day before we
8  hit the range.
9    Q.  What types of training did you do on the
10  range at the academy?
11    A.  Basic stuff.  How to fix malfunctions.  I
12  know we did a night shoot.  So we went in for the
13  nighttime to do night shooting, lowlight shooting.
14  Manual -- like, quick reloads of the firearms.  Moving
15  and shooting.  That's pretty much what I can recall.
16    Q.  Did you have to qualify on the 229 with the
17  academy or did that come later when you actually went
18  to Somerville?
19    A.  Both.  We had to qualify in the academy and
20  then when we went to the department.
21    Q.  Did any of the training that was provided to
22  you at the academy deal with how to safely carry a
23  pistol in a holster?
24    A.  I'm sure it was addressed.  So yes.



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
41—44

Page 41

1    Q.  Do you remember anything that was said about
2  that?
3    A.  I recall them always making sure that we had
4  our retentions fully engaged when in patrol, because
5  people would try to take our guns.  So I recall that.
6    Q.  When you say retention, what type of
7  retention are you referring to that had to be engaged?
8    A.  So our holsters have always been triple
9  retention holsters, so we have to have all three
10  retentions engaged in order to make sure that the
11  firearm's completely secure.
12    Q.  And one of that would be the hood; is that
13  right?
14    A.  Yes.
15    Q.  And then what are the other two?
16    A.  So you would push down on the hood.  You
17  would rock it forward.  And there was also, like, a
18  tab on the side that you would push in.  So you'd push
19  in, push the hood down, and then you'd rock it forward
20  and rock it back to get it out.  So the hood goes
21  forward, the gun rocked back a little bit, and pull
22  up.
23    Q.  When you were carrying the 229, what model or
24  manufacturer holster did you have?

Page 42

1    A.  I don't recall.  I believe it was Safariland.
2    Q.  And you had a Safariland on the day of the
3  accidental discharge; is that right?
4    A.  Yes.
5    Q.  Do you still have a Safariland holster?
6    A.  That is a good question.  I don't know.  They
7  gave us new holsters after the incident.  I don't
8  recall what brand it was.
9    Q.  So at any point in time, you know, regardless
10  of -- well, I got to start that question over.
11       So up until the point in time of the accidental
12  discharge, it sounds like you were carrying Safariland
13  holsters?
14    A.  Yes.
15    Q.  And at any point in time, regardless of
16  brand, it would've been triple retention?
17    A.  Yes.
18    Q.  With the triple retention holster that you
19  were using with the 229 or the P320, was the retention
20  system the same?
21    A.  Yes.
22    Q.  Was there any kind of physical or audio
23  indication that signaled to you that the pistol was
24  fully holstered?

Page 43

1    A.  You would hear click.  You would hear a
2  click.  When the firearm went into the holster you
3  would hear a click.
4    Q.  What about when you put the hood up?  Was
5  there any kind of audio or something you could feel
6  with that?
7    A.  I mean, when you pushed it forward, I mean,
8  there could've been a click, but I don't recall
9  exactly.  I just know there -- like, when you push it
10  forward, it would stop.  And that's when you know it
11  was fully off.
12    Q.  Is it possible to get a pistol into that type
13  of retention holster and put the hood up without
14  having the pistol fully holstered?
15    A.  No.  No.  If that -- if the -- if the gun is
16  not seated in properly, you're not going to be able to
17  engage the hood, because the gun wouldn't be flush in
18  the hood -- in the holster.  That -- that hood would
19  not engage.
20    Q.  Did any of the training you received at the
21  academy address whether something could get down into
22  your holster and pull the trigger inadvertently?
23    A.  I don't believe that was ever addressed.  I
24  don't recall.

Page 44

1    Q.  Did any of the training at the academy
2  address what you as an officer should do to prevent
3  accidental discharges involving your firearm?
4    A.  Yes.
5    Q.  What did that training entail?
6    A.  Keep your finger off the trigger unless you
7  intend to shoot whatever you're pointing at.
8    Q.  Anything else?
9    A.  I don't recall.
10    Q.  Do you remember anything else about the
11  safety training that was provided to you at the
12  academy that we haven't discussed already?
13    A.  No.
14    Q.  Okay.  So once you got out of the academy,
15  did you go straight to work at Somerville Police
16  Department?
17    A.  Yes.
18    Q.  And that's when you came in as a patrol
19  officer and went out on the street?
20    A.  Yes.
21    Q.  How long did you carry the 229 at Somerville?
22    A.  I don't recall the exact dates.  I would say
23  maybe four or five years.
24    Q.  So that would put us around 2014 or 2015?



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
45–48

Page 45

1    A.  Okay.  So a little bit longer.  Yeah.  Maybe
2  2016 might've switched.  I -- don't quote me on that,
3  but I think that was around the time.  2016, 2017.
4    Q.  Okay.  I understand that's an estimate.
5  Sometime around -- did you say 2016 or --
6    A.  2016, 2017.
7    Q.  Okay.
8    A.  I don't recall exactly when, but I think it
9  was around maybe those years.
10   Q.  And that's when you switched from the 229 to
11 the 320?
12   A.  I believe so.  Yes.
13   Q.  Were you involved in any way in the selection
14 of the P320 by the department?
15   A.  No.
16   Q.  Do you know who was involved with that
17 selection?
18   A.  I believe Lieutenant Vivolo.
19   Q.  Do you know what his role was?
20   A.  He's our armorer and training lieutenant.
21   Q.  Do you know whether he considered any other
22 firearms other than the P320 when he selected it?
23   A.  I don't know.
24   Q.  Do you know anything about his selection

Page 46

1  process?
2    A.  I don't.
3    Q.  Were you issued the P320 that was involved in
4  this accidental discharge back in 2016 or '17?
5    A.  Yes.
6    Q.  So in other words, that was a bit of an
7  inartful question.
8       At any point in time, the one you were originally
9  issued wasn't replaced before the discharge; is that
10 right?
11   A.  So are you saying the one that at the time of
12 the incident?  It was the same one that they had
13 issued me originally.  Yes.
14   Q.  Are you aware of any kind of modifications or
15 alterations that were made to that pistol prior to the
16 discharge?
17   A.  No.
18   Q.  Did you have any kind of malfunctions or
19 issues with the performance of the P320 prior to that
20 accidental discharge?
21   A.  Possibly at the range.  I know we trained to
22 clear malfunctions, so if we had a malfunction on the
23 range, most likely it was intentional because we were
24 creating it to -- in order to train how to clear it.

Page 47

1  I know we did that when we used dummy rounds.  Whether
2  my gun jammed or malfunctioned at the range, I don't
3  believe -- I don't recall.
4    Q.  Okay.
5    A.  No malfunctions.  I know that.  But if it
6  jammed, it could've been while I was shooting, and we
7  just fixed it.
8    Q.  Okay.  How did the P320 shoot when you got
9  it?
10   A.  Really well.  I -- a lot better than the last
11 one.
12   Q.  What was the difference that you liked about
13 it?
14   A.  With the 320, what I liked about it was its
15 lighter.  The trigger pull's not as long or as heavy.
16 It's not a heavy trigger pull, whereas the 229 was a
17 heavier trigger pull and the gun was a lot heavier
18 because it was a 40 cal and now we're using 9 cal -- a
19 9 millimeter.
20   Q.  So you liked the fact that the trigger pull
21 was shorter and lighter than the 320?
22   A.  Yes.  And the gun itself was lighter.
23   Q.  Why was the trigger pull being shorter and
24 lighter important to you?

Page 48

1    A.  It made it more accurate to shoot at the
2  range.
3    Q.  Did the department issue a new holster to you
4  when you were given that P320?
5    A.  I believe so.  Yes.  I believe so.
6    Q.  Do you know if the holster that was issued to
7  you when you were first issued the 320 was the same
8  one that was involved on the accidental discharge?
9    A.  I don't recall.
10   Q.  I take it when you were issued the P320, the
11 department would've provided some sort of training on
12 how to use it; is that right?
13   A.  Yes.
14   Q.  Who provided that training?
15   A.  Lieutenant Vivolo.
16   Q.  Was anybody else involved?
17   A.  We have other training -- like, firearms
18 instructors.  So they would've been at familiarization
19 day and at the range with us.
20   Q.  What does familiarization day entail?
21   A.  So basically, we came into the department to
22 start and we were brought into the academy room.  And
23 we were issued -- we had to turn in our old Sigs and
24 we were issued the new Sigs.  And basically, he just



Page 49

1  talked to us about the gun, how to take it apart, how
2  to clean it, how to put it back together. Just that
3  type of stuff.
4        THE VIDEOGRAPHER: Excuse me.
5        MR. WOY: Sure.
6        THE WITNESS: Oh. Sorry.
7        THE VIDEOGRAPHER: It's okay.
8  BY MR. WOY:
9        Q. All right. So you were issued the pistol on
10  familiarization day, but I take it that at some point
11  prior to that you had heard that you would be getting
12  the 320?
13       A. Yes.
14       Q. When did you first hear that you'd be issued
15  the 320?
16       A. I don't recall the exact date, but I know he
17  sent an email out to us and let us know, and then he
18  gave us our training dates.
19       Q. Did you know anything about the P320 around
20  the time that you were first told that you'd be
21  transitioning to it?
22       A. So I had Googled it because I wanted to see
23  what it looked like and just kind of read about it,
24  because it was a brand new gun that we were getting.

Page 50

1  And I had Googled the gun.
2        Q. Do you recall whether you went to Sig Sauer's
3  website when you did that online search or whether you
4  just read third-party materials?
5        A. I remember Googling it, and I think I just
6  picked a few links and read them. I don't recall if I
7  went exactly to Sig's website.
8        Q. Do you recall any information that you
9  learned as a result of those searches?
10       A. Yes.
11       Q. What did you learn?
12       A. I had read an article how the 320 was known
13  to go off if dropped. If whoever was carrying it
14  dropped the firearm, the firearm was known to
15  discharge.
16       Q. Did you learn anything else about it?
17       A. I had read that they had, you know,
18  supposedly fixed the issue.
19       Q. Anything else?
20       A. No.
21       Q. Do you know anything about what causes or
22  what could cause the P320 to discharge if it was
23  dropped?
24       A. It went into a lot of, like, specific

Page 51

1  mechanical stuff that I didn't really understand, so I
2  can't recall off the top of my head.
3        Q. Do you know if the information about the
4  potential for discharge, if dropped, came from Sig's
5  website or from other source?
6        A. It was another source.
7        Q. At some point, did you learn about the
8  voluntary upgrade program at Sig instituted in
9  connection with that research?
10       A. I believe one of the articles addressed it,
11  and then at familiarization day, I had asked about it.
12       Q. Did you ask Lieutenant Vivolo?
13       A. Yes.
14       Q. What did he say about it?
15       A. So I had addressed what I had read with him
16  that I read that -- you know, I read an article where
17  if you drop the gun, the gun is known to go off, and I
18  had some concerns about that because we do a very
19  physical job. And he said that the guns that we had
20  were an upgraded version and that that issue had been
21  fixed.
22       Q. And when he said that to you, did that, you
23  know, sway your concerns, or did you still have
24  reservations about carrying the 320?

Page 52

1        A. I trusted him, so I said all right, cool,
2  we're good.
3        Q. Did you know anybody who either had or had
4  used a 320 before you were issued them?
5        A. No.
6        Q. I take it that you didn't fire a P320 before
7  it was issued to you by the department, then?
8        A. No.
9        Q. When you were issued the P320, were you given
10  any kind of written materials with it?
11       A. Yes. So we got the box that it came in, and
12  I believe there was a brochure inside. And then
13  Vivolo -- Lieutenant Vivolo, I'm sure he handed out
14  the paperwork like he always does on firearms day. So
15  I know our policy was updated with the new Sig 320
16  information in the policy.
17       Q. When you say there is a brochure in the box,
18  was that a brochure from Sig Sauer or from someone
19  else?
20       A. Yes. Sig.
21       Q. When you say brochure, are you able to be any
22  more specific about what that document was?
23       A. No. I just remember inside the box there was
24  like a -- like a little booklet, like a pamphlet or --



Page 53

1    Q. Did you read through that pamphlet?

2    A. I did not.

3    Q. So you wouldn't have any information about
4  what kind of warnings were provided, or instructions
5  were provided in that pamphlet then?

6    A. No.

7    Q. Other than that pamphlet, were you provided
8  any other written materials from Sig Sauer with your
9  pistol?

10    A. No. I don't believe so.

11    Q. Prior to being issued the P320, did you
12  review any written materials of any kind prepared by
13  Sig Sauer?

14    A. I don't believe so.

15    Q. And I think you said that you don't recall
16  either way whether you had gone to Sig Sauer's website
17  before you were issued the P320; is that accurate?

18    A. Yeah. I don't recall.

19    Q. So I take it you couldn't tell me anything
20  about what was on Sig Sauer's website at the time you
21  were issued the P320?

22    A. No.

23    Q. Since the day that you were issued your P320,
24  have you reviewed any kind of written materials

Page 54

1  prepared by Sig Sauer in connection with the P320?

2    A. I don't believe so.

3    Q. All right. Similar question. Since you were
4  issued the P320, have you gone to Sig Sauer's website
5  at any point in time?

6    A. I believe I did. I believe so.

7    Q. Do you recall when that was?

8    A. No.

9    Q. What was the purpose in going to Sig's
10  website?

11    A. I think it was -- it was when I was
12  researching -- getting, like, an off-duty firearm. I
13  think I was just looking at the different firearms
14  they had because I did like the Sig 320, and I wanted
15  to see if they had a more compact model.

16    Q. Do you recall any specific information that
17  you learned through Sig's website when you went to
18  look at it at that time?

19    A. No.

20    Q. Do you recall -- oh, I asked you when -- I
21  asked you that already. All right. Was that the only
22  time that you've been to Sig's website?

23    A. I can't recall, to be honest.

24    Q. And you said you went to the website to

Page 55

1  consider or to research whether there was a smaller
2  version of the P320?

3    A. Yeah. Like a compact version. Something to
4  carry, like, off-duty.

5    Q. Okay. Have you purchased the P320 other than
6  the one that was issued to you by the department?

7    A. No.

8    Q. I take it that that time you went to the
9  website to look for the compact version would've been
10  before your accident of discharge, then?

11    A. Yes.

12    Q. We've been going a little over an hour. Do
13  you want to take a break?

14    A. I'm okay.

15    MR. WOY: How about you guys? Do you want to
16  take a break? Okay. We'll keep going.

17  BY MR. WOY:

18    Q. All right. When you were issued the P320,
19  you received some training from Lieutenant Vivolo,
20  right?

21    A. Uh-huh.

22    Q. What did that safety training that was
23  provided by him with respect to the P320 entail?

24    A. Knowing Vivolo well, it was don't point it

Page 56

1  unless you're going to shoot it, always keep it
2  pointing down range, keep your finger off the trigger,
3  keep it off the trigger guard, out of the trigger
4  guard unless you're going to pull the trigger, and
5  just pretty much, like, how to clear malfunctions.

6    Q. You said knowing Vivolo. What do you
7  mean by that?

8    A. He uses very colorful terminology when we're
9  training.

10    Q. Okay. Is he a pretty thorough training
11  officer, do you think?

12    A. Yeah. I'd say so.

13    Q. Do you recall whether Lieutenant Vivolo
14  addressed the fact that the P320 doesn't have an
15  external manual safety during that training?

16    A. I'm sure he addressed it because if it did,
17  he would have to show us where it was, so yes.

18    Q. Do you remember anything specific he said
19  about that?

20    A. I just think he said there's no safety on it.

21    Q. Do you recall him saying anything about what
22  that meant with regard to the safety measures you had
23  to take as someone carrying that handgun?

24    A. I don't recall.



Case 1:22-cv-10470-PBS   Document 832-4   Filed 03/28/24   Page 126 of 439

Page 57

1    Q.  Do you recall whether he specifically
2  addressed the fact that the P320 doesn't have a tab
3  trigger or hinged trigger or anything like that?
4    A.  It -- the trigger wasn't -- wasn't any
5  different really than our 2229, so probably not.  I
6  don't recall, though.
7    Q.  Other than what we've talked about already,
8  do you recall anything about the safety instructions
9  that were given to you by the Somerville P.D. with
10  respect to the P320?
11    A.  No.
12    Q.  Okay.  After the familiarization day, did you
13  start carrying the P320 right away, or did you have to
14  qualify on it at some later point?
15    A.  We went to the range to practice with it, and
16  then, I believe, we did a qualification.
17    Q.  Was that the same day as familiarization, or
18  was that sometime later?
19    A.  It was the same day.
20    Q.  Did you have any trouble qualifying with it?
21    A.  No.
22    Q.  What did the qualification process entail?
23    A.  It's a 50-round qualification course, so
24  we're shooting from 15-yard line, the 10-yard line,

Page 58

1  7-yard line, 5-yard line, and 3-yard line.
2    Q.  Do any of the aspects of the qualification
3  require you to, you know, manipulate the holster or
4  quickly draw the weapon out of the holster or anything
5  like that?
6    A.  When we start the qualification, our -- we
7  usually holster, and then when he yells up, we would
8  take it out of the holster and fire it, and it's timed
9  also.  We have a time limit, but it's plenty of time.
10  You don't have to rush.
11    Q.  Do you own any personal firearms?
12    A.  I do.
13    Q.  What do you own?
14    A.  I had -- I had a M and P 40 compact.  And I
15  ended up trading it legally with a coworker, and he
16  gave me his BODYGUARD 380.
17    Q.  When did you make that trade?
18    A.  I don't recall the exact date.  Years ago.
19    Q.  And that BODYGUARD, is it Smith and Wesson?
20    A.  Yes.
21    Q.  Was that trade before or after the accidental
22  discharge?
23    A.  It was before.
24    Q.  Do you still have the BODYGUARD?

Page 59

1    A.  I do.
2    Q.  Do you carry it?
3    A.  Occasionally, off-duty.
4    Q.  Do you have any other personal firearms?
5    A.  No.
6    Q.  Have you ever owned any -- even if you got
7  rid of them, have you ever owned any other personal
8  firearms?
9    A.  Just that M and P 40 compact.
10    Q.  Did the M and P 40 compact have an external
11  manual safety on it?
12    A.  I don't recall.
13    Q.  Did you personally select and purchase that M
14  and P 40?
15    A.  Yes.
16    Q.  When did you purchase it?
17    A.  Good question.  I don't recall exactly.  I
18  believe it was before my son was born, so before 2014.
19    Q.  Is that something that you carried as, kind
20  of, a secondary weapon on duty, or was that strictly an
21  off-duty weapon?
22    A.  Off duty.
23    Q.  Is that the same for the BODYGUARD?
24    A.  Yes.

Page 60

1    Q.  Why did you trade the M and P for the
2  BODYGUARD with your coworker?
3    A.  I wanted something smaller, something more
4  compact that I could easily, you know, hide.
5    Q.  Does the BODYGUARD have an external manual
6  safety?
7    A.  It does.
8    Q.  Is it a striker-fired pistol?
9    A.  So striker-fired would be the internal,
10  right, because the hammer would be on the outside?
11    Q.  Yeah.  So let me ask this.  Do you know the
12  difference between a hammer-fired pistol and a
13  striker-fired pistol?
14    A.  I believe the hammer-fired is -- it has
15  the -- I'm not really good with gun terminology, but I
16  think it has that piece on the back that, like, does
17  this.  And then the -- I think a striker-fired does
18  not have that hammer on the back, I believe.  I should
19  know that.
20    Q.  How often do you carry the BODYGUARD?
21    A.  Not every time.  If I feel like I'm going
22  somewhere that's sketchy, I will carry it.
23    Q.  When kind of a holster do you have for the
24  BODYGUARD?



Page 61

1    A. It's an -- it's an inner pants
2  holder -- holster, so it clips on the outside, and then I
3  can secure it on the inside of my waistband.
4    Q. Is it an appendix holster, or do you carry
5  it -- well, let me ask you this. Where physically do
6  you have that holster?
7    A. Right here --
8    Q. Okay.
9    A. -- inside, like -- so I guess -- is that why
10 it's called an appendix because it's near your
11 appendix? Sure, that's where I carry it, right here.
12   Q. Okay. Got you. What type of retention do
13 you have on that holster?
14   A. I just pull it up. I don't think there is,
15 like, an actual retention on it. I believe it
16 just -- you just pull it up. There's no hood or
17 anything.
18   Q. Do you know who manufactures that holster?
19   A. I don't. I got it on Amazon.
20   Q. When you purchased the M and P 40, was it
21 important to you whether or not that pistol had an
22 external manual safety?
23   A. No.
24   Q. Did the fact that the BODYGUARD had an

Page 62

1  external manual safety motivate the trade in any way?
2    A. No.
3    Q. How did you select the M and P 40 when you
4  purchased it?
5    A. I went to the gun store, and I remember
6  having a conversation with the -- the seller. And I
7  think it was something that he had recommended.
8    Q. Do you ever carry a backup weapon while
9  you're working at Somerville?
10   A. No.
11   Q. Does the department allow you to carry a
12 backup weapon?
13   A. It's in our policy that you can but you need
14 to get permission from the chief, and you have to
15 qualify with it.
16   Q. Does the department maintain a list of
17 firearms that are approved for backup weapon carry?
18   A. I don't know.
19   Q. Do you know if you would be permitted to
20 carry a firearm as a backup weapon if it had an
21 external manual safety at Somerville?
22   A. I don't know.
23   Q. Does Somerville have a policy with regard to
24 whether you are permitted to carry a firearm other

Page 63

1  than the P320 on duty?
2    A. I believe administrative positions can carry
3  a different firearm, but I don't know if anyone
4  actually does.
5    Q. Do you know if you'd be permitted to carry
6  something other than the P320 if you asked?
7    A. I don't know.
8    Q. Have you ever asked if you could carry
9  something other than the P320?
10   A. I asked if we could switch guns after my
11 incident. I remember that, but, no, they did not
12 allow me to.
13   Q. Who did you ask?
14   A. I believe I was speaking to Deputy Chief
15 Stanford.
16   Q. Did you talk to anybody else about whether
17 you could switch guns?
18   A. In an official position? No.
19   Q. So let me ask you this just to clarify. Were
20 you asking him if the whole department could switch
21 from the P320, or if just you could switch from the
22 P320?
23   A. I had asked if the department was considering
24 switching firearms because of what happened.

Page 64

1    Q. Okay. And what did he say in response to
2  you?
3    A. He told me that they were having a serious
4  conversation about it.
5    Q. When you said they, do you know who he was
6  referring to?
7    A. I'm assuming it was him, the chief, and
8  Lieutenant Vivolo.
9    Q. So you asked if the department was
10 considering switching as a whole from the P320, but
11 you never asked if you personally could carry
12 something else; is that accurate?
13   A. Yes.
14   Q. And fair to say, the department did not
15 switch from the P320?
16   A. Yes.
17   Q. Do you know why the decision was made to stay
18 with the P320?
19   A. I don't.
20   Q. Have you ever asked if you could be issued a
21 P320 with an external manual safety?
22   A. No.
23   Q. Do you know whether the P320 is available
24 with the external manual safety as an option?



Page 65

1    A. I don't.
2    Q. Do you know whether the department would
3  allow you to carry a pistol with a tab trigger if you
4  asked?
5    A. I don't know.
6    Q. Fair to say, you've never asked if you could?
7    A. Yes.
8    Q. Do you know of any officers, other than
9  people in admin functions, who carry a pistol other
10  than P320 at Somerville?
11    A. No.
12    Q. Does departmental policy require you to keep
13  a round in the chamber?
14    A. I don't know, to be honest.
15    Q. Do you currently carry the P320?
16    A. Yes.
17    Q. Do you carry it with a round in the chamber?
18    A. No.
19    Q. Did you prior to the discharge?
20    A. Yes.
21    Q. Has any of the training provided to you by
22  Somerville P.D. addressed whether or not you should
23  carry your pistol with a round in the chamber?
24    A. It's just something we've also been trained

Page 66

1  to do, so it's what we did.
2    Q. Sorry. Tied up with the cords here.
3    A. No worries.
4    Q. When you returned to working full-time at the
5  department, that was towards the end of April of 2022;
6  is that right?
7    A. I believe so.
8    Q. Was there any period of time when you
9  returned to work full-time where you didn't carry a
10  P320 or other pistol while on duty?
11    A. I'm sorry. Can you rephrase the question?
12    Q. Yeah. And that's my fault for the poorly
13  worded question. So when you went back to work after
14  the discharge, was there any point in time where you
15  just didn't carry a pistol at all while you were
16  working full-duty?
17    A. No. If you're -- if you're on full-duty,
18  you're carrying.
19    Q. Yeah. Are you comfortable carrying the P320
20  currently?
21    A. No.
22    Q. Why is that?
23    A. Because I'm afraid it will go off again.
24    Q. Have you attended any kind of firearms

Page 67

1  training through Somerville P.D. or anywhere else
2  since the accidental discharge?
3    A. Just with Somerville for the range and with
4  the Middlesex County sheriffs.
5    Q. What was the training with the sheriffs for?
6    A. So once a year, they come to us with a
7  trailer. And in the trailer, they have a projection
8  screen set up, and it displays a scenario on the
9  backstop of the trailer. And you can shoot live
10  rounds in the trailer at the scenario going on. So
11  you're basically interacting with the scenario that
12  they control from a control center behind you. And
13  they'll give you different scenarios to walk through
14  as if it is real. In some of the scenarios, you have
15  to shoot your firearm.
16    Q. Has any of these safety training, since your
17  accidental discharge that you've received from
18  Somerville or the sheriff focus --
19    A. I'm sorry. You asked for safety training.
20  No. No safety training.
21    Q. Okay.
22    A. That was just firearms training.
23    Q. Got you.
24    A. Okay.

Page 68

1    Q. Okay. So let's go back and clarify that.
2    A. Okay.
3    Q. So since your accidental discharge, you
4  haven't received any kind of additional safety
5  training, with respect to firearms, from any source;
6  is that right?
7    A. No.
8    Q. Okay. And the training that you were talking
9  about was firearm proficiency-type training?
10    A. Yes.
11    Q. Okay. Has there been a change in the holster
12  that's used by Somerville since your accidental
13  discharge?
14    A. Yes.
15    Q. When did that change in holster occur?
16    A. Right after my incident.
17    Q. Do you know why the department changed
18  holsters?
19    A. So Lieutenant Vivolo had a theory that our
20  holsters before were not the best fit for the P320.
21  It wasn't -- wasn't specifically -- I'm not sure the
22  exact terminology, but he said it wasn't a good fit
23  for the gun anymore.
24    Q. Do you know anything more about why he didn't



Page 69

1 think it was a good fit?

2    A. They believe because -- they believe that
3 because it's not a exact fit to the gun, that
4 something can get inside the holster.

5    Q. Do you think that the holster that you were
6 using on the day of the discharge was a good fit for
7 your P320?

8    A. I had been carrying it for years, so yes.

9    Q. What's the difference between the holster
10 that you had on the day of the incident and the one
11 that was issued to you by the department right after?

12    A. So the new holsters we have, you cannot use a
13 rail light on the gun. So we cannot use rail lights
14 anymore, which we did have before. And I believe this
15 holster is specifically made for the P320, and it's
16 molded, like type, I guess. I don't know the real
17 terminology, but it's a better fit.

18    Q. Do you know if the holster that you had on
19 the day of the discharge was made specifically for the
20 P320?

21    A. I don't recall.

22    Q. That was a Safariland?

23    A. Yes.

24    Q. Did the department have any policy with

Page 70

1 regard to whether you were supposed to have a rail
2 light on your pistol?

3    A. I don't recall, but I know it wasn't
4 mandatory. Like, we wouldn't get disciplined if we
5 didn't have our rail light on.

6    Q. Did the department issue rail lights?

7    A. Yes.

8    Q. Did you have one at the time of the
9 discharge?

10    A. No.

11    Q. And when I say have one, I just want to be
12 clear. I'm not asking if you had it on the pistol.
13 I'm asking whether you had one that you had --

14    A. My old one?

15    Q. -- access to? Yeah.

16    A. Yes. I have one.

17    Q. Was that something that the department issued
18 to you?

19    A. Yes.

20    Q. Did you ever use it prior to the discharge?

21    A. Yeah. I would occasionally have it on my
22 gun.

23    Q. Why would you have it on sometimes and not
24 others?

Page 71

1    A. So if I was working a detail, we have a
2 different holster that we can wear on details. So I
3 had worked a detail the day prior, and when I switched
4 my gun from that holster to my duty holster, I had
5 forgot to put the rail light on it.

6    Q. Is that something that you would usually put
7 the rail light back on when you came off a detail and
8 went back to regular duty?

9    A. I'd say most of the time, yes, but not every
10 time.

11    Q. Was the day of the incident a time when you
12 were expected to work into the night or into when, you
13 know, turned dark?

14    A. On the day of the incident, yes. I was
15 working 4 to midnight.

16    Q. When you work the 4 to midnight shift, is
17 that a time when you would typically be expected to
18 have a rail light on your pistol?

19    A. Be expected to? Again, I don't believe it
20 was mandatory that we had to use them because not
21 everybody used them, but typically I would have it on,
22 especially if I was working a night shift, but I had
23 forgot it.

24    Q. The holster that you used on the detail the

Page 72

1 day before, what type of holster was that?

2    A. I don't remember the brand, but it's -- it's
3 just the one that has the -- the push button and then you
4 rock it forward and pull up. So it's not a triple
5 retention.

6    Q. Is it still an outside-the-waistband holster?

7    A. Yes.

8    Q. Is the holster that you use now with your
9 P320 a holster that does not allow for a rail light?

10    A. Yes.

11    Q. The holster that you had at the time of the
12 incident, you said that, you know, Vivolo didn't think
13 it was a good fit for the P320. Is that because there
14 was some room in the top of the holster that would
15 allow something to get down in potentially to the
16 trigger area?

17    A. That's what they believed. Yes.

18    Q. Do you think that that was possible?

19    A. No.

20    Q. You don't think it's possible for something
21 to get down into the trigger area of the holster that
22 you had on the day of the incident?

23    A. Not unless it's intentional.

24    Q. So you said not unless it's intentional.



Page 73

1 Let's say you had a zipper pull of some kind.  Do you
2 think that you could get -- if you were trying to, do
3 you think you could a zipper pull down into the
4 trigger area --
5     A. If you were --
6     Q. -- of a holstered pistol?
7     A. If you were trying to, it could be possible.
8     Q. And if you were trying to and you got the
9 zipper pull down in there, do you think it would be
10 possible for that zipper pull to pull the trigger?
11    A. I can't say for certain.
12    Q. Let's say, just hypothetically, that you try
13 to get it down in there.  If you ever get the zipper
14 pulled down into the holster into the trigger area and
15 it did pull the trigger, would you expect the gun to
16 fire?
17    A. No.
18    Q. Okay.  Why not?
19    A. It's holstered.  It wouldn't -- the slide
20 wouldn't be able to make a complete -- like wouldn't
21 be able to go back completely.  I wouldn't expect it
22 to fire that easily.
23    Q. Do you think a discharge could occur if the
24 trigger was pulled by a zipper pull?

Page 74

1     A. It's possible, I suppose.
2     Q. Well, let me ask you this.  Let's say, you
3 know, putting the holster aside and the zipper pull
4 aside, if the trigger was pulled on the P320, you'd
5 expect it to discharge, right?
6     A. Yes.
7     Q. And that's regardless of whether the trigger
8 pull was intentional or not.  If the trigger is
9 pulled, it's going to fire?
10    A. Yes.
11    Q. Because the gun doesn't know whether you
12 intend to pull it or not, right?
13    A. Yes.
14    Q. And the gun can't tell whether it's your
15 finger pulling the trigger or something else?
16    A. It's an inanimate object, so no, it can't
17 tell.
18    Q. Let's go off the video record.  Off the
19 record completely.
20    THE VIDEOGRAPHER:  The time is 10:30 a.m.
21    (Off the record.)
22    THE VIDEOGRAPHER:  The time is 10:36 a.m.
23 This is the beginning of media unit number 2.  We're
24 back on the record.

Page 75

1 BY MR. WOY:
2     Q. Are you a member of the NRA or any other kind
3 of firearms organizations?
4     A. No.
5     Q. Do you receive any kind of firearm
6 publications of any kind?
7     A. No.
8     Q. Do you participate in any kind of
9 recreational firearm shooting activities?
10    A. No.
11    Q. Now, I know you told us you had a LTC permit,
12 I think, license to carry?
13    A. Yes.
14    Q. Do you have any other kind of
15 firearms-related permits or authorizations?
16    A. No.
17    Q. Have you ever been a firearms instructor for
18 any reason or purpose?
19    A. No.
20    Q. Do you know anything about the standards the
21 P320 tested to before it was put on the market?
22    A. No.
23    Q. So I take it you've never seen any pistol
24 testing standards?

Page 76

1     A. No.
2     Q. Never read any kind of firearms testing
3 standards?
4     A. No.
5     Q. Do you think your accidental discharge
6 occurred without the trigger being pulled?
7     A. I know I didn't pull it.  I can't -- I can't
8 for certain if something pulled it, but I know I
9 didn't pull it.
10    Q. So you can't say one way or the other whether the
11 trigger was pulled to cause the discharge?
12    A. It was in a triple retention holster.
13 Nothing should've been able to get in there and pull
14 the trigger.
15    Q. Is it your belief that it fired without a
16 trigger pull, or do you just not know?
17    A. Well, I guess guns can't fire without the
18 trigger being pulled, so -- I just know I didn't pull
19 it.  I don't know if something pulled it.  I know I
20 didn't pull it.  So I can't say for certain.
21    Q. Would you agree with me that P320 won't fire
22 unless the trigger is pulled?
23    MR. CEISLER:  Objection.  You can answer if
24 you know.



Page 77

1      THE WITNESS: Can I -- can you repeat the
2  question?
3  BY MR. WOY:
4      Q. Sure. Yeah. Would you agree with me that
5  the P320 won't fire unless something pulls the
6  trigger?
7      A. I believe any gun should not fire unless the
8  trigger is pulled, so I can't say specifically to the
9  320. But with my general knowledge and belief, no gun
10  should go off without the trigger being pulled.
11     Q. So what I guess I'm trying to get at is, in
12  your answers to request for admission that you sent to
13  your prior counsel in this case, what I took from them
14  was that based on your admission to your denials, it
15  was your position that the gun fired without a trigger
16  pull. Does that ring a bell? Do remember answering
17  them?
18     A. I believe at the time that I didn't pull the
19  trigger, and I don't believe anything was inside of my
20  holster that pulled the trigger. So if something
21  pulled the trigger, I don't know.
22     Q. Okay. So is it fair to say that you would
23  agree with me that it is possible that something got
24  down in your holster and pulled the trigger?

Page 78

1      MR. CEISLER: Objection.
2      THE WITNESS: I know I didn't pull the
3  trigger, and I know there was nothing inside my
4  holster that pulled the trigger.
5  BY MR. WOY:
6      Q. What do you think caused it to go off?
7      A. I don't know.
8      Q. How do you know there wasn't anything inside
9  your holster that pulled the trigger?
10     A. Because if there was something inside my
11  holster, my gun would not sit inside the holster
12  properly, and I would not have been able to enact the
13  tensions, and that holster is made to keep the gun
14  secure. And I've never had anything get inside my
15  holster, so I know there was nothing in that holster.
16  I would've known.
17     Q. Do you recall answering request for
18  admissions in this case?
19     A. Was it a form?
20     Q. Yeah. So there were a number of questions,
21  and it would be something like -- one of them was
22  admit that the P320 or -- admit that the accidental
23  discharge occurred without a trigger being pulled.
24  Does that ring a bell to you? Do you recall being

Page 79

1  involved in answering them?
2      A. I remember answering a form with a bunch of
3  questions on it. Yes.
4      Q. Do you remember doing answers to
5  interrogatories as well?
6      A. Interrogatories. Was that done over the
7  phone?
8      Q. It may have, and I wouldn't be involved in
9  that.
10     A. Oh.
11     Q. That would be with you and your prior
12  attorney?
13     A. Yes.
14     Q. Okay. Do you recall any distinction between
15  answers to interrogatories and request for admissions
16  and them being addressed distinctly, or do you not
17  necessarily --
18     A. I don't recall. There was a lot that went
19  on.
20     Q. Understood. Yeah. Are you able to tell me
21  how, if it is possible, that your P320 could discharge
22  without the trigger being pulled?
23     MR. CEISLER: Objection.
24     THE WITNESS: I don't know.

Page 80

1  BY MR. WOY:
2      Q. Do you have any kind of personal belief as to
3  what happened to cause the discharge?
4      MR. CEISLER: Objection. Asked and answered.
5  You can answer one more time.
6      THE WITNESS: I don't know.
7  BY MR. WOY:
8      Q. Okay. Fair enough. Is there anything
9  specific about the P320, other than the fact you
10  experienced this accidental discharge, that makes you
11  uncomfortable carrying it today?
12     A. Before the incident, I didn't have any
13  worries with it. After the incident, I do not feel
14  comfortable at all carrying it.
15     Q. Is there anything specific about the way it's
16  designed that you believe, you know, is unsafe, in
17  your personal opinion -- I know you're not an
18  expert -- that makes you uncomfortable carrying it?
19     A. The fact that it went off inside a triple
20  retention holder and shot me makes me very
21  uncomfortable. So to me, could it happen again? Yes.
22  The way I see it is it's -- it's a ticking time bomb
23  that could just go off at any time again, so.
24     Q. Does the fact that it doesn't have a tab



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
81–84

Page 81

1  trigger make you uncomfortable?
2     A. No. I've been carrying firearms for many
3  years, and none of them had a tab trigger. And I
4  never felt uncomfortable before, and I still don't
5  feel uncomfortable without a tab trigger. It's just
6  this particular firearm.
7     Q. How about the fact that it doesn't have an
8  external manual safety? Does that make you
9  uncomfortable?
10    A. No.
11    Q. Do you have any personal beliefs about
12 whether or not it is important for law enforcement
13 officers to carry a pistol without an external manual
14 safety?
15    MR. CEISLER: Objection.
16    THE WITNESS: I don't have an opinion either
17 way.
18 BY MR. WOY:
19    Q. Do you know why law enforcement agencies
20 might select a pistol without an external manual
21 safety?
22    MR. CEISLER: Objection.
23    THE WITNESS: I don't.
24 BY MR. WOY:

Page 82

1     Q. If you were going to look for a new pistol
2  today, would it be important to you either way whether
3  it had an external manual safety or a tab trigger?
4     A. No.
5     Q. If you still had the same type of holster for
6  carrying a different firearm other than the P320,
7  would you be uncomfortable with that?
8     A. Would I be uncomfortable carrying the
9  previous holster --
10    Q. Yeah.
11    A. -- with a different firearm? No.
12    Q. If it were shown that something could get
13 down inside of that previous holster, the one you had
14 on the day of the discharge, regardless of what model
15 or manufacturer pistol was in it, and pull the
16 trigger, would you be uncomfortable then?
17    A. It depends how easily it would be. I don't
18 think something can get in there easily -- easily
19 without you trying to get something in there. I don't
20 think it's possible.
21    Q. Did you have any kind of external accessories
22 on the pistol on the day of the incident? I know you
23 didn't have a flashlight or a light. Did you have
24 anything else on it?

Page 83

1     A. No.
2     Q. How often did you fire your P320 prior to the
3  discharge?
4     A. Twice a year, mostly. At the range for
5  qualification when the sheriff's trailer came. That's
6  pretty much the only time I really fired it.
7     Q. How often did you clean it?
8     A. Typically, I would clean it after every range
9  day, but -- yeah -- typically, I would clean it after
10 every range day.
11    Q. When you did clean it, what did you do? How
12 much did you disassemble it? What type of cleaning
13 did you do?
14    A. So I would break it down enough where -- I
15 don't know, like a nomenclature for everything and
16 stuff, but I would take it apart. Would be able to
17 take the barrel out. Clean the barrel. Clean the
18 external part. Clean inside the gun because when
19 we're at the range, there's sand stuff, so I want to
20 make sure there's no sand inside. So just a -- a
21 basic cleaning. Like, I don't take little pieces
22 apart. I just kind of take the big pieces apart and
23 then clean it, put some lubricant, put it back
24 together, and call it a day.

Page 84

1     Q. When was the last time you cleaned it prior
2  to the discharge?
3     A. It wasn't at the last range day we did, which
4  would've been fall of 2021. So the last time I
5  would've cleaned it, like a -- taking it apart and
6  cleaning it would've been fall of 2020.
7     Q. Was the range day, in the fall of 2021, the
8  last time you had fired it?
9     A. Yes.
10    Q. All right. So I want to talk about the day
11 of the incident. If that's okay, we can move into
12 that?
13    A. That's fine.
14    Q. All right. So it was April 6th of 2022,
15 right?
16    A. Yes.
17    Q. Okay. It's my understanding it took place at
18 about 3:50 p.m. in the afternoon. Does that sound
19 right?
20    A. I was after roll call, so around that time.
21    Q. Okay. And your shift that day was 4 to
22 midnight, you said?
23    A. Yes.
24    Q. What time would you typically show up for a 4



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
85–88

Page 85

1 to midnight shift?
2    A. Depends.  If I was working a detail before, I
3 would probably get there before 3:30 so I would have
4 time to change into my patrol uniform.  That day in
5 particular, I did not work a detail, so I was there
6 probably around 3:15, 3:30.
7    Q. Okay.  When you first got to the station that
8 day, do you recall what you did?
9    A. If I had gotten there a little bit early, I
10 probably sat in my car for a little bit, probably just
11 on my phone.  And then probably closer to roll call
12 time, I would've gone out of the cruiser.
13       I did have a different jacket on when I pulled up
14 because I didn't want, like, people to see my uniform
15 when I was driving, so I had a different jacket on.
16 And I switched into my patrol jacket, went into roll
17 call, and I had to put my vest on.  So I took the
18 jacket off, put the vest on, put my stuff in the vest,
19 put my jacket on, secured everything, and then we had
20 roll call.
21    Q. All right.  And towards the beginning of that
22 answer, you were saying probably and if you had showed
23 up at certain times.
24    A. Uh-huh.

Page 86

1    Q. Do you remember sitting in your car and, you
2 know, before you went in, or is it just kind of, you
3 know, I got there early, this is what I would've
4 done?
5    A. I remember getting there a little bit early,
6 and I think I sat in my car for a few minutes.
7    Q. Okay.  All right.  And I just want to
8 distinguish between, you know, things you actually
9 remember and things that, you know, you could say
10 typically this is what I would do, but I don't
11 remember on that exact day, if that makes sense.
12    A. Yes.
13    Q. Okay.  All right.  So you said you went in,
14 and you put your patrol jacket on and put your vest
15 on.  I take it that would be your bulletproof vest?
16    A. Yes.  It's an external carrier.
17    Q. What do you mean by that?
18    A. So we wear it on the outside of our uniform
19 so it looks -- it has like a -- what is the word
20 called -- so it -- the carrier itself looks like our
21 uniform.  So we can wear it externally.
22    Q. Gotcha.  Okay.  Do you have any kind of equipment
23 that you strap onto the vest?
24    A. Everything is already strapped on.  The only

Page 87

1 thing that I do is I put things into the pouches.  So
2 like, when I'm a detail, I have a -- a hard holster
3 for the mags, so I switch those into the pouches I
4 have on my vest.  So I would switch those in.
5       When I go to put my vest on, I usually take
6 everything out of the patches -- out of the pouches to
7 make it a little bit lighter so it's easier to get on
8 over my head and strap it on, and then I put
9 everything back in the pouch.
10    Q. Okay.  What is attached externally, if
11 anything, to the vest?
12    A. Externally to my vest would be the two mags,
13 so the mag pouches, a handcuff pouch, handcuffs.  I
14 believe my pepper spray is on there as well.
15    Q. Anything else?
16    A. I can't say for certain if I switched up a
17 little bit, but my flashlight would probably be on
18 there as well, a small flashlight.
19    Q. Okay.  So on the day of the discharge, you
20 put the vest on and all this in a locker room or
21 somewhere?
22    A. No.  I put it on in the roll call room.
23    Q. In the roll call room?  Okay.
24    A. Yes.

Page 88

1    Q. Okay.  Gotcha.  When you showed up to work that
2 day, did you have your duty belt with your holster on,
3 or did you put that on later?
4    A. I had it on in the car.
5    Q. Is that typical?  You put it on before you
6 leave home, wear it to work?
7    A. Yeah.
8    Q. Now, the day before, you said before that you
9 were on some sort of a detail; is that right?
10    A. Yes.
11    Q. What was the detail you were on the day
12 before?
13    A. I don't remember the company, but I believe I
14 was on Bow Street.
15    Q. How do you spell that?  B-O-W?
16    A. B-O-W.  Yes.
17    Q. What type of a detail was it?
18    A. A road detail.  So I'm standing out in the
19 road.  I believe it was me and a Medford officer,
20 actually.
21    Q. And what were you directing traffic or doing
22 something else?
23    A. I mean, probably directly traffic at times,
24 but basically, you're just there kind of to protect



Page 89

1 the work crew because they're in the street doing
2 something, so we just kind of standing there making
3 sure nobody drives into them.
4     Q.  Oh, it was road work of some kind --
5     A.  Yes.
6     Q.  When you're on a detail like that -- well,
7 let me ask you this.  Specifically on that detail --
8     A.  Uh-huh.
9     Q.  -- did you have your duty belt with your
10 holster, or were you using something else?
11     A.  I was using something else.
12     Q.  And that was the -- I think you had mentioned
13 before you had a detail holster that you use?
14     A.  Yes.
15     Q.  Okay.  When did that detail end?
16     A.  I had -- I was working the first half, so I
17 would've left probably around 3 to give me time to go
18 back to the station and change into my patrol uniform.
19     Q.  Oh, okay.  So the detail ended the day of the
20 discharge?
21     A.  Oh, I'm sorry.
22     Q.  Or was it the day before?
23     A.  The day before.
24     Q.  Okay.

Page 90

1     A.  But I worked a 4 to midnight shift that day
2 too.
3     Q.  I see.  Okay.  Oh, so you -- between the time
4 of the detail and the time of the discharge, you had
5 also worked another 4 to midnight shift then?
6     A.  Yes.
7     Q.  Okay.  So when you get off of the detail at
8 that point in time, do you go home, or do you go
9 straight to the station?
10     A.  After I got off the detail, I went straight
11 to the station.
12     Q.  Was your duty belt and regular duty holster
13 at the station already?
14     A.  I don't recall exactly.  It would either be
15 in my locker or in my car.
16     Q.  And then you would've changed into the duty
17 belt either in the roll call room or in the locker
18 room?
19     A.  The duty belt I would've put on in the locker
20 room.
21     Q.  Okay.  So you would've had to take the P320
22 out of your detail holster, put it into the duty
23 holster at that time, right?
24     A.  Yes.

Page 91

1     Q.  Was that the last time that you had put the
2 P320 into your holster before the discharge?
3     A.  Yes.
4     Q.  All right.  So the day before you worked that
5 4 p.m. to midshaft, put your pistol into the holster
6 on your duty belt, left it in there, didn't take it
7 out at any point in time between then and the
8 discharge?
9     A.  Yes.
10     Q.  Was that 4 p.m. to midshaft when you worked
11 as a detective or a patrol officer?
12     A.  Patrol.
13     Q.  What type of -- well, do you recall what you
14 did on that specific shift?
15     A.  I was sector east that night before, and I
16 was supposed to be sector east again.  So the day of
17 the discharge, that was part of the sector east.
18     Q.  Did you have to arrest anybody or do anything
19 physical or anything like that?
20     A.  I don't recall.
21     Q.  Okay.  Just a pretty typical shift?  Nothing
22 sticks out to you?
23     A.  No.  I don't think anything crazy happened
24 that I can recall.

Page 92

1     Q.  All right.  So when you get off that 4 p.m.
2 to midnight shift the day before, do you take your
3 duty belt off with the pistol still holstered?
4     A.  Yes.  If I -- when I drove home -- yes.  It
5 would still be in the holster on the duty belt.  Even
6 if I took the belt off, it would still be in the
7 holster.
8     Q.  Okay.  So you'd still be wearing the duty
9 belt when you went to -- you would go straight home?
10 You wouldn't go back to the station and take it off?
11     A.  No.  I would -- I took it home that night.
12     Q.  When you take it off at home, do you leave
13 the pistol in there or do you typically put it into
14 some sort of a gun safe or lock it up?
15     A.  So that night I believe I left it in my car
16 in the holster on the duty belt in the trunk.
17     Q.  Okay.  And then the next day, the day of the
18 discharge, you take the same car to work, I take it?
19     A.  Yes.
20     Q.  Is that a police car or is it your personal
21 vehicle?
22     A.  My personal.
23     Q.  I take it some sort of sedan with an enclosed
24 trunk of some kind?



Page 93

1    A. It's an SUV.
2    Q. SUV? Okay.
3    A. Yeah.
4    Q. And then when you got to work the next day,
5  is that the next time you did anything with the duty
6  belt when you got to the station?
7    A. So before I left for work, I put my duty belt
8  on at home and then drove to work.
9    Q. I see. Okay. So you got up the next day,
10  went out to your car, got the duty belt out. And did
11  you put it on out there?
12    A. I put it on in my -- at home in the -- in the
13  garage before I left.
14    Q. Did you do anything to check the pistol to
15  make sure it was still fully holstered?
16    A. It looked fully holstered to me because I
17  hadn't taken it out, so it should've been fine.
18    Q. Do you recall specifically, you know, taking
19  a look at it and make sure there was nothing unusual
20  about it at that time?
21    A. I would've grabbed it, put it on, put the
22  straps on. Good to go.
23    Q. Sure. Okay.
24    So when you get to work at that point, you know,

Page 94

1  putting on the vest on, obviously, doesn't require you
2  to take the duty belt off or anything like that,
3  right?
4    A. No.
5    Q. Did anything else that day, before the
6  discharge, require you to take the duty belt off or
7  the pistol out of the holster or anything?
8    A. No.
9    Q. I take it on the shift the night before you
10  didn't have any need to do draw your weapon?
11    A. No. I don't believe so.
12    Q. And you mentioned that you were wearing a
13  different jacket on the way to work; is that right?
14    A. Yes.
15    Q. When did you put on, I guess, your duty
16  jacket, for lack of a better term?
17    A. When I got to the station.
18    Q. Did you do that inside the station or
19  outside?
20    A. I did it outside.
21    Q. Was your personal vehicle parked in the same
22  parking lot where the discharge occurred?
23    A. Yes.
24    Q. All right. So when you put the jacket on, is

Page 95

1  that something that has a zipper on the front?
2    A. Yes.
3    Q. So we have some pictures. We'll take a look
4  at the jacket, I think, in a bit. The jacket has a
5  snap and a strap that goes around your pistol or your
6  holster, right?
7    A. Yes.
8    Q. You're right-handed?
9    A. Yes.
10    Q. So your pistol's on your right hip?
11    A. Uh-huh. Yes.
12    Q. When you put the jacket on when you got to
13  work, do you recall whether you snapped that strap on
14  the jacket?
15    A. Yes.
16    Q. Does the strap that you snap go around the
17  holster, below the holster, or where does it go in
18  relation --
19    A. So if your gun is here, there's a hole in the
20  jacket. You can zipper it up or unzip it, depending
21  on, you know, if you want access to your firearm.
22  Obviously, I'm working patrol. I want access to it.
23    So it's unzipped, and then the tabs -- so I would
24  do is, I would put it -- put the hole -- make sure the

Page 96

1  firearm was completely outside the hole. And then I
2  would take the straps and strap them underneath the
3  holster.
4    Q. How many straps are there?
5    A. Just one on each side. It's like a -- like a
6  buckle.
7    Q. Okay.
8    A. A button.
9    Q. And then they connect to each other, right?
10    A. Yes.
11    Q. Is there any other kind of method of securing
12  that part of your jacket, or is it just the two straps
13  that connect?
14    A. The two straps and the zipper.
15    Q. Did you buckle them, you know, the two straps
16  together out in the parking lot before you went into
17  roll call?
18    A. I believe I did.
19    Q. Did you unbuckle them at any point in time
20  when you went into the station?
21    A. Nope.
22    Q. Have you seen any surveillance video? I know
23  there's some, you know, captured the discharge. Is
24  there any surveillance video that you've seen that



Page 97

1 shows you showing up to work that day?

2     A. I haven't seen it, but I know there is.

3     Q. Do you have any knowledge of what's on the

4 video that shows you showing up to work that day?

5 Other than just what you remember about, you know,

6 actually being there?

7     A. Lieutenant Perrone told me during my IA

8 interview that they have me on video from the moment I

9 show up to work, going into roll call, leaving roll

10 call, and then up to the time of the incident. So I

11 know they -- they were able to monitor my movements on

12 camera.

13     Q. Okay. So you put your vest on, I assume,

14 before you put your jacket on; is that right?

15     A. Yes.

16     Q. Okay.

17     A. I took the jacket off and put it back on

18 after.

19     Q. Gotcha. What does roll call entail?

20     A. Talking, shift assignments. If there's any

21 officer safety information they need to pass on.

22 Knowing my crew, there's a lot of joking around. But

23 for the most part, it's shift assignment, officer

24 safety, any important -- important announcements.

Page 98

1     Q. And did you say you were in the east sector

2 that day?

3     A. Sector east. Yes.

4     Q. Sector east. Okay.

5     Is that somewhere that you'd be by yourself in

6 the patrol car, or does someone else go with you?

7     A. All of our cruisers are basically one man

8 cruisers, unless we have an overage of officers

9 working and we don't have enough cruisers. Sometimes

10 we'll double up. But I was alone. I was supposed to

11 be alone in my cruiser that night.

12     Q. All right. So if you could, could you walk

13 me through, you know, what you do from the time you

14 leave roll call up to the point where the discharge

15 occurs?

16     A. So roll call ended. Got up. We walked out

17 of the roll call room. And then we walked through the

18 fire department parking lot to get to the back lot.

19     So I went to my personal car, opened the truck.

20 I grabbed my duty bag, put it on my right shoulder,

21 grabbed my lunch bag, which I put on my left shoulder.

22 And then I grabbed my water bottle and my blender

23 bottle. And I was carrying those in my left hand and

24 started walking down the lot.

Page 99

1     Turned -- like, made the corner around the

2 vehicles to get to the cruiser I wanted to take, which

3 was the same cruiser I had taken the night before, so

4 I knew exactly where I had parked it.

5     So as I'm walking, I'm holding my strap, holding

6 my stuff. And as I get to the front of the cruiser, I

7 start to -- I knew I slipped my hand down the strap

8 because I was going to take my bag off to put it down

9 on the ground to get my cruiser keys.

10     And as I did that motion, I heard a loud bang,

11 and I felt a searing pain in my thigh and immediately

12 I thought someone shot me. So do you want me to keep

13 going or --

14     Q. Let's stop there. We'll walk through a

15 little bit of it.

16     So it's tough to tell from the video. I've seen

17 the surveillance video. There's no audio. Have you

18 heard any audio?

19     A. I don't believe there's audio.

20     Q. Okay. I don't either. At least that I've

21 seen.

22     So it's tough to tell exactly when the discharge

23 occurs. So we'll take a look at it in a second. But

24 it sounds like from what you just said the discharge

Page 100

1 occurred before your duty bag was actually down on the

2 ground; is that right?

3     A. It happened as I was going to put it down.

4 Yes.

5     Q. As you were in the motion of moving that

6 strap of the duty bag off your right shoulder?

7     A. Yes.

8     Q. And just for the -- you know, we can see this

9 in the video, but when we look at transcript later, we

10 won't be able to see -- you were making motion like

11 you're holding the duty bag strap with your right

12 hand --

13     A. Yes.

14     Q. -- up near your right shoulder; is that right?

15     A. Yes. Because if I don't hold it, it can

16 slip. So I usually hold it as I'm walking.

17     Q. Is the duty bag something that you keep with

18 you? You take it home, you bring it to work? Or is

19 it something that's specific to sector east that you

20 get when you are assigned in that sector?

21     A. It's my personal duty bag. So I bring it

22 home with me. It stays in my car. I don't leave it

23 in a cruiser.

24     MR. WOY: So Daniel, a set of photographs



Page 101
1  that are from the investigation materials.  I'll mark
2  these photos as a packet as Exhibit 1.
3      (Defendant's Exhibit No. 1 was marked for
4   identification.)
5  BY MR. WOY:
6      Q.  All right.  So I'm going to hand you what's
7  been marked as Exhibit 1.  And take a second to look
8  at those photos, if you would, in there.
9      A.  Okay.
10     Q.  All right.  So the first page of Exhibit 1,
11 that looks to me like your duty jacket that you were
12 discussing with the snap.  On this photo it's the left
13 side, but if you were wearing it, it would be on your
14 right side; is that right?
15     A.  Yes.
16     Q.  And then you could kind of see that -- well,
17 you can't see that it's unzipped in this photo, the
18 portion near your holster; is that right?
19     A.  Yes.
20     Q.  So then if we just flip to the next photo.
21 So it's the back of the first page, it looks like,
22 same one?
23     A.  Yep.
24     Q.  Okay.  So is this a photo of your duty bag?

Page 102
1      A.  Yes.
2      Q.  And I see on the left side of the photo
3  something that says LifeVac.
4      A.  Yes.
5      Q.  Is that something that was attached to your
6  bag?  I can't quite tell if it's attached in this
7  photo.
8      A.  Yes.
9      Q.  So when you look at the surveillance video, you
10 can see something.  It looks like it's probably that
11 LifeVac bag hanging off the bag as you're walking.
12     A.  Yeah.
13     Q.  Does that sound right?
14     A.  Yes.
15     Q.  Okay.  What's the LifeVac?
16     A.  So it wasn't issued to us, but it's something
17 I carry.  I do believe Lieutenant Vivolo has bought
18 them.  We just haven't been issued to them since.  But
19 it's an anti-choking device.  So if someone were
20 choking, you put it on their face, pump it, and it's
21 supposed to create a suction that will remove whatever
22 the object is that they're choking on.
23     Q.  Oh.  Interesting.  Okay.
24     And then there are two more photos, so three

Page 103
1  total in this packet that's been marked as Exhibit 1
2  that show your duty bag.  Does that sound right?
3      A.  Yes.
4      Q.  Now, take a look at those three photos and
5  tell me if that is an accurate depiction of what your
6  duty bag looked like and, you know, what was attached
7  to it, what was in the -- I guess, the end.  Like,
8  there's some Lysol in there.  Does it look like it
9  looked on the day of the discharge?
10     A.  Yes.
11     Q.  What type of things do you keep in the duty
12 bag?
13     A.  Everything.  I usually have my own first aid
14 supplies.  So I have some, like, QuickStop,
15 tourniquets.  I'll have personal stuff like a
16 hairbrush, extra pens, notebooks, a ticket book, crash
17 report, gloves.  Just anything I think I would need
18 while on the road, instead of having to go back to my
19 cruiser or going back to my locker.  Just things I
20 would carry.  Those are my cruiser keys.  I see the
21 Lysol, the pouches, the LifeVac.  That's pretty much
22 it.
23     Q.  All right.  Look at the last photo, the
24 one that shows the keys, there's -- it looks like the

Page 104
1  thin blue line.  Keychain on there and the keys.  Were
2  they the keys that you pick up in the station for the
3  cruiser?
4      A.  No.  Those are my keys.
5      Q.  Those are your personal keys?  Okay.
6      A.  Yes.
7      Q.  Is there a key on there to your personal
8  vehicle as well?
9      A.  No.
10     Q.  Were those keys attached to the duty bag just
11 as it's shown in this photo when the discharge
12 occurred?
13     A.  Yes.
14     Q.  And it looks like in that same photo there's
15 some bottles of some kind of liquid of some kind.  Do
16 you see them?
17     A.  Yeah.  That's hand sanitizers.
18     Q.  Okay.  They were in there on the day of the
19 discharge?
20     A.  Yes.
21     Q.  Is there anything that was attached or
22 located in this exterior portion of the duty bag
23 that's not shown in this photo?
24     A.  I don't believe so.



Page 105

1    Q. And just so we can get an idea of the
2  orientation of this bag, I think I understand it from
3  the surveillance video, but it looked to me, like, in
4  the video, and correct me if I'm wrong, so this bag
5  was obviously on your right shoulder, right?
6    A. Yes.
7    Q. And just so we agree on terminology here, can
8  we, you know, look at the second photo -- yeah.
9  That'll work.
10       The part with the red cross sign and the two
11  flags, can we call that the front of the bag?
12    A. Yes.
13    Q. Okay. So the front of the bag would've been
14  facing away from your body at the time of the
15  discharge?
16    A. Yes.
17    Q. And then if we look at the next photo, fair
18  to call this the backside of the bag?
19    A. Yes.
20    Q. So the back would've been up against your
21  body at the time of the discharge?
22    A. Yes.
23    Q. All right. And then that would, you know,
24  obviously, given that orientation, the keys that are

Page 106

1  shown in the last photo, then, would be towards the
2  front when the discharge occurred?
3    A. Yes. Be over here.
4    Q. Okay. And then the LifeVac would've been
5  what we could see on the surveillance video hanging
6  off the backside?
7    A. Yes.
8    Q. Or the rear side, I guess.
9    A. Yep.
10    Q. Are you able to tell me how or where in
11  relation to your pistol, at the time of the discharge,
12  the backside of the bag -- so if we look at the second
13  of the three photos, where it's located?
14    A. So my bag -- I don't like to have it hanging
15  low, so it would've been right around here. Around my
16  waist.
17    Q. Would the backside of the bag shown in the
18  second photograph here be up against the holstered
19  pistol?
20    A. Yes.
21    Q. Okay. And then if we look at the keys that
22  are hanging off on this keychain in the last photo,
23  where were they in relation to the holstered pistol
24  when the discharge occurred?

Page 107

1    A. So if my holster is here, the bag, the keys
2  would've been in the front. Would've been ahead of
3  it. So the keys would've been over here. So in front
4  of the holster, away from it.
5    Q. Okay. And then when you went to take the bag
6  off your shoulder, you made a motion like you were
7  repositioning it and getting ready to put it down on
8  the ground, right?
9    A. Yes.
10    Q. So did the bag itself change position in
11  relation to where your holstered pistol was located at
12  that time?
13    A. No.
14    Q. Do you know whether the keys that are
15  pictured in this last photo were touching or up
16  against the holstered pistol when it discharged?
17    A. Nope. They weren't.
18    Q. How do you know that?
19    A. Because it was ahead of the holster. So the
20  bag -- the way -- how long the bag is -- the bag's
21  probably about this long on me, the keys would've been
22  up here. The holster's here.
23    Q. And for purposes of the transcribed record,
24  you were motioning, you know, showing us with your

Page 108

1  hands where the bag was located. And when you were
2  saying the keys were up here, it was towards the front
3  of your body.
4    A. It was before the holster. Doesn't make
5  contact with the holster.
6    Q. Gotcha. How far off the ground was the bag
7  when the discharge occurred?
8    A. I'm not very tall, so not very far from the
9  ground. Two feet. Two, three feet maybe.
10    Q. Okay. So if we look at this photo, it's the
11  second one of the bag in this Exhibit 1, you see the
12  strap here with the rubber portion?
13    A. Yes.
14    Q. That's what goes over your shoulder, right?
15    A. Yes.
16    Q. So was that rubber portion of the strap still
17  on your right shoulder when the discharge occurred?
18    A. So when I got to the front of the cruiser, I
19  slipped my hand down to take the bag off because I
20  would've taken it off to put it down on the ground.
21  So as I was motioning to do this, that's when the gun
22  went off.
23    Q. Okay. And it looks like your right hand is
24  still just about shoulder height at the time of the



Page 109

1  discharge?
2      A.  Yes.  Yes.
3      Q.  Okay.  Did you have the actual -- this rubber
4  portion of the strap in your hand, or were you holding
5  onto a different portion of the strap at the time?
6      A.  I don't recall exactly.
7      Q.  Looking at this same picture, the second one
8  of the duty bag, what is this that I'm pointing to on
9  the strap?
10     A.  That's a tourniquet.
11     Q.  Okay.  Did you have anything else attached to
12  the strap of this bag when the discharge occurred?
13     A.  I don't believe so.
14     Q.  All right.  Looking back at the first photo
15  in this Exhibit 1, which is your jacket, did you have
16  the jacket zippered up, the front of the jacket
17  zippered up when the discharge occurred?
18     A.  No.
19     Q.  When you were carrying the bag, given that
20  your jacket was unzippered, did the front right
21  portion, so this portion of the jacket, did that get
22  pushed back to your side at all; do you know?
23     A.  I don't recall.  It would -- I don't believe
24  it would've because I have the strap underneath the

Page 110

1  holster.  So that shouldn't have done much moving.
2      Q.  Is there anything underneath the jacket that
3  attaches to your duty belt or your pants or anything
4  else?
5      A.  No.
6      Q.  The zipper pull that's shown in this photo,
7  is that attached to the -- as you're wearing it, the
8  right side of the jacket, so the part that would've
9  been on the same side as your holstered pistol?
10     A.  It appears to be.  Yes.
11     Q.  Yeah.  That's what it looked like to me from
12  the photo, but I've ever seen it in person.
13     A.  Yeah.  No.  It's attached to the zipper.
14     Q.  Other than that zipper pull that we just
15  talked about and the strap that we talked
16  about already that goes underneath your holster, is
17  there anything on that side of the jacket in that
18  vicinity, like other zipper pulls or any other straps
19  or anything like that?
20     A.  Just that strap, and then the zipper is up
21  here.  But I don't believe so.
22     Q.  Did you have anything attached to your duty
23  belt on the same side of the belt as the holstered
24  pistol?

Page 111

1      A.  No.  Just the -- there's a strap, like a duty
2  belt strap just to secure your duty belt to the inner
3  belt.  That would've been the only thing.  We're not
4  supposed to keep anything really near our firearm.
5      Q.  What type of an attachment is there on that
6  strap?
7      A.  There's nothing on it.  It's just a strap.
8      Q.  Yeah.  That was a poorly worded question.
9  Let me ask you this way.
10         How did you attach that strap to your regular
11  belt?
12     A.  So it's like two button -- buckles with two
13  buttons.  So we would -- so it looks like this.  And
14  then you would just -- they overlap on each other and
15  the -- the button snaps.  So it's a snap closure, I
16  guess you would call it.
17     Q.  Did you have that snap closed at the time of
18  the discharge?
19     A.  Yes.  That secures my duty belt to my inner
20  belt.
21     Q.  What type of pants were you wearing at the
22  time of the discharge?
23     A.  I think they're Blauer patrol pants.
24     Q.  Do they have any kind of features that allow

Page 112

1  you to strap the pants to your duty belt?
2      A.  They have belt loops.
3      Q.  Just regular belt loops that -- like, on
4  regular pants are attached permanently, then?
5      A.  Yes.
6      Q.  Is there a pocket on the righthand side of
7  your duty pants that you were wearing at the time?
8      A.  My pants probably -- they were a 10 pocket.
9  So there's 10 pockets on them total.  So there's a
10  pocket here, right at your hip, like a -- like a
11  normal pant pocket would be.  And then there's a -- I call
12  it a thigh pocket, but it's like a side pocket.  So that
13  would've been right here on my -- my thigh on each
14  side -- each side.  So one, two.
15         And then there's two pockets on the front.
16  Three, four.  Two pockets on the back.  Five, six.
17  Then there's a smaller pocket on the back side.  So
18  that's seven.  I think there's another one on the
19  other side, so eight.  There's 10 pockets on there
20  somewhere.
21     Q.  Okay.
22     A.  There's 10.
23     Q.  All right.  The right hip pocket, is there a
24  zipper or some kind of closure on that?



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
113–116

Page 113

1    A. No. Should be a picture of the pants.
2    Q. Yeah. I think we have them. They were the
3 ones that were cut, right?
4    A. Yeah.
5    Q. I just didn't print out a copy to bring with
6 me.
7    A. Oh, okay.
8    Q. But I do have it.
9    So I have some screenshots from the surveillance
10 video. I'll mark these as Exhibit 2.
11    (Defendant's Exhibit No. 2 was marked for
12    identification.)
13 BY MR. WOY:
14    Q. And then there's one on the front and one on
15 the back. We'll start with the one on the front.
16    Is that you in the surveillance video screenshot?
17    A. It looks like me.
18    Q. And then you can see that looks like the duty
19 bag you were just talking about was on your right
20 shoulder there?
21    A. Yes.
22    Q. Can you tell?
23    A. Sure. It's kind of grainy.
24    Q. Yeah. We can look at the actual surveillance

Page 114

1 video in just a minute. I'll bring that up.
2    Now that we've gone through the duty bag, I don't
3 have that much to ask you about this. But you know,
4 if you flip to the second -- the backside. So the
5 second photo.
6    A. Yeah.
7    Q. I'm guessing that if you look kind of down
8 here, is that the LifeVac?
9    A. That's the LifeVac. Yes.
10    Q. Okay. So you've pretty much answered my
11 questions, I think, about these photos already. We
12 talked about the duty bag.
13    But if you look at this second photo, you know,
14 it looks to me like the duty bag is positioned a
15 little more around your backside than what you
16 described.
17    A. Yeah.
18    Q. Would you agree with that?
19    A. Yes. From walking. Yes.
20    Q. Yeah. Is that the position that you think it
21 was in when the discharge occurred, or do you think it
22 moved?
23    A. It moved.
24    Q. Okay. And how did it move?

Page 115

1    A. Because when I stopped in front of the
2 cruiser, I moved my hand because I was going to take
3 it off. So I believe it was more in front of me.
4    Q. Okay. So when it moved from what's shown in
5 this second photo in this Exhibit 2 --
6    A. I believe so.
7    Q. -- to a little further forward around the
8 right side of your body?
9    A. I believe so.
10    Q. You can hang onto that if you want. I'll
11 take it back. I'm done with it.
12    A. Oh, no. You're done with both of these?
13    Q. Yes. So I'll give these back to the court
14 reporter so we don't lose them.
15    MR. WOY: Thank you.
16 BY MR. WOY:
17    Q. I'm going to bring up a clip of the
18 surveillance video. Just bear with me.
19    So just going to pull this quickly. And it's a
20 short clip. And then I think we'll see -- I think
21 that's you walking from the left side, right?
22    A. Uh-huh. Yes.
23    Q. And then I just want to ask you a few quick
24 questions about when the discharge occurred and

Page 116

1 that'll be about it. Just give it a second.
2    (Video played.)
3    THE WITNESS: There.
4 BY MR. WOY:
5    Q. Okay. So if we replay this and I put the
6 cursor over the pause button, are you able to pause it
7 when the discharge occurs?
8    A. Yes.
9    Q. Okay. All right. So you can try. If you
10 miss it, that's fine. We'll do it again.
11    (Video played.)
12    THE WITNESS: Right there.
13 BY MR. WOY:
14    Q. Okay.
15    A. It's like maybe a second right before that.
16 Oops. I pressed play.
17    Q. Okay.
18    A. My bad.
19    Q. That's all right.
20    A. So it's like right before that. I'm -- I
21 suck at this. I'm sorry.
22    Q. Take your time.
23    A. I think it's like right here.
24    Q. Okay. Thank you.



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
117–120

Page 117

1    A. No problem.
2       MR. WOY: So what I'm going to do is I'm
3    going to take a screenshot of this, Danny, and then
4    we'll mark it as an exhibit to deposition.
5       MR. CEISLER: Yeah. Why don't you do a
6    screenshot and just look at it one more time and see
7    if you're total and absolute that that's the right
8    spot?
9    BY MR. WOY:
10      Q. Okay. I don't know if I have the ability to
11   zoom in here for you, but this is the same size at
12   what the video was. So take a look. You can
13   absolutely, you know, say, "No. I didn't quite get
14   it," and we can go back to the video. Watch it a few
15   more times. Whatever you need to do.
16      A. Can we go back?
17      Q. Absolutely.
18      A. Click on it.
19         So right before I drop the bag, that's when it
20   went off.
21      Q. So is it that moment or is it before that
22   moment?
23      A. It's like a -- like a second before -- if I
24   do, like, 10 seconds. Jump back too far. It's

Page 118

1    literally when I stop and start to leave. That's when
2    it happened.
3         Right there. Right there.
4       Q. That one?
5       A. Yeah.
6       Q. Comfortable with that?
7       A. Because you see me drop the bag. Drop it.
8       Q. So do you drop the bag after the discharge?
9       A. As -- as soon as I heard it and I
10   felt -- yeah. I dropped the bag.
11      Q. All right. So I'm going to take a new screen
12   clip of this and you can watch it. Just make sure I'm
13   not --
14         (Whispered conversation)
15   BY MR. WOY:
16      Q. Yeah. Okay. Are you comfortable with that
17   as the time you think it happened?
18      A. Yeah. Yeah.
19      Q. Okay. All right. So I'll send this to the
20   court reporter and we'll mark this as Exhibit 3.
21         (Defendant's Exhibit No. 3 was marked for
22         identification.)
23   BY MR. WOY:
24      Q. All right. Thank you very much.

Page 119

1    A. You're welcome.
2    Q. All right. And I know you said that
3    obviously, you felt a searing pain when the discharge
4    occurred, right?
5    A. Yeah.
6    Q. So I'm sorry for making you go back through
7    this, but can you just kind of walk me through what
8    happened from the moment of the discharge onward?
9    A. So the moment I heard the bang, it sounded
10   really close and I felt the pain in my thigh. And my
11   immediate thought was, "Someone just shot me." And so
12   instinctively, dropped my stuff to run for cover
13   because I didn't know where it came from.
14      And as I turned to run, I looked down and saw
15   where the hole was in my pants and realized it was
16   right where my holster was. And I was like, "Oh,
17   shit. My gun just shot me." And I think I yelled and
18   Tom Lambert came running over, and he grabbed me. And
19   I said, "My gun shot me." And then Brian Pavao came
20   and grabbed me. And then just -- people just started
21   coming left and right over.
22   Q. Lambert was the first one to you?
23   A. Yes.
24   Q. Okay. And then Pavao was the second?

Page 120

1    A. Yes.
2    Q. All right. And then at some point, did you
3    get -- like, did they lay you down on the ground; or
4    what happened?
5    A. No. I had grabbed onto a car. And then when
6    Brian ran over, I think I grabbed onto Brian. And I
7    was holding onto Brian. And someone said, "We need to
8    take off your duty belt." And I said, "No. Don't
9    touch it. It's going to go off again." And they
10   said, "We have to get it off." And I said, "Okay.
11   I'll help you."
12      So I turned to undo the belt buckle, because they
13   were having a hard time getting it off. They didn't
14   know exactly how it worked. We all have different
15   belt buckles. And so I got it off and then someone
16   just took it and got away from me. And then I went
17   back to holding onto Brian.
18   Q. Okay. You were standing when the belt came
19   off?
20   A. Yes.
21   Q. Do you know who took the belt off of you?
22   A. I don't know who took it off. Someone took
23   it off and I didn't see where it went.
24   Q. So when you looked down towards your gun



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
121–124

Page 121

1 immediately after the discharge, did you see anything
2 in the holster area that shouldn't have been there?
3      A.  No.  Because I wasn't looking at the gun.  I
4 was looking at the hole.  I just looked down.  I just
5 remember seeing the hole.  And I didn't even look at
6 the gun, but I know it was holstered.  I remember
7 seeing it in the holster.  I just -- I wasn't trying
8 to inspect it.  I was just, like, "Shit.  I got shot.
9 I got to run."
10     Q.  Yeah.  Was the hood up at the time; do you
11 know?
12     A.  Everything was engaged the way it should've
13 been.  I didn't touch it, so it was still engaged.
14     Q.  Did you see the gun at any point in time
15 after it was taken off of -- after the belt was taken
16 off of you?
17     A.  Unh-unh.  No.
18     Q.  Do you know who, if anyone, took the gun out
19 of the holster?
20     A.  I didn't know it at the time, but I read
21 after -- afterwards and what they told me, it was Tom
22 Lambert.
23     Q.  He's the one that first took the gun out of
24 the holster?

Page 122

1      A.  Yes.
2      Q.  Okay.  Have you ever spoken to him about
3 that?
4      A.  No.
5      Q.  Do you know where the spent shell casing was
6 from the discharge when he -- well, let me ask you
7 this.
8          Did you see it eject, the spent shell casing?
9      A.  No.
10     Q.  Do you know where the shell casing ended up?
11     A.  I didn't know it at the time, but when they
12 cut my pants I heard someone say, "I found the
13 bullet."  So I guess it was in my pants.
14     Q.  All right.  So just to be clear, I want to
15 distinguish between the bullet and the casing, like,
16 the wrap.
17     A.  Oh.  So the casing, I don't -- like, the
18 casing, I don't know.  I learned afterwards it was
19 still inside.  It was still -- I -- so it hadn't
20 ejected out of the holster.
21     Q.  Okay.  So was it in the barrel still, or the
22 chamber still, or was it still piped into the ejection
23 port?
24     A.  I didn't see it.  I just heard it was -- it

Page 123

1 was still inside the holster, and that it was -- it
2 was still kind of in the barrel, like still piped.
3      Q.  Okay.  Who did you hear that from?
4      A.  It was afterwards during the investigation.
5 They said they had found it still, like, partially,
6 like, ejected but inside the holster, so --
7      Q.  Okay.  So just to be clear, because the way
8 I've heard it, I think you've said a few different
9 things.  And I'm not saying anything about what
10 you're -- I just want to make sure I'm understanding.
11         You said that it was still in the barrel, but you
12 also said it was still piped.  To me, those are two
13 different things.
14     A.  You're right.  So it's two different things
15 because the barrel is -- so the slide.  So when you
16 shoot a gun, the spent casing gets ejected out.  It
17 was there.  It was in that -- I don't know what you
18 call it.  The port.
19     Q.  Yeah.
20     A.  I'm going to call it port.  It was in there.
21     Q.  Okay.  So if I --
22     A.  Sorry.
23     Q.  -- looked at your gun and looked at that
24 ejection port, I would see the casing stuck in there?

Page 124

1      A.  Yes.
2      Q.  Okay.
3      A.  Yes.  Not the barrel.
4      Q.  All right.  And then at some point I -- well,
5 before we get there.
6          You said that you told Lambert, "My gun shot me,"
7 right?
8      A.  Yes.
9      Q.  Did you talk to anybody else at the scene
10 about how the discharge occurred?
11     A.  There was no discussion about it.  I
12 just -- I was shot.  They were treating me for a
13 gunshot wound.  So we weren't talking about it.
14     Q.  Okay.  Okay.  Someone provide medical treatment
15 before the ambulance got there?
16     A.  Yes.
17     Q.  Who did that?
18     A.  Somebody that was there.  Someone threw some
19 gauze on it and wrapped it.
20     Q.  Okay.  I saw the picture of your pants.  It
21 looked like someone cut them.  Did they cut them at
22 the scene?
23     A.  Samir did.  Yes.  Samir Messaoudi.  He cut my
24 pants.



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
125–128

Page 125

1    Q. How do you say his last name?
2    A. Messaoudi.
3    Q. Messaoudi.
4    A. Yes.
5    Q. Okay. What was his involvement in the
6  response, other than cutting your pants?
7    A. He works on my shift, so he was there to
8  work. And he just -- he was in the back lot when it
9  happened.
10    Q. Do you know if he saw the discharge occur?
11    A. I don't think so. I don't know. There
12  was -- there was quite a few people in the back lot,
13  but I don't think anybody was, like, watching me.
14    Q. Have you spoken to anybody who said that they
15  saw it happen?
16    A. I don't -- no. I didn't talk to anyone that
17  said they saw it happen. They heard it happen, but I
18  don't think anyone actually saw it happen.
19    Q. All right. And then at some point, the
20  ambulance with the EMT showed up; is that right?
21    A. It was the fire department, Cataldo's
22  supervisor, and then the ambulance showed up.
23    Q. Did you know any of those first responders
24  from the fire department or Cataldo?

Page 126

1    A. Yeah. I mean, I've worked with the fire
2  department guys before. The Cataldo guys, I don't
3  think I was familiar with them. They're not, like, my
4  regulars that I had.
5    Q. Do you know approximately how long it took
6  for the ambulance to get there?
7    A. I think it was pretty quick. I mean,
8  Cataldo's based right down the street from us, so I
9  don't think it was very long. Maybe five minutes.
10    Q. Did they do anything for you at the scene, or
11  had your coworkers already given you -- you said they
12  wrapped some gauze around it.
13    A. Yeah. No. I guess the -- I remember going
14  on the gurney and going into the ambulance. I think
15  they took the gauze off, because that was the first
16  time I saw what it looked like.
17    Q. Were you already on the gurney at that point?
18    A. Yes.
19    Q. What did it look like?
20    A. I just saw blood. Red blood and what I
21  thought was a hole, so --
22    Q. Now, I've seen it described -- I think in
23  your answers the interrogatories, as a graze. In some
24  other places I've seen the word superficial used.

Page 127

1    A. Yeah.
2    Q. Are those two accurate descriptors of what --
3    A. Yeah. It was a graze. It was a flesh wound.
4  When I looked at it, when I saw it, I just saw red, so
5  I didn't see if it had punctured deeply. I -- I
6  knew they found the bullet because I heard them say
7  they found the bullet, so I knew it didn't go inside.
8  But yeah. To me it just looked like a red mess. And
9  then when they cleaned it up, then I saw it looked
10  like it -- it was a chunk was missing.
11    Q. So it didn't actually tunnel underneath of
12  your skin?
13    A. No. It didn't. It just took off that top
14  layer, so --
15    Q. Did you take any photographs of the injuries?
16    A. I did.
17    Q. Do you still have them?
18    A. I do.
19    Q. Do you have them, I'm thinking -- I guess on your
20  phone or somewhere else?
21    A. Yeah. They're on my phone.
22    Q. Okay. Let's go off the record.
23        THE VIDEOGRAPHER: The time is 11:40 a.m.
24  Off the record.

Page 128

1        (Off the record.)
2        THE VIDEOGRAPHER: The time is 11:46 a.m.
3  Back on the record.
4  BY MR. WOY:
5    Q. Thank you very much for providing those
6  photos. The last one that at least came from the
7  email, the one where it looks like it's the most
8  healed, are you able to tell me how long after the
9  discharge you took that photo?
10    A. Do you mind if I look at it?
11    Q. Yeah. Go ahead.
12    A. So I took that picture on March 19th, so a
13  little over 6 weeks maybe.
14    Q. On March 19th?
15    A. March -- oh. Wait a minute. May. So
16  those -- those last two photos, those were recent. So
17  it would be the -- this picture would've been the last
18  one I took. And that was May 11th.
19    Q. So let's do this. I don't have the ability
20  to print these out, I don't think, but I'll send them
21  to the court reporter and we can mark these photos
22  that are sent directly from the witness to Danny to me
23  as Exhibit 4. And I'm going to show you -- you can
24  just look on my email here, if that's helpful to you.



Page 129

1    (Defendant's Exhibit No. 4 was marked for
2    identification.)
3       THE WITNESS:  So that was at the time of the
4    incident.  That was in the hospital.
5    BY MR. WOY:
6       Q.  So this, for the purpose of the record, the
7    first photo at the very top of the email that you sent
8    was taken at the hospital, right?
9       A.  Yes.
10      Q.  Okay.  And then when was the next one taken?
11      A.  I believe that was taken the next day.
12      Q.  Okay.  How about this?  Are you able to tell?
13      A.  I'd have to look at the date.
14      Q.  I think it's easier -- I don't think it's
15   necessary to get the exact date.
16      Maybe we you can just bookend, kind of, end of
17   the progression.  So I'm going to go down to -- you
18   said the last two --
19      A.  So those were --
20      Q.  -- to the very bottom one.
21      A.  I --
22      Q.  When was this taken?
23      A.  That was in March of this year.
24      Q.  March of 2023?

Page 130

1       A.  Yes.
2       Q.  So is that about what it looks like right
3    now?
4       A.  Yes.
5       Q.  Okay.  And the photo above that, was that
6    taken at the same time?
7       A.  Same day.  Yeah.
8       Q.  Okay.  And then the third photograph from the
9    bottom that we're looking at now, do you know when
10   that was taken?
11      A.  That one was taken in May of 2022.
12      Q.  Okay.  Do you know when in May that photo was
13   taken?
14      A.  The date -- May 11th.
15      Q.  Okay.  So then are these photos all in order
16   of the actual progression of the healing starting with
17   the top, being on the date of the discharge --
18      A.  Yes.
19      Q.  -- down, and then this goes order up to May
20   11th?
21      A.  Yes.
22      Q.  Okay.  All right.  Thank you very much.
23      A.  You're welcome.
24      Q.  Did you have any kind of issues with

Page 131

1    infection with the wound?
2       A.  I thought I was.  And if you look at some of
3    the pictures, it looks pretty gross.  But the doctor
4    said it -- she -- they tested it and they said there
5    was no infection.
6       Q.  So there's some other stuff I want to ask you
7    about quickly before we get to the damages and your
8    injuries.  We'll come back to it.  We'll talk to it a
9    little more.
10      A.  Okay.
11      Q.  But before I get there, I just want to ask a
12   little bit about the investigation that was done,
13   okay?
14      A.  Okay.
15      Q.  All right.  I've seen the report that was
16   issued by Lieutenant Perrone.  Could you just kind of
17   give me an overview of what your understanding of the
18   investigation that was done is?
19      A.  So from what Lieutenant Perrone told me, they
20   didn't believe that I had done anything wrong, because
21   they saw the video right away.
22      And to them it did not look anything I had done.
23   So they said it was just a matter of policy and
24   procedure.  But they had to do the internal affairs

Page 132

1    investigation.  So I wasn't worried about it.  It was
2    just standard procedure.
3       Q.  And then did the results are documented in the
4    report.  Have you seen the report?
5       A.  I have.  Yes.
6       Q.  Is there anything that they told you about
7    the results of their investigation that didn't make it
8    into the report that you're aware of?
9       A.  No.
10      Q.  So if we take a look at -- you know, if we
11   review that report, if you review the report, we have
12   a pretty accurate understanding of what was
13   communicated to you during the investigation process?
14      A.  Yes.
15      Q.  I understand you had to give a recorded
16   statement as a result of that process?
17      A.  Yes.  They reported it.
18      Q.  You've listened to that audio recording in
19   preparation for your deposition today, right?
20      A.  Yes.
21      Q.  Did you give any other statements as a result
22   of this discharge?
23      A.  For the investigation?  Just that -- just
24   during that interview.



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
133–136

Page 133

1     Q. Okay. Just to be clear, I'm not asking you
2 what you told your attorneys or anything like that.
3 But you kind of qualified that and said for the
4 investigation.
5        So outside of what you told your attorneys, did
6 you give any other kind of written statements outside
7 of the investigation?
8     A. I had done an interview with the Washington
9 Post and the New York Post.
10     Q. When did those interviews take place?
11     A. The New York Post was recent. I don't
12 remember the exact date. And then the Washington Post
13 was -- was at the end of March, I believe.
14     Q. Of 2023?
15     A. Yes.
16     Q. How'd you get in touch with the Washington
17 Post and the New York Post?
18     A. They reached out to my lawyer. Or I
19 think -- I think they reached to -- to Stephen
20 Semenza.
21     Q. Okay. Who did you speak with from the Post?
22 I'm sorry. I should differentiate. The Washington
23 Post.
24     A. The Washington Post, I don't remember her

Page 134

1 name off the top of my head, but I have her number.
2 Do you want me to look --
3     Q. No. That's okay. I don't need her number.
4        Do you know if she recorded your interview with
5 her?
6     A. It was a video-recorded interview. And then
7 I also did one over the phone with a different
8 reporter from the Washington Post. So there was a
9 phone interview with the Washington Post reporter, and
10 then they came in person to do an in-person interview
11 that was on camera.
12     Q. Do you know if the phone interview was
13 recorded in any way?
14     A. I don't recall. I don't recall.
15     Q. Okay.
16     A. I know the New York Post one was.
17     Q. Okay. So the New York Post one, was that an
18 interview you gave over the phone?
19     A. That was a phone recorded interview. Yes.
20     Q. Not investigator, but the journalist you
21 spoke to from the New York Post said that they were
22 recording it?
23     A. Yes. He told me he was recording it.
24     Q. Do you have a copy of that recording?

Page 135

1     A. I do not.
2     Q. Do you know what his name was?
3     A. Not off the top of my head. It's in the
4 email somewhere.
5     Q. Okay. But if we needed to locate it, you
6 would be able to track that down for us?
7     A. Yes. And if you Google it, he's the one that
8 wrote the article.
9     Q. Oh, okay. So you spoke to the -- okay. Easy
10 enough.
11     A. Yeah. I'm -- I'm pretty sure he was the
12 actual writer and interviewer.
13     Q. Gotcha. Did you give any other interviews,
14 other than what we've already discussed?
15     A. No. I don't believe so. Just those two.
16     Q. Have you spoken with -- well, let me preference
17 this by --
18     You've already told us and given us copy of the
19 Facebook messages with Brittany Hilton, right?
20     A. Uh-huh.
21     Q. Other than Ms. Hilton, have you spoken with
22 anybody else who has experienced an accidental
23 discharge involving the P320?
24     A. Walter Collette.

Page 136

1     Q. Did you talk to him at all about how your
2 discharge happened, or occurred?
3     A. Yeah. I -- he was there, actually, when it
4 happened, because we work the same shift. So I
5 remember he had asked me -- he was like, "What
6 happened?" And I said, "I don't know. It just went
7 off when I was walking to my cruiser." So that was
8 pretty much it.
9     Q. Did he talk to you at all about how his
10 accidental discharge occurred?
11     A. Yes.
12     Q. What do you know about how his discharge
13 occurred?
14     A. From what he told me, he had it in his gym
15 bag wrapped in a towel, and when he went to put it on
16 his shoulder, the bag on his shoulder, the gun went
17 off and struck him in the calf, I believe it was.
18     Q. Do you ever store your P320 in a gym bag?
19     A. I've transported it in a gym bag. Yes.
20     Q. When do you do that, do you have it in a
21 holster?
22     A. It's always in the holster. Yes. But I
23 unload it.
24     Q. Oh, okay. So when you put it in your gym



Page 137

1  bag, you have -- number one, you have it holstered,
2  right?
3      Q.  So before his incident, I -- it would always
4  be in the holster and I would put it in my gym bag.
5  After his incident, I started unloading it, even
6  though it was in the holster, because that was a fear
7  of mine.
8      Q.  Okay.
9      A.  And that's also why I wore my duty belt in
10  the car, because I was nervous about keeping it in the
11  trunk, because in case of an accident, I didn't want
12  it to go off.
13     Q.  So his discharge occurred before yours,
14  right?
15     A.  Yes.
16     Q.  Did you learn about his discharge before
17  yours?
18     A.  Yes.
19     Q.  When you learned about his discharge, did you
20  speak with anybody at Somerville about any concerns
21  you had related to the safety of the P320?
22     A.  Yeah.  I -- I remember after that incident
23  happened, a lot of us were concerned because -- I
24  mean, he had his gun secured and you know, we're all

Page 138

1  taught to believe that the gun doesn't go off unless
2  you pull the trigger.  So -- I mean, he had it in the
3  gym bag, so who pulled the trigger?  Why did it go
4  off?
5        So after that, I stopped transporting it, like,
6  in the duty belt in the trunk of my car.  And if I
7  wasn't wearing it and I was transporting it that way,
8  I would unload it and I would make sure there was
9  nothing in the chamber, just in case, again, like, if
10  I got rear ended or in a car accident and my kid is in
11  the car, my dog is in the car, I was concerned about
12  that.
13     Q.  Were you aware that his pistol was unholstered in
14  his duty bag?
15     A.  I -- I remember him saying it was wrapped in
16  a towel.
17     Q.  Other than Walter Collette and Brittany
18  Hilton, have you spoken with anybody else who had an
19  accidental discharge with the P320?
20     A.  No.
21     Q.  And you provided some text messages that you
22  exchanged with you know, people you know about your
23  discharge and your injuries and the aftermath, right?
24     A.  Uh-huh.  Yes.

Page 139

1      Q.  Since you provided those text messages to
2  Counsel, have you sent any more text messages or
3  emails about how the discharge occurred to anybody?
4      A.  Not that I recall.
5      Q.  So I understand you didn't receive any kind
6  of discipline or anything as a result of this
7  discharge?
8      A.  No.
9      Q.  And you were cleared of all wrongdoing by the
10  department?
11     A.  Yes.
12     Q.  Did they talk to you in connection with the
13  investigation about whether it's possible that
14  something got down into the holster and pulled the
15  trigger?
16     A.  Lieutenant Perrone never said that to me.  It
17  was what I heard afterwards from other people talking.
18     Q.  Who did you hear that from?
19     A.  I can't recall the exact names.  But I know
20  people afterwards were talking about, oh Lieutenant
21  Vivolo thinks something got in your holster and that's
22  how the trigger was pulled.  So I didn't hear that
23  from, like, Perron -- Lieutenant Perron or Lieutenant
24  Vivolo themselves.  That's just what I heard other

Page 140

1  officers saying.
2      Q.  Did you hear anybody else that thought that
3  that's what happened, other than Vivolo?
4      A.  No.  No one really talked to me about what
5  they thought happened.  They just -- they knew the gun
6  went off in the holster without anyone pulling the
7  trigger.  So --
8      Q.  All right.  So let's shift gears a little
9  bit, and talk about your treatment, and then I'll try
10  and wrap it up relatively soon, okay?
11     A.  All right.
12     Q.  I'm not going to make any promises on the
13  time.  But --
14     A.  That's fine.
15     Q.  -- we're getting there.  So you indicate
16  before -- I apologize.  One more line of questioning
17  before we go.
18        So you indicate in one of your answers to the
19  interrogatories -- and I can give you a copy if
20  you -- it's just a quick question.  I'm not going to
21  mark this as an exhibit, but it's Exhibit -- or
22  Interrogatory number 9.  You indicate in there that
23  you spoke to another officer Yvon Jean-Jacque --
24     A.  Yes.



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
141–144

Page 141

1    Q. -- on the phone who told you he was also
2  concerned about the gun?
3    A. Uh-huh.
4    Q. Is he someone with your department?
5    A. Yes.
6    Q. What did he say about his concerns with
7  regard to the 320?
8    A. I don't recall the exact words he said. I
9  just know he talked to me about being concerned about
10  it after what happened to me.
11    Q. Okay. Yeah. All right. That's all. That's
12  the only thing I wanted to ask you about that.
13    MR. WOY: We'll mark as -- what exhibit we
14  you up to here?
15    THE REPORTER: This will be 5.
16    MR. WOY: 5. Okay.
17    (Deposition Exhibit No. 5 was marked for
18    identification.)
19  BY MR. WOY:
20    Q. This would be a copy of the ambulance report.
21  And I just have one or two quick questions for you
22  about this. So I marked another copy of the exact
23  same -- you're welcome to look at that one if you want
24  since he's got it for you. So if you just look at the

Page 142

1  highlighted portion in there, it looks, you know, I
2  see that it describes it as the superficial GSW or
3  gunshot wound due to accidental discharge.
4    And then goes on to say wound had blood but was
5  not actively bleeding. And then it goes on further to
6  say, appeared to be a severe abrasion with strong
7  bruising around the wound.
8    Could you just tell me a little bit about how
9  much it was bleeding at the time? Would you agree
10  with this characterization of it wasn't actively
11  bleeding when the ambulance got there?
12    A. Yeah. I didn't see, like, blood, like,
13  pouring down. So --
14    Q. Okay.
15    A. I wouldn't say it was extreme.
16    Q. Yeah. Okay. And then we did see some -- and
17  we saw some bruising in the photos that you --
18    A. Uh-huh.
19    Q. -- you took and sent to us.
20    A. Yeah.
21    Q. Is that a pretty accurate depiction of the
22  bruising that you suffered as a result of this
23  incident or was there some more severe bruising that's
24  not captured in those photos?

Page 143

1    A. No. I think I got the worst of it in the
2  photos.
3    Q. All right. That's all I have for you on that
4  one. So you're welcome to keep looking at it if you
5  want. But --
6    A. Yeah.
7    Q. All done?
8    A. Yeah. I never saw it before. So I'm just --
9    Q. Yeah. Any of these records that I show you
10  you're welcome to just take your time and look over
11  before I ask any questions, okay?
12    A. All right. Thank you.
13    Q. So the next one will be an
14  excerpt to the emergency department records. So there
15  are more to them than this. I just didn't print them
16  out because I don't have any questions about the rest,
17  at this point. So this one is from the emergency
18  record marked as Exhibit 6.
19    (Deposition Exhibit No. 6 was marked for
20    identification.)
21  BY MR. WOY:
22    Q. And it says in here that you had some mild
23  right shoulder pain in the emergency room. Does that
24  sound right?

Page 144

1    A. I -- I don't recall. But if I told them I
2  had shoulder pain then I had shoulder pain.
3    Q. Okay. So as you sit here today that's not
4  something that you necessarily associate with
5  discharge, right?
6    A. No.
7    Q. So it looks to me like whoever wrote this is
8  kind of associating it with the duty bag. And in the
9  note -- earlier in the note it says she notes she
10  dropped her duty bag from her shoulder and ran towards
11  her coworkers at that time. She had some mild right
12  shoulder pain.
13    Does the description of dropping your duty bag
14  from your shoulder sound right? Do you remember
15  telling anybody that? Is it just --
16    A. No. I think I said I was putting my duty
17  belt down. I had my duty bag down.
18    Q. Okay. All right. So if you turn the page to
19  the next side I have highlighted there -- well it
20  starts, patient is a police officer. And then the
21  highlighting starts, reports her duty bag fell off her
22  right shoulder, caught on her belt and her vertically
23  oriented 9 millimeter pistol discharged.
24    Does that sound like an accurate description of



Page 145

1    what happened?
2        A.  No.
3        Q.  Okay.  So I can guess as to what you would
4    disagree with.  So why don't you tell me, you know,
5    what part of that you disagree with?
6        A.  My duty bag did not fall off my right
7    shoulder.  It did not catch on my belt and my gun
8    wasn't vertically oriented.
9        Q.  Do you have any idea how that got into this
10   record?
11       A.  No idea.
12       Q.  And then this also -- it mentions some right
13   shoulder pain.  It says, where her bag caught.  Do you
14   recall, let's say, after the discharge from the ER.
15   Do you recall having pain in your right shoulder?
16       A.  It's not something I recall now.  But I don't
17   know.  I don't think so.
18       Q.  Okay.  All right.  That's all I have for you
19   question-wise on that one.  Thank you.
20       A.  No problem.
21       Q.  All right, so when you got to the ER, just
22   kind of generally, could you tell me what they did for
23   you?
24       A.  They took me back into one of the bays.  I

Page 146

1    know the first thing they did was they checked me head
2    to toe to make sure there was no entry or exit wounds
3    other than what I thought I had.  That looked fine.
4    Then they -- I know they did a -- they brought a
5    portable X-ray in to take an X-ray to make sure there
6    was no, like, shrapnel or anything else in the body.
7        They cleaned it, they flushed it, they bandaged
8    it.  And then they gave me something for pain.  And
9    then they just monitored me, I guess, for a little
10   bit.  And then they released me.
11       Q.  It's my understanding that you didn't have
12   any kind of remnants of the bullet in your body
13   anywhere; is that right?
14       A.  Right.
15       Q.  Did you go back to the ER at any point in
16   time, as a result of your injuries?
17       A.  Not to the ER.  No.
18       Q.  So I understand you went, I think next, to
19   the worker's compensation doctor.  Does that sound
20   right?
21       A.  Yeah.  Cambridge Health Alliance.
22       Q.  Okay.  And the record I have indicates you
23   were there on April 14th of 2022.  Does that sound
24   right?

Page 147

1        A.  Sure.  I don't remember exactly when I went.
2    But I remember going.
3        Q.  I'll mark it first -- yeah.
4        A.  Okay.
5        Q.  So I mean, that's the date of this record.
6    So really the only reason I'm asking you that is to
7    make sure, you know -- I don't think you went again.
8    It looks like you only had one visit to the worker's
9    compensation doctor; is that right?
10       A.  Yes.  And then I went to my PCP.
11           MR. WOY:  All right.  So we're marking this
12   as Exhibit 9.
13           THE REPORTER:  7.
14           MR. WOY:  7.  I'm sorry.
15           (Deposition Exhibit No. 7 was marked for
16   identification.)
17   BY MR. WOY:
18       Q.  So take a minute to take a look at that and
19   then let me know when you're ready.
20       A.  Okay.
21       Q.  All right.  So you've had a minute to take a
22   look at that record.  Is there anything in there that
23   jumps out at you that you think is inaccurate?
24       A.  No.  It's okay.  It looks fine.

Page 148

1        Q.  And before we get even to this -- so from the
2    time you got home from the ER to the time you went to
3    this worker's compensation provider on April 14th --
4        A.  Uh-huh.
5        Q.  -- did you receive any other kind of medical
6    treatment?
7        A.  I don't believe so.  No.
8        Q.  Did you have to do any kind of wound care for
9    yourself at home --
10       A.  Yes.
11       Q.  -- during that time?
12       A.  Yes.  I had to keep the wound clean and
13   change the bandage frequently.  And then take pain
14   meds as needed.
15       Q.  What kind of pain medication did you have?
16       A.  At the hospital they gave me something.  I
17   don't remember what it was.  But it was something
18   stronger.  And then at home it was just ibuprofen.
19       Q.  After you left the hospital is there any kind
20   of pain medication that you took, ibuprofen?
21       A.  Is it -- I'm sorry, what?
22       Q.  Yeah.  Did you take anything other than
23   ibuprofen after you left the hospital?
24       A.  No.  Just the ibuprofen.



Case 1:22-cv-16420-PBS   Document 312284   Filed 03/28/24   Page 149 of 489

Page 149

1    Q. How often did you have to change the bandage?
2    A. I think it was once or twice a day.
3    Q. What was the pain like from between, let's
4  say, from the time that you left the ER, up until the
5  time you went to the emergency room, what was your
6  experience?
7    A. I know I had a hard time sleeping because I
8  like to sleep on my side and I couldn't sleep on my
9  side where I got shot.  So it was mostly, like, on my
10  back and then if I were to turn on my side, I would
11  get woken up by the pain.  So I'd have to fix myself.
12      I know cleaning it sometimes would hurt.  Because
13  I'd have to clean it with, like, a saline solution and
14  then put, like, Neosporin on it, and then put the
15  bandage on it.  And then the -- I know the tape that I
16  was using for the gauze was, like, starting to
17  irritate my skin.  I was getting, like, little cuts on
18  my skin.  So that was very uncomfortable.  But it
19  was -- it was manageable.
20    Q. From the time you left the ER to the time you
21  went to this worker's comp doctor, were you working in
22  any way or were you out completely?
23    A. No.  I think I was still out.  I don't think
24  I had returned yet.

Page 150

1    Q. I see in here, kind of a little more than
2  halfway down, I have it highlighted.  It says, has
3  returned to working out of home, spinning and walking
4  on treadmill, reports she feels medically ready for
5  full duty from both a physical and mental health
6  perspective.
7    A. Uh-huh.
8    Q. Is that an accurate description of how you
9  were feeling and what you were doing at that time?
10    A. I know I was trying to go back to work as
11  soon as possible, because I was trying to become a
12  detective and I didn't want this to hold me up.  So I
13  wanted to go back to work as soon as possible.
14    Q. Do you think you went back to work before you
15  were ready or do you think you were appropriately
16  ready to return, when you did, in fact, return?
17    A. I think I went back before I was ready, to be
18  honest.
19    Q. Why do you say that?
20    A. Because I was still really nervous to carry
21  the gun, still had fears of it going off again.  And I
22  think I was just more concerned about getting the
23  position, than taking care of myself.
24    Q. From a physical standpoint, we'll put

Page 151

1  aside -- you know, you mentioned that your concerns
2  were on the gun and being nervous.
3    A. Uh-huh.
4    Q. But from a physical standpoint, do you think
5  you were physically ready to return to work when you
6  did?
7    A. I know the doctor was more like, give it some
8  more time to heal.  But I told her I wanted to go
9  back.  So they just said to be careful with the
10  dressing and to be careful about things rubbing up
11  against it.  Like, make sure your pants aren't too
12  tight, make sure, you know, if you're wearing the gun
13  it's not digging into the wound, otherwise it's going
14  to delay this healing process.
15    Q. So on this same note under mental health, it
16  says you meant met with a clinician at Critical
17  Incident Stress Management group last week?
18    A. Uh-huh.
19    Q. Do you recall who you met with?
20    A. Mabel Lam.
21    Q. How many times did you meet with Mabel?
22    A. I think it started off once a week and then
23  it went to twice a month.  And I saw her for several
24  months.

Page 152

1    Q. When did you first go to see Mabel?
2    A. It was -- I think I spoke to her on the phone
3  shortly after the incident.  Not that same day.  But
4  probably within the week.  And then the first time I
5  saw her in person, I don't recall.
6    Q. Are you still going to see Mabel?
7    A. No.
8    Q. When did you stop visiting with her?
9    A. Maybe the fall of 2022.
10    Q. Did you transition to any other mental health
11  professionals at that point in time or was that the
12  end of your treatment?
13    A. No.  I just -- I didn't go to see anybody
14  else after her.
15    Q. Why did you stop seeing her?
16    A. It was getting a lot between the scheduling
17  because obviously she had a limited schedule and I had
18  a limited schedule.  I was in school and I had
19  classes.  She had some medical concerns on her own
20  part.
21      So it was just getting a lot of -- kind of
22  difficult to find a time that worked for both of us
23  that wasn't going to cut into anything else.  And just
24  by that point I think I was just tired of talking



Page 153

1  about it.  I just -- to me I felt like it wasn't
2  helping anymore.  It was just making me angrier.
3      Q.  So what time type of mental health concerns
4  were you seeing her for?
5      A.  So obviously I was, you know, dealing with
6  the aspect that in my head, I thought I was going to
7  die.  So it was the trauma from that, from what
8  happened to me.  The anxiety, the anxiousness about
9  having to carry the gun again, going back to work.
10      I had concerns about how people were going to
11  look at me and view me as an officer, especially once
12  I started going back full duty and not carrying one in
13  the chamber and people knowing.  I was afraid people
14  weren't going to trust me as their backup or they're
15  going to think that I was a liability.
16      So that was concerning.  So that was something we
17  talked about.  And it was just a -- I had some
18  recurring nightmares about what happened.
19      Q.  Do you still get nightmares about what
20  happened?
21      A.  Not very often.  I think it's been a while
22  since I had one.  But in the beginning, they were very
23  vivid.
24      Q.  How often did you get them in the beginning?

Page 154

1      A.  The night of, I know I had one and I woke up
2  crying and gasping for air.  I was hyperventilating
3  because I -- it felt like it was happening again.
4  That first week, I think it was almost nightly I had a
5  nightmare about it.  And then it started to taper off,
6  maybe once a week.  And then finally I would go, like,
7  a month without having a nightmare about it and then
8  suddenly I would have a nightmare about it.  But
9  I -- I think it's been a few months.
10      Q.  Did Mabel Lam render any kind of formal
11  diagnosis in connection with your treatment with her?
12      A.  I know in the beginning she talked about
13  PTSD.  That I was having signs and symptoms of it.  I
14  don't know if she diagnosed me with it.  But I know we
15  did talk about me experiencing some of the signs and
16  symptoms of it.
17      Q.  Anything else?
18      A.  The anxiety.
19      Q.  Has anybody formally diagnosed you with PTSD?
20      A.  No.
21      Q.  Do you think that you are suffering from
22  PTSD?
23      A.  I think there's definitely some -- yeah.
24  Definitely.  Not as, you know, what most people would

Page 155

1  think of PTSD, like -- like, flash backs where it's
2  like you're in it again and it's happening.  Not like
3  combat PTSD.  But like trauma.  That I definitely
4  think so.
5      Q.  Have you treated with anybody, other than
6  Mabel Lam, for mental health concerns related to this
7  incident?
8      A.  To this incident?  No.
9      Q.  Now.  I understand that you have some history
10  with anxiety prior to this; is that right?
11      A.  Yes.
12      Q.  How did the incident affect or -- let me ask
13  you this.  Did your anxiety change in any way, from
14  prior to the incident, to post the incident?
15      A.  With the gun, yes.  Like as I mentioned, I'm
16  not comfortable carrying around chambered in the
17  firearm.  So I do not.  When I do have to load it and
18  pull it out of the holster I do get nervous about it.
19  Yeah.  It's just -- I'm not -- I'm very anxious about
20  carrying the gun.  It's -- it makes nervous.
21      Q.  So does the anxiety that you attribute to
22  this incident, does that center on use and carrying
23  the gun or does it extend to just kind of a
24  generalized day-to-day basis about things unrelated to

Page 156

1  the gun, as well?
2      A.  I mean, I was concerned because at first,
3  like, my son was having some issues with it because he
4  had heard what happened.  So my concerns was, is this
5  going to affect my son?  And then always making sure,
6  like, my son knew mom was safe, mom was okay, checking
7  in with him a lot.  So that was a concern I had aside
8  from the gun itself.
9      And then my anxiety was mostly with people at
10  work.  How are people going to view me?  Were
11  people going to think I was a liability?  Were
12  they -- you know, if I didn't feel comfortable doing
13  something, were they going to try to fire me?  Were
14  they going to use this against me when I try to become
15  a detective?  Were they not going to make me a
16  detective because of this?  Those were all the
17  concerns I had.
18      Q.  Do you think that you've suffered any
19  consequences at work, as a result of this incident?
20      A.  No.  I don't think so.
21      Q.  We've talked about the anxiety and the
22  nightmares that you had and have still had from time
23  to time.  Is there anything else that you think you
24  attribute, from a mental health perspective, to this



Page 157

1  incident?
2      A.  Because of the incident, I definitely have a
3  lot of resentment towards my department because they
4  have not switched guns.  I feel like if they took
5  safety -- our safety seriously, they would switch the
6  guns because they've had two officers injured by this
7  gun, and I don't know if they're waiting for a third
8  or a fourth.  I just don't understand why they haven't
9  decided to switch the guns.  And why they would take
10  that -- that chance.
11        So I have some resentment towards them for that.
12  Don't have much trust in them or confidence in them.
13  So I guess it's changed my perspective of the people I
14  work for.
15      Q.  Is that what is driving your request to
16  switch to Cambridge police?
17      A.  Yes.
18      Q.  Do you have any plans to make any kind of
19  mental health treatment appointments or to see any
20  other mental health providers?
21      A.  So with my internship at the wellness center,
22  they do recommend that we follow-up with mental health
23  treatment for ourselves because of the clientele that
24  we're dealing with, and the stuff we're going to hear,

Page 158

1  and the stuff we're going to see.
2        So she said there's a possibility that based on
3  what happened to me could resurface working with
4  patients who are experiencing trauma from being first
5  responders or military members.  So that is something
6  that we did talk about and something she encouraged.
7  So I told her we would address it as it comes.
8      Q.  Okay.
9      A.  So --
10      Q.  Do you find yourself being more startled than
11  you would have been, prior to the discharge, by things
12  like gunshots or other loud noises?
13      A.  I mean, if I hear something that sounds like
14  a gunshot, I immediately think, okay what was that?  What
15  happened?  Is someone hurt?  But I wouldn't say,
16  like, if someone dropped something in the kitchen
17  that's loud, like, I don't, like, flinch.  Like, I can
18  differentiate between the sounds.  But when I hear,
19  like, something that sounds like a gunshot, a
20  firecracker, like, I do startle.  Like, I -- what was
21  that?
22      Q.  Do you think that's a different reaction than
23  you would have had, if you didn't have this accidental
24  discharge?

Page 159

1      A.  I mean, it depends, I guess.  I mean, depends
2  on the environment.  Like, if I'm at work I'm always
3  going to expect something for like that to happen.
4  But now, it's just, like, I'm always, like, if I hear
5  it I just automatically think gunshot.  Like, what just
6  happened?  So --
7      Q.  I apologize for asking about this.  I don't
8  intend to go too far into it.  But I did see in the
9  records, that you lost a close friend around the time
10  of this?
11      A.  Yes.
12      Q.  Could you just tell me really briefly about
13  what happened and the circumstances?
14      A.  So my coworker who was a good friend of mine,
15  Randy, we'd been friends since I was an officer, hung
16  out outside of work.  We had our group of people that
17  we hung out with.  We we'd go to movies, go to bars,
18  go to dinner, hang out at people's houses.
19        On June 19th, he -- I had left work from my day
20  shift.  He came in for the first half before the
21  midnight shift.  I was home when I got a call from my
22  boyfriend at the time, telling me that they had rushed
23  Randy to MGH, and that it didn't look good, and I
24  asked, well what happened.  And he says they found him

Page 160

1  unresponsive in his cruiser in the back lot, which is
2  where my incident had happened.
3        And when my incident happened, Randy was, like,
4  my rock.  He checked in with me every single day, made
5  sure I was okay, texted me or called me every day that
6  I was home from the incident.  Telling me not to rush
7  back to work, take care of myself.  He was the one
8  that told me that Mabel was amazing, that I'd love her
9  and she'd be great and -- because he worked with her
10  from CISM.
11        And I just immediately jumped in my car and went
12  to the hospital.  They wouldn't let us see him.  They
13  told us to leave.  I got back home and that's when I
14  found out he had passed.  So going back to work to be
15  with my coworkers.  They offered some grief
16  counseling.  CISM came by.  And from what we all knew
17  at the time, was they just found him unresponsive and
18  then they believed it was a heart attack.  So --
19      Q.  Yeah.  So sorry that happened.
20        Was some of your treatment with Mabel, to address
21  any trauma that developed, concerns from that incident, as
22  well?
23      A.  Yeah.
24      Q.  All right.  I understand that you also



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
161–164

Page 161

1  visited your primary care physician for treatment for
2  this injury?
3      A. Yes.
4      Q. This accident, right?
5      A. Yes.
6      Q. And it looks like it was on April 21st of
7  2022. And I've only found one visit record. Does
8  that sound right to you?
9      A. I think so. Yes.
10     Q. Okay. So it sounds like the treatment that
11  you've received for this incident was here on the date
12  of the incident?
13     A. Uh-huh.
14     Q. The worker's compensation provider on April
15  14th?
16     A. Uh-huh.
17     Q. Your primary care physician on April 21st and
18  then your follow-up counseling with Mabel Lam?
19     A. Uh-huh.
20     Q. Is there any other kind of treatment that you
21  received as a result of this incident?
22     A. Medically? No. Just that and then Mabel.
23     Q. When you say "medically, no," is there
24  something else that you might associate or was driven

Page 162

1  by the occurrence of this incident?
2      A. No. I mean, it was just kind of working with
3  my family, and talking to them, and just making sure,
4  like -- they would check in with me, make sure
5  everything was fine. But other than that, no.
6      Q. Okay. So when you went back to your --
7      MR. WOY: And I can mark this because I'm
8  going to ask you a question or two about it.  The
9  next one is Exhibit 8.
10     (Deposition Exhibit No. 8 was marked for
11  identification.)
12  BY MR. WOY:
13     Q. All right. So this is an excerpt from your
14  family doctor records. So take your time if you want
15  to take a look at it and just let me know when you're
16  ready.
17     A. Okay.
18     Q. All right. So it says in here from April
19  21st of 2022 that you didn't have any pain in the area
20  of the injury at the time of this visit. Does that
21  sound right to you?
22     A. Yeah.
23     Q. Have you had any pain in the area of the
24  injury, since April 21st of 2022?

Page 163

1      A. I know for a few weeks, like, I would get,
2  like, these shooting pains down my leg while it was
3  healing. But I think once it fully healed I think I
4  just -- I got, like, phantom pains, which is like the
5  same thing I had with my C section. But, no. Nothing
6  that I had to go see the doctor for.
7      Q. Okay. Is it fair to say that at this point,
8  you're pain free?
9      A. Yes. Physically, yes.
10     Q. Is there anything about your physical
11  injuries that prevents you from doing anything
12  work-related, hobby-related, anything on a day-to-day
13  basis, at this point?
14     A. No.
15     Q. All right. And the family doctor released
16  you to go back to work full-time without restrictions,
17  on April 21st; is that right?
18     A. Yes.
19     Q. Okay. When did you first return to work
20  after the discharge?
21     A. I don't recall. I'd have to look it up.
22     Q. Okay. Was it sometime shortly after April
23  21st?
24     A. I would assume so. If she cleared me then I

Page 164

1  would have gone back on my next scheduled shift.
2      Q. Okay. I know that you in your answers to
3  interrogatories, indicated that you have lost some pay
4  as a result of this incident, because you weren't able
5  to work details or overtime; is that right?
6      A. Yes.
7      Q. Okay. Do you have any kind of estimate of
8  how much you think you lost as a result?
9      A. So I normally would pick up shifts
10  whenever -- like, if I didn't have my son for the
11  night, I would try to work on extra shift or a detail.
12  And if I was working a night shift, I would try to
13  work during the day, like a detail. So I would have
14  to look at the schedule to see what the week looked
15  like.
16     Q. Okay.
17     A. Because we have a rotating schedule. So --
18     Q. Are you able to estimate for me, on a weekly
19  basis, how often you're able to pick up either detail
20  or overtime?
21     A. I'd -- at that time average was probably two
22  to three shifts a week.
23     Q. You were out of work for about two weeks for
24  this; is that right?



Page 165

1    A. From the paid admin leave, yes.  And then I
2  think I was on restricted duty.  So I wasn't -- I
3  couldn't do, like, details or overtime.  I was only
4  allowed to go back to doing that when I went back to
5  full duty.  So a few weeks, three weeks, four weeks.
6    Q. Okay.  So starting April 21st, you were able
7  to pick up overtime and details if you wanted; is that
8  right?
9    A. Yeah.  I don't think they told me I had to
10 wait, like, three shifts, because we have a rule,
11 like, if you're out for more than three days, you have
12 to work, like, a certain amount of shifts before you
13 can do details and overtime.  I don't think they did
14 that to me.
15   Q. Yeah.
16   A. Because of the circumstances.
17   Q. Is there a specific hourly rate that you get
18 for overtime and details?
19   A. Overtime, I believe, it's like 71 an hour.
20 Details is 60 an hour.
21   Q. Do you know how much, let's say, on an
22 average week, you would make in overtime and details
23 combined, in additional pay?
24   A. Average week?  Details, it's like 400 after

Page 166

1  taxes.  Overtime, it's about 480 to 500, after taxes.
2  Before taxes, it would just be the rate times the
3  hour.
4    Q. Okay.  Have you had to pay any kind of
5  medical expenses out of pocket, for this incident?
6    A. I don't think so.  I don't think they -- I
7  had any co-pays.  But I know there's a debt collector
8  coming after me and I keep directing him back to the
9  station.  So --
10   Q. Is that for treatment related to this
11 incident?
12   A. Yes.  From MGH.
13   Q. Oh.  From the hospital?
14   A. Yes.
15   Q. Okay.
16   A. He called me at work.  I have no idea how he
17 got my work number.
18   Q. Does your worker's compensation coverage
19 pay --
20   A. It should.
21   Q. -- for your medical care?
22   A. It should.  Yes.  I don't know why he called
23 me.
24   Q. All right.  So other than the -- any kind of,

Page 167

1  you know, if your worker's comp start to leave, or if
2  you've had to pay anything out of pocket, or if you
3  have to -- and your overtime and details.  So are
4  there any other financial losses that you've incurred,
5  as a result of this incident?
6    A. My pants.
7    Q. Your pants?
8    A. Those were my favorite pair of pants --
9    Q. Oh no.
10   A. -- and they cut them.  And they've not
11 reimbursed me for them.
12   Q. Yeah.
13   A. So that -- those pants, $160, I think,
14 because it's a ten-pocket pants.
15   Q. Pricey pants.
16   A. They're very expensive.
17   Q. Anything else?
18   A. Physically?  No.  I don't think so.
19   Q. Yeah.  Okay.
20       THE VIDEOGRAPHER:  We have six minutes left
21 on the tape.
22       MR. WOY:  I think I could wrap up in six
23 minutes.
24       THE VIDEOGRAPHER:  Okay.  Let's see.

Page 168

1        THE WITNESS:  Challenge accepted.
2  BY MR. WOY:
3    Q. Is there anything physically or from a mental
4  or emotional perspective, that you attribute to this
5  incident, that we haven't already talked about?
6    A. No.  I mean, I made my concerns about the
7  anxiety of carrying the gun.  That I won't carry one
8  chamber.  I mean, that -- not carrying one chamber
9  concerns me because, God forbid, someone just starts
10 shooting at me like, am I going to have that quick
11 second to blow one in?
12   Q. Yeah.
13   A. Like, that -- that concerns me.  Like, is
14 that going to be -- am I a liability to myself?  Am I
15 not -- am I going to be a liability to others because
16 of that?  But I just can't bring myself to carry it
17 loaded, because I just don't -- I -- I literally think
18 of it as a ticking time bomb.  I just won't do it.
19       So that concerns me.  I'm like wrestling with
20 someone, chasing after someone, or if I get pushed or
21 knocked down, a car accident, like that -- those all
22 just go through my head all the time.  So I'm
23 just -- I don't know.  I just -- there's always these
24 scenarios that goes in my head of what could happen if



ASHLEY CATATAO
ASHLEY CATATAO vs SIG SAUER

June 06, 2023
169–172

Page 169

1  I load one in the chamber.
2      Q.  Okay.
3      A.  And I'm just afraid, like, what do my
4  co-workers think of me, because I won't load one in
5  the chamber.
6      Q.  Yeah.
7          MR. WOY:  All right.  I think I'm pretty much
8  finished up.  Just give me a minute to look through my
9  notes and make sure, all right?
10         THE WITNESS:  Sounds good.
11         THE VIDEOGRAPHER:  Should we go off the
12  record?
13         MR. CEISLER:  Why don't we go off the record
14  because I'm going to have just a couple questions.
15         MR. WOY:  Okay.  Yeah.  That's fine.  Yeah.
16         MR. CEISLER:  I mean, it might be two
17  minutes' worth of questions.  But yeah.
18         THE VIDEOGRAPHER:  The time is 12:36 p.m.
19  this concludes media number 2.  We're off the record.
20         (Off the record.)
21         THE VIDEOGRAPHER:  The time is 12:39 p.m.
22  media meeting number 3.  We're on the record.
23              EXAMINATION
24  BY MR. CEISLER:

Page 170

1      Q.  All right.  Ashley, I just have a couple
2  questions.  You mentioned that you thought the holster
3  that you were using at the time of the incident,
4  wasn't made -- either wasn't made specifically for the
5  P320 or you weren't sure, you didn't recall if it was
6  made specifically for P320.  Does that sound right?
7      A.  Yes.
8      Q.  How well did the P320 fit into that holster?
9      A.  I thought it was a pretty good fit.  I never
10  had any concerns with it.  I think it was pretty good.
11  Like, it was a tight fight.  I didn't feel it jostling
12  around in there.  So I personally thought it was a
13  nice tight fit for the -- the gun.  But --
14      Q.  How tight was the fit?
15      A.  Tight enough that I wouldn't be able to get
16  anything in there.  Like, nothing ever fell in there
17  while it was secured.  I never had any issues with it.
18  So I think it was a nice tight fit.
19      Q.  How hard would it be for a string or a strap
20  or something like that, to get into the holster?
21      A.  I feel like you'd have to deliberately push
22  it in there in order for it to get in there because
23  it's only, like, very little space that you could fit,
24  like, your pinky.  But you have to deliberately push

Page 171

1  it in there.  Like, it's not just going to weasel its
2  way in.
3      Q.  The flash light that couldn't fit into the
4  holster, about how big was that flash light?
5      A.  I'm not good with measurements.  Like, two,
6  three inches.  Is that about right?  Two or three
7  inches?
8      Q.  On top or along?
9      A.  So it's -- it's about this long.  And then
10  about probably that thick.
11      Q.  Okay.
12      A.  And it goes on the rail of the gun.
13      Q.  Okay.  So just kind of on the side of the gun
14  as opposed to on top?
15      A.  So if you got the gun like this, it would go
16  underneath here, underneath the barrel.
17      Q.  Okay.
18      A.  So it goes on the rail.
19      Q.  Okay.  So to confirm, do you have any way to
20  estimate about how big the -- the gap or space might
21  have been between the holster and the pistol?  And if
22  you can't, that's fine.
23      A.  So I know after the incident when they talked
24  about something getting in there, and they talked

Page 172

1  about, like, a pinky could fit in there, I
2  took -- because I think it was someone else had the
3  holster.  And I took my pinky and I could push it in
4  there.  But you had to push it in there.  Like, it
5  wasn't just going to slide in there very easily.  You
6  had to push it in there.  Like, you had to
7  deliberately be trying to stick your finger in there,
8  to get it in there.
9      Q.  Okay.
10         MR. CEISLER:  All right.  I have nothing
11  further.
12         MR. WOY:  Nothing further for me.
13         MR. CEISLER:  All right.  Well we're all
14  going to the same place.  We can go off the record.
15         THE REPORTER:  Before we go off the record
16  can I just take transcript orders of what format you
17  want them in?
18         MR. WOY:  Electronic copy for us.
19         MR. CEISLER:  Yeah.  Yeah.  We'll do
20  electronic copy.  And that'll be standing for all
21  these.
22         MR. WOY:  Yep.  Same here.
23         THE VIDEOGRAPHER:  Do both sides need video
24  or just --



Page 173

```
1        MR. CEISLER:  No.
2        THE VIDEOGRAPHER:  -- for one side?
3        MR. WOY:  We'll take it.
4        MR. CEISLER:  We'll take it, too.  Yeah.  I
5   usually don't.  But I'm going to take this one.
6        THE VIDEOGRAPHER:  The time is 12:42 p.m.
7        THE WITNESS:  He's wearing his suit today
8   so --
9        MR. CEISLER:  Yeah.
10       THE VIDEOGRAPHER:  This concludes the
11  deposition of Ashley Catatao.  We're off the record.
12   (Whereupon, the examination concluded at 12:42 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 174

```
1                CERTIFICATE OF REPORTER
2
3         I, RAYMOND DOAN, a Digital Reporter and
4   Notary Public in and for the Commonwealth of
5   Massachusetts, do hereby certify:
6         That the foregoing witness whose examination
7   is hereinbefore set forth was duly sworn and that said
8   testimony was accurately captured with annotations by
9   me during the proceeding.
10        I further certify that I am not related to
11  any of the parties to this action by blood, marriage,
12  or employ, and that I have no interest in the outcome
13  of this matter, financial or otherwise.
14        In witness thereof, I have hereunto set my
15  hand this 20th day of June, 2023.
16
17        Raymond Doan
18
19  RAYMOND DOAN
20  Notary Commission Massachusetts: N/A
21  Commission Expires:  November 16, 2029
22
23
24
```

Page 175

```
1             CERTIFICATE OF TRANSCRIPTIONIST
2
3         I, Traci E. Underwood, Certified Court
4   Reporter, do hereby certify:
5         That the foregoing is a complete and true
6   transcription of the original digital audio recording
7   of the testimony and proceedings captured in the
8   above-entitled matter.  As the transcriptionist, I
9   have reviewed and transcribed the entirety of the
10  original digital audio recording of the proceeding to
11  ensure a verbatim record to the best of my ability.
12        I further certify that I am neither attorney
13  for nor a relative or employee of any of the parties
14  to the action; further, that I am not a relative or
15  employee of any attorney employed by the parties
16  hereto, nor financially or otherwise interested in the
17  outcome of this matter.
18        IN WITNESS THEREOF, I have hereunto set my
19  hand this 20th day of June, 2023.
20
21
22        Traci E. Underwood
23             Traci E. Underwood, CCR
24
```

Page 176

```
1               DEPOSITION ERRATA SHEET
2
3   Our Assignment No. J9675680
4   Case Caption:  ASHLEY CATATAO vs. SIG SAUER, INC.
5
6         DECLARATION UNDER PENALTY OF PERJURY
7
8         I declare under penalty of perjury that I
9   have read the entire transcript of my examination
10  taken in the above-captioned matter or the same has
11  been read to me, and the same is true and accurate,
12  save and except for changes and/or corrections, if
13  any, as indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.
16
17     Signed on the _____ day of _____, 20___.
18
19
20            _____
21                ASHLEY CATATAO
22
23
24
```


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 177

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20
21
22
23    SIGNATURE:_____DATE:_____
24                ASHLEY CATATAO
```

Page 178

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20
21
22
23    SIGNATURE:_____DATE:_____
24                ASHLEY CATATAO
```



# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ASHLEY CATATAO

Plaintiff,

v.                                                    CA No.: 1:22-cv-10620

SIG SAUER, INC.

Defendant.

**<u>AMENDED COMPLAINT AND JURY DEMAND</u>**

**<u>SUMMARY OF ACTION</u>**

1.      Plaintiff, Ashley Catatao. ("Officer Catatao"), resides in the Commonwealth of

Massachusetts and is a police officer with approximately eleven years of service with the

Somerville Police Department ("SPD").

2.      Officer Catatao began her employment with the SPD in 2011 and serves as a

patrol officer with SPD. Prior to that, Catatao volunteered her time as an auxiliary officer with

the city of Somerville.

3.      This action seeks actual, compensatory, and punitive damages, as well as

equitable relief, relating to defendant SIG Sauer, Inc.'s ("SIG Sauer's") negligence, defective

design, breach of warranties and unfair and deceptive marketing practices regarding a semi-

automatic gun known as the P320 (the "P320") that fired on Officer Catatao without a trigger

pull on or about April 6, 2022.

4.      The P320 is a striker-fired,[1] semi-automatic pistol that was introduced to the

market in 2014. Its trigger weight ranges between 5.5 and 7.5 pounds. It is the first striker-fired

pistol SIG Sauer manufactured.

5.      In January 2014, the SIG Sauer P320 was introduced in North America. Since its

2

inception, there have been at least fifty-two reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and citizens. Approximately thirteen lawsuits brought by individual plaintiffs and three class actions have been filed against SIG Sauer alleging that the P320 is defective and dangerous.



---

[1] A striker-fired pistol differs from the traditional "hammer-fired." It has no external hammer to be pulled back by the thumb; rather, it has an internal "striker" that is held back under spring pressure like a bow and arrow. Once the slide is moved or "racked" backward, the weapon is fully cocked and ready to fire. The only component holding the striker back is the weapon's "sear." In this illustrative photo of a typical striker-fired pistol, the striker, in red, is held back by the sear, in blue.



6.      In April 2022 Officer Catatao was a police officer for the SPD. At this time, the SPD were using P320 Sig Sauer firearm models. On April 6, 2022, Officer Catatao was set to begin her 4pm-12am SPD first half shift. After observing roll call for a brief period of time inside the SPD station at 220 Washington Street, Somerville MA Officer Catatao began walking out of the Somerville Police headquarters towards her police cruiser parked in the back parking lot.

7.      While walking toward her police cruiser at approximately 4:00pm ET to begin her shift, Officer Catatao had her P320 service firearm securely holstered on her right hip on her duty belt when the gun unintentionally discharged.

8.      At no time did Officer Catatao touch the trigger, and no other item touched the trigger when the gun discharged. The bullet impacted Officer Catatao's upper right thigh. The incident was caught on surveillance video and Officer Catatao has already been cleared of any wrongdoing by the SPD. This is the second incident of an unintentional P320 discharge within the SPD in the last three years.

9.     Officer Catatao's SPD issued P320 should not have discharged without a trigger pull. Indeed, SIG Sauer warranted that it would never do so. In its "Safety Without Compromise" marketing materials for the P320, SIG Sauer states:



10.     Despite this express representation, which SIG Sauer has made for approximately seven years, and despite a "voluntary upgrade" program announced in 2017, Officer Catatao's P320 fired without the trigger being pulled.

11.     Before the sale of the P320s to the SPD, SIG Sauer knew or should have known that, due to three internal defects, the P320 could fire, and, in fact had a long history of firing, without a trigger pull.

12.     For many years since the P320 was first introduced in 2014, SIG Sauer has recklessly failed to recall it, despite knowing of defective discharges throughout the United States and abroad between at least 2016 and 2021, many of which occurred before Catatao's P320 discharged in April 2022.

13.     Many of these defective discharges have inflicted severe physical and emotional wounds on law enforcement officers and civilians including another SPD Officer just a few years prior.

5

14.     SIG Sauer's negligence has been the direct and proximate cause of substantial economic and non-economic harm to Officer Catatao.

## JURISDICTION

15.     Jurisdiction over SIG Sauer is proper pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332 as the parties are citizens of different states.  Plaintiff is a citizen of Massachusetts. Defendant Sig Sauer, Inc. is a Delaware corporation with a principal place of business in Newington, New Hampshire.  The amount in controversy exceeds $75,000.

## VENUE

16.     The claims asserted in this action arose within this district and the allege damage occurred in this district. Venue is therefore proper pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1391(b)(2) and (3).

## PARTIES

17.  Defendant SIG Sauer, f/k/a "SIGARMS," has a principal place of business in Newington, New Hampshire. It markets and distributes its products in 88 countries, according to one of its own press releases. "SIG Sauer" is also the brand name used or formerly used by several sister companies involved in the design and manufacture of firearms.

18.     Plaintiff, Ashley Catatao is an eleven year Somerville police officer with significant firearms experience.

## FACTUAL ALLEGATIONS

### I.    April 2022 Discharge Incident

19.    In April 2022 Officer Catatao was a police officer for the SPD. At this time, the SPD were using P320 Sig Sauer firearm models. On April 6, 2022 Catatao was set to begin her work shift at approximately 4pm. After observing roll call inside the SPD station Officer Catatao walked outside of the building towards the back parking lot where her police cruiser was located.

20.    Officer Catatao had her P320 service firearm securely holsterd on her right side on her duty belt. As Officer Catatao walked towards the police cruiser, with the firearm holstered on her right side her P320 discharged without a trigger pull.

21.    At no time did Officer Catatao touch the trigger, and no other item touched the trigger. The bullet impacted Officer Catatao's upper right thigh. The incident was caught on surveillance video..

### II.    Marketing of the P320

22.    Years before the April 2022 Discharge Incident occurred, SIG Sauer expressly warranted that the weapon could not fire without a trigger pull. In its marketing materials, SIG Sauer states:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

8

23.     Additional SIG Sauer marketing materials provide:



24.     At the same time, SIG Sauer contradictorily warned in the original version of the owner's manual for the P320 that the weapon could fire if dropped:

25.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the U.S. Secret Service, the Federal Bureau of Investigation, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, including the Somerville Police Department, to require their agents and officers to carry pistols with a chambered round.

26.     SIG Sauer was aware that law enforcement officials are routinely required to carry pistols with a chambered round when it sold its defective P320s to U.S. law enforcement agencies and departments, including the Somerville Police Department.

27.     It is widespread practice among civilians who "conceal carry" their pistols to do so with a round in the chamber.  This practice is consistent with the rules of firearm safety, as

17

Pistols should not be vulnerable to un-commanded discharges under any circumstances.

28.     SIG Sauer's advertisements for the P320 stress the military and law-enforcement lineage of its firearms and focus on highlighting the modularity, safety, and functionality of the P320 for civilians and law enforcement alike.

29.     Military and law enforcement sales are a significant source of profit for SIG Sauer and are also a powerful marketing tool that SIG Sauer uses to spur additional sales to U.S. law enforcement and civilian markets, as demonstrated in these SIG Sauer marketing materials:





30.     As demonstrated in these marketing materials, SIG Sauer advertised that the P320 would function in a safe manner.

31.     These representations were contained within SIG Sauer's advertisements, packaging, package inserts, and website, and were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to purchasers.

## III.    Early Problems with the P320 and the August 2017 "Voluntary Upgrade Program"

32.     The P320 is the first striker-fired pistol SIG Sauer ever manufactured. SIG Sauer assembled it using the same frame and fire control unit from an earlier hammer-fired model, the P250.

33.     In early 2016, while competing for a $580,000,000 contract to supply the U.S. Army with a new service pistol, SIG Sauer's prototype P320s exhibited 200 malfunctions or more during Army testing.  These defects included failure to eject spent casings, firing upon impact with the ground, and failing to fire.

34.     In 2016, the Department of Defense notified SIG Sauer of more than 200 malfunctions with P320 prototypes.  It demanded that SIG Sauer fix all design problems associated with the P320.

35.     In early 2016, SIG Sauer was also warned by a Florida police department that the P320 was capable of firing without a trigger pull.

36.     SIG decided not to publicly disclose the 2016 warnings it had received about the P320's defects.

37.     As early as 2016, if not years before, members of SIG Sauer's management and design teams began a concerted effort to conceal defective discharge events.

38.     This effort involved SIG Sauer employees visiting local law enforcement agencies that had reported defective discharge events and seizing the weapons for inhouse "testing" in New Hampshire.

39.     Rather than seek to learn about P320's tendency to fire without a trigger pull, SIG Sauer actively avoided learning the details of defective discharge events, and instead

recharacterized and concealed them, blaming items such as keys, articles of clothing, seatbelt buckles, foreign objects, and holsters for the discharge events.

40.     In one email exchange, for example, a SIG Sauer employee claiming to investigate a February 2017 defective discharge event in Roscommon, Michigan refrained from even viewing an incident report or a bodycam video, stating in an email that he "did not want to see anything [the police department] did not want me to see."

41.     The SIG Sauer employee sent to Roscommon, Thomas Mechling, eventually watched the bodycam video and noted that the officer in question exclaimed "tell me how a gun would fire still in the holster" after the discharge. This discharge did not involve the weapon being dropped.

42.     SIG Sauer has since falsely claimed that the Roscommon Police Department "investigated" the incident, and "found" that the officer's seat belt buckle (i) plunged from its normal retracted position into the officer's holster; (ii) worked its way down to the trigger guard; (iii) wrapped itself around the trigger; and (iv) fired the gun as the officer was exiting his vehicle with no trailing seatbelt in sight.

43.     This explanation was suggested and developed by SIG Sauer employees, including Al Larochelle.

44.     SIG Sauer has also provided items of value to officers and police departments with knowledge of P320 defective discharges, claiming internally that the endangered officers showed no distrust in the P320, and currying favor with them by leaving SIG Sauer trinkets such as hats, pins and handcuff keys.

45.      The disconnect between SIG Sauer's public representations and its private knowledge shows a conscious disregard for the lives and safety of members of law enforcement

officers and the public. At all times relevant to this Complaint, SIG Sauer employed a skillful

public relations campaign, internet marketing, and in-person reassurances of the P320's alleged

safety that was designed to maximize profit at the expense of safety.

46.     At the same time, SIG Sauer has privately struggled to find an engineering

solution that would prevent the P320 from unintentionally firing on civilians and law

enforcement officers without trigger pulls.

47.     On August 4, 2017, a Stamford, Connecticut SWAT officer sued SIG Sauer in the

United States District Court for the District of Connecticut (hereinafter, "the Connecticut Suit")

for damages relating to a P320 that shot him in the knee when it fell from a distance of less than

three feet and hit the ground.

48.     The Stamford discharge resulted in a wave of national negative media publicity

and attention regarding the safety of the P320, including on television and the internet.

49.     Four days later, SIG Sauer issued a press release stating that the P320 could fire

without a trigger pull under certain conditions but "reaffirmed" the "safety" of the P320 to all

users:

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

23



PR Contact:
Jordan Hunter
SIG SAUER, Inc.
603-610-3293
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

### SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** — In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There has been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement units as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG in

**SIG 000177**

50.     SIG Sauer's claim that its new warnings regarding the capability of the P320 to

fire without a trigger pull upon "shock" or "vibration" were similar to language in other

24

manufacturers' product manuals was not true.  In fact, it is critical safety requirements that firearms only fire when the trigger is pulled.

51.     On August 14, 2017, SIG Sauer announced a Voluntary Upgrade Program (the "VU Program") for the P320.

52.     The VU Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while adding a mechanical "disconnector," allegedly to make the P320 even "better" than it already was.

53.     According to the SIG Sauer website, many of these changes had "nothing to do with drop safety."

54.     The VU Program was intended to correct a defective firing assembly within several hundred thousand P320s, while also denying to consumers, law enforcement, and the general public any dangers inherent in the "non-upgraded" P320-platform firearms.

55.     According to SIG Sauer, these VU Program "changes" represented an "alternate design" of the P320 and attempted to fix design problems.

56.     SIG Sauer declined to label the VU Program a "recall" and expressly stated that all P320s in circulation were safe.

57.     When the VU Program was announced in August 2017, days after the Connecticut Suit was filed, SIG Sauer knew of numerous defects with the firing control unit in the P320 for almost two years, if not longer.

58.     At the time the VU Program was announced, SIG Sauer had also just recently obtained the $580,000,000 U.S. Army contract.

59.     A mandatory recall would have been a public relations calamity for SIG Sauer in light of the recent U.S. Army contract.

60.     The Department of Defense submitted an urgent May 10, 2017, Engineering Change Proposal (the "DoD Engineering Change Proposal") for the prototype of the military version of the P320.  The DoD Engineering Change Proposal provides further corroboration that SIG Sauer well knew of numerous defects with the P320 prior to the VU Program's announcement.

61.     The DoD Engineering Change Proposal demanded that the entire internal firing system for the P320 be replaced. SIG Sauer complied and made all requested engineering changes.

62.     To avoid the extraordinary costs of a mandatory recall, SIG Sauer continued to assure end users of approximately 500,000 commercial versions of the P320 that they were safe. The commercial versions of the P320 were used by law enforcement agents and civilians.

63.     SIG Sauer has never recalled the P320, despite having recalled other products known to have defects.

64.     SIG Sauer's former German sister company, SIG GMBH, sustained $35 million in financial losses after describing the VU Program it in tax filings with the German government as a "recall."

**IV.    Changes to the P320 Manual**

65.     Sometime after January 2017, SIG Sauer removed the warning from the user manual referenced in paragraph 60 regarding a chambered round, and replaced it with the following dramatically different language:

26


All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices. **Careless and improper handling of any firearm can result in unintentional discharge.**

66.     SIG Sauer had never previously represented that mere "vibration" could cause the weapon to discharge, a statement directly at odds with its warranty that the weapon would only fire if the trigger was pulled.

67.     SIG Sauer had also expressly represented since the P320's manufacture and distribution in 2014 that the weapon possessed a "robust safety system."

68.     In fact, SIG Sauer's original design and manufacture of the P320 in 2014 (or earlier) rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat.

69.     Specifically, the P320 possessed an inadequate sear-striker connection, an inadequate internal striker safety, and far too much horizontal and vertical "play" with internal parts inside the slide. In addition, massive amounts of mold injected metal "rollover" on the surfaces of critical internal connecting parts rendered them unstable, and the P320 lacked any external safety or tabbed trigger safety.

## V.    Chronological History of Other Defective Discharges of the P320

70.    There have been many prior incidents of defective discharges involving the P320 caused by the weapon merely being handled, accidentally dropped, or holstered or un-holstered.

71.    In February 2016, a holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer motioned to exit the vehicle during a snowstorm.  The incident was captured on the officer's body cam video which shows that no object entered the officer's holster prior to or during the discharge.

72.    In 2016, the police department of Surprise, Arizona, complained to SIG Sauer of two separate incidents of P320s firing without trigger pulls.

73.    In October 2016, a P320 fired un-commanded on retired New York Police Department officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

74.    In November 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

75.    On January 5, 2017, a P320 shot un-commanded, hitting a Stamford SWAT team member in his left knee when the pistol fell to the ground, while fully holstered, from less than three feet.

76.    On February 28, 2017, a P320 discharged un-commanded while in use by the University of Cincinnati Police Department.

77.    On June 14, 2017, a P320 discharged un-commanded in Wilsonville, Oregon.

78.    113. On June 20, 2017, a P320 discharged un-commanded while in use by the Howell Townhship Police Department in New Jersey.

79.    In June 2017, SIG Sauer shipped approximately 800 P320s to the Sheriff's Department of Loudoun County, Virginia, privately assuring its leadership, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to use the weapon as it was. As noted below, three P320s within this shipment, including two "upgraded" versions, later fired without trigger pulls on three Loudon County deputy sheriffs, severely injuring each of them.

80.    On July 28, 2017, a P320 discharged un-commanded in Tarrant County, Texas.

81.    On August 7, 2017, SIG Sauer's Chief Executive Officer ("CEO") released a statement that "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."  This statement was false.  SIG Sauer knew, at the time of the statement, that an officer in Connecticut had been shot by a so-called "drop fire" with the commercial version of the P320 some eight months earlier.

82.    On August 8, 2017, SIG Sauer announced the VU Program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety." This statement was false, or at least intentionally misleading, as there are no federal government standards for gun safety, a fact well known to SIG Sauer when it issued this press release.[3]

83.    The VU Program was presented to the public as purely optional and not urgent or mandatory.  The stated reason for the upgrade was to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges.

_____

[3] No federal agency oversees how firearms are designed or built. Congress exempted firearms from any federal regulation when it created the Consumer Product Safety Commission in 1972 due to Second Amendment concerns.

84. On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

85. In October 2017, a P320 discharged un-commanded in a public place in Georgia when an officer fell to the ground in pursuit of a suspect. The officer's weapon, which was holstered, fired without a trigger pull when the officer hit the ground.

86. On November 12, 2017, a P320 discharged un-commanded in Tyler, Texas.

88. In January 2018, a P320 discharged un-commanded in Dallas County, Texas.

89. On February 7, 2018, Loudoun County Virginia Deputy Sheriff Marcie Vaidnais 's ("Sheriff Vadnais") P320 fired on her un-commanded in Virginia, severing her right femur and causing catastrophic skeletal injury and deformity. The resulting injuries necessitated four general anesthesia surgeries, caused severe emotional distress and trauma, and ended her lawenforcement career.

90. Computer tomography scanning of Sheriff Vadnais's P320 identified both a design defect and a manufacturing defect – to wit, crossed sear springs that apply upward spring pressure to the sear to keep it from falling and releasing the striker. This defective spring installation, among other defects, resulted in unequal spring pressure and caused a precarious engagement between the striker foot and the sear, thereby rendering Sheriff Vadnais's P320 susceptible to un-commanded discharge.

91. In April 2018, SIG Sauer issued a second "voluntary upgrade" notice to all users orowners of the P320.  SIG Sauer did not recall the weapon.

92. In May 2018, civilian Gunter Walker reported to SIG Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

30

93.     In June 2018, a police officer in Williams County, Ohio, reported that his P320 discharged un-commanded twice in one moment as he was attempting to move the slide backward.  One round grazed the officer's arm; the other blew through his patrol car's driver side door.

94.     In May 2018, a police officer in Rancho Cucamonga, California, reported that his P320 fired un-commanded while he was walking inside his department locker room. The casing of the round did not eject, as it should have if the firearm were operating properly.

95.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

96.     In December 2018, civilian Robert Lang's P320 fired on him un-commanded, causing severe tunneling wounds to his right leg.

97.     On May 19, 2019, Lieutenant Thomas Ahern was performing a routine function of his P320 when it fired at him without any force towards the trigger, resulting in the bullet impacting his left thigh.

98.     On July 23, 2019, Somerville Police Officer Walter Collette Jr.'s service issued P320 fired on him un-commanded without a trigger pull while wrapped in his personal gym bag causing serious injuries to his left leg.

99.     On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg.

100.    In August 2019, Philadelphia Transit Officer Craig Jacklyn's ("Officer Jacklyn") P320 fired un-commanded while holstered, nearly hitting a bystander in the subway.

101.    The incident was captured on video, and Officer Jacklyn was returned to duty the next day, with no discipline. The Philadelphia transit authority replaced all P320s, and fully exonerated Officer Jacklyn of any alleged wrongdoing.

102.    On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County, Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg.

103.    On October 10, 2019, Officer Desrosiers's P320 discharged un-commanded. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

104.    On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection, it was found that the spent casing did not eject. The discharge was investigated by Major Peter J. Villani ("Major Villani") of the United States Veterans Affairs police agency, who is a SIG-certified armorer.

105.    Major Villani's report noted that, due to the design of the P320, "it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear]."

106.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette ("Officer Gardette") of the police department in Manteca, California, as he was preparing for work. The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt around his waist.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

107.    On December 2, 2019, a P320 fired un-commanded while in the possession of CPD Detective David Albert as he was in the process of putting on his duty belt.

108.    In January 2020, a fully holstered P320 fired un-commanded on an Army veteran in Utah, penetrating his leg and impacting his femur bone.

109.    On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, causing catastrophic bone damage to his lower left leg.

110.    In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg. This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

111.    In June 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster, and resulting in a broken bone in the civilian's foot.

112.    On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury.

113.    On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement ("ICE") agent at a firing range in Maryland, striking him in the leg and causing serious injury.  The weapon discharged when the ICE agent placed his hand on the grip to the draw gun.

114.    On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm. In a press release, SIG Sauer blamed the discharge on the weapon's holster.

115.    In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee.  The bullet resulted in a tunnel wound to her right thigh.

116.    On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas.  The bullet entered millimeters

away from her vagina and exited her rear end, leaving inoperable shrapnel near and around her sciatic nerve.

117.    In January 2021, a P320 fired un-commanded on a gun shop manager in Three Rivers, Texas as he cleared the weapon, blowing off one of his fingers.  The weapon was out of battery when it fired.

118.    On May 12, 2021, a P320 fired un-commanded on a second Homeland Security agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled.  The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula.

119.    On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh.

120.    In June 2021, the Pasco County, Florida, Sheriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs and causing significant injuries.

121.    In June 2021, a P320 fired un-commanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

122.    Upon information and belief, employees at SIG Sauer's training academy in New Hampshire have admitted to defective discharges causing injury in both 2016 and 2017.

## COUNT I

## NEGLIGENCE

123.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 122 of the Complaint, as though fully set forth herein.

124.     At all relevant times, SIG Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon him merely placing his hand on the weapon's grip before selling the gun and placing it into the stream of commerce.

125.     At all relevant times, SIG Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon gripping the weapon before selling the gun and placing it into the stream of commerce.

126.     At all relevant times, SIG Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, SIG Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

127. SIG Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

    ii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    iii.    By failing to issue a mandatory recall of the P320 as SIG Sauer had done in the past with other defective products;

    iv.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    v.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Plaintiff, of said defective, hazardous, and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    vi.    By failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG Sauer, and during which times employees, servants or agents of SIG Sauer had an opportunity to inspect, service and work on the gun;

    vii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual, referenced in Paragraph 60, for the gun after several incidents of accidental discharges;

    viii.    Other negligent acts and omissions to be developed in the course of discovery.

128. SIG Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

129.     The gun's defective condition was not visible and Plaintiff was not capable
of realizing the dangerous condition and could not have discovered the dangerous condition
even upon performing a reasonable inspection of the same.

130.     SIG Sauer's negligence as alleged in this Count directly and proximately caused
the April 2022 Discharge Incident and Plaintiff's injuries resulting from the accident.

131.     As a direct and proximate result of the negligence set forth in this Count, Plaintiff
suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the
enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent
or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG
Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees,
costs of suit, and all other claims available by law.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

132.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs
1 through 131 of the Complaint, as though fully set forth herein.

133.     At all relevant times, SIG Sauer was in the business of marketing, selling, and
distributing weapons, including the gun causing Plaintiff's injuries.

134.     SIG knew of the ordinary purposes for which the gun was intended and impliedly
warranted it to be of merchantable quality, safe, and fit for such purposes (which included
"vibrated" and handled while situated within and without a holster) and all other
reasonably foreseeable uses.

135.     At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

    i.     Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

    iii.   Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.   Negligently failing to unambiguously warn purchasers and end users of the gun, including Catatao, of said defective, hazardous and unreasonablydangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

    vi.   Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

136.     Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG Sauer's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident and Plaintiff's injuries.

137.     As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

138.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 137 of the Complaint, as though fully set forth herein.

139.     By its actions, SIG Sauer knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled. Yet it presented to SPD, Plaintiff, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

140.     SIG Sauer's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

141.     SIG Sauer knew or should have known that the P320 was defective and that it had a history of, and was prone to, firing without a trigger pull. SIG Sauer knew or should have known that the P320 therefore posed a danger to SPD police officers, their families, and the citizens of Somerville.

142.     SIG Sauer's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

143.     SIG Sauer's conduct was the direct and proximate cause of Plainitff's injury, an open wound to her upper right thigh and  emotional distress.

144.     As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, and loss of the capacity for the enjoyment of life.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

145.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 144 of the Complaint, as though fully set forth herein.

146.     Upon information and belief, SIG Sauer had knowledge of the various defects with the commercial version of the P320 firearm years before the April 2022 Discharge Incident.

147.     Despite having such knowledge, SIG Sauer failed to issue a mandatory recall of the P320, despite the ability to do so, which would have prevented Plaintiff's emotional distress.

148.     Had SIG Sauer acted responsibly and repaired the defects in the commercial version of the P320 before the April 2022 Discharge Incident, Plaintiff's P320 never would have discharged un-commanded.  The round discharged from Plaintiff's weapon easily could have taken Plaintiff's life or the life of a fellow officer or civilian, or caused severe injuries to Plaintiff, a

40

fellow officer, or a civilian.

149. SIG Sauer knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the P320 instead of a mandatory recall.

150. SIG Sauer's conduct was self-serving, deceptive, reckless, intolerable, and outrageous.

151. SIG Sauer's conduct was the direct and proximate cause of plaintiff's physical injury, an open wound to her right thigh, and s emotional distress.

152. The emotional distress sustained by Plaintiff was severe.

153. As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, and loss of the capacity for the enjoyment of life.. These injuries are either permanentor continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V

## Violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, §§ 2, 11

154. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 153 of the Complaint, as though fully set forth herein.

155. At all relevant times, SIG Sauer was engaged in trade or commerce within the Commonwealth of Massachusetts, including the trade or commerce of selling, or causing to be sold, the subject firearms within the Commonwealth of Massachusetts and to the City of Somerville.

156. The SIG Sauer firearms used by Plaintiff, including the P320 firearm that malfunctioned on or about April 6, 2022, was sold or caused to be sold by SIG Sauer within the Commonwealth of Massachusetts.

157. When Plaintiff used the SIG Sauer firearms in question, including the P320 that malfunctioned on or about April 6, 2022, she was acting as an agent or employee of the City of Somerville.

158. As a result of SIG Sauer's actions, and in connection with SIG Sauer's sale of firearms within the District of Massachusetts, Plaintiff was harmed and suffered emotional distress due to his SIG Sauer firearm malfunctioning on or about April 6, 2022

159. SIG Sauer engaged in unfair or deceptive acts or practices in connection with its sale of firearms to the City of Somerville.

160. SIG Sauer is liable to Plaintiff for up to three times the damages that Plaintiff incurred, together with all related court costs, attorneys' fees, and interest.

.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Assume jurisdiction over this case;

2.      Empanel a jury and, after trial, find Defendant liable for all causes of action herein;

3.      Award Plaintiff damages for her economic losses

4.      Award Plaintiff compensatory damages, including but not limited to damages for emotional distress, mental anguish, inconvenience and loss of enjoyment of life, including interest;

5.      Double or treble the award to Plaintiff of his actual damages pursuant to Mass. Gen. Laws Ch. 93A, §§ 2, 11;

6.      Order Defendant SIG Sauer to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 that the weapon can fire without a trigger pull;

7.      Retain jurisdiction over this case until Defendant has complied with all orders of the Court;

8.      Award Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

9.      Award such equitable, injunctive, or other relief as the Court may deem just and proper.

Plaintiff demands a trial by jury on all counts.

Respectfully submitted,

/s/ Stephen Semenza
Stephen Semenza (BBO #694675)
Kelly and Associates
83 Atlantic Avenue Suite 202
Boston, MA  02110
(617) 807-0855
 Stephen@1800lawguys.com

/s/ John R. Bita III
(BBO #667886)
Kelly and Associates
83 Atlantic Avenue Suite 202
Boston, MA  02110
(617) 807-0855
 @1800lawguys.com


Counsel for Plaintiff Ashley Catatao

Dated:  May 27, 2022

# EXHIBIT E

FILED IN OPEN COURT
U.S.D.C. - Atlanta

JUN 2 0 2024

KEVIN P. WEIMER, Clerk
By_____ Deputy Clerk

# **VERDICT FORM**

We, the jury, return the following verdict:

    **1.**     **Did the defendant, Sig Sauer, Inc., supply a product that was defectively designed at the time the product left the defendant's control because it did not possess a tabbed trigger?**

          YES   ✓          

          NO  _____

If your answer to question 1 is yes, proceed to Question 2. If your answer to question 1 is no, proceed to question 3.

    **2.**     **Did the defective design of the P320 cause harm to Plaintiff Robert Bryan Lang?**

          YES   ✓        

          NO  _____

Proceed to question 3.

    **3.**     **Did the defendant, Sig Sauer, Inc. supply a product that was defective because adequate warnings about the possibility of unintended discharges were not provided?**

          YES   ✓        

          NO  _____

1

If your answer to question 3 is yes, proceed to Question 4.  If your answer to question 4 is no, proceed to question 5.

**4.     Did the absence of warnings cause harm to Plaintiff Robert Bryan Lang?**

YES ___✓___

NO _____

Proceed to question 5.

**5.     Was the defendant, Sig Sauer, Inc., negligent for selling the P320 without a tabbed trigger?**

YES ___✓___

NO _____

If your answer to question 5 is yes, proceed to question 6. If your answer to question 5 is no, proceed to question 7.

**6.     Did the defendant, Sig Sauer, Inc.'s negligence in the sale of P320 cause harm to Plaintiff Robert Bryan Lang?**

YES ___✓___

NO _____

Proceed to question 7.

2

7.    Was the defendant, Sig Sauer, Inc., negligent for failing to warn customers of the risk of the P320 unintendedly discharging?

YES _____✓_____

NO _____

If your answer to question 7 is yes, proceed to question 8.  If your answer to question 7 is no, proceed to question 9.

8.    Did the defendant, Sig Sauer, Inc.'s failure to warn customers of the risk of unintended discharges cause harm to Plaintiff Robert Bryan Lang?

YES _____✓_____

NO _____

Only proceed to question 9 if you answered YES to questions 1 AND 2; and/or 3 AND 4; and/or 5 AND 6; and/or 7 AND 8.  If you did not answer YES to any of those combinations of questions, your verdict is for the defendant, and you should not proceed further except to date and sign this verdict form and return it to the courtroom.

9.    Was there negligence on the part of Plaintiff Robert Bryan Lang, which was a cause of his damage?

YES _____

NO _____✓_____

3

11.    What is the amount of any damages sustained by Plaintiff Robert Bryan Lang for pain and suffering, disability, physical impairment, mental anguish, inconvenience, the loss of enjoyment of life, and stipulated past medical expenses?

    a.    In the past?                                    $ 1,610,000.00

    b.    In the future?                                  $ 690,000.00

    c.    Stipulated past medical expenses    $50,963.43

**TOTAL DAMAGES of Plaintiff Robert Bryan Lang:**

**(add lines 11(a) and (b) and (c)):**

$ 2,350,963.43

SO SAY WE ALL, this ___20th___ day of __June__ , __2024__ .

_____  FOREMAN OR FOREWOMAN
      Zechariah McIntyre

# EXHIBIT F

## OSI Videos

(A hard copy will provided to the court)

EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kyle Guay

      v.                               Civil No. 20-cv-736-LM
                                     Opinion No. 2022 DNH 109 P

Sig Sauer, Inc.

## O R D E R

On the evening of January 28, 2020, plaintiff Kyle Guay returned home from walking his dogs and, as he did every night, started to remove his holster from his belt. The holster held his Sig Sauer P320 pistol. While removing the holster—and even though he had not pulled the trigger—the P320 suddenly fired. Guay was shot in the leg and sustained entrance and exit gunshot wounds to his right thigh.

Guay sued Sig Sauer for products liability, violation of express and implied warranties, violation of the Magnuson-Moss Warranty Act, and violation of New Hampshire's Consumer Protection Act, RSA chapter 358-A (the "CPA"). In July 2022, the court held a four-day jury trial. The CPA claim was tried to the court because there is no right to a jury trial under that statute. See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 369-70 (2009). A jury decided the remaining claims in Sig Sauer's favor. After trial, the court took the CPA claim under advisement.

Despite finding Guay's version of events credible, the court concludes that Guay did not meet his burden to prove that Sig Sauer engaged in an unfair or

deceptive act under the CPA.  See RSA 358-A:2.  This order details the court's findings of fact and rulings of law.  See Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

I. <u>Kyle Guay</u>

Guay lives in Hillsboro, New Hampshire, and works as a shop foreman servicing vehicles.  He has a long history of using firearms.  His father—a military veteran—first taught Guay to handle guns when Guay was between three and five years old.  In addition, Guay's brother—also a veteran—trained Guay in firearms use.  Guay took a hunter safety course in his early teens.  As to pistols specifically, he bought his first one in 2010.  Prior to this incident, none of Guay's guns had ever accidentally discharged.

Guay purchased a Sig Sauer P320 pistol at Shooters Outpost in Hooksett, New Hampshire, in December 2016.  Before buying it, Guay researched the P320 online.  During this research, Guay read a statement on Sig Sauer's website stating that "the P320 won't fire unless you want it to."  Specifically, the statement read:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

After purchasing the P320, Guay carried it with him every time he took his two dogs for a walk. He had no incidents with it for three-plus years.

## II. The Accident (January 28, 2020)

On January 28, 2020, after returning home from taking his dogs for a walk, Guay began to remove his holster, using his right hand to grab the holster and work it off his belt. The gun fired, and a bullet went through Guay's right thigh—leaving an entrance and exit wound.

Guay testified that he did not remove the gun from the holster. Rather, he described the gun firing when he grabbed the holster to remove the holster from his belt. Guay claimed that he had not pulled the trigger—even accidentally. In shock and on the floor, Guay telephoned his longtime partner, Jacquelyn O'Leary, who called 911.

Two Hillsboro police officers—Officer William Bannister and Sergeant Nicholas Hodgen—arrived soon after, and Guay told them what happened. Guay said that he did not touch the trigger on the P320, and the gun was still fully in the holster when it accidentally fired. What Guay told the officers was consistent with his testimony at trial. While in Guay's home, the officers saw that the holster had exploded into pieces; a larger fragment of it was still attached to Guay's pants, and other pieces were strewn about in the area.

3

An EMT arrived and helped get Guay into an ambulance.[1]  At the hospital, medical staff washed his wound with a saline solution, and then "packed it" with gauze.  Guay was discharged the next day.

After being released from the hospital, Guay was out of work for three weeks. His pain continued, and he would sometimes feel a vibrating, burning sensation in his leg.  He had trouble sleeping and would wake up in the middle of the night with night terrors.  He described the night terrors as seeing "demons coming out of my legs" and sometimes seeing "weird-monster"-like-flowers, growing out of his legs. He would wake up drenched in sweat.  To this day, he still takes sleeping medication to cope with his anxiety.

The court found Guay credible in every respect.  Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged. With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it.  Moreover, as expert testimony revealed, the P320 had a 6.7-pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure.  The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in

---

[1] The EMT testified that Guay told her that he accidentally shot himself in the leg when he was attempting to take his gun out of his holster.  Sig Sauer made much of this inconsistency.  The court does not put much weight in the EMT's testimony on this point, because her focus at the time was on treating Guay's gunshot wounds, not on recording the precise manner in which Guay described the gun discharging.  Guay testified at trial, and told Officer Bannister shortly after the incident, that while he was attempting to take the holster off the belt on his pants, the gun was still fully in the holster.  Guay never deviated from that version of events.

the holster.  In short, the court found Guay's testimony about the gunshot, how it occurred, and his resulting injuries consistent and believable.  The court therefore places great weight on Guay's testimony.

### III.  Problems with the P320 Pistol (May 2017)

Sig Sauer began selling the P320 pistol in 2014.  Sean Toner is a senior design engineer at Sig Sauer and the leader of the P320's design team.  He testified as one of Sig Sauer's expert witnesses.  Sig Sauer designed the P320 principally to market to the military and law enforcement, which looks for simple, easy-to-use, and lightweight firearms.

In January 2017, Sig Sauer entered a contract with the United States Army (worth $580,000,000) to supply the Army with a new service pistol.  In May 2017, the Army issued a change proposal, in which it identified various problems with the P320 and requested that Sig Sauer make several changes.  Most notably, the Army had realized that when dropped at a certain angle, the P320 could accidentally fire.  At trial, Toner explained that the trigger was essentially activating itself during the drop.  Because the components inside the gun have inertia, the trigger could continue falling after the gun hit the ground and, if the gun landed at a particular angle, this could effectively cause a trigger pull.  In response to the Army's concerns, Sig Sauer modified the P320's design by, among other things, reducing the weight of the internal components to have less inertial effect.

5

Sig Sauer also modified the commercial version of the P320, and as of August 2017, all commercial P320s manufactured by Sig Sauer were the modified version. On August 4, 2017, Sig Sauer issued a press release entitled "Sig Sauer® Reaffirms Safety of the P320® Pistol." It stated that there "have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date." The press release did not mention that there had been reports of drop-fires in the primary market for P320s (the military and law enforcement market).

A few days later, on August 8, Sig Sauer issued another press release announcing its "voluntary upgrade program." Per the program, a customer (like Guay) with a P320 manufactured before August of 2017 had the option to contact Sig Sauer, mail in their gun, and have Sig Sauer "upgrade" it free of charge and ship it back to them. The press release stated, however, that the pre-upgrade version of the P320 still met U.S. standards for safety, as well as rigorous testing protocols for global military and law enforcement agencies.

Guay reviewed information about the voluntary upgrade on Sig Sauer's website. He declined to send his gun in for repairs because Sig Sauer's website assured him that the P320 was still safe without the upgrade. Specifically, the website contained a Frequently Asked Questions section, where it stated: "Is my P320 safe in its current configuration? Yes. The P320 meets and exceeds all US safety standards . . . ." Pl.'s Exh. No. 25.

6

At trial, Guay made much of the fact that Sig Sauer labeled its program a "voluntary upgrade" rather than a "mandatory recall," arguing that the choice of language contributed to his belief that the P320 model he owned was safe. Yet, though Sig Sauer conceded that the pre-upgrade P320 had a potential "drop-fire" problem, there was no evidence introduced at trial that (at the time of the upgrade program) Sig Sauer had any reason to issue a recall for the accidental misfire problem that Guay later experienced. And, there was no evidence introduced at trial connecting the mechanical relationship between the "drop-fire" problem identified by the Army and the accidental misfire that Guay experienced.

As for Sig Sauer's decision to call its program a "voluntary upgrade," Toner testified that "there isn't much difference" between the terms "mandatory recall" and "voluntary upgrade." He testified that the pre-upgrade P320 continued to satisfy industry standards—even though he conceded it was susceptible to the drop-fire vulnerability that the Army identified. Toner testified that the modifications made as part of the upgrade program did not offer any additional protection against the P320 firing without a trigger pull because—in his opinion—it would be impossible for the P320 to fire without a trigger pull.

Not all Sig Sauer executives agree with Toner's interpretation of the language "voluntary upgrade" versus a "mandatory recall." Phil Strader, a corporate designee for Sig Sauer, testified (during a deposition in a different P320 misfire case) that Sig Sauer could have labeled the initiative a "mandatory recall" instead of a "voluntary upgrade." Indeed, he pointed out that Sig Sauer had

7

previously issued a mandatory recall for one of its rifle models. He further testified that a mandatory recall for the P320 would sound "worse" and "more dire" than a voluntary upgrade. In any event, the evidence at trial established that, with respect to Guay, the language of the press releases (and the information on Sig Sauer's website) persuaded Guay there were no safety concerns with his P320 and he saw no reason to send it in for repair.

IV. Evidence of other accidental misfires

Although the Amended Complaint in this case contained numerous allegations of other P320s misfiring, the evidence at trial included only one other misfire incident (in addition to Guay's). Specifically, Guay introduced video footage of an alleged misfire of a P320 in Roscommon, Michigan, that occurred on February 4, 2016. The video was from the bodycam of Officer Michael Richardson of the Roscommon Sheriff's Department. The video begins with Officer Richardson sitting in his cruiser on the side of a highway to help a car stranded in a snowstorm. The video shows Officer Richardson exiting his cruiser when suddenly his holstered P320 fires. After the sound of the gunshot, Officer Richardson speaks to another officer at the scene as follows:

| RICHARDSON: | What the hell? You explain to me how a gun goes off getting out of the car. |
| OTHER OFFICER: | Huh. What? |
| RICHARDSON: | Yea. |
| OTHER OFFICER: | No shit. |
| RICHARDSON: | Holy shit. |

8

| | |
|---|---|
| OTHER OFFICER: | Scare the shit out of you huh? |
| RICHARDSON: | Something hit my leg. I don't know if I'm shot or what but … |
| OTHER OFFICER: | Looks like your ah hip. |
| RICHARDSON: | You're my witness man. I'm glad I got a witness. Look at that you tell me how that goes off? |
| OTHER OFFICER: | Holy shit. I don't know man. That's bizarre. You were just standing up and it went off. |
| RICHARDSON: | Yea, I was just getting out of the car. |
| OTHER OFFICER: | Good thing it didn't get your frick'n *(inaudible)*. |
| RICHARDSON: | Holy shit man. |
| OTHER OFFICER: | Or your hand. I'm not a big fan of Glocks. |
| RICHARDSON: | It's not a Glock it's a SIG. |
| OTHER OFFICER: | Oh, it is? |
| RICHARDSON: | I am going to take this out and unload the damn thing. It even wrapped another one in. Oh no, it didn't. That's a discharged round. |
| RICHARDSON: | Can I get your name? |
| OTHER OFFICER: | Yea. Get you my card. |
| RICHARDSON: | Whoa. That could have ruined my whole goddamned day. |
| OTHER OFFICER: | Explain that to the sheriff, eh? |
| RICHARDSON: | Yea.  I am so glad you're here man. |
| RICHARDSON: | Could you imagine having to explain that, hey, I was getting out of the car, and it went off. And they're going to be like, are you serious? Wow, that hurt. That stung. |

. . .

| | |
|---|---|
| RICHARDSON: | I just for the life of me can't figure out how that went off. |

OTHER OFFICER:    Yea, because there's no, uh, your seatbelt wouldn't have hit that.

RICHARDSON:    No, I mean, the trigger was completely covered. I don't know. Honestly, I don't know. No idea. Like I said, I'm glad you were here, man, you're my witness.

. . . .

In his Incident Report (dated February 4, 2016), Officer Richardson wrote: "As I exited the patrol vehicle, my weapon discharged while being completely in the holster."

After the incident, a sergeant with the Roscommon County Sheriff's Department investigated. Contrary to Officer Richardson's statement in the video that the seatbelt could not have hit the trigger because it was completely covered, the sergeant found that, as Officer Richardson rose to exit his car, the driver's side seatbelt somehow dislodged the trigger. At trial, the Sheriff Department's findings were presented in the form of an affidavit. The court was not persuaded that the seatbelt somehow caused the accidental discharge; the court found the video itself (including Officer Richardson's statements at the scene) persuasive evidence that the P320 can misfire without someone pulling the trigger.

Even though the Roscommon incident occurred in February 2016, there was no evidence that Sig Sauer became aware of the incident (or saw the video) close in time to the incident. Rather, the only evidence introduced at trial that anyone at Sig Sauer had seen the Roscommon video was a deposition of a Sig Sauer corporate executive that took place on January 10, 2019. That deposition established that

10

employees at Sig Sauer had watched the Roscommon bodycam video, and the company had, at one time, a copy of it in its possession.  But the evidence at trial did not establish the date on which Sig Sauer first became aware of the incident.

Other than Guay's testimony and the video of the Roscommon incident, Guay introduced no other evidence about specific P320s and alleged misfires.  There was mention—in passing and without any detail— that Guay's two expert witnesses (Peter Villani and Timothy Hicks) had examined other P320s and had discovered the same problem they detected in Guay's gun: that the P320 was capable of accidentally discharging without a trigger pull.  Both of those witnesses had examined other P320s where the owner had alleged a similar accidental misfire.  Specifically, Villani testified that he had examined 12 other P320s in connection with accidental misfires, or "uncommanded discharges."  Hicks testified that he had investigated and analyzed 8-10 other P320s alleged to have discharged without a trigger pull.  However, Guay introduced no further evidence about the other P320s that Villani and Hicks had examined.

On cross-examination of Sig Sauer's expert witnesses (Sean Toner and Derek Watkins), Guay asked about their knowledge of other misfire incidents.  This line of questioning focused more on the experts' attitudes toward the allegations than on details about the allegations or the guns at issue.  For example, Toner testified that, including Guay's P320, he had examined at least four P320s (not including the Roscommon P320) that were alleged to have discharged without a trigger pull.  He found no problems or defects in Guay's gun, nor in any of the other guns he

11

examined.  Toner testified that it was not possible for Guay's gun or any other P320 to accidentally misfire.  Despite Sig Sauer having the Roscommon video in its possession since at least January 2019, Toner testified that he first learned of the Roscommon incident the month before this trial.  When asked if it concerned him that multiple people were claiming that their guns were going off without a trigger pull, Toner stated: "It did give me concern but it didn't make me investigate — want to investigate whether it would be possible or not."

On cross-examination of Derek Watkins, Guay also inquired about Watkins's awareness of allegations of accidental misfires.  Watkins is a mechanical engineer who runs a Kentucky consulting company that offers expert services in products liability actions, specifically in the firearms industry.  Watkins examined Guay's P320 and concluded that there was no problem with Guay's P320 and the only way it could have fired was if Guay had somehow pulled the trigger.  Watkins testified on cross-examination that Sig Sauer had retained him in approximately 13 other cases where P320s were alleged to have fired without someone pulling the trigger. He reached the same conclusion in every instance: there was no defect in any P320 that could cause it to accidentally misfire.  Watkins testified that, during the process of writing his report, he read Guay's complaint.  He acknowledged that the complaint contained numerous other alleged incidents of the P320 firing without someone pulling the trigger.  Watkins conceded that he did not mention any of those allegations in his report.

That line of cross-examination ended as follows:

Q. I'm asking because nowhere in your report is there any discussion of all the other incidents around the country involving allegations that the P320 discharged without a trigger pull on law enforcement [and] civilians from California, Texas, Connecticut, 20 other states.  It's not in your report, correct?

A. No, that's not in my report, no.

In sum, the evidence at trial included two incidents of an alleged misfire without a trigger pull: Guay's testimony (his accident on January 28, 2020) and the video of the Roscommon incident (occurred on February 4, 2016).  And, each of the four experts mentioned that they were aware of other, unspecified, and undated allegations of P320s misfiring without a trigger pull.[2]

## RULINGS OF LAW

Count VII of Guay's Amended Complaint alleges that Sig Sauer violated the CPA.  "Whether a party has committed an unfair or deceptive act, within the meaning of the [CPA], is a question of fact." CRMC Bethlehem, LLC v. N. Country Env'tl Servs., Inc., No. 1:09-cv-344-JL, 2010 WL 3002025, at *3 (D.N.H. July 29,

---

[2] To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive.  As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon incident was persuasive in showing that a P320 can fire without a trigger pull.  Furthermore, Watkins admitted that—despite having read the numerous allegations of misfires (without a trigger pull) in the complaint—he did not deem them worthy of mention in his expert report. And Toner testified that he found such misfire allegations unworthy of investigation.  Had Watkins and Toner been less dismissive of these allegations, the court may have found their testimony more credible.

2010) (emphasis omitted) (quoting Chroniak v. Golden Inv. Corp., 983 F.2d 1140,

1146 (1st Cir. 1993)).  The New Hampshire Supreme Court has noted that under

the plain language of the CPA, "the court is vested with the authority to decide

claims brought under RSA chapter 358-A."  Hair Excitement, 158 N.H. at 369.  The

plaintiff has the burden of proving his CPA claim by a preponderance of the

evidence.  See Moulton v. Bane, No. 14-cv-265-JD, 2016 WL 1091093, at *11

(D.N.H. Mar. 21, 2016).

The CPA provides that it is unlawful "to use any unfair method of

competition or . . . unfair or deceptive act or practice in the conduct of any trade or

commerce within this state."  RSA 358-A:2.  The statute sets forth a non-exhaustive

list of seventeen unfair methods of competition and deceptive acts or

practices.  See id. at I-XVII.  Guay alleged in the Amended Complaint that Sig

Sauer violated sections V and VII.  Section V states that it is unlawful to

"[r]epresent[] that goods or services have . . . characteristics, . . . benefits . . . that

they do not have . . . ."  RSA 358-A:2(V).  Section VII states that it is unlawful to

"[r]epresent[] that goods or services are of a particular standard, quality, or grade . .

. if they are of another . . . ."  RSA 358-A:2(VII). [3]  To prove a claim under these

---

[3]In his Proposed Findings of Fact and Rulings of Law (doc. no. 83), Guay
argues that Sig Sauer committed an unfair or deceptive act based on the Federal
Trade Commission ("FTC") standard, which the New Hampshire Supreme Court
has endorsed.  See Milford Lumber Co., Inc. v. RCB Realty, Inc., 147 N.H. 15, 19
(2001).  Guay is correct that the New Hampshire Supreme Court looks to the FTC
to interpret RSA 358-A.  Id.  Although Guay cited the FTC standard in his recent
filing, he has not made any argument about that standard nor has he advanced any
alternative theory of liability.  And, in the Kelton and Beer cases, discussed infra,

sections of the statute, a plaintiff must establish that the defendant "made a
representation, with actual knowledge of its falsity or reckless disregard for its
truth, with the intent to induce consumers to enter a transaction." D'Pergo Custom
Guitars, Inc. v. Sweetwater Sound, Inc., 561 F. Supp. 3d 114, 122 (D.N.H. 2021)
(analyzing a claim under section V); Brace v. Rite Aid Corp., No. 10–cv–290–LM,
2011 WL 635299, at *3 (Feb. 14, 2011) (same test under section VII); McNeal v.
Lebel, 157 N.H. 458, 469 (2008)) (holding that CPA not violated where the alleged
misrepresentations were not made to induce plaintiffs to enter a consumer
transaction).

Guay's theory of liability at trial was that Sig Sauer violated the CPA when it
advertised that the P320 was safe and that it "won't fire unless you want it to." The
evidence established that Guay saw that advertisement in December 2016, and that
it induced him to purchase the gun. Thus, liability under Guay's theory could
obtain under either section V or section VII. See Beer v. Bennett, 160 N.H. 166, 169
(2010) (holding that seller could violate either section V or VII for representing an
item has characteristics or qualities it lacks); Kelton v. Hollis Ranch, LLC, 155 N.H.
666, 667 (2007) (same).

Because the statutory language requires "unfair or deceptive" conduct, the
New Hampshire Supreme Court has held that the seventeen unfair methods

_____

the New Hampshire Supreme Court has explained the requisite degree of
knowledge a consumer like Guay must prove for a seller like Sig Sauer to be liable
under the CPA for engaging in an "unfair or deceptive" practice. These rulings are
controlling on the critical question in this case.

defined by statute do not impose strict liability and require "some element of knowledge on the part of the defendant." Kelton, 155 N.H. at 668. Two cases illustrate the requisite degree of knowledge.

First, in Kelton, a seller advertised a horse as a gelding (i.e., a castrated male horse), but the horse later turned out to have an undescended right testicle that produced testosterone, causing stud-like behavior. Id. at 666. The buyer argued that the horse seller violated sections V and VII because he represented that the horse had characteristics it did not have. See RSA 358-A:2, V & VII. The court disagreed, holding that 358-A does not impose strict liability because the plain language of the statute requires that a defendant's conduct be "unfair" or "deceptive." 155 N.H. at 668. The court noted that a veterinarian had examined the horse and determined that an examination—even by a veterinarian—prior to the sale would not have indicated that it had a recessed testicle, and that there was no reason for the seller to have known about it. Id. Because the seller had no knowledge, the court found that its conduct was not "deceptive" or "unfair" under the CPA. Id. at 668.

In Beer v. Bennett, the court distinguished Kelton and found the seller had the requisite knowledge for liability. 160 N.H. at 168. In Beer, an automobile dealer advertised a vintage car as having "pretty vigorous performance," but after a buyer purchased it, the buyer discovered it was missing a number of parts needed to make it operable. Id. The car dealer argued that even if he made a misrepresentation, he did so unintentionally because he never inventoried the parts

16

and did not know any parts were missing.  Id. at 170.  Indeed, the car dealer

admitted he had never driven or even examined the car.  Id. at 169.  The New

Hampshire Supreme Court found the car dealer liable, distinguishing his "rather

cavalier attitude" from the Kelton horse seller's "good faith mistake."  Id. at 171.

The Court held that the car dealer's "reckless disregard for the truth of his

statements satisfie[d] the degree of knowledge or intent required by Kelton."  Id.

The court found that a violation under either section V or VII would be proven on

these facts.  Id. at 169.

In sum, then, a party violates 358-A:2, V & VII if it: (1) represents the goods

or services are of a particular standard, quality, or grade when they are of another

(or have characteristics they do not have), (2) knows the representation is false or

has a reckless disregard for its truth, and (3) does so with the intent to induce

consumers to buy the product.  See Beer, 160 N.H. at 168; McNeal, 157 N.H. at 469;

Kelton, 155 N.H. at 668; see also D'Pergo, 561 F. Supp. 3d at 122; Brace, 2011 WL

635299, at *3.

Turning to Guay's case, Sig Sauer's relevant representation is the "Safety

Without Compromise" notice that Guay read on Sig Sauer's website before

purchasing his P320 in December 2016.  In that notice, Sig Sauer promised that the

P320 "won't fire unless you want it to."  A reasonable consumer would, at the very

least, understand this warranty as guaranteeing that the P320 would not fire

without the user intentionally pulling the trigger.  The court has found that Guay's

17

pistol fired without him pulling the trigger.  Sig Sauer, therefore, represented the

P320 was of one quality when it was of another.  See RSA 358-A:2, V & VII.

The question, then, is whether Sig Sauer knew the representation was false

or had a reckless disregard for its truth.  As an initial matter, Toner testified that

Sig Sauer tested the P320's safety mechanisms under the applicable industry safety

procedures, and that the P320 satisfied the relevant standards.  There is no

evidence to the contrary.

The strongest evidence introduced at trial that Sig Sauer knew or should

have known that the P320 could potentially fire without an intentional trigger pull

is the Roscommon incident.  Even under Sig Sauer's theory of the Roscommon

incident (i.e., the seatbelt caused the gun to fire), Officer Richardson did not "want"

his P320 to fire and did not intentionally pull the trigger.  However, there was no

evidence introduced at trial to show that Sig Sauer was aware of the Roscommon

incident at the relevant time: in December 2016, when Guay purchased his P320 in

reliance upon the advertisement.  The evidence only established that Sig Sauer had

seen the Roscommon video by January 10, 2019, more than three years after Guay

purchased his gun.

If Sig Sauer had, in fact, known about the Roscommon incident—or any of the

other alleged instances of the P320 firing without a trigger pull—before December

2016, then that knowledge may establish reckless disregard for the truth of the

"Safety Without Compromise" advertisement.  But, given that Guay has not shown

that Sig Sauer had any knowledge of any potential defect with the P320 prior to

18

December 2016, he has not shown that Sig Sauer knew the advertisement was false (or had a reckless disregard for the truth) of that advertisement.

## CONCLUSION

In sum, Guay has not met his burden to prove that Sig Sauer violated either RSA 358-A(2)(V) or 358-A(2)(VII).[4]

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 8, 2022

cc: Counsel of Record

---

[4] To the extent consistent with this order, the court grants the parties' proposed findings of fact and rulings of law on the CPA claim (doc. nos. 84 & 85). To the extent they are inconsistent, the court denies them.

# EXHIBIT H

Case 1:22-cv-11674-FDS Document 83-9 Filed 03/28/25 Page 2 of 4
Case 1:22-cv-11674-FDS Document 128-9 Filed 03/28/24 Page 213 of 439
Deposition of Officer Daniel Witts                    Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3                        - - -

 4


 5    JACQUES DESROSIERS      :
      and YOLETTE L.          :
 6    DESROSIERS,             :
                              :
 7            Plaintiffs,     :   CIVIL CASE NO.
                              :   1:22-CV-11674-FDS
 8         vs.                :
                              :
 9    SIG SAUER, INC.,        :
                              :
10            Defendant.      :

11

12

13

14            The recorded video conference

15    deposition of OFFICER DANIEL WITTS, on Thursday,

16    July 11, 2024, commencing at 10:22 a.m. before

17    Natalie J. Goldhill, a Professional Reporter and a

18    Notary Public in and for the Commonwealth of

19    Pennsylvania.

20

21

22

23

24

25
```

```
 1    A P P E A R A N C E S :

 2


 3       SALTZ, MONGELUZZI & BENDESKY, P.C.
         BY:  RYAN HURD, ESQUIRE
 4             SAM HAAZ, ESQUIRE
         One Liberty Place
 5       1650 Market Street, 52nd Floor
         Philadelphia, Pennsylvania 19103
 6       (215) 910-4765
         rhurd@smbb.com
 7              Representing the Plaintiffs

 8

 9       HALLORAN & SAGE, LLP
         BY:  DUNCAN J. FORSYTH, ESQUIRE
         One Goodwin Square
10       225 Asylum Street
         Hartford, Connecticut 06103
11       (860) 297-4696
         forsyth@halloransage.com
12              Representing Officer Daniel Witts

13

14       LITTLETON JOYCE UGHETTA & KELLY, LLP
         BY:  DOUGLAS HARTMAN, ESQUIRE
15       10 Post Office Square
         Suite 800 South
16       Boston, Massachusetts 02109
         (617) 284-4206
17       douglas.hartman@littletonjoyce.com
                Representing the Defendant, Sig Sauer,
18       Inc.

19
                            - - -
20
      A L S O   P R E S E N T :
21
      Mitchell Reisbord, Video Specialist
22
      Benjamin Levy, Saltz Mongeluzzi Bendesky
23
      Jalyn Brown, Halloran & Sage
24

25
```

```
 1                        I N D E X

 2


 3       WITNESS                              PAGE

 4       OFFICER DANIEL WITTS

 5              Examination by Mr. Hurd       6, 60, 70

 6              Examination by Mr. Hartman    46, 68

 7


 8


 9            - - E X H I B I T S - -

10       EXHIBIT NUMBER        DESCRIPTION        PAGE MARKED/
                                                  REFERENCED
11       Exhibit 1             Surveillance Video 72/25
                               Clip
12

13       Exhibit 2             Police Officer's   72/27
                               Body Camera
14                             Footage

15       Exhibit 3             Surveillance       72/29
                               Footage Screen
16                             Shot

17       Exhibit 4             Surveillance       72/30
                               Footage Screen
18                             Shot 4, Firearm
                               Discharge
19

20       Exhibit 5             Surveillance       72/31
                               Footage Screen
21                             Shot 5, After
                               Firearm Discharge
22

23       Exhibit 6             Screen Shot after  72/32
                               Firearm Discharge
24

25
```

```
 1        - - E X H I B I T S (Continued) - -

 2     EXHIBIT NUMBER          DESCRIPTION          PAGE MARKED/
                                                    REFERENCED
 3     Exhibit 7               Sig Sauer            72/33
                               Statement on
 4                             Montville Police
                               Department
 5                             Incident

 6     Exhibit 8               Surveillance         72/60
                               Footage Image,
 7                             Front of Officer's
                               Body
 8

 9     Exhibit 9               Case/Incident        72/63
                               Report
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1    THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Mitch Reisbord.  I'm a
3  videographer retained by Everest Court Reporting.
4    This is a video deposition for the
5  U.S. District Court of Massachusetts, number
6  1:22-CV-16674-FDS.
7    Today's date is July 11th, 2024.  The
8  time is 10:22 a.m.  This deposition is being held in
9  the matter of Jacques Desrosiers and Yolette
10  Desrosiers versus Sig Sauer, Inc.  The deponent is
11  Officer Daniel Witts.
12    All present counsel will be noted on
13  the stenographic record.  The court reporter is
14  Natalie Goldhill and she will now swear in the
15  witness.
16    . . . . . .OFFICER DANIEL WITTS, was
17  called as a witness, and after having been duly
18  sworn remotely, according to the law, was examined
19  and testified as follows:
20    THE COURT REPORTER:  Counsel, I'm
21  ready.
22    MR. FORSYTH:  Gentleman, just for the
23  record, we will reserve the right to read and sign
24  the deposition.
25    - - EXAMINATION - -

Page 6

1  BY MR. HURD:
2    Q.    Good morning, Officer Witts.
3    A.    Good morning.
4    Q.    My name is Ryan Hurd and I'm one of
5  the attorneys who represents the plaintiff in this
6  matter against Sig Sauer in connection to an
7  unintended discharge.
8    I'm going to be asking you some
9  questions today about an unintended discharge that
10  you experienced back on July 24th of 2023.  Is that
11  agreeable?
12    A.    Yep.
13    Q.    All right.  Let's begin.  If you
14  could, please introduce yourself.
15    A.    My name is Daniel Witts.  I'm an
16  officer with the Montville Police Department.  I've
17  been with them for the last nine years.
18    MR. HARTMAN:  Ryan, not to interrupt,
19  but do you want to do usual stipulations?
20    MR. HURD:  Sure.
21  BY MR. HURD:
22    Q.    Where did you go -- where did you
23  go --
24    MR. HURD:  Does somebody want to say
25  something?

Page 7

1    MR. HARTMAN:  I was just going to say
2  the usual stipulations, Ryan, but I think between
3  you and I, that's fine.
4    MR. HURD:  That's agreeable.  Okay.
5  Let's proceed.
6  BY MR. HURD:
7    Q.    Officer Witts, who are you currently
8  employed with and what is your rank?
9    A.    An officer with the Montville Police
10  Department in Connecticut.
11    Q.    Thank you.  When did you go to the
12  police academy?
13    A.    I went to the police academy in 2015.
14    Q.    Immediately after the police academy,
15  did you then join Montville?
16    A.    Yes.  I was hired by Montville while I
17  was in the academy.
18    Q.    Tell us about your experience in the
19  academy.  What type of training did you have?
20    A.    A lot of classroom training obviously
21  learning all the laws we have to follow, motor
22  vehicle, criminal.  We had firearms training for
23  rifle, shotgun, pistol.  A lot of hands-on training,
24  use-of-force training.  Typical things that all
25  police officers go through.

Page 8

1    Q.    Tell us specifically about the firearm
2  training as it relates to a pistol.  What did that
3  involve?
4    A.    For the pistol, I believe it was a
5  full-week course.  The first day was fully
6  classroom.  And then for the final four days, it was
7  half classroom, half on-the-range training.
8    In between each time we shot, you
9  would go back to the classroom, discuss what we were
10  going to do, and go and shoot that course of fire.
11  It was a 40-hour block.
12    Q.    After joining Montville, did you have
13  any additional training or obtain any certifications
14  related to firearms?
15    A.    I did.
16    Q.    Could you tell us about that?
17    A.    So one of them was for an armorer, I
18  went to the Sig academy to be an armorer for the
19  P320.  That was in 2019.
20    In 2020, I went back to the Sig
21  academy in New Hampshire for a 40-hour block where I
22  was certified as a pistol instructor.  Then I was
23  recertified in '21 with POST in Connecticut.
24    Q.    Give us some more details about
25  becoming an armorer on a P320 back in 2019.  What

Page 9

specifically did that entail?

A.   So it was a new platform for us. We were going from the P220 and we sent three guys, me included, to an 8-hour armorer's course up in New Hampshire. We went over everything from the safeties of the gun to completely stripping down the gun, both field stripping and taking down every part we possibly could, discussing how to put it together, and take it back apart. It was an eight-hour course up in New Hampshire.

Q.   After that course and everything you learned there, would you say you were familiar with the P320?

A.   I would, yep.

Q.   Did you feel confident with the P320?

A.   Absolutely, yep.

Q.   For the laypeople out there listening, what is an armorer?

A.   It's just someone that knows more details of the weapon. We can break it down, we can do more internal cleanings of it. If the weapon has any kind of malfunctions or issues, it's just a guy that has more knowledge of the weapon system than a normal officer.

     If there's maintenance to be done to

Page 10

the weapon, it's an armorer that has to do that maintenance. A normal officer cannot strip it down as far as we can.

Q.   You said you went back to the Sig academy in 2020. Is that right?

A.   About there, yep.

Q.   And what was that for?

A.   I went for the firearm instructor course.

Q.   What did that involve?

A.   So it was a little bit of classroom. The first day was classroom and the rest was on-the-range shooting discussing different techniques of shooting and how to use the knowledge I have, how to pass it on to the guys that I'm going to instruct. It was pretty much to create you to be an instructor for that firearm.

Q.   So did you become a certified firearms instructor after that course?

A.   I did through Sig. But in the eyes of Connecticut, you still got to go through their POST certified class. So that was an additional two days of training and then they certified me in Connecticut.

Q.   What does POST stand for? I

Page 11

understand it's an acronym.

A.   It's a Police Officer Standards and Training Council. They certify all of our certs in Connecticut.

Q.   And what is involved in going through POST?

A.   Okay. So that's our basic academy in Connecticut to get certified as an officer. Once you're through it every three years, you have to do a 40-hour block to stay certified.

Q.   And when did you do POST?

A.   2015.

Q.   As an officer in Montville from 2015, did you regularly carry a firearm?

A.   Every shift, yeah.

Q.   Every single day that you work?

A.   Yep.

Q.   And you were regularly carrying as of July 24th of 2023. Is that right?

A.   '23, yep.

Q.   When were you issued a Sig Sauer P320?

A.   It was sometime during 2019 after we got rid of our older Sigs.

Q.   What were the older Sigs?

A.   We had P220Rs, I believe, because they

Page 12

had a rail on the bottom. It was a 45-cal hammered gun.

Q.   Was that a double action?

A.   Yep.

Q.   The P320, do you know or were you told whether that was a double action or a single action?

A.   I can't recall if they went over it in the class. I assume it's a double action, but I can't recall from the armorer's course if they specifically went over that.

Q.   Okay. Did they give you any type of manuals or instruction guides when you went through the armorer's course?

A.   Yeah. We went through it and then we have it in our armory still. They break down -- a full breakdown of what we went over and all the instructions for the weapon.

Q.   So if in the armorer's manual back in 2019 it said that the P320 was a double action, is that a representation that you would have relied on?

A.   If it was something -- I don't remember. So if it was in there, I can't recall.

Q.   But what I'm asking is if you were given a manual, an armorer's manual on the 320, would you have trusted the representations that were

Page 13

1  made in that manual?
2      A.    A hundred percent.  It was a manual
3  issued to us from Sig who created the gun.  So I
4  would go solely off of what that manual said.
5      Q.    When you received the P320 in 2019,
6  did you qualify with that gun --
7      A.    I did.
8      Q.    -- through Montville?  And what's that
9  mean, to qualify?
10     A.    So it's a POST standard.  It's got to
11 be a 60-round course shooting anywhere from contact;
12 so a foot away up to 25 feet away.  A 60-round
13 course you got to shoot.  Each round is worth five
14 points.  You got to shoot at least a 140 to pass.
15 It's doing standing, kneeling, one-handed,
16 two-handed, behind cover.  Just different things
17 that we might see in the field.
18     Q.    I want to take a step back to the
19 armorer's manual.  Would you have expected that
20 manual to tell you what the trigger weight was on
21 the P320?
22     A.    I would think it would, yes.
23     Q.    Okay.  And is that something that you
24 would have relied upon, their representation of what
25 the trigger weight was?

Page 14

1      A.    Yep, a hundred percent.
2      Q.    When you were issued the P320 in 2019,
3  were you also issued a holster?
4      A.    We were.
5      Q.    Was that a Safariland?
6      A.    It was a Safariland 6000 series.
7      Q.    Okay.  What does it mean for a holster
8  to have retention?
9      A.    It's a level of safety that someone
10 can't walk up and just remove your -- hanging from
11 your holster.  There are certain safeties that only
12 someone who carries that holster, who is familiar
13 with that holster would know how to get that gun out
14 to use it.  So if we're going to struggle with a
15 suspect, it can't just easily fall out into anyone's
16 hands.
17     Q.    And that Safariland, did that have
18 those type of retentions on it?
19     A.    The style we have, it's a triple
20 retention.  So it's got three safeties in place that
21 someone would have to defeat in order to get that
22 gun out.
23     Q.    Tell us what those safeties are and
24 how they work in terms of -- for a layperson to
25 understand.

Page 15

1      A.    So one's just a hood that bends over
2  the top of the gun so someone coming from the front
3  of you can't grab your gun.  It kind of would just
4  deflect their hand.
5          Another one is a strap that actually
6  goes over the back of the gun that stops the gun
7  from getting pulled out of your holster.  Another
8  one is a lever inside your gun that grabs onto the
9  frame of the gun that the lever comes forward.  So
10 now you can pull your gun out.
11     Q.    That lever is part of the holster
12 itself?
13     A.    Yeah, it's built inside.  It grabs
14 onto the front where the ejection port is.  It grabs
15 that little piece on the front of the pistol.
16     Q.    Okay.  The pistol that you had, the
17 P320 that you had at the time of your discharge in
18 July of '23, was that the original P320 you got in
19 '19?
20     A.    It was.
21     Q.    Had any modifications been made to
22 that pistol prior to the unintended discharge you
23 had?
24     A.    The only thing that was ever changed
25 on it was the other grip modules.  That was it.  We

Page 16

1  never replaced barrels or never replaced springs or
2  anything.
3      Q.    Okay.  And the grip modules, that's
4  one of the things that Sig actually advertises as a
5  feature of it that --
6      A.    Yep.
7      Q.    -- change up a module.  Right?
8      A.    Yes, sir.
9      Q.    -- one of the benefits of getting it.
10 Those grip modules, do they come through Sig?
11     A.    They do.
12     Q.    Did you make any modifications to it
13 that were not authorized or not something supplied
14 by Sig?
15     A.    I did not.
16     Q.    Your holster, did you make any
17 modifications to that?
18     A.    The only thing we changed in our
19 holsters is we attached a tourniquet holder to the
20 front.  It uses the same hardware; you remove a
21 bolt, put a piece of plastic on, reinsert that bolt.
22 It's just a way we can carry a tourniquet on our
23 weapon systems.
24     Q.    Is that something commonly done by
25 police officers particularly with this Safariland

Page 17

holster?

A. Yeah. You can find it on multiple different websites. A lot of cops are carrying it that way. Every cop has a tourniquet in the exact same spot. That way if you get shot, we don't have to look you over to find where he's hiding your tourniquet. It's plain, it's right in view. We know exactly where it's at.

Q. And did your holster have that tourniquet fastened on there?

A. It did.

Q. So let's talk about July 24th, 2023. When did you first put your pistol in the holster on that day?

A. So I have a take-home cruiser. So when I was coming in to work, I always put it on the same way. I keep it in a locker in my garage, put the holster on before coming in for work that day.

Q. And is that what you did that particular day?

A. Yes, sir.

Q. Took it out of your locker and you put it on?

A. Yes, sir.

Q. Was the gun already in its holster

Page 18

when you put it on?

A. Yes, sir. So I keep it in my locker. I usually put my belt on. I always take my gun out and I do a press check, make sure there's a round in the chamber, and I re-holster it.

Q. What's a press check in layperson's terms?

A. It's just slowly sliding back your top slide just enough to make sure there's a round inside that chamber.

Q. And then do you check your holster to make sure nothing's in there before putting the gun back in it?

A. I tend to look down inside of it, yes.

Q. Okay. Did you look down inside it on that particular day?

A. I don't know for sure. It's a standard practice I usually do. So I would assume I did, but I'm not sure.

Q. Is it your expectation that you would have done that?

A. Yes, sir.

Q. Based on your habit and routine?

A. Yes, sir.

Q. What time did your shift start on July

Page 19

24th?

A. I was day shift. So I would have started at 7:50 in the morning.

Q. What time did the discharge ultimately happen?

A. I don't know -- I don't remember the exact time. I know it was earlier in the morning, but I couldn't give you an exact time.

Q. Did you take your gun out of the holster at any point between first putting it in for your shift and the discharge?

A. I did not.

Q. So take us through and tell us what happened the morning of July 24th, 2023.

A. So leading up to the discharge, I was actually in the report room working on my normal reports. I saw a bunch of officers running down the main hallway stating that another cop was in a fight in the front lobby. So I joined that pack of officers as we run to the lobby.

We observed I believe it was two officers fighting a male on the ground. We helped subdue that man to get him into handcuffs. Once he was in handcuffs, he was getting verbal against us, he was resisting us walking him out of the lobby.

Page 20

So I made the decision to grab his legs rather than lifting him up by his shoulders and hurting his shoulders or his wrists, I just decided to grab his legs and carry him outside to our lockup.

As I bent down, I heard a loud bang. Once I stepped back, I could smell the smoke of a gun. I looked down and I could see smoke coming out of the holster. I immediately turned toward my lieutenant who was next to me and made sure, "hey, LT, I didn't touch my gun. It's still in the holster." He looked at it and said, "yep, it's still in there. You're fine."

After the suspect was out of the lobby and in the lockup, I went into the armory, took my gun out of the holster, and we sat in the armory and we contacted our chief.

Q. In the armory, did you take your gun and holster off as one unit or did you take the gun out first?

A. So our holsters have a quick release that Safariland supplies and we can slide them right off our holsters -- right off our belts.

Q. So you took it off as a package?

A. I did.

Page 21

Q.   Did you then take the P320 out of the holster?

A.   Not right away.  Once one of my other officers was in there, another firearms guy, we did eject the round that was inside of the chamber just to make sure the weapon was clear and it didn't have a chance of going off again.  So we did make the weapon --

Q.   Do you -- do you know what a stovepipe is?

A.   I do.

Q.   Could you explain in layperson's terms what a stovepipe is?

A.   So it's when after you fire your gun, the round is supposed to eject out the side of it.  Extractor grabs it, pulls it around to the rear.  It doesn't fully eject.  So pretty much part of your round is sticking out.  It jams your weapon, but part of the round is sticking out of the -- right where it ejects and you got to pop it out, but you can see the brass sticking out.

Q.   So you're using the term round and you just mentioned the word brass.  Are you referring to the spent shell casing?

A.   So round or brass I think is two terms

Page 22

I go back and forth with.

Q.   Is it also accurate to call it a casing?

A.   Yep.

Q.   A bullet casing?

A.   Another term for it, yep.

Q.   Okay.  So when you experience a stovepipe, would you agree that that's when the casing does not eject from the gun?

A.   Yes, sir.

Q.   And in this instance, did you experience a stovepipe or a failure of the casing ejecting?

A.   I did not.  When we ejected it, the casing was fully inside the breach still.

Q.   Okay.  So the casing did not eject?

A.   It did not at all.

Q.   Do you have any idea why that is?

A.   So if it's in the holster, there's a back strap over it that doesn't allow the slide to cycle.  It can only cycle maybe half an inch to an inch, at most.  It's not enough for the slide to come back enough to eject any kind of casing or brass.

Q.   When your P320 discharged, you would

Page 23

agree it was in your holster.  Right?

A.   Yes, sir.

Q.   Was it fully seated?

A.   Yes, sir.

Q.   Was it retained by the retention on that Safariland triple retention holster?

A.   Yes, sir.

Q.   Was the hood in place where it was supposed to be?

A.   Mm-hmm.  Yes, sir.

Q.   Was your finger anywhere near the trigger or the gun itself?

A.   No, sir.

Q.   Was your hand anywhere near it?

A.   No.

Q.   How sure are you that your finger or hand were not near the gun that went off?

A.   I'm a hundred percent sure of that.  I was reaching for the guy's legs that were out in front of me.

Q.   Okay.  Did you have the opportunity after this incident to review security surveillance footage of the incident?

A.   I did.

Q.   Was one of those recordings from video

Page 24

in the foyer up on the ceiling or the wall?

A.   Yes, sir.

Q.   And was another one body camera footage?

A.   Yep.

Q.   When did you first have the opportunity to watch that surveillance recording?

A.   So we looked at it maybe within 20 or 30 minutes of it going off.

Q.   Who was present when you got to watch that video?

A.   Most of the officers in that video.  I know for sure it was my lieutenant and one or two of the sergeants, but it was most people in that video.

Q.   Everyone wanted to see it?

A.   Yeah.  We wanted to figure out what happened.  We didn't know -- we didn't know if the suspect grabbed it or what.

Q.   Was there an incredible amount of interest in seeing that video because it was inexplicable to you that the gun went off without you pulling the trigger or without you touching it?

MR. HARTMAN:  Objection.  You may answer it.

THE WITNESS:  Yes, sir.

Page 25

BY MR. HURD:

Q.   Immediately after the discharge, did you have any explanation for what had happened?

A.   I did not.

Q.   Let me show you what I will mark as Exhibit 1.  Can you see my screen?

A.   Yes, sir, I can.

Q.   Can you identify for us what we're looking at in Exhibit 1?

A.   So it's the front lobby of our PD. The one door that's open, that leads to our secretary's office.  The suspect is already in handcuffs.  All the cops are working that shift.

Q.   And the suspect is off to the right side of this view?

A.   Yes, sir.  In between the two officers.

Q.   Who is this gentleman with the yellow? Is he also an officer?

A.   That's Sergeant Spring.  He was just coming in for a morning road job when everything took place.

Q.   Okay.  So there were nine of you in this room when this happened.  Is that right?  Not counting the suspect.

Page 26

A.   Yes, sir.

Q.   Is that you in the center pointing?

A.   It is.

Q.   What are you pointing to or what are you doing there?

A.   I think we're discussing what we're going to do with the suspect.  We were bringing him to the side where that sergeant's at and we were going to walk him out the front door.

(Whereupon the video was played and stopped.)

BY MR. HURD:

Q.   That video, that eight-second video I just played, is that an accurate depiction of what you recall happening with your unintended discharge?

A.   Yes, sir.

Q.   I'm going to play it one more time and ask what's this flash we see narrowly miss an officer's leg?

(Whereupon the video was played and stopped.)

THE WITNESS:  The firearm discharging.

BY MR. HURD:

Q.   Did your holster have a closed bottom with a muzzle locator?

A.   It did.  It has the plug at the bottom for the muzzle.

Page 27

Q.   Okay.  Was there damage to the holster?

A.   There was.  The whole bottom was blown out.

Q.   Let me show you a second video that I'll mark as Exhibit 2.  Can you identify this video perspective for us?

A.   It's from an officer's body worn camera.  I believe it was from Officer Hughes's camera.

Q.   Is that something that he would have activated just before this incident happened because you guys were dealing with a suspect?

A.   Yeah.  So any time we have contact with the public, we have to activate them.  He was actually in the lobby with his FTO and they both had their cameras activated.

Q.   What's an FTO?

A.   So Officer Hughes, it was his second day on the police force after graduating the academy.  It's just an officer, a senior officer, who kind of teaches him the way on how to be a cop. Like a senior officer can point him in different directions and show him the ropes.

Q.   I see a timestamp on this camera

Page 28

footage up here as 9:03.  Does that refresh your recollection of about when this incident happened?

A.   I know it was early in the morning. It could be that time.  I just can't recall when exactly when it happened.

(Whereupon the video was played and stopped.)

BY MR. HURD:

Q.   Did that seven-second video I just played for you at Exhibit 2 accurately depict what you recall happening with your unintended discharge?

A.   Yes, sir.

Q.   How many times would you say you've watched this video?

A.   Um --

Q.   More than ten?

A.   Way more than ten.

Q.   And same for the other video?  More than ten times?

A.   I would say the other one more than this one.  I think the other one is the more popular one, but I've seen them both 30, 40, 50 times.

Q.   Okay.  In watching both of these videos 30, 40, 50 times, did you ever find any reason to blame yourself for this discharge happening?

Page 29

A.    No, sir.  Not at all.

Q.    Did you ever find any reason to blame anyone else in this room for your discharge happening?

A.    No, sir.

Q.    Was there any contact between you and the other officer to the right with the red stripes on his arm?

A.    Not that I recall or remember.

(Whereupon the video was played and stopped.)

BY MR. HURD:

Q.    So in this moment right here at about six seconds, do you know if there was contact one way or another?

A.    It's possible.  I just can't recall if there was for sure or not.

Q.    Okay.  I'm frozen at seven seconds right now and you can see a white line in this image.  Is this also the muzzle blast?

A.    Yes, sir.

Q.    Let me show you an image that I'm going to have marked as Exhibit 3.

Would you agree this is an accurate screen shot of the video that we just saw?

A.    Yes, sir.

Page 30

Q.    Okay.  I'm going to zoom in here.  You would agree that's your P320 on your hip in your Safariland holster?

A.    Yes, sir.

Q.    Is this your tourniquet that's kind of visible in the front?

A.    Yes, sir.

Q.    Is your P320 properly secured in the holster in this image?

A.    It is.

Q.    Is the hood up?

A.    It is.

Q.    Do you see anything in this image that should have indicated to you that your P320 was about to discharge without your intent?

A.    I do not.

Q.    Do you see anything in this image or have you seen anything in connection to this incident to suggest that your P320 was either not seated in the holster properly or that the hood wasn't over the holster?  Or the P320, excuse me.

A.    No, I haven't.

Q.    I'm going to show you another screen shot that I'll have marked as Exhibit 4.  Strike that.  I'll show you the image Exhibit 4.  This is

Page 31

Screen Shot 4.

Can you tell me what is happening in or what's depicted in this image?

A.    So this is right when the suspect was refusing to walk out on his own.  I reached down to grab his legs.  That's when you can see that the firearm is discharging right there.

Q.    Where are your hands and your arms at this --

A.    Right now, they're both wrapped around -- right around his knees.

Q.    Okay.  Now I'll show you what I'll have marked as Exhibit 5, Screen Shot 5.

And you would agree that your testimony about where your hands and your arms are are consistent with what's depicted in this image?

A.    Yes, sir.

Q.    So this is just a moment after your discharge occurred.  Correct?

A.    Yes, sir.

Q.    I'm going to zoom back in on your P320 and your Safariland holster.

Is there anything in this image that suggests to you that your P320 was not properly seated and secured in your holster?

Page 32

A.    No, there is not.

Q.    After the incident occurred, did you see any evidence whatsoever to suggest to you that your P320 was not properly seated or secured in your Safariland holster?

A.    I did not.

Q.    Let me show you what I'll have marked as Exhibit 6.  Tell us what's happening in the image marked as Exhibit 6.

A.    So that's right after it went off.  So we all heard a bang and I could smell what I know from being on the range and being around guns to be the remnants of a round going off.  I looked down and I could see smoke coming out of my holster.  That's when I'm realizing that it was my gun.

Q.    After this incident, did Sig Sauer or anybody from Sig Sauer reach out to you?

A.    Not to me.

Q.    Did anyone from Sig Sauer interview you?

A.    They did not.

Q.    Did anyone from Sig Sauer come to the Montville Police Department to investigate?

A.    Not that I know of.

Q.    Did you see the statement that Sig

Page 33

Sauer released after this incident?

A.   I did.

Q.   I'll show you what I'm going to have marked as Exhibit 7.  Is this the statement that you saw with images of you?

A.   Yes, sir.

Q.   So according to this Exhibit 7 Sig Sauer statement, it was issued on July 31st of 2023. Is that about when you saw it?

A.   I believe I saw it the day it came out, yes.

Q.   How did you see it?  In what medium?

A.   I believe someone -- the first one I saw, somebody either sent it to my Instagram or my Facebook page.  I saw it was popping up online on the firearms forums and stuff that I follow.

Q.   And when you're seeing this popping up from people that are sending it to you on Instagram or on different forums, what's going through your head?

A.   For me, it was Sig's attempt to try to create a narrative of what happened, trying to protect their weapon system.

Q.   I'm going to scroll to Page 2 of this statement.  It lists a PR contact, Samantha Piatt,

Page 34

director of communications and media relations.

Did Samantha Piatt ever contact you to get your account of what happened?

A.   No, sir.

Q.   You will see in the first image there's an indication that Sig is saying that the pistol was not fully seated in the holster, not secured by retention hood.  I'm going to zoom in close.

Are you able to see anything in this image that corroborates this statement that Sig is making?

A.   No.  The back of the hammer looks higher up because that's the hood itself.  It's covering the back of the firearm.

Q.   Is that here where my cursor is?

A.   Yes, sir.

Q.   And for anybody that can't see my cursor, is that hood area depicted with a glimmer of light?

A.   Yes, sir.  It would be right on top where it crowns over.

Q.   I'm moving over to the second image where Sig has a caption that says, "holster retention hood not fully closed over the pistol,"

Page 35

with an arrow pointing.  What's the arrow pointing at if you're able to even tell us?

A.   So that's our tourniquet holder.  That white thing that's pointing out is the timestamp that's on the front of the CAT tourniquets.

It's the white strap that you're supposed to put a time on when you apply a tourniquet.  And once you tighten the tourniquet, you have a sticky you have to tie down.  That's to go over to keep the stick from unturning.

Q.   So this arrow is not pointing at the holster retention hood.

A.   No, sir.

Q.   Is that correct?

A.   It's pointing at the tourniquet that's mounted to my holster.

Q.   Moving over to the third image where Sig has supplied the caption, "pistol not fully seated in the holster.  Not secured by retention hood."  Do you agree with that caption?

A.   I do not.

Q.   Do you see anything in this image that suggests this caption is accurate in any way?

A.   I do not.

Q.   There's a line in the statement that

Page 36

says, this improperly holstered condition would have left the firearm's trigger exposed to vulnerable -- exposed and vulnerable to actuation.

Do you agree with Sig's statement that the holster was -- or that the gun was improperly holstered?

A.   I do not.

Q.   Next line reads that even properly holstered, the features of the involved holster allow for foreign object intrusion and interaction with the trigger as has been seen in other instances -- or incidents, excuse me.

Did anybody from Sig in your armorer's course or when you were getting your firearm's instructor certificate tell you that the Safariland holster that you guys were issued was prone to intrusion by foreign objects?

A.   No, not that I can recall.

Q.   Okay.  Did anyone from Sig back in 2019 when you went to the armorer's course or 2020 when you had the instructor's certification or up to 2023, did anybody from Sig ever tell you that there were other instances of the P320 discharging without the user's intent?

A.   No, they did not.

Page 37

Q.    You never received any bulletin from
Sig saying to watch out, some folks have experienced
unintended discharges?
        MR. HARTMAN:  Objection.
        THE WITNESS:  I did not.
BY MR. HURD:
Q.    Are you aware of anyone at Montville
ever receiving a bulletin, any type of notice or
warning from Sig that the P320 -- or that users of
the P320 were sometimes experiencing unintended
discharges while the gun was in the holster?
A.    Not that I'm aware of, no.
Q.    And I apologize if I'm redundant.  Did
they send you any warning or bulletin about the
Safariland holster you're using up to July of 2023?
A.    Not to me.
Q.    Okay.  I'm sorry, just to go down.
I'm going to share Exhibit 7 with you one more time.
        According to Sig Sauer's statement,
they indicate that "we regret that the involved
agency jumped to conclusions regarding the cause of
this discharge without first carefully examining the
footage of the incident and providing Sig Sauer with
an opportunity to assist in the examination of the
involved firearm."

Page 38

Did you or your agency jump to a
conclusion about what the cause of this discharge
was?
A.    I don't believe we did, no.
Q.    Did you and your department carefully
examine the footage of the incident?
A.    We did.  Multiple officers reviewed
the photo, the videos.
Q.    And you said that you reviewed it 30
40, 50 times.  Did other officers including your
chief probably review it just as many trying to
figure out what happened?
A.    I believe so.  Even when this video --
these pictures came out, they were sent to multiple
officers all the time at our PD.
Q.    Were you part of Montville's decision
to get the P320 back in 2019?
A.    Yes, sir.
Q.    Tell me about that decision process.
What did you and your department consider?
A.    So we were coming out of the P220
or -- yeah, 220.  We wanted something with a higher
capacity for ammunition.  Our old guns had nine
rounds.  We wanted to buy a nine mil; more rounds,
less recoil.

Page 39

I actually owned a personal P320 that
I enjoyed shooting.  I liked it.  We went and test
shot it.  We contacted Sig.  They actually sent us a
loaner out that we shot and we bring to the range,
run it a little bit.  We had a holster we put it in.
        Everyone seemed to like it.  We shot
it a lot better than we were shooting our other guns
and we decided to go with them.
Q.    You said you had a personal 320.  When
did you get that one?
A.    That must have been in '17 or '18.
Q.    Were you ever told about Sig Sauer's
they call it a voluntary upgrade program?
A.    Yes, sir.
Q.    -- recall?
A.    Yes, sir.
Q.    When did you first learn about that?
A.    It was just around the time we were
looking at the new 320s, that was one of our
concerns hearing that if you dropped it, they went
off.
        I actually sent my personal back to
the recall.  In the armorer's course, they showed us
the new safeties they put in and that issue was
taken care of.

Page 40

Q.    So you said that you sent yours back.
So did you have a pre-upgrade gun that you sent in
and you had it modified to have the additional
attempted trigger change and the additional internal
safety installed?
A.    Yes, sir.  The recall that Sig
offered.
Q.    Okay.  So yours actually went -- your
personal gun actually went through that?
A.    Yes, sir.
Q.    And you said that when you were
looking at getting the 320, you considered the
voluntary upgrade program and that people were
experiencing drop fires.  Right?
A.    Yes, sir.
Q.    Was it your understanding that the
guns that you would be ordering were all going to be
post-upgrade guns?
A.    Yeah.  We were told that that issue
was taken care of and the new ones wouldn't need
upgrades, that it was already done.
Q.    So you trusted Sig's representation
that you weren't going to have that type of issue
with your gun.  Right?
A.    Yes, sir.

Page 41

Q.    Have you ever shot a Glock before?

A.    I have.

Q.    How many pistols would you say you've shot? How many different types?

A.    I probably shot 30 or 40 different kind of pistols from different manufacturers.

Q.    Did many of those pistols have a tabbed trigger?

A.    Most of them do, yeah.

Q.    Did anyone at Sig at any point in your dealing with them whether going through the armorer's course, whether going through the considerations of getting P320s for Montville, did anyone ever say, hey, we have this model available with a tabbed trigger like a Glock has?

A.    No, sir.

Q.    Did you have any idea that that model was available with a tabbed trigger?

A.    No, sir.

Q.    If I told you that they actually never made that model with a tabbed trigger other than a prototype, would you know one way or another?

A.    I have no idea, sir. I've only ever seen this kind that we've had.

Q.    Fair to say you've never seen a P320

Page 42

with a tabbed trigger?

A.    I have not.

Q.    The folks in the department that made the decision to get the P320 in 2019, who were they? Was it a committee that was formed?

A.    It was the three firearms instructors and it was our lieutenant at the time and we were under the resident trooper program. So a state trooper was actually acting as our chief and he went with what we decided. The state was moving in the same process.

Q.    Who was that state trooper who was acting as your chief?

A.    Sergeant Juhola who has since retired.

Q.    And who were the firearms instructors? I think one was you. Right?

A.    So I was just going through the process of getting started of helping them out. So I wasn't certified yet. The two certified ones were Sergeant Galdenzi and Sergeant Shepherd.

Q.    Do you recall who you guys were dealing with at Sig in getting the original P320s?

A.    I believe it was through Atlantic Tactical. That was -- Sergeant Shepherd handled all the ordering and all communications. I never had

Page 43

any kind of e-mails being sent to anyone for firearms.

Q.    Atlantic Tactical is a regular distributor for Sig. Is that right?

A.    Yes, sir.

Q.    What does -- strike that. At some point, the Montville Police Department was looking at getting new or additional P320s in 2023. Is that right?

A.    Yes, sir.

Q.    Who was making that decision?

A.    So we -- the guns we were coming away from, we enjoyed them. We shot them very well. They were coming up on their lifespans of having so many rounds shot through them. So it was just time to get new firearms in the PD. We wanted a little bit of an upgrade. That's it.

Q.    So you guys decided to stick with the P320?

A.    Yes, sir.

Q.    At that time, were you dealing with somebody from Atlantic Tactical or somebody from Sig?

A.    Atlantic Tactical still, I believe. That was Sergeant Shepherd's area.

Page 44

Q.    After your untended discharge in July of '23, did you guys change your decision about continuing with the P320?

A.    We did.

Q.    And why was that?

A.    It was just the chief asked my opinion. I said the gun did something I couldn't explain and I didn't feel comfortable putting that back out in the field with officers.

If I could explain it, I'd say, okay, we could explain it. We can figure out why it happened and I'll be fine, but it was something I couldn't explain. I didn't trust it going out with my officers.

Q.    If you had thought that you did something that caused that discharge, would you have any problem owning that, taking responsibility?

A.    Mistakes happen and it would have been -- I mean, I would have felt bad for it, but it is what it is.

Q.    What does the Montville Police Department use now for their everyday carry?

A.    We have Glock 45 MOSs.

Q.    And does that Glock have a tabbed trigger on it?

Page 45

A.   It does.

Q.   Do you ever have any problem using that tabbed trigger when you want to fire?

A.   I do not.

Q.   Have you ever had a glove or something get caught in that tab?

A.   I have not.

Q.   Have you ever had a single complaint about that tab on that trigger on your Glock?

A.   I have not.

Q.   Does the tab on your Glock -- does the tab on your Glock's trigger slow you down in firing?

A.   No, once you get used to it.  It's definitely a different feeling coming from a Sig, but it's still the same accuracy, same speed for shooting.

Q.   Was your holster a light-bearing holster?

A.   It was.

Q.   Did you have a light on your P320 --

A.   I did.

Q.   -- when the discharge occurred?

A.   Yes, sir.

Q.   What kind of light did you have?

A.   It was a Streamlight TR-1.

Page 46

Q.   So even aside from the retention, the three levels of retention that that Safariland had, considering that your 320 had a light on it, did it fit securely within that Safariland holster?

A.   It did.

Q.   Did you ever have any prior issue with that holster?

A.   No, sir.

Q.   Did you ever have a prior unintended discharge?

A.   No, sir.

Q.   I don't believe I have any further questions for you right now.  The other attorneys may.  I thank you for your participation today.

A.   Thank you.

MR. HARTMAN:  Thank you, Ryan.

BY MR. HARTMAN:

Q.   My name is Douglas Hartman, Officer. I represent Sig Sauer.  First, my apologies for being late today.  Sorry to take your time like that.

Quick question, sir.  Do you have any prior weapons training prior to the police department?

A.   Yes, sir.

Page 47

Q.   Where did you receive that training?

A.   I was in the United States Marine Corps for four years.

Q.   When were you in?

A.   From 2007 to 2011.

Q.   What was your MOS?

A.   3531.  I was a motor T operator.

Q.   And what assistance did you have training on with the Marine Corps?

A.   The Colt M4, the Beretta nine mil, and the machine guns, the 240 and 249.

Q.   Any other weapons assistance you were trained on in the Marine Corps?

A.   No, sir.

Q.   What weapon did you carry on a daily basis in the Marine Corps?

A.   The M4.

Q.   Your MOS didn't require the carrying of the M9?

A.   No.

Q.   And then boot camp, did you qualify on the M4?

A.   Yes, sir.

Q.   What did you qualify as?

A.   A sharp shooter at boot camp.

Page 48

Q.   During your four years, I assume you qualified every year?

A.   Yes, sir.

Q.   What were your qualifications?  What did you qualify as?

A.   It was expert after I was once in the fleet in the Marine Corps.

Q.   Excellent.  What unit were you in?

A.   CLB 7.

Q.   And where are they out of?

A.   29 Palms in California.

Q.   Any other weapons training prior to the police department training?

A.   No, sir.

Q.   Did you ever serve as a police officer with any other town or municipality or state?

A.   No, sir.

Q.   Let's go to the date of the incident, July 24th, 2023.  Were you wearing a duty belt that day?

A.   Yes, sir.

Q.   How long had you been using the duty belt that you had on that day?

A.   I believe it was my second one.  I know I got a new one when I graduated with my first

Page 49

1 patrol dog.
2    Q.    So what about -- strike that.  About
3 what year did you start using the duty belt that you
4 had on that day?
5    A.    Probably 2018.
6    Q.    Now did you have a load vest on that
7 day also?
8    A.    I had one, but I did not have one
9 during that incident.
10    Q.    You did not have it on during the
11 incident?
12    A.    No, sir.
13    Q.    What type of load vest was it?
14    A.    I can't, off the top of my head,
15 remember the manufacturer.
16    Q.    Does everybody wear the same load vest
17 at Montville Police Department?
18    A.    Yes, sir.  I believe they're Armor
19 Express now that I think of it.
20    Q.    Armor Express?
21    A.    Yes, sir.
22    Q.    Were you a 3531 through your whole
23 time in the Marine Corps?
24    A.    Yes, sir.
25    Q.    Honorable discharge?

Page 50

1    A.    Yes, sir.
2    Q.    What rank were you on discharge?
3    A.    Corporal.
4    Q.    You shouldn't be calling me sir
5 because I was only a corporal too.
6    A.    There you go.
7    Q.    I believe you answered this question.
8 But the Safariland holsters that you used for the
9 P320, those were sourced from Atlantic Tactical.
10 Correct?
11    A.    I wasn't in charge of ordering, but I
12 believe so.
13    Q.    That was Sergeant Shepherd that was in
14 charge of ordering I believe you said?
15    A.    Yes, sir.
16    Q.    Thank you.  The holster that you were
17 using on July 24th, 2023, was that the original
18 holster you had been issued back in 2000 -- forgive
19 me if I get this wrong -- you said '19 that you got
20 the P320s?
21    A.    Yes, sir.
22    Q.    Was that the original holster?
23    A.    It was.
24    Q.    And when did you put the tourniquet
25 attachment on that holster?

Page 51

1    A.    I believe it was the same year we got
2 them, 2019.  It was fairly quick.
3    Q.    So you didn't get the tourniquet right
4 when you first got the holster?  That came a short
5 bit after --
6    A.    Came separate, yep.
7    Q.    And do you know where you sourced the
8 tourniquet?
9    A.    I believe they're from RDR Gear.
10    Q.    Just after -- well, still during the
11 incident, but just after the discharge, you said you
12 went into the armory.  Is that correct?
13    A.    Yes, sir.
14    Q.    And you slid your holster off your
15 duty belt with the pistol in it.  Correct?
16    A.    Yes, sir.
17    Q.    Who was the other officer with -- who
18 was the other officer that was there with you?
19    A.    Initially when I just took it off, I
20 was in there by myself.
21    Q.    Okay.  And when you removed the pistol
22 from the holster, who was the officer?  Who was
23 there?
24    A.    Sergeant Shepherd.
25    Q.    Was he on duty that day or did he have

Page 52

1 yet to come in?
2    A.    I believe he was just getting off
3 duty.  He usually works midnights.  I think he was
4 just hanging over.
5    Q.    I believe you said there was still a
6 shell casing in the chamber of the P320.
7    A.    Yes, sir.
8    Q.    Is that correct?
9    A.    Yes, sir.
10    Q.    Was the slide fully closed when --
11    A.    It was.
12    Q.    Just let me finish my question, I'm
13 sorry.  I know you know where I'm going with this,
14 but was the slide fully closed as you pulled the
15 pistol out of the holster?
16    A.    Yes, sir.
17    Q.    Did it snap closed or was it just
18 fully closed as soon as you started pulling it out?
19    A.    It was fully closed.  It was sitting
20 in there.
21    Q.    There was no part of that shell casing
22 sticking out of the ejection port?
23    A.    No, sir.
24    Q.    And did you eject the shell casing out
25 of the chamber?

Page 53

```
1    A.   I did.
2    Q.   And where -- did it fall on the floor?
3  Did you eject it onto a table?  How did you
4  manage --
5    A.   Onto one of the work benches we have
6  in the armory.
7    Q.   Did you examine that shell casing?
8    A.   I didn't really look at it.  I
9  remember just putting it on the counter.  I just
10 noticed one came out.  I didn't look at
11 primer hits or anything like that, no.
12   Q.   I have a list of questions written
13 down, but you've answered some.  So I'm trying to
14 not ask you the same questions twice.
15        During the incident, we saw the videos
16 and the stills and there were two officers on either
17 side of the suspect.
18   A.   Yes, sir.
19   Q.   The one closest to you, just to your
20 right to the left of the suspect, the sergeant
21 there, what was his name?
22   A.   Sergeant Sumpf.
23   Q.   Can you spell that last name for me?
24   A.   S-U-M-P-F -- P-F.
25   Q.   At the time of the incident, was your
```

Page 54

```
1  body camera on?
2    A.   It was not.
3    Q.   We did see one video that was from a
4  body camera.  Is there any other video from anybody
5  else's body camera in that room?
6    A.   No, sir.
7    Q.   Do you know if any of the other eight
8  officers other than the one that had the body camera
9  on that we saw had their body camera on?
10   A.   I can't recall if they did or not.
11   Q.   Just for clarification, you mentioned
12 an FTO.  That's Field Training Officer.  Correct?
13   A.   Yes, it is.
14   Q.   Talking about the videos, you said you
15 reviewed them 30 or 40 times.  That's your estimate.
16 Correct?
17   A.   Yes, sir.
18   Q.   Did you -- are any of those views
19 subsequent to July 31st of 2023?
20   A.   Some.
21   Q.   About how many times did you look at
22 the video after the end of July 2023?
23   A.   It was more because when you start
24 posting on Youtube, you see people make their own
25 videos of it.  That's when I started watching more
```

Page 55

```
1  of them.
2    Q.   About how many times did you view the
3  video before the end of July 2023 do you think?
4    A.   Before, I reviewed it only once with
5  our lieutenant in his office before it was released.
6  That's when I started seeing them.
7    Q.   Do you remember when that view in your
8  lieutenant's office was?
9    A.   It was the same day as the incident.
10 Shortly after.
11   Q.   What's the lieutenant's name?
12   A.   Lieutenant Radford.
13   Q.   And you testified you currently have a
14 Glock 45, but I missed the model number.  What was
15 the model number?
16   A.   It's a Glock 45 MOS.
17   Q.   MLS or MOS?
18   A.   MOS.
19   Q.   Mike, Oscar, Sierra?
20   A.   Yes, sir.
21   Q.   Thank you.  You've said on the date of
22 the incident you had a Streamlight 301 on your
23 weapon?
24   A.   A TLR-1.
25   Q.   TLR-1.  And when did you affix that
```

Page 56

```
1  Streamlight to your weapon for the first time?
2    A.   When we first were issued the guns.
3  We went through our initial training with them.
4  They were on them.
5    Q.   And did you always carry your P320
6  from the time it was issued to the time of the
7  incident with that TLR-1 on it?
8    A.   Yes, sir.
9    Q.   I want to talk to you about your duty
10 belt a little bit.  What kind of duty belt was it?
11   A.   I can't -- I don't know the exact
12 brand.  I think we get them from Galls.  Our other
13 sergeant orders all of our gear.
14   Q.   Are you still wearing the same duty
15 belt you were wearing on that day?
16   A.   I am not.
17   Q.   Did it have a buckle or Velcro to
18 close the front?
19   A.   It had a plastic buckle with two
20 release points on it.
21   Q.   So like a clip that clips together?
22   A.   Yes, sir.
23   Q.   What equipment were you carrying on
24 that duty belt on the date of the incident?
25   A.   The only thing on my duty belt was the
```

Page 57

handgun, holster, and a set of handcuffs.
Q.     The handgun, holster, and a set of handcuffs?
A.     Yes, sir.
Q.     Where were the handcuffs?
A.     They're slightly behind my handgun. Maybe four inches behind it.
Q.     Were they just tucked into a belt or were they in a holster?
A.     They're in a Kydex holder.
Q.     Can you say the name of the holder again, please?
A.     They're called Kydex holsters.  Just a foreign plastic that the cuffs click into.
Q.     So it doesn't have a flap over the top.  They click in and it has an indent in the middle that holds the cuffs in there?
A.     Yeah.  They're divided by retention, yep.
Q.     Did you carry chain cuffs or hinged cuffs?
A.     Hinged.
Q.     And other than the holster with the weapon in it and the cuff holder with cuffs in it, there was nothing else on your duty belt?

Page 58

A.     Just one set of my car keys up front on my front left.
Q.     And how were they affixed to the duty belt?
A.     It's a quick release.  So they slide in and out of a little metal clip.
Q.     Are they contained within any kind of pouch or holder or are they hanging loose?
A.     They're hanging loose on a ring.
Q.     How many keys do you have on your key ring?
A.     Just one car key and a fob to get into our building.
Q.     What kind of car key was it?  Was it --
A.     Ford Explorer.
Q.     When you went to the armory's course at Sig Sauer, did you -- I believe you answered this, but I'm just not a hundred percent clear.  Did you bring back any paperwork from that course?
A.     Yes, sir.
Q.     And are you still in possession of that paperwork?
A.     I know they're in the armory somewhere.  I'm not sure exactly where they are, but

Page 59

I believe we do have them still.
Q.     So you stored them in the armory somewhere?
A.     Yes, sir.
Q.     Let me review my notes for a little bit here, make sure I have everything.
       After your review of the video in your lieutenant's office, were you involved in any further investigation of your discharge?
A.     I was not.
Q.     Were you interviewed by anybody?
A.     I was not.
Q.     Did you write up a written report regarding the discharge?
A.     Yes, sir.  I did.
Q.     After the -- strike that.  Did you write up more than one report regarding the discharge?
A.     Just the one, I believe.
Q.     There were no follow-ups or addendums?
A.     No, sir.
Q.     That's all the questions I have. Thank you very much, Officer.
A.     Sure.  Thank you.
       MR. HURD:  Would you guys -- I have a

Page 60

few more questions.  Would you guys mind if we take a five-minute comfort break?
       MR. HARTMAN:  Not a problem.
       MR. HURD:  All right.  Let's come back at 11:30.
       THE VIDEOGRAPHER:  Stand by.  The time is 11:25.  Off the record.
       (Whereupon there was a recess.)
       THE VIDEOGRAPHER:  Time is 11:35.  We are back on the record.
BY MR. HURD:
Q.     Officer Witts, a moment ago you were talking about having a key to the Explorer and a fob to get into the building.  Right?
A.     Yep.
Q.     Where was that located at on your body?
A.     It's to my front left over my -- the right -- pretty much in the center of my left leg.
Q.     Okay.  Let me show what I'll have marked as Exhibit 8.  Can you see my screen there?
A.     I can.
Q.     I'm zooming in to the image of the front of your body.  We can see what looks like a reflection of a metallic item.  Do you see that

Page 61

there where my cursor is?

A.   Yes, sir.

Q.   Is that where your key and key fob were kept?

A.   Yes, sir.

Q.   Let me show you -- I'm going to go back to the Exhibit 1 of our surveillance footage.

(Whereupon the video was played and stopped.)

BY MR. HURD:

Q.   All right.  So I'm at second 1.  I can't zoom in on this, I'm sorry.  Looking at this exhibit, do you see where my cursor is?

A.   Yes, sir.  I do.

Q.   The front of your left leg, is that the key to the truck and the building?

A.   Yes, it is.

Q.   Okay.  Off to your left-hand side next to your left hand, is there something on your body there?

A.   That's just my cargo pocket.  Usually my patrol gloves are kept on that side.  It might be the top of the patrol gloves sticking out.

Q.   Did you have anything on your belt or your pants or your body near the vicinity of the P320 and holster other than the tourniquet kit?

Page 62

A.   Only thing that's close to it is a set of cuffs that sit just behind my gun.

Q.   Okay.  So it would be behind the gun closer to your butt.  Right?

A.   Yes, sir.

Q.   Any chance those cuffs could have gotten in there?

A.   No.

Q.   Okay.  What was the size of your P320?  Was it a full size or a carry?

A.   It was a full size.

Q.   And did you have the smaller grip on it?

A.   It had a smaller size.  Yes, sir.

Q.   Immediately after the discharge, you said that you took the P320 and holster off as a unit.  Right?

A.   Yep.

Q.   Ultimately when you removed the P320 from the holster, what did you have to do to remove it?

A.   So defeat the retention systems of the holster and then you're able to slide it out.

Q.   So the retention systems were still active and holding it in place.  Right?

Page 63

A.   Yes, sir.

Q.   You mentioned having damage to the bottom of your holster where the muzzle locater is located.  Correct?

A.   Yes, sir.

Q.   I'm going to show you what I'll marked as Exhibit 9.  This is a case/incident report that was produced to us.  Have you ever seen this before?

A.   I don't believe so.  No, sir.

Q.   Okay.  In this case/incident report, there were photos and it was represented that it was holster debris.  Do you see those four photos there?

A.   Yes, sir.

Q.   Do you recall seeing that debris after the incident happened?

A.   I remember seeing debris on the ground, but I never got a close-up look like these before, no.

Q.   Okay.  I want to zoom in on this top right one in particular.

Being familiar with your holster, do you know what part this is?  Would this be the bottom of it?

A.   I believe it would be the bottom, yes.

Page 64

Q.   Did you have any part of the investigation and --

A.   No, I did not.

Q.   Okay.  Prior to July 24th, 2023, did you have any bias against Sig?

A.   No, not at all.

Q.   Did you trust in Sig as a brand?

A.   Yes, sir.

Q.   Did you trust in the P320?

A.   Yes, sir.  I enjoyed the gun, yes.

Q.   The question is did you trust in it?

A.   Yes, sir.

Q.   How about now?

A.   No, sir.

Q.   Are you aware of any other incidents like yours?

A.   Yes, sir.

Q.   Did you become aware of them only after your incident?

A.   Yes, I did.

Q.   Tell me which incidents you're aware of with as much specificity as you can.

A.   I don't know the exact PDs.  I know there's one out in Mass.  A couple other -- I couldn't tell you the PDs from around the country,

Page 65

1 but I know there's other ones where they all said
2 their firearms go off.
3    Q.   How did you come to learn of those
4 other incidents?
5    A.   Just seeing what popped up online and
6 other PDs were contacting us to see if they could
7 get the video because they had a similar incident
8 and they wanted to see what we thought about it. A
9 lot of PDs contacted us following what happened.
10    Q.   Say more than five PDs did?
11    A.   I would say it's more than five.  Yes,
12 sir.
13    Q.   More than ten?
14    A.   It might be as high as ten.  I don't
15 think it was more than ten, though.  Not contact
16 that I heard about it.  It could be, but not that I
17 talked to.
18    Q.   Were they contacting you directly or
19 were they contacting Chief Blanchette?
20    A.   Either Chief Blanchette or Lieutenant
21 Radford.  Some were sent directly to my voicemail
22 just because a midnight sergeant took it.  They
23 would forward it to me.  The majority came through
24 our upper command.
25    Q.   Did you speak to members of other

Page 66

1 police departments about what happened when they
2 called?
3    A.   I spoke to a few.  Not all of them.
4 Some calls the LT or chief talked to.  I did, I
5 talked to a few of them.
6    Q.   Did you tell them anything different
7 than what you've told us today?
8    A.   No, sir.
9    Q.   Did you have any communication
10 whatsoever with anyone else directly that reported
11 having unintended discharge?
12    A.   No, sir.
13    Q.   Did anybody reach out to you on social
14 media, e-mail, otherwise, and say, hey, Officer
15 Witts, I had a discharge?
16    A.   No, sir.
17    Q.   Did you receive any communication from
18 anybody out in the public criticizing or ridiculing
19 you about what happened?
20    A.   Yes, sir.
21    Q.   More than five?
22    A.   Yes, sir.
23    Q.   More than ten?
24    A.   I would say so, yeah.
25    Q.   More than 15?

Page 67

1    A.   Yes, sir.
2    Q.   Are these just regular members of the
3 public or are they law enforcement?
4    A.   Regular members and the majority of
5 law enforcement.
6    Q.   Okay.  And these were folks that
7 reached out to criticize you?
8    A.   Either -- not reach out, but maybe at
9 trainings I go to.  They brought it up all the time.
10    Q.   What was brought up?
11    A.   They would always ask about the
12 holster, why wasn't the holster going off once Sig
13 released their video, saying it was pretty much my
14 negligence of not holstering my gun.  It was brought
15 up at all the trainings I go to.
16    Q.   Did you speak one-on-one with these
17 folks and set the record straight?
18    A.   For the most part I did, but some of
19 them were just comments online I could see not
20 directly at me, but they were just bashing me
21 online.  Once I started reading them, I stopped
22 caring and I stopped following the posts.
23    Q.   And is it your impression these folks
24 got their minds made up based on that statement that
25 Sig let out?

Page 68

1    A.   That statement and some other guys
2 made videos pretty much following their statement,
3 but yes.
4    Q.   Okay.  I don't have any further
5 questions for you.  I thank you.
6    A.   Thank you.
7 BY MR. HARTMAN:
8    Q.   Officer, just a few.  What type of
9 ammunition were you using on the day of the
10 incident?
11    A.   I don't know the exact kind.  I
12 believe it's federal.
13    Q.   Is the -- strike that.  Is the
14 Montville Police Department still using the same
15 type of ammunition that they were using on July 24th
16 of 2023?
17    A.   Yes, sir.
18    Q.   Do you know who at Montville Police
19 Department sources their ammunition through?
20    A.   I believe it's AAA, but, again, that's
21 Officer or Sergeant Shepherd's department.  He
22 orders them, but I believe it's AAA.
23    Q.   Do you still have your personal P320?
24    A.   I do not.
25    Q.   What happened to that weapon?

Page 69

1  A.   I traded it in at a local gun store.
2  Q.   When did you trade it?
3  A.   After this incident.
4  Q.   Do you remember how long after?
5  A.   I would say it was within four to six
6  months.
7  Q.   In that four to six months, did you
8  fire your personal P320?
9  A.   Not that I can recall, no.
10 Q.   Do you belong to any rod and gun clubs
11 or any other shooting establishment outside the
12 Montville Police Department?
13 A.   I do not, but we do get free
14 memberships for our one in town.  So we are members,
15 but it's not something I pay for.
16 Q.   All right, I'm confused.  You get a
17 free membership because you're a Montville Police
18 Department --
19 A.   Yes, sir.
20 Q.   What's the name of the place in town?
21 A.   What is it?  Quaker Hill Rod and Gun
22 Club.
23 Q.   Have you ever been there?
24 A.   Yes, sir.
25 Q.   Have you --

Page 70

1  A.   That's where we do our annual
2  trainings.
3  Q.   Other than your annual trainings, have
4  you utilized your membership with the Quaker Hill
5  Rod and Gun Club?
6  A.   I have.
7  Q.   How often do you go there?
8  A.   I'd say a handful of times a year on
9  my own.
10 Q.   How many times have you been there
11 since the incident?
12 A.   Outside of training?
13 Q.   Yes.
14 A.   Maybe four or five.
15 Q.   Is there any video in the armory at
16 the Montville Police Department?
17 A.   There is not.
18 Q.   That's all the questions I have.
19 Thank you.
20 A.   Thank you, sir.
21 BY MR. HURD:
22 Q.   I have about four more.  Why do police
23 officers and members of law enforcement carry
24 firearms?
25 A.   It's situations we're put in.  We're

Page 71

1  put in unknown situations, which, unfortunately,
2  sometimes we confront people that are dangerous.
3  It's to protect ourselves and to protect the public.
4  Q.   Is it important that law enforcement
5  can depend on their firearms?
6  A.   Yes, sir.
7  Q.   As far as you're concerned, can you
8  depend on a firearm that discharges when it's
9  sitting in your holster and you bend over?
10 A.   No, sir.
11 Q.   As far as you're concerned, can law
12 enforcement depend on the P320?
13 A.   Me, personally, no.
14 Q.   I have no further questions.  Thank
15 you.
16 A.   Thank you.
17      MR. HARTMAN:  I have no further
18 questions.  Thank you for your time, Officer.
19      THE WITNESS:  Thank you, sir.
20      THE VIDEOGRAPHER:  Okay.  That
21 concludes the video deposition.  The time is 11:47.
22 We are off the record.
23      THE COURT REPORTER:  Would all counsel
24 like to order the transcript?
25      MR. HURD:  Yes, please.  Electronic

Page 72

1  only.
2      MR. HARTMAN:  Yes, please.  Electronic
3  only here too.
4      (Witness excused.)
5      (Deposition concluded at 11:47 a.m.)
6  (Whereupon the documents were post-marked, for
7   identification purposes, as Exhibit 1 through
8            Exhibit 9.)

1                          - - -

2               E R R A T A   S H E E T

3                          - - -

4

5      PAGE       LINE       CHANGE

6      _____    _____    _____

7      _____    _____    _____

8      _____    _____    _____

9      _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____

25     _____    _____    _____

Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3        I,                      , do hereby

 4   certify that I have read the foregoing pages and

 5   that the same is a correct transcription of the

 6   answers given by me to the questions therein

 7   propounded, except for the corrections or

 8   changes in form or substance, if any, noted in

 9   the attached Errata Sheet.

10

11

12

13

14
     _____  _____
15    Date Signature

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T E

 2

 3              I, Natalie J. Goldhill, a Court Reporter

 4      and Notary Public, Chester County, Pennsylvania, do

 5      hereby certify that the witness was by me first duly

 6      sworn to testify to the whole truth and that the

 7      above deposition was recorded stenographically by me

 8      and was transcribed by means of computer-aided

 9      transcription under my personal direction and that

10      the said deposition constitutes a true record of the

11      testimony given by said witness.

12              I further certify that I am not a relative

13      or employee of any of the parties, a relative or

14      employee of any attorney involved in this action, or

15      financially interested directly or indirectly in

16      this action.

17

18

19

20      Natalie J. Goldhill, Notary Public
        Chester County, Pennsylvania and
21      New Castle County, Delaware

22

23

24

25
```

## WORD INDEX

**< 0 >**
**02109**  2:*16*
**06103**  2:*10*

**< 1 >**
**1**  3:*11*  25:*6, 9*  61:*7,*
*10*  72:*7*
**1:22-CV-11674-FDS**
*1:7*
**1:22-CV-16674-FDS**
*5:6*
**10**  2:*15*
**10:22**  1:*16*  5:*8*
**11**  1:*16*
**11:25**  60:*7*
**11:30**  60:*5*
**11:35**  60:*9*
**11:47**  71:*21*  72:*5*
**11th**  5:*7*
**140**  13:*14*
**15**  66:*25*
**1650**  2:*5*
**17**  39:*11*
**18**  39:*11*
**19**  15:*19*  50:*19*
**19103**  2:*5*

**< 2 >**
**2**  3:*13*  27:*6*  28:*9*
*33:24*
**20**  24:*8*
**2000**  50:*18*
**2007**  47:*5*
**2011**  47:*5*
**2015**  7:*13*  11:*12, 13*
**2018**  49:*5*
**2019**  8:*19, 25*  11:*22*
*12:19*  13:*5*  14:*2*
*36:20*  38:*17*  42:*4*
*51:2*
**2020**  8:*20*  10:*5*
*36:20*
**2023**  6:*10*  11:*19*
*17:12*  19:*14*  33:*8*
*36:22*  37:*15*  43:*8*
*48:19*  50:*17*  54:*19,*
*22*  55:*3*  64:*4*  68:*16*

**2024**  1:*16*  5:*7*
**21**  8:*23*
**215**  2:*6*
**220**  38:*22*
**225**  2:*10*
**23**  11:*20*  15:*18*  44:*2*
**240**  47:*11*
**249**  47:*11*
**24th**  6:*10*  11:*19*
*17:12*  19:*1, 14*  48:*19*
*50:17*  64:*4*  68:*15*
**25**  13:*12*
**284-4206**  2:*16*
**29**  48:*11*
**297-4696**  2:*11*

**< 3 >**
**3**  3:*15*  29:*22*
**30**  24:*9*  28:*21, 23*
*38:9*  41:*5*  54:*15*
**301**  55:*22*
**31st**  33:*8*  54:*19*
**320**  12:*24*  39:*9*
*40:12*  46:*3*
**320s**  39:*19*
**3531**  47:*7*  49:*22*

**< 4 >**
**4**  3:*17, 18*  30:*24, 25*
*31:1*
**40**  28:*21, 23*  38:*10*
*41:5*  54:*15*
**40-hour**  8:*11, 21*
*11:10*
**45**  44:*23*  55:*14, 16*
**45-cal**  12:*1*
**46**  3:*6*

**< 5 >**
**5**  3:*20, 21*  31:*13*
**50**  28:*21, 23*  38:*10*
**52nd**  2:*5*

**< 6 >**
**6**  3:*5, 23*  32:*8, 9*
**60**  3:*5*
**6000**  14:*6*
**60-round**  13:*11, 12*
**617**  2:*16*

**68**  3:*6*

**< 7 >**
**7**  4:*3*  33:*4, 7*  37:*18*
*48:9*
**7:50**  19:*3*
**70**  3:*5*
**72/25**  3:*11*
**72/27**  3:*13*
**72/29**  3:*15*
**72/30**  3:*17*
**72/31**  3:*20*
**72/32**  3:*23*
**72/33**  4:*3*
**72/60**  4:*6*
**72/63**  4:*9*

**< 8 >**
**8**  4:*6*  60:*21*
**800**  2:*15*
**860**  2:*11*
**8-hour**  9:*4*

**< 9 >**
**9**  4:*9*  63:*7*  72:*8*
**9:03**  28:*1*
**910-4765**  2:*6*

**< A >**
**a.m**  1:*16*  5:*8*  72:*5*
**AAA**  68:*20, 22*
**able**  34:*10*  35:*2*
*62:23*
**Absolutely**  9:*16*
**academy**  7:*12, 13, 14,*
*17, 19*  8:*18, 21*  10:*5*
*11:7*  27:*21*
**account**  34:*3*
**accuracy**  45:*15*
**accurate**  22:*2*  26:*13*
*29:23*  35:*23*
**accurately**  28:*9*
**ACKNOWLEDGMEN**
**T**  74:*1*
**acronym**  11:*1*
**acting**  42:*9, 13*
**action**  12:*3, 6, 8, 19*
*75:14, 16*
**activate**  27:*15*

**activated**  27:*12, 17*
**active**  62:*25*
**actuation**  36:*3*
**addendums**  59:*20*
**additional**  8:*13*
*10:22*  40:*3, 4*  43:*8*
**advertises**  16:*4*
**affix**  55:*25*
**affixed**  58:*3*
**agency**  37:*21*  38:*1*
**ago**  60:*12*
**agree**  22:*8*  23:*1*
*29:23*  30:*2*  31:*14*
*35:20*  36:*4*
**agreeable**  6:*11*  7:*4*
**allow**  22:*20*  36:*10*
**ammunition**  38:*23*
*68:9, 15, 19*
**amount**  24:*19*
**annual**  70:*1, 3*
**answer**  24:*24*
**answered**  50:*7*  53:*13*
*58:18*
**answers**  74:*6*
**anybody**  32:*17*
*34:18*  36:*13, 22*  54:*4*
*59:11*  66:*13, 18*
**anyone's**  14:*15*
**apart**  9:*9*
**apologies**  46:*19*
**apologize**  37:*13*
**apply**  35:*7*
**area**  34:*19*  43:*25*
**arm**  29:*8*
**Armor**  49:*18, 20*
**armorer**  8:*17, 18, 25*
*9:18*  10:*1*
**armorer's**  9:*4*  12:*9,*
*13, 18, 24*  13:*19*
*36:13, 20*  39:*23*
*41:12*
**armory**  12:*15*  20:*15,*
*16, 18*  51:*12*  53:*6*
*58:24*  59:*2*  70:*15*
**armory's**  58:*17*
**arms**  31:*8, 15*
**arrow**  35:*1, 11*
**aside**  46:*1*
**asked**  44:*6*

Case 1:22-cv-10470-PBS   Document 83-29   Filed 03/28/24   Page 243 of 439
Deposition of Officer Daniel Witts
Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

asking  6:8  12:23
assist  37:24
assistance  47:8, 12
assume  12:8  18:18
48:1
Asylum  2:10
Atlantic  42:23  43:3,
22, 24  50:9
attached  16:19  74:9
attachment  50:25
attempt  33:21
attempted  40:4
attorney  75:14
attorneys  6:5  46:13
authorized  16:13
available  41:14, 18
aware  37:7, 12  64:15,
18, 21

< B >
back  6:10  8:9, 20, 25
9:9  10:4  12:18
13:18  15:6  18:8, 13
20:7  22:1, 20, 23
31:21  34:13, 15
36:19  38:17  39:22
40:1  44:9  50:18
58:20  60:4, 10  61:7
bad  44:19
bang  20:6  32:11
barrels  16:1
Based  18:23  67:24
bashing  67:20
basic  11:7
basis  47:16
becoming  8:25
believe  8:4  11:25
19:21  27:9  33:10, 13
38:4, 13  42:23  43:24
46:12  48:24  49:18
50:7, 12, 14  51:1, 9
52:2, 5  58:18  59:1,
19  63:10, 25  68:12,
20, 22
belong  69:10
belt  18:3  48:19, 23
49:3  51:15  56:10, 15,
24, 25  57:8, 25  58:4
61:23

belts  20:23
benches  53:5
bend  71:9
BENDESKY  2:3, 18
bends  15:1
benefits  16:9
Benjamin  2:18
bent  20:6
Beretta  47:10
better  39:7
bias  64:5
bit  10:11  39:5
43:17  51:5  56:10
59:6
blame  28:24  29:2
Blanchette  65:19, 20
blast  29:19
block  8:11, 21  11:10
blown  27:3
Body  3:13  4:7  24:3
27:8  54:1, 4, 5, 8, 9
60:17, 24  61:18, 24
bolt  16:21
boot  47:21, 25
Boston  2:16
bottom  12:1  26:22,
24  27:3  63:3, 24, 25
brand  56:12  64:7
brass  21:21, 23, 25
22:24
breach  22:15
break  9:20  12:15
60:2
breakdown  12:16
bring  39:4  58:20
bringing  26:7
brought  67:9, 10, 14
Brown  2:18
buckle  56:17, 19
building  58:13  60:14
61:15
built  15:13
bullet  22:5
bulletin  37:1, 8, 14
bunch  19:17
butt  62:4
buy  38:24

< C >

California  48:11
call  22:2  39:13
called  5:17  57:13
66:2
calling  50:4
calls  66:4
Camera  3:13  24:3
27:9, 10, 25  54:1, 4, 5,
8, 9
cameras  27:17
camp  47:21, 25
capacity  38:23
caption  34:24  35:18,
20, 23
car  58:1, 12, 14
care  39:25  40:20
carefully  37:22  38:5
cargo  61:20
caring  67:22
carries  14:12
carry  11:14  16:22
20:4  44:22  47:15
56:5  57:20  62:10
70:23
carrying  11:18  17:3
47:18  56:23
CASE  1:7
Case/Incident  4:9
63:7, 11
casing  21:24  22:3, 5,
9, 12, 15, 16, 23  52:6,
21, 24  53:7
Castle  75:21
CAT  35:5
caught  45:6
cause  37:21  38:2
caused  44:16
ceiling  24:1
center  26:2  60:19
certain  14:11
certificate  36:15
certification  36:21
certifications  8:13
certified  8:22  10:18,
22, 23  11:8, 10  42:19
certify  11:3  74:4
75:5, 12
certs  11:3
chain  57:20

chamber  18:5, 10
21:5  52:6, 25
chance  21:7  62:6
change  16:7  40:4
44:2  73:5
changed  15:24  16:18
changes  74:8
charge  50:11, 14
check  18:4, 6, 11
Chester  75:4, 20
chief  20:17  38:11
42:9, 13  44:6  65:19,
20  66:4
CIVIL  1:7
clarification  54:11
class  10:22  12:8
classroom  7:20  8:6,
7, 9  10:11, 12
CLB  48:9
cleanings  9:21
clear  21:6  58:19
click  57:14, 16
Clip  3:11  56:21
58:6
clips  56:21
close  34:9  56:18
62:1
closed  26:22  34:25
52:10, 14, 17, 18, 19
closer  62:4
closest  53:19
close-up  63:18
Club  69:22  70:5
clubs  69:10
Colt  47:10
come  16:10  22:23
32:22  52:1  60:4
65:3
comes  15:9
comfort  60:2
comfortable  44:8
coming  15:2  17:16,
18  20:8  25:21  32:14
38:21  43:12, 14
45:14
command  65:24
commencing  1:16
comments  67:19
committee  42:5

Case 1:22-cv-16240-RBS Document 8389 Filed 03/28/24 Page 244 of 439
Deposition of Officer Daniel Witts
Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

**commonly** 16:24
**Commonwealth** 1:18
**communication** 66:9,
17
**communications** 34:1
42:25
**complaint** 45:8
**completely** 9:6
**computer-aided** 75:8
**concerned** 71:7, 11
**concerns** 39:20
**concluded** 72:5
**concludes** 71:21
**conclusion** 38:2
**conclusions** 37:21
**condition** 36:1
**conference** 1:14
**confident** 9:15
**confront** 71:2
**confused** 69:16
**Connecticut** 2:10
7:10 8:23 10:21, 24
11:4, 8
**connection** 6:6 30:18
**consider** 38:20
**considerations** 41:13
**considered** 40:12
**considering** 46:3
**consistent** 31:16
**constitutes** 75:10
**contact** 13:11 27:14
29:6, 13 33:25 34:2
65:15
**contacted** 20:17 39:3
65:9
**contacting** 65:6, 18,
19
**contained** 58:7
**Continued** 4:1
**continuing** 44:3
**cop** 17:4 19:18
27:22
**cops** 17:3 25:13
**Corporal** 50:3, 5
**Corps** 47:3, 9, 13, 16
48:7 49:23
**Correct** 31:19 35:14
50:10 51:12, 15 52:8
54:12, 16 63:4 74:5

**corrections** 74:7
**corroborates** 34:11
**Council** 11:3
**counsel** 5:12, 20
71:23
**counter** 53:9
**counting** 25:25
**country** 64:25
**County** 75:4, 20, 21
**couple** 64:24
**course** 8:5, 10 9:4,
10, 11 10:9, 19 12:9,
13 13:11, 13 36:14,
20 39:23 41:12
58:17, 20
**COURT** 1:1 5:3, 5,
13, 20 71:23 75:3
**cover** 13:16
**covering** 34:15
**create** 10:16 33:22
**created** 13:3
**criminal** 7:22
**criticize** 67:7
**criticizing** 66:18
**crowns** 34:22
**cruiser** 17:15
**cuff** 57:24
**cuffs** 57:14, 17, 20, 21,
24 62:2, 6
**currently** 7:7 55:13
**cursor** 34:16, 19
61:1, 12
**cycle** 22:21

**< D >**
**daily** 47:15
**damage** 27:1 63:2
**dangerous** 71:2
**DANIEL** 1:15 2:12
3:4 5:11, 16 6:15
**date** 5:7 48:18
55:21 56:24 74:15
**day** 8:5 10:12 11:16
17:14, 18, 20 18:16
19:2 27:20 33:10
48:20, 23 49:4, 7
51:25 55:9 56:15
68:9
**days** 8:6 10:22

**dealing** 27:13 41:11
42:22 43:21
**debris** 63:13, 15, 17
**decided** 20:3 39:8
42:10 43:18
**decision** 20:1 38:16,
19 42:4 43:11 44:2
**defeat** 14:21 62:22
**Defendant** 1:10 2:17
**definitely** 45:14
**deflect** 15:4
**Delaware** 75:21
**Department** 4:4
6:16 7:10 32:23
38:5, 20 42:3 43:7
44:22 46:24 48:13
49:17 68:14, 19, 21
69:12, 18 70:16
**departments** 66:1
**depend** 71:5, 8, 12
**depict** 28:9
**depicted** 31:3, 16
34:19
**depiction** 26:13
**deponent** 5:10 74:1
**deposition** 1:15 5:4,
8, 24 71:21 72:5
75:7, 10
**DESCRIPTION** 3:10
4:2
**DESROSIERS** 1:5, 6
5:9, 10
**details** 8:24 9:20
**different** 10:13
13:16 17:3 27:23
33:19 41:4, 5, 6
45:14 66:6
**direction** 75:9
**directions** 27:24
**directly** 65:18, 21
66:10 67:20 75:15
**director** 34:1
**Discharge** 3:18, 21,
23 6:7, 9 15:17, 22
19:4, 11, 15 25:2
26:14 28:10, 24 29:3
30:15 31:19 37:22
38:2 44:1, 16 45:22
46:10 49:25 50:2

51:11 59:9, 14, 18
62:15 66:11, 15
**discharged** 22:25
**discharges** 37:3, 11
71:8
**discharging** 26:20
31:7 36:23
**discuss** 8:9
**discussing** 9:8 10:13
26:6
**distributor** 43:4
**DISTRICT** 1:1, 2 5:5
**divided** 57:18
**documents** 72:6
**dog** 49:1
**doing** 13:15 26:5
**door** 25:11 26:9
**double** 12:3, 6, 8, 19
**DOUGLAS** 2:14
46:18
**douglas.hartman@littl
etonjoyce.com** 2:17
**drop** 40:14
**dropped** 39:20
**duly** 5:17 75:5
**DUNCAN** 2:9
**duty** 48:19, 22 49:3
51:15, 25 52:3 56:9,
10, 14, 24, 25 57:25
58:3

**< E >**
**earlier** 19:7
**early** 28:3
**easily** 14:15
**eight** 54:7
**eight-hour** 9:10
**eight-second** 26:12
**either** 30:19 33:14
53:16 65:20 67:8
**eject** 21:5, 15, 17
22:9, 16, 23 52:24
53:3
**ejected** 22:14
**ejecting** 22:13
**ejection** 15:14 52:22
**ejects** 21:20
**Electronic** 71:25
72:2

else's 54:*5*
e-mail 66:*14*
e-mails 43:*1*
employed 7:*8*
employee 75:*13*, *14*
enforcement 67:*3*, *5*
70:*23* 71:*4*, *12*
enjoyed 39:*2* 43:*13*
64:*10*
entail 9:*1*
equipment 56:*23*
Errata 74:*9*
ESQUIRE 2:*3*, *4*, *9*,
*14*
establishment 69:*11*
estimate 54:*15*
Everest 5:*3*
everybody 49:*16*
everyday 44:*22*
evidence 32:*3*
exact 17:*4* 19:*7*, *8*
56:*11* 64:*23* 68:*11*
exactly 17:*8* 28:*5*
58:*25*
Examination 3:*5*, *6*
5:*25* 37:*24*
examine 38:*6* 53:*7*
examined 5:*18*
examining 37:*22*
Excellent 48:*8*
excuse 30:*21* 36:*12*
excused 72:*4*
EXHIBIT 3:*10*, *11*,
*13*, *15*, *17*, *20*, *23* 4:*2*,
*3*, *6*, *9* 25:*6*, *9* 27:*6*
28:*9* 29:*22* 30:*24*, *25*
31:*13* 32:*8*, *9* 33:*4*, *7*
37:*18* 60:*21* 61:*7*, *12*
63:*7* 72:*7*, *8*
expectation 18:*20*
expected 13:*19*
experience 7:*18* 22:*7*,
*12*
experienced 6:*10*
37:*2*
experiencing 37:*10*
40:*14*
expert 48:*6*
explain 21:*12* 44:*8*,

*10*, *11*, *13*
explanation 25:*3*
Explorer 58:*16* 60:*13*
exposed 36:*2*, *3*
Express 49:*19*, *20*
Extractor 21:*16*
eyes 10:*20*

< F >
Facebook 33:*15*
failure 22:*12*
Fair 41:*25*
fairly 51:*2*
fall 14:*15* 53:*2*
familiar 9:*12* 14:*12*
63:*22*
far 10:*3* 71:*7*, *11*
fastened 17:*10*
feature 16:*5*
features 36:*9*
federal 68:*12*
feel 9:*15* 44:*8*
feeling 45:*14*
feet 13:*12*
felt 44:*19*
field 9:*7* 13:*17* 44:*9*
54:*12*
fight 19:*18*
fighting 19:*22*
figure 24:*16* 38:*12*
44:*11*
final 8:*6*
financially 75:*15*
find 17:*2*, *6* 28:*23*
29:*2*
fine 7:*3* 20:*13* 44:*12*
finger 23:*11*, *16*
finish 52:*12*
fire 8:*10* 21:*14* 45:*3*
69:*8*
Firearm 3:*18*, *21*, *23*
8:*1* 10:*8*, *17* 11:*14*
26:*20* 31:*7* 34:*15*
37:*25* 71:*8*
firearms 7:*22* 8:*14*
10:*18* 21:*4* 33:*16*
42:*6*, *15* 43:*2*, *16*
65:*2* 70:*24* 71:*5*
firearm's 36:*2*, *14*

fires 40:*14*
firing 45:*12*
first 8:*5* 10:*12*
17:*13* 19:*10* 20:*20*
24:*6* 33:*13* 34:*5*
37:*22* 39:*17* 46:*19*
48:*25* 51:*4* 56:*1*, *2*
75:*5*
fit 46:*4*
five 13:*13* 65:*10*, *11*
66:*21* 70:*14*
five-minute 60:*2*
flap 57:*15*
flash 26:*17*
fleet 48:*7*
Floor 2:*5* 53:*2*
fob 58:*12* 60:*13*
61:*3*
folks 37:*2* 42:*3* 67:*6*,
*17*, *23*
follow 7:*21* 33:*16*
following 65:*9* 67:*22*
68:*2*
follows 5:*19*
follow-ups 59:*20*
foot 13:*12*
Footage 3:*14*, *15*, *17*,
*20* 4:*6* 23:*23* 24:*4*
28:*1* 37:*23* 38:*6*
61:*7*
force 27:*20*
Ford 58:*16*
foregoing 74:*4*
foreign 36:*10*, *17*
57:*14*
forgive 50:*18*
form 74:*8*
formed 42:*5*
FORSYTH 2:*9* 5:*22*
forsyth@halloransage.
com 2:*11*
forth 22:*1*
forums 33:*16*, *19*
forward 15:*9* 65:*23*
four 8:*6* 47:*3* 48:*1*
57:*7* 63:*13* 69:*5*, *7*
70:*14*, *22*
foyer 24:*1*
frame 15:*9*
free 69:*13*, *17*

Front 4:*7* 15:*2*, *14*,
*15* 16:*20* 19:*19*
23:*20* 25:*10* 26:*9*
30:*6* 35:*5* 56:*18*
58:*1*, *2* 60:*18*, *24*
61:*14*
frozen 29:*17*
FTO 27:*16*, *18* 54:*12*
full 12:*16* 62:*10*, *11*
full-week 8:*5*
fully 8:*5* 21:*17*
22:*15* 23:*3* 34:*7*, *25*
35:*18* 52:*10*, *14*, *18*,
*19*
further 46:*12* 59:*9*
68:*4* 71:*14*, *17* 75:*12*

< G >
Galdenzi 42:*20*
Galls 56:*12*
garage 17:*17*
Gear 51:*9* 56:*13*
Gentleman 5:*22*
25:*18*
getting 15:*7* 16:*9*
19:*24* 36:*14* 40:*12*
41:*13* 42:*18*, *22* 43:*8*
52:*2*
Give 8:*24* 12:*11*
19:*8*
given 12:*24* 74:*6*
75:*11*
glimmer 34:*19*
Glock 41:*1*, *15* 44:*23*,
*24* 45:*9*, *11* 55:*14*, *16*
Glock's 45:*12*
glove 45:*5*
gloves 61:*21*, *22*
go 6:*22*, *23* 7:*11*, *25*
8:*9*, *10* 10:*21* 13:*4*
22:*1* 35:*10* 37:*17*
39:*8* 48:*18* 50:*6*
61:*6* 65:*2* 67:*9*, *15*
70:*7*
goes 15:*6*
going 6:*8* 7:*1* 8:*10*
9:*3* 10:*15* 11:*5*
14:*14* 21:*7* 24:*9*
26:*7*, *9*, *16* 29:*22*
30:*1*, *23* 31:*21* 32:*13*

Case 1:22-cv-16540-PBS Document 83-29 Filed 03/28/24 Page 246 of 439
Deposition of Officer Daniel Witts
Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

*33*:*3*, *19*, *24*  34:*8*
37:*18*  40:*17*, *23*
41:*11*, *12*  42:*17*
44:*13*  52:*13*  61:6
63:6  67:*12*
**Goldhill**  1:*17*  5:*14*
75:*3*, *20*
**Good**  6:2, *3*
**Goodwin**  2:9
**gotten**  62:7
**grab**  15:*3*  20:*1*, *4*
31:6
**grabbed**  24:*18*
**grabs**  15:*8*, *13*, *14*
21:*16*
**graduated**  48:*25*
**graduating**  27:*20*
**grip**  15:*25*  16:*3*, *10*
62:*12*
**ground**  19:*22*  63:*18*
**guides**  12:*12*
**gun**  9:*6*, 7  12:2
13:*3*, 6  14:*13*, *22*
15:*2*, *3*, *6*, *8*, *9*, *10*
17:*25*  18:*3*, *12*  19:9
20:*8*, *11*, *16*, *18*, *19*
21:*14*  22:9  23:*12*, *17*
24:*21*  32:*15*  36:5
37:*11*  40:2, *9*, *24*
44:7  62:2, *3*  64:*10*
67:*14*  69:*1*, *10*, *21*
70:5
**guns**  32:*12*  38:*23*
39:7  40:*17*, *18*  43:*12*
47:*11*  56:2
**guy**  9:*22*  21:*4*
**guys**  9:*3*  10:*15*
27:*13*  36:*16*  42:*21*
43:*18*  44:2  59:*25*
60:*1*  68:*1*
**guy's**  23:*19*

**< H >**
**HAAZ**  2:*4*
**habit**  18:*23*
**half**  8:7  22:*21*
**HALLORAN**  2:*7*, *18*
**hallway**  19:*18*
**hammer**  34:*13*
**hammered**  12:*1*

**Hampshire**  8:*21*  9:*5*,
*10*
**hand**  15:*4*  23:*14*, *17*
61:*18*
**handcuffs**  19:*23*, *24*
25:*13*  57:*1*, *3*, *5*
**handful**  70:*8*
**handgun**  57:*1*, 2, 6
**handled**  42:*24*
**hands**  14:*16*  31:*8*, *15*
**hands-on**  7:*23*
**hanging**  14:*10*  52:*4*
58:*8*, 9
**happen**  19:5  44:*18*
**happened**  19:*14*
24:*17*  25:*3*, *24*  27:*12*
28:2, 5  33:*22*  34:*3*
38:*12*  44:*12*  63:*16*
65:*9*  66:*1*, *19*  68:*25*
**happening**  26:*14*
28:*10*, *25*  29:*4*  31:2
32:*8*
**hardware**  16:*20*
**Hartford**  2:*10*
**HARTMAN**  2:*14*
3:6  6:*18*  7:*1*  24:*23*
37:*4*  46:*16*, *17*, *18*
60:*3*  68:7  71:*17*
72:2
**head**  33:*20*  49:*14*
**heard**  20:6  32:*11*
65:*16*
**hearing**  39:*20*
**held**  5:*8*
**helped**  19:*22*
**helping**  42:*18*
**hey**  20:*10*  41:*14*
66:*14*
**hiding**  17:6
**high**  65:*14*
**higher**  34:*14*  38:*22*
**Hill**  69:*21*  70:*4*
**hinged**  57:*20*, *22*
**hip**  30:2
**hired**  7:*16*
**hits**  53:*11*
**holder**  16:*19*  35:*3*
57:*9*, *10*, *11*, *24*  58:*8*
**holding**  62:*25*
**holds**  57:*17*

**holster**  14:*3*, 7, *11*, *12*,
*13*  15:7, *11*  16:*16*
17:*1*, *9*, *13*, *18*, *25*
18:*11*  19:*10*  20:*9*, *12*,
*16*, *19*  21:2  22:*19*
23:*1*, 6  26:*22*  27:2
30:*3*, *9*, *20*, *21*  31:*22*,
*25*  32:*5*, *14*  34:7, *24*
35:*12*, *16*, *19*  36:5, *9*,
*16*  37:*11*, *15*  39:5
45:*17*, *18*  46:*4*, 7
50:*16*, *18*, *22*, *25*  51:*4*,
*14*, *22*  52:*15*  57:*1*, 2,
*23*  61:*25*  62:*16*, *20*,
*23*  63:*3*, *13*, *22*  67:*12*
71:9
**holstered**  36:*1*, 6, 9
**holstering**  67:*14*
**holsters**  16:*19*  20:*21*,
*23*  50:*8*  57:*13*
**Honorable**  49:*25*
**hood**  15:*1*  23:*8*
30:*11*, *20*  34:*8*, *14*, *19*,
*25*  35:*12*, *20*
**Hughes**  27:*19*
**Hughes's**  27:9
**hundred**  13:2  14:*1*
23:*18*  58:*19*
**HURD**  2:*3*  3:5  6:*1*,
*4*, *20*, *21*, *24*  7:*4*, 6
25:*1*  26:*11*, *21*  28:7
29:*11*  37:6  59:*25*
60:*4*, *11*  61:9  70:*21*
71:*25*
**hurting**  20:*3*

**< I >**
**idea**  22:*18*  41:*17*, *23*
**identification**  72:7
**identify**  25:*8*  27:6
**Image**  4:6  29:*19*, *21*
30:*9*, *13*, *17*, *25*  31:*3*,
*16*, *23*  32:*8*  34:*5*, *11*,
*23*  35:*17*, *22*  60:*23*
**images**  33:*5*
**Immediately**  7:*14*
20:9  25:2  62:*15*
**important**  71:*4*
**impression**  67:*23*

**improperly**  36:*1*, 5
**inch**  22:*21*, 22
**inches**  57:7
**Incident**  4:5  23:*22*,
*23*  27:*12*  28:2  30:*19*
32:2, *16*  33:*1*  37:*23*
38:6  48:*18*  49:9, *11*
51:*11*  53:*15*, *25*  55:*9*,
*22*  56:7, *24*  63:*16*
64:*19*  65:7  68:*10*
69:*3*  70:*11*
**incidents**  36:*12*
64:*15*, *21*  65:*4*
**included**  9:*4*
**including**  38:*10*
**incredible**  24:*19*
**indent**  57:*16*
**indicate**  37:*20*
**indicated**  30:*14*
**indication**  34:6
**indirectly**  75:*15*
**inexplicable**  24:*21*
**initial**  56:*3*
**Initially**  51:*19*
**inside**  15:*8*, *13*  18:*10*,
*14*, *15*  21:5  22:*15*
**Instagram**  33:*14*, *18*
**installed**  40:5
**instance**  22:*11*
**instances**  36:*11*, *23*
**instruct**  10:*16*
**instruction**  12:*12*
**instructions**  12:*17*
**instructor**  8:*22*  10:*8*,
*17*, *19*  36:*15*
**instructors**  42:6, *15*
**instructor's**  36:*21*
**intent**  30:*15*  36:*24*
**interaction**  36:*10*
**interest**  24:*20*
**interested**  75:*15*
**internal**  9:*21*  40:*4*
**interrupt**  6:*18*
**interview**  32:*19*
**interviewed**  59:*11*
**introduce**  6:*14*
**intrusion**  36:*10*, *17*
**investigate**  32:*23*
**investigation**  59:9

64:2
**involve** 8:*3*  10:*10*
**involved** 11:5  36:9
37:*20, 25*  59:8  75:*14*
**issue** 39:*24*  40:*19, 23*
46:*6*
**issued** 11:*21*  13:*3*
14:2, *3*  33:8  36:*16*
50:*18*  56:2, *6*
**issues** 9:*22*
**item** 60:*25*
**its** 17:*25*

**< J >**
**JACQUES** 1:*5*  5:*9*
**Jalyn** 2:*18*
**jams** 21:*18*
**job** 25:*21*
**join** 7:*15*
**joined** 19:*19*
**joining** 8:*12*
**JOYCE** 2:*14*
**Juhola** 42:*14*
**July** 1:*16*  5:7  6:*10*
11:*19*  15:*18*  17:*12*
18:25  19:*14*  33:8
37:*15*  44:*1*  48:*19*
50:*17*  54:*19, 22*  55:*3*
64:*4*  68:*15*
**jump** 38:*1*
**jumped** 37:*21*

**< K >**
**keep** 17:*17*  18:2
35:*10*
**KELLY** 2:*14*
**kept** 61:*4, 21*
**key** 58:*10, 12, 14*
60:*13*  61:*3, 15*
**keys** 58:*1, 10*
**kind** 9:*22*  15:*3*
22:*23*  27:22  30:*5*
41:*6, 24*  43:*1*  45:*24*
56:*10*  58:*7, 14*  68:*11*
**kit** 61:*25*
**kneeling** 13:*15*
**knees** 31:*11*
**know** 12:5  14:*13*
17:*8*  18:*17*  19:*6, 7*
21:*9*  24:*13, 17*  28:*3*

29:*13*  32:*11, 24*
41:22  48:*25*  51:7
52:*13*  54:7  56:*11*
58:*24*  63:*23*  64:*23*
65:*1*  68:*11, 18*
**knowledge** 9:*23*
10:*14*
**knows** 9:*19*
**Kydex** 57:*10, 13*

**< L >**
**late** 46:*20*
**law** 5:*18*  67:*3, 5*
70:*23*  71:*4, 11*
**laws** 7:*21*
**laypeople** 9:*17*
**layperson** 14:*24*
**layperson's** 18:*6*
21:*12*
**leading** 19:*15*
**leads** 25:*11*
**learn** 39:*17*  65:*3*
**learned** 9:*12*
**learning** 7:*21*
**left** 36:2  53:*20*  58:2
60:*18, 19*  61:*14, 18*
**left-hand** 61:*17*
**leg** 26:*18*  60:*19*
61:*14*
**legs** 20:2, *4*  23:*19*
31:*6*
**level** 14:*9*
**levels** 46:*2*
**lever** 15:*8, 9, 11*
**Levy** 2:*18*
**Liberty** 2:*4*
**lieutenant** 20:*10*
24:*13*  42:7  55:*5, 12*
65:*20*
**lieutenant's** 55:*8, 11*
59:*8*
**lifespans** 43:*14*
**lifting** 20:2
**light** 34:*20*  45:*20, 24*
46:*3*
**light-bearing** 45:*17*
**liked** 39:*2*
**line** 29:*18*  35:*25*
36:8  73:*5*

**list** 53:*12*
**listening** 9:*17*
**lists** 33:*25*
**little** 10:*11*  15:*15*
39:5  43:*16*  56:*10*
58:6  59:5
**LITTLETON** 2:*14*
**LLP** 2:*7, 14*
**load** 49:*6, 13, 16*
**loaner** 39:*4*
**lobby** 19:*19, 20, 25*
20:*14*  25:*10*  27:*16*
**local** 69:*1*
**located** 60:*16*  63:*4*
**locater** 63:*3*
**locator** 26:*23*
**locker** 17:*17, 22*  18:2
**lockup** 65:*25*
**long** 48:22  69:*4*
**look** 17:6  18:*14, 15*
53:8, *10*  54:*21*  63:*18*
**looked** 20:8, *12*  24:8
32:*13*
**looking** 25:9  39:*19*
40:*12*  43:7  61:*11*
**looks** 34:*13*  60:*24*
**loose** 58:8, *9*
**lot** 7:*20, 23*  17:*3*
39:7  65:*9*
**loud** 20:*6*
**LT** 20:*11*  66:*4*

**< M >**
**M4** 47:*10, 17, 22*
**M9** 47:*19*
**machine** 47:*11*
**main** 19:*18*
**maintenance** 9:*25*
10:2
**majority** 65:*23*  67:*4*
**making** 34:*12*  43:*11*
**male** 19:*22*
**malfunctions** 9:*22*
**man** 19:*23*
**manage** 53:*4*
**manual** 12:*18, 24*
13:*1, 2, 4, 19, 20*
**manuals** 12:*12*
**manufacturer** 49:*15*
**manufacturers** 41:*6*

**Marine** 47:2, *9, 13,
16*  48:7  49:*23*
**mark** 25:*5*  27:*6*
**MARKED** 3:*10*  4:*2*
29:22  30:*24*  31:*13*
32:*7, 9*  33:*4*  60:*21*
63:*7*
**Market** 2:*5*
**Mass** 64:*24*
**MASSACHUSETTS**
1:2  2:*16*  5:*5*
**matter** 5:*9*  6:*6*
**mean** 13:9  14:7
44:*19*
**means** 75:*8*
**media** 34:*1*  66:*14*
**medium** 33:*12*
**members** 65:*25*  67:2,
*4*  69:*14*  70:*23*
**membership** 69:*17*
70:*4*
**memberships** 69:*14*
**mentioned** 21:*23*
54:*11*  63:2
**metal** 58:*6*
**metallic** 60:*25*
**middle** 57:*17*
**midnight** 65:*22*
**midnights** 52:*3*
**Mike** 55:*19*
**mil** 38:*24*  47:*10*
**mind** 60:*1*
**minds** 67:*24*
**minutes** 24:*9*
**missed** 55:*14*
**Mistakes** 44:*18*
**Mitch** 5:*2*
**Mitchell** 2:*18*
**MLS** 55:*17*
**Mm-hmm** 23:*10*
**model** 41:*14, 17, 21*
55:*14, 15*
**modifications** 15:*21*
16:*12, 17*
**modified** 40:*3*
**module** 16:*7*
**modules** 15:*25*  16:3,
*10*
**moment** 29:*12*  31:*18*
60:*12*

**MONGELUZZI** 2:*3, 18*

**months** 69:*6, 7*
**Montville** 4:*4* 6:*16* 7:*9, 15, 16* 8:*12* 11:*13* 13:*8* 32:*23* 37:*7* 41:*13* 43:*7* 44:*21* 49:*17* 68:*14, 18* 69:*12, 17* 70:*16*
**Montville's** 38:*16*
**morning** 6:*2, 3* 19:*3, 7, 14* 25:*21* 28:*3*
**MOS** 47:*6, 18* 55:*16, 17, 18*
**MOSs** 44:*23*
**motor** 7:*21* 47:*7*
**mounted** 35:*16*
**moving** 34:*23* 35:*17* 42:*10*
**multiple** 17:*2* 38:*7, 14*
**municipality** 48:*16*
**muzzle** 26:*23, 25* 29:*19* 63:*3*

**< N >**
**name** 5:*2* 6:*4, 15* 46:*18* 53:*21, 23* 55:*11* 57:*11* 69:*20*
**narrative** 33:*22*
**narrowly** 26:*17*
**Natalie** 1:*17* 5:*14* 75:*3, 20*
**near** 23:*11, 14, 17* 61:*24*
**need** 40:*20*
**negligence** 67:*14*
**never** 16:*1* 37:*1* 41:*20, 25* 42:*25* 63:*18*
**New** 8:*21* 9:*2, 4, 10* 39:*19, 24* 40:*20* 43:*8, 16* 48:*25* 75:*21*
**nine** 6:*17* 25:*23* 38:*23, 24* 47:*10*
**normal** 9:*24* 10:*2* 19:*16*
**Notary** 1:*18* 75:*4, 20*
**noted** 5:*12* 74:*8*

**notes** 59:*5*
**nothing's** 18:*12*
**notice** 37:*8*
**noticed** 53:*10*
**NUMBER** 3:*10* 4:*2* 5:*5* 55:*14, 15*

**< O >**
**object** 36:*10*
**Objection** 24:*23* 37:*4*
**objects** 36:*17*
**observed** 19:*21*
**obtain** 8:*13*
**obviously** 7:*20*
**occurred** 31:*19* 32:*2* 45:*22*
**offered** 40:*7*
**Office** 2:*15* 25:*12* 55:*5, 8* 59:*8*
**OFFICER** 1:*15* 2:*12* 3:*4* 5:*11, 16* 6:*2, 16* 7:*7, 9* 9:*24* 10:*2* 11:*2, 8, 13* 25:*19* 27:*9, 19, 21, 23* 29:*7* 46:*18* 48:*15* 51:*17, 18, 22* 54:*12* 59:*23* 60:*12* 66:*14* 68:*8, 21* 71:*18*
**officers** 7:*25* 16:*25* 19:*17, 20, 22* 21:*4* 24:*12* 25:*17* 38:*7, 10, 15* 44:*9, 14* 53:*16* 54:*8* 70:*23*
**Officer's** 3:*13* 4:*7* 26:*18* 27:*8*
**Okay** 7:*4* 11:*7* 12:*11* 13:*23* 14:*7* 15:*16* 16:*3* 18:*15* 22:*7, 16* 23:*21* 25:*23* 27:*1* 28:*22* 29:*17* 30:*1* 31:*12* 36:*19* 37:*17* 40:*8* 44:*10* 51:*21* 60:*20* 61:*17* 62:*3, 9* 63:*11, 20* 64:*4* 67:*6* 68:*4* 71:*20*
**old** 38:*23*
**older** 11:*23, 24*
**Once** 11:*8* 19:*23* 20:*7* 21:*3* 35:*8*

45:*13* 48:*6* 55:*4* 67:*12, 21*
**one-handed** 13:*15*
**one-on-one** 67:*16*
**ones** 40:*20* 42:*19* 65:*1*
**one's** 15:*1*
**online** 33:*15* 65:*5* 67:*19, 21*
**on-the-range** 8:*7* 10:*13*
**open** 25:*11*
**operator** 47:*7*
**opinion** 44:*7*
**opportunity** 23:*21* 24:*7* 37:*24*
**order** 14:*21* 71:*24*
**ordering** 40:*17* 42:*25* 50:*11, 14*
**orders** 56:*13* 68:*22*
**original** 15:*18* 42:*22* 50:*17, 22*
**Oscar** 55:*19*
**outside** 20:*4* 69:*11* 70:*12*
**owned** 39:*1*
**owning** 44:*17*

**< P >**
**P.C** 2:*3*
**P220** 9:*3* 38:*21*
**P220Rs** 11:*25*
**P320** 8:*19, 25* 9:*13, 15* 11:*21* 12:*5, 19* 13:*5, 21* 14:*2* 15:*17, 18* 21:*1* 22:*25* 30:*2, 8, 14, 19, 21* 31:*21, 24* 32:*4* 36:*23* 37:*9, 10* 38:*17* 39:*1* 41:*25* 42:*4* 43:*19* 44:*3* 45:*20* 50:*9* 52:*6* 56:*5* 61:*25* 62:*9, 16, 19* 64:*9* 68:*23* 69:*8* 71:*12*
**P320s** 41:*13* 42:*22* 43:*8* 50:*20*
**pack** 19:*19*
**package** 20:*24*
**PAGE** 3:*3, 10* 4:*2*

33:*15, 24* 73:*5*
**pages** 74:*4*
**Palms** 48:*11*
**pants** 61:*24*
**paperwork** 58:*20, 23*
**part** 9:*7* 15:*11* 21:*17, 19* 38:*16* 52:*21* 63:*23* 64:*1* 67:*18*
**participation** 46:*14*
**particular** 17:*20* 18:*16* 63:*21*
**particularly** 16:*25*
**parties** 75:*13*
**pass** 10:*15* 13:*14*
**patrol** 49:*1* 61:*21, 22*
**pay** 69:*15*
**PD** 25:*10* 38:*15* 43:*16*
**PDs** 64:*23, 25* 65:*6, 9, 10*
**Pennsylvania** 1:*19* 2:*5* 75:*4, 20*
**people** 24:*14* 33:*18* 40:*13* 54:*24* 71:*2*
**percent** 13:*2* 14:*1* 23:*18* 58:*19*
**personal** 39:*1, 9, 22* 40:*9* 68:*23* 69:*8* 75:*9*
**personally** 71:*13*
**perspective** 27:*7*
**P-F** 53:*24*
**Philadelphia** 2:*5*
**photo** 38:*8*
**photos** 63:*12, 13*
**Piatt** 33:*25* 34:*2*
**pictures** 38:*14*
**piece** 15:*15* 16:*21*
**pistol** 7:*23* 8:*2, 4, 22* 15:*15, 16, 22* 17:*13* 34:*7, 25* 35:*18* 51:*15, 21* 52:*15*
**pistols** 41:*3, 6, 7*
**Place** 2:*4* 14:*20* 23:*8* 25:*22* 62:*25* 69:*20*
**plain** 17:*7*
**plaintiff** 6:*5*
**Plaintiffs** 1:*7* 2:*7*

plastic  16:*21*  56:*19*
57:*14*
platform  9:*2*
play  26:*16*
played  26:*10*, *13*, *19*
28:*6, 9*  29:*10*  61:*8*
please  6:*14*  57:*12*
71:*25*  72:*2*
plug  26:*24*
pocket  61:*20*
point  19:*10*  27:*23*
41:*10*  43:*7*
pointing  26:*2, 4*  35:*1,*
*4, 11, 15*
points  13:*14*  56:*20*
Police  3:*13*  4:*4*  6:*16*
7:*9, 12, 13, 14, 25*
11:*2*  16:*25*  27:*20*
32:*23*  43:*7*  44:*21*
46:*23*  48:*13, 15*
49:*17*  66:*1*  68:*14, 18*
69:*12, 17*  70:*16, 22*
pop  21:*20*
popped  65:*5*
popping  33:*15, 17*
popular  28:*20*
port  15:*14*  52:*22*
possession  58:*22*
possible  29:*15*
possibly  9:*8*
Post  2:*15*  8:*23*
10:*21, 25*  11:*6, 11*
13:*10*
posting  54:*24*
post-marked  72:*6*
posts  67:*22*
post-upgrade  40:*18*
pouch  58:*8*
PR  33:*25*
practice  18:*18*
present  5:*12*  24:*10*
press  18:*4, 6*
pretty  10:*16*  21:*17*
60:*19*  67:*13*  68:*2*
pre-upgrade  40:*2*
primer  53:*11*
prior  15:*22*  46:*6, 9,*
*23*  48:*12*  64:*4*
probably  38:*11*  41:*5*
49:*5*

problem  44:*17*  45:*2*
60:*3*
proceed  7:*5*
process  38:*19*  42:*11,*
*18*
produced  63:*8*
Professional  1:*17*
program  39:*13*
40:*13*  42:*8*
prone  36:*16*
properly  30:*8, 20*
31:*24*  32:*4*  36:*8*
propounded  74:*7*
protect  33:*23*  71:*3*
prototype  41:*22*
providing  37:*23*
Public  1:*18*  27:*15*
66:*18*  67:*3*  71:*3*
75:*4, 20*
pull  15:*10*
pulled  15:*7*  52:*14*
pulling  24:*22*  52:*18*
pulls  21:*16*
purposes  72:*7*
put  9:*8*  16:*21*  17:*13,*
*16, 17, 22*  18:*1, 3*
35:*7*  39:*5, 24*  50:*24*
70:*25*  71:*1*
putting  18:*12*  19:*10*
44:*8*  53:*9*

< Q >
Quaker  69:*21*  70:*4*
qualifications  48:*4*
qualified  48:*2*
qualify  13:*6, 9*  47:*21,*
*24*  48:*5*
question  46:*22*  50:*7*
52:*12*  64:*11*
questions  6:*9*  46:*13*
53:*12, 14*  59:*22*  60:*1*
68:*5*  70:*18*  71:*14, 18*
74:*6*
quick  20:*21*  46:*22*
51:*2*  58:*5*

< R >
Radford  55:*12*  65:*21*
rail  12:*1*

range  32:*12*  39:*4*
rank  7:*8*  50:*2*
RDR  51:*9*
reach  32:*17*  66:*13*
67:*8*
reached  31:*5*  67:*7*
reaching  23:*19*
read  5:*23*  74:*4*
reading  67:*21*
reads  36:*8*
ready  5:*21*
realizing  32:*15*
really  53:*8, 10*
rear  21:*16*
reason  28:*24*  29:*2*
recall  12:*7, 9, 22*
26:*14*  28:*4, 10*  29:*9,*
*15*  36:*18*  39:*15, 23*
40:*6*  42:*21*  54:*10*
63:*15*  69:*9*
receive  47:*1*  66:*17*
received  13:*5*  37:*1*
receiving  37:*8*
recertified  8:*23*
recess  60:*8*
recoil  38:*25*
recollection  28:*2*
record  5:*2, 13, 23*
60:*7, 10*  67:*17*  71:*22*
75:*10*
recorded  1:*14*  75:*7*
recording  24:*7*
recordings  23:*25*
red  29:*7*
redundant  37:*13*
REFERENCED  3:*10*
4:*2*
referring  21:*23*
reflection  60:*25*
refresh  28:*1*
refusing  31:*5*
regarding  37:*21*
59:*14, 17*
regret  37:*20*
regular  43:*3*  67:*2, 4*
regularly  11:*14, 18*
re-holster  18:*5*
reinsert  16:*21*
Reisbord  2:*18*  5:*2*

related  8:*14*
relates  8:*2*
relations  34:*1*
relative  75:*12, 13*
release  20:*21*  56:*20*
58:*5*
released  33:*1*  55:*5*
67:*13*
relied  12:*20*  13:*24*
remember  12:*22*
19:*6*  29:*9*  49:*15*
53:*9*  55:*7*  63:*17*
69:*4*
remnants  32:*13*
remotely  5:*18*
remove  14:*10*  16:*20*
62:*20*
removed  51:*21*  62:*19*
replaced  16:*1*
Report  4:*9*  19:*16*
59:*13, 17*  63:*7, 11*
reported  66:*10*
Reporter  1:*17*  5:*13,*
*20*  71:*23*  75:*3*
Reporting  5:*3*
reports  19:*17*
represent  46:*19*
representation  12:*20*
13:*24*  40:*22*
representations  12:*25*
represented  63:*12*
Representing  2:*7, 12,*
*17*
represents  6:*5*
require  47:*18*
reserve  5:*23*
resident  42:*8*
resisting  19:*25*
responsibility  44:*17*
rest  10:*12*
retained  5:*3*  23:*5*
retention  14:*8, 20*
23:*5, 6*  34:*8, 25*
35:*12, 19*  46:*1, 2*
57:*18*  62:*22, 24*
retentions  14:*18*
retired  42:*14*
review  23:*22*  38:*11*
59:*5, 7*

Case 1:22-cv-01640-PBS Document 83-29 Filed 03/28/24 Page 250 of 439
Deposition of Officer Daniel Witts
Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

reviewed 38:7, 9
54:15 55:4
rhurd@smbb.com 2:6
rid 11:23
ridiculing 66:18
rifle 7:23
right 5:23 6:13
10:5 11:19 16:7
17:7 20:22, 23 21:3,
19 23:1 25:14, 24
29:7, 12, 18 31:4, 7,
10, 11 32:10 34:21
40:14, 24 42:16 43:4,
9 46:13 51:3 53:20
60:4, 14, 19 61:10
62:4, 17, 25 63:21
69:16
ring 58:9, 11
road 25:21
rod 69:10, 21 70:5
room 19:16 25:24
29:3 54:5
ropes 27:24
round 13:13 18:4, 9
21:5, 15, 18, 19, 22, 25
32:13
rounds 38:24 43:15
routine 18:23
run 19:20 39:5
running 19:17
RYAN 2:3 6:4, 18
7:2 46:16

< S >
Safariland 14:5, 6, 17
16:25 20:22 23:6
30:3 31:22 32:5
36:15 37:15 46:2, 4
50:8
safeties 9:6 14:11, 20,
23 39:24
safety 14:9 40:5
SAGE 2:7, 18
SALTZ 2:3, 18
SAM 2:4
Samantha 33:25 34:2
sat 20:16
SAUER 1:9 2:17
4:3 5:10 6:6 11:21

32:16, 17, 19, 22 33:1,
8 37:23 46:19 58:18
Sauer's 37:19 39:12
saw 19:17 29:24
33:5, 9, 10, 14, 15
53:15 54:9
saying 34:6 37:2
67:13
says 34:24 36:1
Screen 3:15, 17, 20,
23 25:6 29:24 30:23
31:1, 13 60:21
scroll 33:24
seated 23:3 30:20
31:25 32:4 34:7
35:19
second 27:5, 19
34:23 48:24 61:10
seconds 29:13, 17
secretary's 25:12
secured 30:8 31:25
32:4 34:8 35:19
securely 46:4
security 23:22
see 13:17 20:8
21:21 24:15 25:6
26:17 27:25 29:18
30:13, 17 31:6 32:3,
14, 25 33:12 34:5, 10,
18 35:22 54:3, 24
60:21, 24, 25 61:12
63:13 65:6, 8 67:19
seeing 24:20 33:17
55:6 63:15, 17 65:5
seen 28:21 30:18
36:11 41:24, 25 63:8
send 37:14
sending 33:18
senior 27:21, 23
sent 9:3 33:14
38:14 39:3, 22 40:1,
2 43:1 65:21
separate 51:6
Sergeant 25:20
42:14, 20, 24 43:25
50:13 51:24 53:20,
22 56:13 65:22
68:21
sergeants 24:14

sergeant's 26:8
series 14:6
serve 48:15
set 57:1, 2 58:1
62:1 67:17
seven 29:17
seven-second 28:8
share 37:18
sharp 47:25
Sheet 74:9
shell 21:24 52:6, 21,
24 53:7
Shepherd 42:20, 24
50:13 51:24
Shepherd's 43:25
68:21
shift 11:15 18:25
19:2, 11 25:13
shoot 8:10 13:13, 14
shooter 47:25
shooting 10:13, 14
13:11 39:2, 7 45:16
69:11
short 51:4
Shortly 55:10
Shot 3:16, 18, 21, 23
8:8 17:5 29:24
30:24 31:1, 13 39:3,
4, 6 41:1, 4, 5 43:13,
15
shotgun 7:23
shoulders 20:2, 3
show 25:5 27:5, 24
29:21 30:23, 25
31:12 32:7 33:3
60:20 61:6 63:6
showed 39:23
side 21:15 25:15
26:8 53:17 61:17, 21
Sierra 55:19
SIG 1:9 2:17 4:3
5:10 6:6 8:18, 20
10:4, 20 11:21 13:3
16:4, 10, 14 32:16, 17,
19, 22, 25 33:7 34:6,
11, 24 35:18 36:13,
19, 22 37:2, 9, 19, 23
39:3, 12 40:6 41:10
42:22 43:4, 23 45:14

46:19 58:18 64:5, 7
67:12, 25
sign 5:23
Signature 74:15
Sigs 11:23, 24
Sig's 33:21 36:4
40:22
similar 65:7
single 11:16 12:6
45:8
sir 16:8 17:21, 24
18:2, 22, 24 22:10
23:2, 4, 7, 10, 13 24:2,
25 25:7, 16 26:1, 15
28:11 29:1, 5, 20, 25
30:4, 7 31:17, 20
33:6 34:4, 17, 21
35:13 38:18 39:14,
16 40:6, 10, 15, 25
41:16, 19, 23 43:5, 10,
20 45:23 46:8, 11, 22,
25 47:14, 23 48:3, 14,
17, 21 49:12, 18, 21,
24 50:1, 4, 15, 21
51:13, 16 52:7, 9, 16,
23 53:18 54:6, 17
55:20 56:8, 22 57:4
58:21 59:4, 15, 21
61:2, 5, 13 62:5, 14
63:1, 5, 10, 14 64:8,
10, 12, 14, 17 65:12
66:8, 12, 16, 20, 22
67:1 68:17 69:19, 24
70:20 71:6, 10, 19
sit 62:2
sitting 52:19 71:9
situations 70:25 71:1
six 29:13 69:5, 7
size 62:9, 10, 11, 14
slid 51:14
slide 18:9 20:22
22:20, 22 52:10, 14
58:5 62:23
sliding 18:8
slightly 57:6
slow 45:12
slowly 18:8
smaller 62:12, 14
smell 20:7 32:11

smoke  20:7, 8  32:14
snap  52:17
social  66:13
solely  13:4
somebody  6:24
33:14  43:22
soon  52:18
sorry  37:17  46:20
52:13  61:11
sourced  50:9  51:7
sources  68:19
South  2:15
speak  65:25  67:16
Specialist  2:18
specifically  8:1  9:1
12:10
specificity  64:22
speed  45:15
spell  53:23
spent  21:24
spoke  66:3
spot  17:5
Spring  25:20
springs  16:1
Square  2:9, 15
stand  10:25  60:6
standard  13:10  18:18
Standards  11:2
standing  13:15
start  18:25  49:3
54:23
started  19:3  42:18
52:18  54:25  55:6
67:21
state  42:8, 10, 12
48:16
Statement  4:3  32:25
33:4, 8, 25  34:11
35:25  36:4  37:19
67:24  68:1, 2
STATES  1:1  47:2
stating  19:18
stay  11:10
stenographic  5:13
stenographically  75:7
step  13:18
stepped  20:7
stick  35:10  43:18
sticking  21:18, 19, 21

52:22  61:22
sticky  35:9
stills  53:16
stipulations  6:19  7:2
stopped  26:10, 19
28:6  29:10  61:8
67:21, 22
stops  15:6
store  69:1
stored  59:2
stovepipe  21:9, 13
22:8, 12
straight  67:17
strap  15:5  22:20
35:6
Streamlight  45:25
55:22  56:1
Street  2:5, 10
Strike  30:24  43:6
49:2  59:16  68:13
strip  10:2
stripes  29:7
stripping  9:6, 7
struggle  14:14
stuff  33:16
style  14:19
subdue  19:23
subsequent  54:19
substance  74:8
suggest  30:19  32:3
suggests  31:24  35:23
Suite  2:15
Sumpf  53:22
S-U-M-P-F  53:24
supplied  16:13  35:18
supplies  20:22
supposed  21:15  23:9
35:7
Sure  6:20  18:4, 9, 12,
17, 19  20:10  21:6
23:16, 18  24:13
29:16  58:25  59:6, 24
Surveillance  3:11, 15,
17, 20  4:6  23:22
24:7  61:7
suspect  14:15  20:14
24:18  25:12, 14, 25
26:7  27:13  31:4
53:17, 20

swear  5:14
sworn  5:18  75:6
system  9:23  33:23
systems  16:23  62:22,
24

< T >
tab  45:6, 9, 11, 12
tabbed  41:8, 15, 18,
21  42:1  44:24  45:3
table  53:3
Tactical  42:24  43:3,
22, 24  50:9
take  9:14  13:18  18:3
19:9, 13  20:18, 19
21:1  46:20  60:1
take-home  17:15
taken  39:25  40:20
talk  17:12  56:9
talked  65:17  66:4, 5
Talking  54:14  60:13
teaches  27:22
techniques  10:14
Tell  7:18  8:1, 16
13:20  14:23  19:13
31:2  32:8  35:2
36:15, 22  38:19
64:21, 25  66:6
ten  28:15, 16, 18
65:13, 14, 15  66:23
tend  18:14
term  21:22  22:6
terms  14:24  18:7
21:12, 25
test  39:2
testified  5:19  55:13
testify  75:6
testimony  31:15
75:11
Thank  7:11  46:14,
15, 16  50:16  55:21
59:23, 24  68:5, 6
70:19, 20  71:14, 16,
18, 19
thing  15:24  16:18
35:4  56:25  62:1
things  7:24  13:16
16:4
think  7:2  13:22
21:25  26:6  28:20

42:16  49:19  52:3
55:3  56:12  65:15
third  35:17
thought  44:15  65:8
three  9:3  11:9
14:20  42:6  46:2
Thursday  1:15
tie  35:9
tighten  35:8
time  5:8  8:8  15:17
18:25  19:4, 7, 8
26:16  27:14  28:4
35:7  37:18  38:15
39:18  42:7  43:15, 21
46:20  49:23  53:25
56:1, 6  60:6, 9  67:9
71:18, 21
times  28:12, 18, 21,
23  38:10  54:15, 21
55:2  70:8, 10
timestamp  27:25
35:4
TLR-1  55:24, 25
56:7
today  6:9  46:14, 20
66:7
Today's  5:7
told  12:5  39:12
40:19  41:20  66:7
top  15:2  18:8  34:21
49:14  57:16  61:22
63:20
touch  20:11
touching  24:22
tourniquet  16:19, 22
17:4, 7, 10  30:5  35:3,
8, 15  50:24  51:3, 8
61:25
tourniquets  35:5
town  48:16  69:14, 20
TR-1  45:25
trade  69:2
traded  69:1
trained  47:13
training  7:19, 20, 22,
23, 24  8:2, 7, 13
10:23  11:3  46:23
47:1, 9  48:12, 13
54:12  56:3  70:12

Deposition of Officer Daniel Witts      Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

**trainings** 67:*9, 15*
  70:2, *3*
**transcribed** 75:*8*
**transcript** 71:*24*
**transcription** 74:*5*
  75:*9*
**trigger** 13:*20, 25*
  23:*12* 24:*22* 36:2, *11*
  40:*4* 41:*8, 15, 18, 21*
  42:*1* 44:*25* 45:*3, 9,*
  *12*
**triple** 14:*19* 23:*6*
**trooper** 42:*8, 9, 12*
**truck** 61:*15*
**true** 75:*10*
**trust** 44:*13* 64:7, *9,*
  *11*
**trusted** 12:*25* 40:*22*
**truth** 75:*6*
**try** 33:*21*
**trying** 33:*22* 38:*11*
  53:*13*
**tucked** 57:*8*
**turned** 20:*9*
**twice** 53:*14*
**two** 10:*22* 19:*21*
  21:*25* 24:*13* 25:*16*
  42:*19* 53:*16* 56:*19*
**two-handed** 13:*16*
**type** 7:*19* 12:*11*
  14:*18* 37:*8* 40:*23*
  49:*13* 68:*8, 15*
**types** 41:*4*
**Typical** 7:*24*

**< U >**
**U.S** 5:*5*
**UGHETTA** 2:*14*
**ultimately** 19:*4* 62:*19*
**Um** 28:*14*
**understand** 11:*1*
  14:*25*
**understanding** 40:*16*
**unfortunately** 71:*1*
**unintended** 6:7, *9*
  15:*22* 26:*14* 28:*10*
  37:*3, 10* 46:*9* 66:*11*
**unit** 20:*19* 48:*8*
  62:*17*

**UNITED** 1:*1* 47:*2*
**unknown** 71:*1*
**untended** 44:*1*
**unturning** 35:*10*
**upgrade** 39:*13* 40:*13*
  43:*17*
**upgrades** 40:*21*
**upper** 65:*24*
**use** 10:*14* 14:*14*
  44:*22*
**use-of-force** 7:*24*
**users** 37:*9*
**user's** 36:*24*
**uses** 16:*20*
**usual** 6:*19* 7:*2*
**usually** 18:*3, 18* 52:*3*
  61:*20*
**utilized** 70:*4*

**< V >**
**vehicle** 7:*22*
**Velcro** 56:*17*
**verbal** 19:*24*
**versus** 5:*10*
**vest** 49:*6, 13, 16*
**vicinity** 61:*24*
**video** 1:*14* 2:*18*
  3:*11* 5:*4* 23:*25*
  24:*11, 12, 14, 20*
  26:*10, 12, 19* 27:*5, 6*
  28:*6, 8, 13, 17* 29:*10,*
  *24* 38:*13* 54:*3, 4, 22*
  55:*3* 59:*7* 61:*8* 65:*7*
  67:*13* 70:*15* 71:*21*
**VIDEOGRAPHER**
  5:*1, 3* 60:*6, 9* 71:*20*
**videos** 28:*23* 38:*8*
  53:*15* 54:*14, 25* 68:*2*
**view** 17:*7* 25:*15*
  55:*2, 7*
**views** 54:*18*
**visible** 30:*6*
**voicemail** 65:*21*
**voluntary** 39:*13*
  40:*13*
**vs** 1:*8*
**vulnerable** 36:*2, 3*

**< W >**

**walk** 14:*10* 26:*9*
  31:*5*
**walking** 19:*25*
**wall** 24:*1*
**want** 6:*19, 24* 13:*18*
  45:*3* 56:*9* 63:*20*
**wanted** 24:*15, 16*
  38:*22, 24* 43:*16* 65:*8*
**warning** 37:*9, 14*
**watch** 24:*7, 10* 37:*2*
**watched** 28:*13*
**watching** 28:*22*
  54:*25*
**way** 16:*22* 17:*4, 5,*
  *17* 27:*22* 28:*16*
  29:*14* 35:*23* 41:*22*
**weapon** 9:*20, 21, 23*
  10:*1* 12:*17* 16:*23*
  21:*6, 8, 18* 33:*23*
  47:*15* 55:*23* 56:*1*
  57:*24* 68:*25*
**weapons** 46:*23*
  47:*12* 48:*12*
**wear** 49:*16*
**wearing** 48:*19* 56:*14,*
  *15*
**websites** 17:*3*
**weight** 13:*20, 25*
**well** 43:*13* 51:*10*
**went** 7:*13* 8:*18, 20*
  9:*5* 10:*4, 8* 12:*7, 10,*
  *12, 14, 16* 20:*15*
  23:*17* 24:*21* 32:*10*
  36:*20* 39:*2, 20* 40:*8,*
  *9* 42:*9* 51:*12* 56:*3*
  58:*17*
**we're** 14:*14* 25:*8*
  26:*6* 70:*25*
**we've** 41:*24*
**whatsoever** 32:*3*
  66:*10*
**white** 29:*18* 35:*4, 6*
**WITNESS** 3:*3* 5:*15,*
  *17* 24:*25* 26:*20* 37:*5*
  71:*19* 72:*4* 75:*5, 11*
**WITTS** 1:*15* 2:*12*
  3:*4* 5:*11, 16* 6:*2, 15*
  7:*7* 60:*12* 66:*15*
**word** 21:*23*

**work** 11:*16* 14:*24*
  17:*16, 18* 53:*5*
**working** 19:*16* 25:*13*
**works** 52:*3*
**worn** 27:*8*
**worth** 13:*13*
**wrapped** 31:*10*
**wrists** 20:*3*
**write** 59:*13, 17*
**written** 53:*12* 59:*13*
**wrong** 50:*19*

**< Y >**
**yeah** 11:*15* 12:*14*
  15:*13* 17:*2* 24:*16*
  27:*14* 38:*22* 40:*19*
  41:*9* 57:*18* 66:*24*
**year** 48:*2* 49:*3* 51:*1*
  70:*8*
**years** 6:*17* 11:*9*
  47:*3* 48:*1*
**yellow** 25:*18*
**Yep** 6:*12* 9:*14, 16*
  10:*6* 11:*17, 20* 12:*4*
  14:*1* 16:*6* 20:*12*
  22:*4, 6* 24:*5* 51:*6*
  57:*19* 60:*15* 62:*18*
**YOLETTE** 1:*5* 5:*9*
**Youtube** 54:*24*

**< Z >**
**zoom** 30:*1* 31:*21*
  34:*8* 61:*11* 63:*20*
**zooming** 60:*23*

## WORD LIST

**< 0 >**
**02109** (1)
**06103** (1)

**< 1 >**
**1** (6)
**1:22-CV-11674-FDS** (1)
**1:22-CV-16674-FDS** (1)
**10** (1)
**10:22** (2)
**11** (1)
**11:25** (1)
**11:30** (1)
**11:35** (1)
**11:47** (2)
**11th** (1)
**140** (1)
**15** (1)
**1650** (1)
**17** (1)
**18** (1)
**19** (2)
**19103** (1)

**< 2 >**
**2** (4)
**20** (1)
**2000** (1)
**2007** (1)
**2011** (1)
**2015** (3)
**2018** (1)
**2019** (10)
**2020** (3)
**2023** (15)
**2024** (2)
**21** (1)
**215** (1)
**220** (1)
**225** (1)
**23** (3)
**240** (1)
**249** (1)
**24th** (9)
**25** (1)

**284-4206** (1)
**29** (1)
**297-4696** (1)

**< 3 >**
**3** (2)
**30** (6)
**301** (1)
**31st** (2)
**320** (4)
**320s** (1)
**3531** (2)

**< 4 >**
**4** (5)
**40** (5)
**40-hour** (3)
**45** (3)
**45-cal** (1)
**46** (1)

**< 5 >**
**5** (4)
**50** (3)
**52nd** (1)

**< 6 >**
**6** (4)
**60** (1)
**6000** (1)
**60-round** (2)
**617** (1)
**68** (1)

**< 7 >**
**7** (5)
**7:50** (1)
**70** (1)
**72/25** (1)
**72/27** (1)
**72/29** (1)
**72/30** (1)
**72/31** (1)
**72/32** (1)
**72/33** (1)
**72/60** (1)
**72/63** (1)

**< 8 >**

**8** (2)
**800** (1)
**860** (1)
**8-hour** (1)

**< 9 >**
**9** (3)
**9:03** (1)
**910-4765** (1)

**< A >**
**a.m** (3)
**AAA** (2)
**able** (3)
**Absolutely** (1)
**academy** (10)
**account** (1)
**accuracy** (1)
**accurate** (4)
**accurately** (1)
**ACKNOWLEDGMENT** (1)
**acronym** (1)
**acting** (2)
**action** (7)
**activate** (1)
**activated** (2)
**active** (1)
**actuation** (1)
**addendums** (1)
**additional** (5)
**advertises** (1)
**affix** (1)
**affixed** (1)
**agency** (2)
**ago** (1)
**agree** (7)
**agreeable** (2)
**allow** (2)
**ammunition** (4)
**amount** (1)
**annual** (2)
**answer** (1)
**answered** (3)
**answers** (1)
**anybody** (8)
**anyone's** (1)
**apart** (1)
**apologies** (1)

**apologize** (1)
**apply** (1)
**area** (2)
**arm** (1)
**Armor** (2)
**armorer** (5)
**armorer's** (10)
**armory** (9)
**armory's** (1)
**arms** (2)
**arrow** (3)
**aside** (1)
**asked** (1)
**asking** (2)
**assist** (1)
**assistance** (2)
**assume** (3)
**Asylum** (1)
**Atlantic** (5)
**attached** (2)
**attachment** (1)
**attempt** (1)
**attempted** (1)
**attorney** (1)
**attorneys** (2)
**authorized** (1)
**available** (2)
**aware** (5)

**< B >**
**back** (28)
**bad** (1)
**bang** (2)
**barrels** (1)
**Based** (2)
**bashing** (1)
**basic** (1)
**basis** (1)
**becoming** (1)
**believe** (28)
**belong** (1)
**belt** (14)
**belts** (1)
**benches** (1)
**bend** (1)
**BENDESKY** (2)
**bends** (1)
**benefits** (1)
**Benjamin** (1)

Deposition of Officer Daniel Witts                    Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

bent  (1)
Beretta  (1)
better  (1)
bias  (1)
bit  (6)
blame  (2)
Blanchette  (2)
blast  (1)
block  (3)
blown  (1)
Body  (13)
bolt  (2)
boot  (2)
Boston  (1)
bottom  (7)
brand  (2)
brass  (4)
breach  (1)
break  (3)
breakdown  (1)
bring  (2)
bringing  (1)
brought  (3)
Brown  (1)
buckle  (2)
building  (3)
built  (1)
bullet  (1)
bulletin  (3)
bunch  (1)
butt  (1)
buy  (1)

< C >
California  (1)
call  (2)
called  (3)
calling  (1)
calls  (1)
Camera  (10)
cameras  (1)
camp  (2)
capacity  (1)
caption  (4)
car  (3)
care  (2)
carefully  (2)
cargo  (1)
caring  (1)

carries  (1)
carry  (9)
carrying  (4)
CASE  (1)
Case/Incident  (3)
casing  (12)
Castle  (1)
CAT  (1)
caught  (1)
cause  (2)
caused  (1)
ceiling  (1)
center  (2)
certain  (1)
certificate  (1)
certification  (1)
certifications  (1)
certified  (8)
certify  (4)
certs  (1)
chain  (1)
chamber  (5)
chance  (2)
change  (4)
changed  (2)
changes  (1)
charge  (2)
check  (3)
Chester  (2)
chief  (8)
CIVIL  (1)
clarification  (1)
class  (2)
classroom  (6)
CLB  (1)
cleanings  (1)
clear  (2)
click  (2)
Clip  (3)
clips  (1)
close  (3)
closed  (7)
closer  (1)
closest  (1)
close-up  (1)
Club  (2)
clubs  (1)
Colt  (1)
come  (6)

comes  (1)
comfort  (1)
comfortable  (1)
coming  (10)
command  (1)
commencing  (1)
comments  (1)
committee  (1)
commonly  (1)
Commonwealth  (1)
communication  (2)
communications  (2)
complaint  (1)
completely  (1)
computer-aided  (1)
concerned  (1)
concerns  (1)
concluded  (1)
concludes  (1)
conclusion  (1)
conclusions  (1)
condition  (1)
conference  (1)
confident  (1)
confront  (1)
confused  (1)
Connecticut  (7)
connection  (2)
consider  (1)
considerations  (1)
considered  (1)
considering  (1)
consistent  (1)
constitutes  (1)
contact  (7)
contacted  (3)
contacting  (3)
contained  (1)
Continued  (1)
continuing  (1)
cop  (3)
cops  (2)
Corporal  (2)
Corps  (6)
Correct  (10)
corrections  (1)
corroborates  (1)
Council  (1)
counsel  (3)

counter  (1)
counting  (1)
country  (1)
County  (3)
couple  (1)
course  (17)
COURT  (7)
cover  (1)
covering  (1)
create  (1)
created  (1)
criminal  (1)
criticize  (1)
criticizing  (1)
crowns  (1)
cruiser  (1)
cuff  (1)
cuffs  (7)
currently  (1)
cursor  (4)
cycle  (2)

< D >
daily  (1)
damage  (2)
dangerous  (1)
DANIEL  (6)
date  (5)
day  (18)
days  (2)
dealing  (4)
debris  (3)
decided  (4)
decision  (6)
defeat  (2)
Defendant  (2)
definitely  (1)
deflect  (1)
Delaware  (1)
Department  (18)
departments  (1)
depend  (3)
depict  (1)
depicted  (3)
depiction  (1)
deponent  (2)
deposition  (8)
DESCRIPTION  (2)
DESROSIERS  (4)

Deposition of Officer Daniel Witts                    Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

| | | | |
|---|---|---|---|
| details *(2)* | enjoyed *(3)* | feet *(1)* | frame *(1)* |
| different *(10)* | entail *(1)* | felt *(1)* | free *(2)* |
| direction *(1)* | equipment *(1)* | field *(4)* | Front *(17)* |
| directions *(1)* | Errata *(1)* | fight *(1)* | frozen *(1)* |
| directly *(5)* | ESQUIRE *(4)* | fighting *(1)* | FTO *(3)* |
| director *(1)* | establishment *(1)* | figure *(3)* | full *(3)* |
| Discharge *(32)* | estimate *(1)* | final *(1)* | full-week *(1)* |
| discharged *(1)* | Everest *(1)* | financially *(1)* | fully *(11)* |
| discharges *(3)* | everybody *(1)* | find *(4)* | further *(6)* |
| discharging *(3)* | everyday *(1)* | fine *(3)* | |
| discuss *(1)* | evidence *(1)* | finger *(2)* | < G > |
| discussing *(3)* | exact *(6)* | finish *(1)* | Galdenzi *(1)* |
| distributor *(1)* | exactly *(3)* | fire *(4)* | Galls *(1)* |
| DISTRICT *(3)* | Examination *(4)* | Firearm *(12)* | garage *(1)* |
| divided *(1)* | examine *(1)* | firearms *(12)* | Gear *(2)* |
| documents *(1)* | examined *(1)* | firearm's *(2)* | Gentleman *(2)* |
| dog *(1)* | examining *(1)* | fires *(1)* | getting *(10)* |
| doing *(2)* | Excellent *(1)* | firing *(1)* | Give *(3)* |
| door *(2)* | excuse *(2)* | first *(16)* | given *(3)* |
| double *(4)* | excused *(1)* | fit *(1)* | glimmer *(1)* |
| DOUGLAS *(2)* | EXHIBIT *(30)* | five *(5)* | Glock *(8)* |
| douglas.hartman@littl | expectation *(1)* | five-minute *(1)* | Glock's *(1)* |
| etonjoyce.com *(1)* | expected *(1)* | flap *(1)* | glove *(1)* |
| drop *(1)* | experience *(3)* | flash *(1)* | gloves *(2)* |
| dropped *(1)* | experienced *(2)* | fleet *(1)* | go *(19)* |
| duly *(2)* | experiencing *(2)* | Floor *(2)* | goes *(1)* |
| DUNCAN *(1)* | expert *(1)* | fob *(3)* | going *(32)* |
| duty *(13)* | explain *(5)* | folks *(5)* | Goldhill *(4)* |
| | explanation *(1)* | follow *(2)* | Good *(2)* |
| < E > | Explorer *(2)* | following *(3)* | Goodwin *(1)* |
| earlier *(1)* | exposed *(2)* | follows *(1)* | gotten *(1)* |
| early *(1)* | Express *(2)* | follow-ups *(1)* | grab *(4)* |
| easily *(1)* | Extractor *(1)* | foot *(1)* | grabbed *(1)* |
| eight *(1)* | eyes *(1)* | Footage *(11)* | grabs *(4)* |
| eight-hour *(1)* | | force *(1)* | graduated *(1)* |
| eight-second *(1)* | < F > | Ford *(1)* | graduating *(1)* |
| either *(5)* | Facebook *(1)* | foregoing *(1)* | grip *(4)* |
| eject *(8)* | failure *(1)* | foreign *(3)* | ground *(2)* |
| ejected *(1)* | Fair *(1)* | forgive *(1)* | guides *(1)* |
| ejecting *(1)* | fairly *(1)* | form *(1)* | gun *(43)* |
| ejection *(2)* | fall *(2)* | formed *(1)* | guns *(8)* |
| ejects *(1)* | familiar *(3)* | FORSYTH *(2)* | guy *(2)* |
| Electronic *(2)* | far *(3)* | forsyth@halloransage. | guys *(10)* |
| else's *(1)* | fastened *(1)* | com *(1)* | guy's *(1)* |
| e-mail *(1)* | feature *(1)* | forth *(1)* | |
| e-mails *(1)* | features *(1)* | forums *(2)* | < H > |
| employed *(1)* | federal *(1)* | forward *(2)* | HAAZ *(1)* |
| employee *(2)* | feel *(2)* | four *(9)* | habit *(1)* |
| enforcement *(5)* | feeling *(1)* | foyer *(1)* | half *(3)* |

Deposition of Officer Daniel Witts                    Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

**HALLORAN** *(2)*
**hallway** *(1)*
**hammer** *(1)*
**hammered** *(1)*
**Hampshire** *(3)*
**hand** *(4)*
**handcuffs** *(6)*
**handful** *(1)*
**handgun** *(3)*
**handled** *(1)*
**hands** *(3)*
**hands-on** *(1)*
**hanging** *(4)*
**happen** *(2)*
**happened** *(16)*
**happening** *(6)*
**hardware** *(1)*
**Hartford** *(1)*
**HARTMAN** *(13)*
**head** *(2)*
**heard** *(3)*
**hearing** *(1)*
**held** *(1)*
**helped** *(1)*
**helping** *(1)*
**hey** *(3)*
**hiding** *(1)*
**high** *(1)*
**higher** *(2)*
**Hill** *(2)*
**hinged** *(2)*
**hip** *(1)*
**hired** *(1)*
**hits** *(1)*
**holder** *(7)*
**holding** *(1)*
**holds** *(1)*
**holster** *(69)*
**holstered** *(3)*
**holstering** *(1)*
**holsters** *(5)*
**Honorable** *(1)*
**hood** *(10)*
**Hughes** *(1)*
**Hughes's** *(1)*
**hundred** *(4)*
**HURD** *(21)*
**hurting** *(1)*

**< I >**
**idea** *(3)*
**identification** *(1)*
**identify** *(2)*
**Image** *(17)*
**images** *(1)*
**Immediately** *(4)*
**important** *(1)*
**impression** *(1)*
**improperly** *(2)*
**inch** *(2)*
**inches** *(1)*
**Incident** *(27)*
**incidents** *(4)*
**included** *(1)*
**including** *(1)*
**incredible** *(1)*
**indent** *(1)*
**indicate** *(1)*
**indicated** *(1)*
**indication** *(1)*
**indirectly** *(1)*
**inexplicable** *(1)*
**initial** *(1)*
**Initially** *(1)*
**inside** *(7)*
**Instagram** *(2)*
**installed** *(1)*
**instance** *(1)*
**instances** *(2)*
**instruct** *(1)*
**instruction** *(1)*
**instructions** *(1)*
**instructor** *(5)*
**instructors** *(2)*
**instructor's** *(1)*
**intent** *(2)*
**interaction** *(1)*
**interest** *(1)*
**interested** *(1)*
**internal** *(2)*
**interrupt** *(1)*
**interview** *(1)*
**interviewed** *(1)*
**introduce** *(1)*
**intrusion** *(2)*
**investigate** *(1)*
**investigation** *(2)*
**involve** *(2)*

**involved** *(6)*
**issue** *(4)*
**issued** *(9)*
**issues** *(1)*
**item** *(1)*
**its** *(1)*

**< J >**
**JACQUES** *(2)*
**Jalyn** *(1)*
**jams** *(1)*
**job** *(1)*
**join** *(1)*
**joined** *(1)*
**joining** *(1)*
**JOYCE** *(1)*
**Juhola** *(1)*
**July** *(18)*
**jump** *(1)*
**jumped** *(1)*

**< K >**
**keep** *(3)*
**KELLY** *(1)*
**kept** *(2)*
**key** *(7)*
**keys** *(2)*
**kind** *(13)*
**kit** *(1)*
**kneeling** *(1)*
**knees** *(1)*
**know** *(28)*
**knowledge** *(2)*
**knows** *(1)*
**Kydex** *(2)*

**< L >**
**late** *(1)*
**law** *(6)*
**laws** *(1)*
**laypeople** *(1)*
**layperson** *(1)*
**layperson's** *(2)*
**leading** *(1)*
**leads** *(1)*
**learn** *(2)*
**learned** *(1)*
**learning** *(1)*
**left** *(7)*

**left-hand** *(1)*
**leg** *(3)*
**legs** *(4)*
**level** *(1)*
**levels** *(1)*
**lever** *(3)*
**Levy** *(1)*
**Liberty** *(1)*
**lieutenant** *(6)*
**lieutenant's** *(3)*
**lifespans** *(1)*
**lifting** *(1)*
**light** *(4)*
**light-bearing** *(1)*
**liked** *(1)*
**line** *(4)*
**list** *(1)*
**listening** *(1)*
**lists** *(1)*
**little** *(7)*
**LITTLETON** *(1)*
**LLP** *(2)*
**load** *(3)*
**loaner** *(1)*
**lobby** *(6)*
**local** *(1)*
**located** *(2)*
**locater** *(1)*
**locator** *(1)*
**locker** *(3)*
**lockup** *(2)*
**long** *(2)*
**look** *(7)*
**looked** *(4)*
**looking** *(5)*
**looks** *(2)*
**loose** *(2)*
**lot** *(5)*
**loud** *(1)*
**LT** *(2)*

**< M >**
**M4** *(3)*
**M9** *(1)*
**machine** *(1)*
**main** *(1)*
**maintenance** *(2)*
**majority** *(2)*
**making** *(2)*

male  (1)
malfunctions  (1)
man  (1)
manage  (1)
manual  (8)
manuals  (1)
manufacturer  (1)
manufacturers  (1)
Marine  (6)
mark  (2)
MARKED  (10)
Market  (1)
Mass  (1)
MASSACHUSETTS
  (3)
matter  (2)
mean  (3)
means  (1)
media  (2)
medium  (1)
members  (5)
membership  (2)
memberships  (1)
mentioned  (3)
metal  (1)
metallic  (1)
middle  (1)
midnight  (1)
midnights  (1)
Mike  (1)
mil  (2)
mind  (1)
minds  (1)
minutes  (1)
missed  (1)
Mistakes  (1)
Mitch  (1)
Mitchell  (1)
MLS  (1)
Mm-hmm  (1)
model  (5)
modifications  (3)
modified  (1)
module  (1)
modules  (3)
moment  (3)
MONGELUZZI  (2)
months  (2)
Montville  (19)

Montville's  (1)
morning  (7)
MOS  (5)
MOSs  (1)
motor  (2)
mounted  (1)
moving  (3)
multiple  (3)
municipality  (1)
muzzle  (4)

< N >
name  (9)
narrative  (1)
narrowly  (1)
Natalie  (4)
near  (4)
need  (1)
negligence  (1)
never  (7)
New  (11)
nine  (5)
normal  (3)
Notary  (3)
noted  (2)
notes  (1)
nothing's  (1)
notice  (1)
noticed  (1)
NUMBER  (5)

< O >
object  (1)
Objection  (2)
objects  (1)
observed  (1)
obtain  (1)
obviously  (1)
occurred  (3)
offered  (1)
Office  (5)
OFFICER  (33)
officers  (16)
Officer's  (4)
Okay  (32)
old  (1)
older  (2)
Once  (10)
one-handed  (1)

one-on-one  (1)
ones  (3)
one's  (1)
online  (4)
on-the-range  (2)
open  (1)
operator  (1)
opinion  (1)
opportunity  (3)
order  (2)
ordering  (4)
orders  (2)
original  (4)
Oscar  (1)
outside  (3)
owned  (1)
owning  (1)

< P >
P.C  (1)
P220  (2)
P220Rs  (1)
P320  (43)
P320s  (4)
pack  (1)
package  (1)
PAGE  (1)
pages  (1)
Palms  (1)
pants  (1)
paperwork  (2)
part  (9)
participation  (1)
particular  (3)
particularly  (1)
parties  (1)
pass  (2)
patrol  (3)
pay  (1)
PD  (3)
PDs  (5)
Pennsylvania  (4)
people  (5)
percent  (4)
personal  (7)
personally  (1)
perspective  (1)
P-F  (1)
Philadelphia  (1)

photo  (1)
photos  (2)
Piatt  (2)
pictures  (1)
piece  (2)
pistol  (14)
pistols  (3)
Place  (6)
plain  (1)
plaintiff  (1)
Plaintiffs  (2)
plastic  (3)
platform  (1)
play  (1)
played  (7)
please  (4)
plug  (1)
pocket  (1)
point  (4)
pointing  (7)
points  (2)
Police  (25)
pop  (1)
popped  (1)
popping  (2)
popular  (1)
port  (2)
possession  (1)
possible  (1)
possibly  (1)
Post  (7)
posting  (1)
post-marked  (1)
posts  (1)
post-upgrade  (1)
pouch  (1)
PR  (1)
practice  (1)
present  (2)
press  (2)
pretty  (5)
pre-upgrade  (1)
primer  (1)
prior  (1)
probably  (3)
problem  (3)
proceed  (1)
process  (3)
produced  (1)

Deposition of Officer Daniel Witts                                                Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

Professional  (1)
program  (3)
prone  (1)
properly  (5)
propounded  (1)
protect  (3)
prototype  (1)
providing  (1)
Public  (7)
pull  (1)
pulled  (2)
pulling  (2)
pulls  (1)
purposes  (1)
put  (14)
putting  (4)

< Q >
Quaker  (2)
qualifications  (1)
qualified  (1)
qualify  (5)
question  (4)
questions  (11)
quick  (4)

< R >
Radford  (2)
rail  (1)
range  (2)
rank  (2)
RDR  (1)
reach  (3)
reached  (2)
reaching  (1)
read  (2)
reading  (1)
reads  (1)
ready  (1)
realizing  (1)
really  (2)
rear  (1)
reason  (2)
recall  (16)
receive  (2)
received  (2)
receiving  (1)
recertified  (1)
recess  (1)

recoil  (1)
recollection  (1)
record  (8)
recorded  (2)
recording  (1)
recordings  (1)
red  (1)
redundant  (1)
REFERENCED  (2)
referring  (1)
reflection  (1)
refresh  (1)
refusing  (1)
regarding  (3)
regret  (1)
regular  (3)
regularly  (2)
re-holster  (1)
reinsert  (1)
Reisbord  (2)
related  (1)
relates  (1)
relations  (1)
relative  (2)
release  (3)
released  (3)
relied  (2)
remember  (8)
remnants  (1)
remotely  (1)
remove  (3)
removed  (2)
replaced  (2)
Report  (6)
reported  (1)
Reporter  (5)
Reporting  (1)
reports  (1)
represent  (1)
representation  (3)
representations  (1)
represented  (1)
Representing  (3)
represents  (1)
require  (1)
reserve  (1)
resident  (1)
resisting  (1)
responsibility  (1)

rest  (1)
retained  (2)
retention  (13)
retentions  (1)
retired  (1)
review  (4)
reviewed  (4)
rhurd@smbb.com  (1)
rid  (1)
ridiculing  (1)
rifle  (1)
right  (39)
ring  (2)
road  (1)
rod  (3)
room  (4)
ropes  (1)
round  (10)
rounds  (3)
routine  (1)
run  (2)
running  (1)
RYAN  (5)

< S >
Safariland  (14)
safeties  (5)
safety  (2)
SAGE  (2)
SALTZ  (2)
SAM  (1)
Samantha  (2)
sat  (1)
SAUER  (15)
Sauer's  (2)
saw  (9)
saying  (3)
says  (2)
Screen  (10)
scroll  (1)
seated  (6)
second  (5)
seconds  (2)
secretary's  (1)
secured  (5)
securely  (1)
security  (1)
see  (29)
seeing  (6)

seen  (6)
send  (1)
sending  (1)
senior  (2)
sent  (9)
separate  (1)
Sergeant  (13)
sergeants  (1)
sergeant's  (1)
series  (1)
serve  (1)
set  (5)
seven  (1)
seven-second  (1)
share  (1)
sharp  (1)
Sheet  (1)
shell  (1)
Shepherd  (4)
Shepherd's  (2)
shift  (5)
shoot  (3)
shooter  (1)
shooting  (7)
short  (1)
Shortly  (1)
Shot  (18)
shotgun  (1)
shoulders  (2)
show  (12)
showed  (1)
side  (6)
Sierra  (1)
SIG  (45)
sign  (1)
Signature  (1)
Sigs  (2)
Sig's  (3)
similar  (1)
single  (3)
sir  (109)
sit  (1)
sitting  (2)
situations  (2)
six  (3)
size  (4)
slid  (1)
slide  (8)
sliding  (1)

Case 1:22-cv-16540-PBS Document 832-89 Filed 03/28/24 Page 259 of 439
Deposition of Officer Daniel Witts
Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

slightly *(1)*
slow *(1)*
slowly *(1)*
smaller *(2)*
smell *(2)*
smoke *(3)*
snap *(1)*
social *(1)*
solely *(1)*
somebody *(4)*
soon *(1)*
sorry *(4)*
sourced *(2)*
sources *(1)*
South *(1)*
speak *(2)*
Specialist *(1)*
specifically *(3)*
specificity *(1)*
speed *(1)*
spell *(1)*
spent *(1)*
spoke *(1)*
spot *(1)*
Spring *(1)*
springs *(1)*
Square *(2)*
stand *(2)*
standard *(2)*
Standards *(1)*
standing *(1)*
start *(3)*
started *(6)*
state *(4)*
Statement *(12)*
STATES *(2)*
stating *(1)*
stay *(1)*
stenographic *(1)*
stenographically *(1)*
step *(1)*
stepped *(1)*
stick *(2)*
sticking *(5)*
sticky *(1)*
stills *(1)*
stipulations *(2)*
stopped *(7)*
stops *(1)*

store *(1)*
stored *(1)*
stovepipe *(4)*
straight *(1)*
strap *(3)*
Streamlight *(3)*
Street *(2)*
Strike *(5)*
strip *(1)*
stripes *(1)*
stripping *(2)*
struggle *(1)*
stuff *(1)*
style *(1)*
subdue *(1)*
subsequent *(1)*
substance *(1)*
suggest *(2)*
suggests *(2)*
Suite *(1)*
Sumpf *(1)*
S-U-M-P-F *(1)*
supplied *(2)*
supplies *(1)*
supposed *(3)*
Sure *(15)*
Surveillance *(8)*
suspect *(11)*
swear *(1)*
sworn *(2)*
system *(2)*
systems *(3)*

< T >
tab *(4)*
tabbed *(7)*
table *(1)*
Tactical *(5)*
take *(10)*
take-home *(1)*
taken *(2)*
talk *(2)*
talked *(3)*
Talking *(2)*
teaches *(1)*
techniques *(1)*
Tell *(15)*
ten *(7)*
tend *(1)*

term *(2)*
terms *(4)*
test *(1)*
testified *(2)*
testify *(1)*
testimony *(2)*
Thank *(16)*
thing *(5)*
things *(3)*
think *(11)*
third *(1)*
thought *(2)*
three *(5)*
Thursday *(1)*
tie *(1)*
tighten *(1)*
time *(28)*
times *(10)*
timestamp *(2)*
TLR-1 *(3)*
today *(4)*
Today's *(1)*
told *(5)*
top *(7)*
touch *(1)*
touching *(1)*
tourniquet *(14)*
tourniquets *(1)*
town *(3)*
TR-1 *(1)*
trade *(1)*
traded *(1)*
trained *(1)*
training *(18)*
trainings *(4)*
transcribed *(1)*
transcript *(1)*
transcription *(2)*
trigger *(16)*
triple *(2)*
trooper *(3)*
truck *(1)*
true *(1)*
trust *(4)*
trusted *(2)*
truth *(1)*
try *(1)*
trying *(3)*
tucked *(1)*

turned *(1)*
twice *(1)*
two *(8)*
two-handed *(1)*
type *(8)*
types *(1)*
Typical *(1)*

< U >
U.S *(1)*
UGHETTA *(1)*
ultimately *(2)*
Um *(1)*
understand *(2)*
understanding *(1)*
unfortunately *(1)*
unintended *(9)*
unit *(3)*
UNITED *(2)*
unknown *(1)*
untended *(1)*
unturning *(1)*
upgrade *(3)*
upgrades *(1)*
upper *(1)*
use *(3)*
use-of-force *(1)*
users *(1)*
user's *(1)*
uses *(1)*
usual *(2)*
usually *(4)*
utilized *(1)*

< V >
vehicle *(1)*
Velcro *(1)*
verbal *(1)*
versus *(1)*
vest *(3)*
vicinity *(1)*
video *(32)*
VIDEOGRAPHER *(5)*
videos *(6)*
view *(4)*
views *(1)*
visible *(1)*
voicemail *(1)*

Deposition of Officer Daniel Witts

Jacques Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc.

voluntary  *(2)*
vs  *(1)*
vulnerable  *(2)*

**< W >**
walk  *(3)*
walking  *(1)*
wall  *(1)*
want  *(6)*
wanted  *(6)*
warning  *(2)*
watch  *(3)*
watched  *(1)*
watching  *(2)*
way  *(9)*
weapon  *(15)*
weapons  *(3)*
wear  *(1)*
wearing  *(3)*
websites  *(1)*
weight  *(2)*
well  *(2)*
went  *(24)*
we're  *(6)*
we've  *(1)*
whatsoever  *(2)*
white  *(3)*
WITNESS  *(10)*
WITTS  *(10)*
word  *(1)*
work  *(5)*
working  *(2)*
works  *(1)*
worn  *(1)*
worth  *(1)*
wrapped  *(1)*
wrists  *(1)*
write  *(2)*
written  *(2)*
wrong  *(1)*

**< Y >**
yeah  *(11)*
year  *(4)*
years  *(4)*
yellow  *(1)*
Yep  *(17)*
YOLETTE  *(2)*
Youtube  *(1)*

**< Z >**
zoom  *(5)*
zooming  *(1)*

# EXHIBIT I

1              IN THE COURT OF COMMON PLEAS

2             PHILADELPHIA COUNTY, PENNSYLVANIA

3                    Case No. 01213

4

5    ABRAHAMS,

6         Plaintiff,

7    v.

8    SIG SAUER, INC., ET AL.

9         Defendants.

10   _____

11

12              ***********************************

13          VIDEOTAPED DEPOSITION OF AARON ROTH

14                   FEBRUARY 2, 2023

15              ***********************************

16

17          VIDEOTAPED DEPOSITION OF AARON ROTH taken via

18   Zoom in the above-styled and numbered cause on February 2,

19   2023 at 11:18 a.m. Central Time before Gina Williams,

20   Registered Professional Reporter, Certified Realtime

21   Reporter, and Certified Realtime Captioner.

22

23

24

25

Page 4

1     VIDEOGRAPHER: We are now on the record. Today's
2 date is February 2, 2023, and the time is 11:18 a.m.
3 Central Time.
4     This is the recorded video deposition of Aaron
5 Roth in the matter of Abrahams v. Sig Sauer, Inc., et
6 al. in the Court of Common Pleas, Philadelphia County,
7 Pennsylvania, June term, 2022, Case Number 01213.
8     My name is Alex Marothy from Everest Court
9 Reporting. I'm the video specialist.
10     The court reporter today is Gina Williams also
11 from Everest, Court Reporting.
12     All counsel appearing today will be noted on the
13 stenographic record.
14     Will the court reporter please swear in the
15 witness.
16                   - - - -
17 WHEREUPON,
18               AARON ROTH
19 was called as a witness and, after having been first duly
20 sworn, was deposed and testified as follows:
21          EXAMINATION
22 BY MR. CEISLER:
23     Q   Good morning, Mr. Roth. My name is Daniel
24 Ceisler. I'm the attorney you spoke to the other day in
25 helping to get this set up.

Page 5

1     How you doing today?
2     A   Good. How are you?
3     Q   Can you see me all right?
4     A   Yes.
5     Q   Can you hear me all right?
6     A   Yes.
7     Q   Okay. You've testified in court, I presume,
8 before?
9     A   I have, yes.
10     Q   Okay. Have you ever been deposed before?
11     A   Yes.
12     Q   Okay. So you understand you're under oath, and
13 this is just like testifying in court; right?
14     A   Correct.
15     Q   And we can't talk over each other because Gina,
16 who is our stenographer today, will have a hard time getting
17 a record.
18     Does that work?
19     A   Yes.
20     Q   If you need a break at any time, just let me
21 know. I don't think we're going to be here very long, but
22 just let me know if you need a break, okay?
23     A   Sounds good.
24     Q   Okay. We're here to talk about an incident that
25 occurred on January 2, 2021.

Page 6

1     Does that sound right to you?
2     A   Yeah, the time frame does. I don't know the
3 exact date, but yes.
4     Q   What was your job on January 2, 2021?
5     A   I was a Milwaukee Police Officer.
6     Q   How long had you been a Milwaukee police officer
7 at that point?
8     A   At that time it was about two and a half going on
9 three years.
10     Q   So you joined around 2018/2019?
11     A   Correct.
12     Q   When you first joined the MPD, being the
13 Milwaukee Police Department, what sidearm were you issued?
14     A   We were issued the Sig Sauer P320.
15     Q   So you had a P320 your entire time with the
16 Milwaukee PD?
17     A   Yes.
18     Q   Prior to January 2, 2021, had you ever had any
19 issues with your P320?
20     A   I had not.
21     Q   How would you carry your P320 when you were on
22 duty?
23     A   In my issued duty belt holster.
24     Q   Do you know what type of holster it was, what
25 brand?

Page 7

1     A   I don't recall, no.
2     Q   Okay. Would you have an optic on your P320?
3     A   We did not, no.
4     Q   So it was just a plain gun?
5     A   Plain gun with iron sights, yes.
6     Q   No safety?
7     A   No safety.
8     Q   When I say "safety," just to clarify, I mean like
9 an external safety of some kind to prevent the trigger from
10 being pulled.
11     A   Correct.
12     (Exhibit A was marked for identification.)
13 BY MR. CEISLER:
14     Q   Okay. I'm going to show you a video, so I'm
15 going to pull that up first. And my screen never wants to
16 share when it's a video, but I think I've got it figured
17 out.
18     Can you see this?
19     A   Yes.
20     Q   Do you see in the bottom left it says, "D5
21 Northeast Parking 2:29 p.m., 1/2/21"?
22     A   Yes.
23     Q   I'm going to play the first two minutes of this
24 video. I just want you to watch it, and then I'm going to
25 ask you about specific points in it, okay?

Case 2:22-cv-01603-PBS Document 83-10 Filed 06/28/24 Page 264 of 439
Deposition of Aaron Roth
Abrahams v. Sig Sauer, Inc., et al.

Page 8

1    A    Okay.

2    Q    For the record, this is the first two minutes of
3  about an 8 minute and 23-second video.

4    A    Okay.

5    Q    Stopping the video at two minutes.

6         Mr. Roth, have you seen this video before?

7    A    I have, yes.

8    Q    What does this video depict generally?

9    A    That we're parking a vehicle.  I was in the rear
10  passenger seat.  When I exited, my firearm discharged.

11   Q    Does this video fairly and accurately depict that
12  incident as you recall it?

13   A    Yes.

14   Q    Does this video in any way depict something
15  different in your recollection of the events?

16   A    No.

17   Q    Do you have any reason to question the
18  authenticity of this video?

19   A    No.

20   Q    So now I'm going to take it back to --

21        We're going to take it second by second, kind of
22  chunk by chunk.

23        So I'm going to go from 1:06, then I'm going to
24  stop it at 1:15.

25        So from 1:06 to 1:15, what do you see -- what's

Page 9

1  happening?

2    A    We were returning from doing surveillance.

3    Q    Who is "we"?

4    A    The driver is Travis Resczynski.

5    Q    Sorry.  Can you spell that, please?

6    A    First name T-r-a-v-i-s.  Last name
7  R-e-s-c-z-y-n-s-k-i, I believe.  That could be off.

8         Steven Suvaka, who is the front passenger,
9  S-t-e-v-e-n S-u-v-a-k-a, and then the driver side passenger
10 -- rear passenger, Zachary Ramion, Z-a-c-h-a-r-y
11 R-a-m-i-o-n, and then myself, again, the rear passenger.

12        We had parked.  Officer Suvaka and Ramion exited
13 the vehicle, as they had to use the restroom or some sort or
14 something inside the district station.

15   Q    I'll have to stop you there because I think
16 you're moving past 1:15, if that's okay.  So I'm going to
17 take this in chunks.

18        So just to I make sure I have your recollection
19 correct, there are four officers in this vehicle.  You're
20 the one in the rear passenger side.  And you've just
21 returned from a surveillance.

22        Is that correct?

23   A    Yeah.

24   Q    You're in what looks like a red Nissan; is that
25 correct?

Page 10

1    A    Yep.

2    Q    Whose red Nissan was that?

3    A    The Police Department's.

4    Q    Is that a vehicle you would often use for
5  surveillance?

6    A    Yes.

7    Q    Okay.  So let's take the next 10 to 15 seconds.
8  So I'm going to take it from 1:15 to 1:22.

9         So the officers from, looks like the front
10 drivers' side, so the driver's seat, and the front passenger
11 seat have gotten out of the car.

12        Does that sound like an accurate depiction of
13 what's happening?

14   A    So it's actually the rear driver seat that exited
15 on the left side of the vehicle in this frame.

16   Q    Got it.

17   A    The right side was the front passenger.

18   Q    There you go, okay.

19        So from 1:22 for about the next 10 seconds, I'll
20 show you this, and then tell me what's happening.

21        Okay.  So what happened in those 10 seconds?

22   A    The --

23        I opened my door, and I was beginning to exit
24 with the video camera in one hand or my bag in one hand, and
25 then I believe I had any cellphone or some object in

Page 11

1  my other hand.  The driver of the vehicle also begins to
2  exit the vehicle.

3         When I go to stand up out of the vehicle, the
4  firearm in my holster discharges and flips out of my
5  holster.  When I stand all the way up, it flips onto the
6  ground.

7    Q    Were your hands on the holster at the time the
8  gun discharged?

9    A    No.

10   Q    There were objects in both of your hands?

11   A    Correct.

12   Q    How sure are you that your hands were not on the
13 gun at the time it discharged?

14   A    100 percent.

15   Q    Did you touch the trigger at the time the gun
16 discharged?

17   A    No.

18   Q    All right.  Now we're going to rewind it a little
19 bit.

20        So can you see the seconds at the bottom here?

21   A    Yeah.

22   Q    Can you see the counter?

23        Keep an eye on that, and see if you can point to
24 me what you believe is the moment of discharge.

25        Or actually, you know what, you just tell me when

Page 12

1 to stop, and I'll stop it. Let's do that.
2     A    Okay, now.
3     Q    Okay. So approximately between 1:24 and 1:25 on
4 Exhibit A is the moment of discharge.
5         Where were you relative to the car at the time of
6 discharge?
7         Were you --
8         Were both feet out?
9         Was one foot out.
10        Tell me what your body position was.
11    A    I know that I was leaning out of it.
12        I don't know if both my feet exited the vehicle
13 at that time. I know that I was attempting to stand up
14 after getting out of the car.
15        I was bent over, as it shows in this frame,
16 because the round discharged back into the seat right that I
17 was sitting in.
18    Q    Do you recall, in this sequence of events, when
19 you took your seatbelt off?
20    A    I do not believe I had my seatbelt on at all
21 during transportation.
22    Q    Would you ordinarily not wear your seatbelt
23 during transportation?
24    A    In this circumstance I did not, no.
25    Q    Okay. So you would have had --

Page 13

1         The seatbelt would have been over your left
2 shoulder; is that correct?
3     A    It would have been over my right shoulder.
4     Q    Oh, right shoulder, okay.
5         So seatbelt's over your right shoulder.
6         What hip is the holster on?
7     A    On my right side.
8     Q    Okay. As you were stepping out of the car, did
9 the seatbelt get caught in your holster?
10    A    No.
11    Q    How sure are you of that?
12    A    100 percent.
13    Q    How are you sure of that?
14    A    Because I did not wear my seatbelt, so the
15 seatbelt was not attached to my body in any way.
16    Q    Okay. The seatbelt was over your right shoulder?
17    A    Yes, but I was not using the seatbelt.
18    Q    Watching the video now, do you see your seatbelt
19 at all?
20    A    I do not.
21    Q    Looking back on it today, do you have any idea
22 what caused your gun to go off?
23    A    I do not.
24    Q    Have you carried a P320 since this incident?
25    A    I carried one after the incident, but now I left

Page 14

1 the State of Milwaukee Police Department, so I do not carry
2 one now.
3     Q    How did you feel about carrying a P320?
4     A    I was definitely more cautious.
5     Q    What did you carry after --
6         Strike that.
7         What do you carry now?
8     A    A Glock 22, .40 caliber.
9     Q    Is your Glock 22 .40 caliber equipped with a tab
10 trigger safety?
11    A    Trigger safety, yes.
12    Q    Does that in any way prevent you from using the
13 gun?
14    A    No.
15    Q    Have you qualified with that gun?
16    A    Yes.
17    Q    Did you shoot fine with it?
18    A    Yes.
19    Q    Do you feel like you're capable of doing your job
20 with the Glock?
21    A    Yes.
22    Q    Do you own any other guns?
23    A    I do.
24    Q    What other guns do you own?
25    A    I own a Glock 17, Gen 4. I own a Sig Sauer P365,

Page 15

1 9mm. I own a Sig Sauer P238, .380 caliber. Then I own an
2 AR-style rifle, .223/5.56, and a 12-gauge shotgun.
3     Q    Do you carry your 365?
4     A    I do.
5     Q    Does it have a manual safety on it?
6     A    No. It's got a trigger safety.
7     Q    Can you describe the trigger safety?
8     A    It's very similar to their newer-style guns.
9         I don't know all the specifics on the safety. I
10 know there's not a manual safety outside of the trigger
11 though.
12    Q    Got it. Is there like a tab in the trigger?
13    A    This one does not.
14    Q    Is there anything that prevents you from pulling
15 it back without, you know, kind of --
16        Do you have to place your finger right in the
17 middle for it to go off, or could you place it anywhere?
18    A    No, you have to have evenly distributed weight on
19 the trigger to pull it straight backwards for it to fire.
20    Q    Okay. All right. So now I'm going to take you
21 back to this video because we stopped it around
22 1:25/1:26 last time. I'll show you about 10 more seconds.
23        So what's going on from 1:25 to 1:40?
24    A    My partners are wondering whose gun went off. I
25 was also wondering the same thing until I felt the heat on

Page 16

1  my right hip from the round discharging from the muzzle.
2       I then realized that my gun flipped out of my
3  holster onto the ground, and then I advised them that it was
4  my gun that went off.
5       Q    So you did not know it was your gun that went off
6  at the beginning?
7       A    I did not.
8       Q    So I'll go from 1:40 to 2 minutes.
9            So what's going on from 1:40 to 2 minutes?
10      A    I retrieved my firearm and placed it back in the
11  holster securely, and then I checked for the round discharge
12  into the vehicle.
13      Q    And the other guys just left you?
14      A    So they told me to wait there, to wait for a
15  supervisor, because in our -- or at the City of Milwaukee,
16  when your gun discharges, you need a supervisor to arrive on
17  scene to essentially figure out what happened.
18      Q    Do you know what you were saying to them around
19  then?
20           It looks like --
21      A    Yeah, so I advised the driver, Travis, I said I
22  didn't even touch it or something along the lines of I
23  didn't even touch it or I didn't pull the trigger or I have
24  no idea how it happened, something along those lines.
25      Q    Okay.  Did the holster have any sort of

Page 17

1  retention?
2       A    It's based on the screw retention.
3       Q    Well, I guess what I mean by that, did it click
4  like when you go into --
5            Did it like click and lock, or was there a hood
6  you put over it or anything like that?
7       A    No.
8       Q    Okay.  So you just --
9            There's no like button or anything like that,
10  that you pressed to let it out?
11      A    There's no button release, no.
12      Q    Did the spent shell casing eject?
13      A    The spent shell casing was still in the firearm.
14      Q    Okay.  Was the trigger covered by the holster?
15      A    Yes.
16      Q    Fully?
17      A    Yes.
18      Q    Was there any way for your finger to get into the
19  trigger well?
20      A    If you manipulated it enough.  It would take
21  quite some effort to get your finger into the trigger guard.
22      Q    Did the City of Milwaukee ever come to a
23  conclusion about what caused the gun to go off?
24      A    They said that it was based on my clothing that I
25  wore that day, that my clothing pulled the trigger.

Page 18

1       Q    Do you think that's possible?
2       A    No.
3       Q    Why is that?
4       A    Based on how the holster covers the trigger well
5  itself.  I had tucked-in T-shirts, so they were not outside
6  of my waistband, and that's the holster I used was outside
7  the waistband.
8            I had a sweatshirt on that fits above the holster
9  or next to the holster and never entered the holster, and
10  that's the only piece of clothing that would have been able
11  to manipulate the trigger.
12      Q    Was there an investigation into this incident?
13      A    There was.
14           I don't know what came of it, other than they,
15  just word of mouth, that I was blamed for the incident.
16      Q    Were you disciplined?
17      A    I was not disciplined.
18      Q    When you say you were "blamed for the incident,"
19  it was blaming your clothing?
20      A    Yes.
21      Q    Did you ever see any sort of report that said
22  that, or is that just your understanding based on what
23  you've been told?
24      A    It's my understanding based on what I've been
25  told.

Page 19

1            There was no official document that I ever
2  received or was told about.
3       Q    So I'm kind of skipping through 2 minutes
4  through, let's say, 4 minutes.
5            So I don't know if you can kind of see the
6  fast-forward there, but it looks like you're standing
7  outside of the vehicle.
8            What are you doing in this time frame?
9       A    I'm kind of --
10           I can feel the heat, so I was kind of checking my
11  pants.  I had a small burn mark, a very, very faint burn
12  mark from the firearm discharging next to my leg.
13           Now I'm just kind of looking around for the
14  casing because I had not manipulated the firearm to check
15  for the casing.  So I'm looking around trying to see if I
16  can find it, and I was unsuccessful.
17      Q    Have you heard the term "stovepipe"?
18      A    Yes.
19      Q    Is that what happened here?
20      A    So the casing was set in the firearm as it would
21  normally when it would fire.  So the casing enters into --
22  or excuse me.
23           The round was already in the chamber, and it
24  fired, but it just did not toss the casing out.  There was
25  no other casing that entered.

Page 20

1    So it was still in the chamber as it normally
2  would sit.
3    Q    The shell casing?
4    A    Right.
5    Q    Okay.  So did you --
6         Did you end up finding and touching the gun
7  again?
8    A    Yeah, so after it flipped out of my holster, I
9  picked it up off the ground and placed it back into my
10 holster, and then I did not touch the firearm again after
11 that.
12   Q    Did you clear it?
13   A    I did not clear it.
14   Q    Okay.
15   A    I waited for my supervisor for that.
16   Q    Okay.  So I'm going to 5:22 now.  This is from
17 5:02 to 6:06.
18        What's going on in that time period?
19   A    So my direct supervisor, Sergeant Ramirez,
20 arrived on scene, as well as Sergeant Sebestyen, where they
21 just asked me kind of what was going on, what happened.
22        As I'm explaining, they're kind of doing their
23 own investigation.  They're asking me where the casing is.
24 I told them I couldn't find it.  They asked me where the
25 round discharged into the vehicle.  At that time I

Page 21

1  couldn't -- I didn't locate where the round discharged.
2    Q    So what's going on at 6:20?
3    A    They are --
4         By "they" I mean my supervisors.
5         We are looking to make sure that no vehicle was
6  struck in the parking lot.
7         And then my -- Sergeant Sebestyen just took the
8  gun from my holster, and now he's clearing it and making it
9  safe where he then finds the casing.
10   Q    Do you know approximately where he's finding the
11 casing?
12        Do you think he's got it already?
13   A    Yeah, I believe he already did it because I
14 believe that he did not rack it, and the casing flew out.  I
15 believe he cause the casing in his hand.  So I don't think
16 he ejected the casing onto the ground.
17        So it's going to be kind of hard to tell.
18   Q    But it's somewhere --
19        We're now 6:35.  It's somewhere in this
20 approximately kind of 6:30 to maybe 6:35, 6:40 timestamp
21 here where he's got your gun?
22   A    Yes.
23   Q    Okay.  Did you personally see that that casing
24 had not ejected?
25   A    Yes.

Page 22

1    Q    So what's happening now at 7:25?
2    A    I believe that I'm speaking with my direct
3  supervisor, Sergeant Ramirez.  Sergeant Sebestyen is giving
4  orders for pictures.  I believe that's what Officer Ramion
5  is doing in that, the flannel by the vehicle, was taking
6  photos of the incident.  And then the lieutenant would be
7  notified regards this incident.
8    Q    Do you recall if the handgun, the P320, was
9  physically inspected by anyone at Milwaukee PD?
10   A    My gun was removed from my person and then put on
11 a table where Sergeant Sebestyen, the lieutenant of
12 District 5, and then was later given to the firearms range
13 where they did a full inspection of the firearm, I believe.
14 I did not see them do it, but that was my impression.
15   Q    Did you get reissued that P320, or were you given
16 a different P320?
17   A    I was issued a different P320.
18   Q    Do you know if that P320 from this incident was
19 ever put back into circulation?
20   A    That I do not know.
21   Q    Did you ever talk to anyone from Sig Sauer about
22 this incident?
23   A    I did.
24   Q    Who did you talk to?
25   A    I don't remember specifically.

Page 23

1         It was another deposition hearing in regards to
2  this video.
3    Q    Okay.  So was it a deposition rather than
4  something else like them checking out the gun or anything
5  like that?
6    A    Correct.
7    Q    Okay.  Do you remember if there was any damage to
8  the holster?
9    A    No damage to the holster because I had an open
10 bottom.
11   Q    So it just shot right through the bottom?
12   A    Correct, there wasn't --
13        It was already an exposed bottom.
14   Q    Did you continue using this holster after the
15 incident?
16   A    I did not.  They took my holster as well.
17   Q    Okay.  Do you know if there was an inspection
18 performed of the holster?
19   A    They said that they did do an inspection for
20 gunpowder residue and things like that.  It sounds like they
21 did not locate any.
22   Q    Okay.  When you say, "It sounds like they did not
23 locate any," what are you basing that off of?
24   A    They told me that I falsified evidence and gave
25 them a different holster.

Page 24

1  Q   Okay.  So you were told you falsified evidence?
2  A   Yes.
3  Q   Did you falsify evidence?
4  A   I did not.
5  Q   Would you falsify evidence?
6  A   No.
7      MR. CEISLER:  That's a good trait.  We try not to
8  either.
9      I have no further questions.
10     Ms. Dennison, who is counsel for Sig Sauer, will
11 have a few, and then I may have a few when she's done,
12 depending on what she asks.
13         EXAMINATION
14 BY MS. DENNISON:
15 Q   Good afternoon.  Quick question because I just --
16 I think I missed it.
17     Who --
18     Who told you that you falsified evidence and gave
19 a different holster?
20 A   I was never told directly.  The firearms range in
21 the City of Milwaukee -- I don't know if it was the sergeant
22 specifically who did the investigation.  Again, I don't know
23 who did the investigation, but word of mouth, they said that
24 I gave them a different holster than what was used that day.
25     Photos were captured of the holster, the firearm

Page 25

1  that day by my supervisor, Sergeant Sebestyen, that day of
2  the incident.
3  Q   Okay.  Do you know, did you ever hear what the
4  basis was for somebody to say that you gave a different
5  holster than what was on your person that day?
6  A   They said, because there was no gun residue or
7  gunpowder residue from the discharge, that it was not the
8  same holster.
9  Q   All right.  So a couple things.
10     You testified today that you were not wearing
11 your seatbelt at all when you were returning to the station
12 that day just prior to the incident; is that right?
13 A   Correct.
14 Q   Okay.  And you mentioned you recall giving
15 testimony in another matter.
16     Have you ever seen that transcript of testimony?
17 A   I have not.
18 Q   Okay.  But you recall giving testimony; correct?
19 correct?
20 A   Yes.
21 Q   Do you recall when you provided that testimony?
22 A   I do not.  It was some time ago.
23 Q   Okay.  If I told you it was in September of 2021,
24 would that sound accurate?
25 A   Yeah, it was quite some time ago, but could fit

Page 26

1  that time frame.
2  Q   Sure.
3      Do you believe that your testimony or
4  recollection of events in September of 2021 would be more
5  accurate than your recollection today as we sit here now?
6  A   I don't think it would be --
7      I remember the incident today like I did in
8  September, so I guess no in that case.
9  Q   Okay.  Back in September you testified -- of 2021
10 you testified that you were wearing your seatbelt that day
11 and that you had unbuckled just prior to the car turning off
12 in the parking lot.
13     Do you recall that?
14 A   I do not recall that.
15 Q   Okay.  So I'm going to share my screen with you
16 so I can show it to you because I don't want to -- I want
17 you to be able to actually see what the transcript stated.
18     Just give me a moment.  Give me one second.  Let
19 me see if I can do it this way.  I have too many things up,
20 so let me try it one more time.
21     So on the screen is a transcript of testimony in
22 the Thomas Frankenberry and Sansani Frankenberry v. Sig
23 Sauer action dated September 24, 2021, and it's the
24 videoconference deposition of Aaron Roth.
25     Do you see this?

Page 27

1  A   Yes.
2  Q   Okay.  Do you recall your testimony being in the
3  Frankenberry v. Sig Sauer matter?
4  A   Yes.
5  Q   Okay.  And do you believe, given the date -- or
6  do you have any reason to believe that this is not the date
7  that you provided that testimony?
8  A   No, I do not.
9  Q   All right.  So I'm going to take you to pages 10
10 to 11 of the transcript.
11     So right here on line 20 you can see you were
12 asked, "Were you buckled?  Did you have your seatbelt
13 buckled at the time that you were in the vehicle?"
14     And you answered, "I took the seatbelt off right
15 before I was -- as I was going to get out."
16     "Question:  When did you unbuckle your seatbelt
17 specifically?"
18     "Answer:  Before the car was parked."
19     Do you see that?
20 A   Yes.
21 Q   Do you have any reason to believe that the
22 testimony you gave that day was not accurate?
23 A   Other than I didn't wear my seatbelt --
24     I don't know why I would have said that.
25     -- but no.

# EXHIBIT J

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    KEITH AND BIANCA CEMINI SLATOWSKI, )
 3                                      )
             Plaintiffs,               )
 4                                      )Civil Action No.
    v.                                  )2:21-cv-00729
 5                                      )
    SIG SAUER, INC.,                    )
 6                                      )
             Defendant.                 )
 7

 8

 9
              ********************************
10            REMOTE VIDEOTAPED DEPOSITION OF
                 SERGEANT DONALD THATCHER
11                   October 21, 2022
              ********************************
12

13

14            SERGEANT DONALD THATCHER, produced as a

15     witness at the instance of the Plaintiffs, was

16     duly sworn and deposed in the above-styled and

17     numbered cause on October 21, 2022, from 9:15 a.m.

18     to 10:03 a.m. CST, stenographically reported

19     remotely, pursuant to the Federal Rules of Civil

20     Procedure and the provisions stated on the record.

21

22

       Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
23                     Texas CSR 9306
                       California CSR 14407
24                     Illinois CSR 084.004659

25
```

Deposition of Officer Donald Thatcher

Keith & Bianca Slatowski v. Sig Sauer, Inc.

Page 4

PROCEEDINGS

(On the record at 9:15 a.m. CST)

THE VIDEOGRAPHER: We are now on the record. Today's date is October 21st, 2022, and the time is 10:15 a.m. Eastern.

This is the recorded video deposition of Officer Donald Thatcher in the matter of Keith and Bianca Slatowski versus SIG SAUER, Inc., in the United States District Court for the Eastern District of Pennsylvania, Civil Action Number 2:21-cv-00729.

My name is Trinity Harris-Womack from Everest Court Reporting, and I am the video specialist. The court reporter today is Becky Graziano, also from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

Will the court reporter please swear in the witness.

(Witness duly sworn.)

MR. CEISLER: May I proceed?

Page 5

THE REPORTER: You may.

SERGEANT DONALD THATCHER, being first duly sworn, testified as follows:

EXAMINATION

BY MR. CEISLER:

Q    All right. Good morning, again, Officer Thatcher. How are you doing?

A    Good morning. I'm good. How are you?

Q    I'm well.

Can you see and hear me all right?

A    Yes.

Q    All right. If at any point I break up or come in and out and there's any Zoom issues, just let me know. Okay?

A    Okay.

Q    So one thing I should clarify is you heard some names in the beginning, Keith and Bianca Slatowski. Those are our clients in another action related to the SIG SAUER P320. Does that work?

A    Yup. Okay.

Q    And the purpose of today's deposition is to show you a video and to allow you to authenticate the video so that it can be used for trial purposes and other purposes down the line.

Page 6

Does that make sense?

A    Yes.

Q    Have you ever been deposed before?

A    Yes.

Q    Okay. When was that?

A    It was -- it was a while ago. It was for a traffic accident involving a motorcycle.

Q    Okay. So I'll just go through a couple quick ground rules. Is that okay?

A    Yes.

Q    First, everything that we're saying today is being taken down on a record -- hold on one second.

It's being taken down on a stenographic record, so Becky, who's one of the heads on top of your screen, is writing down everything we're saying. So for her to be able to do her job, we just need to go one at a time. Does that work?

A    Okay. Yes.

Q    So I'll ask you the question, and just please, even if you think you know the answer, just let me finish asking the question and I'll let you answer the question. Does that work?

A    Yes.

Page 7

Q    And exactly like you're doing, I just need you to answer verbally. So "yeses," "nos," whatever words you need to use to answer the question. But I can't have "uh-huhs" or "huh-uhs" or head shakes or anything like that. Does that work?

A    Yes, sir.

Q    Next, most of what I'm going to ask you today is going to be pretty straightforward. I don't know what Ms. Dennison's going to ask you, but if you don't know the answer to anything, "I don't know" is a perfectly acceptable answer today. Does that work?

A    Yeah. Yes, sir.

Q    You can take a break at any point if you need. I don't plan on being long at all. But if you do need a break, just let me know. Does that work?

A    Yes.

Q    All right. I'm going to roll right into this.

Can you see my screen, sir?

A    Yes, sir.

MR. CEISLER: All right. I'm going to introduce as Exhibit A a video that is

Page 8

1  titled "Unblurred Video," which I actually
2  received several minutes ago and have not
3  had the opportunity to rename, so it's
4  named "Unblurred Video."
5       (Thatcher Exhibit A marked.)
6  BY MR. CEISLER:
7   Q    Have you seen this -- you know, I'm going
8  to show it once, and I'll ask you a few questions.
9       (Video playback began.)
10 BY MR. CEISLER:
11  Q    All right.  Were you able to see that,
12 sir?
13  A    Yes, sir.
14  Q    Have you seen this video before?
15  A    Yes, sir.
16  Q    When did you see this video before?
17  A    I believe it was the day after it
18 occurred.
19  Q    Did you see this video today?
20  A    Yes.  This morning, yes.
21  Q    Okay.  And the day after it occurred?
22  A    Yeah, I believe it was the day after, yes.
23  Q    Okay.  So just broadly speaking -- and
24 then we'll go kind of second by second -- what is
25 this video?

Page 9

1   A    This is the -- where we park.  It's the --
2  behind the police station.  It's usually where we
3  park when we're on duty so we can get to the car
4  and just -- we just pull right out from there onto
5  the road.
6   Q    Okay.  What does this video depict?
7   A    This is me.  I was pulling in off -- just
8  a regular patrol, about to go into the station.
9   Q    Okay.  And how do you know this is a video
10 of you?
11  A    Well, I could see it.  It's the car I
12 always use, and that's me getting out of the car.
13  Q    Do you recall this incident?
14  A    Yes.
15  Q    Does this video fairly and accurately
16 depict the incident as you remember it?
17  A    Yes.
18  Q    Do you have any reason to believe this
19 video does not fairly and accurately depict this
20 incident as you recall?
21  A    No.
22  Q    Do you recall what date this incident
23 occurred?
24  A    February 7th.
25  Q    Okay.  Of what year?

Page 10

1   A    2022.
2   Q    Where did this incident occur?
3   A    It was right behind the station where we
4  usually park, at 962 Main Street in Honesdale.
5   Q    Do you know what camera captured this
6  video?
7   A    I don't know the name of it.  Just the
8  back parking lot.
9   Q    Sure.  But is it a security camera?  Or
10 what type of camera?
11  A    It's -- yeah.  It's a security camera.
12  Q    Okay.  So to confirm, this is a security
13 camera that captured a video of you from that
14 February incident in 2022?
15  A    Correct.
16  Q    Okay.  Some of those questions might seem
17 silly, but they're authentication questions --
18  A    Sure.
19  Q    -- that allow us to use this video.
20       Okay.  Now I'm going to show the video
21 again, and I'd like you to -- I'm going to show it
22 kind of bit by bit, and I want you to tell me what
23 happened in that bit.  Okay?
24  A    Okay.
25  Q    So I'm starting at 0 seconds.

Page 11

1       (Video playback began.)
2  BY MR. CEISLER:
3   Q    And I'm stopping at 5 seconds.
4       So walk me through what's happening in
5  the first 5 seconds of this video.
6   A    Okay.  I'm just -- actually just grabbing
7  my -- it looked like coffee or my cup and my phone
8  and stepping out of the car to walk towards the
9  station.
10  Q    Okay.  So what do you have in your left
11 hand here?
12  A    That, I believe, is my -- is my phone.
13  Q    Okay.  Do you have anything in your right
14 hand?
15  A    It doesn't look -- no.  No.  I don't
16 believe I had anything in my right hand.
17       No, I...
18  Q    So you do not believe you have anything in
19 your right hand as you're getting out of the car
20 here?
21  A    No.  I -- yeah, I grabbed my phone -- I
22 believe that's my phone -- and then placed that in
23 my left hand and stepped out.
24  Q    Other than that being your phone, is there
25 anything else you can think that that would be in

Page 12

your left hand?

A    I can't think of what it would be. The only thing I -- getting out of the car is usually I have my phone sitting there. I believe it's my phone.

Q    Okay. At what point, do you recall, did you take off your seat belt?

A    Right when I stopped the car. I pulled in, stopped, took my seat belt off.

Q    Okay. So let's take it now, 5 seconds to 10 seconds.

Actually, let's go 5 seconds to 8 seconds. Okay?

A    Yup.

(Video playback began.)

BY MR. CEISLER:

Q    What is happening from 5 seconds to 8 seconds, which is the clip I just showed you?

A    I heard a loud bang.

Q    Okay. Did you know what the loud bang was immediately?

A    No, not at first. It shocked me. You know, I didn't know what it was. It was just this loud bang, and it took me a second or two to figure out what -- what it was.

Page 13

Q    So I'm going to drag the cursor along. Can you see the seconds at the bottom of the screen here?

A    Yes.

Q    Okay. I'm going to drag the cursor -- it actually won't say the second until I stop it, but take me to the point of discharge. Tell me when you think you heard the bang.

A    Right about -- right about there. Yeah, it was --

Q    So you think the moment where you look down as you're getting out of the car, which is --

A    Yes. Right there. Exactly. That's -- yeah.

Q    Which is at about the 6-second mark here --

A    Yes.

Q    -- there's a discharge?

A    Yes. Yes, sir.

Q    Can you tell me where -- is it -- strike that.

Is it a gun that discharged?

A    Yes.

Q    What gun discharged?

A    What discharged?

Page 14

Q    Yeah. What gun discharged? Was it your gun? I'm trying to --

A    It was my -- yeah, it's my on-duty gun, which was -- at that time was a SIG SAUER P320.

Q    Where was your SIG SAUER P320 at the moment of discharge?

A    It was in my holster.

Q    Where was your holster at the moment of discharge?

A    It was on the left side of my hip where I usually have my holster.

Q    So when you said left side of your hip, was it -- do you see my arrow?

A    Yes.

Q    Is -- what side of your body?

A    It's on the left side. It would be near the car there, the car side.

Q    Got it.

So it is on the side of the hand where you're -- you have something in your hand, you believe to be your phone?

A    Correct. Yes.

Q    Okay. Are you left-handed or right-handed?

A    I am left-handed.

Page 15

Q    So you draw with your left hand, and that's why the holster's on your left hip?

A    Yes, sir.

Q    Okay. What type of holster did you have?

A    That is a Blackhawk T-Series -- T-Series holster. It's a triple retention holster.

Q    Triple retention holster.

So can you describe when you put the gun in the holster, does it make a click? Or how do you know it's seated?

A    Yes. It actually locks in. It makes a click and it locks in.

Q    Is the trigger accessible when the gun is fully seated?

A    No, sir.

Q    What is covering the trigger at the time the gun is fully seated?

A    The holster is -- it's fully covered on -- where the trigger is at with plastic. It's a -- you can't get to the trigger at all.

Q    How -- how do you know that the gun is seated in the holster?

A    Well, it's a triple retention. It clicks in, and then it's got a hood over top of it, making it triple retention. You have to click

Deposition of Officer Donald Thatcher                    Keith & Bianca Slatowski v. Sig Sauer, Inc.

Page 16

1  the -- pull the hood of it up over so the gun
2  can't come out at all.
3      Q    Was the hood over the gun at the time of
4  this incident?
5      A    Yes, sir.
6      Q    So was the gun fully holstered at the time
7  of this incident?
8      A    Yes, sir.
9      Q    All the levels of the triple retention
10 were activated at the time of this incident?
11     A    Yes, sir.
12     Q    So I'm going to take you to the moment
13 where you say you -- you described the discharge.
14 Where is your left hand?
15     A    My left hand, right there -- and I'm just
16 getting out and I'm actually in shock, because I
17 heard the shot go off, and I didn't know at -- for
18 a second what -- you know, what happened.  So I'm
19 just -- I'm just getting out with -- it looks --
20 it appears to be my phone in my hand.
21     Q    Okay.  So your left hand, is it touching
22 your gun?
23     A    No.  Not at all.
24     Q    Is your left hand touching the trigger of
25 your gun?

Page 17

1      A    Not at all.  No, sir.
2      Q    Where is your right hand at the time of
3  discharge?
4      A    My right hand is just pushing the door
5  open.  It's on the door.
6      Q    Is your right hand touching the gun at the
7  time of discharge?
8      A    No, sir.
9      Q    Is your right hand touching your holster
10 at the time of the discharge?
11     A    No, sir.
12     Q    Had you made any modifications to the P320
13 prior to this incident?
14     A    No, sir.  The only thing, it has a
15 flashlight mounted on it.
16     Q    Okay.  On top?
17     A    It's on the bottom.
18     Q    On the bottom?
19     A    Yeah.
20     Q    So it's between the trigger and the end of
21 the barrel?
22     A    Yes.  That -- yeah.  They have mounts for
23 them for police that we put them on like that.
24     Q    Okay.  Do you recall where you got that --
25 that light?

Page 18

1      A    It was issued to us from -- you'd have to
2  ask the chief of police where they got them from.
3      Q    Okay.  And was the holster designed to fit
4  the -- that you know of, to fit the gun with the
5  flashlight on it?
6      A    Yes.  They're made for that, yes.
7      Q    Does the flashlight interact with the
8  trigger in any way?
9      A    No, sir.
10     Q    Okay.  What blocks the flashlight from
11 touching the trigger?
12     A    The trigger guard.
13     Q    Okay.  So I'm taking you now starting at
14 8 seconds and going to the end of the video, and
15 I'll show you and just tell me what you're doing
16 here.
17         (Video playback began.)
18         THE WITNESS:  Okay.  Well, now I'm
19 checking my weapon, and it's locked in.
20 Everything is there, like it should be.
21 And at that point, realizing it just went
22 off inside the holster, I didn't touch it
23 after that.  If you could see, I walk away
24 into the station.  And at that point, I
25 called the lieutenant to advise him that

Page 19

1  my gun just discharged.
2  BY MR. CEISLER:
3      Q    Was any investigation performed into this
4  incident?
5      A    I don't know how much an investigation.
6  The lieutenant, what he did was he showed up.  He
7  was on duty at the point, and we waited until I
8  was in the station and he showed up, and we took
9  the gun out of the holster.
10     Q    Were you disciplined at all as a result of
11 this incident?
12     A    Disappointed?
13     Q    Disciplined.
14     A    Oh, no.  No, sir.
15     Q    Do you know why you were not disciplined
16 as a result of this incident?
17     A    I believe they realized it had nothing to
18 do with anything -- none of my fault.  It was --
19 anything I did.
20     Q    Were you following your department's
21 procedures at the time of this incident?
22     A    Yes, sir.
23     Q    Were you violating any department
24 procedures at the time of this incident?
25     A    No, sir.

Deposition of Officer Donald Thatcher                    Keith & Bianca Slatowski v. Sig Sauer, Inc.

Page 20

1  Q    Are you trained on the use of firearms,
2  sir?
3  A    Yes, sir.
4  Q    Do you understand the basic rules of
5  firearm safety?
6  A    Yes, sir.
7  Q    What -- what are the basic rules, to your
8  understanding, of firearm safety?
9  A    Well, obviously never point the gun at
10 any -- anybody.  We don't pull the gun out at all
11 unless, you know, circumstances, you know, apply
12 for that.  But, yeah, I've been a police officer
13 since 2003 with, you know, qualifications with a
14 gun every year.  So, yeah, I believe I'm pretty
15 verse in safety of guns.
16 Q    Were you pointing the gun at anybody in
17 this incident?
18 A    No, sir.
19 Q    Did you pull your gun out in this
20 incident?
21 A    After it occurred, we cleared the gun for
22 safety reasons.
23 Q    But not at the time of discharge; correct?
24 A    Upon discharge, no.  No, I did not.
25 Q    Did anybody ever accuse of you violating

Page 21

1  any firearm safety rules?
2  A    No, sir.
3  Q    Can you think of anything that you did
4  wrong to cause this gun to go off?
5  A    No.
6       MS. DENNISON:  Object to the form.
7  BY MR. CEISLER:
8  Q    Sitting back today, do you have any idea
9  how or why this gun discharged?
10 A    I have no idea why.
11 Q    As a police officer, do you expect that
12 your guns are going to go off in their holster?
13 A    Not at all.
14 Q    Do you trust gun manufacturers to make
15 guns that don't go off in their holster?
16 A    I do.
17      MS. DENNISON:  Objection to form.
18 BY MR. CEISLER:
19 Q    Did you trust SIG SAUER with your safety
20 here, sir?
21 A    Yes, I did.
22 Q    Did SIG SAUER earn your trust?
23 A    No.
24      MS. DENNISON:  Objection to form.
25

Page 22

1  BY MR. CEISLER:
2  Q    You were not hit by this round; right,
3  sir?
4  A    I was not, no.
5  Q    Could you have been?
6  A    Yes.
7  Q    Where is the gun now?
8  A    That gun has, with the other SIG SAUERs we
9  had, have been returned to the company that we
10 bought them off of, Atlantic Tactical.
11 Q    Was SIG SAUER notified of this incident?
12 A    I believe so.  That would have to be
13 clarified with the chief of police.  He's the one
14 that did that part.
15 Q    Okay.  Let's see.
16      Do you have any idea if your seat belt
17 got in the holster in any way?
18 A    I --
19      MS. DENNISON:  Objection to form.
20      THE WITNESS:  I have no idea.  When
21 I got out, I took the seat belt off.  It
22 felt like it was, like, alongside of me,
23 the seat belt, when I took it off and got
24 out, but it was already cleared from me
25 when I stepped out, when the gun went off.

Page 23

1  BY MR. CEISLER:
2  Q    And --
3  A    The seat belt --
4  Q    Oh, sorry.  Go ahead, sir.
5  A    Yeah, it was already -- the seat belt was
6  not -- when the gun went off, it was not attached
7  to me.  You know what I'm saying?
8  Q    And the hood was over the gun the whole
9  time you were in the car; right?  It was over --
10 A    Yes.
11 Q    The holster -- the gun was fully
12 holstered?
13 A    Yes.
14 Q    Okay.
15      MR. CEISLER:  I have no further
16 questions.
17      Officer Thatcher, thank you so much
18 for your time.  Ms. Dennison may have a
19 few questions -- she may have a bunch of
20 questions -- and then I may have some
21 follow-ups.  But we do appreciate your
22 time, sir.
23      THE WITNESS:  Okay.  Thank you.
24      MS. DENNISON:  Thank you, sir.  I
25 do --

Page 40

1  further questions for you.  Thank you,
2  Sergeant Thatcher.
3       FURTHER EXAMINATION
4  BY MR. CEISLER:
5  Q    Sergeant, I have about three questions.
6  A    Okay.
7  Q    Did the round discharge after you shot --
8  or after it shot?
9  A    It discharged -- yes.  It went into the
10 pavement.
11 Q    Okay.  It came out of the -- it came out
12 of the gun?
13 A    Yes.
14 Q    Okay.  Your GLOCK has a little tab on the
15 trigger; right?
16 A    I believe so, yes.
17 Q    Do you know if you need to pull that
18 little tab to make the trigger discharge?
19 A    Yes.
20 Q    Have you shot with your GLOCK?
21 A    Yes.
22 Q    Have you had any issues pulling the
23 trigger?
24 A    No, sir.
25 Q    Has that little tab prevented you from

Page 41

1  being able to use the gun the way you need to use
2  it?
3  A    No, sir.
4       MR. CEISLER:  I have no
5  questions -- no further questions.
6       MS. DENNISON:  I have -- I just
7  have one.
8       FURTHER EXAMINATION
9  BY MS. DENNISON:
10 Q    Just to clarify, Sergeant Thatcher, I know
11 you said the round went into the pavement.  Do you
12 know what happened to the shell casing?
13 A    I believe we still have it.
14 Q    Do you know where it was found?
15 A    Yes.  It was actually still in the
16 chamber.  It couldn't -- because the hood was over
17 the -- the holster, the gun couldn't eject it.  It
18 was actually still in the chamber.
19      MS. DENNISON:  Okay.  Thank you.
20 That's all I have.
21      FURTHER EXAMINATION
22 BY MR. CEISLER:
23 Q    And to clarify, so did it come out after
24 you took the gun out of the holster?  Did you take
25 the gun out of the holster?

Page 42

1  A    Yes.  When we -- when I -- I came into the
2  station, did not touch the weapon until
3  Lieutenant Langman show- -- arrived, and then I
4  pulled the gun out, handed it over to
5  Lieutenant Langman, and he ejected the casing out,
6  which was still in the chamber.
7  Q    Got it.
8  A    And then we -- we stripped the gun of the
9  rounds and made them -- made it safe.
10 Q    Got it.
11      So the round itself, the bullet, went
12 through the bottom of the holster, hit the
13 pavement, and the casing stayed inside the
14 holster; is that correct?
15 A    Yes.  It actually went down through the
16 back of my pant leg.  I have pant leg holes.  So
17 it went down through my pant leg, and then it hit
18 the pavement, yes.
19 Q    Got it.
20      MR. CEISLER:  Kristen, any
21 follow-ups?
22      MS. DENNISON:  No.
23      THE WITNESS:  No.  I don't have
24 anything.
25      MR. CEISLER:  All right.  We're

Page 43

1  done.  Thank you very much, Sergeant.  We
2  appreciate your time, and we appreciate
3  your department's cooperation in getting
4  us these videos.  And I hope you have a
5  great, safe rest of your day.
6       THE WITNESS:  All right.  Thank
7  you.  You too.
8       THE VIDEOGRAPHER:  All right.  This
9  now concludes the video deposition of
10 Officer Donald Thatcher.  We're going off
11 the record at 11:03 a.m.
12      (Off the record at 10:03 a.m. CST)
13      (The following discussion was held off
14 the video record:)
15      (On the record at 10:18 a.m. CST)
16      MR. CEISLER:  What was Exhibit C in
17 that deposition, and how was it acquired?
18      MS. DENNISON:  Oh, yeah.  I'll send
19 you a copy of it.  Exhibit C is -- was an
20 exhibit to a municipal, like, magisterial
21 district matter filed by Honesdale Police
22 Department against Atlantic Tactical and
23 SIG SAUER that was apparently resolved
24 yesterday between Honesdale Police
25 Department and Atlantic Tactical.

EXHIBIT K

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    _____
 3
    KEITH and BIANCA SLATOWSKI,    :
 4                                 :
              Plaintiffs,          :
 5                                 :  CIVIL ACTION
         v.                        :  No. 2:21-cv-00729
 6                                 :
    SIG SAUER, INC.,               :
 7                                 :
              Defendant.           :
 8

 9

10

11

12           The video recorded deposition of

13      OFFICER ROBERT GREENE, was held on Wednesday,

14      May 24, 2023, commencing at 10:05 a.m. via

15      Zoom Web Conference, before Heather Hoffman,

16      Court Reporter-Notary Public, there being

17      remote:

18

19

20

21

22

23
    Stenographically Reported By:
24  Heather Hoffman, RPR
```

```
 1   Remote Appearances:

 2     DANIEL L. CEISLER, ESQUIRE
          Saltz, Mongeluzzi & Bendesky, P.C.
 3        One Liberty Place
          1650 Market Street
 4        52nd Floor
          Philadelphia, Pennsylvania 19103
 5        215.575.3898
          dceisler@smbb.com
 6
            On behalf of the Plaintiffs:
 7

 8     KRISTEN DENNISON, ESQUIRE
          Littleton Park Joyce Ughetta & Kelly, LLP
 9        201 King of Prussia Road
          Suite 220
10        Radnor, Pennsylvania 19087
          484.254.6226
11        kristen.dennison@littletonpark.com

12          On behalf of SIG Sauer:

13
       COLIN CHERICO, ESQUIRE
14        United States Attorney's Office
          Eastern District of Pennsylvania
15        615 Chestnut Street, Suite 1250
          Philadelphia, Pennsylvania 19106
16        colin.cherico@usdoj.gov

17          On behalf of Immigration & Customs
            Enforcement:
18
     VIDEOGRAPHER:
19        Alex Marothy

20   ALSO PRESENT:
     Ryan D. Hurd, Esquire
21   Sean Eaton-Robb
     Saltz, Mongeluzzi & Bendesky, P.C.
22
     Alexandra Ellis - ICE
23   Sarah Shilvock -  ICE

24
```

```
 1                              INDEX
                   DEPOSITION OF ROBERT GREENE
 2                     Wednesday, May 24, 2023

 3

 4    Examination By:                                      Page

 5          Mr. Ceisler...................................5

 6

 7    Examination By:

          Ms. Dennison...............................33
 8

 9

10

11

12

13                  -- E X H I B I T S --

14    Exhibit               Description                    Page

15    Greene-1      Video...................................6

16    Greene-2      Truncated Video.......................10

17    Greene-3      Management Inquiry
                    Investigative Report.................16
18

19    Greene-4      Answers to Interrogatories...........57

20

21

22

23

24
```

Page 4

1  Whereupon,

2              - - -

3      IT WAS STIPULATED AND AGREED by and

4  amongst counsels that signing, sealing,

5  certification and filing be reserved; and

6  that all objections, except as to the form of

7  the question, be reserved until the time of

8  trial.)

9      THE VIDEOGRAPHER:  We are now on the

10 record.  Today's date is May 24th, 2023, and

11 the time is 10:05 a.m. Eastern Time.

12     This is the recorded video deposition

13 of Robert Greene -- Officer Robert Greene

14 being taken in the matter of Keith and

15 Bianca Slatowski versus SIG Sauer, Inc., in

16 the United States District Court for the

17 Eastern District of Pennsylvania,

18 Case Number 2:21-cv-00729.

19     My name is Alex Marothy, I'm the video

20 specialist.  The court reporter today is

21 Heather Hoffman.  We are both from

22 Everest Court Reporting.

23     All counsel appearing today will be

24 noted on the stenographic record.

Page 5

1      Will the court reporter please swear in

2  the witness.

3              - - -

4      ROBERT GREENE, having been duly sworn, was

5  examined and testified as follows:

6              - - -

7           EXAMINATION

8  BY MR. CEISLER:

9      Q    All right.  Good morning,

10 Office Greene.  How are you doing today?

11     A    Good morning.  I'm fine.

12     Q    Can you please state your duty

13 position?

14     A    I am a deportation officer with ERO

15 under ICE.

16     Q    How long have you been with ICE?

17     A    Sixteen years.

18     Q    Can you describe the firearms training

19 you've received with ICE?

20     A    We qualify every quarter with my issued

21 SIG Sauer.

22     Q    How long have you been carrying a

23 SIG Sauer?

24     A    Since I got hired on the agency, that's

Page 6

1  the only manufacturer that I've been issued.

2      Q    Do you recall the different types of

3  models of SIG Sauer you've received?

4      A    We had a prior one that was a

5  40 caliber, and I honestly can't remember the model

6  number off the top of my head.

7      Q    Have you ever experienced an

8  unintentional discharge, other than the one which

9  occurred on August 3rd, 2021, which we're going to

10 talk about today?

11     A    No.

12          (Greene Deposition Exhibit 1 was

13     marked for identification.)

14 BY MR. CEISLER:

15     Q    I'm now going to show you a video.  I'm

16 going to mark it as Exhibit 1.

17          Can you see my screen all right, sir?

18     A    Yes, I can.

19     Q    All right.  I'm going to play you the

20 first minute of the video and then ask you some

21 questions about it.  Okay?

22     A    All right.

23          (Whereupon, a video was played for the

24     deponent to view.)

Page 7

1  BY MR. CEISLER:

2      Q    I am going to stop it at 32 seconds.

3          Sir, have you seen this video before?

4      A    I have.

5      Q    What does this video depict, generally?

6      A    It depicts me taking out the lockbox

7  key and putting back in my equipment and my duty

8  weapon back in the holster.

9      Q    Is there a discharge of a weapon in

10 this video?

11     A    Yes, there was.

12     Q    Does this video fairly and accurately

13 represent the discharge incident of

14 August 3rd, 2021, as you recall it?

15     A    Yes.

16     Q    I'm now going to show you another

17 video, which is, I can represent to you, a close-up

18 of the same video.  I'm just going to ask you a few

19 questions about that.

20     A    Okay.

21          MR. CEISLER:  Off the record for a

22     second.

23          THE VIDEOGRAPHER:  We're going off the

24     record.  The time is 10:09 a.m.

Page 8

1          (Whereupon, a short recess was had from
2     10:09 a.m. to 10:10 a.m.)
3          THE VIDEOGRAPHER:  We are back on the
4     record.  The time is 10:10 a.m.
5  BY MR. CEISLER:
6     Q    All right.  Sir, can you see my screen
7  all right?
8     A    Yes.
9     Q    I'm going to show you another video.
10         (Whereupon, a video was played for the
11    deponent to view.)
12 BY MR. CEISLER:
13    Q    Does this video fairly and accurately
14 represent the August 3rd, 2021, discharge incident,
15 as you recall it?
16         MS. DENNISON:  Objection to form.
17 BY MR. CEISLER:
18    Q    You can answer, sir.
19    A    Yes.
20    Q    Is there anything different about this
21 video, other than the fact that it's zoomed in from
22 the other video?
23         MS. DENNISON:  Objection to form.
24

Page 9

1  BY MR. CEISLER:
2     Q    You can answer, sir.
3          MR. CHERICO:  Yeah, object- -- I join
4     the objection.
5          I mean, I'm sure it appears like the
6     same video, but I don't know if he's, like,
7     been able to study them.
8          MR. CEISLER:  Sure.  Well, I will
9     show -- I will show the video, which I can
10    represent is just zoomed in from the first
11    video.
12 BY MR. CEISLER:
13    Q    And I'm just seeking to confirm that
14 this video also fairly and accurately represents
15 his recollection of this incident.
16    A    Yes.
17         MS. DENNISON:  It's the same objection.
18 BY MR. CEISLER:
19    Q    What I'm going to do now, sir, is go
20 through this video, kind of, chunk by chunk, and I
21 would like you to describe what you recall about
22 this incident and describe what is happening in the
23 video.
24         MS. DENNISON:  Danny, I'm going to --

Page 10

1  I'm going to object to the extent that you're
2  contemporaneously showing him a video that
3  could potentially be refreshing his
4  recollection, while also asking him what his
5  independent recollection is.  I don't --
6  BY MR. CEISLER:
7     Q    Do you recall this incident from
8  August 3rd of 2021?
9     A    Yes.
10    Q    All right.
11         STENOGRAPHIC REPORTER:  Counsel, can we
12 go off the record for a second.
13         MR. CEISLER:  Sure.
14         MS. DENNISON:  Sure.
15         THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 10:12 a.m.
17         (Whereupon, a short recess was had from
18 10:12 a.m. to 10:14 a.m.)
19         THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 10:14 a.m.
21         (Greene Deposition Exhibit 2 was
22 marked for identification.)
23         MR. CEISLER:  All right.  I'm going to
24 introduce this video as Exhibit 2.  This is

Page 11

1  the video with the zoom.
2  BY MR. CEISLER:
3     Q    First, where are you in this video,
4  sir?
5     A    I am at the lockbox inside of the jail
6  sally port, the St. Clair County Jail in
7  Port Huron, Michigan.
8     Q    And just to absolutely confirm:  That
9  is you with the blue jacket and the tan, khaki
10 pants?
11    A    Yes.
12    Q    What were you doing there, sir?
13    A    I am getting ready to unlock the
14 lockbox and take out my ICE-issued equipment and my
15 sidearm.
16    Q    Had you worked at this facility before?
17    A    I'm sorry?
18    Q    Had you work at this -- had you worked
19 at this facility before?
20    A    For ICE?
21    Q    Yes, sir.
22    A    Yes.
23    Q    And what were you doing at this
24 facility?

Deposition of Officer Robert Greene                    Keith & Bianca Slatowski v. Sig Sauer, Inc.

Page 12

1    A    I was there as a liaison for my agency.
2    Q    So here you are at the lockbox. We're
3 at 14 seconds in the Video 2 -- Exhibit 2.
4         So can you describe for me what you are
5 doing from -- actually, we're at 10 seconds, so
6 between 10 seconds and about 11 seconds.
7         So in that chunk I just showed you,
8 right before you put your hand on the gun, what are
9 you doing?
10   A    Right before I put my hand on the gun?
11   Q    No, right -- right before you put your
12 hand on the gun.
13   A    I'm reaching in the box and pulling out
14 my firearm.
15   Q    Okay. So your firearm, was it in the
16 holster at -- at that point?
17        MR. CHERICO:  Objection.
18        MS. DENNISON:  Same objection.
19 BY MR. CEISLER:
20   Q    Where is your firearm right now?
21        MR. CHERICO:  Okay, just let's right --
22 like, the "right now" part --
23        MR. CEISLER:  Sure.
24        MR. CHERICO:  -- I think is what we're

Page 13

1 trying to clear up.
2 BY MR. CEISLER:
3    Q    In this -- in this moment, where is
4 your firearm?
5    A    In this moment, I believe it's still
6 inside the box. It's -- obviously, I can't see it,
7 so that would be my assumption.
8    Q    So you are retrieving your firearm from
9 the box?
10   A    Correct.
11   Q    Okay. Where is your firearm at this
12 moment?
13   A    It's in my hand just above the holster,
14 I believe.
15   Q    And you are holstering the weapon?
16   A    Correct.
17   Q    Okay. Stop me at the moment of
18 discharge that you -- as you recall it.
19   A    There.
20   Q    There?
21        MS. DENNISON:  Objection to form.
22 BY MR. CEISLER:
23   Q    As you recall, this frame at 13 seconds
24 is the moment of discharge?

Page 14

1    A    As best as I can tell. I -- I honestly
2 don't recall that exact moment.
3    Q    Okay. So, approximately, this frame
4 right here -- well, I'll show you another frame,
5 two frames later.
6         Do you believe the weapon had
7 discharged at this point?
8    A    By my body language, I believe so.
9    Q    Okay. We're going back a frame
10 earlier, where was your finger at the moment of
11 discharge?
12   A    Are you -- which finger are you
13 referring to?
14   Q    Let's say your right index finger.
15        MR. CHERICO:  Ob- -- objection. On the
16 basis that I don't think he's been able to
17 identify exactly when the discharge occurred.
18 He hasn't recalled that. And so, therefore,
19 to say, "where was your finger at the time of
20 discharge," I find a little -- that's my
21 objection.
22        MS. DENNISON:  Join in the objection.
23 BY MR. CEISLER:
24   Q    Do you recall where your finger was at

Page 15

1 the moment of discharge?
2    A    I believe it was outside of the
3 holster.
4    Q    Do you recall giving a statement as
5 part of an investigation into this incident?
6    A    Yes.
7    Q    Do you recall if in your statement you
8 said whether your finger was inside the holster or
9 outside of the holster?
10        MR. CHERICO:  Objection.
11        You can answer if you understand.
12   A    I don't recall exactly when I made that
13 statement. But I -- if that's what I said at that
14 time, I'm not going to argue that.
15        MR. CHERICO:  The objection: We
16 haven't established what you did say.
17        THE WITNESS:  Right.
18        MS. DENNISON:  So...
19        THE WITNESS:  Yeah.
20        MR. CHERICO:  That's...
21        THE WITNESS:  I honestly can't remember
22 at -- it's been a while since I spoke to
23 anybody about it.
24

Page 16

BY MR. CEISLER:

Q   Okay.  Sure.

MS. DENNISON:  Please join in the objection.

(Greene Deposition Exhibit 3 was marked for identification.)

MR. CEISLER:  All right.  Then I'm going to introduce, as Exhibit 3, a document which has been produced to us entitled Management Inquiry Investigative Report, along with ten exhibits that came with it.  This was produced by ICE to us.

BY MR. CEISLER:

Q   There's a line here which states, "DO-redacted stated, I honestly have no idea.  I made sure that my finger was outside the trigger guard area while holstering, and nothing was in the holster.  So I really have no idea clue as to what happened."

Does that statement refresh your recollection of what you stated as part of the investigation at the time as to whether your finger was inside the trigger guard?

MS. DENNISON:  Objection to form.

Page 17

A   I'm going to -- yes, if -- that's the statement I gave at the time -- at that time, I believe that's what I believed and what I said.

BY MR. CEISLER:

Q   Sir, was your finger inside of the trigger guard at the time this gun discharged?

A   No.

Q   How sure are you of that?

A   I feel a hundred percent sure on that.

Q   Was your finger on the trigger at the time the gun went off?

A   No.

Q   And how sure are you of that?

A   I'm a hundred percent sure of that also.

Q   Was your finger outside of the holster at the time the gun discharged?

A   Yes, I believe so.

Q   And you've reviewed video of this incident, correct?

A   It's been a while, but, yes, I did.

Q   And did that video confirm your belief that your finger was outside of the holster at the time of the incident?

Page 18

A   It did to me, yes.

Q   What were you wearing at the time of the incident?

A   ICE issued -- I guess you could say it's a uniform.

Q   I'll pull the video back up.

So can you describe to me, kind of, head to toe what you're wearing?

A   I'm wearing an ICE windbreaker jacket.  I can't see the shirt, but I don't see why I would have worn anything different.  I typically wore an ICE-issued polo on my day of work, and those are khaki BDU-style pants.

Q   Are you wearing a belt, a duty belt?

A   I'm wearing a belt.  It's not an issued duty belt.  It's one that I purchased myself.  They don't issue us duty belts.

Q   What type of holster are you wearing?

A   That is the issued holster that I received when I received that weapon.  It's a black molded plastic.  I believe the brand was the same as the firearm.

Q   Was there any zippers on your polo shirt?

Page 19

A   On my shirt, no -- there's -- no, no zippers.

Q   Were there any zippers on the pants?

A   Just at the groin area, one zipper.

Q   And is it fair to say that zipper could not touch or get inside your holster?

A   Yes, I would say.

Q   What zippers were on the windbreaker?

A   There were no zippers.

Q   How would you tie or fasten or close the windbreaker?

A   It had snaps.

Q   Okay.  Did the snaps go outside the jacket in any way or were they, kind of, right in close, attached to the jacket?

MR. CHERICO:  Objection.

MS. DENNISON:  Objection to form.

BY MR. CEISLER:

Q   You can answer, sir.

A   I honestly don't know how to explain them.  They're snaps on a windbreaker.

Q   Like, typical snaps on a windbreaker or anything -- it's a button that clips in?

A   Yeah, I mean as far as --

Page 20

1    MS. DENNISON:  Object to form.
2  BY MR. CEISLER:
3    Q    You can answer, sir.
4    A    Again, I don't know how else to -- to
5  me, it seems standard.  I don't know any different.
6    Q    Looking at the video and going back to
7  your recollection, are there any zippers that could
8  have gotten into your holster?
9    MS. DENNISON:  Objection to form.
10    A    No.
11  BY MR. CEISLER:
12    Q    Can you think of anything that was
13  inside of your holster at the time of the
14  discharge?
15    MS. DENNISON:  Objection to form.
16    A    I can't think of anything.
17  BY MR. CEISLER:
18    Q    Sitting here today, having a couple
19  years between the incident and today, having
20  reviewed the video, having participated in an
21  investigation of this incident, do you have any
22  idea what caused that gun to go off?
23    MS. DENNISON:  Objection to form.
24

Page 21

1  BY MR. CEISLER:
2    Q    You can answer, sir.
3    A    I do not.
4    Q    Did a spent shell casing eject from the
5  gun?
6    A    I don't know.
7    MS. DENNISON:  Objection to form.
8  BY MR. CEISLER:
9    Q    You don't recall if a shell casing
10  ejected?
11    A    I do not.
12    MR. CEISLER:  I'm now going to go to
13  Exhibit 3 --
14    STENOGRAPHIC REPORTER:  Counsel, is
15  this Exhibit 4?  3 was a document --
16    MR. CEISLER:  This is 3.  I'm
17  referring to Exhibit 3 --
18    STENOGRAPHIC REPORTER:  Back to 3.
19    MR. CEISLER:  -- which is the
20  investigation report and its exhibits.
21  BY MR. CEISLER:
22    Q    So this is the St. Clair County Jail
23  Incident Report.
24    Do you recall speaking with someone

Page 22

1  from the St. Clair County Sheriff's Office as part
2  of an investigation?
3    A    Yes.
4    Q    There's a line in this report which
5  provides --
6    MS. DENNISON:  Could you -- Danny, I
7    don't mean to interrupt you.  Could you
8    just -- this is a 66-page document, so just,
9    for the record, even though I know we have
10    video, but for the written record, could you
11    identify what exhibit and page number you're
12    referencing.
13    MR. CEISLER:  Sure.  This is Page 3 of
14    Exhibit 5 to the ICE Investigation Report.
15  BY MR. CEISLER:
16    Q    So there is a line which provides,
17  "(Redacted) holstered the pistol.  His finger was
18  not on the trigger and out on the trigger guard.
19  He said his pistol was within the holster when he
20  heard it fire.  At this time, he was not sure if a
21  round actually discharged in the pistol.  He said
22  he set it down and determined the round did not
23  actually eject."
24    Does that statement accurately reflect

Page 23

1  your recollection of the event?
2    MS. DENNISON:  Objection to form.
3    A    I don't honestly remember.
4  BY MR. CEISLER:
5    Q    Okay.  So do you have any reason to
6  believe you would have said anything other than
7  what this indicates?
8    MR. CHERICO:  Objection.
9    MS. DENNISON:  Objection to form.
10  BY MR. CEISLER:
11    Q    You can answer, sir.
12    MR. CHERICO:  Objection.  He said --
13    you've showed him the document to refresh his
14    recollection, and he doesn't recall.  So I
15    don't know what...
16  BY MR. CEISLER:
17    Q    Okay.  Would you have been -- would you
18  have been dishonest in any way when being
19  interviewed by the St. Clair Sheriff's Department?
20    MS. DENNISON:  Objection to form,
21    hearsay.
22    A    No.
23  BY MR. CEISLER:
24    Q    Would you have shared your recollection

Page 24

of the events accurately, to the best of your
ability?

MR. CHERICO: Objection.

You can answer.

A    I believe so, I would have. I don't...

BY MR. CEISLER:

Q    Would you have said that a round did
not actually eject if you knew a round ejected?

MS. DENNISON: Objection to form.

A    No.

BY MR. CEISLER:

Q    Do you have any reason to question now,
sitting here today, that a round did not actually
eject from the gun?

MS. DENNISON: Objection to form.

A    I do not.

BY MR. CEISLER:

Q    Was your pistol fully seated at the
time it discharged?

MS. DENNISON: Objection to form.

A    I do not know.

BY MR. CEISLER:

Q    Was it inside of the holster at the
time it discharged?

Page 25

A    I believe it was, partially.

Q    Do you know, partially or fully?

A    I do not know how far in the holster it
was.

Q    Okay. And to confirm, this was a
SIG Sauer P320, correct?

A    Yes.

Q    And it was SIG Sauer P320 that you were
issued by ICE?

A    Yes. I was issued that weapon by ICE.

Q    It didn't have any sort of manual
external safety?

A    No.

Q    Okay. Was an investigation performed
into this incident?

A    By whom?

Q    By ICE.

A    Yes.

Q    Were you disciplined by ICE as a result
of this incident?

A    No.

Q    Do you recall why you were not
disciplined by ICE as a result of this incident?

A    It was just determined -- or I was told

Page 26

it was determined that I didn't -- there was no
wrongdoing on my part.

Q    Is that because your finger was not on
the trigger at the time the weapon discharged?

MR. CHERICO: Objection.

MS. DENNISON: Objection to form.

A    I don't know why they would have made
that conclusion. That's just what I was told, not
the reason behind it.

BY MR. CEISLER:

Q    Have you seen this document before, the
Management Inquiry Investigative Report?

A    I honestly can't remember if I have
seen it or not.

Q    Do you recall at any point receiving
the findings of the investigation, which listed
here provide, "Based on all the information,
interviews, facts, and video obtained throughout
this investigation, it does not support that
DO-redacted caused a negligent discharge of his
ICE-issued firearm. Video of the incident clearly
shows that DO-redacted finger was not on the
trigger or inside the trigger guard when his weapon
discharged."

Page 27

Okay. Have those findings ever been
provided to you?

A    Yes. The findings were provided to me.

Q    Okay. And does this statement here
accurately reflect the findings as they were
provided to you?

A    To my best recollection, yes.

Q    Okay. Were you negligent in this
incident?

MR. CHERICO: Objection.

MS. DENNISON: Objection to form.

A    No.

BY MR. CEISLER:

Q    Did you do anything wrong?

MS. DENNISON: Objection to form.

A    No.

BY MR. CEISLER:

Q    Did you do anything outside of your
training?

MS. DENNISON: Objection to form.

A    Not that I'm aware of.

BY MR. CEISLER:

Q    Were you following your training?

A    Yes.

Page 28

Q    Were you following the basic rules of firearm safety, as you know them?

A    Yes, as I know them.

Q    I'm going to pull the video back up. So I want you to walk me through the next few seconds here after the discharge.

What happened immediately after the discharge to the gun?

A    Af- -- after the discharge, I mean, obviously, the video shows I was startled. I immediately put the weapon down on the ground to try to ascertain what had just occurred.

Q    Do you still see my screen?

A    Yes.

Q    What's happening now?

A    The best I can remember is -- I mean, I was obviously upset and I know that there was some damage done to those pants that I was wearing, so...

Q    Who are you talking to?

A    I can't tell exactly who it is, I know it's an employee of the jail, but I don't know which employee exactly.

Q    Did you expect, at this time, that a

Page 29

pistol could discharge without you putting your finger on the trigger?

MR. CHERICO:  Objection.

MS. DENNISON:  Objection to form.

BY MR. CEISLER:

Q    You can answer, sir.

A    I really can't answer that because --

MR. CHERICO:  Okay.  I'm -- we're moving away from what happened.  We're starting to ask for opinions and -- and things like that that really are outside the scope.

So if we can put it in a different direction, we can continue.  Otherwise, I'll start directing him not to answer.

BY MR. CEISLER:

Q    Did you speak with anybody outside of this investigation about -- or outside of ICE about what happened?

A    Yes.

Q    Who did you speak with?

A    Are you talking the day of?  Down the road?  I mean, is there a context --

(Overlapping speakers).

Page 30

Q    Between -- between when it happened and today.

A    Oh, well, there's been -- I mean, jail personnel, obviously.  At the time of the incident, EMS arrived eventually, my spouse explained, and then I was contacted by different attorneys about the incident.

Q    Have you ever told anybody a version of the events that differed from what you told today?

A    No.

MS. DENNISON:  Object to the form.

BY MR. CEISLER:

Q    Was there a flashlight mounted on the firearm at the time of discharge?

A    No.

Q    Okay.  Do you recall being issued different types of holsters with this firearm?

A    With this firearm, I believe I was issued two holsters.

Q    Do you think you received a molded plastic pancake-style concealment holster and a Safariland Duty Holster?

A    I rec- -- it was -- the molded plastic wasn't a pancake, it was a belt loop.  And then I

Page 31

received another holster, also, another duty holster.

Q    And that molded plastic belt loop, that was the one you were using at the time of the incident?

A    Correct.

Q    Do you recall if that holster was designed for a flashlight to go into it, a weapon-mounted flashlight?

MR. CHERICO:  Objection.

A    No.

BY MR. CEISLER:

Q    It was not?

A    Correct.

Q    Okay.  And I believe you've already testified to this, but I just want to confirm: This was a holster you were issued by ICE, correct?

A    Correct.  It was given to me by my agency.

Q    I'm now going to show you Page 4 of Exhibit 3 -- strike that.  It's not Page 4.  It's Page 4 of Exhibit 9.

So it's Page 4 of 5, of Exhibit 9, which is the Acting AFOD Affidavit.

Page 32

What is an "AFOD"?

A    It stands for Assistant Field Office Director.

Q    Did you speak to your Assistant Field Office Director about what happened after this incident?

A    I do not remember.

Q    Okay.  In this document, which was provided to us by ICE, the assistant field office director, as part of the investigation, was asked, "To your knowledge, was the shell casing found?"  Their answer: "Yes, the shell casing was lodged in the breach of the firearm when it was turned in to me."

Do you have any reason to doubt the Assistant Field Office Director's response there?

MS. DENNISON:  Objection to form.

A    No.  That's what they stated.

MR. CEISLER:  That's all the questions I have right now.

Ms. Dennison, I'm sure, will have a few, and then I may have some on the back end.  So thank you very much for your time today, sir.

Page 33

EXAMINATION

BY MS. DENNISON:

Q    Good morning, sir.  My name is Kristen Dennison.  I represent SIG Sauer in this matter for which you've been asked to provide a deposition.

Were you injured in this incident?

A    Yes, slightly.

Q    And how were you injured?

A    I had -- I believe an epidermal abrasion.

Q    What does that mean?

A    In layman terms, the doctor said a really bad bruise.

Q    Okay.  When did you see a doctor?

A    I honestly don't remember how soon after the incident I saw a doctor.

Q    Okay.  Did you see a doctor once or more than once about this injury?

A    For this injury, just the one time.

Q    Okay.  And why did you go to the doctor to get it looked at?

A    My office asked if -- asked the same question, if I was injured.  I told them and they

Page 34

said that I should go get it checked out.

Q    Okay.  And what did the doctor tell you about the bruise?

A    He just told me that it's going to be sore and hurt for a while.  He gave me some topical cream to put on it that might help it, but he said only time is going to fix it.

Q    Okay.  And did it heal?

A    Eventually, yes.

Q    You said that you were contacted by some attorneys, different attorneys.

Do you recall who you were contacted by?

A    I do not remember anybody's name.

Q    How many attorneys contacted you?

A    The first time it was one attorney, and then the next time it was a different firm, and I believe there was more than one attorney on the call, but I don't remember specifically how many people or anybody's names.

Q    Were you ever contacted by an attorney named Jeff Bagnell, if you recall?

A    I don't recall, but the name does sound vaguely familiar.

Page 35

Q    The attorneys who contacted you, do you know why they contacted you?

A    Initially, I was contacted because they told me that they were a client -- they had a client that was also an employee of my agency that was involved in a similar incident.

MR. CEISLER:  I'm going to object, and can we go off the record.

THE VIDEOGRAPHER:  We're going off the record.  The time is 10:43 a.m.

(Whereupon, discussion was held off the video and stenographic record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:47 a.m.

BY MS. DENNISON:

Q    Okay.  All right.  Officer Greene, just before we went off the record, we were talking about -- I was asking you some questions about attorneys who contacted you.

A    Uh-huh.

Q    Were there -- were there ever -- was there a time when you contacted an attorney yourself to seek legal advice?

A    No, not for legal advice.

Page 36

Q    Okay.  All right.  So was there a time
when you reached out to an attorney at any point in
time about your injury, where you initiated the
contact?

A    I never initiated the contact with any
attorney.  I did provide the courtesy if there was
a message or something sent to me, I did, you know,
politely return their call or, you know, try to get
back with them.

Q    Okay.  Now, I asked you if you remember
the name Jeff Bagnell and you indicated it sounded
familiar, but you couldn't -- I think you couldn't
be sure that that was somebody that you spoke with.

Do you recall ever speaking with
Mr. Ceisler here, who has been asking you the
questions so far this morning?

A    As I stated earlier, I did speak to
multiple lawyers with, I believe, different firms.
And it could have been him, I don't remember
everybody's names.

It was -- like I said, it was a while
ago.  And, you know, I never looked -- wrote
anything down or kept anything with anybody's name
on it, nor did I ever receive anything from anybody

Page 37

with their name on it either.

Q    Okay.  Now, right before we went off
the record, I had asked you what the attorneys who
contacted you about -- spoke with you about.  And
you indicated that you were initially contacted by
a lawyer, and you started saying they had a client,
I think you said with ICE, who was also injured.

Can you -- can you finish telling me
what that conversation was.

A    Yes.  This -- the first attorney
reached out to me said -- he'd introduced himself,
said, basically, briefly, what he was calling me
about.  And, honestly, he knew a whole lot of the
facts about what had already happened to me before
I told him anything.  And then when he explained to
me who his client was, it made sense.  We work for
the same agency, different offices.

But in the government, you know, I
mean, there's a large flow of information that gets
disseminated around.  So I wasn't surprised that
somebody else had already known everything.  I
mean, before I even showed up in the building -- my
field office the next day, everybody already knew.
So -- and I didn't tell anybody.

Page 38

Q    The first lawyer who contacted you, who
did he represent?

A    I -- I don't remember the name, to be
honest, and I can't honestly say if he said the
name specifically.  He just -- I believe he told me
he was an ERO officer, I thought he said.  I
don't -- I could be wrong, and out of Philadelphia.

And he just explained to me this -- his
incident.  It was more severe than mine, but
similar.  And we carried the same weapon,
obviously, work for the same agency, so...

Q    Do you recall if it was
Keith Slatowski?

MR. CEISLER:  Objection.

A    I do not.  I don't -- honestly, I do
not remember the name or if he said the whole name,
to be honest.

BY MS. DENNISON:

Q    Sure.  No problem.

Do you recall how many times -- I know
you talked about the first time, one attorney,
second time, it was more than one attorney from a
different office.  Do you recall if there were more
than those two times you were contacted by

Page 39

attorneys about the incident?

MR. CEISLER:  Objection.

A    Yes.  There was more than those two
times.  I honestly don't remember how many times.
Because like I said, sometimes it would be a phone
call and I didn't answer the call, so...

BY MS. DENNISON:

Q    Okay.  Do you recall if it was more
than two firms?

MR. CEISLER:  Objection.

A    I believe so.  Like I said, I don't
know what firms they worked for, but I thought that
there were two different firms.

BY MS. DENNISON:

Q    Do you recall if the attorneys who were
contacting you were representing individuals who
had been injured using a P320?

MR. CEISLER:  Objection.

A    I believe -- the first one that
contacted me, for sure.  After that, I don't
believe the other attorneys I spoke to ever got in
any -- into specifics.

BY MS. DENNISON:

Q    Okay.  Did you ever meet in person with

Page 40

1  any of these attorneys?
2          MR. CEISLER:  Objection.
3      A    No.
4  BY MS. DENNISON:
5      Q    And you talked about speaking with your
6  spouse as well.  What did you tell your spouse had
7  happened?
8      A    Well, she knew what I was doing that
9  day because the night before I always tell her
10  where I'm going to be, out of town, whatever, in
11  case something happens or she, you know, isn't
12  surprised that I was on the road or wherever.  And
13  when I came home earlier than expected because I
14  had to change my pants because they were just --
15  well, basically destroyed in that incident, that's
16  kind of, like, when we got into the whole
17  conversation of, like, you know, what happened.
18      Q    And what did you tell her?
19      A    I just told her that my weapon
20  discharged.  And I -- at that time, I had no clue,
21  no idea what had happened, and that I had to -- I
22  came from the field office.  I need to backtrack.
23          I left the sheriff's department and
24  went to the field office, because that's what I was

Page 41

1  directed to.  So then after I came back from
2  Detroit -- I live about an hour north of the field
3  office.  So I explained to her what had happened in
4  as much detail and as many facts as I knew at the
5  time, which wasn't very much.
6      Q    And you were asked if you had -- you
7  were shown Exhibit 3 and asked if you had seen that
8  before.  And I believe you indicated you could not
9  recall if you had seen that before; is that
10  correct?
11      A    Could you tell me again what Exhibit 3
12  was?
13      Q    Oh, sure.  Exhibit 3 was the
14  Management Inquiry Investigative Report.
15      A    Yeah.  I honestly don't recall.  Not
16  that I didn't, but I don't remember if I ever saw
17  it.
18      Q    Have you ever had to fill out a
19  Management Inquiry Investigative Report in the
20  course of your career with ICE?
21      A    Not that I can remember.  This whole
22  incident was new to me, the process at least.
23      Q    Okay.  What year did you start with
24  Homeland Security?

Page 42

1      A    2007, I believe, June.
2      Q    What did you do before that?
3      A    I was a federal police officer with the
4  Department of Veterans Affairs.
5      Q    What was your role with them?
6      A    I was a federal police officer and I
7  was assigned to the John D. Dingell Medical Center
8  in Detroit, Michigan.
9      Q    What were your responsibilities in that
10  position?
11      A    The easy -- easiest way to describe it
12  was we were a federal prop- -- a small -- like a
13  small town police force.  We had all the normal
14  rankings, vehicles, and we had an average foot
15  traffic, you know, 10,000 people a day, 1.4 million
16  square feet was the building.  The property was
17  four city blocks in the City of Detroit in not
18  exactly the best neighborhood, so we were pretty
19  busy.
20      Q    Okay.  Did you carry a weapon?
21      A    Yes, I did.
22      Q    What did you carry?
23      A    A Beretta 9mm.
24      Q    And how long were you a federal police

Page 43

1  officer with the Department of Veterans Affairs?
2      A    I started in 2003, so about four and a
3  half years.
4      Q    Okay.  What did you do prior to your
5  work with the Department of Veterans Affairs?
6      A    Prior to there --
7      Q    Yes.
8      A    -- I worked for a number of different
9  agencies.  I actually worked for the
10  St. Clair County Sheriff Department, I worked for
11  Oakland County Sheriff Department, Clay Township
12  Police Department.  Basically some law enforcement
13  organization or another for almost -- oh, since the
14  mid '90s, since I got out of the police academy,
15  basically.
16      Q    What other weapons have you carried in
17  the course of your duties as a police officer?  I'm
18  really just asking about pistols.  I don't need to
19  know about long guns.
20      A    Right.  Yeah.  Side arm, I had a -- my
21  first one was a Smith & Wesson 5906 9mm.
22          Off duty, I carried a Smith & Wesson
23  Sigma.  Then they transitioned us over, and I
24  carried a Glock 40 millimeter.

Deposition of Officer Robert Greene                                    Keith & Bianca Slatowski v. Sig Sauer, Inc.

Page 44

1       MR. CHERICO:  Who is "they"?
2       A    I'm sorry, the St. Clair County Sheriff
3  Department, they switched over from Smith & Wessons
4  to the Glocks.
5       And then after that, I carried the
6  Beretta with the veterans.
7  BY MS. DENNISON:
8       Q    Okay.  When were you issued your P320
9  with ICE?
10      A    I honestly don't remember that.  Over
11 the course of 16 years, I've, you know, had -- I
12 believe now three, possibly four different
13 firearms.  I don't remember the dates.  I just --
14 we show up at our quarterly range and if it's a new
15 weapon, we get switched out.  We get a new weapon
16 switched out.
17      Q    I am going to show you -- well, let me
18 just ask you:  I know you don't recall specifically
19 when you were issued that firearm.  If it was
20 reported it was around August of 2020, would that
21 sound accurate to you?
22      A    If that's what it was reported, yeah.
23 I mean, I can't argue it, because I honestly don't
24 remember.

Page 45

1       Q    What were you carrying before the P320?
2       A    A SIG Sauer 40 caliber, and I honestly
3  can't remember the -- recall the model number off
4  the top of my head right now.
5       Q    Do you know if it was a 226 or a 229 or
6  just no recollection?
7       A    I don't have a specific recollection,
8  no.
9       Q    Okay.  Are you still with ICE?
10      A    I am.
11      Q    What is your current position?
12      A    Deportation officer.
13      Q    Are you still in Detroit?
14      A    I'm assigned to Detroit, but I'm on
15 temporary detail as St. Clair County liaison.
16      Q    How long have you been on that detail?
17      A    I believe sometime around November of
18 '22, maybe mid-November.
19      Q    Okay.  What is your current duty weapon
20 with ICE?
21      A    The SIG Sauer 9mm, the issued one.
22      Q    The P320?
23      A    Correct.
24      Q    Is it the same P320 that was involved

Page 46

1  in your incident?
2       A    No, that was taken --
3       Q    Different?
4       A    -- from me the day of the incident.
5       Q    And then were you issued a different
6  P320 after the incident?
7       A    Correct.  A different 3 -- P320 was
8  given to me along with a new holster.
9       Q    Did you have any objections to carrying
10 the P320 after your incident?
11      MR. CEISLER:  Objection.
12      A    I have no -- honestly, I have no say in
13 that.  That's the weapon they issue me for the job
14 that I have, so I take what I am given and work
15 with what I'm given.
16 BY MS. DENNISON:
17      Q    Did you have any personal concerns with
18 carrying the P320 again after your incident?
19      MR. CEISLER:  Objection.
20      MR. CHERICO:  Objection.
21      He answered this.
22      A    I really didn't have any thoughts on it
23 either way.
24 BY MS. DENNISON:

Page 47

1       Q    Okay.  Do you know whether ICE has a
2  policy not to have its officers carry duty weapons
3  with manual thumb or grip safeties?
4       MR. CHERICO:  Objection.
5       MR. CEISLER:  Objection.
6       A    The only thing that I've been told
7  verbally -- I have not seen any policy -- that
8  we're just not allowed to do any altering or
9  modifications to the weapon.
10 BY MS. DENNISON:
11      Q    Do you know what a tabbed trigger is?
12      MR. CEISLER:  Objection.
13      A    I do not.
14 BY MS. DENNISON:
15      Q    In your work with your prior police
16 departments, both county police and federal police,
17 did you carry a weapon -- a pistol that had a
18 manual thumb or grip safety?
19      MR. CEISLER:  Objection.
20      A    I -- yes.  I believe there were two of
21 them that did -- had some form of safety.
22 BY MS. DENNISON:
23      Q    Which ones?
24      A    The Smith & Wesson 5906 had a

Page 48

1 de-cocking lever and the Beretta 9mm had some type
2 of safety.
3    Q    Did you ever see your holster that you
4 were wearing at the time of the incident after the
5 incident?
6    A    After the incident --
7    Q    Yes.
8    A    -- I reported to the field office and
9 they took my -- the personnel at the field office
10 took the weapon and the holster that day, and I
11 have not seen either since.
12    Q    Did you look at the holster after the
13 incident and before you handed it over to ICE?
14    A    I briefly looked at it.  After I
15 arrived at the office, I obviously made the weapon
16 safe, handed it to them, and then took my belt to
17 take the holster off and handed it to them and
18 that's the last cursory -- or last view I had of
19 it.
20    Q    Okay.  What ammunition were you using?
21 Or what was loaded in the weapon that day?
22    A    Our issued 9mm.  I don't remember the
23 exact grain.
24    Q    Do you remember the brand?

Page 49

1    A    I do not, honestly.
2    Q    Do you know the magazine capacity on
3 that weapon?
4    A    I believe it's 17.
5    Q    Okay.  Did you carry the weapon fully
6 loaded with one in the chamber?
7    A    Yes.  That's our policy.  It has to be
8 what they call "full-duty carry" when you're on
9 duty.
10    Q    And is it that how it was loaded on
11 that day of the incident?
12    A    Yes.
13    Q    Now, you were putting the pistol in
14 your holster at the time of the discharge; is that
15 correct?
16    A    Correct.  I was re-holstering the
17 weapon.
18    Q    And what was your plan?  What were you
19 going to do after you re-holstered the weapon?
20         MR. CHERICO:  Objection.
21         You can answer if you understand.
22    A    I was -- after re-holstering the
23 weapon, it was my intent to finish the mission of
24 the day.

Page 50

1 BY MS. DENNISON:
2    Q    Okay.  What time of day did this occur?
3    A    I don't recall exactly.  I want to say
4 approximately 4:00 in the morning.  It was very
5 early.
6    Q    Now, had you already completed the duty
7 that you were supposed to do that day or were you
8 starting that day?  Were you in the middle?  What
9 was the -- what was happening around that -- around
10 that time?
11         MR. CHERICO:  Objection.
12         MS. DENNISON:  Yeah, it was a terrible
13    question.
14 BY MS. DENNISON:
15    Q    So what time had you reported for your
16 shift that day?
17    A    I was assigned for a transport mission
18 from St. Clair County Jail to the Detroit field
19 office, and my arrival time at the sheriff's
20 department was scheduled to be around 4:00 a.m.
21         So like I said, I don't remember the
22 exact minute, if I got there right on time,
23 early -- and after I was supposed to pick up the
24 subjects and transport them, that was my mission

Page 51

1 for the day.
2    Q    So is that the start of your shift that
3 day?
4    A    No, the start would have been prior to
5 that, because my start actually ends -- I mean, the
6 shi- -- I believe it would have been sometime after
7 3:00 a.m., because there's prep work involved and I
8 have to get my government vehicle and everything
9 else.
10    Q    Okay.  And so when you start sometime
11 after 3:00 a.m., where do you go to get your
12 government vehicle and, you know, what else is it
13 that you have to do before you arrive at
14 St. Clair County Prison at 4:00?
15    A    Well, there's an assigned vehicle there
16 at -- for my position.  Whoever is liaison at that
17 facility has an assigned vehicle.  So the vehicle
18 was assigned to me.
19         I don't remember at the time if the
20 vehicle was located elsewhere or if I actually had
21 it at my home.  That -- it's -- it kind of just
22 falls on me, whatever best suits me.  They don't
23 care where I start from.
24         But prior to that, I make sure I have

Page 52

enough sets of belly chains, cuffs.  I check the
back seat, make sure there's nothing back there.  I
just -- cursory inspection of the vehicle in
general.  If I need to go get gas, I go get gas so
I don't have to make any stops, and then I make
sure I have the correct paperwork I need because I
have to have release paperwork to give
St. Clair County, and then I make phone calls to
give them a heads up ETA of when I approximately
will be there.
        Q    All right.  So you arrived at St. Clair
and you had your duty-issued pistol and other
ICE-issued equipment locked in a lockbox at the
sally port at St. Clair Prison already?
            MR. CHERICO:  Objection.
        A    No, I -- I arrived there, and then I
have to lock up all this -- any weapons or anything
that could be a weapon before I'm allowed to go
inside the facility.
BY MS. DENNISON:
        Q    Okay.  All right.  So you arrived and
locked everything up in the lockbox; is that
accurate?
        A    Correct.  Yes, I would have locked up

Page 53

the items in the lockbox.
            MR. CHERICO:  Can you just explain to
    everyone what actually went in the lockbox.
        A    Okay.
            MR. CHERICO:  What -- which equipment.
        A    I put in my magazine with my extra
rounds.  I put in -- I carry a pocketknife and my
firearm.  Those are the three items that went in
the lockbox.
BY MS. DENNISON:
        Q    And then after you did that, did you go
inside the prison?
        A    I did.
        Q    How long were you inside the prison?
        A    I honestly don't recall.  That just --
it all varies on how many people I was picking up,
were they completely ready.  Again, I have to
recheck paperwork, if there's property,
medications, funds, a number of things.  It could
be as quick as 15 minutes.  It could be as long as
a half an hour or more depending, again, of all
those factors.
        Q    Okay.  And then when you come out --
sorry.  Let me ask that again.

Page 54

        So what stage of the process of this
transport were you in when you went to the lockbox
to take out your ICE-issued equipment and your
pistol?
        A    I would have been at the end of the
mission, so I would have already had the
individuals loaded into my vehicle, their property,
their paperwork, again, meds, funds, whatever they
had.  And then I would have -- once they're secured
in, I would have went over to the lockbox to
retrieve everything that I had locked up in there
earlier.
        Q    Okay.  So you would have had the
prisoners locked up in the vehicle, you were going
to get your equipment back, and then were you going
to transport them to their --
        A    Correct.
        Q    -- ultimate location?
        A    Yeah, the Detroit field office was
where I was going to be transporting them to.  It's
about an hour's drive.
        Q    So after this incident, what happened
with the prisoners?
        A    Immediately after the incident -- once

Page 55

the sheriff's department came up to see what was
wrong, I called my immediate supervisor, explained
to him what happened, and he proceeded to tell me
what to do next.
        Q    Okay.  And what did you have to do
next?
        A    He just told me to stay there and do
not clear the scene until the sheriff's department
released me because he was sure that they had
procedures and policies that they had to go
through, and he would make arrangements to have
somebody else from my office come with a different
vehicle to pick up those subjects that I had
already loaded in.
        Q    Okay.  So at some point, do you
recall -- you may have been asked this, so I
apologize.  Do you recall making a statement to
anyone at ICE about your incident?
        A    Are you talking the day of or down the
road?
        Q    I -- I was going to get to that next.
So I guess my question is:  Do you recall making a
statement, whether it was one, more than one, and
then I was going to ask you when.

Page 56

1    A    Yeah.
2    Q    If it's easier, you can just tell me
3  what you recall about any statements provided.
4    A    Well, the day of, I spoke to multiple
5  people.  Obviously, my immediate supervisor,
6  another supervisor who was one of our firearms
7  supervisors -- might even have been two of them.  I
8  spoke to multiple people supervision-wise, and
9  then, because like I said, there were people sent
10 to replace me, other people had already known what
11 happened, because, obviously, they wanted to know
12 why there was somebody going to replace me.  So
13 people were coming up to me and asking me what had
14 happened, but...
15   Q    Do you -- do you recall making any
16 recorded statements where there was -- where it was
17 taped or there was somebody transcribing what was
18 being asked and answered?
19   A    No, not to my knowledge.
20   Q    In the course of your time with the
21 police departments before ICE and then ICE, were
22 you ever present when anyone had an accidental
23 discharge, not counting yours?
24   A    Wow.  I've got to say, like, I'm

Page 57

1  closing in on 30 years.  I want to say there's
2  probably been at least one incident.  I mean, I
3  know there's stories of incidents in my mind but I
4  can't remember if they were told to me or if I was
5  actually present, the facts are pretty
6  clear.
7        I honestly am not entirely sure, but I
8  wouldn't be surprised if somebody said, Hey, you
9  were there.  So...
10       MS. DENNISON:  Okay.  I'm going to show
11   you what I'm going to mark as Exhibit 4.  I
12   think we're at 4.
13       (Greene Deposition Exhibit 4 was
14   marked for identification.)
15 BY MS. DENNISON:
16   Q    And I'm just going to ask you -- I
17 think I already know the answer, but I'm going to
18 ask you anyway:  I'm showing you a document and it
19 is -- let me see, it is only about, I think, four
20 pages, three pages.  And it's got a caption on
21 it -- a different caption, not this case, but
22 John Tyler Herman versus SIG Sauer, Inc.
23   A    Uh-huh.
24   Q    And it is that plaintiff, Mr. Herman's,

Page 58

1  responses to discovery in that question -- in that
2  case, and it involves questions about your
3  incident.
4        Have you ever seen a document like this
5  before?
6    A    No.
7    Q    I'm sorry.  Have you -- have you ever
8  seen this document before?
9    A    I have not seen this document.  I don't
10 know anything about it.
11   Q    Okay.  That was my guess, but I wanted
12 to confirm it.
13       Now, there was an answer here purported
14 to be about your incident.  So it -- it says that
15 the incident occurred August 3rd, 2021, in Detroit,
16 Michigan, and a description of the incident.
17       And the description indicates, "Witness
18 was attempting to remove his subject P320 pistol
19 from its holster, upon doing so the pistol
20 discharged."
21       Is that statement incorrect, as stated,
22 to the best of your knowledge?
23   A    Yes.
24   Q    Okay.  Because you were attempting to

Page 59

1  holster your pistol at the time of discharge; is
2  that correct?
3    A    Correct.
4    Q    Okay.  I am also going to go back to
5  that prior Exhibit 3, which you were shown, which
6  is the report from ICE on your incident.
7        Okay.  And this is -- the report itself
8  that was marked as Exhibit 3 is five pages, the
9  Management Inquiry Investigative Report is five
10 pages, and then there are a number of exhibits
11 attached to it, which comprise the full 66 pages of
12 Exhibit 3 that you were shown when Mr. Ceisler was
13 asking you some questions earlier.  And I believe,
14 you know, we've indicated a couple times you don't
15 know that you've seen this document.
16       My question for you is:  On this first
17 page, there is Allegation.  And where I've
18 highlighted, you'll see it says -- and this
19 highlighted is my version, that's not the marked
20 version on Exhibit 3, just for clarification for
21 the record, but it indicates, "Negligent discharge
22 of ICE-issued firearm" is the Allegation.  My
23 question for you is:  Have you heard that term
24 before, either as it relates to your incident or

Page 60

other incidents that you may have heard of within ICE?

MR. CEISLER: Objection.

MR. CHERICO: Objection.

A    I've heard of that term. I can't remember if somebody told me that term in relation to my incident, though.

BY MS. DENNISON:

Q    Do you have any understanding, either through ICE or personally -- and if so, explain which one -- as to what the term "negligent discharge" means?

MR. CHERICO: Objection.

MR. CEISLER: Objection.

A    I don't know what they would consider negligent.

BY MS. DENNISON:

Q    Okay. I'm still on Exhibit 3. I have this in two different documents, so I just have to go -- give me one minute here, if you don't mind. Oh, I'm still screensharing. Good. So you see it now.

All right. So up here should be the exhibits, which I'm going to try to get bigger so

Page 61

we can actually read it, but, clearly, I'm having some issues with the format. So give me one moment. I'll try to fix it on my end before I show Mr. Greene.

Okay. So here are the exhibits to that first five-page report, the entirety of which is marked as Exhibit 3. And I have some -- I have a few of these highlighted if you just give me a moment.

Okay. So what I am taking you to now is Exhibit 6, which you've been shown before, the Office of Firearms Training Program (OFTP) Report of Examination, Dated August 5th, 2021. And for clarification, this is part of Exhibit 3, attached to the deposition record, it just happens to be Exhibit 6 to the Exhibit 3 report. And this is the Report of Examination from August 5th, 2021.

Were you ever shown a report of the examination of your pistol?

A    No. I was never shown or told anything, to be honest.

Q    Okay. Now on the Conclusions for the examination, it indicated that "A physical examination of the subject firearm revealed the

Page 62

firearm is serviceable, and functions as designed."

Was that information ever conveyed to you?

A    No, I have -- no information was conveyed to me about it at all.

Q    Do you have any knowledge as to what happened to your P320 after your incident?

A    I do not. I handed it over, and they told me that it would be, I guess, inspected. I don't know if that's even the right word, but they never said by whom or where.

Q    The P320 that you were issued to replace this one, was that the same type of P320?

A    I'm not a real gun person, to be honest; it looked the same to me, but I don't know if it's exactly the same or not.

MR. CHERICO: Do you mean the exact same -- do you mean the exact same model or --

MS. DENNISON: Yes.

BY MS. DENNISON:

Q    Yeah, so did it also have a 17 magaz- -- the magazine, did it have a 17-bullet capacity?

Page 63

A    Yes. For that matter, yes, it was -- lists as the same model, different serial number obviously, but...

Q    Yes, different serial, same model.

Give me a moment, please, if you wouldn't mind, as I get you to the next exhibit I have a question about.

Okay. So now I want to show you -- we're still on Exhibit 3 attached to your deposition.

A    Uh-huh.

Q    This is the Exhibit 8 attached to Exhibit 3 and this is, FF-redacted Agent's Affidavit- Meeting with HQ ICE OFTP Executive Leadership and Field Supervision at the AOU, Altoona, PA.

That's lot of acronyms.

A    Uh-huh.

Q    And if we go down to the actual Management Inquiry Affidavit, it says, State of Virginia, County of Fairfax, and it's redacted. Who -- who did this?

But it says, "I am a designated agency Management Official, Fact Finder, for U.S.

Page 64

1 Immigration and Customs Enforcement, Administrative
2 Inquiry Unit."
3        Have you ever seen this affidavit
4 before?
5    A   I have not.
6    Q   Okay.  Now, it appears that this
7 affidavit was done by this management official
8 reviewing the unintentional discharge and appears
9 that the video itself had been reviewed and
10 indicates, "The video was unremarkable to conclude
11 if a, 'foreign object, e.g., clothing, string from
12 jacket,' was a factor in the discharge.  End of
13 report."
14        Do you see that?
15    A   I do.
16    Q   Was this ever discussed with you at any
17 point, whether there was a -- whether the video
18 showed a foreign object that would have been a
19 factor in the discharge?
20    A   No.  It was never talked about with me
21 about any --no one ever discussed the video with me
22 from my office or anywhere.
23    Q   When did you first see the video?
24    A   Immediately after the incident.  I

Page 65

1 mean, I had to wait for the process at
2 St. Clair County.
3        So I knew they had cameras.  I had
4 asked if I could view it, and the lieutenant took
5 me to his office and he pulled it up.
6    Q   Now, I am going to show you what is
7 marked as -- well, it's still Exhibit 3 to your
8 deposition, but this is Exhibit 9, and it's the
9 Acting -- which you were shown before with
10 Mr. Ceisler -- the Acting AFOD Affidavit, dated
11 October 6th, 2021.
12        And this is where I asked you, before,
13 if you recalled August 2020 being a date when you
14 were issued your P320 firearm, because the Acting
15 AFOD was asked, "When was DO-redacted issued that
16 firearm," and it indicates "August 10, 2020."
17        And I believe you had indicated you
18 don't have a recollection, but, you know, if the
19 record reflected that, you wouldn't dispute it; is
20 that correct?
21    A   Yes, that's correct.  If that's what
22 the record shows, I have no reason to dispute it.
23    Q   Do you recall one way or the other
24 having that P320 for approximately a year prior to

Page 66

1 this incident?
2    A   Yes, I mean I know I've had it -- had
3 it for a while.  I couldn't tell you exactly how
4 many years, but if it's -- was about a year that --
5 that's what it was.
6    Q   Do you recall how many times you
7 qualified on that P320 prior to the incident?
8    A   If I had it for a full year and we
9 qualify every quarter, so four times,
10 approximately, depending on exactly when the fourth
11 quart qual [sic] was.
12    Q   Do you have a recollection as to how
13 many rounds you would have fired through that
14 pistol as of the time of the discharge in
15 August of 2021?
16    A   Well, the course of fire for
17 qualifications, I believe, is 50 rounds.  So, I
18 mean, after that, if we do other shooting, it's for
19 practice or whatever, but the qualification course
20 itself is 50 rounds.  So the minimum I would -- at
21 the range would always be at least 50 rounds.
22    Q   Okay.  Did you have a practice as to
23 whether when you qualified you would put more than
24 50 rounds through the pistol, either at

Page 67

1 qualification or in between qualifications?
2        MR. CHERICO:  Objection.
3    A   I don't recall.  Like I said, the only
4 thing I know is consistent is the qualification
5 course, 50 rounds and certain distances and time.
6        But I don't know the rest of the day,
7 loading capacity, or how many more rounds or how
8 many went through the weapon.
9    Q   Do you ever go to the range in between
10 qualifications to practice with your weapons?
11    A   I do not, not with that weapon.  The
12 only time that weapon hasn't been on our range is
13 during COVID when I had to go to a remote location
14 with just myself and one firearms officer.
15    Q   So I'm just trying to make sure I
16 understand this:  Would you have only fired that
17 P320 at scheduled quarterly trainings?
18    A   Correct.
19    Q   Okay.  And did you ever have to fire
20 that P320 in the course of your duties outside of
21 qualifications?
22    A   No.  Outside of qualifications, no.
23    Q   Okay.  Do you recall being provided
24 with a weapon-mounted flashlight with your pistol?

Page 68

1    A    Yes.  I was issued one.  It was not on
2  the weapon at the time, but I was issued one.
3    Q    Now, this officer was asked: "Did
4  DO-redacted explain to you, or another SFI, how he
5  believed the firearm discharged, e.g., finger on
6  trigger, jacket got caught in trigger, holster
7  caught trigger, etc.?"
8         And the answer says, "He stated he did
9  not have his finger on or near the trigger and that
10 the gun just went off.  He also stated that OFTP
11 told him that his zipper got caught in the trigger
12 while he was holstering."
13        Do you recall anybody stating to you
14 that your zipper got caught in the trigger while
15 you were holstering?
16   A    Nobody from my agency said anything to
17 me about a zipper.  I mean, the coat didn't even
18 have any zippers on it, so I don't even know where
19 that came from.
20   Q    Do you know -- OFTP was -- what was
21 that acronym again?
22   A    Office of Firearms Training Program.
23   Q    Okay.  Do you have any recollection
24 whether anybody from OFTP told you that anything

Page 69

1  got caught in the trigger while you were
2  holstering?
3    A    I never -- best to my recollection,
4  ever remember speaking to anybody from OFTP.
5    Q    And as we sit here, you have no
6  understanding how your pistol discharged on
7  August 3rd, 2021; is that correct?
8    A    That is correct.
9    Q    When you looked at your holster before
10 you turned it in, did you see any damage to the
11 holster?
12   A    I couldn't see anything with it.  But
13 as I stated earlier, I didn't really inspect it all
14 that well.  I didn't have it for very long after
15 the incident.
16   Q    Do you know if anybody ever took any
17 photographs of the holster after your incident?
18   A    I was asked to take pictures and send
19 them.  I don't know where they went or what
20 happened to them.  I don't have them, but I
21 think -- at least -- I wouldn't say "I think," I
22 was told that that was just because they wanted to
23 make sure they reissued me the same holster again.
24   Q    Did you actually take -- do you recall

Page 70

1  actually taking pictures of your holster?
2    A    I honestly can't remember -- recalling
3  taking the photos.
4    Q    And have you looked for photographs of
5  your holster since then and not been able to find
6  them?
7    A    It's been a while.  I've had a
8  different phone issued to me, so -- and I don't --
9  I'm not a big backing-up-with-the-cloud type of
10 guy, so I'm not very tech savvy, so they're
11 probably gone.  Unless somebody else has them, I
12 don't know.
13   Q    Were you ever informed whether anybody
14 inspected your holster to see if there was any
15 damage to the holster after your incident?
16   A    When I handed the weapon and the
17 holster over at the field office later that
18 morning, the firearms instructor that took
19 possession of both, he briefly looked at the
20 holster and he verbally told me, he goes, "I don't
21 see any issues with it, but I'm going to give you a
22 new one anyway."  So he did.  And that was the last
23 I saw of it.
24   Q    Were you issued the same type of

Page 71

1  holster?
2    A    Yeah, a brand-new one in a plastic bag,
3  identical.
4    Q    Have you changed any of your practices
5  in holstering or un-holstering your pistol since
6  this incident?
7    A    Well, obviously, I'm a lot more
8  cautious because, as I've said, I have no idea what
9  happened, but I'm going to continue to try to do
10 everything in my power to make sure it doesn't
11 happen again.
12   Q    When you say you're "a lot more
13 cautious," how so?
14   A    Well, like I said, you know, from what
15 I've just seen and stuff like that and I was told
16 that there was -- there was something lodged or
17 possibly something in there.  I -- obviously, I --
18 I always did before, I make sure to double check
19 that there's nothing in the holster, nothing
20 obstructed, you know.
21   Q    Have you had any problems or issued
22 with -- issues with the P320 that you were issued
23 after this incident?
24   A    No.

Page 72

Q    And how about the subject P320 that was involved in this incident, prior to August 3rd, 2021, did you have any problems or issues with the P320?

A    Not that I can remember. I mean, there might have been something the firearms -- sometimes that they have to strip them down at the range if they're really dirty internally or something, but that's -- only an armorer can do that. So I don't know what might have been done, but...

Q    And you are not a certified armorer for the P320?

A    I am not.

Q    Can you tell me about what training you received on the P320 when it was issued to you? The original one that was involved in this incident.

A    Initially, there were multiple sizes in the frame offered -- obvious reasons. Some need the smaller, some need a larger. So they do a fitting to see which one is the most comfortable in my hand, and then we go through -- unload it first, a general familiarization. I mean, obviously, it was very similar to the model before, but they

Page 73

still go through it anyways.

And then they run practice rounds with you through it before they actually set up a qualification.

Q    Okay. Have you ever heard of transitional training when you go from one pistol to another as one of your duty weapons?

A    Yes, we have done transitional training for, like, long guns and pistols, switching over.

Q    Do you recall if you did any transitional training when you switched over to the P320?

A    I don't. But that was kind of a different time because that was right at the time when COVID -- and our whole range operations completely changed. There were no more full days and there was a whole lot less people, for obvious reasons, for distancing.

Q    Okay. So was your transitional training going over to the P320, was that different than transitional training you had experienced before that, because of the different practices after COVID?

A    Only in the fact there were less people

Page 74

present and it was shorter. It was designed around to get there, get it done, minimal contact with the other people in the office, and then accomplish -- finish everything within whatever the blocked timeframe they had.

Q    Now, as part of that transitional training, were there any discussions about any of the features of the P320 that were different from the previously issued SIG pistol?

A    I don't specifically recall much differences. Obviously, it's a different round so there would be less kickback on it and more rounds. And they also said that something different with the trigger weight, but they said that was because of the model and the different round.

Like I said, I'm not really a gun guy, so I don't know the particulars about it.

Q    Did you have any firearm experience prior to going into the police academy?

A    No. When I started at the police academy, that was the first time I ever held or fired a firearm or gun of any kind.

Q    And do you own any firearms other than your ICE-issued weapons?

Page 75

MR. CHERICO:  Objection.

A    I do.

BY MS. DENNISON:

Q    Do you own any other SIG pistols?

MR. CEISLER:  Objection.

A    No.

BY MS. DENNISON:

Q    Do you own any other pistols?

MR. CEISLER:  Objection.

A    I have three other semiautomatic pistols.

BY MS. DENNISON:

Q    What -- what manufacturers?

MR. CEISLER:  Objection.

BY MS. DENNISON:

Q    What make and model?

A    Two Smith & Wessons and a Glock.

Q    What type of Smith & Wesson?

MR. CEISLER:  Objection.

MR. CHERICO:  Objection.

A    5906 and a Sigma.

BY MS. DENNISON:

Q    Are they the same ones that you had when you were at the police department?

Page 76

```
 1      A    I did.  Back in the day, there was few
 2  police jobs, so I worked part-time for multi
 3  departments, and the consequences for that, besides
 4  the low pay, was you had to buy your own equipment.
 5  So I bought these firearms and I just always have
 6  kept them.
 7      Q    And same with the Glock?
 8      A    What's that?
 9      Q    Same with the Glock?  They were all
10  your -- they were all the pistols that you had when
11  you worked in the police department?
12      A    Yeah, that's the one that stung the
13  worst.  It was extremely expensive at the time.
14      Q    The Glock?
15      A    Yeah.
16      MS. DENNISON:  Okay.  I don't think I
17  have any other questions for you.
18      THE WITNESS:  Okay.
19      MS. DENNISON:  Danny, do you have
20  follow-up?
21      MR. CEISLER:  No.  No follow-ups.
22  Thank you very much, Officer Greene.
23      THE WITNESS:  You're welcome.
24      MS. DENNISON:  All right.  Thank you
```

Page 77

```
 1  all.
 2      THE VIDEOGRAPHER:  Okay.  This now
 3  concludes the video deposition of Officer
 4  Robert Greene.  We're going off the record at
 5  11:40 a.m.
 6          (Witness Excused)
        (Deposition concluded at 11:40 a.m.)
 8              -  -  -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1          C E R T I F I C A T I O N

2

3              I, Heather Hoffman, RPR, a Court

4        Reporter and Notary Public in and for the

5        Commonwealth of Pennsylvania, do hereby

6        certify the foregoing to be a true and

7        accurate transcript of my original

8        stenographic notes taken at the time and

9        place hereinbefore set forth.

10

11

12        _____

13

14   Heather Hoffman, Court Reporter-Notary Public
     in and for the Commonwealth
15   of Pennsylvania

16   DATED:  06/06/2023

17

18

19        (The foregoing certification of this
          transcript does not apply to any
20        reproduction of the same by any means,
          unless under the direct control and/or
21        supervision of the certifying shorthand
          reporter.)

22

23

24

```
 1                    - - -
                 INSTRUCTIONS TO THE WITNESS
 2                    - - -

 3       Read your deposition over carefully.
    It is your right to read your deposition
 4  and make changes in form or substance.  You
    should assign a reason in the appropriate
 5  column on the ERRATA SHEET for any change made.

 6
         After making any change in form or
 7  substance, and which have been noted on the
    following ERRATA SHEET, along with the
 8  reason for change, sign your name on the
    ERRATA SHEET and date it.
 9

10       Then sign your deposition at the end
    of your testimony in the space provided.
11  You are signing it subject to the changes
    you have made in the ERRATA SHEET, which
12  will be attached to the deposition before
    providing.  The witness need not be a
13  Notary Public.  Any competent adult may witness
    your signature.
14

15

16        Return the Original ERRATA SHEET to
          Saltz, Mongeluzzi & Bendesky, P.C.
17        Daniel L. Ceisler, Esquire
          Saltz, Mongeluzzi & Bendesky, P.C.
18        One Liberty Place
          1650 Market Street
19        52nd Floor
          Philadelphia, Pennsylvania 19103
20        215.575.3898 dceisler@smbb.com

21

22       Court Rules require filing within 30 days
    after you receive your deposition.
23

24
```

```
 1                        SIGNATURE PAGE
                              OF
 2                        ROBERT GREENE

 3              I hereby acknowledge that I have read

 4         the foregoing deposition dated Wednesday,

 5         May 24, 2023, and that the same is a true and

 6         correct transcription of the answers given by

 7         me to the questions propounded, except for

 8         the changes, if any, noted on the attached

 9         ERRATA SHEET.

10

11    Signature

12

13    _____

14    ROBERT GREENE

15

16    _____

17    WITNESSED BY:              DATE

18

19    _____    _____

20    ADDRESS

21    _____

22

23    _____

24
```

# EXHIBIT L

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC*, Civil Action 21-CV-00729 further dissemination is not authorized

Case 1:21-cv-10620-PBS Document 32-13 Filed 03/29/24 Page 304 of 439

**EXHIBIT 3**

Greene 5/24/2023 H.H.

# U.S. Immigration and Customs Enforcement

*Enforcement and Removal Operations*
*Administrative Inquiry Unit*

500 12th Street SW
Washington, D.C. 20536

## Management Inquiry Investigative Report

**DATE**
October 13, 2021

**CASE NUMBER**
(b) (7)(E)

**TITLE**
(b) (6), (b) (7)(C) /DEPRTN OFFCR/(b) UNITENTIONAL DISCHARGE OF SERVICE WEAPON (NO INJURY/DAMAGE)/DETROIT, WAYNE, MI.

**ALLEGATION**
Negligent Discharge of ICE Issued Firearm

**FINDING**
Not Referred to Management

**FINAL CASE RESOLUTION**
Not Referred to Management

**INVESTIGATIVE REPORT TO**
(b) (6), (b) (7)(C)        (b) (6), (b) (7)(C)
Unit Chief
Administrative Inquiry Unit

**THROUGH** (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)
Detention and Deportation Officer
Administrative Inquiry Unit

**INVESTIGATIVE REPORT PREPARED BY**
(b) (6), (b) (7)(C)        (b) (6), (b) (7)(C)
Detention and Deportation Officer
Administrative Inquiry Unit

Signature of AIU Chief or Designee

**Summary**:
On August 3, 2021, the Joint Intake Center (JIC) received information from Immigration and Customs Enforcement (ICE), Supervisory Detention and Deportation Officer (SDDO) (b) (6), of Enforcement and Removal Operations located in Detroit, MI (ERO/Detroit) reporting an unintentional discharge of a firearm by Deportation Officer (DO) (b) (6), (b) (7)(C) of ERO/Detroit.

Based on this allegation a Management Inquiry was conducted by (b) (6), (b) (7)(C), hereinafter referred to as a Fact Finder (FF), Administrative Inquiry Unit, on behalf of the Office of Professional Responsibility (OPR).

Allegation: Negligent Discharge of ICE Issued Firearm
Finding: Not Referred to Management

**Details of Inquiry**:
On August 3, 2021, the JIC received information from ICE, SDDO (b) (6), (b) of ERO/Detroit reporting an unintentional discharge of a firearm by DO (b) (6), (b) of ERO/Detroit. According to

*Warning: This document is UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of the originating office ERO AIU. No portion of this report should be furnished to the media, either in written or verbal form.*

Rev 09-03-2020

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC,* Civil Action 21-CV-00729 further dissemination is not authorized

the information received, DO [(b) (6), (b)] had an accidental discharge of his firearm at St. Clair County Jail. There were no injuries and no property damage from this incident. **(Exhibit 1)**

On August 27, 2021, FF [(b) (6), (b) (7)(C)] was assigned MI 202110082 in JICMS.

On August 30, 2021, FF [(b) (6), (b)] received a copy of DO [(b) (6), (b)] internal ICE Memorandum titled, "Accidental Discharge of Firearm," dated August 3, 2021. DO [(b) (6), (b) (7)(C)] reported the following information.

On August 3, 2021, at approximately 4:21am, ERO Detroit DO [(b) (6), (b)] was preparing to depart the sallyport of the St Clair County Jail (SCCJ), located at 1170 Michigan Road, Port Huron, MI 48060, with three (3) ICE detainees and one (1) USMS prisoner. After securing the ICE detainees and USMS prisoner into the transport vehicle, DO [(b) (6), (b)] then retrieved his ICE issued Sig Sauer P320 firearm, extra magazine clip and knife from the sallyport lockbox. Upon holstering his firearm into his ICE issued holster, DO [(b) (6), (b)] reported the firearm discharged inside his holster. DO [(b) (6), (b)] reported his index finger was not near the trigger when the firearm discharged. DO [(b) (6), (b)] placed the firearm on the ground as SCCJ personnel responded. DO [(b) (6), (b)] reported SCCJ personnel searched the sallyport and found no damage from the spent round and could not locate the spent shell casing. Upon his return to ERO Detroit, DO [(b) (6), (b)] turned the firearm over to Senior Firearms Training Instructor [(b) (6), (b)]. **(Exhibit 2)**

On August 30, 2021, FF [(b) (6), (b)] received a copy of the FACTS transfer (for examination) of DO [(b) (6), (b)] ICE issued firearm from ERO Detroit to the Office of Firearms and Tactical Programs (OFTP), Armory Operations Unit (AOU), in Altoona, PA, dated August 3, 2021. **(Exhibit 3)**

On August 30, 2021, FF [(b) (6), (b)] received a copy of DO [(b) (6), (b)] FACTS Qualification Report, dated August 30, 2021. On May 21, 2021, and August 20, 2021, DO [(b) (6), (b)] received passing scores (201/200) and (203/200) for FY 2021 Q2 and Q3 respectively. **(Exhibit 4)**

On September 1, 2021, FF [(b) (6), (b)] received a copy of the St. Clair County Sheriff's Office (SCSO) Case Report 210026890, dated August 3, 2021. SCSO Deputy [(b) (6), (b) (7)] reported the following information.

On August 3, 2021, SCSO Sergeant [(b) (6), (b) (7)] advised there was an accidental firearm discharge in the St. Clare County Jail (SCCJ) involving ICE Officer [(b) (6), (b) (7)(C)] and requested that SCSO Deputy [(b) (6), (b) (7)] obtain a report.

SCSO Deputy [(b) (6), (b) (7)(C)] reported he interviewed DO [(b) (6), (b)] in the SCCJ sally port. DO [(b) (6), (b) (7)(C)] stated he was at the jail to retrieve 3 prisoners that he was going to be transporting. When he arrived at the SCCJ, DO [(b) (6), (b)] placed his pistol in lockbox #8 in the sally port. DO [(b) (6), (b) (7)(C)] said after he retrieved the prisoners from the jail and secured them in his vehicle, he returned to the lockbox to retrieve his pistol. DO [(b) (6), (b)] stated he holstered the pistol, and his finger was not on the trigger and out on the trigger guard. DO [(b) (6), (b) (7)(C)] stated his pistol was

*Warning: This document is UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of the originating office ERO AIU. No portion of this report should be furnished to the media, either in written or verbal form.*

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC*, Civil Action 21-CV-00729 further dissemination is not authorized

within the holster when he heard it fire. DO [(b)(6), (b)(7)(C)] was not sure if a round actually discharged in the pistol. DO [(b)(6), (b)(7)(C)] stated he set it down and determined the round did not actually eject. DO [(b)(6), (b)(7)(C)] had a small tear in his pants under the holster from the gas that escaped the barrel. DO [(b)(6), (b)(7)(C)] was not injured; however, he was still examined by jail medical staff and Tri Hospital EMS. DO [(b)(6), (b)(7)(C)] attributed this accident to some type of pistol malfunction. SCSO Deputy [(b)(6), (b)(7)(C)] reported DO [(b)(6), (b)(7)(C)] then left for Detroit to speak to his Superiors. Surveillance video of the incident has been saved by jail supervisors. **(Exhibit 5)**

On September 1, 2021, FF [(b)(6), (b)(7)(C)] received a copy of the Office of Firearms Training Program (OFTP) Report of Examination, dated August 5, 2021. In part, a physical examination of the subject firearm revealed the firearm is serviceable, and functions as designed. The firearm displayed no indication of tampering, anomalies, defective parts, or modifications. All firing components and all mechanical safety features are serviceable and functioned as designed. The subject firearm is within factory specifications and complies with the ICE Firearms Policy. **(Exhibit 6)**

On September 16, 2021, JICMS uploaded the video of DO [(b)(6), (b)(7)(C)] accidental discharge at the SCCJ.

On September 17, 2021, FF [(b)(6), (b)(7)(C)] reviewed the incident video and can report the following information. FF [(b)(6), (b)(7)(C)] observed DO [(b)(6), (b)(7)(C)] retrieve items, including a firearm from a SCCJ lockbox. As DO [(b)(6), (b)(7)(C)] was holstering his firearm (right-handed), FF [(b)(6), (b)(7)(C)] observed DO [(b)(6), (b)(7)(C)] right index finger was extended and not on the trigger or inside the trigger guard. FF [(b)(6), (b)(7)(C)] observed DO [(b)(6), (b)(7)(C)] right pant leg move (just below the holster) as DO [(b)(6), (b)(7)(C)] holstered his firearm. FF [(b)(6), (b)(7)(C)] observed DO [(b)(6), (b)(7)(C)] check himself, concentrating near his right hip and leg area and observed the firearm was located on the sallyport floor by the lockboxes. FF [(b)(6), (b)(7)(C)] observed numerous SCCJ personnel respond to the incident. FF [(b)(6), (b)(7)(C)] observed DO [(b)(6), (b)(7)(C)] speak with SCCJ personnel and observed SCCJ personnel looking all over the sallyport with flashlights. FF [(b)(6), (b)(7)(C)] observed DO [(b)(6), (b)(7)(C)] on the phone almost immediately after the incident. FF [(b)(6), (b)(7)(C)] witnessed SCCJ personnel pick up the firearm and place it back into the lockbox and lock it. FF [(b)(6), (b)(7)(C)] observed SCCJ personnel unload the ICE detainees from the vehicle and take them back into the SCCJ.

FF [(b)(6), (b)(7)(C)] completed an Agent's affidavit memorializing the video of DO [(b)(6), (b)(7)(C)] unintentional discharge at the St. Clair County Jail. **(Exhibit 7)**

On September 23, 2021, FF [(b)(6), (b)(7)(C)] met virtually with ICE HQ Office of Firearms and Training Program (OFTP) Assistant Director [(b)(6), (b)(7)(C)], ICE HQ OFTP Deputy Assistant Director [(b)(6), (b)(7)(C)], and Armory Operations Unit (AOU), Unit Chief [(b)(6), (b)(7)], Altoona, PA. [(b)(6), (b)(7)(C)]

The purpose of the meeting was to review DO [(b)(6), (b)(7)(C)] unintentional discharge at the St. Clair County Jail and determine if there was intent of misconduct. In part, all parties concluded there was no intent of misconduct. DO [(b)(6), (b)(7)(C)] index finger was clearly off the trigger and outside

*Warning: This document is UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of the originating office ERO AIU. No portion of this report should be furnished to the media, either in written or verbal form.*

Rev 09-03-2020

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC*, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC*, Civil Action 21-CV-00729 further dissemination is not authorized

Case 1:22-cv-10640-PBS   Document 32-13   Filed 12/23/24   Page 35 of 39

OFFICIAL USE ONLY                    SENSITIVE                    Page **4** of 5

the trigger guard when the firearm discharged. Further the video was unremarkable to conclude if a "foreign object, e.g., clothing, string from jacket, was a factor in the discharge. End of report.

FF (b) (6), (b) completed an Agent's affidavit memorializing the meeting with HQ ICE OFTP Executive Leadership and Field Supervision at the AOU, Altoona, PA. **(Exhibit 8)**

On October 6, 2021, FF (b) (6), (b) interviewed Acting Assistant Field Office Director (AFOD) (b) (6), (b) (7) virtually via Microsoft Teams regarding the allegation noted above. FF (b) (6), (b) (7)(C) advised Acting AFOD (b) (6) of the purpose of the interview and provided the appropriate rights, warnings, and advisements. Acting AFOD (b) (6) provided the following information.

On August 3, 2021, Acting AFOD (b) (6) also an ERO Detroit Senior Firearms Instructor, assisted DO (b) (6), (b) (7)(C) Supervisory Detention and Deportation Officer gather the necessary information for reporting the accidental/unintentional discharge. Acting AFOD (b) (6) stated DO (b) (6), (b) was carrying the ICE issued Sig Sauer P-320C issued August 10, 2020. At the time of the Acting AFOD (b) (6) stated DO (b) (6), (b) accidental/unintentional discharge, DO (b) (6), (b) was using the ICE issued molded plastic pancake style concealment holster. Acting AFOD (b) (6) stated he inspected DO (b) (6), (b) holster and noticed no anomalies that may have caused the discharge. Acting AFOD (b) (6) stated that a round did discharge from the firearm and the shell casing was still lodged in the breach of the firearm when it was turned over to him. Acting AFOD (b) (6) stated he also assisted in gathering in DO (b) (6), (b) training documents and requirements for the accidental/unintentional discharge. Acting AFOD (b) (6) stated DO (b) (6), (b) qualified with the firearm and received a passing score.

Acting AFOD (b) (6) provided an affidavit memorializing his statement. **(Exhibit 9)**

On October 7, 2021, FF (b) (6), (b) interviewed DO (b) (6), (b) (7)(C) virtually via iPhone regarding the allegation noted above. FF (b) (6), (b) advised DO (b) (6), (b) of the purpose of the interview and provided the appropriate rights, warnings, and advisements. DO (b) (6), (b) is a bargaining unit employee; however, DO (b) (6), (b) did not exercise his right to union representation during his interview. DO (b) (6), (b) provided the following information.

DO (b) (6), (b) stated that, on August 3, 2021, he was conducting an ICE Detainee transport from the SCCJ to ERO Detroit for ICE Air Operations processing. In part, DO (b) (6), (b) stated he was carrying his ICE issued firearm Sig Sauer P320 9mm semi-automatic. DO (b) (6), (b) stated he was using the ICE issued hard plastic holster at the time of the unintentional discharge. DO (b) (6), (b) stated he did review the video of the incident prior to this interview. When asked what could have caused the unintentional discharge, DO (b) (6), (b) stated, "I honestly have no idea. I made sure that my finger was outside the trigger guard area, while holstering, and nothing was in the holster. So, I really have no idea clue as to what happened."

DO (b) (6), (b) (7)(C) provided an affidavit memorializing his statement. **(Exhibit 10)**

*Warning: This document is UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of the originating office ERO AIU. No portion of this report should be furnished to the media, either in written or verbal form.*

Rev  09-03-2020

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC,* Civil Action 21-CV-00729 further dissemination is not authorized

**Findings**:

Based on all the information, interviews, facts, and video obtained throughout this investigation, it does not support that DO (b) (6), (b) (7)(C) caused a negligent discharge of his ICE issued firearm. Video of the incident clearly shows that DO (b) (6), (b) (7)(C) finger was not on the trigger or inside the trigger guard when his weapon discharged. Therefore, this Management Inquiry will Not be Referred to Management for Agency action.

**Exhibits**:

1. JIC ROI and source documents, dated August 3, 2021
2. DO (b) (6), (b) (7)(C) ICE Memorandum, dated August 3, 2021
3. FACTS firearms transfer (for examination), dated August 3, 2021
4. DO (b) (6), (b) (7)(C) FACTS Qualification Report, dated August 30, 2021
5. St Clare County Sheriff's Office, Case Report (b) (7)(E) dated August 3, 2021
6. OFTP AOU Report of Examination, dated August 5, 2021
7. Sallyport Video of DO (b) (6), (b) (7)(C) AD, uploaded to JICMS, dated September 16, 2021
8. Self-Affidavit meeting between FF (b) (6), (b) (7)(C) and OFTP Executive Leadership and AOU Supervision in Altoona, PA.
9. Acting AFOD (b) (6) Affidavit, dated October 6, 2021
10. DO (b) (6), (b) (7)(C) Affidavit, dated October 7, 2021

*Warning: This document is UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of the originating office ERO AIU. No portion of this report should be furnished to the media, either in written or verbal form.*

Rev  09-03-2020

Provided in response to a Touhy request in *Slatowski v. Sig Sauer, INC,* Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 1

ROI and Source Documents,

dated August 3, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Case 2:21-cv-10726-DDB Document 52-13 Filed 12/20/24 Page 310 of 439

OFFICIAL USE ONLY                                    SENSITIVE                                        Page 1 of 3

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| **Immigration and Customs Enforcement** | (b) (7)(E) |
| | **PREPARED BY** |
| | (b) (6), (b) (7)(C) |
| **REPORT OF INVESTIGATION** | **2. REPORT NUMBER** |
| | 001 |

**3. TITLE**

(b) (6), (b) (7)(C)  /DEPRTN OFFCR/(b)  Unintentional Discharge of Service Weapon (No Injury/Damage)/DETROIT, WAYNE, MI(6)

**4. FINAL RESOLUTION**

| 5. STATUS | 6. TYPE OF REPORT | 7. RELATED CASES |
|---|---|---|
| Initial Report | Allegation | |

**8. TOPIC**

Unintentional discharge of a firearm by a DO.

**9. SYNOPSIS**

On August 3, 2021, the Joint Intake Center (JIC) received information from Immigration and Customs Enforcement (ICE), Supervisory Detention and Deportation Officer (SDDO) (b) (6), (b) (7) of Enforcement and Removal Operations located in Detroit, MI (ERO/Detroit) reporting an unintentional discharge of a firearm by Deportation Officer (DO) (b) (6), (b) (7)(C)  of ERO/Detroit.

| 10. CASE OFFICER (Print Name & Title) | 11. COMPLETION DATE | 14. ORIGIN OFFICE |
|---|---|---|
| (b) (6), (b) (7) - Joint Intake Specialist | 03-AUG-2021 | Joint Intake Center |
| 12. APPROVED BY(Print Name & Title) | 13. APPROVED DATE | 15. TELEPHONE NUMBER |
| (b) (6), (b) (7)(C) - JIC Supervisor | 03-AUG-2021 | No Phone Number |

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMA NS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTA NED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, DEPARTMENT OF HOMELAND SECURITY, TOGETHER WITH A COPY OF THE DOCUMENT.

THIS DOCUMENT CONTA NS INFORMATION REGARD NG CURRENT AND ON-GO NG ACTIVITIES OF A SENSITIVE NATURE. IT IS FOR THE EXCLUSIVE USE OF OFFICIAL U.S. GOVERNMENT AGENCIES AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY IT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE DEPARTMENT OF HOMELAND SECURITY.  DISTRIBUTION OF THIS DOCUMENT HAS BEEN LIMITED AND FURTHER DISSEM NATION OR EXTRACTS FROM THE DOCUMENT MAY NOT BE MADE WITHOUT PRIOR WRITTEN AUTHORIZATION OF THE ORIGINATOR.

OFFICIAL USE ONLY                                    SENSITIVE

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

OFFICIAL USE ONLY                    SENSITIVE                          Page 2 of 3

Case 1:22-cv-10626-BBS Document 22-13 Filed 12/20/24 Page 311 of 439

| | DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|---|
|  | | (b) (7)(E) |
| | | **PREPARED BY** |
| | | (b) (6), (b) (7)(C) |
| | **REPORT OF INVESTIGATION CONTINUATION** | **2. REPORT NUMBER** |
| | | 001 |

## 10. NARRATIVE

On August 3, 2021, the JIC received information from ICE, SDDO (b) (6), (b) (7) of ERO/Detroit reporting an unintentional discharge of a firearm by DO (b) (6), (b) (7)(C) of ERO/Detroit.

According to the information received, DO (b) (6), (b) (7)(C) had an accidental discharge of his firearm at St. Clair County Jail. There were no injuries and no property damage from this incident.

Originating documentation is attached to the case file.

End of report.

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

| DEPARTMENT OF HOMELAND SECURITY | 1. CASE NUMBER |
|---|---|
| | (b) (7)(E) |
| | **PREPARED BY** |
| | (b) (6), (b) (7)(C) |
| **REPORT OF INVESTIGATION**<br>**Exhibit List** | **2. REPORT NUMBER** |
| | 001 |

None

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**For Official Use Only Not for Public Disclosure**

**MANAGEMENT INQUIRY AFFIDAVIT**

**STATE OF:**     **VIRGINIA**

**COUNTY OF:**     **FAIRFAX**

I, (b) (6), (b) (7)(C), who after being duly sworn state the following:

I am a designated agency Management Official, Fact Finder, for U.S. Immigration and Customs Enforcement, Administrative Inquiry Unit.

On September 23, 2021, FF (b) (6), (b) (7)(C) met virtually with ICE HQ Office of Firearms and Training Program (OFTP) Assistant Director (b) (6), (b) (7)(C), ICE HQ OFTP Deputy Assistant Director (b) (6), (b) (7)(C), and Armory Operations Unit, Unit Chief Daren Dowell, Altoona, PA.

The purpose of the meeting was to review DO (b) (6), (b) (7)(C) unintentional discharge at the St. Clair County Jail and determine if there was intent of misconduct. In part, all parties concluded there was no intent of misconduct. DO (b) (6), (b) (7)(C) index finger was clearly off the trigger and outside the trigger guard when the firearm discharged. Further the video was unremarkable to conclude if a "foreign object, e.g., clothing, string from jacket, was a factor in the discharge. End of report.

The contents of this statement are true and correct to the best of my knowledge and belief.

Subscribed and sworn this 7th day of October 2021.

(b) (6), (b) (7)(C)

_____    _____

Signature of Affiant, Fact Finder    Name & Title/Position

U.S. Immigration and Customs Enforcement

Enforcement and Removal Operations

Administrative Inquiry Unit

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

ICE - Significant Event Notification - Significant Incident Report

## ICE Significant Incident Report

Submitted Date and Time of Report: 8/3/2021  0920  EST

| | | |
|---|---|---|
| Incident Date: 8/3/2021 | Incident Time: 0420 | Incident Location: |
| ICE Component: Enforcement & Removal Operations | Division: Field Operations Division | Area: Eastern Operations |
| Case Number: No Case Involved | Office: WG - FOD DETROIT - DET | Lead Agency: B - DHS / ICE |
| SEN Incident Number: (b) (7)(E) | Initial/Follow-Up: Initial | Event Status: Routine |
| Related SEN Number: | Related Case Number: ------ | SEACATS Number: |
| Intel Number: | ENFORCE Number: | |

| Employee | | Operational | | Security | Other |
|---|---|---|---|---|---|
| Shots Fired At Employee | Air/Marine Incidents | National Security Interest | Escape | | |
| Shots Fired By Employee | Controlled Delivery | Facility Disturbance | Suicide Attempt | | |
| Employee Assaulted | Significant Seizure | Terrorism Related | Hunger Strike | | |
| Employee Death | Significant Arrest | Foreign Military/Police Incursion | Media Interest | | |
| Employee Injured | IPAS | WMD/HAZMAT | Alien Injury/Death | | |
| Employee Arrested | SCR | Demonstrations | Vehicle Incidents | | |
| Firearms Discharge to Include Unintentional Discharge | Rescue | JTTF | Other | | |
| Use of Baton or other Impact Weapon | Weapon Violations | Bomb Threat | Predator | | |
| Use of OC Spray or other Chemical Agents | Other Agency Interest | DHS SAR | Gang Related | | |
| Other Use of Force | Unaccompanied Children | | | COVID19 | |
| Loss or Theft of Firearm or Body Armor | COVID19 Disruptions | | | | |

| | | |
|---|---|---|
| Principal Subject: Person | Last Name: (b) (6), | First Name: (b) Alien ID: |
| Date of Birth: (b) (6), | Country of Birth: United States | Citizenship: |

### Narrative

Report Title: ERO Detroit - Accidental Discharge of an Agency Issued Firearm

ERO Detroit - Accidental Discharge of an Agency Issued Firearm
Issue:
On August 3, 2021, ERO Detroit provided ERO HQ Domestic Operations with information pertaining to an accidental discharge of an agency issued firearm by an ICE employee at the St Clair County Jail in Port Huron, Michigan.

Background:

On August 3, 2021, at approximately 0420 hrs EDT, an ERO Detroit Deportation Officer (DO) reported an accidental discharge of a firearm outside of a training environment. The accidental discharge occurred while the DO holstered his agency issued firearm following its removal from a secure lockbox in the sallyport area of the jail. Upon returning the firearm to the holster, the DO reported that the weapon discharged. No injuries or property damage occurred as a result of this accidental discharge.

On August 3, 2021, at approximately 0634 hrs EDT, ERO Detroit made telephonic notification of this incident to an ERO HQ (A) Deputy Assistant Director.

On August 3, 2021, at approximately 0815 hrs EDT, ERO Detroit made telephonic notification of this incident to the Joint Intake Center.

ERO Detroit will complete the ICE Use of Force Assault and Discharge report, a memorandum providing a narrative description of the events and will notify the Office of Firearms and Tactical Programs (OFTP). Additionally, ERO Detroit will send the firearm to OFTP for inspection.

(A)Deputy Field Office Director (b) (6), (b) (7)  reviewed and approved this SIR.
(C)

Violations of Law:

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized
(b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Action Taken:

**Other Agencies Notified:**

| Name | Agency | Phone | Date | Time |
|------|--------|-------|------|------|
| none | | | | |

Injuries:                                                              Injuries (Names and Extent of Injury):
Fatalities:
Damage:
Unaccompanied Child Count:

Locations:

| Type | Address | City | State | Zip |
|------|---------|------|-------|-----|
| Other | 1170 Michigan Rd | Port Huron | Michigan | 48060 |

Reported to ICE Operations Center via Phone:

Public Affairs Notified: No - Without comments
Comments:

| | | |
|---|---|---|
| Reported By: (b) (6), (b) (7) | Phone: (b) (6), (b) | Cell/Pager: (b) (6), (b) |
| Supervisor: (b) (6), (b) (7) | Phone: (b) (6), (b) | Cell/Pager: (b) (6), (b) |

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

(b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized
Case 1:22-cv-11037-THS Document 85-2 Filed 02/20/24 Page 316 of 439

# JOINT INTAKE CENTER – TELEPHONE WORKSHEET

Reset Form

| Date 08/03/2021 | Time 8:13 AM | Intake Specialist (b) (6), (b) (7)(C) |
|---|---|---|
| **Time Sensitive?**<br>☐ Yes ☐ No | | Arrests, assaults (physical/sexual), bribes, death, discharge of weapon, medical, media, serious injuries, suicide, workplace violence, e.g. |

## Caller Data

☐ Anonymous ☐ Detainee ☑ Source ☐ Subject ☐ Victim ☐ Witness

| Name (b) (6), (b) (7)(C) | | Phone Number (b) (6), (b) (7)(C) |
|---|---|---|
| A# | | City, State Detroit, MI |
| Facility Name | | |

## Information

☑ Allegation ☐ Management Issue ☐ Detainee Issue ☐ Incident ☐ Other

### Briefly Describe (Who/What/Where/When/Why)

(b) (6), (b) (7)(C)

☐ CBP ☑ ERO ☐ HSI ☐ Other

## Action Taken

☐ JICMS File # _____    ☐ JIC Log # _____

### Referred To

☐ OIG Duty Agent ☐ OPR Duty Agent ☐ CBP IA Duty ☐ Local ERO ☐ ERO CDH
☐ ERO JIC Email ☐ Other Agency

### Helpful Numbers

**Community and Detainee Helpline (CDH) -** (888) 351-4024 (M-F 0800 – 1700)
**DOJ EOIR -** (800) 898-7180 (immigration court dates, status of hearings)
**CIS NCSC -** (800) 375-5283  (M-F 0800 – 1800, Case Status, Benefits, etc)
**LESC -** (855) 448-6903
**Detainee locator -** www.ice.gov/locator

Revised 8/1/2013

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 2

DO (b) (6), (b) (7)(C) Memorandum
titled, "Accidental Discharge
of Firearm,
dated August 3, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

*Office Enforcement and Removal Operations*
*Detroit Field Office*

**U.S. Department of Homeland Security**
333 Mt. Elliott
Detroit, Michigan, 48207



**U.S. Immigration
and Customs
Enforcement**

August 3, 2021

MEMORANDUM FOR:     (b) (6), (b) (7)(C)

Supervisory Detention and Deportation Officer

FROM:     (b) (6), (b) (7)(C)

Deportation Officer
Detroit Field Office

SUBJECT:     Accidental Discharge of Firearm

This memo is reporting of my accidental discharge of my issued firearm (SIG P320, Serial #DB10783) after holstering.

On the morning of August 3rd, 2021 at approximately 4:21am, while leaving the St. Clair County Jail, located at 1170 Michigan Road, Port Huron, Mi. 48060. I was physically located in the sally port(garage) of the County Jail preparing to depart with three (3) ICE Detainees for ICE Air Operations and USMS transfer. Once all 3 detainees where safely secured in my home to work (HTW) issued vehicle, I went to retrieve my items from the county jail's lock box (#8). I first placed my loaded extra magazine in my holder, I then placed my work issued lock back knife (S&W Extreme Ops) in my right side pocket, I then proceeded to retrieve my firearm and place in my government issued holster, at which time, my issued firearm discharged from the holster. At no time, was my index finger or any other part of my hand anywhere near the trigger and general area. I immediately put the firearm on the ground as St. Clair County Jail personnel responded. I then notified SDDO (b) (6), (b) (7)(C) (IAO supervisor) and advised him of the situation. SDDO (b) (6), (b) (7)(C) stated he would notify my immediate supervisor SDDO (b) (6), (b) (7) and one of the firearms instructors. Shortly after the firearm discharge, multiple St. Clair County Sheriff Department employees had arrived at the area of the discharge. I spoke with Lt. (b) (6), (b) (b) (6), (b) (7)(C) and explained what had occurred and he and some of his employees surveyed the area to look for damage or a spent round or casing. Nothing was located, no damages of impact, no bullet fragments, and no spent shell casing have been located.

After arriving at the Detroit Field Office, firearm was turned over to Senior Firearms Training Instructor (b) (6), (b) (7)(C) and issued a replacement firearm.

www.ice.gov

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 3

DO (b) (6), (b) (7)(C) FACTS

Transfer,

dated August 3, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Transfer

Status  Complete

**Requester**

(b) (6), (b) (7)(C)   - ERO FIELD OFC DETROIT

**Reason** *

Unissued

**From**

ERO DET FIELD OFC DETROIT (SERIALIZED) - 333 Mt. Elliott Detroit MI 48207 US  (b) (6), (b) (7)(C)

**To**

Altoona - Armory Operations (SERIALIZED) - 320 E. Chestnut Ave. Altoona PA 16601 US  (b) (6), (b) (7)(C)

**Address**

320 E. Chestnut Ave.
Altoona, PA 16601 US
Phone #: (b) (6), (b) (7)
Alternate Phone #: (b) (6), (b) (7)(C)

**Tracking Number**

(b) (7)(E)

1 🏷 0 ⚙

| Item Type | Product | Serial Number | Item Status | Status | Physical Location |
|---|---|---|---|---|---|
| PISTOL | SIG-SAUER P320C (3.9, 9 mm, SEMI) | (b) (7)(E) | Service Use | Accepted | DRO Repair |

**Attachments**

👤 (b) (6), (b) (7)(C)   added comment on 08/04/2021 1:20:26 PM

Accidental discharge
Firearm is excess

👤 (b) (6), (b) (7)(C)   added comment on 08/03/2021 10:22:47 AM

Officer had AD with firearm on August 3, 2021. Firearm needs to be inspected. (b) (7)(E)   No need for replacement or return of (b) (7)

👤 (b) (6), (b) (7)(C)   created document on 08/03/2021 10:22:47 AM

👤 (b) (6), (b) (7)(C)   last modified document on 08/04/2021 1:20:26 PM

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 4

DO (b) (6), (b) (7)(C) FACTS

Qualification Report, dated

August 30, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**U.S. Department of Homeland Security**

# Firearms, Armor and Credentials Tracking System

| Qualification Dates From: 10/01/2020 To: 08/30/2021 | Qualification Report | Aug 30, 2021 11:32:22 AM |
| --- | --- | --- |

**Report Type: Combined List of Passing and Failed Scores**

Total Items: 5

Report Run Date: 30-08-2021 11:32 AM

ERO-> ERO FIELD OFC DETROIT      ->NO Sub-Office

| Qual Date | Entry Date | Name | Origin | Make | Model | Serial Number | Item | Disposition | Document Nbr | % | Test Score | Passing Score | Status | Low Vision |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 12/10/20 | 12/31/20 | (b) (6), (b) (7)(C) | GOV | SSS | P320C | (b) (7)(E) | PISTOL | Regular | (b) (7)(E) | 91 | 228 | 200 | Pass | N |
| 3/12/21 | 3/13/21 | | GOV | SSS | P320C | | PISTOL | Regular | | 80 | 199 | 200 | Not Pass | N |
| 3/12/21 | 3/13/21 | | GOV | SSS | P320C | | PISTOL | Regular | | 89 | 223 | 200 | Pass | N |
| 5/21/21 | 5/21/21 | | GOV | SSS | P320C | | PISTOL | Regular | | 80 | 201 | 200 | Pass | N |
| 8/20/21 | 8/30/21 | | GOV | SSS | P320C | | PISTOL | Regular | | 81 | 203 | 200 | Pass | N |
| | | Sub-Office Individuals 1 | | Make & Model 4 | | Firearm(s) 2 | | | | | Passing Score 4 | Not Passed 1 | | |

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

| Program Office Name | Item Count |
|---|---|
| ERO | 5 |

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

| Parameters | |
|---|---|
| Qlfctn dt Begin | 10/1/2020 12:00:00 AM |
| Qlfctn dt End | 8/30/2021 12:00:00 AM |
| Specific Employee | (b) |
| Disposition | |
| Item Type | |
| Make | |
| Model | |
| ORGID | 0 |
| ORGCHILD | 1 |
| ORG Exclude | 0 |
| Org Begin | |
| Org End | |
| RTYPE | 3 |
| SORT | Date |
| Submitted User | (b) |
| Qual Score Begin | |

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

| Qual Score End | |
|---|---|

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 5

St. Clare County Jail

Incident Report, dated

August 3, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Case 1:22-cv-11675-TLL Document 32-23 Filed 12/20/24 Page 330 of 439

# ST CLAIR COUNTY SHERIFF'S OFFICE

1170 MICHIGAN ROAD
PORT HURON MI 48060
(b) (7)(E)



## Case Report

| Administrative Details: | |
|---|---|
| CR No | Subject |
| (b) (7)(E) | C3360 – Discharge of Weapon by Officer |
| Report Date/Time | Occurrence Date/Time |
| 08/03/2021 05:27 | 08/03/2021 05:27 |
| Location | Call Source |
| 1170 MICHIGAN RD | PHONE |
| Dispatched Offense | Verified Offense |
| (b) (7)(E) | C3360 Discharge of Weapon by Officer |
| County | City/Twp/Village |
| 74 - Saint Clair | 20 - Port Huron Twp |
| Division | |
| Shift A | |

| Action Requested: | |
|---|---|
| [ ] Arrest warrant | [ ] Review only |
| [ ] Search warrant | [ ] Forfeiture |
| [ ] Juvenile petition | [ ] Other |

Created On 08/04/2021 03:15 PM

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

| Offenses: |
|---|

| C3360 - Discharge of Weapon by Officer (b) (6), (b) (7)(C) | | |
|---|---|---|
| IBR Code / IBR Group / | Offense File Class | |
| Crime Against | Loca ion Type 15 - Jail/Prison/Penitentiary/Corrections Fac | Offense Completed Completed |
| Domestic Violence No | Hate/Bias 00 - None (No Bias) | |
| Using A-Alcohol: No   C-Computer Equipment: No   D-Drugs/Narcotics: No | | Cargo Theft |

| People: | | | | | | |
|---|---|---|---|---|---|---|
| (b) (6), (b) (7)(C)          (O-OTHER) (L-LAW ENFORCEMENT OFFICER)  [(b) (6), (b) (7)   (07683)] | | | | | | |
| PE: | W.Type: Last Name (b) (6), | | First Name (b) (6), | Middle Name (b) | Suffix | Mr/Mrs/Ms |
| DOB (Age) (b) (6), (b) (7) | Sex M | Race WHITE | Ethnicity | Birth City & State | Birth Country | Country of Citizenship |
| Street Address (b) (6), (b) (7) | | | Apt # | County | Country | Home Phone UNKNOWN | Work Phone |
| City (b) | | | State (b | Zip (b) | Cell Phone (b) (6), (b) | Email |
| Notes ICE Deportation Officer | | | | | | |

| Narrative: |
|---|

| CR No: (b) (7)(E) | Written By: (b) (6), (b) (7)(C) | Date: 08/03/2021 05:57 AM |
|---|---|---|

See dictation.

CLOSED/(b) (6),
(b) (7)

| CR No: (b) (7)(E) | Written By: (b) (6), (b) (7)(C) | Date: 08/04/2021 02:57 PM |
|---|---|---|

SUMMARY:

This report will detail the accidental firearm discharge that took place at the SCC Jail involving an Immigration and Customs Enforcement Officer.

DATE/TIME:

8-3-21/0400 during the regular shift of Platoon 4

AGENT INFORMATION:

Created On 08/04/2021 03:15 PM

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

[barcode]

(b) (6), (b) (7)(C) , ICE Deportation Officer from Detroit.

PISTOL INVOLVED:

Dept. issued Sig Sauer 9mm, SERIAL# (b) (7)(E)

REPORT:

On 8-3-21 at 0500 shift briefing, Sgt. (b) (6), advised there was an accidental firearm discharge in the jail involving ICE Officer (b) (6), (b) (7)(C) . Sgt. (b) (6), requested I go to the jail and obtain a report as to what happened.

I went to the jail where I met with Agent (b) (6), in the sally port. I asked him to explain what happened. (b) (6), (b) (7)(C) said he was at the jail to retrieve 3 prisoners that he was going to transporting. When he arrived at the jail he placed his pistol in lockbox #8 in the sally port. (b) (6), (b) (7)(C) said after he retrieved the prisoners from the jail and secured them in his vehicle he returned to the lockbox to retrieve his pistol.

(b) (6), (b) (7)(C) holstered the pistol, his finger was not on the trigger and out on the trigger guard. He said his pistol was within the holster when he heard it fire. At this time he was not sure if a round actually discharged in the pistol. He said he set it down and determined the round did not actually eject.

He had a small tear in his pants under the holster from the gas that escaped the barrel. (b) (6), (b) (7)(C) was not injured, however, he was still examined by jail medical staff and Tri Hospital EMS. (b) (6), (b) (7)(C) attributed this accident to some type of pistol malfunction. After speaking to me he left for Detroit to speak to his Superiors.

At the time of the discharge, Deputies (b) (6), (b) (7)(C) and (b) (6) were in the booking area. They were the first Officers to check on (b) (6), (b) (7)(C) but did not witness the discharge.

Jail Supervisors on duty at the time of this incident were Sgt.'s (b) (6), and (b) (6), (b) (7) as well as Lt. (b) (6), (b) (7) Surveillance video of the incident has been saved by Jail Supervisors.

CLOSED

Created On 08/04/2021 03:15 PM

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

KREINER/cr

cc:  Jail Admin. (b) (6), (b)
(7)(C)

Created On 08/04/2021 03:15 PM
Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 6

Office of Firearms Training

Program (OFTP) Report of

Examination, dated

August 5, 2021

FOR OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

# Department of Homeland Security
# Immigration and Customs Enforcement
# Office of Firearms and Tactical Programs
# Armory Operations Unit

# REPORT OF EXAMINATION

**CASE NUMBER**:
(b) (7)(E)

**CASE CONTROL/EXAMINING OFFICIAL**:
Equipment Specialist, Ordnance (ESO) (b) (6), (b) (7)(C), Office of Firearms and Tactical Programs (OFTP), Armory Operations Unit (AOU).

**CASE CONTROL SUPERVISOR**:
Unit Chief (b) (6), (b) (7)(C), Office of Firearms and Tactical Programs (OFTP), Armory Operations Unit (AOU).

**DATE ITEMS RECEIVED BY OFTP**:
August 5, 2021

**SUBJECT ITEM EXAMINED:**
MAKE:  Sig Sauer
MODEL:  P320C
ACTION TYPE:  Semi-Automatic Pistol
CALIBER:  9mm x 19
SERIAL NUMBER: (b) (7)(E)

**ITEMS RECEIVED**:
1.  1 Brass casing, fired with full firing pin indent (.020 depth).
2.  2-FACTS Transfers (b) (7)(E) and (b) (7)(E)

**ALLEGED INCIDENT**:
Unintentional Discharge

**INITIAL REPORT RECEIVED FROM**:
(b) (6), (b) (7)(C) ERO Field Office Detroit

**DATE EXAMINATION INITIATED**:
August 5, 2021

**DATE EXAMINATION COMPLETED**:
August 5, 2021

FOR OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

FOR OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

**DETAILS OF EXAMINATION**:
On August 5, 2021, I received the subject firearm for examination. A detailed inspection of the subject firearm revealed the subject firearm is serviceable, and functions as designed. No indications of tampering, anomalies, defective parts, or modifications were found during the inspection. All firing components and all mechanical safety features are serviceable and functioned as designed. The subject firearm is within factory specifications and in compliance with the ICE Firearms Policy.

The trigger pull weight is 7 and 7 ¼ pounds. This means the trigger will pick up and hold a 7-pound trigger weight and will not pick up a 7 ¼ - pound trigger weight. This is within the 5-to-8-pound factory specifications.

Safety Features:
1. Striker Safety Lock: The striker safety lock mechanically blocks the striker (firing pin) from moving forward and striking the primer of a chambered round unless the trigger is pulled completely to the rear.
2. Safety Lever: When the trigger is pulled to the rear the safety lever pushes the striker safety lock up.
3. Secondary Striker Notch: The striker catches on the secondary striker notch if the primary sear surface fails to hold the striker to the rear.
4. Disconnector: Prevents the firearm from being fired if the barrel is unlocked.
5. Takedown Lever: The takedown lever prevents the firearm from being disassembled if the slide is not locked to the rear.
6. Takedown Safety Lever: The takedown safety lever prevents the firearm from being disassembled with a magazine inserted into the firearm.

The subject firearm was test-fired using duty ammunition and experienced no malfunctions.

**CONCLUSIONS:**
A physical examination of the subject firearm revealed the firearm is serviceable, and functions as designed. The firearm displayed no indication of tampering, anomalies, defective parts, or modifications. All firing components and all mechanical safety features are serviceable and functioned as designed. The subject firearm is within factory specifications and complies with the ICE Firearms Policy.

FOR OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 7

FF (b) (6), (b) (7)(C) Agent's Affidavit - video of DO (b) (6), (b) (7)(C) unintentional discharge at the St. Clair County Jail

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**For Official Use Only Not for Public Disclosure**

**MANAGEMENT INQUIRY AFFIDAVIT**

**STATE OF:**  VIRGINIA

**COUNTY OF:**  FAIRFAX

I, (b) (6), (b) (7)(C)        , who after being duly sworn state the following:

I am a designated agency Management Official, Fact Finder, for U.S. Immigration and Customs Enforcement, Administrative Inquiry Unit.

On September 17, 2021, FF (b) (6), (b)  reviewed the St. Clair County Jail's video of DO (b) (6), (b)  unintentional discharge, dated August 3, 2021. The review revealed the following information:

On September 17, 2021, FF (b) (6), (b)  reviewed the incident video and can report the following information. FF (b) (6), (b)  observed DO (b) (6), (b)  retrieve items, including a firearm from a SCCJ lockbox. As DO (b) (6), (b)  was holstering his firearm (right handed), FF (b) (6), (b)  observed DO (b) (6), (b)  right index finger was extended and not on the trigger or inside the trigger guard. FF (b) (6), (b)  observed DO (b) (6), (b)  right pant leg move (just below the holster) as DO (b) (6), (b)  holstered his firearm. FF (b) (6), (b)  observed DO (b) (6), (b)  check himself, concentrating near his right hip and leg area and observed the firearm was located on the sallyport floor by the lockboxes. FF (b) (6), (b)  observed numerous SCCJ personnel respond to the incident. FF (b) (6), (b)  observed DO (b) (6), (b)  speak with SCCJ personnel and observed SCCJ personnel looking all over the sallyport with flashlights. FF (b) (6), (b)  observed DO (b) (6), (b)  on the phone almost immediately after the incident. FF (b) (6), (b)  witnessed SCCJ personnel pick up the firearm and place it back into the lockbox and lock it. FF (b) (6), (b)  observed SCCJ personnel unload the ICE detainees from the vehicle and take them back into the SCCJ.

The contents of this statement are true and correct to the best of my knowledge and belief.

Subscribed and sworn this 7th day of October 2021.

(b) (6), (b) (7)(C)

_____
Signature of Affiant, Fact Finder

_____
Name & Title/Position
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations
Administrative Inquiry Unit

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

(b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

(b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

(b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

(b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

b) (7)(E)

b) (7)(E)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

(b) (7)(E)

Produced in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not aut

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 8

FF (b) (6), (b) (7)(C) Agent's Affidavit - Meeting with HQ ICE OFTP Executive Leadership and Field Supervision at the AOU, Altoona, PA

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## DISCLOSURE WARNING FOR NON-BARGAINING UNIT EMPLOYEES
## WARNING TO NOT DISCLOSE INVESTIGATIVE INFORMATION

You are being interviewed as part of a continuing official investigation by the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility. As this investigation is sensitive in nature, you are instructed not to discuss the nature of this interview with any other person(s), except private legal counsel. Failure to comply with this directive could subject you to disciplinary and/or criminal action for interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

I, (b) (6), (b) (7)(C) _____ have read and understand the above warning.
              (Employee's Name)


(b) (6), (b) (7)(C)

_____    09/23/2021
Signature                    Date

ICE Form 70-029 (8/20)                                          Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## DISCLOSURE WARNING FOR NON-BARGAINING UNIT EMPLOYEES
## WARNING TO NOT DISCLOSE INVESTIGATIVE INFORMATION

You are being interviewed as part of a continuing official investigation by the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility. As this investigation is sensitive in nature, you are instructed not to discuss the nature of this interview with any other person(s), except private legal counsel. Failure to comply with this directive could subject you to disciplinary and/or criminal action for interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

I, (b) (6), (b) (7) _____ have read and understand the above warning.
(Employee's Name)

(b) (6), (b) (7)(C)

_____              09/23/2021
Signature                            Date

ICE Form 70-029 (8/20)                                    Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**DISCLOSURE WARNING FOR NON-BARGAINING UNIT EMPLOYEES
WARNING TO NOT DISCLOSE INVESTIGATIVE INFORMATION**

You are being interviewed as part of a continuing official investigation by the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility. As this investigation is sensitive in nature, you are instructed not to discuss the nature of this interview with any other person(s), except private legal counsel. Failure to comply with this directive could subject you to disciplinary and/or criminal action for interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

I, (b) (6), (b) (7) _____ have read and understand the above warning.
(Employee's Name)

(b) (6), (b) (7)(C)

_____ Signature        09/23/2021 Date

ICE Form 70-029 (8/20)                                Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**For Official Use Only Not for Public Disclosure**

**MANAGEMENT INQUIRY AFFIDAVIT**

**STATE OF:**　　　**VIRGINIA**

**COUNTY OF:**　　**FAIRFAX**

I, (b) (6), (b) (7)(C)　　　, who after being duly sworn state the following:

I am a designated agency Management Official, Fact Finder, for U.S. Immigration and Customs Enforcement, Administrative Inquiry Unit.

On September 23, 2021, FF (b) (6), (b) (7)(C) met virtually with ICE HQ Office of Firearms and Training Program (OFTP) Assistant Director (b) (6), (b) (7)(C), ICE HQ OFTP Deputy Assistant Director (b) (6), (b) (7)(C), and Armory Operations Unit, Unit Chief (b) (6), (b) (7)(C), Altoona, PA.

The purpose of the meeting was to review DO (b) (6), (b) (7)(C) unintentional discharge at the St. Clair County Jail and determine if there was intent of misconduct. In part, all parties concluded there was no intent of misconduct. (b) (6), (b) (7)(C) index finger was clearly off the trigger and outside the trigger guard when the firearm discharged. Further the video was unremarkable to conclude if a "foreign object, e.g., clothing, string from jacket, was a factor in the discharge. End of report.

The contents of this statement are true and correct to the best of my knowledge and belief.

Subscribed and sworn this 7th day of October 2021.

(b) (6), (b) (7)(C)

_____　　　　_____
Signature of Affiant, Fact Finder　　Name & Title/Position
　　　　　　　　　　　　　　　　　U.S. Immigration and Customs Enforcement
　　　　　　　　　　　　　　　　　Enforcement and Removal Operations
　　　　　　　　　　　　　　　　　Administrative Inquiry Unit

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 9

Acting AFOD (b) (6), (b) (7)(C) Affidavit,

dated October 6, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## YOUR RE␣UIRED APPEARANCE AND SWORN TESTIMONY

You, _____ (b) (6), (b) (7)(C) _____ are hereby directed to personally appear
(Employee's Name)

on __10/0␣/2021__ before _____ (b) (6), (b) (7)(C) _____
   (Date)                    (Name and Title of Investigating Official)

at _____ Virt␣ally via Mi␣r␣␣t Teams _____
                                 (Location)

in connection with an official investigation being conducted or authori␣ed by the U.S. Immigration and Customs
Enforcement, Office of Professional Responsibility.

You are advised that your willful refusal to appear, as directed herein, and provide sworn testimony in accordance with the
authority outlined in 8 C.F.R. 103.1(e) and 8 U.S.C. 13␣7(b), may be construed to be insubordination, which in and of
itself could result in revocation of any security clearance you may hold and the institution of disciplinary action against
you, up to and including dismissal from the Agency.

You will be questioned concerning your ␣nowledge of alleged misconduct relating to
D␣ (b) (6), (b)␣ AD␣n␣A␣g␣st␣3␣2021

If you are in a bargaining unit, you may have a right to Union representation.

Your appearance is requested as

[X] A␣itness

[ ] A Subject

(b) (6), (b) (7)(C)

Signature of Investigating Official

U.S. Immigration and Customs Enforcement

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**A**                   **R**

(b) (6), (b) (7)(C)

Employee Signature                 __10/05/2021__
                                        Date

ICE Form 70-021 (8/20)                                        Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## T IRD PARTY WITNESS INTERVIEW NOTIFICATION
## FOR NON-BARGAINING UNIT EMPLOYEES

You are not currently the subject of this investigation. However, you may be held responsible for any false statements you ma e, or for any administrative violation that you admit.

As an employee of the Department of Homeland Security, you are required to cooperate in this investigation by answering questions truthfully and under oath, both orally and in writing, and to provide documents and other materials concerning matters of official interest as part of this investigation.  Failure or refusal to cooperate may subject you to disciplinary action, up to and including removal.

(b) (6), (b) (7)(C) _____

(Employee's Name)

(b) (6), (b) (7)(C)

Employee Signature                    Date  10/05/2021

ICE Form 70-02   (8/20)                                    Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## DISCLOSURE WARNING FOR NON-BARGAINING UNIT EMPLOYEES
## WARNING TO NOT DISCLOSE INVESTIGATIVE INFORMATION

You are being interviewed as part of a continuing official investigation by the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility. As this investigation is sensitive in nature, you are instructed not to discuss the nature of this interview with any other person(s), except private legal counsel. Failure to comply with this directive could subject you to disciplinary and/or criminal action for interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

I, (b) (6), (b) (7)(C) _____ have read and understand the above warning.
(Employee's Name)

(b) (6), (b) (7)(C)

Signature                                         10/05/2021
                                                  Date

ICE Form 70-029 (8/20)                                               Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement
For Official Use Only Not for Public Disclosure

**MANAGEMENT INQUIRY AFFIDAVIT** (b)(6)

**STATE OF**: Michigan

**COUNTY OF**: Wayne

I, (b) (6), (b) (7)(C), who after being duly sworn state the following:

I am providing the following statement in response to questions, which were posed to me by an agency designated fact finder of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations pursuant to an Office of Professional Responsibility (OPR) Management Inquiry.

Q. Please state your full name, present position, grade, and duty location?
A. (b) (6), (b) (7)(C), (a)AFOD, (b) (6), (b) (7), Detroit, Michigan.

Q. How long have you been employed at ICE/ERO?
A. 14.5 years

Q. What is your current assignment?
A. (a)AFOD of Enforcement.

Q. How long have you worked in your current assignment?
A. 2.5 months.

Q. Please describe the job-related duties you perform daily in your current assignment.
A. I currently am the second line supervisor for two Field Operations Teams and the Detroit Criminal Alien Program.

Q. Please provide the name and title of your first line supervisor and your second line supervisor. (Amount of time they supervised you.)
A. (b) (6), (b) (7)(C), (a)DFOD 2.5 months. (b) (6), (b) (7)(C), FOD 2.5 months.

Q. Is there anything that may impede your ability to provide a truthful statement today?
A. No.

Affiant Initials:
Fact Finder Initials: (b)(6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**
**For Official Use Only Not for Public Disclosure**

<u>**MANAGEMENT INQUIRY AFFIDAVIT**</u> 

Q. Do you consider yourself to be under the influence of any medication, alcohol or any other substance at this time which could adversely affect your ability to answer these questions completely and truthfully?

A. No.

Q. Do you understand your obligation to be forthcoming and truthful?

A. Yes.

Q. Have you turned off all electronic equipment that could be used to record this interview? (iPhone, video cameras, etc.).

A. Yes.

Q. Do you understand that you are prohibited from recording this interview?

A. Yes.

Q. Have you or are you currently involved in any other pending investigation or proceedings relating to this allegation (s)? (OIG, HSI, OPR, etc.)

A. No.

Q. On August 3, 2021, describe your involvement into the incident of DO (b) (6), (b) (7)(C) accidental discharge/unintentional discharge at the St. Clair County Jail?

A. I was notified of the AD/UD and assisted DO (b) (6), (b) (7)(C) supervisor and management in gathering the necessary information for proper reporting of the AD.

Q. What type of firearm was DO (b) (6), (b) (7) carrying at the time of the incident? Was it government issued or personally owned?

A. Sig Sauer P-320C. Government issued.

Q. When was DO (b) (6), (b) (7) issued that firearm?

A. August 10, 2020.

Q. What other equipment was DO (b) (6), (b) (7) issued when he was issued his firearm?

Page **2** of 5

Affiant Initials:
Fact Finder Initials: (b) (6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**
**For Official Use Only Not for Public Disclosure**

## MANAGEMENT INQUIRY AFFIDAVIT _____ (b)(6)

A. 4 magazines, weapon mounted flashlight, concealment holster and Duty holster.

Q. When was the last time DO (b) (6), (b) (7) qualified with that firearm?
A. May 21, 2021.

Q. Did DO (b) (6), (b) (7) receive a passing score?
A. Yes.

Q. What type of holster(s) was issued to DO (b) (6), (b) (7) with his government issued firearm?
A. DO (b) (6), (b) (7) was issued the two OFTP provided holsters. The molded plastic pancake style concealment holster and the Safariland duty holster.

Q. What type of holster was he using at the time of the accidental discharge/unintentional discharge?
A. The molded plastic pancake style holster.

Q. I understand the holster may have been disposed of locally, is that correct?
A. That is correct.

Q. Before its disposal, did you or another SFI, inspect the holster? Did you notice any anomalies that may have caused the accidental discharge/unintentional discharge?
A. Yes, the holster was inspected, and it did not appear to have any anomalies that would have caused the AD/UD.

Q. Did DO (b) (6), (b) (7) explain to you, or another SFI, how he believed the firearm discharged, e.g., finger on trigger, jacket got caught in trigger, holster caught trigger, etc.?
A. He stated he did not have his finger on or near the trigger and that the gun just went off. He also stated that OFTP told him that his zipper got caught in the trigger while he was holstering.

Q. To your knowledge was a round fired from the firearm?
A. Yes, a round was fired from the firearm.

Affiant Initials:
Fact Finder Initials: (b)(6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**
**For Official Use Only Not for Public Disclosure**

<u>**MANAGEMENT INQUIRY AFFIDAVIT**</u> 

Q. To your knowledge, was the shell casing found?

A. Yes, the shell casing was lodged in the breach of the firearm when it was turned into me.

Q. Since August 3, 2021, describe your involvement into the incident of DO (b) (6), (b) (7)(C) accidental discharge/unintentional discharge?

A. I assisted in gathering the training documents and requirements for notification.

Q. Is there any additional information I have not asked you that you believe may be helpful to this inquiry?

A. St. Clair County Sheriff's Department provided ERO Detroit with a video of the incident.

Q. Is there anything else you would like to add to your statement?

A. No.

Q. Have you had the opportunity and time to review your affidavit for accuracy?

A. Yes.

Page **4** of **5**

**Affiant Initials:**
**Fact Finder Initials:** (b) (6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**
**For Official Use Only Not for Public Disclosure**

<u>**MANAGEMENT INQUIRY AFFIDAVIT**</u> 

I have read the foregoing statement consisting of <u>5 </u>pages, each of which I have signed or initialed.  I fully understand this statement and it is true, accurate, and complete to the best of my knowledge and belief.  I made the corrections shown and placed my initials opposite each.  Should I become aware of any additional information regarding the matter for which I provided this statement, I will promptly contact the fact finder and provide such information.  I made this statement freely and voluntarily, without any threats or reward, or promises of reward having been made to me in return for it.

_____
Signature of Affiant & Date

Sworn and subscribed before me this 6th day of October 2021, virtually via Microsoft Teams.

_____
Signature of Agency Fact Finder & Date
(b) (6), (b) (7)(C)
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations

Page **5** of **5**

**Affiant Initials:**
**Fact Finder Initials:** (b)(6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

# Exhibit 10

DO ▮▮▮▮▮ Affidavit

(b) (6), (b) (7)(C)

October 7, 2021

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# DISCLOSURE WARNING FOR BARGAINING UNIT EMPLOYEES
# WARNING TO NOT DISCLOSE INVESTIGATIVE INFORMATION

You are being interviewed as part of a continuing official investigation by the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility. As this investigation is sensitive in nature, you are instructed not to discuss the nature of this interview with any other person(s), except private legal counsel or your union representative(s).

The signing of ICE Form 70-020 does not restrict in any way the employee from discussing and/or consulting with legal counsel regarding the facts of the investigation. This form does not limit the employee's choice of legal counsel or limit the employee to discussing and/or consulting with only one union representative during the investigation.

Failure to comply with this directive could subject you to disciplinary and/or criminal action for interfering with or impeding an official investigation.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

This advisement was made prior to the interview of _____ (b) (6), (b) (7)(C) _____
(Employee's Name)

on __10/0 /2021__ (mm/dd/yyyy) at __3:0____.m. (time, a.m./p.m.).

(b) (6), (b) (7)(C) _____
Name and Title of Interviewing Official
U.S. Immigration and Customs Enforcement

(b) (6), (b) (7)(C)
_____
Employee Signature

ICE Form 70-020 (8/20)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# YOUR RE UIRED APPEARANCE AND SWORN TESTIMONY

You, _____ (b) (6), (b) (7)(C) _____ are hereby directed to personally appear
(Employee's Name)

on  10/0 /2021  before _____ (b) (6), (b) (7)(C) _____
(Date)                                    (Name and Title of Investigating Official)

at _____ Virt ally via Mi r s t Teams _____
(Location)

in connection with an official investigation being conducted or authori ed by the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility.

You are advised that your willful refusal to appear, as directed herein, and provide sworn testimony in accordance with the authority outlined in 8 C.F.R. 103.1(e) and 8 U.S.C. 13 7(b), may be construed to be insubordination, which in and of itself could result in revocation of any security clearance you may hold and the institution of disciplinary action against you, up to and including dismissal from the Agency.

You will be questioned concerning your  nowledge of alleged misconduct relating to
nintenti nal dis arge

If you are in a bargaining unit, you may have a right to Union representation.

Your appearance is requested as

☐ A  itness

☒ A Subject

(b) (6), (b) (7)(C)

Signature of Investigating Official

U.S. Immigration and Customs Enforcement

---

**A                        R**

(b) (6), (b) (7)(C)

Employee Signature                                        10/0 /2021
Date

ICE Form 70-021 (8/20)                                        Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
## U.S. Immigration and Customs Enforcement

# GENERAL NOTICE

I am investigating the alleged    nintenti nal dis arge    irearm

_____
(theft, misuse of position, loss, etc.)

You, (b) (6), (b) (7)(C) _____

(Employee's Name)

are the subject of the investigation concerning this matter.

**O**

☐ The general nature of this matter is criminal.

☒ The general nature of this matter is administrative.

**O**

☐ This interview is related to possible criminal misconduct by you.

☒ This interview is not related to possible criminal misconduct by you.

(b) (6), (b) (7)(C)

_____     (b)_____     10/0 /2021
Employee's Signature                                      Employee's Initials            Date

ICE Form 70-023 (8/20)                                                                          Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# WEINGARTEN RIG TS
## EMPLOYEE NOTIFICATION REGARDING UNION REPRESENTATION

Pursuant to  U.S.C. 7114(a)(2)( ), you have the right to be represented during the interview about to ta e place by a person designated by the exclusively recogni ed labor organi ation for the unit in which you wor , if

(a) you reasonably believe that the results of this interview may result in disciplinary action against you  and

(b) you request representation.

I ,  _____(b) (6), (b) (7)(C)_____  ac nowledge receipt of the
(Employee's Name)

aforementioned notification of my right to representation.


(b) (6), (b) (7)(C)

_____          10/0 /2021____
Signature of Employee                        Date

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized
Case 1:22-cv-00729 Document 32-2 Filed 12/20/24 Page 365 of 439

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## ADMINISTRATIVE WARNING ACKNOWLEDGEMENT

I, _____ (b) (6), (b) (7)(C) _____ hereby acknowledge receipt of
(Employee's Name)

the Administrative Warning. I understand that _____ (b) (6), (b) (7)(C) _____ has been
(Interviewing Official)

charged with conducting an official inquiry. I have been informed this inquiry is solely administrative in nature.

I have been informed that I may be subject to disciplinary action, up to and including removal (termination of employment) for my failure or refusal to cooperate with this investigation relating to the performance of my duties as an employee of the Department of Homeland Security. I have been informed that I may also be subject to criminal prosecution and/or administrative disciplinary action for any false answer that I give to any questions.

I have been advised that neither my answers, nor any information or evidence gained by reason of my answers, can be used against me in a criminal proceeding. The answers that I furnish and any information and/or evidence received may be used in the course of an administrative proceeding, which could result in a disciplinary action, including dismissal.

I understand that, pursuant to Departmental and ICE policies and directives, I am required to cooperate in this investigation by answering questions truthfully and under oath, and to provide documents and other materials concerning matters of official interest as part of this investigation.

(b) (6), (b) (7)(C)

| | | | |
|---|---|---|---|
| Employee's Signature | 10/0 /2021 | 3:12 | .m. |
| | Date | Time | a.m./p.m. |

(b) (6), (b) (7)(C) _____
Name and Title of Interviewing Official
U.S. Immigration and Customs Enforcement

ICE Form 70-031 (8/20)

Page 1 of 1

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized
Case 1:22-cv-11860-THS Document 82-2613 Filed 3/23/24 Page 366 of 439

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. I    i    ration an   Custo   s Enforce   ent**
**For Official Use Only Not for Public Disclosure**

**MANAGEMENT IN   UIRY AFFIDAVIT**

**STATE OF**:          Michigan

**COUNTY OF**:        Wayne

I, (b) (6), (b) (7)(C) , who after being duly sworn state the following:

I am providing the following statement in response to questions, which were posed to me by an agency designated fact finder of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations pursuant to an Office of Professional Responsibility (OPR) Management Inquiry.

Q. Please state your full name, present position, grade, and duty location?
A. (b) (6), (b) (7)(C)         , Deportation Officer, GS12, Detroit Michigan ICE/ERO Field Office

Q. How long have you been employed at ICE/ERO?
A. Over 14yrs

Q. What is your current assignment?
A.  Detained Docket Officer/St. Clair Co. Jail Liaison Officer

Q. How long have you worked in your current assignment?
A. St. Clair Co. Jail Liaison Officer-over 10yrs, Detained Docket Officer-2 weeks

Q. Please describe the job-related duties you perform daily in your current assignment.
A. Manage Detained Docket for Africa and Europe, Liaison duties at St. Clair Co. Jail to ICE Field Office

Q. Please provide the name and title of your first line supervisor and your second line supervisor. (Amount of time they supervised you.)
A. Detained Docket-SDDO (b) (6), (b) (7)(C) , St. Clair-SDDO-(b) (6), (b) (7)(C), AFOD (b) (6),   and AFOD (b) (6),

Q. Is there anything that may impede your ability to provide a truthful statement today?
A. No

Page    of

**Affiant Initials:** (b)
**Fact Fin  er Initials:** (b)
(6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Case 1:22-cv-00729-JTN-PJG Document 82-25 Filed 03/22/24 Page 367 of 439

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. I   i  ration an  Custo  s Enforce   ent**
**For Official Use Only Not for Public Disclosure**

<u>**MANAGEMENT IN  UIRY AFFIDAVIT**</u>

Q. Do you consider yourself to be under the influence of any medication, alcohol or any other substance at this time which could adversely affect your ability to answer these questions completely and truthfully?

A. No

Q. Do you understand your obligation to be forthcoming and truthful?

A. Yes

Q. Have you turned off all electronic equipment that could be used to record this interview? (iPhone, video cameras, etc.).

A. Yes

Q. Do you understand that you are prohibited from recording this interview?

A. Yes

Q. Have you or are you currently involved in any other pending investigation or proceedings relating to this allegation (s)? (OIG, HSI, OPR, etc.)

A. No

Q. On August 3, 2021, it was reported to the Joint Intake Center you had an unintentional discharge of your firearm at the St. Clair County Jail (SCCJ). Why were you at the SCCJ that morning?

A. I was there conducting an ICE Detainee transport from that facility to the Detroit Field Office for ICE Air Operations.

Q. What type of firearm were you carrying at the time of the incident? Was it government issued or personally owned?

A. Department issued Sig Sauer P320-9mm-semi-automatic

Q. What type of holster(s) were you issued with your government issued firearm?

A. Department issued Sig belt loop, hard plastic holster

Q. What type of holster were you using at the time your firearm discharged?

A. Department issued Sig belt loop, hard plastic holster

Page    of

**Affiant Initials:** (b)
**Fact Fin  er Initials:** (b)
(6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. I    i  ration an  Custo   s Enforce   ent**
**For Official Use Only Not for Public Disclosure**

## MANAGEMENT IN  UIRY AFFIDAVIT

Q. Was it one of the holsters you were issued by ICE with the Sig Sauer P320C?

A. Yes

Q. Have you had an opportunity to view the video footage from that incident?

A.  Yes

Q. Based on a review of the video, I observed your finger was indexed and outside the trigger guard as you returned to the holster. In your words, what do you think happened that caused your firearm to discharge?

A.  I honestly have no idea, I made sure that my finger was outside the trigger guard area, while holstering, and nothing was in the holster.  So, I really have no clue as to what happened.

Q. Is there anything else you would like to add to your statement?

A.   No

Q. Have you had the opportunity and time to review your affidavit for accuracy?

A.  Yes

Page    of

**Affiant Initials:** (b)
**Fact Fin  er Initials:** (b)
(6)

Provided in response to a Touhy request in Slatowski v. Sig Sauer, INC, Civil Action 21-CV-00729 further dissemination is not authorized

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. I    i  ration an  Custo  s Enforce   ent**
**For Official Use Only Not for Public Disclosure**

<u>**MANAGEMENT IN  UIRY AFFIDAVIT**</u>

I have read the foregoing statement consisting of <u>    </u> pages, each of which I have signed or initialed.  I fully understand this statement and it is true, accurate, and complete to the best of my knowledge and belief.  I made the corrections shown and placed my initials opposite each.  Should I become aware of any additional information regarding the matter for which I provided this statement, I will promptly contact the fact finder and provide such information.  I made this statement freely and voluntarily, without any threats or reward, or promises of reward having been made to me in return for it.

(b) (6), (b) (7)(C)

Signature of Affiant & Date

Sworn and subscribed before me this day of October 2021, virtually via Microsoft Teams.

(b) (6), (b) (7)(C)

Signature of Agency Fact Finder & Date

(b) (6), (b) (7)(C)

U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations

Page    of

**Affiant Initials:** (b)

**Fact Fin  er Initials:** (b)
(6)

# EXHIBIT M

1          UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF KENTUCKY

2

3                          -  -  -

4    STEPHEN MAYES,                :
                                   :
5          Plaintiff,              :
                                   :
6                                  : CIVIL ACTION NO.
           vs.                     : 1:19-cv-00146-GNS
7                                  :
                                   :
8    SIG SAUER, INC.,              :
                                   :
9          Defendant.              :

10

11                         -  -  -

12               WEDNESDAY, APRIL 14, 2021

13                         -  -  -

14

15               TRANSCRIPT OF ORAL DEPOSITION OF
     CRAIG JACKLYN (via videoconference), taken by and

16   before NANNETTE S. O'BRIKIS, Court Reporter and
     Notary Public, held at 1234 Market Street, 6th

17   Floor, Philadelphia, Pennsylvania, on the above
     date, commencing at 10:17 a.m.

18

19

20

21

                           -  -  -

22

23

24

Case 2:22-cv-11069-PBS Document 83-14 Filed 06/28/24 Page 23 of 89

```
 1              MR. BROWN:  That's my memory.
 2              MR. BAGNELL:  The miscellaneous
 3         action, Bob, they do have an appearance in
 4         that and now they're coincidentally -- they
 5         are in the Slatowski matter, but they, you
 6         know, I couldn't file that motion without
 7         them being -- they pro hoc'd me in, so I
 8         think they can be on -- I don't even think
 9         he's on, but I think he can -- on that
10         basis, I think he can participate somewhat.
11              MR. KELLY:  I just object if he's
12         not counsel of record in the Mayes case
13         because it's my understanding that this
14         case is noticed only in the Mayes case.
15              MR. BAGNELL:  Okay.
16    BY MR. BAGNELL:
17         Q.     All right.  Officer, I want to go
18    back again to the -- to the police cart that
19    you're in that day.
20              You're going down a concourse with
21    Officer McDowell on your right.  You were driving.
22    Correct?
23         A.     Yes.
24         Q.     I think you said your holstered
```

Case 2:22-cv-10620-PBS Document 83-14 Filed 06/28/24 Page 374 of 439

```
                                              Page 37
```

```
 1    P320 is on your right side?

 2           A.      Yes.  It's on my right thigh.

 3           Q.      Is that a tactical holster?

 4           A.      Yes, it is.

 5           Q.      Is it also known as a drop holster

 6    in your experience?

 7                   MR. KELLY:  Objection.  Leading.

 8    BY MR. BAGNELL:

 9           Q.      Have you heard that term?

10           A.      Yes, I have.

11           Q.      Okay.  What's the advantage of a

12    tactical holster in the performance of your

13    duties?

14           A.      For some intruders, it's more

15    accessible.  It comes from the draw.  For me, I

16    prefer that.  It wasn't mandatory.  We have

17    officers that sometimes prefer their weapon

18    directly on their hip.

19           Q.      So your weapon that day was

20    midthigh area.  Is that correct?

21           A.      Yes.

22           Q.      Somewhat lower than your waist.

23    Correct?

24           A.      Yes.  Yes.
```

CRAIG JACKLYN

1          Q.        Were your hands, as you're driving

2     on that day, 6:00 p.m., Officer, were your hands

3     on your P320, your holstered P320, at any time?

4          A.        No.

5          Q.        Where were your hands?

6          A.        Both my hands were on the steering

7     wheel.

8          Q.        All right.  Can you -- can you now

9     tell us what happened as you're approaching the

10    beauty -- beauty parlor on the right-hand side

11    that we're all here to talk about?

12         A.        All right.  What happened is, I'm

13    driving at a slow rate.  I'm coming to a stop.  I

14    come to a stop.  I depress the brake, disengage

15    the vehicle, my -- now the vehicle is at a

16    complete halt.

17              My partner is exiting on his right

18    as I get ready to exit or attempt to exit on my

19    left.

20              As I -- as I go to raise up out of

21    the seat, there's a muffled pop.  Right away, my

22    partner and I, we get out thinking that it was a

23    tire blowout.

24              We look around and looking at the

CRAIG JACKLYN

Page 39

1   tires, I don't see anything.  My partner looks at

2   the tires.  He doesn't see anything.

3                   I walk around to the front of the

4   cart and I immediately notice a bullet hole or a

5   hole in the front of the cart.

6                   I reached down and touched my

7   holster and find out that it's warm to my touch.

8                   At that time, I told my partner, I

9   think I've had a discharge.

10                  Look around, I immediately turn my

11  body camera on, call for a supervisor.  By the

12  way, I also looked inside the vehicle and I had an

13  iced tea sitting on the dash in a cup holder and

14  there was a hole through that as well.

15                  We secured the area, called for a

16  supervisor, and from there, my partner, he was --

17  I know people that were there were worried about

18  the safety of the weapon, but I know that, at that

19  particular time, the weapon was completely safe.

20                  There wasn't going to be another

21  discharge because the round never discharged out

22  of the weapon.  It never cycled.

23        Q.      Sir, I want to go back and ask you

24  some questions about what you just stated.  At one

CRAIG JACKLYN

Page 40

1    point you said you were raising up out of the
2    cart, I think.
3         A.       Right.
4         Q.       Can you describe how you did that
5    physically?
6         A.       What happens is, is that, you know,
7    we have a lot of gear on and everything, so you
8    shift your weight and you lift up.
9                  I use the steering wheel as a
10   leverage point to get out, and at that particular
11   moment, that's exactly when apparently the weapon
12   discharged.
13        Q.       How many hands did you have on the
14   wheel when you were trying to raise up?
15        A.       Both hands.
16        Q.       Both hands?
17        A.       Both hands on the wheel.
18        Q.       Do you have any doubt about that or
19   question whatsoever?
20        A.       No.  There wasn't any doubt about
21   that.
22        Q.       And did you just testify that the
23   gun fired when your hands were on the wheel or
24   sometime later?

Case 2:22-cv-11062-PBS  Document 83-14  Filed 06/28/24  Page 377 of 439

CRAIG JACKLYN

```
 1        A.       As I -- there's no way for me to
 2   know it was simultaneously or at the exact time
 3   that I raised up, but in that couple of seconds or
 4   millisecond, the weapon had discharged.  My hand's
 5   on the steering wheel, I'm raising, we hear the
 6   pop.
 7               We look around.  We don't see any
 8   blown-out tires.  I notice a hole in the front of
 9   the cart, notice that my iced tea is leaking.  I
10   feel the heat from my holster.  I think we got a
11   -- I got a discharge and it's incredible.
12        Q.       And anything like that happen to
13   you before in your law enforcement or military
14   career?
15        A.       Absolutely not.
16        Q.       What was your -- what was your
17   personal reaction to the discharge?
18        A.       I've been handling weapons, like I
19   said, since I was a kid.  I know all the safety
20   rules.  I've taught weapons handling, the whole
21   nine yards.
22               I was stunned that it happened.  I
23   would have never -- if I'd have read the story
24   somewhere, I would have never believed that a
```

EXHIBIT N

**Page 1**

CONFIDENTIAL

1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
   IN AND FOR MANATEE COUNTY, FLORIDA
2
   CASE NO: 20-CA-1741
3
4
   KEVIN MICHAEL POWERS and
5  TAMMY LEE POWERS,
6       Plaintiffs,
7  vs.
8  SIG SAUER, INC., and L&O
   SIG SAUER VERWALTUNGS-GMBH,
9  and DANA SAFETY SUPPLY,
   INC.,
10
       Defendants.
11

          _____

12
13    CONFIDENTIAL DEPOSITION OF KEVIN MICHAEL POWERS
14         Taken on Behalf of the Defendants
15
16       DATE TAKEN:   Wednesday, October 6, 2021
17       TIME:         9:34 a.m. - 1:21 p.m. EST
18       LOCATION:     Via Zoom Videoconference
19
20
21
22
23
24    Examination of the witness taken remotely before:
25          Matthew McKinney, FPR-C

**Page 2**

1              APPEARANCES OF COUNSEL
2
3  On behalf of the Plaintiffs:
4       NICHOLAS S. GURNEY, Esquire
        Gurney Law, PLLC
5       1238 East Concord Street
        Orlando, Florida 32803
6       (407) 554-5757
        Nick@gurney.law
7       (Appearing via videoconference)
8
9  On behalf of Defendants Sig Sauer, Inc., and L&O Sig
   Sauer Verwaltungs-GMBH:
10
        KEITH B. GIBSON, Esquire
11      Littleton Park Joyce Ughetta & Kelly, LLP
        4 Manhattanville Road
12      Suite 202
        Purchase, New York  10577
13      (914) 417-3400
        Keith.gibson@littletonpark.com
14      (Appearing via videoconference)
15            and
16      ANTHONY J. PETRILLO, Esquire
        Luks, Santaniello, Petrillo, Cohen & Peterfriend
17      100 North Tampa Street
        Suite 2120
18      Tampa, Florida  33602
        (813) 226-0081
19      Ajp@ls-law.com
        (Appearing via videoconference)
20
21
22
23
24
25

**Page 3**

1                     INDEX
2
3  WITNESS:  KEVIN MICHAEL POWERS              PAGE
4  Direct Examination by Mr. Gibson              5
5  Cross-Examination by Mr. Gurney             137
6  Redirect Examination by Mr. Gibson          140
7  Certificate of Oath                         143
8  Certificate of Reporter                     144
9  Errata Sheet                                145
10
11

                 INDEX TO EXHIBITS

12
13  DEFENDANT'S         DESCRIPTION            PAGE
14  Exhibit 1      Photographs                  80
15  Exhibit 2      Police report                66
16
17                   - - -
18
19
20
21
22
23
24
25

**Page 4**

1    DEPOSITION OF KEVIN MICHAEL POWERS
2         October 6, 2021
3         - - -
4       THE REPORTER:  The attorneys participating in
5  this deposition acknowledge that the court reporter
6  is not present with the witness and that I will be
7  reporting the proceedings and administering the
8  oath remotely, pursuant to Florida Supreme Court
9  Administrative Order No. AOSC-20-16, extended by
10 subsequent orders.
11      The parties and their counsel consent to this
12 arrangement and waive any objections to this manner
13 of reporting.  I have identified the deponent by
14 seeing his driver's license.
15      Would counsel and the deponent please indicate
16 your agreement on the record?
17      And we'll start with Mr. Gibson, if we could.
18      MR. GIBSON:  I agree.
19      MR. GURNEY:  Agreed.
20      MR. PETRILLO:  Agreed.
21      THE REPORTER:  And, Mr. Powers, if you'll also
22 agree and consent to being sworn in.
23      THE WITNESS:  I agree.
24         KEVIN MICHAEL POWERS,
25 having been first duly sworn and responding "I do,"



Page 57

1 between the time you got home until, you know, right
2 before the incident occurred.
3    A.  Okay.  I came home.  I followed my same
4 routine.  When I get home, my golden retriever Stella
5 would come greet me.  I went into the kitchen.  I turned
6 on the light over the sink.  I went to the hallway.  I
7 turned the light on in the hallway, and then I turned
8 right and went into the laundry room, and in the laundry
9 room, I took off my radio, which was attached to the --
10 we wear exterior vests.  I took off the radio, put it on
11 the washer, and then took off my vest and hung it up in
12 the laundry room.
13        Then I went into the bedroom.  I took my radio
14 with me and went in the bedroom, put the radio on top of
15 the dresser.  My wife was there, not sitting up, not
16 sitting bolt-up, but sort of reclining in the bed.  I
17 said good morning or whatever.  She was going to be
18 getting ready to go up to her job, and I was getting
19 ready to go to bed.
20        So I put the radio up on the top of the
21 dresser.  I took my two magazines out of my gun belt,
22 put them up into the tin on top of the dresser.  I took
23 out my pepper spray, did the same.  I put that away.  I
24 took out my TASER, and I ejected the cartridge to the
25 TASER.  I never kept those together either.  I always

Page 58

1 separated them.  I put, I believe, the TASER in the top
2 drawer, and then I went to clear my weapon, take my
3 weapon out and clear my weapon.
4    Q.   Okay.  So that's a good place to stop.  Thank
5 you.
6        So your -- I assume you're wearing a uniform
7 shirt.  That's still on?
8    A.  Oh, yes, yes.
9    Q.   And how about your belt, is your belt still
10 around your waist?
11    A.  Oh, yeah, yes.  I didn't take my gun belt off
12 until after I was laying on the ground injured.
13    Q.   Okay.  So typically you, at this point, would
14 have removed the pistol, rendered it safe, set it down
15 and then removed your duty belt and undressed?  Is that
16 your typical routine?
17    A.  That's correct.
18    Q.   Okay.  All right.  So now we've got you're
19 removing the pistol.  The pistol is holstered on your
20 left hip; correct?
21    A.  That's correct.
22    Q.   Okay.  So now you're removing the holster.
23 Just walk me through what you did before it discharged.
24    A.  Okay.  I took the pistol out of the holster.
25 I ejected the magazine.  I put that magazine on top of

Page 59

1 the dresser.  I switched the firearm to my right hand.
2 I went to pull the slide back to eject the remaining
3 round in the chamber.  The slide did not go all the way
4 back to be locked, so I would say it was somewhere in
5 between, you know, its normal in-battery position and to
6 the locking point, and the slide slipped out of my hand
7 and slammed forward, so the round was never ejected, and
8 that's when it discharged.
9    Q.   Okay.  So I just want to make sure I've got it
10 all correct step by step.  So you removed the P320
11 pistol from the holster with your left hand; correct?
12    A.  Correct.
13    Q.   And you pressed the magazine release, let the
14 magazine fall out, and you set that on the dresser;
15 correct?
16    A.  Right.  It didn't fall.  I placed it on the
17 dresser.
18    Q.   Fell in your hand?
19    A.  Well, there are some -- correct, yes, into my
20 hand.
21    Q.   Then you switched the pistol from your left
22 hand to your right hand?
23    A.  That's correct.
24    Q.   And how are you holding it in your right hand?
25 Is it, you know, essentially sitting on top of your

Page 60

1 right hand with the left side facing up?
2    A.  No.  I'm holding the butt of the firearm.  I'm
3 holding the handle, my fingers --
4    Q.   Okay.  So your fingers are wrapped around the
5 grip, and your fingers are --
6    A.  Right.
7    Q.   -- below the trigger guard?
8    A.  Correct.
9    Q.   Okay.  And so you're holding it in the right
10 hand.  You take your left hand, put it on top of the
11 slide so you can rack the slide and eject the round?
12    A.  That's correct.  I would normally turn over to
13 the -- the firearm would almost be parallel to the
14 ground.  It's hard to describe that.  The butt of the
15 gun would be parallel to the ground, and I always -- it
16 would always be pointing towards the concrete block
17 wall.
18        MR. GURNEY:  I'm sorry.  The portion of the
19 question with the trigger guard, can you read that
20 back, Matthew?  Just -- I couldn't hear it.
21        THE REPORTER:  Yeah.
22        Question:  "Okay.  And so you're holding it in
23 the right hand.  You take your left hand, put it on
24 top of the slide so you can rack the slide and
25 eject the round," or you mean the prior question?



# EXHIBIT O

## Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE NORTHERN DISTRICT OF GEORGIA
3                        ATLANTA DIVISION
4
5                                 )
    ROBERT LANG,                  )
6          Plaintiff,             ) CIVIL ACTION FILE NO.:
                                  )
7    vs.                          ) 1:21-cv-04196-CAP
                                  )
8    SIG SAUER, INC.,             )
           Defendant.             )
9    _____)
10
11
12                     DEPOSITION OF
13                      Robert Lang
14                    March 23, 2022
15                     10:27 a.m.
16          303 Peachtree Street NE, Suite 3500
                 Atlanta, Georgia 30308
17
18
19
20
21          Ariel Walcott, CVR, CCR
22        Esquire Deposition Solutions
              2700 Centennial Tower
23               101 Marietta Street
              Atlanta, Georgia 30303
24               (404)495-0777
25
```

## Page 2

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Matthew Bonham
         Protentis Law LLC
5        5447 Roswell Road NE
         Atlanta, Georgia 30342
6        Office: (404)593-2460
         E-mail: matt@protentislaw.com
7
     FOR THE DEFENDANT:
8
9        Keith Gibson
         Littleton Park Joyce Ughetta & Kelly LLP
10       4 Manhattanville Road, Suite 202
         Purchase, NY 10577
11       Office: (914)417-3400
         E-mail: keith.gibson@littletonpark.com
12       Andrew Horowitz
         Drew, Eckl & Farnham LLP
13       303 Peachtree Street, Suite 3500
         Atlanta, Georgia 30308
14       Office: (404)885-1400
         Fax: (404)876-0992
15       E-mail: ahorowitz@deflaw.com
16
17   ALSO PRESENT:
18   Baily Diaz (videographer)
19
20
21              TRANSCRIPT LEGEND
22   -- Cross-talk/interruption/change of thought
     (ph) Phonetically spelled
23   [sic] Written as spoken
     (unintelligible) Not capable of being understood
24
25
```

## Page 3

```
1          I N D E X   T O   E X A M I N A T I O N S
2    EXAMINATION                                    PAGE
3    DIRECT EXAMINATION BY: Keith Gibson              4
4
5             I N D E X   T O   E X H I B I T S
6    DEFENDANT'S EXHIBIT        DESCRIPTION         PAGE
7    Exhibit No. 1      Robert Lang's copy of IDs    16
8    Exhibit No. 2      Norcross Gun Club & Range    27
                        receipt
10   Exhibit No. 3      Plaintiff's responses to     37
11                      interrogatories
12   Exhibit No. 4      Video of Robert Lang         55
13   Exhibit No. 5      Photos of Mr. Lang's wound   60
14   Exhibit No. 6      Incident report             68
15   Exhibit No. 7      Mr. Lang's text message     78
16                      exchanges
17   Exhibit No. 8      SIG's inspection report and 114
18                      inspection of Mr. Lang's pistol
19
20
21
22
23
24
25
```

## Page 4

```
1              P R O C E E D I N G S
2       VIDEOGRAPHER:  Good morning, we're now on the record.
3    The time is 10:45 a.m. on Wednesday March 23, 2022.  This
4    begins the deposition of Robert Lang taken in the matter
5    of Robert Lang versus SIG Sauer Incorporated by the United
6    States District Court for the Northern District of
7    Georgia, Atlanta division.  The case number is
8    1:21-cv-04196-CAP.  The videographer today is Baily Diaz.
9    The court reporter is Ariel Walcott, and we're both from
10   Esquire Deposition Solutions.  Counsel, will you please
11   announce your name for the record, who you represent and
12   the court reporter will than swear in the witness.
13      MR. BONHAM:  Matthew Bonham on behalf of Mr. Lang.
14      MR. GIBSON:  Keith Gibson, Littleton Park Joyce
15   Ughetta and Kelly on behalf of SIG Sauer.
16      MR. HOROWITZ:  I'm Andrew Horowitz.  I'm here for SIG
17   Sauer too.
18              Robert Lang,
19   having been first duly sworn, testified under oath as follows:
20              DIRECT EXAMINATION
21   BY MR. GIBSON:
22      Q.  Good morning, Mr. Lang.
23      A.  Morning, sir.
24      Q.  We met briefly earlier.  My name is Keith Gibson.
25   I'm an attorney with Littleton Park, Joyce Ughetta and Kelly,
```

ROBERT LANG
LANG vs SIG SAUER

March 23, 2022
45–48

Page 45

1  with the time that it was test fired and shipped with the
2  firearm. I know that as common practice. Outside of that, I'm
3  not too terribly privy to all the testing that it goes through.
4      Q.  Ever read any testing standards by the NIJ or SAAMI?
5      A.  No.
6      Q.  You ever heard of SAAMI Sporting Arms and Ammunition
7  Manufacturer's Institute?
8      A.  (non-verbal response.)
9      Q.  Okay.  How often did you clean your 320?
10     A.  I would bore clean it every time I would go out and
11  shoot.  If I shot over a hundred rounds, I would run a bore
12  thing through the barrel.  But as far as dis-assembly, maybe
13  after a thousand rounds, I would take the slide off and give
14  the slide a good cleaning, and then lubricate and clean the
15  board, put it back together.  But as far as take down, it would
16  just be a simple take down.  I never really try and dig into my
17  firearms any further than a simple take down for cleaning.
18     Q.  Are you familiar with the term field strip?
19     A.  Mm-hm.
20     Q.  That's what you would do?
21     A.  That's what I would do.
22     Q.  Okay.  Never removed the fire control unit from the
23  grip module?
24     A.  Never once.
25     Q.  Okay.  Ever perform any repair maintenance on your

Page 46

1  320 prior to the incident?
2      A.  No.
3      Q.  Did anyone else ever have to repair or maintain your
4  P320 prior to your --
5      A.  No.
6      Q.  Okay.  Just the field stripping, clean it every
7  thousand rounds or so, do a bore brush.
8      A.  Bore brush (unintelligible).
9      Q.  Okay.  How often did you fire your P320 in the nine
10  months that you had before the incident approximately?
11     A.  Over a thousand rounds.
12     Q.  Would you go every week to the range, every couple
13  weeks?
14     A.  After the first couple of weeks, I would say I was
15  going weekly.  Then as time goes on, I was more and more
16  comfortable with it.  Slowed down a little bit, ammo prices
17  started going up.  It slowed down from there.
18     Q.  Where would you go to fire?
19     A.  I would go to Sharpshooters.
20     Q.  Okay.  In 2018, you were a member of Sharpshooters?
21     A.  I can't remember if at that point I was a member yet.
22  I don't remember exactly.  It would've been right around then
23  is when I joined as a member, but I had been so close to my
24  house.  I had been shooting there prior to being a member for a
25  while.

Page 47

1      Q.  Other than shooting at the range, have you ever fired
2  your 320 anywhere else?
3      A.  320?  No, not that I can recall.
4      Q.  The nine months between March of 2018 and December
5  2018, did you have any issues with the operation of your 320?
6      A.  No, never once.  I could say that it's actually the
7  first handgun I've ever purchased that did not at least have a
8  failure to eject or something like that occur within the first
9  two hundred rounds.
10     Q.  Starting in March 2018, your P320 was your concealed
11  carry pistol?
12     A.  It was.
13     Q.  Carry it basically every day?
14     A.  Yes.
15     Q.  When you would get into your vehicle, did you leave
16  your holster pistol on or would you take it off?
17     A.  Stay on.
18     Q.  Stay on?
19     A.  Mm-hm.
20     Q.  Okay.
21         COURT REPORTER:  Is that a yes?
22     A.  Yes.  I'm sorry.
23     Q.  Do you carry a pistol now?
24     A.  I do.
25     Q.  What pistol do you have?

Page 48

1      A.  I carry a Kimber K6s.
2      Q.  Did you get that after the incident?
3      A.  I did.
4      Q.  What type of gun is the Kimber K6s?
5      A.  That is a hammerless double action only, 357 Magnum
6  revolver, six rounds.
7      Q.  On the date of the incident, I believe we talked
8  about you were using the BlackPoint holster that you purchased
9  with the 320; right?
10     A.  Yes, sir.
11     Q.  Prior to December 11, 2018, do you have any incident,
12  any issues with the holster?
13     A.  (non-verbal response.)
14     Q.  What type of holster was it as far as retention?
15     A.  It was a retention holster inside the waistband and
16  similar to all polymer retention -- I mean it wasn't like a
17  manual retention.  It was -- I don't know what term you'd call
18  it, but I know like something outside the waistbands have like
19  button retention.  It wasn't like that.  It was just retention
20  based on the design of the gun.
21     Q.  So the single retention and just the friction of the
22  gun?
23     A.  Yes.  It kind of had like a little click to it.
24     Q.  Okay.  But you didn't have to push a button or --
25     A.  No, there was no button, but there was a nice snap



ROBERT LANG
LANG vs SIG SAUER

March 23, 2022
49–52

Page 49

1  type of feeling.
2      Q.  Was there a tool that allowed you to tighten or
3  loosen?
4      A.  Yes, there was.
5      Q.  Okay.  You keep it fairly tight, fairly loose?
6      A.  I like mine fairly tight.
7      Q.  Okay.  But never had any issues removing it from the
8  holster?
9      A.  No.
10     Q.  Okay.  Did you ever have to draw the pistol from the
11  holster when it was in your waistband?
12     A.  Have to?
13     Q.  Did you ever do it?
14     A.  Yes.
15     Q.  Okay.  Under what circumstances?
16     A.  Practice.
17     Q.  Okay.  At a range?
18     A.  At a range, at home, unloaded.  Something I practice
19  quite often with all guns that I carry.
20     Q.  Okay.  Just to make sure you're comfortable if you
21  ever need to?
22     A.  Exactly.
23     Q.  Okay.  Never any issues when you were doing that
24  drawing with the gun getting stuck or anything like that?
25     A.  No.

Page 50

1      Q.  Okay.  When was the last time you fired the pistol
2  before your incident?  Do you recall?  It can be approximate
3  within a week, within a month.  Something else, if you know?
4      A.  At that time, I was only 32.  So I'd say probably
5  within a month, month and a half at most.
6      Q.  That would've been at the range?
7      A.  Yes.  That would've been over at Sharpshooters.
8      Q.  Between the last time you fired the pistol at the
9  range and when the incident happened, did you field strip and
10  clean it?  Do you recall?
11     A.  No, I did not.  I do recall.  I didn't field strip
12  it.  I just bore taped it.
13         MR. GIBSON:  Okay.  Can we go off the record?
14         VIDEOGRAPHER:  The time is 11:34 a.m., and we're
15  going off the record.
16         (Recess was taken.)
17         VIDEOGRAPHER:  The time is 11:45 a.m., and we're back
18  on the record.
19     Q.  Welcome back, Mr. Lang.  I now want to shift focus to
20  December 11, 2018.  Do you recall what day of the week that
21  was?
22     A.  It was a weekday.  I came home from work.  Can't
23  recall which day it was.
24     Q.  Tuesday.
25     A.  Tuesday.  All right.

Page 51

1      Q.  Do you recall around when the accident happened?
2      A.  Not exactly, but I mean it would've been after work.
3  So it's somewhere between probably 6:00 and 7:00.
4      Q.  It occurred at your home at 625 Kingsport Drive.
5      A.  635.
6      Q.  635.  Was anyone else home when the accident
7  happened?
8      A.  Yes.  My wife and son were home.
9      Q.  Okay.  What'd you do the day of the accident?  You
10  went to work?
11     A.  I went to work.
12     Q.  What are your work hours approximately?
13     A.  I would say at that time, working from 10:00 to 6:00
14  typically at the office.
15     Q.  Okay.  How long does it take you to get home?
16     A.  If I'm on traffic, it could be 10 minutes -- or 20 or
17  15 minutes to 35 minutes.  It's usually closer to 35 minutes.
18     Q.  Have any alcohol that day?
19     A.  No, sir.
20     Q.  Were you on any medications at that time, other than
21  the heart medication we discussed earlier?
22     A.  No, sir.
23     Q.  Using any recreational drugs that day?
24     A.  No, sir.
25     Q.  These are the tough questions.  How did you sleep the

Page 52

1  night before?  Anything stick out one way or the other?
2      A.  I slept well, if I remember correctly.  Nothing that
3  sticks out.  I got to work on time and, if I recall, did my job
4  well that day.
5      Q.  Anything stick out that's happening out of the
6  ordinary that day before you got home?
7      A.  No.
8      Q.  Okay.  How long after you got home did the accident
9  occur?  Approximately?
10     A.  Not long.  I mean --
11     Q.  Why don't you walk me through from the time you got
12  home till the accident occurs, and then we'll stop and go a
13  little slower.
14     A.  As I recall, came in, walked -- and the way my house
15  is set up, so you got the foyer and just a little bit of a
16  hallway, and then open concept, living room off to the right,
17  kitchen off to the left.  I remember my wife and son were
18  coming down the hallway towards me.  My wife was going to take
19  him upstairs to give him a bath.  We said our hellos, gave my
20  son a hug and they went off upstairs just to give him a bath.
21  I recall walking and turning into the living room area a little
22  bit to take a look at the TV.  I believe Jeopardy was on.  I
23  remember answering the question, getting it right.  And that's
24  when I proceeded to do what I would do every day when I'd come
25  home which would be to remove my firearm and put it in the safe



ROBERT LANG                                                March 23, 2022
LANG vs SIG SAUER                                          53–56

Page 53

1  location downstairs.
2       Coming back out of the living room, as I'm walking
3  towards that direction, I stop by the -- between the kitchen
4  and the living room, that little hallway area, to remove my
5  firearm, put my hand down like I would normally do, put my
6  thumb on top of the slide to then pull around and loosen the
7  belt clip. And then from there, go to take it out. But in
8  this particular day, my hand went down, pushed on the slide,
9  right as my finger got to the belt clip onto the holster, the
10 firearm went off.
11      Q. Okay. What were you wearing?
12      A. I was wearing slacks and a polo shirt and an
13 undershirt. I always wear undershirts. Obviously, it's not
14 very comfortable to carry inside the waistband without an
15 undershirt on.
16      Q. The undershirt would've been tucked in inside the
17 holster, so between the holster and your body?
18      A. Correct.
19      Q. Okay. Then how about the polo shirt?
20      A. Polo shirt would've been out now, not tucked in.
21      Q. That's over the --
22      A. Correct.
23      Q. This is December. Were you wearing a coat?
24      A. Yes, I probably was. Honestly, that's not something
25 I recall exactly. But if I was, which in December, probably it

Page 54

1  was a light jacket. I probably took it off and hooked it up.
2       Q. At the time of the incident, you recall having
3  slacks, undershirt tucked in, inside the holster, between the
4  holster and your body, and then a polo shirt that would've been
5  untucked and over the holster?
6       A. Correct.
7       Q. Have any jewelry on?
8       A. My wedding ring. I think that was about the time I
9  got my Tissot, so I would've had a Tissot watch on and my
10 wedding ring. That's it.
11      Q. Okay. Nothing on your right hand?
12      A. No.
13      Q. Okay. No bracelet?
14      A. Nope. Not a big jewelry guy.
15      Q. Was anything else attached to your belt besides your
16 holster?
17      A. No.
18      Q. Okay. Just typical leather belts or fabric, or do
19 you recall?
20      A. This is a brown leather belt.
21      Q. Okay.
22      A. With the proper width for the holster.
23      Q. Matt, if you want to come in, I'm going to show him
24 the video that you produced. That's what's on this. I'm going
25 to mark it as an exhibit.

Page 55

1       MR. BONHAM: Okay. Sounds good. That will be
2  Exhibit Four?
3       (Defendant's Exhibit No. 4 was marked for
4  identification.)
5       Q. Yes. Mr. Lang, I'm going to show you a video that
6  your counsel --
7       A. Yeah because it's hard to explain the process without
8  showing it.
9       Q. Yes. I just want to make sure that we've got clear
10 what it is.
11      A. Yes, absolutely.
12      Q. This appears to be short, but was this the belt that
13 you were wearing at the time?
14      A. Yes. Was the correct belt.
15      Q. This is this the holster. This is your 320; I assume
16 it's unloaded.
17      A. Correct.
18      Q. T-shirt tucked in between the holster shirt; is that
19 how you would've been wearing your t-shirt all day of the
20 incident?
21      A. Mm-hm.
22      Q. Then I don't know if this is a polo shirt, but
23 sometimes --
24      A. Yes. That was a weekend, I think. I took the video,
25 so I don't know what it is.

Page 56

1       Q. The shirt is pulled up and rolled up. Is that what
2  you would typically do with your polo shirt, or did you do that
3  on the day of the incident?
4       A. Yes. I would always just roll it up.
5       Q. Okay. This is just a short ten second video. In the
6  video, you actually undo your belt. Is that how you would
7  typically --
8       A. Yes. That is how I typically do it. I didn't
9  mention that, but yes, that is how I did it that day as well.
10 With that particular belt, the reason I kind of forgot is
11 because recently I've been wearing one that's more designed for
12 holsters that has some stretch to it. I'm doing it, so it's
13 not necessary.
14      Q. Okay.
15      A. But yes, at that point, that was my process, was to
16 undo the belt first so that I could easily just slide the belt
17 out; put just enough tension on the clip, pull it out and slide
18 the belt. Never got that far. I got as far as undoing the
19 belt, put my hand on it and get my finger to the clip when it
20 went off.
21      Q. Okay. On the video, you've got your hand on the gun
22 before you undid the belt. Do you know if you did that on the
23 day of the incident or not?
24      A. I would typically just double check to make sure that
25 nothing had shifted or anything before trying to remove them



Page 57

1 together with any of my firearms. I can't recall if I did or
2 did not do it that night. But it is just out of habit in the
3 video when I was doing it. It could have been something I did,
4 but I don't recall specifically that night.
5    Q.   On the day of the incident though, you did undo your
6 belt before the gun discharged?
7    A.   Yes.
8    Q.   Okay. Let's just watch it again. You undid your
9 belt. I'm going to stop it right there. You're putting your
10 thumb on the back of the grip. You're using your middle finger
11 and ring finger to pull out on the -- there's a clip on the
12 holster that clips on the belt.
13    A.   Then slide the belt down.
14    Q.   And then slide the belt down and lift it out. Is
15 that what's shown in this Exhibit Four? Is that what you did
16 on the date of the incident?
17    A.   Yes.
18    Q.   Okay. Tell me to stop it when you think -- so right
19 there, you've got your thumb on the back of the grip, you're
20 starting to grab --
21    A.   I hadn't even begun pulling on the clip.
22    Q.   Okay. Is this a little bit before this?
23    A.   Little bit before this, I had just kind of started
24 pulling on it, and my other hand had not even started moving to
25 pull the belt down.

Page 58

1    Q.   About there?
2    A.   Yes. I mean even a little bit prior to that. Right
3 when I started putting tension on that.
4    Q.   Right when your thumb started to push --
5    A.   Right when my thumb started to push on the back, and
6 it's the same timing type of motion. Right when I started
7 putting a little bit of tension and pulling out on the glove,
8 gun fired.
9    Q.   Okay. This is about six seconds in the video that
10 we're watching.
11    A.   Mm-hm.
12    Q.   Okay. You believe your left hand had not started to
13 pull the belt?
14    A.   No. I know I did not.
15    Q.   Okay. We're going to mark this USB with the ten
16 second video as Exhibit Five, and that will stay with the
17 transcript. I'm going to give you the -- there's a password to
18 unlock it. I'm just going to leave that attached. How were
19 you standing at the time? What I mean, are your feet about
20 shoulder width apart, standing straight up?
21    A.   Standing straight up, shoulder width apart.
22    Q.   Similar to how you were in the video we just looked
23 at?
24    A.   Mm-hm.
25    Q.   Okay. Where did the bullet impact you?

Page 59

1    A.   Directly. Thigh up here, came out down there
2 directly.
3    Q.   Okay. You're wearing slacks today. Are those
4 similar to the type of slacks you would've been wearing?
5    A.   Yes.
6    Q.   It's around where the bottom of the pocket is? It's
7 where you're pointing towards.
8    A.   Yes.
9    Q.   Around where the bullet went in through, and then it
10 exited above the knee?
11    A.   Yes.
12    Q.   Okay. Where did the bullet come to rest?
13    A.   In my hardwood floors.
14    Q.   Okay. Did the shell casing eject from the gun?
15    A.   It did not which was actually the first time that
16 ever happened. I'd actually mentioned that earlier that, that
17 was the only gun I had ever had that within the first 200
18 rounds had never had a failure to eject. I mean clearly with
19 it in the holster, the slide was being impeded. So I can
20 understand why it would have a failure to eject the cartridge
21 to that point.
22    Q.   When you say the slide is being impeded by the
23 holster, what do you mean?
24    A.   I mean if the gun goes off with restriction around
25 it, it's not going to move fast enough, and it's possible for

Page 60

1 it to catch the casing. That's what happened. I have that
2 shell casing. You can see the indentation where it was caught
3 in the slide.
4    Q.   Okay. What happened to the pistol after it
5 discharged if you know? Did it come out of the holster?
6    A.   After it discharged, I did pull it out of the
7 holster, shell casing sticking out of the top of it. I removed
8 the magazine, cleared the shell casing. There wasn't another
9 round because it couldn't cycle. There was another round in
10 there, but I double checked to make sure there was nothing else
11 in there. Pulled the slide back, cocked it manually back
12 because at that point, the magazine was not in. And then I set
13 the firearm on my kitchen counter next to where I was.
14    Q.   Did you lock the slide back?
15    A.   Yes. I manually locked it back because the magazine
16 was out already, so it wouldn't have locked back unless it was
17 an empty bag in it.
18    Q.   Now when you're doing all this, making the gun safe
19 after the incident, did you know you had been impacted at that
20 point?
21    A.   No. I did not even think it had hit me at that
22 point. Because immediately when it happened, I saw the hole on
23 the floor, and I didn't feel anything.
24    Q.   Let's mark this as Exhibit Five.
25       (Defendant's Exhibit No. 5 was marked for



E   HIBIT P

1          IN   THE COURT OF COMMON PLEAS

2       PHILADELPHIA COUNTY, PENNSYLVANIA

3                  - - -

4

5   GEORGE ABRAHAMS          : CASE NO.

6                              220601213

7

8

9       V.                   :

10

11

12   SIG SAUER, INC.          :

13

14                  - - -

15            October 20, 2023

16                  - - -

17

18       Videotaped deposition of JOHNNY DAVIS,

19   taken remotely via teleconferencing on the

20   above date, commencing at 10:01 a.m., before

21   Michelle Palamarchuk, RPR, RMR and Notary

22   Public in and for the Commonwealth of

23   Pennsylvania.

24

Page 9

1  chamber; correct?
2      A.  Yes, sir, that's true.
3      Q.  Prior to November 16th of 2022, how
4  long had you been carrying the P320?
5      A.  For almost two years.
6      Q.  Do you have experience with that
7  weapon, taking it out, one, carrying it,
8  and two, taking it out and training with it
9  during qualifications?
10     A.  Yes, that's correct.
11     Q.  Prior to November of 2022 did you
12 ever have an unintended discharge?
13     A.  No, not prior to that, no.
14     Q.  So on November 16th of 2022 you were
15 carrying your P320; is that correct?
16     A.  Yes, sir.
17     Q.  Had any modifications been made to
18 it?  Did you change the trigger or do
19 anything to it or was it as you received it?
20     A.  No, it was as I received it.  The
21 policy in our department we cannot manipulate
22 the firearm or change nothing from it.  So
23 it's the same as they gave it to me.
24     Q.  Could you tell the jury what happened

Page 10

1  to you on November 16th of 2022?
2      A.  Sure.  I was in a friend's house.  I
3  don't like to use my gun inside the houses,
4  so I put my gun -- it was in the holster that
5  the agency gave me, a pelvis holster.  So I
6  put it on my friend's safety box.
7          So we were there for a few hours.  We
8  were talking about work and what happened at
9  work.  And from there, I just needed to leave
10 because I have to like come back in at
11 4:00 o'clock in the morning.  I told him that
12 I have to leave.
13         I took my gun out of the safe box.  I
14 put it on my pelvis.  And from there walked
15 like two or three steps outside of his house
16 and the firearm just discharged.
17     Q.  Let me stop you there.
18     A.  I did not put my hand on the trigger.
19 It was at all times in the holster and it
20 didn't get stuck on no clothing or nothing
21 like that.
22     Q.  Let me stop you and break it down
23 mechanically step by step?
24     A.  Sure.

Page 11

1      Q.  To make sure that we're
2  understanding.
3      A.  Sure.
4      Q.  So the pistol was in the holster in
5  your friend's safe; correct?
6      A.  Yes, yes.
7      Q.  And when it was time for you to leave
8  you took the pistol while it was still in the
9  holster and you placed it inside of your
10 waistband; right?
11     A.  Yes, sir.
12     Q.  And is that what's known as an
13 appendix carry?
14     A.  Yes.
15     Q.  So the pistol was in the holster
16 inside of your waistband and then you began
17 to walk; is that correct?
18     A.  Yes, sir.
19     Q.  And as you were walking, the pistol
20 discharged?
21     A.  I took like two or three steps and
22 suddenly it just went off.
23     Q.  Where were your hands at when it went
24 off?

Page 12

1      A.  Well, I was walking.  Obviously, I
2  had my hands beside me.  I didn't have it
3  near the gun or nothing like that.
4      Q.  Was the pistol fully in the holster?
5      A.  Yes, it was.
6      Q.  And is there any way that your
7  clothing or anything got caught up in the
8  holster?
9      A.  No, sir, no.  I don't think so.  No,
10 'cause when I put the gun on it, I just had
11 my shirt outside.  So here you have to have
12 it concealed when you're off duty, so you
13 have to have your shirt outside.  So I know
14 it was not in touch with nothing because I
15 make sure.
16     Q.  The holster that you were using, that
17 was a department-issued holster; is that
18 correct?
19     A.  Yes, sir.
20     Q.  Was it a Safariland made for the Sig?
21     A.  Yes.
22         MR. WOY:  Ryan, I'm just going
23         to object to some leading questions
24         here.  There's been quite a few.  I

E   HIBIT Q

Page 5

1  THE VIDEOGRAPHER: We are now on
2  the record. Today's date is
3  July 7th, 2023. The time is 9:00
4  o'clock a.m. Eastern. This is the
5  recorded video deposition of Matthew
6  Breedon, being taken in the matter of
7  John Tyler Herman versus Sig Sauer,
8  Incorporated in the United States
9  District Court for the Western
10 District of Oklahoma, Civil Case
11 CIV-21-1038-SLP.
12    I'm Paul D'Ambra, the video
13 technician. Our court reporter today
14 is Michelle Palamarchuk. We are both
15 from Everest Court Reporting.
16    All counsel appearing today will
17 be noted on the stenographic record.
18    Will the court reporter please
19 swear in the witness.
20    COURT REPORTER: Yes.
21    - - -
22 MATTHEW ALLEN BREEDON, after having first
23 been duly sworn/affirmed, testified as
24 follows:

Page 6

1    - - -
2    EXAMINATION
3    - - -
4  BY MR. CEISLER:
5    Q. Good morning, Mr. Breedon. How are
6  you doing?
7    A. Good. How are you?
8    Q. Can you see and hear me okay?
9    A. I can.
10   Q. So I'm going to ask you a few
11 questions about an incident that happened on
12 April 4th, 2022. Does that sound good to
13 you?
14   A. Yes.
15   Q. And prior to April 4th, 2022 what was
16 your training and experience with firearms?
17   A. I would say fairly significant for a
18 civilian. I began using firearms back in
19 2008 when I was -- actually before that, in
20 2005 when I became an Assistant District
21 Attorney, I worked in the Dougherty Judicial
22 Circuit in Albany, Georgia. In Georgia,
23 Assistant DAs are sometimes issued firearms
24 and we do often carry.

Page 7

1    While as an Assistant District
2  Attorney in Albany, I was assigned to work
3  with the Dougherty County Metro S.W.A.T.
4  team, so I would train with them, I would
5  shoot with them weekly, I would attend some
6  of their trainings, not the full trainings
7  that they would go to but some of them. And
8  I continued to qualify yearly and train
9  yearly with firearms.
10   Q. Would you carry a firearm regularly?
11   A. Yes.
12   Q. What different types of firearms
13 would you carry?
14   A. When I began, I carried a Glock 23.
15 There was a short period of time where I
16 carried a full-size Sig P226 and then went
17 back to a Glock. I eventually purchased a
18 Sig P320 through our distributor which I
19 carried for a little over two years before
20 the incident.
21   Q. Prior to April 4th, 2022, did you
22 ever have any unintended discharges?
23   A. No.
24   Q. No unintended discharges with the

Page 8

1  Glock?
2    A. No.
3    Q. None with the Sig 226?
4    A. No.
5    Q. So let's talk about the day of the
6  incident, April 4th, 2022. Where were you?
7    A. I was at the District Attorney's
8  office. At this time I'm employed as a
9  Senior Assistant District Attorney in the
10 Effingham office of the Ogeechee Judicial
11 Circuit. It's Springfield, Georgia, but it's
12 right above Savannah, Georgia where I worked
13 before. I am the supervisor of that office.
14   On the day that all of this happened,
15 it was the end of the day about five o'clock.
16 I was in the office of another Assistant DA,
17 Ian Heap. I was removing the weapon from my
18 holster when it fired without me ever
19 touching the trigger.
20   Q. Where was your finger at the time the
21 gun went off?
22   A. As I was removing the weapon from my
23 holster, I grabbed it and my finger was
24 outside of the holster and outside of the

Page 9

1  frame not touching the holster. My finger
2  was nowhere near the trigger when the weapon
3  fired.
4       I remember after the weapon fired,
5  looking down at where my finger was and it
6  was up near the frame and the slide, nowhere
7  near the trigger.
8       Q. How sure are you that your finger
9  wasn't on the trigger?
10      A. A hundred percent.
11      Q. And I know you just told me a little
12  bit because you were looking at it. But how
13  are you 100 percent sure your finger wasn't
14  on the trigger?
15      A. I have removed weapons from holsters
16  hundreds of times. I do it the same way each
17  time. I've never been close to touching the
18  trigger removing a weapon and I know where my
19  finger was at all times. And I specifically
20  looked down after the weapon fired and you
21  would see my finger on the trigger
22  immediately if it did and my finger was
23  nowhere near the trigger of the weapon.
24      Q. Were you hit by the bullet?

Page 10

1       A. Yes, it struck me in my upper thigh.
2  Just below where the holster is. The bullet
3  traveled down my leg and exited behind my
4  knee.
5       Q. Do you have any idea what caused the
6  gun to go off?
7       A. I don't.
8       Q. So sitting back over a year since the
9  incident I'm sure you've thought about it a
10  number of times?
11      A. Yes.
12      Q. And just no idea?
13      A. No. I mean, the position where the
14  weapon would have had to be when it fired for
15  the bullet to hit me in my thigh right below
16  the holster without me touching the trigger
17  there was nothing there, so there's no reason
18  for it to fire.
19      MR. CEISLER: I have no further
20  questions.
21      Thank you very much.
22
23
24

Page 11

1                    - - -
2              EXAMINATION
3                    - - -
4  BY MR. WOY:
5       Q. Good morning, sir. My name is
6  Jonathan Woy. I'm the attorney for Sig Sauer
7  in this lawsuit and I just have some
8  follow-ups from Danny's questions if that's
9  okay with you.
10      A. Sure.
11      Q. All right. You mentioned you started
12  working as an ADA I think in 2005; is that
13  right?
14      A. Yes.
15      Q. Was that straight out of law school?
16      A. It was.
17      Q. And you also mentioned that as an ADA
18  you were either issued a handgun or permitted
19  to carry it? I didn't quite understand that
20  testimony.
21      A. ADAs in Georgia under the carry
22  statues at the time -- you know, we've
23  changed our laws over time -- but we were
24  listed in the same statute as law

Page 12

1  enforcement. So most ADAs do carry. Some
2  offices issue you firearms. I was not issued
3  one, we purchased our own through the office
4  distributor.
5       Q. And was that the Glock 23 that you
6  purchased?
7       A. Yes.
8       Q. How long did you carry that Glock 23?
9       A. Three to four years.
10      Q. So that would take us up to about
11  2008 or 2009-ish?
12      A. Yes.
13      Q. And where were you working as an ADA
14  at that time?
15      A. The Dougherty Judicial Circuit. It's
16  a one-county circuit. The main city being
17  Albany, Georgia. It's in Southwest Georgia.
18      Q. Was it in about 2008 or '9 when you
19  went to the Sig 226?
20      A. Yes.
21      Q. And then how long did you carry that
22  226?
23      A. Not long, maybe a year. It is a
24  larger weapon. For my intents and purposes,

# E  HIBIT R

```
 1           UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF KENTUCKY
 2

 3                        Case No. 3:22-cv-00010-GFV

 4     TIMOTHY DAVIS,                              :
                                                   :
 5             Plaintiff,                          :
                                                   :
 6                                                 :
                  vs.                              :
 7                                                 :
                                                   :
 8                                                 :
                                                   :
 9     SIG SAUER, INC.,                            :
                                                   :
10             Defendant.                          :
                                                   :
11                                                 :
                                                   :
12                                                 :
                                                   :
13                                                 :

14           ---------------------------------------
             DEPOSITION UNDER ORAL EXAMINATION OF:
15                       MICHAEL LINGO
                       October 20, 2023
                          -----------
16     REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR
                          ------------
17

18

19
       JOB #  23526
20

21

22

23

24

25
```

Page 6

1      MR. HURD: So I'd like to place a
2  standing objection to any questions from Mr. Woy that
3  are not directed at, or relevant to determining, if
4  this OSI incident that Mr. Lingo had is related to
5  the incident in the subject case. And that will save
6  me from making a bunch of objections when Mr. Woy is
7  questioning the witness later. Thank you.
8      MR. WOY: That's fine.
9      THE VIDEOGRAPHER: We are now on the
10  video record. Today's date is October 20, 2023, and
11  the time is 12:05 p.m. Mountain Daylight Time.
12      This is the recorded video deposition
13  of Michael Lingo being taken in the matter of Timothy
14  Davis vs. Sig Sauer, Inc., in the United States
15  District Court for the Eastern District of Kentucky,
16  Civil Case No. 3:22-CV-00010-GFV.
17      My name is James Jarmon, and I'm the
18  video specialist. The court reporter today is
19  Jennifer Wielage, and we're both from Everest Court
20  Reporting.
21      All counsel appearing today will be
22  noted on the stenographic record.
23      Will the court reporter please swear
24  in the witness?
25

Page 7

1      THE REPORTER: Do all counsel agree
2  to the remote swearing in of the witness?
3      MR. HURD: Yes.
4      MR. WOY: Yes.
5  MICHAEL LINGO,
6  5822 Red Sox Way, No. 2, Billings, Montana 59101,
7  having been first duly sworn, testifies as follows:
8  EXAMINATION BY MR. HURD:
9      Q.    Good afternoon, Mr. Lingo. How are
10  you today?
11      A.    We're busy today, so -- winter's
12  coming on Monday -- well, Sunday night, so...
13      Q.    Well, hopefully, we won't keep you
14  too long today. I expect that you'll be done in
15  about an hour and a half, okay?
16      A.    Sounds good.
17      Q.    So as you know, together with my
18  firm, we represent a number of individuals who have
19  been injured by the unintended discharge of their
20  P320 six-hour pistols, and I understand that you had
21  such an incident. I'm going to ask you some
22  questions about that today.
23      If you would, please begin by
24  introducing yourself to the jury.
25      A.    My name is Michael Lingo. I'm 32

Page 8

1  years old. I live in rural Montana; basically, the
2  west side of Montana.
3      I am a heavy civil superintendent for
4  a large firm that does large foundations and
5  infrastructures for the Yellowstone Club and as such.
6      Q.    Is it correct that on January 7,
7  2023, you had an unintended discharge with your Sig
8  Sauer P320?
9      A.    Yes.
10      Q.    Prior to January 7, 2023, what was
11  your experience with firearms?
12      A.    Firearms, with me, started at a very
13  young age. I was gifted a Red Ryder BB gun at the
14  age of four. I was taught the fundamentals of
15  firearm safety and fire -- proper handling of
16  firearm -- firearms themselves. And then progressing
17  through that, I've had multiple different long
18  rifles, shotguns, handguns and multiple other
19  trainings and safety trainings with such firearms.
20      Q.    Tell us a little bit more about the
21  safety trainings that you've had over the years.
22      A.    So it starts early. I was in the
23  Youth Hunter Safety Program at the age of 10 and a
24  ha -- or I was 10 when I took that. At the age of --
25  I believe it's 12, that's when I took my full hunter

Page 9

1  safety education.
2      At the age of 21, I took the
3  concealed weapons permit license and class for the
4  State of Montana, at the age of 21.
5      And then, at the age of, I believe
6  26, I have attended a long rifle shooting
7  fundamentals and safety course. That was for a shoot
8  competition, long-range rifles, and then at the age
9  of 30, I attended a tactical training and safety
10  class done by Tony Cowden, and just recently, I
11  attended another class from Tom Castro, who is one of
12  the top USPSA pistol competition shooters, all in
13  such.
14      I am working on doing my RO
15  certification for USPSA, which goes over a lot of gun
16  handling fundamentals, everything like that, with the
17  competitions that I do currently shoot.
18      Q.    Prior to January 7, 2023, would you
19  regularly carry a firearm?
20      A.    Since the age of 16, I have carried a
21  pistol during bow season and rifle season in Montana,
22  which is roughly about four months, and then, at the
23  age of 21, was when I had my concealed weapon
24  license, and I've had a pistol with me ever since.
25      Q.    In all of those years of carrying a

Page 10

1 pistol, did you ever have an unintended discharge
2 prior to January 7, 2023?
3     A.     No, sir.
4     Q.     On January 7, 2023, were you carrying
5 your P320?
6     A.     Yes.
7     Q.     Tell us what, if any, modifications
8 had been made to that from its stock existence?
9     A.     The only thing that was placed on the
10 firearm were attachments, but as far as internal
11 modifications, there was none.
12          External modifications included a Sig
13 Romeo 1 PRO Red Dot, which is designed to fit that
14 pistol itself, and then there was a SureFire HL1
15 SureFire weapons light on the front of the weapon as
16 well.
17     Q.     Did you have a holster for that
18 pistol suitable for those modifications?
19     A.     Yes.  I had a -- they're custom-made
20 holsters from Safariland, and it's a Safariland Duty
21 holster that is meant specifically for that firearm.
22     Q.     So tell us what happened on January
23 7, 2023.
24     A.     So, as I had mentioned before, I am a
25 competitive pistol shooter.  And that firearm was

Page 11

1 purchased for such competitions.  I was on a routine,
2 regular training weekend.  I'm usually training
3 anywhere -- in the winter months, it's one to maybe
4 two weekends a month out on the range.  I had gone
5 with my shooting partner, and we had been through
6 close to 100 rounds that day.  We had set up stages
7 that we had pulled from USPSA; basically, replicating
8 the stages that we would shoot in the upcoming
9 season.
10          I had loaded my magazines, placed
11 them in my weapons belt, and then loaded my magazine
12 and loaded my P320, placed it in the holster.  This
13 is back at the -- basically, the bench; had walked
14 forward probably about ten years to the established
15 start stick.  And then my shooting partner was coming
16 up behind me with the shot timer and I went to
17 reposition my feet on the start stick and as soon as
18 I moved my feet, the pistol discharged into the
19 holster.
20     Q.     Was the pistol fully seated in the
21 holster before you start walking to your starting
22 place?
23     A.     Yes.
24     Q.     How sure are you of that?
25     A.     100% because it is in a Safariland

Page 12

1 duty holster, and those are a three-tension holster
2 with a lock.  So it was all the way seated down with
3 a bill flopped over.  Yeah, that's how I know it was
4 all the way in there.
5     Q.     Where were your hands at when the
6 pistol discharged?
7     A.     Hands were midchest.
8     Q.     And is it correct that that holster
9 was on your thigh?
10     A.     Yes.  So that was on a drop holster
11 that was mounted to my thigh.
12     Q.     Was there anything hanging out of
13 your pocket, like a key laniard or a toggle on a
14 zipper of your clothing that would have been in the
15 vicinity of that holster?
16     A.     No.  That day it was mid 30s.  I was
17 in Wrangler blue jeans and I was in a Carhartt
18 sweatshirt with the sleeves rolled up, and I have a
19 two-piece bison belt that my sweatshirt and shirt
20 gets tucked in underneath of that, and with it
21 hanging in midthigh, there's no clothing that can
22 come down in between there and the pistol itself.
23 And with the Safariland duty holster, the trigger is
24 fully enclosed in the holster itself.
25     Q.     Was there anything that could have

Page 13

1 gotten down into that trigger guard area and pulled
2 that trigger?
3     A.     No.
4     Q.     I'm going to share my screen with you
5 and show you two images.
6          Well, first, let me ask you:  Was
7 there damage to that holster?
8     A.     Yes.
9     Q.     Is that holster open at the bottom or
10 closed at the bottom?
11     A.     It was closed.
12     Q.     You say "was" past tense.  Are you
13 indicating that it was no longer closed after the
14 discharge?
15     A.     Yes, sir.
16     Q.     Was the damage to that holster at the
17 bottom of it --
18     A.     Yes, sir.
19     Q.     -- where the muzzle is?
20     A.     Yeah.
21     Q.     So let me start at the top.
22          Is this an image of your P -- the
23 subject P320?
24     A.     Yes, sir.
25     Q.     And page 2 of <mark>Exhibit 1</mark>, is this an

Page 14

1 image of the holster after it was damaged?
2    A.    Yes, sir.
3    Q.    Was any of this damage depicted in
4 the holster there prior to your discharge?
5    A.    No.
6    Q.    Page 3 of Exhibit 1, is this also an
7 image of your damaged holster?
8    A.    Yes.
9    Q.    And page 4 of Exhibit 1, is this a
10 picture of you?
11    A.    Yes, sir.
12    Q.    And is that where you were wearing
13 the holster at the time of your discharge?
14    A.    Exactly the same spot, yes.
15    Q.    Okay.  Is that the same holster?
16    A.    Yep.
17    Q.    Was this picture taken --
18    A.    Yes, sir.
19    Q.    -- prior to the discharge?
20    A.    Yes.  That picture was taken in the
21 shooting class I took with Tony Cowden.
22    Q.    So your rig there is the same rig
23 that you had the day of the discharge?
24    A.    Yes.
25    Q.    How sure are you --

Page 15

1    A.    As --
2    Q.    I'm sorry.  Go ahead.
3    A.    As you can see, with the way that
4 belt setup is, your clothing gets tucked in with the
5 belt.
6    Q.    Did you have a tourniquet or anything
7 hanging off of the holster itself, like police
8 officers sometimes do?
9    A.    No.  That holster does not have a
10 mount.
11    Q.    How sure are you that either your
12 hand or finger or something did not pull that
13 trigger?
14    A.    100%.
15    Q.    When your pistol discharged, were you
16 struck?
17    A.    Yes.
18    Q.    Where were you struck?
19    A.    I was struck less than an inch below
20 my right knee on the outside.  It missed my tibia,
21 where that connects into the top of your knee, and
22 the bullet went down the inside of my front of my
23 calf and then stopped on the top of my -- where your
24 foot and ankle kind of meets there.
25    Q.    There is a medical record -- I

Page 16

1 believe it was from EMS or Fire that responded that
2 suggested that you said you shot yourself.
3    A.    100% --
4    Q.    Did you ever tell anyone -- let me
5 ask you the question.
6         Did you ever tell anyone after this
7 incident that you shot yourself?
8    A.    100% no.  I even corrected the
9 sheriff when I was in the emergency room because he
10 had suggested that as well.  And that's when I
11 corrected him on his statement that he had assumed
12 that I was -- that I physically manipulated the
13 pistol to where I caused the accidental discharge.
14         And that was also said when I had
15 first called 911 when we were at the gun range, and
16 it was brought up when I had was transferred from my
17 vehicle to the ambulance, and then, again, when the
18 sheriff came in to do an after-accident report when I
19 was in the emergency room.
20    Q.    So if anybody suggested to you that
21 you shot yourself, would you disagree with them?
22    A.    100%.
23    Q.    You mentioned that you do competitive
24 shooting.
25         Do you continue to competitively

Page 17

1 shoot?
2    A.    Yes, sir.
3    Q.    Do you still use a P320?
4    A.    Absolutely not.
5    Q.    Why not?
6    A.    The trigger safety has become
7 completely relevant to -- or irrelevant to anything
8 that I want around me.
9         I have switched -- since then, I have
10 switched back to a Glock model of pistol for pistol
11 competitions, as long -- as well with my concealed
12 carry weapon.
13         MR. HURD:  I do not believe I have
14 any further questions for you.  I thank you for
15 participating today, and Mr. Woy will now have some
16 questions for you.
17         THE DEPONENT:  Okay.
18 EXAMINATION BY MR. WOY:
19    Q.    Sir, thanks for being here today.
20         My name is Jonathan Woy and I
21 represent Sig Sauer in a lawsuit that's been filed on
22 behalf of another litigant involving a P320
23 discharge.
24         So I have some questions for you
25 about -- mostly about what you've testified to

Page 18

1 already today, and then maybe a few other areas.
2 Okay?
3      A.    Okay.
4      Q.    You said you're using a Glock now for
5 your competition shooting, right?
6      A.    Yes.
7      Q.    What model Glock are you using?
8      A.    It's a Shadow Systems DR920L. It's a
9 Glock 34.
10      Q.    Does it have a standard Glock trigger
11 on it still?
12      A.    Yes.
13      Q.    Does that trigger have a tab, tab
14 trigger?
15      A.    Yes.
16      Q.    Do you think if the P320 that you had
17 on your day of the discharge had a tab trigger
18 similar to the one on your Glock that your discharge
19 still would have occurred?
20      MR. HURD: I'm going to object to the
21 extent it calls for expert testimony, but you can
22 answer.
23      A.    I think that there is a flaw in the
24 design of the P320, and I cannot say, if it had a tab
25 trigger, if that would have sold the problem that I

Page 19

1 had with the discharge of the P320.
2      Q.    What do you think the flaw in the
3 design of the P320 is?
4      MR. HURD: Same objection. Go ahead.
5      A.    That it was a bad design. I'm sure
6 there's plenty of others that can dig further into
7 that, but it's just a bad design.
8 BY MR. WOY:
9      Q.    And I understand you're not an expert
10 in firearm design. I just want to know what your
11 opinion -- if you have an opinion -- if you don't,
12 that's fine. But if there is something specific that
13 you can point to that you think is problematic in the
14 design of the P320, I'd like to know about it.
15      MR. HURD: Same objection.
16      A.    I think it's just a bad design.
17 BY MR. WOY:
18      Q.    Okay, fair enough. If someone who
19 was designated as an expert witness by one of the
20 parties to the lawsuit that you're here testifying in
21 connection with today, if one of their expert
22 witnesses were to say that the only way your
23 discharge could have occurred is if something pulled
24 the trigger, would you disagree with that person?
25      MR. HURD: Objection.

Page 20

1      A.    Could you rephrase that question?
2      Q.    Sure.
3      A.    As far as an expert?
4      Q.    So if there was a witness called at
5 trial who was qualified by the Court as an expert in
6 firearm design and that witness testified that the
7 only way your P320 could have discharged is if
8 something pulled the trigger, would you disagree with
9 that person?
10      MR. HURD: Same objection.
11      A.    100%.
12 By MR. WOY:
13      Q.    And why is that?
14      A.    Because there's a hole in my leg.
15      Q.    And it's your position that the
16 discharge occurred without any movement of the
17 trigger whatsoever?
18      A.    That was fully seated in a designed
19 holster, no.
20      Q.    Just so we have a clear record, when
21 we go back and read that exchange later, it's going
22 to be a little unclear. I understand from the
23 context that -- or at least I think I do. So let me
24 just try and rephrase. Okay?
25      Is it your testimony that your

Page 21

1 pistol -- your P320 discharged without any trigger
2 movement whatsoever?
3      A.    Yes. And you're referencing the
4 actual trigger shoe itself, correct? Nothing
5 internal?
6      Q.    That's right. I'm talking about the
7 trigger that, if you look at it, just as we can see
8 in the photos that we looked at earlier --
9      A.    Yep.
10      Q.    -- the part of the trigger you can
11 see, that's what I'm talking about.
12      A.    Yep.
13      Q.    So if you were to compare your
14 discharge to the discharge of somebody else involving
15 a P320 where that other person's pistol is claimed to
16 have discharged as a result of trigger movement, your
17 discharge is completely different then, right?
18      MR. HURD: Objection.
19      MR. WOY: I'm sorry. I couldn't hear
20 his answer.
21      A.    They're separate cases.
22 BY MR. WOY:
23      Q.    That's because your discharge that
24 you claim did not involve any trigger movements is
25 completely different from a discharge that did

Page 22

1  involve a some sort of trigger movement; is that
2  right?
3          MR. HURD:  Objection.
4  BY MR. WOY:
5      Q.    You can answer, sir.
6      A.    Could you rephrase that?
7      Q.    Do you want me to just repeat the
8  question or do you want me to rephrase it
9  differently?
10     A.    Go ahead and just repeat the question
11  if you would, please.
12     Q.    Sure.  Happy to do it.  So the
13  discharge of your pistol, which you say did not
14  involve any trigger movement whatsoever, would be
15  completely different from a discharge experienced by
16  somebody who claims that their pistol discharged as a
17  result of the trigger being pulled?
18         MR. HURD:  Objection.  You can answer
19  if you have any idea.
20     A.    I don't have any comment on that.
21  BY MR. WOY:
22     Q.    What I'm asking, sir, is you're
23  saying your discharge occurred without the trigger
24  being moved or moved in any way?
25     A.    Yes.

Page 23

1      Q.    That's, obviously, different than
2  somebody who's claiming that their pistol discharged
3  as a right of something pulling the trigger, right?
4      A.    Yes.
5      Q.    And how long did you have your P320
6  before the discharge occurred?
7      A.    A little more than a year and a half.
8      Q.    Do you own any other 320s, other than
9  the one involved in your discharge?
10     A.    I did.  I have since this incident
11  removed that from my firearms collection.
12     Q.    I take it you still have the pistol
13  that was involved in your discharge, though; is that
14  right?
15     A.    I had just sent it off to one of
16  their experts with the holster with the law firm.
17  So, but, yes, it was in my possession until last
18  weekend -- last Saturday.
19     Q.    Had you discharged that pistol at all
20  since the accidental discharge occurred?
21     A.    No.
22     Q.    When your discharge occurred, did the
23  spent shell casing eject?
24     A.    No.
25     Q.    What was the name of the friend that

Page 24

1  was with you when the discharge occurred?
2      A.    Bryce Vance.
3      Q.    Do you happen to know his address?
4      A.    Not off the top of my head.  Sorry
5  about that.
6      Q.    Yeah, no problem.
7          You testified that you changed to
8  the -- back to the Glock because the trigger safety
9  became completely irrelevant to anything you wanted
10  around you.  What did you mean by the "trigger
11  safety"?
12     A.    With the trigger shoot itself, every
13  striker fire pistol I have has some form of external
14  safety, whether it be a manual side slide safety, a
15  grip safety or a trigger shoot safety.  So that's why
16  I switched back to a Glock.
17     Q.    Because you wanted something with an
18  external safety of some kind?
19     A.    Yes, sir.
20     Q.    Why did you see a need for an
21  external safety if you don't believe the trigger
22  moved causing your discharge?
23         MR. HURD:  Okay.  You can answer.
24     A.    Sorry.  Could you say that one more
25  time, please?

Page 25

1  BY MR. WOY:
2      Q.    Yeah, so you testified that you don't
3  think there was any movement of the trigger to cause
4  your discharge, but it was important to you that the
5  pistol you used after the discharge had an external
6  safety.
7          Why was an external safety relevant
8  to you if you believe the discharge occurred without
9  the trigger moving?
10     A.    Because I've had --
11         MR. HURD:  Objection.  Go ahead.
12     A.    I've had 15 years of carrying a
13  pistol with an external safety and I've never had a
14  discharge with those types of pistols.  So I guess
15  experience answers that.
16     Q.    Sorry to interrupt you.
17     A.    You're good.
18     Q.    So the Safariland holster that you
19  had, did you purchase that when you purchased the
20  P320?
21     A.    Yes.  Well, ordered.  Placed the
22  order.  They have to be made for those.
23     Q.    So, approximately, how long had you
24  had that holster before the discharge occurred?
25     A.    A year and two months.  I purchased

Page 26

1  the pistol, and then less than probably a month
2  later, I purchased the holster.
3      Q.    Is that the same holster that you use
4  for your competitive shooting?
5      A.    No.
6      Q.    What holster do you use for your
7  competitive shooting?
8      A.    Obviously now I use a different model
9  for a Glock.  I use a T.REX Arms holster, that is not
10 a tension holster, and, obviously, to meet with the
11 rules and regulations of USPSA, it cannot be a drop
12 holster.  It has to meet with the belt line itself.
13     Q.    On the day of your discharge, you
14 were practicing for a USPSA competition, right?
15     A.    Yes, sir.
16     Q.    Why were you using a drop holster at
17 the time?
18     A.    Because I hadn't gotten the parts to
19 bring the holster up yet.
20     Q.    In the, say, six months leading up to
21 the time of your discharge, how often did you use the
22 holster in a drop holster configuration?
23     A.    I had close to 1200 rounds through
24 that gun and holster.
25           On average, during the summer months,

Page 27

1  two to three times per week, not including dry fire
2  practice at home of holstering and unholstering the
3  weapon, yeah, from home.
4      Q.    All right.  So I want to talk a
5  little bit about the events leading up to the actual
6  discharge.
7           I know you mentioned you loaded the
8  pistol.  You loaded your magazines.  When you did
9  that, were you sitting at a table of some kind?
10     A.    I was standing.
11     Q.    Were you standing at a table or --
12     A.    Yes.  Sorry.  Standing at a table.
13     Q.    Okay.  No need to apologize.  You
14 answered my question, so, I --
15     A.    Okay.
16     Q.    So where were you storing the
17 magazines that you did not put into the pistol?
18     A.    They are in designated magazine
19 pouches on my belt on the left-hand side.
20     Q.    And then I take it you're a
21 right-handed shooter?
22     A.    Yes.
23     Q.    Did you put the P320 into your
24 holster while you were still standing near that
25 table?

Page 28

1      A.    After I had turned up-range, yes.
2      Q.    Okay.  So you turned to face up-range
3  and then do you have to bend over a little bit in
4  order to get down to where that drop holster is
5  located to put the pistol into it?
6      A.    No.  That's why I had sent that
7  picture with that.  That meets right where my hand
8  is.  It's standing at full -- standing all the way
9  up.
10     Q.    Okay.  So when you put the pistol
11 into the holster that day, you were standing straight
12 up?
13     A.    Yes.
14     Q.    And I know you said that you were
15 wearing a Carhartt sweatshirt that day, right?
16     A.    Yes.
17     Q.    Did you have that sweatshirt tucked
18 into your belt?
19     A.    Yes.
20     Q.    Were you wearing anything over the
21 Carhartt sweatshirt?
22     A.    No.
23     Q.    Do you still have that Carhartt
24 sweatshirt?
25     A.    I do actually.

Page 29

1      Q.    Does it zip up in the front?
2      A.    No.
3      Q.    Are there any kind of -- I'm sorry.
4  Go ahead.
5      A.    It's a traditional sweatshirt.  A
6  hoodie I guess is a better way for it.
7      Q.    When you turned the face up range,
8  did you look into the holder before you put your
9  pistol into it?
10     A.    Yes.  I guide the pistol down into
11 the holster every time.
12     Q.    When you say you "guide it in," do
13 you look into the holster before you put it into?
14     A.    Yes, sir.  Basically, making sure
15 that it's clear when you put everything in the
16 holster, making sure that you're placing it in the
17 holster hole itself.
18     Q.    What did you see when you looked down
19 at the holster before you put your pistol into it
20 that day?
21     A.    A clear holster or a black -- a black
22 holster.
23           MR. HURD:  Just to clarify the
24 record, when you just said clear, you mean like clear
25 like empty, not clear as in you could see through it?

Page 30

THE DEPONENT: Yes, sir.
BY MR. WOY:
Q.     What time of day did your discharge
occur?
A.     I believe roughly at 1 o'clock. I'd
have to look at when I made it to the ER. I think it
was 3 o'clock, so it would have been 1, 1:30.
Q.     Was it a sunny day or overcast or
what were the lighting conditions like?
A.     A sunny day.
Q.     If you look down into the holster
given that the muzzle end of it was closed, are you
able to see what's in there if you look down?
A.     Yes.
Q.     The table where you loaded your
magazines, was there anything other than your -- the
magazines themselves and your ammunition on that
table?
A.     No.
Q.     Did anything fall off that table
while you were standing near it before the discharge
occurred?
A.     The one thing I would add is that
with the ALS holster, they have the thumb lock, and
if there was anything in the holster itself, that

Page 31

would have not locked and you can feel that when you
seat the pistol, the lock hits your thumb, so that
way it's fully seated and locked. So no, nothing
fell off the table and the holster was clear when the
pistol was placed in the holster.
Q.     Does that holster have a hood on it?
A.     It does.
Q.     What position was the hood in when
the discharge occurred?
A.     The hood would have been -- so it has
a back strap hood and then it also had an optics
cover hood which were in the forward position.
Q.     When you say "forward position," is
that -- so I'm thinking of -- I guess I'm thinking of
the back strap hood, which would be --
A.     Yeah.
Q.     -- if you're looking at it, it's kind
of up, if the pistol is seated in the holster, the
hood is, I guess, behind the slide at that point. So
that if you tried to pull it up, if there's no other
retention on there, if you pull it up on the pistol,
the back of the slide would hit the hood?
A.     No, not with that holster because the
hood is the secondary locking mechanism. That's what
the thumb lock is for. So even with the hood laid

Page 32

forward or not behind the slide of the pistol, there
still is the tension lock with your thumb that you
have to manually release.
Q.     Yeah, okay. So the hood then, let's
say -- so the triple retention is -- is the hood one
of the retention mechanisms?
A.     Yes.
Q.     And then the thumb lock is another?
A.     Yes.
Q.     So was -- when you're saying the hood
was forward, would that be the hood, that part of the
retention was disengaged?
A.     Yes. The back strap that goes over
the slide.
Q.     Why wasn't that back strap pushed
forward at the time?
A.     Because I was getting ready to start
my stage.
Q.     When you put the pistol into the
holster initially after loading it, did you have the
back strap up over the rear of the pistol at all or
was it always forward?
A.     It was forward that day. The back
strap is intended when you're not -- you push that
forward or you can pull it all out at once, but if

Page 33

you're ready to engage, stuff like that, that is one
of the ones that you roll forward and then you still
have the thumb lock itself.
Q.     What's the third retention other than
the thumb lock in the hood?
A.     I'd have to look at their website. I
know they have the three. Those are the two that I
know off the top of my head. I'm not sure what they
count as their third one.
Q.     Did you feel the thumb retention
engage when you put the pistol into the holster?
A.     Yes.
Q.     When the discharge occurred, did the
pistol remain in the holster?
A.     Yes.
Q.     Were you the one that only removed
the holster -- the pistol from the holster after the
discharge or did your friend do that?
A.     I did.
Q.     What did you have to do to get the
pistol out of the holster after the discharge?
A.     So, obviously, with an incident like
that, when I had reached down, I had -- I hit the
thumb lock and removed the pistol from the holster
and then cleared the firearm to make the breach open

Page 34

1  from there and that's where I had turned to go back
2  to the shooting bench because I needed to obviously
3  sit down and figure out what is going on.
4      Q.    When you pulled the pistol out of the
5  holster, did you look down to see if there was
6  anything in the holster?
7      A.    After the pistol was removed?
8      Q.    Right.
9      A.    Not that I can recall.
10     Q.    When you say "not that I can recall,"
11 are you saying you don't recall looking down or you
12 don't recall seeing anything else in there?
13     A.    I was in a very high-stress situation
14 and I can't remember if I had looked into the holster
15 after I had removed the pistol.
16     Q.    Understood.
17          MR. WOY: I'm going to bring up one
18 of the photo -- one of the photos that was showed to
19 you earlier.
20 BY MR. WOY:
21     Q.    Can you see that photo?
22     A.    Yes.
23     Q.    Okay. If I zoom in a little bit, I'm
24 going to look at your knee area.
25          Can you see my cursor on my screen

Page 35

1  around your knee?
2      A.    Yes, sir.
3      Q.    Okay. So it looks like your kneecap
4  is probably about right here. Does that sound about
5  right?
6      A.    That's the way it looks, yes.
7      Q.    Okay. And then it sounds like -- you
8  said that the round entered your leg, I think you
9  said about an inch below your leg?
10     A.    Yep, and then to the left so,
11 basically, right where your tibia bone comes in;
12 right about there.
13     Q.    And do you have --
14     A.    Yes, sir. I do have photos of that
15 day there, of the emergency room. I don't know if
16 those are too graphic to share, but...
17     Q.    I don't know -- yeah, we'll
18 eventually want to see them, but I'm not going to ask
19 you to bring them up today during this deposition,
20 but I appreciate it.
21     A.    Yep.
22     Q.    I was just trying to get a sense of
23 where -- you know, obviously, I'm not marking this
24 photo. I'm just trying to get a sense of where the
25 bullet entered. And then it sounds like it traveled

Page 36

1  down the -- kind of the outside of your calf.
2      A.    Yep.
3      Q.    To the front -- and then lodged
4  down -- was it kind of the front outside of your
5  lower calf area, right above where your calf meets
6  your ankle?
7      A.    So right in the crease where your
8  ankle makes a 90 with your calf that's coming down,
9  right in that soft tissue where that joint makes a
10 90.
11     Q.    Got you. Did you clean up the inside
12 of your holster at all after the discharge occurred?
13     A.    No.
14     Q.    It sounds like there was some sort of
15 law enforcement response; is that right?
16     A.    Yes.
17     Q.    Did some sort of law enforcement
18 agency or officer show up at the scene of the
19 discharge?
20     A.    Not while I was on-site, no.
21     Q.    When did you first meet with someone
22 from a law enforcement agency?
23     A.    Close to a half an hour after the
24 incident.
25     Q.    Where were you located at that time?

Page 37

1      A.    I was in my pickup; in the
2  passenger's seat.
3      Q.    Did your friend drive you in your
4  pickup to a hospital?
5      A.    We were headed to the hospital and
6  then we met the ambulance on an off-ramp about 15
7  miles away from the hospital.
8      Q.    Got it. What was the name of the
9  ambulance service?
10     A.    I believe it's Bozeman Deaconess is
11 the main hospital.
12     Q.    And the ambulance that brought you to
13 Bozeman Deaconess, was it from Bozeman Deaconess
14 Hospital?
15     A.    Yes.
16     Q.    The law enforcement officer that you
17 said met up with you there as well, what law
18 enforcement agency was that individual from?
19     A.    I believe -- I'd have to jog my
20 memory, Bryce Vance could probably mention that more,
21 but I believe there should have been a sheriff and
22 then a local Belgrade police officer as well.
23     Q.    Have you seen any police reports
24 generated as a result of your discharge?
25     A.    Not the official police report, but

Page 38

1  I've seen the ones that they have put out, like an
2  incidence in the paper and stuff like that.
3      Q.    Was there some sort of publication in
4  a newspaper about this incident?
5      A.    Yes.
6      Q.    What newspaper?
7      A.    I believe it was the Belgrade
8  Newspaper, and then there was an article -- I'd have
9  to ask my wife.  They had an article online as well
10 and I don't know if that was Bozeman's news or if
11 that was Gallitan County's news.
12     Q.    Were you interviewed by anybody from
13 law enforcement about your discharge?
14     A.    Yes.
15     Q.    What law enforcement agency
16 interviewed you?
17     A.    It would have been Gallitan County
18 Sheriff's Department.
19     Q.    Was your interview recorded?
20     A.    Not that I know.
21     Q.    Did you give a written statement of
22 any kind?
23     A.    I did not give a written statement,
24 no.
25     Q.    Do you know if your friend who was

Page 39

1  there with you was interviewed?
2      A.    Yes, after I was taken in the
3  ambulance.
4      Q.    Do you know if your friend who was
5  there actually saw the discharge happen?
6      A.    Yes.
7      Q.    Have you talked to him about what he
8  saw?
9      A.    Yes.
10     Q.    And what did he say about what he
11 saw?
12     A.    The same as -- he was coming from
13 behind me with the shot timer.  So he was walking up
14 and then he had seen the pistol go off in the holster
15 and my first instinct was to hold the pistol from the
16 holster and open the breach and turn because
17 immediately after the discharge, my foot was
18 completely numb.  I thought there was something in my
19 foot.  I thought it had hit my foot and I didn't
20 realize that it was in the -- in the leg itself.
21     Q.    You mentioned that you moved your
22 foot on, I think you called it the starting stick; is
23 that right?
24     A.    Yes, sir.
25     Q.    When you say starting stick, what

Page 40

1  does that look like?
2      A.    For us that day it was, basically, a
3  line that we had drawn in the gravel; just a foot
4  mark in the gravel.
5      Q.    Were you in any kind of, you know,
6  bent-over position, getting ready to begin your
7  shooting routine?
8      A.    No.
9      Q.    How were you standing?
10     A.    Standing straight up with toes
11 touching our established start-line.  That's why I
12 had moved my feet, to make sure my toes were on the
13 start line.
14     Q.    Were you in a position that -- well,
15 let me ask you:  So once you're on the start line,
16 you said your friend was going to be timing you, how
17 do you know when to start?
18     A.    So we followed the same thing that
19 USPSA does.  Your RO in USPSA, so he was acting as an
20 RO, will stand behind you and we have a shot timer
21 and he will ask you if the shooter is ready, and you
22 either nod your head, say yes, and then you'd say,
23 okay, stand by.  He hits the start button which has a
24 delay of usually like three seconds and then a buzzer
25 goes off and then that's when your time starts is

Page 41

1  when the buzzer goes off.
2      Q.    Did he ask you if you were ready
3  before the discharge occurred?
4      A.    He hadn't made it up to me yet.
5      Q.    Where was your right hand when the
6  discharge occurred?
7      A.    Midchest.
8      Q.    Why didn't you have it up toward your
9  chest?
10     A.    I believe when I was moving my feet,
11 I had my hands, basically, right around where your
12 walking thing is as I was moving my feet.
13     Q.    You said right around where your what
14 is?
15     A.    Well, when I say "midchest," in
16 between your bellybutton and your chest itself,
17 basically, hands-up at 90 degrees; elbows at 90.
18     Q.    Is that a specific position that you
19 need to be in when you're on the starting stick or
20 you just happened to have your hands there?
21     A.    That's -- it depends on the different
22 stages.  USPSA has all sorts of different hand
23 positionings and ways that you start stages and
24 that's the way that we had -- like I said, he wasn't
25 up there.  He wasn't ready for me to start engaging

Page 42

1 targets, so I did not have my hands at low rest
2 because that's usually where you place your hands
3 when your RO tells you:  Shooter, are you ready?
4         MR. WOY:  I think I'm just about
5 finished, sir.  I just want to take a second to look
6 at my notes.  And I may have another question or two
7 for you and I may not.  We may be done.  So bear with
8 me a second.
9 BY MR. HURD:
10    Q.    You were asked some questions by
11 Mr. Hurd about a medical record where there was an
12 indication that someone had written you had shot
13 yourself.
14        Do you remember that questioning?
15    A.    Yes.
16    Q.    Do you have copies of those medical
17 records?
18    A.    No, because I had -- I believe my
19 wife may.  You'll have to forgive me.  I work a long
20 ways away from my actual home where all of those are
21 actually kept, so...
22    Q.    How did you come to know that there
23 was some indication in those medical records that you
24 had shot yourself?
25    A.    From the --

Page 43

1         MR. HURD:  Objection -- I'm going to
2 object and just put a word of caution out there that
3 you don't discuss anything that we discussed because,
4 you know, there's an attorney-client privilege.  If
5 you learned of that outside of that, you can testify
6 to that.  Do you follow me?  Like if you've
7 independently seen the record, then that's fine.  But
8 if you have not independently seen the record, you
9 couldn't answer that.
10        THE DEPONENT:  Yeah.
11 BY MR. WOY:
12    Q.    Let me ask you this:  Have you ever
13 actually seen that record where there's some
14 indication that you had shot yourself?
15    A.    A medical document, no.
16    Q.    Did you ever see any other records
17 where there was some indication that you had
18 accidentally shot yourself?
19    A.    Personally, myself, no.  If I recall
20 the ones I had seen, they were labeled as a firearm's
21 discharge.
22    Q.    Where were those records from?
23    A.    I believe it would have been Bozeman
24 Deaconess as well.
25        MR. WOY:  All right, sir.  Those are

Page 44

1 all the questions I have for you.  Thank you very
2 much for your time today.
3         THE DEPONENT:  Thank you.
4         MR. HURD:  Thank you.  You're done.
5         MR. WOY:  Do you want to ask some
6 more questions?
7         THE DEPONENT:  We can really get into
8 it if you'd like.
9         MR. WOY:  No, we're good, thank you
10 very much, sir.  I appreciate your time.
11        THE VIDEOGRAPHER:  This now concludes
12 the video deposition of Michael Lingo.  We're now off
13 the record at 12:57 p.m. Mountain Time.
14        (Exhibit 1, Four Pages of
15 Photographs, was marked for Identification by
16 the court reporter.)
17        THE REPORTER:  Mr. Woy, would you
18 like a copy of the transcript?
19        MR. WOY:  Yes, just electronic and
20 regular turnaround is fine?
21        THE VIDEOGRAPHER:  Would you like a
22 video copy, Mr. Woy?
23        MR. WOY:  Not at this time, thank
24 you.
25        (Deposition concluded at 12:59 MT.)

```
 1          UNITED STATES DISTRICT COURT FOR
            THE EASTERN DISTRICT OF KENTUCKY
 2

 3          I, Jennifer L. Wielage, CCR No. 30X100191600,

 4     Certified Court Reporter, certify:

 5          That the foregoing proceedings were taken

 6     before me at the time and place therein set forth, at

 7     which time the witness was put under oath by me;

 8          That the testimony of the witness, the

 9     questions propounded, and all objections and

10     statements made at the time of the examination were

11     recorded stenographically by me and were thereafter

12     transcribed;

13          That a review of the transcript by the

14     deponent was not requested;

15          That the foregoing is a true and correct

16     transcript of my shorthand notes so taken.

17          I further certify that I am not a relative or

18     employee of any attorney of the parties, nor

19     financially interested in the action.

20          I declare under penalty of perjury under the

21     laws of California that the foregoing is true and

22     correct.

23          Dated this 10th day of January 2018.

24     _____

25     Jennifer L. Wielage, CCR, RPR, CRR
```

E   HIBIT S

1      UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF OKLAHOMA
2

3   JOHN TYLER HERMAN,        : CASE NO.:
            Plaintiff         : CIV-21-1038-SLP
4                             :
            vs.               :
5                             :
    SIG SAUER, INC.,          :
6           Defendant         :

7                   *   *   *

8           VIDEOTAPED DEPOSITION OF

9            OFFICER JOSEPH HALASE

10           FRIDAY, JULY 21, 2023

11                  *   *   *

12

13      Videotaped deposition of OFFICER

14  JOSEPH HALASE, taken remotely, commencing at

15  12:12 p.m. before Debbie Leonard, Registered

16  Diplomate Reporter, Certified Realtime

17  Reporter.

18

19

20

21

22

23

24

```
 1              A P P E A R A N C E S

 2   COUNSEL FOR PLAINTIFF:

 3        SALTZ MONGELUZZI & BENDESKY, PC
          BY:  RYAN HURD, ESQ.
 4        One Liberty Place
          1650 Market Street
 5        52nd Floor
          Philadelphia, Pennsylvania 19103
 6        (717) 333-4873
          rhurd@smbb.com
 7

 8   COUNSEL FOR DEFENDANT:

 9        LITTLETON PARK JOYCE UGHETTA & KELLY LLP
          BY:  B. KEITH GIBSON, ESQ.
10        The Centre at Purchase
          4 Manhattanville Road, Suite 202
11        Purchase, New Jersey 10577
          (914) 934-4290
12        keith.gibson@littletonpark.com

13

     ALSO PRESENT:
14
          Alex Marothy, Videographer
15

16

17

18

19

20

21

22

23

24
```

INDEX TO WITNESSES

WITNESS:    OFFICER JOSEPH HALASE          PAGE

           BY MR. HURD                          5
           BY MR. GIBSON                        14
           BY MR. HURD                          49

INDEX TO EXHIBITS

                                          PAGE
EXHIBIT         DESCRIPTION               MARKED

(None marked.)

Page 4

1   THE VIDEOGRAPHER:  We are now
2   on the record.
3       Today's date is July 21st,
4   2023, and the time is 12:12 p.m.
5   Eastern time.
6       This is the recorded video
7   deposition of Officer Joseph Halase
8   being taken in the matter of John
9   Tyler Hermann versus SIG Sauer Inc. in
10  the United States District Court for
11  the Western District of Oklahoma, Case
12  Number CIV-21-1038-G.
13      My name is Alex Marothy.  I'm
14  the video specialist.  The court
15  reporter is Debbie Leonard.  We are
16  both from Everest Court Reporting.
17      All counsel appearing today
18  will be noted on the stenographic
19  record.
20      Will the court reporter please
21  swear in the witness.
22          * * *
23      OFFICER JOSEPH HALASE,
24  having been first duly sworn, testified as

Page 5

1   follows:
2           * * *
3       EXAMINATION
4           * * *
5   BY MR. HURD:
6       Q.   Good afternoon, Officer Halase.
7   My name is Ryan Hurd, and together with the
8   law firm of Saltz Mongeluzzi & Bendesky, we
9   represent a number of individuals who have
10  been injured by unintentional discharges of
11  their SIG Sauer P320s.
12      And I understand that you've
13  had such a discharge, and we're going to ask
14  you some questions about that today.  Is that
15  okay?
16      A.   Yes.
17      Q.   Okay.  Let's begin, if you
18  could, please introduce yourself to the jury.
19      A.   My name is Joseph Halase.
20      Q.   Are you currently employed?
21      A.   Yeah.  I'm 53 years old.  I'm
22  currently employed with Immigration and
23  Customs Enforcement.  I'm employed with the
24  Milwaukee, Wisconsin, sub-office.  I live in

Page 6

1   Mount Pleasant, Wisconsin.  I'm married, a
2   wife and two kids.
3       Q.   Tell us about your law
4   enforcement background.
5       A.   I enlisted in the Marine Corps
6   in 1989.  From there I went to -- in 1994 I
7   went to Wisconsin Department of Corrections.
8       In 1997 I was hired by the --
9   formerly Immigration and Naturalization
10  Service in Chicago, Illinois, that later
11  became Immigration and Customs Enforcement.
12      I transferred to the Milwaukee
13  office in 2006, and I've been there ever
14  since.
15      Q.   During that long span of
16  experience in law enforcement, did you have
17  experience with firearms?
18      A.   Yes.
19      Q.   Tell us about your experience
20  with firearms.  When did it begin?
21      A.   Can you repeat that?  I had an
22  issue hearing you.
23      Q.   Tell us, please, about your
24  experience with firearms.

Page 7

1       A.   I had training in firearms
2   starting in 1989 as a -- as a Marine.  That
3   continued on into Department of Corrections.
4       Q.   When you joined Customs
5   Enforcement agency -- or I'm sorry -- ICE,
6   did you receive training on use of handguns,
7   pistols?
8       A.   Yes.
9       Q.   Tell us about that training.
10      A.   That training -- we trained
11  every quarter.  However, my initial training
12  was an academy-type setting.  Your firearms
13  courses consisted of the safe, proper
14  handling of weapons, things of that nature.
15      Q.   Was that academy setting
16  training in 1997 --
17      A.   Yes.
18      Q.   -- approximately?  Okay.
19      And you said you train every
20  quarter with handguns as well?
21      A.   Yes.
22      Q.   You go through qualification
23  training?
24      A.   Every quarter, yes.

Page 8

1    Q.    And does -- each occasion you
2  had that training, do you go over the safe
3  and proper handling of handguns?
4    A.    Yes.
5    Q.    Prior to July 27, 2020, did you
6  ever have an unintended discharge of any
7  firearm?
8    A.    No.
9    Q.    From 1997 up to the present,
10 tell us about the firearms that you would
11 regularly carry.  What kind?
12   A.    If I -- Beretta.  The Beretta
13 40-caliber we've carried for a number of
14 years.  Later on it was -- they switched over
15 to a SIG 40-caliber, I believe, and then they
16 transitioned to the SIG P320 nine millimeter.
17   Q.    On July 27th of 2020, you were
18 carrying your SIG P320; is that correct?
19   A.    That's correct.
20   Q.    Was that a department-issued
21 pistol?
22   A.    Yes.
23   Q.    Was that issue -- excuse me.
24        Was that pistol issued with a

Page 9

1  SIG holster?
2    A.    Yes.
3    Q.    Were any modifications made to
4  the pistol prior to July 27th of 2020?
5    A.    No.
6    Q.    Did you go through training and
7  qualifications on the handling and use of the
8  SIG Sauer P320?
9    A.    Yes.
10   Q.    And I understand that on
11 July 27, 2020, you had an unintended
12 discharge with that P230; is that correct?
13   A.    That's correct.
14   Q.    Please tell the jury about what
15 happened on July 27, 2020.
16   A.    So I was with a team, doing an
17 enforcement operation in the city of
18 Milwaukee.  We decided we were going to have
19 a -- my team decided we were going to have a
20 meeting, so that meeting was to take place in
21 a parking lot down the street, which
22 consisted of a Target store.
23        I decided I was going to use
24 the restroom prior to this meeting starting.

Page 10

1  I went into the restroom.  I entered the
2  stall.  I pulled down my pants.  Oh, let me
3  back up just a second.
4        I entered the stall, closed the
5  door, and I removed my weapon from the
6  holster and placed it on the rear -- on
7  the -- on the back side of the toilet.
8        I did that because I did not
9  want anybody -- the general public coming in
10 and seeing this pistol hanging underneath the
11 stall or if it -- it could have -- I didn't
12 want it resting on the floor.
13        So I finished.  I fixed my
14 belt.  I fixed my pants.  I re-holstered.  I
15 felt the -- I holstered the weapon, and I
16 felt it seat in the holster, and it
17 discharged.
18   Q.    What's that mean, to seat?  You
19 said "seat."  What does that mean?
20   A.    That means that the weapon
21 was -- was securely in the holster.
22   Q.    So when you felt the weapon
23 seat, it then discharged?
24   A.    Yes.

Page 11

1    Q.    Where was your finger when you
2  felt the pistol discharge?
3    A.    It was outside the holster.
4    Q.    How sure are you that your
5  finger was outside the holster?
6    A.    A hundred percent.  There
7  wouldn't be any room inside the holster.
8    Q.    That holster covered the
9  trigger and trigger guard; is that right?
10   A.    That's right, yes.
11   Q.    Where was the holster located
12 on your body?
13   A.    It was on my right -- right hip
14 area.
15   Q.    And was it fastened to your
16 belt?
17   A.    It was fastened to my belt,
18 yes.
19   Q.    Were you hit by the bullet?
20   A.    Yes.
21   Q.    Where were you hit?
22   A.    In the right upper hip area.
23 Or upper thigh, just below my hip area, I
24 guess.

Page 12

Q.    What did you do immediately after the discharge?

A.    I exited -- I exited the restroom, went out to notify my supervisor, who was -- they were waiting for me in the parking lot.

I explained what happened. They started examining me.  They removed the -- they started removing equipment off of my belt.  Another officer removed my weapon and said -- and he -- the brass never ejected, the spent round, the casing.

Q.    The casing never ejected from the ejection portal on the P320?

A.    Correct.

Q.    Do you know why that was?

A.    It was in the holster.

MR. GIBSON:  [Indiscernible.]

THE REPORTER:  Sorry.  Was there an objection?

MR. GIBSON:  Yeah, to form.

BY MR. HURD:

Q.    Was it your impression that the casing didn't eject because the pistol was in

Page 13

its holster?

MR. GIBSON:  Objection to form. You can answer any time I object, sir.  That's just for the record.

BY MR. HURD:

Q.    You can answer.

A.    Okay.  I -- yes, I do believe that.

Q.    Do you have any idea what caused the pistol to discharge?

A.    No.  However, I do know that my finger was not anywhere near the trigger.

Q.    Do you believe there was anything else in the holster that could have caused it to pull the trigger?

A.    No.  It -- it -- at this time, no.

Q.    Do you believe that there's room in the holster for anything else to have fit in there with the pistol?

A.    No.

Q.    Officer Halase, I don't believe I have any further questions for you at this

Page 14

time.  Thank you.

A.    Thank you.

* * *

EXAMINATION

* * *

BY MR. GIBSON:

Q.    Good afternoon, Officer Halase. My name is Keith Gibson.  I'm an attorney representing SIG Sauer in this case, and I just want to go into a little more detail about your incident.  Okay?

A.    Yes, sir.

Q.    If you don't hear me, don't understand my question, please just let me know.

Similar to what I did, your counsel may at some point raise an objection. If you hear that, that's just for the record. Unless he asks you not to answer, I'll go ahead and ask you to answer the question. Okay?

A.    Okay.

Q.    All right.

MR. HURD:  Keith, before you

Page 15

begin -- before you begin --

MR. GIBSON:  Yeah.

MR. HURD:  -- let me place my standard standing objection on the record.

And that is that I object to any question that is not directed to obtaining information to determine whether Officer Halase's unintended discharge is similar to the unintended discharge in the subject case.  Is that agreeable?

MR. GIBSON:  Yes.

MR. HURD:  Thank you.

BY MR. GIBSON:

Q.    Okay.  So I'm going to ask you just a few more details about the incident.

So my understanding is you were in a Target store restroom at the time the discharge occurred, correct?

A.    That's correct.

Q.    To your knowledge, was anyone else in the restroom when the pistol fired?

A.    No, there was no one else in

Page 16

1   there.
2       Q.    Okay.  And you mentioned the
3   holster, and I believe you said it was a SIG
4   holster; is that correct?
5       A.    Correct.
6       Q.    And what leads you to believe
7   it was a SIG holster?
8       A.    It's marked SIG Blade-Tech, I
9   believe the name of it is.
10      Q.    Okay.  So it's just the marking
11  on the holster that leads you to believe it's
12  a SIG holster?
13      A.    That's correct.
14      Q.    Okay.  And it was designed to
15  fit the P320 specifically, correct?
16      A.    As far as I know, yes.
17      Q.    Okay.  Have you ever owned any
18  other holster by Blade-Tech?
19      A.    No.
20      Q.    Okay.  Are you aware of whether
21  Blade-Tech has any affiliation with SIG
22  specifically?
23      A.    I do not.
24      Q.    Okay.  And that holster was

Page 17

1   issued to you, as well as the gun, correct?
2       A.    That's correct.
3       Q.    Okay.  Prior to the day of the
4   incident, had you ever had any issues with
5   your holster before?
6       A.    No.
7       Q.    Okay.  Never had any difficulty
8   either holstering or unholstering your P320?
9       A.    No.
10      Q.    Okay.  Was the holster damaged
11  in the incident?
12      A.    No.
13      Q.    Okay.  Is the holster open at
14  the bottom?
15      A.    It is.
16      Q.    Okay.  Do you have any
17  photographs of the holster from after the
18  incident?
19      A.    I actually took a photo just a
20  few days ago.  Like, I'm not sure what kind
21  of quality it is.
22      Q.    Okay.
23      A.    I'm going to bring it up on my
24  phone.

Page 18

1       Q.    Well, just do this.  Just make
2   sure you save that.  Maybe send it to
3   Mr. Hurd, and I'll follow up with him to get
4   a picture of it.  So --
5       A.    Okay.  I did take a picture of
6   it, but I only took a picture of it where it
7   says Blade-Tech.
8       Q.    Okay.
9       A.    I can redo it at a later date.
10      Q.    Well, let me ask you this.  So
11  am I understanding correct that you still
12  have the holster?
13      A.    I do.
14      Q.    Okay.  And since the date of
15  the incident, has the holster been used?
16      A.    No.
17      Q.    Okay.  Has the holster been
18  cleaned since the date of the incident?
19      A.    Has it been cleaned?  No.
20      Q.    Okay.  So I'm going to ask you
21  just to hold on to that, not do anything to
22  it, preserve it if you're not using it,
23  and we'll -- we'll take some photographs or
24  look at it at some point in the future.

Page 19

1   Okay?
2       A.    Okay.
3       Q.    And if you have any questions,
4   just reach out to Mr. Hurd, and we can
5   discuss.
6       A.    Okay.
7       Q.    Now, after the incident, did
8   the P320 stay in the holster or did it come
9   out or something else?
10      A.    No, it stayed in the holster.
11      Q.    Okay.  Now, at the time the
12  P320 fired, was your hand still in contact
13  with any part of the gun?
14      A.    It happened pretty fast.  I
15  just recall holstering the weapon.  I felt it
16  seat.  I don't recall if I removed my hand
17  from the -- you know, the handle of the
18  weapon or if it went off after I moved my
19  hand.
20      Q.    Okay.  So as you sit here
21  today, you don't know if your palm and thumb
22  were still in contact with the rear grip of
23  the pistol; is that fair?
24      A.    That's fair to say.

Page 20

1    Q.    Okay.  But you recall your
2 finger being outside the holster, along the
3 side of the pistol, correct?
4    A.    Yes.
5    Q.    Okay.  And when you say fully
6 seated, does it snap in when it's fully
7 seated in the holster?
8    A.    This particular holster, it
9 didn't snap in, but you can -- you could tell
10 after you used it a few times when it's
11 seated, when it's in the holster where it's
12 supposed to be.
13    Q.    Got it.  Okay.  Now, when
14 the -- when the pistol initially discharged,
15 were you immediately aware you had been hit?
16    A.    No.
17    Q.    Okay.  How did you determine
18 that you had been hit by a round?
19    A.    When I went out to my team and
20 I explained to my supervisor what had
21 happened, they started examining the area,
22 and then that's -- then it was determined
23 that I had been -- been struck by the round,
24 yes.

Page 21

1    Q.    Okay.  How long passed between
2 the time of the discharge and when you got
3 out to your team and they started to examine
4 you, approximately?
5    A.    Probably two minutes maybe.
6    Q.    Okay.  And during those two
7 minutes, you weren't feeling pain or anything
8 that indicated you had been hit by the
9 bullet?
10    A.    I was feeling pain, but I
11 wasn't sure if it could have been, like, a --
12 like, a --
13    Q.    Graze wound?
14    A.    A graze wound, a flash wound or
15 something to that effect.
16    Q.    Okay.  So you felt some
17 discomfort but weren't sure that the bullet
18 had actually entered your body?  Is that
19 fair?
20    A.    Correct, correct.
21    Q.    Okay.  And then when you got
22 out to your team, they started examining you
23 and determined that the bullet had actually
24 entered your lower hip?

Page 22

1    A.    It was determined that I was
2 bleeding.  To the extent of what damage was
3 done, nobody really knew at that time.
4    Q.    Okay.  Now, after the accident,
5 did you -- did you lose your balance?  Did
6 you fall down to the floor, anything like
7 that?
8    A.    No.
9    Q.    Okay.  Did you ever lose
10 consciousness?
11    A.    No.
12    Q.    Okay.  Now, I believe you said
13 you walked out to the parking lot and you
14 reported the incident to your supervisor; is
15 that correct?
16    A.    That's correct.
17    Q.    And what is his name?
18    A.    Brent Kriehn, K-R-I-E-H-N.  He
19 was my supervisor at the time.  However, he
20 is no longer my supervisor.
21    Q.    Can you spell that again?
22 K-R --
23    A.    K-R-I-E-H-N.
24    Q.    Okay.  And I believe you said

Page 23

1 that another officer is the one who removed
2 your pistol and told you that the shell
3 casing had not ejected, correct?
4    A.    Correct.
5    Q.    And who was that?
6    A.    I -- I want to say it's Rick
7 Hanson.
8    Q.    Okay.
9    A.    He's a special agent.
10    Q.    Okay.  Any other agents you
11 recall being present when you walked out
12 immediately after the incident?
13    A.    Yes.  There were several other
14 people present.  I would actually have to
15 look at my report to -- to recall who --
16 everybody that was there at the time.
17    Q.    Okay.  And we'll get the
18 documents in the future, but as you sit here
19 today, do you recall anyone else specifically
20 who was there?
21    A.    I do not.
22    Q.    Okay.  Did anyone call 911?
23    A.    Yes.
24    Q.    And who did that?

Page 24

1    A.    I believe that was my
2  supervisor, Brent Kriehn.
3    Q.    Okay.  And I guess before I get
4  to the 911 call, do you recall what you told
5  Supervisor Kriehn about what happened when
6  you got out to -- to the parking lot?
7    A.    Right.  I believe I said
8  something to the effect of, "I had a
9  discharge."
10   Q.    Okay.  Beyond saying you had a
11 discharge, do you recall saying anything
12 else?
13   A.    I do not.
14   Q.    Okay.  Did you say anything
15 specifically about, you know, "My finger
16 wasn't on the trigger," "I didn't pull the
17 trigger," anything like that, or do you not
18 recall as you sit here?
19   A.    I do not recall.
20   Q.    Okay.  And did you hear
21 Supervisor Kriehn speak with 911?
22   A.    I do not remember that.
23   Q.    Okay.
24   A.    I think I was kind of off to

Page 25

1  the side during this time.
2    Q.    Okay.  Did law enforcement
3  officers respond to the parking lot?
4    A.    I don't recall them responding
5  to the parking lot, no.
6    Q.    Okay.  Did any law enforcement
7  agency outside of ICE perform any
8  investigation of this incident, to your
9  knowledge?
10   A.    Yes.
11   Q.    And what agency was that?
12   A.    Milwaukee Police Department.
13   Q.    Okay.  And did the Milwaukee
14 Police Department interview you at some point
15 about the incident?
16   A.    Yes.
17   Q.    And when -- when was that,
18 approximately?
19   A.    It was approximately three to
20 four days or maybe even -- I'd have to look
21 at the date.  It was, I want to say, within a
22 week of the incident.
23   Q.    Okay.  A few days after the
24 incident at some point?

Page 26

1    A.    Right.
2    Q.    And did they come to your home
3  to interview you?
4    A.    No, I went to them.  I went to
5  their office.
6    Q.    Okay.  And was the interview
7  recorded, to your knowledge?
8    A.    That, I do not know.
9    Q.    Is there anything that you
10 recall telling the Milwaukee police officer
11 about how the incident occurred that's
12 different or in addition to what you've said
13 here today?
14   A.    Well, at the time, I -- they
15 asked me, "What do you think" -- "What could
16 have caused this?  What do you think could
17 have caused this?"
18        At the time I was speculating.
19 I'd been trained that the only way your
20 pistol is going to fire is if you put your
21 finger on the trigger, so I had no knowledge
22 of this weapon having any history at that
23 point.
24        I might have told them my shirt

Page 27

1  could have got into the holster, but looking
2  back now, I don't believe that that's
3  possible [indiscernible].
4            *  *  *
5        (Court reporter clarification.)
6            *  *  *
7        MR. HURD:  Officer Halase, can
8  you repeat your answer?
9        THE WITNESS:  Starting from --
10       MR. HURD:  You don't -- you
11 didn't believe that your shirt could
12 have been caught in it.  You said
13 something that you didn't believe it
14 was possible.
15       THE WITNESS:  I don't believe
16 that that's possible, just for the
17 fact [indiscernible] --
18       THE VIDEOGRAPHER:  Would you
19 like to go off the record, Counsel?
20       MR. HURD:  Yeah, let's go off
21 and regroup.
22       THE VIDEOGRAPHER:  We're going
23 off the record.  The time is
24 12:35 p.m.

Page 28

* * *

(Recess taken from 12:35 p.m. to 12:40 p.m.)

* * *

THE VIDEOGRAPHER:  We're back on the record.  The time is 12:40 p.m.

BY MR. GIBSON:

Q.    Officer Halase, when we -- when we kind of had our technical issues, you were -- you were commenting that you had initially told the Milwaukee Police Department that you were speculating that possibly your shirt could have gotten into the holster and pulled the trigger, but as you sit here today, you don't believe that is possible.  Is that fair?

A.    Yes.

Q.    And why do you not believe that is possible?

A.    I don't believe it's possible at this point because it's never been an issue in the past for me.  Nothing has ever got tangled up in my holster.  There would be -- there was no room in the holster for a

Page 29

part of a shirt or even -- or even my finger.

Q.    Do you recall what you were wearing on the day of the incident?

A.    Yeah.  I was wearing a blue -- I was plain clothes, so I was bearing blue jeans.  I had a T-shirt that was tucked in. I had a regular leather belt, with my holster on my right side.

I had a -- another case to hold a -- that holds a pair of handcuffs and another magazine on my left side.  I had a T-shirt tucked in, and I was wearing a short-sleeve, button-down shirt, collared shirt.

Q.    Okay.  Was the button-down shirt untucked or tucked in?

A.    It was untucked.

Q.    Okay.  Do you know the name of the officer, the Milwaukee police officer you spoke with?

A.    I believe his last name was Hutchinson.

Q.    Okay.  Have you ever seen any police report or other investigative document

Page 30

from the Milwaukee Police Department related to your incident?

A.    Yes.

Q.    Okay.  Do you have a copy of that?

A.    Yes.

Q.    Okay.  I'll ask your attorney to have you send that to him, but we'll -- I'll deal with him.

Did the Milwaukee Police Department ever take possession of your P320 pistol?

A.    I don't recall.  My pistol was taken from me after the incident, and I don't recall if Milwaukee Police Department had my pistol or if my pistol was sent to Fort Benning, Georgia, with our firearms unit for an inspection.  I don't -- I don't recall if the Milwaukee Police Department ever had my weapon.

Q.    Okay.  So for some period of time, you were without your weapon, and your understanding is it was being examined either by Milwaukee or by ICE.  Is that fair?

Page 31

A.    If I had -- I would think that ICE had had it.  I was off for a little bit of time, so yes, either ICE or Milwaukee Police Department had my weapon.

Q.    Okay.  Have you ever seen any report from ICE or from Milwaukee Police Department related to any examination or testing of your pistol?

A.    No.

Q.    Have you ever spoken with anyone at either ICE or Milwaukee Police Department about any examination or testing of your pistol and the results of that examination or testing?

A.    I believe, when I came back to work, my weapon had already been sent back to the office, and it was reissued to me, the same weapon, and I was told that there was nothing wrong with the weapon.

Q.    And who told you there was nothing wrong with the weapon?

A.    If I had to guess, it was one of our firearms instructors.  I can't be positive on who might have told me that.

Page 32

I've never seen anything in writing.

Q.   Okay.  So you were just told it was examined, nothing was wrong with it, but you've never seen any report or other documentation regarding an examination of your weapon; is that correct?

A.   That's correct.

Q.   Okay.  Approximately how long were you out of work from the time of your incident until when you returned?

A.   I don't think I went back to work for -- it was around 45 days.  However, I was allowed -- towards -- before the 45 days, I was actually working from home for a little bit of time, so it was -- it would have been 45 days before I actually physically reported back to the office.

Q.   Got it.  And when you reported back in 45 days, is that when your P320 pistol was returned to you?

A.   I believe so, yes.

Q.   Okay.  And so the incident is in July of 2020.  We're talking approximately mid-September of 2020?  Does that sound about

Page 33

right?

A.    It -- that sounds -- that sounds about right.

Q.   Okay.  Did you express any concern to your boss or anyone at ICE about carrying the P320 after you returned?

A.   Yes, yes.

Q.   And what did they say?

A.   Well, that's the issued weapon.  That's the weapon that's issued.

Q.   Okay.  Have you continued to carry the P320 since September of 2020?

A.   I have.

Q.   Any issues with your 320 since the date of your accident?

A.   There's been no issues.  However, I refuse to carry a chambered round now.

Q.   So you carry it with the magazine in but no round in the chamber?

A.   That's correct.

Q.   And is there any internalized policy that requires you to carry with a round in the chamber?

Page 34

A.   That, I would have to look.  I -- I'm not sure if there is or not.  I know there -- I can't be sure on that, no.  We -- we are trained to carry -- they call it duty carry.  Is it a policy?  I'm not sure.

Q.   Do your supervisors or others at ICE know you carry without a round in the chamber?

A.   That, I don't know.

Q.   Okay.  So you never had any discussions with anyone else at ICE about the fact that now you're carrying it without a round in the chamber, correct?

A.   Coworkers.  Just coworkers.

Q.   None of your supervisors, though?

A.   That, I may have.  I -- I can't be sure.  I can't be positive.

Q.   Okay.  Now, going back to the day of the incident, did -- did EMTs and ambulance, anything like that, respond to the scene?

A.   Yes.  The Milwaukee Fire Department, which was the EMTs.

Page 35

Q.   Okay.  Did you know any of the EMTs who responded, either by name or --

A.   No.

Q.   Okay.

A.   No.

Q.   Other than bandaging and cleaning the wound, were you provided any treatment by the EMTs?

A.   No.  Just a transport to the hospital.

Q.   Okay.

A.   Like I said, I believe they might have -- there might have been some bandaging.

Q.   Okay.  Do you know who Jody Seymore is?

A.   No.

Q.   Since the pistol was returned to you in September of 2020, have you continued to use it during quarterly training?

A.   Yes.

Q.   Okay.  Do you recall approximately when you were assigned the P320

Page 36

1  by ICE, when you made the switch over?
2      A.    One week prior to the day of
3  the incident.
4      Q.    Okay.
5      A.    So it was -- the incident
6  happened on a Monday, I believe, and the
7  previous Monday is when we had the course on
8  the transition.
9      Q.    Okay.  So you had only had your
10 pistol for one week at the time of the
11 incident?
12     A.    Yes.
13     Q.    Okay.  But you had gone through
14 firearms training with the pistol when it was
15 first issued to you?
16     A.    Yes.
17     Q.    Okay.  Prior to receiving your
18 P320 a week or so before the incident, had
19 you ever reviewed any information about the
20 320, either online or from any other source?
21     A.    No.
22     Q.    Okay.  And just to be clear,
23 you didn't have any input into the selection
24 of the P320 as ICE's assigned duty firearm;

Page 37

1  is that correct?
2      A.    That's correct.
3      Q.    Okay.  Prior to being issued
4  your P320 [indiscernible], had you ever held
5  or shot another [indiscernible]?
6                *  *  *
7          (Court reporter clarification.)
8                *  *  *
9  BY MR. GIBSON:
10     Q.    Prior to being issued your P320
11 by ICE, had you ever held or shot a P320
12 pistol before?
13     A.    No.
14     Q.    Okay.  And I believe you may
15 have answered this, but at the time of your
16 incident, had you heard or been made aware of
17 anyone else having an accidental or
18 unintentional discharge with a P320, whether
19 it be within ICE or outside of ICE?
20     A.    No.  I wasn't informed of that
21 until some of my -- one of my coworkers came
22 to see me while I was still in the hospital.
23     Q.    And who was that?
24     A.    He's -- he was a supervisor,

Page 38

1  special agent with Homeland Security
2  Investigations.  His name was Scott
3  Engelhardt.  I don't believe he's with the
4  agency any longer --
5      Q.    What's the last name?
6      A.    -- but he had heard --
7             Englehardt.
8      Q.    Okay.  And what did
9  Mr. Englehardt tell you?
10     A.    He actually didn't tell me.  He
11 told my wife that I was number 13 in the
12 agency that this happened to at that time.
13 However, I had no knowledge of any --
14 anything like that at that -- at that point.
15     Q.    And was that number 13 who had
16 had an unintentional discharge of a P320 or
17 an unintentional discharge generally, if you
18 know?
19     A.    I took it as the P320.
20     Q.    Okay.  Have you ever spoken
21 with any other ICE officer who claims that
22 his or her P320 discharged without a trigger
23 pull?
24     A.    Yes.

Page 39

1      Q.    And who is that?
2      A.    There was another ICE officer
3  in Milwaukee.  Our -- our conversation
4  consisted of, "How are you doing?  Hope you
5  get better."  And that was the extent of it.
6  He's also with Homeland Security
7  Investigations.
8      Q.    And you don't know his name?
9      A.    I'm bad with names.
10            Russell Dykema is his name.
11     Q.    Okay.  And did Officer Dykema
12 or Agent Dykema describe his incident to you?
13     A.    I just know that he had a
14 discharge.  We did not -- I did not ask him,
15 and he didn't tell me.
16     Q.    Okay.  Did you give him any
17 information or details about your discharge?
18     A.    He already knew the details
19 about my discharge.
20     Q.    Okay.  Other than Agent Dykema,
21 anyone else within ICE you've ever spoken or
22 communicated with who claims that he or she
23 had an unintentional discharge of a P320
24 pistol?

Page 40

1    A.    No.

2    Q.    Now, when you received your

3 P320 pistol, you recognize it didn't have a

4 manual thumb safety, correct?

5    A.    Correct.

6    Q.    And are you aware that the P320

7 is available with a manual thumb safety as an

8 option?

9    A.    I wasn't aware of that, no.

10    Q.    Are you aware of that today?

11    A.    I believe so, yes.

12    Q.    Now, are you aware that ICE

13 prohibits manu- -- or prohibited

14 manufacturers from submitting for

15 consideration pistols that were equipped with

16 manual thumb safeties?

17    A.    No, I'm not aware of that.

18    Q.    Okay.  Have you ever had any

19 discussions with anyone at ICE about why your

20 pistols, whether they be P320s or other

21 pistols, do not include manual thumb

22 safeties?

23    A.    No.

24    Q.    And you understand that a

Page 41

1 manual thumb safety locks the trigger when

2 it's engaged and prevents the trigger from

3 being pulled?

4    A.    Yes.

5          MR. HURD:  Objection.

6 BY MR. GIBSON:

7    Q.    Did you say yes?

8    A.    Yes.

9    Q.    Okay.  Prior to your accident,

10 did you have any concerns or did you express

11 any concerns to anyone about carrying a duty

12 weapon that was not equipped with a manual

13 thumb safety?

14    A.    No.

15    Q.    Okay.

16    A.    I probably carried a weapon

17 without a safety.

18    Q.    Okay.  Why is that?

19    A.    I mean, I'm not a gun expert,

20 but all the weapons that we carried are --

21 were double action.  It's just what was

22 issued.

23    Q.    Have you ever purchased a

24 handgun for personal use, outside of the guns

Page 42

1 that were issued to you by ICE, in the

2 last --

3    A.    No.

4    Q.    -- ten years?

5    A.    No.

6    Q.    So the weapons you carried were

7 all -- were always the duty weapons you were

8 issued by ICE or previously by the Department

9 of Corrections?

10    A.    Only -- only by ICE.

11    Q.    Okay.

12    A.    I was not issued from the

13 Department of Corrections.

14    Q.    Got it.  So earlier you told

15 Mr. Hurd that, prior to the 320, you had been

16 issued a Beretta 40-caliber pistol; is that

17 correct?

18    A.    That's correct.

19    Q.    Do you recall the model of that

20 pistol?

21    A.    I'm pretty sure it was -- it

22 was a Brigadier 96-D.  I can't be positive on

23 that.

24    Q.    Do you know the difference

Page 43

1 between a hammer-fired and a striker-fired

2 pistol?

3    A.    I do not.

4    Q.    Okay.  Did the Beretta

5 Brigadier 96-D or whatever it was you carried

6 have an external manual safety?

7    A.    It did not.

8    Q.    Okay.  What about a tab

9 trigger?  Do you know what that is?  Tabbed

10 or bladed trigger?

11    A.    I just know that there's a

12 safety on the trigger.  Other than that, I do

13 not know.

14    Q.    And did the Beretta have a

15 safety on the trigger?

16    A.    No.

17    Q.    And the SIG 40-caliber that you

18 had prior to the P320, do you recall the

19 model of that pistol?

20    A.    I do not.

21    Q.    Do you recall whether it had an

22 external hammer that cocks?

23    A.    It did not.

24    Q.    Did your prior SIG have an

Deposition of Officer Joseph Halase                                    John Tyler Herman v. Sig Sauer, Inc.

Page 44

external manual safety?
     A.    No.
     Q.    Did it have any safety on the
trigger?
     A.    No.
     Q.    Do you know the purpose of a
bladed or hinged trigger?
     A.    I've never -- I don't recall
ever being trained on that, so I do not know.
     Q.    Okay.  Other than the time the
pistol was out of your possession when ICE
was examining it shortly after the incident,
has the pistol been in your possession
continuously since you received it back in
September of 2020?
     A.    Yes.
     Q.    Have you had any issues with
the operation of the pistol since September
of 2020?
     A.    I have not.  Several months
ago, the armorers came around and replaced
the trigger bar springs in the weapons in all
the -- in all the duty weapons.  That's the
only time it's -- anything has ever been

Page 45

changed.
     Q.    What did you say they replaced?
     A.    The trigger bar spring.
     Q.    Did they tell you why they were
replacing the trigger bar springs in all the
P320s?
     A.    They did not.
     Q.    Now, recognizing the pistol --
the P320 didn't have a manual safety, you
would have expected that if the trigger was
pulled on the gun, the gun would fire,
correct?
          MR. HURD:  Objection.
          THE WITNESS:  Correct.
BY MR. GIBSON:
     Q.    Did you say "correct"?
     A.    Yes.
     Q.    Okay.  And I understand these
questions -- I understand your position is
neither your finger nor anything else pulled
the trigger, but even if the trigger is
pulled accidentally or inadvertently, your
expectation is, if the trigger is pulled, the
gun will fire, correct?

Page 46

          MR. HURD:  Objection.
          You can answer.
          THE WITNESS:  Correct.
BY MR. GIBSON:
     Q.    And that's true whether it's a
finger or a foreign object or anything else
that pulls the trigger, right?
          MR. HURD:  Objection.
          THE WITNESS:  Correct.
BY MR. GIBSON:
     Q.    And the gun doesn't know
whether you intend to pull the trigger or
not.  It just knows, if the trigger is
pulled, the gun fires.  Correct?
          MR. HURD:  Objection.
          You can answer.
          THE WITNESS:  Correct.
BY MR. GIBSON:
     Q.    Okay.  But just to be clear,
your position is that nothing pulled the
trigger in your incident; is that right?
     A.    That's correct.
     Q.    Okay.  Between the time
[indiscernible]?

Page 47

          *  *  *
     (Court reporter clarification.)
          *  *  *
BY MR. GIBSON:
     Q.    Between the date your P320
pistol was issued and the date of your
accident, which I recognize is only a week,
did you disassemble the pistol at any point
in time during that week?
     A.    As part of the transition
course, yes, we were -- in a classroom
setting, yes, we did -- we did disassemble
the pistol --
     Q.    Okay.
     A.    -- and put it back together.
     Q.    And did you field strip it, or
did you do a full disassembly?  And if you
don't know what the difference is, let me
know, and I'll explain what I'm asking.
     A.    As far as I know, we just did a
field strip.
     Q.    Okay.  So you removed the
slide, took the barrel out?
     A.    Basically we -- we were told

Page 48

1 what to clean and what to take apart and what
2 not to take apart, so it would have been a
3 field strip.
4      Q.    Okay.  So the fire control unit
5 was not removed from the grip of the pistol;
6 is that fair?
7      A.    I would say that's fair, yes.
8      Q.    Okay.  After your incident, did
9 you contact SIG Sauer at any point to tell
10 them what happened?
11     A.    I did not.
12     Q.    Why not?
13     A.    That -- I -- I don't know how
14 to answer that.  I just didn't feel obligated
15 to do that at that point.
16     Q.    Okay.  Do you know one way or
17 the other --
18     A.    I --
19     Q.    I'm sorry.
20     A.    I mean, my agency already had
21 everything that they needed to -- all the
22 reports.  I assumed if there was anything
23 that they wanted SIG to know, they would --
24 my agency would contact them.

Page 49

1      Q.    Do you know one way or the
2 other whether anyone from ICE ever contacted
3 SIG Sauer to inform SIG about your incident?
4      A.    I do not know.
5      Q.    Other than Agent Dykema, have
6 you ever spoken or communicated with anyone,
7 including people outside of ICE, who claims
8 they've had an unintentional discharge of a
9 P320?
10     A.    No.
11     Q.    Okay.  That's all I have for
12 you today, sir.  So unless Ryan has some
13 additional questions, I think we're done with
14 you.
15           MR. HURD:  Just one question
16      for clarification.
17                * * *
18           EXAMINATION
19                * * *
20 BY MR. HURD:
21     Q.    The prior two pistols that you
22 had, they were both double-action; is that
23 right?
24     A.    As far as I know, yes.

Page 50

1      Q.    And the P320 was the first
2 single-action you had?
3           MR. GIBSON:  Object to form.
4           You can answer.
5 BY MR. HURD:
6      Q.    I'll restate it.
7           Was the P320 the first
8 single-action pistol you had?
9           MR. GIBSON:  Objection to form.
10 BY MR. HURD:
11     Q.    I couldn't hear you, Joe.
12     A.    I believe so, yes.
13           MR. HURD:  I have no further
14 questions.
15           MR. GIBSON:  All right.
16 Officer Halase, thank you for your
17 time.  We appreciate it.
18           THE WITNESS:  Thank you so much
19 too, sir.
20           THE VIDEOGRAPHER:  This now
21 concludes the video deposition of
22 Officer Joseph Halase.  We're going
23 off the record.  The time is 1:03 p.m.
24                * * *

Page 51

           (Witness excused.)
                * * *
           (Off the record at 1:03 p.m.)
                * * *

# EXHIBIT T



SOMERVILLE FIRE DEPARTMENT
*SOMERVILLE, MA*

# NFIRS Incident #22003732

| FDID | State | Incident Date | Station | Incident Number | Exposure | Report Status |
|------|-------|---------------|---------|-----------------|----------|---------------|
| 17274 | MA | 04/06/2022 | | 22003732 | 0 | APPROVED |

| Resubmit Date |
|---------------|
| 04/06/2022 |

**Address**

| Location Type | STREET ADDRESS | | Census Tract | |
|---------------|----------------|--|--------------|--|
| St. Prefix | St. Number | St. Name | St. Type | St. Suffix |
| | 220 | WASHINGTON ST | STREET | |
| Apt. Number | Cross Street or Directions | | | |
| | | | | |
| | City | | State | Zip |
| | SOMERVILLE | | MA | 02143 |

**Incident Details**

| C: Incident Type | E1: Dates & Times | | E2: Shifts & Alarms | | |
|------------------|-------------------|--|---------------------|--|--|
| 321 EMS CALL, EXCLUDING VEHICLE ACCIDEN | Date/Time | | Shift/Platoon | Alarms | District |
| D: Aid Given/Received | (mm/dd/yyyy hh:mm:ss) | | | | |
| | Alarm | 04/06/2022 15:51:46 | Special Study ID# | | Special Study Value |
| Mutual Aid (FDID) Agency - State | Arrival | 04/06/2022 15:52:31 | | | |
| ( ) - | Controlled | | Incident Under Investigation | | N |
| | Last Unit Cleared | 04/06/2022 16:05:45 | | | |

| F: Actions Taken | G1: Resources | | | G2: Estimated Dollar Losses & Values | |
|------------------|---------------|--|--|--------------------------------------|--|
| Primary Action | | Apparatus | Personnel | LOSSES: | |
| 31 PROVIDE FIRST AID & CHECK FOR INJURIES | Suppression | 2 | 6 | Property $ | |
| | EMS | 2 | 3 | Contents $ | |
| | Other | 0 | 0 | PRE-INCIDENT VALUE: | |
| | | | | Property $ | |
| | | | | Contents $ | |

SIG-CATATATO-SOMERVILLE-FD1 000001

| H1: Casualties | Deaths | Injuries |
|---|---|---|
| Fire Service | | |
| Civilian | | |

**H3: Hazardous Materials Release**

**H2: Detector**

**I: Mixed Use Property**

**J: Property Use**

365  POLICE STATION

---

**K1: Person/Entity Involved**

Person/Entity #: 1

| Business Name | PUBLIC SAFETY BUILDING | | Phone Number | |
|---|---|---|---|---|
| Prefix | First Name | MI | Last Name | Suffix |
| | ASHLEY | | CATATO | |
| | St. Num | St.Name | St. Type | |
| | 220 | WASHINGTON ST | | |
| | Apt. Number | P.O.Box | | |
| | | | | |
| | City | | State | Zip |
| | SOMERVILLE | | MASSACHUSETTS | |
| Notes | | | | |
| | | | | |

---

**K2: Owner**

| Business Name | | | Phone Number | |
|---|---|---|---|---|
| Prefix | First Name | MI | Last Name | Suffix |
| | | | | |
| St. Prefix | St. Num | St.Name | St. Type | St. Suffix |
| | | | | |
| | Apt. Number | P.O.Box | | |
| | | | | |
| | City | | State | Zip |
| | | | | |

---

**L: Remarks**

An approx. 30 y/o female sustained a grazing gunshoot wound to her upper right thigh due

SIG-CATATATO-SOMERVILLE-FD1 000002

to an accidental discharge of a handgun.  Bleeding was minimal. She was transported to MGH by Cataldo amb. All members wore PPE.

**M: Authorization**

| Approved By | Approver Name | Position | Assignment | Date |
|---|---|---|---|---|
| 39120 | TIERNEY, S | DEPUTY CHIEF | | 04/07/2022 06:32:39 |
| Officer in-Charge | Officer Name | Position | Assignment | Date |
| 9436 | KERNER, E | LIEUTENANT | | 04/06/2022 19:53:05 |
| Member ID | Member Name | Position | Assignment | Date |
| 9436 | KERNER, E | LIEUTENANT | | 04/06/2022 19:53:05 |

# Company Reports

| Agency | Incident Number | Exposure | Unit ID | Report Number |
|---|---|---|---|---|
| SOM-FD | 22003732 | 0 | EN3 | 1 |

| Apparatus | |
|---|---|
| Apparatus Type | Apparatus Use |
| (11) ENGINE | (1) SUPPRESSION |

**Response Address**

| St. Prefix | St. Num | St. Name | St. Type | St. Suffix |
|---|---|---|---|---|
| | 220 | WASHINGTON ST | STREET | |
| | Apt. Number | | | |
| | | | | |
| | City | | State | Zip |
| | SOMERVILLE | | MASSACHUSETTS | |
| Cross Street | | | | |

| Dispatch Time | Arrival Time | Cleared Time |
|---|---|---|
| 04/06/2022 15:51:58 | 04/06/2022 15:52:31 | 04/06/2022 16:05:45 |

| Situation Found | 29   MEDICAL ASSIST |
|---|---|
| Hydrant Location | |
| Hydrant Condition | |
| Hydrant Damaged | |

SIG-CATATATO-SOMERVILLE-FD1 000003

| | No |
| --- | --- |

**Actions Taken**

| |
| --- |

**Equipment Used**

| Type | Qty. | Measurement | Notes |
| --- | --- | --- | --- |

**Company Members Responding**

| ID | Name | Rank | Acting | Actions Taken |
| --- | --- | --- | --- | --- |
| 9436 | KERNER, E | LIEUTENANT | No | |
| 28070 | KELLEY, T | FIREFIGHTER | No | |
| 78360 | O'HEARN, T | FIREFIGHTER | No | |

**Report Narrative**

**Filed By**

| Member ID | Member Name |
| --- | --- |
| 9436 | KERNER, E |

# Geocodes

| Agency | Incident Number | Exposure | Unit ID | Report Number |
| --- | --- | --- | --- | --- |
| SOM-FD | 22003732 | 0 | L2 | 1 |

**Apparatus**

| Apparatus Type | Apparatus Use |
| --- | --- |
| (12) TRUCK OR AERIAL | (1) SUPPRESSION |

**Response Address**

| St. Prefix | St. Num | St. Name | St. Type | St. Suffix |
| --- | --- | --- | --- | --- |
| | 220 | WASHINGTON ST | STREET | |
| | Apt. Number | | | |
| | | | | |
| | City | | State | Zip |

SIG-CATATATO-SOMERVILLE-FD1 000004

| Cross Street | SOMERVILLE | MASSACHUSETTS |
|---|---|---|
| | | |

| Dispatch Time | Arrival Time | Cleared Time |
|---|---|---|
| 04/06/2022 15:51:58 | 04/06/2022 15:52:31 | 04/06/2022 15:55:55 |

| Situation Found | 24   INVESTIGATION |
|---|---|
| Hydrant Location | |
| Hydrant Condition | |
| Hydrant Damaged | No |

| Actions Taken |
|---|
| 93   CANCELLED ENROUTE |

| Equipment Used | | | |
|---|---|---|---|
| Type | Qty. | Measurement | Notes |

| Company Members Responding | | | | |
|---|---|---|---|---|
| ID | Name | Rank | Acting | Actions Taken |
| 30160 | MACMULLIN, B | LIEUTENANT | No | |
| 31080 | LAYTON,R | FIREFIGHTER | No | |
| 3483 | MOYNIHAN, DENNIS | FIREFIGHTER | No | |

| Report Narrative |
|---|
| cancelled enroute |

| Filed By | |
|---|---|
| Member ID | Member Name |
| 30160 | MACMULLIN, B |

| Geocode Information | | |
|---|---|---|
| Dispatch Class | Map Layer | Map Area |
| FIRE/RESCUE | FIRE BOX | 2214 |
| FIRE/RESCUE | CHIEF DISTRICT | C2 |
| FIRE/RESCUE | ENGINE DISTRICT | 3 |
| FIRE/RESCUE | LADDER DISTRICT | 2 |
| POLICE | REPORTING AREA | 25 |

SIG-CATATATO-SOMERVILLE-FD1 000005

| POLICE | DISTRICT | EAST |
| POLICE | PRECINCT | 1 |
| POLICE | SECTOR | E3 |
| POLICE | WARD | 2 |

# EXHIBIT U

Video Surveillance of Officer
Catatao's Unintended Discharge

*(A Hard Copy will be provided to
the court)*

# EXHIBIT V

**In the Matter Of:**

POWERS vs SIG SAUER

20-CA-1741

---

# WILLIAM TOKAJER

*March 21, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        Q    And who is that?

 2        A    That was Joel --

 3             MR. GURNEY:  Pierce.

 4             THE WITNESS:  Thank you.

 5        Q    Thank you.  I couldn't remember it either.

 6        A    And his was actually a different type of

 7   malfunction.  His was actually in the holster, and as

 8   he was exiting his truck he had his computer bag and

 9   the computer bag had a zipper, metal zipper -- I don't

10   know what you call the thing that moves the zipper

11   that -- it's the mechanism, the pull thing, and that

12   went into the side of the holster.

13             The holster itself was improperly

14   manufactured, and they changed that after.  You could

15   get items into the trigger guard, so as he was taking

16   the bag out it was next to his side, and when he put it

17   down the zipper catch went into the holster itself and

18   fired the weapon.

19        Q    Did you or your department do an

20   investigation to come to that conclusion?

21        A    Yes.

22        Q    And how did the department come to that

23   conclusion for Officer Pierce?

24        A    We did a review of the holster.  We put them

25   side by side with weapons in them and showed that the
```



EXHIBIT W

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                        -    -    -

4

5   KEITH AND BIANCA SLATOWSKI: CIVIL ACTION
                              : NO. 2:21-cv-00729
6              Plaintiffs,  :
                            :
7           vs.             :
                            :
8   SIG SAUER, INC.         :
                            :
9              Defendant.   :

10

11                       -    -    -

12           Wednesday, February 23, 2022

13                       -    -    -

14        Sworn video recorded deposition of

15   CHRISTOPHER MEYER, taken remotely via Zoom

16   conference, commenced at 10:02 a.m. on the above

17   date before Kimberly Wendt, a Certified Court

18   Reporter and Notary Public.

19

20                       -    -    -

21

22

23

24

Page 29

1 is intentional.
2     Q.   So I'm going to show you again
3 SIG-OAI 1853 and 1854, and it looks like it is --
4 there are ten comments, and for comment one there
5 are 12 questions that should be answered, right?
6     A.   Yes.
7     Q.   Okay.
8     A.   Let me see those questions, so I
9 can confirm that -- make sure nothing was
10 modified, since exact -- since we're referencing
11 yours exactly.
12     Q.   I didn't hear what you said there.
13     A.   Since we're referencing this exact
14 document.  Name of individual involved, agency
15 name, reporting person, contact information of
16 reporting person --
17     Q.   I'm sorry, let me stop you for a
18 second.  Are you reading off of something else?
19     A.   Yeah.  I'm reading what we use.
20     Q.   Okay.
21     A.   Which is -- which is the same
22 that -- which was provided by law enforcement.
23     Q.   Okay.  So are you saying that you
24 and the law enforcement side each have a template

Page 30

1 document that you are supposed to use for any
2 complaints of accidental discharges?
3     A.   That is correct.
4     Q.   And are you saying that it is
5 slightly modified from the one that we see here?
6 Looks like you were using a couple different
7 words.
8     A.   For instance, I'm just looking
9 at -- it looks like the phrasing is a little -- a
10 little different, like date and time of
11 occurrence is the same, and then how was it
12 reported, instead of -- like we don't use
13 agencies, so we don't have -- so that's something
14 that we wouldn't necessarily fill out.
15     Q.   Okay.  Let me stop you for a
16 second.  So it looks like this one was filled out
17 related to a Groton Police Department in
18 Connecticut incident in February of 2021.  Do you
19 see that?
20     A.   Um-hum.
21     Q.   Yes?
22     A.   I do, yes.
23     Q.   Do you know whether the document
24 that you are using off of your computer is just

Page 31

1 the updated version of this sheet?  Is it a
2 different sheet than the one law enforcement
3 sales use -- uses?
4     A.   I couldn't say definitively
5 compared to this one, but it does seem like it's
6 an updated version.
7     Q.   Okay.  What is the name at the top
8 of the one that you're talking about?
9     A.   Ours is called Unintentional
10 Discharge Report.
11     Q.   Okay.  I'm going to show you a
12 document 1860.  Do you see this document, sir?
13     A.   Yep.  Yes, I do.
14     Q.   Is this the document that you're
15 referring to?
16     A.   That looks more like it.  Let me
17 just compare it real quickly.  Would you mind
18 scrolling down to the bottom of the page?
19     Q.   Let me know if you need me to
20 scroll up or down.
21     A.   And can you scroll a little bit
22 further down, please?  Yes, that looks like it.
23 Mine has an area where it says additional
24 information -- oh, there it is, where you

Page 32

1 scrolled down -- and attached photos.  That's --
2 that is the same document that we're using.
3     Q.   So we're looking at SIG-OAI 1860
4 to 1862, and this format is the one that you all
5 typically use?
6     A.   Correct.
7     Q.   Do you know why there's a
8 different one that is used, or at least was used
9 in the incident in Connecticut in 2021 marked OAI
10 1853?
11     A.   I do not.
12     Q.   The document that we see as 1860
13 to 1862, is that the form that has been used for
14 unintentional discharges since you started in
15 customer service?
16     A.   That's the form that we've been
17 using since I've been a manager.
18     Q.   And you became a manager -- would
19 that be as a -- that was what you just got into
20 last year, right?
21     A.   Correct.
22     Q.   What were you using before then?
23     A.   We have a -- we would ask as many
24 questions as possible, but it wouldn't -- it

wouldn't be like this same form.  It would
just -- it would be what we use for a standard
RMA, and then we would ask, first and foremost,
if the individual is okay, and then just
questions that we would ask for any sort of issue
that a firearm could have, so what ammo they were
using, what holster, things of that nature, but
nothing -- nothing more set in stone like that.
 Q.    Let me just make sure I
understand.  Before you became a manager, was
there a written type of report that outlined the
types of information you needed to get for any
unintended discharge call?
 A.    Not for customer service.
 Q.    Okay.  Was there any document
other than the One Note document you talked about
earlier, that informed the customer service reps
what questions to ask, what information to get?
 A.    Not a specific document, no.
 Q.    Okay.  Other than the original
training through the Customer Service One Note,
was there any additional training provided to the
customer service reps, as to what to get for an
unintended discharge, before you all drafted and

started using this report form?
 A.    The general -- the general idea
was to get as much information as possible, which
was as much information as we could get for any
call, for anyone who has a general issue with a
firearm, as well as, you know, any instance or
any property damage or personal damage.
 Q.    Okay.  So if you're a customer
service rep, you get the One Note training, and
then you get additional guidance to get as much
information as possible.  Is there anything else
that is given to them either verbally, or in a
document, that outlines what to get in terms of
specific information on an unintentional
discharge, before you all started using the
report in 2021?
 A.    No.
 Q.    As of 2021, were all incidents
where there was a complaint of an unintended
discharge required to use that unintentional
discharge report?
 A.    As of -- as of mid-2021, yes.
 Q.    And do you know if law enforcement
used any written report before the middle of 2021

on their side?
 A.    I'm unaware.
 Q.    For example, I'll show you again
this document that we've marked as 18 -- it's
been Bates labeled SIG-OAI 1853 and 1854.  This
is a different report.  I'm sure much of the
information is similar, name and date, but there
are other things that are a little dissimilar.
Do you know if prior to mid-2021 whether this
form was being uniformly used for LE sales?
 A.    I couldn't say definitively.
 Q.    And if it was being used by LE
sales, I take it you would not know the time when
it started to be used; am I correct?
 A.    That is correct.
 Q.    Is there -- you talked about how
the non-LE side is broken down -- director,
manager, supervisor, rep -- do you know how the
LE side is broken down, other than specific reps
for specific law enforcement sales?
 A.    I would assume it's similar, but I
don't know the exact way it's set up.
 Q.    For example, I assume the rep for
a particular LE sale is not only dealing with

customer complaints, but they're dealing with
sales, they're dealing with ongoing information,
and any other communication with their customer,
correct?
 A.    That is correct.
 Q.    So on the LE side -- strike that.
        On your side, the non-LE side,
there is a specific department for complaints,
but on the LE side, the -- basically, the sales
people have to field the complaints themselves,
correct?
 A.    So the question that you asked
previous, were you saying that that was on the LE
side, that they had to -- they had to service
with sales and service and complaints?
 Q.    You know, I don't know, let me try
to just rephrase the question.  It sounds like on
the non-LE side, you all have a specific division
that deals with customer complaints, customer
inquiries, customer questions?
 A.    Everyone handles all of those
evenly, so there isn't one person who takes
complaints.
 Q.    Right.  It's the customer service

Page 141

documents, and from my own personal experience,
from, you know, what I've heard and what I've
seen with my daily job.

Q.   And when you say what you've heard
and what you've seen, tell me what you mean by
that, that would identify that it was February 4,
2016, as opposed to November of 2015 or January
of 2015?

A.   If I'm not mistaken, February 4,
2016 was before the voluntary upgrade program
started, so when I heard about the voluntary
upgrade program, it was the first of me hearing
of any sort of drop issue, and that these
provided documents, that this was the first
documented one of the provided ones of an
incident report that was non-drop related, so
with my experience, this is, as far as I know,
the first incident provided.

Q.   Okay.  And just for the record,
these documents appear to be a nine-page police
incident report, and then four pages of
affidavits from the Marcie Vadnais case related
to comparison of that incident and this incident,
fair?

Page 142

A.   That is what I see as well.

Q.   Do you know how Sig became aware
of this incident?

A.   No, I'm not aware.

Q.   If -- I think you agree with this.
If Sig became aware of this incident outside of a
letter from a lawyer or a legal filing, you would
agree with me that it would have been required to
be entered within the Oracle system, correct?

A.   We definitely would have suggested
to bring it in, and then it would've been notated
in Oracle.

Q.   Suggested to bring it in, I've got
to ask some follow up, because I don't know what
that means.

Wasn't it the policy back in
February of 2016, that if an incident like this
one was learned of by Sig, outside of a letter
from a lawyer or a legal filing, that it had to
go into Oracle?

A.   Do you mean documented?  Yes, so
it would be -- if they called into customer
service, then, yes, this would've been
documented, but if they had called this in for

Page 143

law enforcement channels, then, yes, our law
enforcement channels would have also wanted to
bring it in for investigation.

Q.   Right.  So whether it came from an
individual calling customer service, or through
the law enforcement sale division, or even if by
chance it came through FFS, all three would have
been required -- any of the three would have been
required to make an Oracle note of this?

MS. DENNISON:  Object to the form.
THE WITNESS:  Just correction,
it's FFL.
BY MR. ZIMMERMAN:

Q.   Sorry.

A.   No, it's okay, just so the record
can be clean.  It is my understanding that they
would notate, but I can only speak for customer
service as that is our -- that is our standard
that we would maintain.

Q.   And so I'll ask a follow up again,
do you know, as the corporate designee for Sig
Sauer, whether the LE department has the same
requirement to create an Oracle entry whenever
there is a report of an incidental or unintended

Page 144

discharge?

A.   I do not know that definitively in
2016.

Q.   And same question for the FFL
inside sales team?

A.   In 2016 I couldn't say
definitively.  Currently, yes, if someone made a
report and had a -- then it would be notated to
some degree.

Q.   Do you know how Sig got this
police report?

A.   I do not.

Q.   Fair to say if they didn't somehow
get this police report, there would have been no
records related to this drop -- to this
unintended discharge that Sig has at least
produced to us?

MS. DENNISON:  Objection to form.
THE WITNESS:  I couldn't say.  I
don't -- I don't know.
BY MR. ZIMMERMAN:

Q.   Okay.  Well, what has been
produced is a nine-page police report and two
affidavits from a lawsuit I believe 20 --

Page 217

1  me to believe that the trigger was -- was
2  not interfered with or was.  It was not
3  a -- it wasn't enough to definitively say
4  that nothing touched the trigger.
5  BY MR. ZIMMERMAN:
6      Q.    So you have just not formed any
7  conclusions, fair?
8          MS. DENNISON:  Objection to form.
9          THE WITNESS:  I mean, in some of
10     the videos, you can't see the firearm at
11     all.  I couldn't --
12  BY MR. ZIMMERMAN:
13     Q.    I'm not -- hold on.  Okay.  So
14  let's take it one at a time.  In the ones where
15  you can't see the firearm, did you form any
16  conclusions?
17     A.    Are you saying can't, C-A-N-T?
18     Q.    Yeah, I'm going to ask you both
19  ways, and I think the answer is going to be, no,
20  you haven't formed any conclusions at all, but I
21  want to be fair to you.
22          For the videos where you cannot
23  see the gun, have you formed any conclusions as
24  to whether or not there was an unintended fire

Page 218

1  without the trigger being pulled, based purely
2  upon your observation of the video?
3          MS. DENNISON:  Object to the form
4      and scope.
5          THE WITNESS:  In seeing the video
6      where you cannot see the firearm, there
7      is no conclusive evidence to show that
8      nothing got within the trigger guard and
9      pulled the trigger.
10  BY MR. ZIMMERMAN:
11     Q.    Or, yeah, or whether it fired
12  without the trigger being pulled?
13     A.    Well, there's no proof of the P320
14  firing with a trigger being pulled.
15     Q.    Yeah, and I know that has been,
16  you know, embedded into you, but you haven't done
17  anything to test that yourself, right?
18          MS. DENNISON:  Objection to form
19      and argumentative.  Go ahead.
20          THE WITNESS:  That is -- that
21      would be a -- those tests would be
22      something that I would refer to Sean
23      Toner.
24  BY MR. ZIMMERMAN:

Page 219

1      Q.    All right.  Are you qualified to
2  do those tests?
3      A.    Am I qualified to do the tests
4  that should be referred to Sean Toner?
5      Q.    Yeah.  The tests that have been
6  performed, the inspections that have been
7  performed to determine whether or not a gun can
8  discharge without a trigger pull?
9      A.    As a manager of customer service,
10  no, I do not perform tests on firearms.
11     Q.    You've just been told that it
12  can't happen, right?
13          MS. DENNISON:  Objection to form.
14  BY MR. ZIMMERMAN:
15     Q.    Probably more than once?
16          MS. DENNISON:  Objection to form.
17          MR. ZIMMERMAN:  I'll withdrawal
18      the question.
19  BY MR. ZIMMERMAN:
20     Q.    Sir, with respect to Oracle, I
21  want to make sure I understand, can you see the
22  notes that LE enters into Oracle?
23     A.    Yes.
24     Q.    And your department, LE, receiving

Page 220

1  and inside sales, those who have access to Oracle
2  within those departments can all see the entries
3  from any of those departments, correct?
4      A.    I'm not sure if they can see
5  everything, especially in regards to receiving.
6      Q.    Now, let's take receiving out.
7  Can everybody else see all notes from LE,
8  customer service, and/or inside sales?
9      A.    I don't know if anyone outside of
10  customer service has blocked image -- like if
11  they can't see other things, but --
12     Q.    So you know your department can
13  see them, you just don't know about the other
14  departments?
15     A.    Correct.
16     Q.    Can you search Oracle by using
17  search terms?  For example, is there some way
18  where you can search the words unintentional
19  discharge, or unintentional alone, and come up
20  with entries that are contained within Oracle?
21     A.    You can search by serial number or
22  customer information.
23     Q.    So is the answer no?  Can you
24  search by terms?  If I were to say search Oracle

Page 221

1 for the word unintentional, would you be able to
2 search Oracle for unintentional, and come up with
3 all the times that unintentional appears?
4      A.   No, you would not be able to
5 search by words like that.
6      Q.   So fair to say unless the person
7 retrieving the information that's been provided
8 to me knows which Oracle accounts have unintended
9 discharge claims, there would be no ability for
10 him to search that information out otherwise,
11 fair?
12           MS. DENNISON:  Objection to form.
13           THE WITNESS:  There would be no
14      way for him to search for those word
15      terms, but as -- as explained before,
16      every -- every unintentional discharge
17      would be -- would go to his attention any
18      time it's brought to our attention.
19 BY MR. ZIMMERMAN:
20      Q.   On the customer service side?
21      A.   Correct.
22      Q.   Do you know if that's the case on
23 the LE side?
24      A.   That is my understanding.

Page 222

1      Q.   Since when?
2      A.   I'm not sure.
3      Q.   Has that always been the case, or
4 is it just now the case?
5      A.   I'm not aware of when that case --
6 of when that was the case.
7      Q.   I appreciate your answer, but I
8 don't know if it answered my question, so my
9 question was if the person retrieving the Oracle
10 notes on unintended discharges cannot search
11 Oracle for key words, they would essentially have
12 to know which accounts have the unintentional
13 discharges within them to be able to produce it,
14 right?
15           MS. DENNISON:  Objection to form.
16           THE WITNESS:  They would -- they
17      would have to know which ones were
18      produced, which were produced to them
19      from each department.
20           MS. DENNISON:  For clarification
21      of the record, just so you know, and --
22      you can keep asking questions if you
23      want -- these records are kept and
24      maintained by the legal department as

Page 223

1 they come in.
2           THE WITNESS:  Each as they come in
3      are immediately brought to the legal
4      department, so, no, they cannot search
5      Oracle by search terms, whether it be
6      negligent, accidental, unintentional, but
7      they could search by serial numbers or
8      customer information.
9           MR. ZIMMERMAN:  Respectfully,
10      Kristen, in response to your comment,
11      there are enough incidents that have been
12      produced without any information in the
13      system other than investigative or
14      inspection reports that leads me to
15      believe that there are either more
16      documents in Oracle that have not been
17      produced, or that they just haven't been
18      following their policies with respect to
19      Oracle input, so I just wanted to make my
20      position clear, because we are going to
21      ask for follow up on this area.
22           MS. DENNISON:  I understand.  I
23      know what your position is.
24 BY MR. ZIMMERMAN:

Page 224

1      Q.   Sir, if you can look at MF -- I'm
2 sorry -- 185, there's a note that MF was made
3 aware of the incident.
4      A.   185?
5      Q.   Yeah.  It's a note from the
6 Riverdale Police incident.  My question is about
7 halfway down that note on 185 there's an
8 indication that MF was made aware of the
9 incident.  Do you know who MF is, or what MF is?
10      A.   I don't know what MF is.
11      Q.   I think I gave you a name earlier
12 Matt Farkas.  Did you tell me who Matt Farkas is?
13      A.   No, that was one I was unfamiliar
14 with.
15      Q.   Okay.  Hearing that name, would
16 that give you any context as to who the MF is
17 here?
18      A.   We -- it would only be a guess if
19 we were to say that was Matt Farkas.
20      Q.   Don't want you to guess.
21      A.   Sorry.  Okay.
22      Q.   So with respect to the inspections
23 or handling of P320s, is there any policy that
24 makes any distinctions on what Sig must do in the