**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                )
JACQUES DESROSIERS and YOLETTE L.)
DESROSIERS,                      )
                                )
              Plaintiffs,        )
                                )        Civil Action
v.                               )        No. 22-cv-11674-PBS
                                )
SIG SAUER, INC.,                 )
                                )
              Defendant.         )
_____ )
```

**MEMORANDUM AND ORDER**

June 24, 2024

Saris, J.

**INTRODUCTION**

Plaintiff Jacques Desrosiers, an officer with the Cambridge Police Department ("CPD"), was injured when his Sig Sauer P320 duty pistol fired in his waistband without his pulling the trigger. He and his wife, Plaintiff Yolette L. Desrosiers, have sued the gun's manufacturer, Defendant Sig Sauer, Inc., on six counts.[1] Centrally, Plaintiffs allege that Sig Sauer designed the P320 defectively and that the defect caused Officer Desrosiers' injuries. Plaintiffs submit reports from William Vigilante, an

---

[1] Plaintiffs assert claims for negligence, breach of the implied warranty of merchantability, negligent infliction of emotional distress, intentional infliction of emotional distress, violation of the Massachusetts Consumer Protection Act, and loss of consortium.

expert on ergonomics and human factors, and James Tertin, an expert on firearm design and engineering. Sig Sauer moves to exclude Tertin's and Vigilante's testimony pursuant to Federal Rule of Evidence 702 and moves for summary judgment.

After a hearing and review of the record, the Court **DENIES** the motion to exclude Tertin's testimony (Dkt. 72) and **ALLOWS IN PART** and **DENIES IN PART** the motion to exclude Vigilante's testimony (Dkt. 71) and the motion for summary judgment (Dkt. 70).

## BACKGROUND

The following facts are undisputed, except where otherwise noted. See Deaton v. Town of Barrington, 100 F.4th 348, 353 (1st Cir. 2024).

### I.    The Shooting

Jacques Desrosiers is an officer with the CPD in Massachusetts. He is married to Yolette Desrosiers. Sig Sauer is a gun manufacturer incorporated in Delaware and principally operating in New Hampshire.

On October 10, 2019, Officer Desrosiers was working a shift in police bookings. Pursuant to CPD policy, officers working in bookings were required to lock their duty gun in a locker outside the booking area. After purchasing his lunch, Officer Desrosiers parked one block away from CPD headquarters. Because he intended to immediately place his gun in a locker, he left his gun holster in his car and tucked his Sig Sauer P320 into his waistband, which

contained a Velcro inner belt. Carrying a gun without its holster violated CPD policy.

As he began to walk the one block to CPD headquarters, Officer Desrosiers carried his keys, radio, and lunch in his left hand and used his right hand to adjust the P320 in his waistband. While he adjusted the pistol, it suddenly discharged. He did not touch its trigger. Officer Desrosiers suffered injury to his right scrotum, penile skin, subcutaneous tissues, and left thigh. His ruptured right testicle required emergency surgery. Security cameras outside CPD headquarters captured footage of the incident.

## II.    **The P320 and its Competitors**

Some pistols come equipped with safety mechanisms that ensure they do not fire unintentionally. A thumb safety is a switch on the side of the pistol. Pressing the switch toggles between "fire mode," in which the user can fire the pistol, and a locked mode, in which he cannot. Dkt. 70 at 4. A trigger safety, also called a "tabbed trigger" or "bladed trigger," is a small tab located on the pistol's trigger that the user must press "for the trigger to

be able to fully depress and fire the weapon." Dkt. 80-2 at 11.



*Figure 1. Thumb Safety (left) and Trigger Safety (right) Mechanisms*
*(See Dkt. 73-21 at 17-19)*

The P320 is a single-action striker-fired pistol. Sig Sauer offers P320s with or without a thumb safety. Sig Sauer does not sell the P320 with a trigger safety.

CPD chose the P320 <u>without</u> a thumb safety as its duty pistol. <u>See</u> Dkt. 70 at 3 ("[F]rom a training and safety perspective, [CPD] decided that a manual thumb safety would be problematic if officers drawing their pistol in response to a threat forgot to disengage the safety."). During direct communications with members of CPD when CPD was deciding which pistol to purchase, Sig Sauer never mentioned that the P320 functions as a single-action gun or that Sig Sauer had been made aware of multiple instances of the P320 accidentally discharging.

Sig Sauer's main competitor for law-enforcement contracts is the manufacturer Glock. Glock manufactures a variety of striker-fired pistols, including the Glock 17. Glock pistols come equipped

with a trigger safety, but not with a thumb safety.

## III. **Tertin's Opinion and Tests**

In his export report, Tertin concludes that the P320 was "unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated." Dkt. 73-21 at 24. He also opines that Sig Sauer could feasibly have added an external safety to the P320, such as a tabbed trigger. See id. at 10 (noting every other commercially available single-action firearm has an external safety).

Tertin's first test examined whether the P320 functions as a double- or single-action pistol. A double-action pistol has a longer pull length to both cock and release the gun's firing mechanism, requiring more consistent pressure over the length of the longer trigger pull than a single-action pistol that is pre-cocked. Glock pistols are double action. To determine how the P320 operates, Tertin removed a portion of the slide's external casing to observe the striker mechanism as the trigger was pulled. He observed that when the P320 was actuated, it did not cock the gun but simply released the striker, indicating that it was a single-action pistol.

Tertin next performed experiments on model P320 and Glock pistols to test whether a tabbed trigger effectively prevents

against unintentional discharges from pressure applied to the side or tip of a trigger. Specifically, he built a "fixture consist[ing] of a sliding arm that" he could adjust from zero degrees to ninety degrees, with zero degrees being a "direct rearward pull." Dkt. 82 at 15. The sliding arm simulated a human finger. He slid the arm-fixture backward, at a variety of angles, to see if the arm at a given angle could actuate the trigger of the P320 or Glock pistols. Tertin found that pressure applied to the edge of the P320 trigger actuated the trigger in three different positions: twenty, thirty, and forty degrees. See id. When he conducted the same experiments on the Glock pistol, which uses a tabbed or bladed trigger, the trigger did not actuate at any angle. See id. at 16-17.

At his deposition, Tertin testified that had the P320's trigger "been a bladed trigger, it's highly unlikely that that gun would have fired in [Officer Desrosiers'] waistband." Dkt. 83-7 at 97:15-17.

## IV. **Vigilante's Qualifications**

Plaintiffs seek to introduce Vigilante as an expert on ergonomics and "human factors." Dkt. 81 at 7. Vigilante has doctorate and master's degrees in the "field of Human Factors and Ergonomics." Id. at 22. He has over twenty-five years of research experience focused on "human-machine interaction, risk perception, and hazard identification and mitigation." Id. at 8. He previously worked as a "Human Factors Engineer" at IBM Corporation, where he

led teams in designing safe and user-friendly consumer and commercial products. Dkt. 73-19 at 4. Vigilante has authored scientific studies, presented work at "multiple professional conferences," and conducted peer reviews in the field of human factors research. Id. Although his curriculum vitae does not list any specific publications or employment experiences related to firearms, it states he has "human factors and ergonomics experience" in the "recreational and sporting activities" industry. Dkt. 83-2 at 2 (capitalization omitted). In particular, it states he has studied how "human factors affect people's ability to safely interact with recreational vehicles, sporting equipment, firearms, and swimming pools." Id.

Additionally, Vigilante is a firearms instructor and Range Safety Officer with the National Rifle Association, the Chief Safety Officer of the International Defensive Pistol Association ("IDPA"), and the IDPA Match Director at the Lower Providence Rod and Gun Club. Dkt. 73-19 at 4. He is also a Range Officer for the "International Confederation of Revolve[r] Enthusiasts." Id. Vigilante has taught classes and trained individuals on using firearms safely. He shoots for sport.

## V.    Vigilante's Tests

Prior to submitting his expert report, Vigilante conducted tests on a model P320 and a Glock pistol. In his first test, Vigilante wore an exemplar pair of the duty pants Officer

Desrosiers wore at the time of the incident and inserted a P320 and a Glock 17 into the waistband. Vigilante found that the P320's trigger, while located inside the duty pants, was "readily" actuated when his index and middle fingers applied pressure to the trigger from outside the pants. Dkt. 73-19 at 32. In contrast, to actuate the trigger on the Glock, Vigilante had to "purposefully and forcefully dig into the pants, using either finger, while bending at the waist to get enough pressure on the front of the trigger." Id.

In his second test, Vigilante placed each pistol into a Safariland Level III holster, inserted a long metal bar and a brass housekey between the holster and the pistol, and attempted to actuate the pistol's trigger. Vigilante was able to actuate the trigger of the P320 with both implements but was unable to actuate the trigger of the Glock, which had a tabbed trigger.

At his deposition, Vigilante testified that although he has no opinion on what pulled the trigger on Desrosiers' P320, "the presence of a tab trigger" would have "significantly reduce[d] the risk" of Officer Desrosiers' accidental discharge. Dkt. 71-20 at 7:6-10, 162:19-163:1.

## LEGAL STANDARD

### I.  Rule 702 Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a witness "qualified as an

expert" may provide an opinion if the proponent shows it is more likely than not that (a) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 assigns district courts a "'gatekeeping role . . .' to determine whether 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Jackson, 58 F.4th 541, 550 (1st Cir. 2023) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)). A court need not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022). However, "the district court's gatekeeping function ought not to be confused with the jury's responsibility to separate wheat from chaff." Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007). Rather, if "the factual underpinning of an expert's opinion is weak," that is "a matter affecting the weight and credibility of the testimony" and not its admissibility. Martinez, 33 F.4th at 24 (quoting Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)). Accordingly, courts interpret Rule 702 "liberally in favor

of the admission of expert testimony." Id. (quoting Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006)).

## II.  **Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in its favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the

nonmovant "must present definite, competent evidence" demonstrating that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## DISCUSSION

### I.  Tertin

There is no dispute Tertin is qualified as an expert. Tertin is the director of research and development at a firearms manufacturer. He has been working as a gunsmith for over fifty years. In that time, he has received seven firearm design patents.

Rather, Sig Sauer argues Tertin's opinions are not "based on sufficient facts or data" and are instead based on his ipse dixit. Fed. R. Evid. 702(b). A court may exclude expert opinion where "there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Tertin's opinions draw on evidence from filings, reports, and videos from this case; the same from other cases where the P320 accidentally discharged; literature from trade organizations and gun manufacturers; and physical examinations he conducted of an exemplar P320 and a Glock pistol. In addition, Tertin conducted his own experiments, first to observe whether the P320 was a

single-action pistol and then to test whether a trigger safety would make the P320 less prone to accidental discharge when pressure is applied to the sides of the trigger.

Sig Sauer contends that Tertin's causation opinion improperly assumes Officer Desrosiers' P320 discharged due to pressure on the side of the trigger. Sig Sauer cites Herman v. Sig Sauer, Inc., an unpublished Tenth Circuit opinion, for support. No. 23-cv-6136, 2025 WL 1672350 (10th Cir. June 13, 2025). In Herman, the plaintiff could not "point[] to any clear evidence in the record about whether parts of his body or his holster did or did not come into contact with the trigger of his P320 at the time of the incident." Id. at *7 n.4. In contrast, Officer Desrosiers stated during his deposition that his "finger wasn't anywhere near the trigger" when his pistol fired. Dkt. 73-15 at 87:16; See Crowe, 506 F.3d at 18 (explaining that the Rule 702 analysis is "case-specific"). Furthermore, "expert[s] may offer opinions based on assumptions that are not contrary to the evidence." Levin, 459 F.3d at 79; See Davis v. Sig Sauer, Inc., 126 F.4th 1213, 1224 (6th Cir. 2025) ("Where an expert bases their opinion on assumed facts, 'mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" (alteration in original) (quoting In re Scrap Metal Antitrust Litig., 527 F.3d 517, 530 (6th Cir. 2008))). Here, Officer Desrosiers testified at his deposition that his finger was

nowhere near the trigger, yet all experts agree that some force was applied to cause the trigger to actuate. Tertin's assumption -- that the trigger was actuated from the side while Officer Desrosiers adjusted his P320 in his waistband -- is not inconsistent with Officer Desrosiers' testimony or the physical evidence.

Tertin's conclusions that 1) the P320 was defectively designed and 2) a trigger safety would have made it "highly unlikely" for the gun in Officer Desrosiers' waistband to accidentally discharge are reasonably connected to his experiments, research, and expertise. Therefore, the Court denies the motion to exclude Tertin's testimony.

## II.  **Vigilante**

Sig Sauer first takes aim at Vigilante's qualifications to testify as an expert on the P320's design, arguing that Vigilante does not have any expertise in gun design and pointing out that this Court previously found Vigilante unqualified to provide expert testimony regarding firearm design. See Catatao v. Sig Sauer, Inc., No. 22-cv-10620, 2024 WL 4012002, at *2 (D. Mass. July 9, 2024). Plaintiffs respond that although Vigilante is not an engineer or gunsmith, his background in human factors research allows him to opine on "risk identification and design of safe products," including guns. Dkt. 81 at 24. Plaintiffs highlight the Sixth Circuit's recent opinion in Davis v. Sig Sauer, Inc., which

noted in dicta, in a footnote, that "Vigilante's lack of expert qualifications in firearm design is not a persuasive reason to exclude his testimony." 126 F.4th at 1226 n.4.

Ultimately, this Court need not weigh in on this dispute because during the Daubert hearing, Plaintiffs conceded that Vigilante's design testimony would be duplicative of Tertin's. The Court excludes Vigilante's design testimony on this ground. See United States v. Mehanna, 735 F.3d 32, 67 (1st Cir. 2013) (upholding lower court's exclusion of two experts on the basis that their testimony was cumulative of that of a testifying expert); United States v. Shay, 57 F.3d 126, 134 (1st Cir. 1995) ("Even if expert testimony is admissible pursuant to Rule 702, it may be disallowed pursuant to Fed. R. Evid. 403 if its prejudicial, misleading, wasteful, confusing, or cumulative nature substantially outweighs its probative value." (emphasis added)).

As for causation, Vigilante conducted incident-specific experiments to test whether a tabbed trigger could have prevented Officer Desrosiers' P320 from discharging. In addition to his experiments using exemplar duty pants and metal implements with a model P320 and Glock 17 described above, Vigilante considered a U.S. Immigration and Customs Enforcement ("ICE") memorandum[2] and

---

[2] In 2019, ICE started to transition from using a Glock as its service pistol to using the P320. The following year, ICE drafted a memorandum describing an increase in unintentional discharges, mostly involving the P320 rather than the Glock, from 2017 to 2020.

reviewed public filings and videos of other accidental discharges involving the P320. His conclusion -- that if a foreign object or Officer Desrosiers' fingers along the outside of his duty pants caused Desrosiers' P320's trigger to depress, "it is more likely than not that a tabbed trigger safety would have prevented this incident" -- is reasonably related to his experiments, research, and expertise. Dkt. 71-19 at 47.[3]

Sig Sauer raises a number of concerns regarding the methodology of Vigilante's tests. For example, Sig Sauer claims Vigilante did not know the exact depth of the gun in Desrosiers' waistband. But these are "matter[s] affecting the weight and credibility of the testimony," not its admissibility. Rodríguez v. Hosp. San Cristobal, Inc., 91 F.4th 59, 70 (1st Cir. 2024) (quoting Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)); Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 109 (1st Cir. 2020) (explaining that lack of certainty in an expert opinion goes to weight and not admissibility). Accordingly, the Court denies the motion to exclude Vigilante's testimony

---

See Dkt. 83-29 at 2. Data acquired in a separate suit against Sig Sauer reveal the same trend between 2020 and 2022.

[3] Sig Sauer raises the same argument based on Herman that Vigilante's causation opinion relies on an unsupported assumption as to how Officer Desrosier's trigger actuated. As discussed above, this assumption is not inconsistent with the evidentiary record in this case and, at most, affects the weight of the testimony not its admissibility.

regarding causation.

### III. **Summary Judgment**

Sig Sauer moves for summary judgment on four grounds: first, Plaintiffs cannot prove legal causation or a design defect; second, Plaintiffs' failure-to-warn theory fails as a matter of law; third, Plaintiffs lack evidence to support their intentional infliction of emotional distress claims; and fourth, Plaintiffs improperly seek punitive damages. This Court considers each argument in turn.

### A.  **Design Defect and Legal Causation**

To succeed, Plaintiffs must show that 1) Officer Desrosiers' P320 was defectively designed, and 2) the defect caused Plaintiffs' injuries. See Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1010, 1024-25, 1038 (Mass. 2013) (explaining that under Massachusetts law, negligence in design, warranty of merchantability, and Chapter 93A claims alleging a product was unreasonably dangerous all require showing defective design and causation); Wasylow v. Glock, Inc., 975 F. Supp. 370, 376-77 (D. Mass. 1996) (same). Sig Sauer argues that Plaintiffs cannot prove a design defect proximately caused the injuries largely because their experts, Tertin and Vigilante, are unqualified to opine on defective design and causation. As discussed above, the Court has determined that Tertin's testimony on design defect and causation and Viligante's testimony on causation are admissible.

Plaintiffs have shown a trialworthy question about whether

16

Sig Sauer designed the P320 defectively. Generally, "[e]xpert testimony . . . is required to support a claim of a design defect." Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc., 573 F. Supp. 2d 372, 380 (D. Mass. 2008) (citing Enrich v. Windmere Corp., 616 N.E.2d 1081, 1084 (Mass. 1993)). And a plaintiff alleging defective design "must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented" his injury. Ducat v. Ethicon, Inc., 534 F. Supp. 3d 152, 158 (D. Mass. 2021) (quoting Evans, 990 N.E.2d at 1014). Plaintiffs' expert Tertin testifies that Officer Desroisers' P320 was defective because it was a single-action pistol with no trigger safety, making it dangerously susceptible to accidental discharge. Tertin supports his opinion with results from his experiments comparing the P320 with a Glock pistol, which uses a tabbed trigger. Moreover, Tertin opines that a tabbed trigger would have been reasonably cost-effective. He indicates all other single-action pistols use an external safety.

Sig Sauer responds that the absence of an external safety was a deliberate design choice, not a defect. But it cites no authority for the proposition that a manufacturer's intentional omission of a safety feature can never constitute a defect as a matter of law. The only case Sig Sauer cites concerned manual safeties for a Glock semi-automatic pistol. See Wasylow, 975 F. Supp. at 374, 379. There, the district judge, in dicta, expressed concern that manual

safeties would "affect the functional capabilities and not just the safety of the respective products." Id. at 379–80 (emphasis omitted). Here, in contrast, Plaintiffs' expert opines that a tabbed trigger would not compromise the P320's functional capabilities and that no other single-action pistol on the market omits external safeties. This evidence creates a genuine dispute of material fact.

Plaintiffs also have raised a genuine issue of fact regarding causation. A plaintiff pursuing a design-defect claim need only "prove that his or her injury was, more probably than not, caused by a defect in the product." Kearney v. Philip Morris, Inc., 916 F. Supp. 61, 64 (D. Mass. 1996) (emphasis added) (citing Walsh v. Atamian Motors, Inc., 406 N.E.2d 733, 734 (Mass. App. Ct. 1980)). Tertin testifies that a tabbed trigger would have made an accidental discharge while the finger was not on the trigger "highly unlikely." Dkt. 83-7 at 97:16. Similarly, Plaintiff's second expert, Vigilante, concludes that "the presence of a tab trigger" would have "significantly reduce[d] the risk" of Officer Desrosiers' accidental discharge. Dkt. 71-20 at 162:25-163:1. Both Tertin and Vigilante conducted experiments to support their opinions. A reasonable jury could decide based on this evidence that it is "more probabl[e] than not" that the lack of a tabbed trigger on Officer Desrosiers' P320 caused his injuries. Kearney, 916 F. Supp. at 64.

Therefore, Sig Sauer's motion for summary judgment fails on the issues of design defect and causation.

## B.    Failure-to-Warn Theory

Sig Sauer argues that summary judgment is warranted on Plaintiffs' failure-to-warn theory because there is no evidence Officer Desrosiers read the operator's manual or would have read any additional warnings from Sig Sauer. Plaintiffs respond that their theory is not based on a failure to warn Officer Desrosiers individually, but rather Sig Sauer's failure to warn CPD more broadly when the department was selecting its duty firearm.

Plaintiffs did not plead a separate failure-to-warn claim. Instead, Plaintiffs wove the theory into their negligence (Count I) and breach of the implied warranty of merchantability (Count II) claims. "In Massachusetts, a manufacturer can be found liable to a user of the product if the user is injured due to the failure of the manufacturer to exercise reasonable care in warning potential users of hazards associated with use of the product." Laaperi v. Sears, Roebuck & Co., 787 F.2d 726, 729 (1st Cir. 1986) (footnote omitted). Furthermore, when a plaintiff alleges both "negligent failure to warn and failure to warn under breach of warranty," both claims "are to be judged by the same standard: the reasonableness of the defendant's actions in the circumstances." Hoffman v. Houghton Chem. Corp., 751 N.E.2d 848, 859 (Mass. 2001). "Under either standard, [a plaintiff] must show that the failure

to warn proximately caused the plaintiff's injuries." Corrigan v. Covidien LP, 748 F. Supp. 3d 1, 11 (D. Mass. 2024) (citing Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 48 (1st Cir. 1991)), appeal filed, No. 24-1858 (1st Cir. Sept. 26, 2024).

Sig Sauer argues that an expert is necessary to support Plaintiffs' failure-to-warn theory, but the sole case it cites acknowledges that "[e]xpert testimony is not always necessary to establish the existence of a warning defect." Calisi v. Abbott Lab'ys, No. 11-cv-10671, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (alteration in original) (quoting Laspesa v. Arrow Int'l, Inc., No. 07-cv-12370, 2009 WL 5217030, at *6 (D. Mass. Dec. 23, 2009)). Here, the jury can assess Sig Suaer's failure to warn CPD about the risks of a single-action pistol with no external safety "in light of their common experience and [the experts' design and causation] testimony," and may reasonably conclude Sig Sauer's communications "failed to make the nature of the risk [of accidental discharge] reasonably comprehensible." MacDonald v. Ortho Pharm. Corp., 475 N.E.2d 65, 71-72 (Mass. 1985). Plaintiffs cite emails between CPD Lieutenant George Sabbey and Sig Sauer in which Sabbey asks specific questions about the P320's chambers based on the operator's manual. In response, Sig Sauer's law enforcement sales representative failed to disclose that the P320 functioned as a single-action gun and that Sig Sauer had received multiple reports of the P320 unintentionally discharging.

Sig Sauer argues that even if it should have warned Sabbey, the lack of warnings did not proximately cause Plaintiffs' injuries because Sabbey did not decide which duty gun CPD adopted. During his deposition, Sabbey clarified that ultimately it was the commissioners who made the selection, and he provided no input. But Sabbey represented that he oversaw purchasing the P320 and that he forwarded his communications with Sig Sauer to others at CPD. Therefore, a reasonable juror could conclude that had Sig Sauer warned Sabbey of the P320's single-action trigger with no external safeties, he might have shared that information widely among CPD, potentially influencing the department's purchasing decision and averting the harm. Accordingly, the Court denies Sig Sauer's motion for summary judgment on Plaintiffs' failure-to-warn theory.

### C.    Intentional Infliction of Emotional Distress

Sig Sauer contends that Plaintiffs cannot meet their burden of proof to show that Sig Sauer intentionally inflicted emotional distress. Plaintiffs do not respond to this argument in their opposition. See Dkt. 80-2 at 40 ("Plaintiffs do not have argument regarding their Intentional Infliction of Emotional Distress claim."). As such, summary judgment is warranted in Sig Sauer's favor. See Montany v. Univ. of New Eng., 858 F.3d 34, 41 (1st Cir. 2017) (holding that the plaintiff's failure to put forth any argument in her opposition to the defendants' motion for summary

21

judgment on a particular claim constituted abandonment of the claim); Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014) (finding that the plaintiffs waived a claim after they did nothing to develop the claim and did not address it in their summary judgment papers).

### D. Punitive Damages

Sig Sauer also moves for summary judgment on Plaintiffs' claims for punitive damages, arguing that punitive damages are not authorized under Massachusetts law for the causes of action pleaded. In Massachusetts, "[p]unitive damages are not favored" and are not available "absent statutory authorization." Pine v. Rust, 535 N.E.2d 1247, 1249 (Mass. 1989). Plaintiffs seek punitive damages in connection with their claims of negligence, breach of the implied warranty of merchantability, negligent infliction of emotional distress, and violation of Massachusetts General Laws Chapter 93A.

Plaintiffs have not identified, and the Court has not found, any Massachusetts statute authorizing punitive damages for their common-law claims. Accordingly, Plaintiffs may not recover punitive damages under those claims. See DeRose v. Putnam Mgmt. Co., 496 N.E.2d 428, 432 (Mass. 1986) ("In this Commonwealth there is no such thing known to the common law as the recovery of punitive damages in addition to compensatory damages." (quoting Boott Mills v. Bos. & Me. R.R., 106 N.E. 680, 683 (Mass. 1914))). However,

Plaintiffs may pursue multiple damages under Chapter 93A. That statute permits the Court to award double or treble damages if it finds that Sig Sauer engaged in unfair or deceptive acts or practices "willful[ly] or knowing[ly]." Mass. Gen. Laws ch. 93A, § 9(3).

**ORDER**

For the foregoing reasons, Sig Sauer's motion to exclude Tertin's testimony (Dkt. 72) is **DENIED**. Sig Sauer's motion to exclude Vigilante's testimony (Dkt. 71) is **DENIED IN PART** with respect to his causation testimony and **ALLOWED IN PART** with respect to his design testimony. Sig Sauer's motion for summary judgment (Dkt. 70) is **ALLOWED** with respect to Plaintiffs' claim of intentional infliction of emotional distress and their request for punitive damages under their common-law claims and is otherwise **DENIED**.


SO ORDERED.

/s/  PATTI B. SARIS
Patti B. Saris
United States District Judge