# EXHIBIT E

Transcribed Trial Testimony of David
Cahn that was video recorded and
played for the Jury

# DavidCahn-editedfortrial

Designation List Report

 **Cahn, David**                                    **2025-06-25**

| | |
|---|---|
| Our Designations | 00:43:49 |
| **TOTAL RUN TIME** | **00:43:49** |



**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| 6:15 - 6:18 | **Cahn, David 2025-06-25** | 00:00:06 | **DavidCahn-edite** |
|  |  |  | **dfortrial.9** |

6:15      Do you solemnly swear to tell the truth, the

6:16      whole truth, and nothing but the truth, so help you, God, or

6:17      you so affirm.

6:18      THE WITNESS:  I do.

| 7:01 - 11:19 | **Cahn, David 2025-06-25** | 00:06:15 | **DavidCahn-edite** |
|  |  |  | **dfortrial.10** |

7:01    Q.   Good afternoon, Doctor.  Thank you for joining us

7:02      today.

7:03      Could we begin by, let's begin by having you

7:04      introduce yourself to the jury.

7:05    A.   So my name is Dr. David Cahn.  I am a board certified

7:06      urologist.  I'm licensed by the State of Pennsylvania.  I

7:07      practice both general urology and subspecialize in urologic

7:08      oncology.

7:09    Q.   Could you explain to us what the field of urology

7:10      entails and what a urologist does?

7:11    A.   The field of urology studies and cares for both

7:12      urinary and sexual health of both male and female patients.

7:13    Q.   As you sit here today, do you have information about

7:14      the injuries suffered by Officer Jacques Desrosiers on

7:15      October 10th, 2019?

7:16    A.   Yes, I do.

7:17    Q.   Did you have the ability to evaluate Officer

7:18      Desrosiers to assess his injuries and his prognosis?

7:19    A.   Yes.

7:20    Q.   And do you have opinions about the cause of his

7:21      injury, the extent of his injuries and his prognosis?

7:22    A.   Yes.

7:23    Q.   Okay.  Before we get into those, let's talk a bit

7:24      about your background.  I want to talk about your

7:25      qualifications.

8:01      Could you please tell the jury about your

8:02      background qualifications

8:03    A.   Absolutely.

8:04      So, um, after graduating, uh, from undergraduate

8:05      in, uh, Pre-Medical Studies, Medical Anthropology,

8:06      Washington University in St. Louis, I then did a master's,

8:07      uh, by medical science where I spent a year doing research

8:08      at University of Medicine Dentistry of New Jersey, which is

8:09      now part of Rutgers.

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| 8:10 | | And then I enrolled in medical school at the |
| 8:11 | | Philadelphia College of Osteopathic Medicine.  I graduated |
| 8:12 | | from there in 2012. |
| 8:13 | | I subsequently did a five-year urologic surgery |
| 8:14 | | residency at Einstein Healthcare Network, which is now part |
| 8:15 | | of Jefferson Hospital.  That was a Level 1 Trauma Center |
| 8:16 | | where we managed, uh, traumatic injuries both from a surgery |
| 8:17 | | perspective and a urologic perspective very frequently. |
| 8:18 | | After that, I completed a two-year fellowship |
| 8:19 | | at the Fox Chase Cancer Center, subspecializing in urologic |
| 8:20 | | oncology. |
| 8:21 | | Since then, I have been an attending physician, |
| 8:22 | | uh, and surgeon at MidLantic Urology in the suburbs of |
| 8:23 | | Philadelphia where I care for both, uh, malignant and benign |
| 8:24 | | decease. |
| 8:25 | | We cover multiple hospitals but one of which for |
| 9:01 | | the last, uh, six to seven years of my practice has been a |
| 9:02 | | Level 2 Trauma Center.  Um, so again, a lot of experience |
| 9:03 | | with urologic trauma and urologic injuries. |
| 9:04 | Q. | I was going to say since graduating medical school, |
| 9:05 | | it sounded like all of your experience was in the field of |
| 9:06 | | urology.  Is that fair? |
| 9:07 | A. | That's correct. |
| 9:08 | Q. | Okay.  What type of trauma would you see through |
| 9:09 | | your residency and your practice as it relates to urological |
| 9:10 | | injuries? |
| 9:11 | A. | So urologic injuries are a common component of |
| 9:12 | | abdominal trauma in multi-organ system trauma.  So |
| 9:13 | | penetrating trauma with bullet wounds, uh, is something |
| 9:14 | | we saw very common. |
| 9:15 | | Um, so the genitalia, the kidneys, the ureters, |
| 9:16 | | the bladder.  We have covered all, all components of, uh, |
| 9:17 | | urologic organs, um, both from penetrating -- again, that |
| 9:18 | | would be more bullet, stab wounds -- and also blood |
| 9:19 | | traumas, uh, car accidents, motor vehicle accidents, airbag |
| 9:20 | | deployment, et cetera, um.  And we would continue that. |
| 9:21 | | So that was both as a resident, um, at Einstein |
| 9:22 | | at a Level 1 Trauma Center and also as a attending, um, at |
| 9:23 | | a Level 2 Trauma Center, which was Crozier Medical Center up |
| 9:24 | | until its closure approximately a month or two ago. |
| 9:25 | Q. | What type of symptoms would you see and would you |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

10:01   treat, um, when somebody comes in with trauma to their
10:02   reproductive organs --
10:03   A.   The --
10:04   Q.   -- specifically for --
10:05   A.   The most common complaint that we see is blood in the
10:06   urine, we call that hematuria, um, but there can be a very
10:07   wide range, wide array of symptoms depending upon which
10:08   urological organ is involved.  So anything from skin and
10:09   soft tissue injuries to deeper urologic traumas, uh, we've
10:10   done surgery on kidneys to save them during traumas,
10:11   ureters, bladders, complex repairs and reconstruction.
10:12   Q.   In connection to your professional career, you have
10:13   prepared what is called a CV or a resume; correct?
10:14   A.   Yes.
10:15   Q.   Let me show you what has been remarked as Plaintiffs'
10:16   Exhibit 251 just for your screen.
10:17   *  *  *  (Plaintiffs' Exhibit 251 was received into
10:18   evidence.)
10:19   BY MR. HURD:
10:20   Q.   Can you identify what we are looking at here?
10:21   A.   That's my CV.
10:22   Q.   Okay.  And is this the most up-to-date copy?
10:23   A.   Yes.
10:24   Q.   Were you retained to evaluate Officer Desrosiers for
10:25   his urological injuries?
11:01   A.   Yes.
11:02   Q.   Have you been paid for your time in reviewing records
11:03   and meeting with him and issuing the report and testifying
11:04   today?
11:05   A.   Yes.
11:06   Q.   What is your hourly rate in connection to your
11:07   participation?
11:08   A.   $600 an hour.
11:09   Q.   Okay.  And is there a flat fee for depositions or
11:10   testimony?
11:11   A.   Yes.  It's $5,000.
11:12   Q.   In connection to your practice today, do you continue
11:13   to see people with trauma, um, urological trauma?
11:14   A.   Yes.
11:15   MR. HURD:  Okay.  With that, I offer Dr. Cahn as
11:16   an expert in the field of urology.

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 11:17  Any objection? | | |
| | 11:18  MS. DEVINE:  Can you hear me?  I said no | | |
| | 11:19  objection. | | |
| 13:05 - 14:25 | **Cahn, David 2025-06-25** | 00:02:29 | **DavidCahn-edite** |
| | 13:05  Q.  Dr. Cahn, I'm now going to ask you some questions | | **dfortrial.2** |
| | 13:06  about things that you reviewed and what you did in | | |
| | 13:07  connection to your evaluation of Officer Desrosiers and then | | |
| | 13:08  about your opinions.  Okay? | | |
| | 13:09  A.  Yes. | | |
| | 13:10  Q.  Uh, do you hold and will you state all of your | | |
| | 13:11  opinions within a reasonable degree of medical certainty? | | |
| | 13:12  A.  Yes. | | |
| | 13:13  Q.  And can you promise not to offer an opinion unless it | | |
| | 13:14  is held to a reasonable degree of medical certainty? | | |
| | 13:15  A.  Yes. | | |
| | 13:16  Q.  Before testifying today, did you have the chance to | | |
| | 13:17  review Officer Desrosiers's medical records? | | |
| | 13:18  A.  I did. | | |
| | 13:19  Q.  Can you tell us what you reviewed? | | |
| | 13:20  A.  So I reviewed, uh, the initial complaint.  I | | |
| | 13:21  reviewed, um, a few files. | | |
| | 13:22  So there was the Massachusetts General Hospital | | |
| | 13:23  medical records, um, from October 10th, um, to 12th.  Those | | |
| | 13:24  charges and payments associated with that. | | |
| | 13:25  His subsequent follow-up, uh, through about June | | |
| | 14:01  6th. | | |
| | 14:02  And then his physical therapy charges, payments, | | |
| | 14:03  medical records. | | |
| | 14:04  I reviewed his psychologic evaluation, uh, from | | |
| | 14:05  Dr. Annunziata, um, as well as the Atrius Health records | | |
| | 14:06  from October 19 to 20 -- uh, to 22 as well as the evaluation | | |
| | 14:07  by Dr. Romirowsky. | | |
| | 14:08  And then there was lab results from Quest from | | |
| | 14:09  January 11th, 2024 and January 31st, 2024. | | |
| | 14:10  I reviewed all those to write my report.  Um, | | |
| | 14:11  and then subsequently, um, I have been able to review some, | | |
| | 14:12  some older records, um, that were even prior to his injury | | |
| | 14:13  over the last week.  I've been able to review those records. | | |
| | 14:14  Q.  And they were records from back in January 2018 and | | |
| | 14:15  July 2018 through October 19th? | | |

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

14:16    A.   Correct.

14:17    Q.   Okay. Did you rely on these records in connection to

14:18       your assessment of Officer Desrosiers in the formation of

14:19       your opinions without his injury?

14:20    A.   All of the records except for the ones prior to the

14:21       injury which I did not have when writing the report.

14:22    Q.   Okay. Um, for the opinions that you are going to be

14:23       issuing today, do they incorporate the prior records?

14:24    A.   Yes, so my opinions today will incorporate the prior

14:25       records.

| 16:02 - 22:11 | **Cahn, David 2025-06-25** | 00:09:33 | **DavidCahn-edite dfortrial.3** |

16:02    Q.   Doctor, based on your review of the records you just

16:03       mentioned, can you tell us what you learned about Officer

16:04       Desrosiers's, um, condition and injury?

16:05    A.   So on October 10th, 2019, uh, Officer Desrosiers

16:06       suffered a gunshot wound. That bullet went through the

16:07       penis, went through the scrotum specifically on the right

16:08       side and then lodged into the left leg.

16:09       So he was brought to, uh, Massachusetts General

16:10       Hospital as an emergent trauma; and he underwent both the

16:11       primary and secondary survey in the trauma bay and, uh,

16:12       emergent urologic surgery.

16:13       So he was found to have lacerations to the

16:14       penis, specifically the penial shaft and the glands, and had

16:15       a lot of that skin and soft tissue removed. So we call that

16:16       a degloving injury.

16:17       At that time, he underwent imaging, so he had a

16:18       CT as well as an ultrasound.

16:19       The CT showed that there was active bleeding

16:20       inside the scrotum, and the ultrasound was consistent with

16:21       what we call a testicular rupture.

16:22       And I can explain more what that is, but the

16:23       testicle is covered with a fibrous connective tissue. We

16:24       call that the tunica. And the bullet went right through

16:25       the tunica, so the inside of the testicle, which is the

17:01       seminiferous tubules. Those make and contain the sperm.

17:02       Those were actually falling out because the covering was

17:03       forcibly removed with the bullet. Um, and then, again, it

17:04       traversed into the left leg and lodged there.

17:05       So he was brought to the Operating Room for an

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

17:06   emergent exploration and repair. Uh, the team washed out
17:07   that area; um, had to remove, uh, the large hematoma which
17:08   is the collection of blood in the testicle; had to stop the
17:09   bleeding that was actively going on from the testicle from
17:10   the vascular injury; and then remove about two-thirds of the
17:11   testicle on that right side.
17:12   They were able to salvage a small portion of it.
17:13   And then they repaired the soft tissue, um, both in the
17:14   scrotum and the penis, the skin, um, both -- you know,
17:15   again both in the penis and scrotal areas as well.
17:16   Q.   Was there any indication about the depth of the
17:17   injury?
17:18   A.   Yes. So the most important place to look is the
17:19   operative report because in the Operating Room, the patient
17:20   is under anesthesia. That is where you can get the best
17:21   detail exam.
17:22   And in the Operative Report, there was no damage
17:23   to the skin, the soft tissue, and the erectile tissues of
17:24   the penis.
17:25   So the erectile tissues are called the corpora
18:01   bodies or the corpora cavernosum. So the bullet went
18:02   through that as well.
18:03   Again, that also has a fibrous covering just
18:04   like the testicle does, and both of those were severely
18:05   damaged.
18:06   Q.   Let's talk about the corpus cavernosum. What is,
18:07   what is that organ or, or part of an organ, and what does it
18:08   do anatomically?
18:09   A.   So the corpora cavernosum is, you can think of it
18:10   like a sponge; and it is a long cylinder in the penis that
18:11   fills with blood with appropriate sexual stimulation, the
18:12   appropriate vascular and nervous system stimulation.
18:13   When it fills with blood, the blood sits within
18:14   that fibrous sac and can give a male an erection.
18:15   Q.   Would it be helpful if we had an illustration of the
18:16   male anatomy, uh, to continue explaining this to the jury?
18:17   A.   Yes.
18:18   MR. HURD: Okay. Let me show you what has been
18:19   premarked as Plaintiffs' Exhibit 252.
18:20   *  *  *  (Plaintiffs' Exhibit 252 was received into
18:21   evidence.)

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 18:22 | BY: MR. HURD: | | |
| | 18:23 | Q. Take a look at that and let us know, is this a fair | | |
| | 18:24 | depiction of the male anatomy? | | |
| | 18:25 | A. Yes, this is a very accurate depiction of male | | |
| | 19:01 | anatomy. | | |
| | 19:02 | Q. Okay. Can you use this to continue explaining the | | |
| | 19:03 | corpus cavernorosum and, um, how Officer Desrosiers's corpus | | |
| | 19:04 | cavernorosum was injured and affected? | | |
| | 19:05 | A. Absolutely. | | |
| | 19:06 | Um, so if we look at the image on the left side | | |
| | 19:07 | where the dotted line is, that is approximately where the | | |
| | 19:08 | bullet entered the penis. | | |
| | 19:09 | Um, it travelled through the skin, which you can | | |
| | 19:10 | see, um, the soft tissue, which on the right-sided diagram | | |
| | 19:11 | you can see, uh, where it's labeled connective tissue. | | |
| | 19:12 | Um, and then it exited the glands. So the | | |
| | 19:13 | glands is the bulbus end of the penis. | | |
| | 19:14 | The corpora cavernorosum as it's diagrammed on | | |
| | 19:15 | the right again is that potential space that can fill with | | |
| | 19:16 | blood with stimulation. | | |
| | 19:17 | So the bullet traversed through that area and | | |
| | 19:18 | caused damage to the erectile bodies. | | |
| | 19:19 | Q. And what happens when damage is caused to the | | |
| | 19:20 | erectile bodies? | | |
| | 19:21 | A. So the way that a normal erection will work is that | | |
| | 19:22 | with appropriate stimulation, blood goes through the arteries | | |
| | 19:23 | and into the penis. It fills the corpora cavernosum on both | | |
| | 19:24 | sides until the pressure gets high enough that the vein gets | | |
| | 19:25 | compressed and the blood does not leave the penis. So it | | |
| | 20:01 | sits in the penis and the male can have an erection. | | |
| | 20:02 | When there is damage to nerves, the sensorium | | |
| | 20:03 | may be, may be disrupted. | | |
| | 20:04 | When there's damage to the vascular structures, | | |
| | 20:05 | both the inflow or the outflow can be disrupted. | | |
| | 20:06 | And when there's damage to the corpora bodies, | | |
| | 20:07 | you can have both leak of blood, you can have scar tissue | | |
| | 20:08 | formation. | | |
| | 20:09 | Um, all three of those were damaged in Officer | | |
| | 20:10 | Desrosiers's case by the bullet. | | |
| | 20:11 | Q. Before testifying today, even before issuing your | | |
| | 20:12 | report, did you have the opportunity to meet with Officer | | |

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

20:13      Desrosiers?

20:14  A.   I did.

20:15  Q.   Tell us about that meeting.

20:16  A.   So we met via a telehealth visit. Um, that was on

20:17      January 8th, 2024 initially. Um, at that time, we talked

20:18      about the downstream complications and ramifications that he

20:19      has had since this traumatic injury.

20:20      Um, the largest issues that he has had has been

20:21      pain: pain in the penis, pain in the scrotum, pain in the

20:22      leg; numbness; erectile dysfunction.

20:23      He has also suffered from associated, uh,

20:24      psychiatric and psychological issues since this, um, but,

20:25      but pain, anxiety, erectile dysfunction, uh, loss of libido,

21:01      numbness, um, have all been associated with, uh, downstream

21:02      complications from this injury.

21:03  Q.   Did he explain to you how, if it at all, it affected

21:04      his daily life or his relationship with his wife?

21:05  A.   He did. So he had had some very minor erectile

21:06      dysfunction prior to the injury. He had used sildenafil,

21:07      which is an oral medication for erections. He was using

21:08      60 milligrams, which is a very mild to moderate dose.

21:09      Just to put it into context, the highest dose

21:10      is 100 milligrams, so it's about 60 percent of the highest

21:11      dose, and that was working when he needed it.

21:12      Since the injury, medications were not working.

21:13      He was unable to obtain an erection. He was having pain

21:14      with touching of his penis, his scrotum, and his leg. Um,

21:15      that had had a severe impact on his sexual health, his

21:16      marriage, and his quality of life.

21:17  Q.   You mentioned that he had taken sildenafil prior to

21:18      this injury, the 60 milligrams. Is there a prevalence of

21:19      erectile defunction -- dysfunction among men that increases

21:20      as they age?

21:21  A.   Absolutely. It's very common.

21:22  Q.   Okay. And was Officer Desrosiers in that bracket, so

21:23      to speak, prior to this injury happening?

21:24  A.   Yes. I would call it well controlled and on the mild

21:25      side.

22:01  Q.   Is ED, erectile dysfunction alone, without the trauma

22:02      of being shot in the penis and testicles, something that is

22:03      readily treatable?

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

22:04   A.   Very.

22:05   Q.   And what is the most common treatment?

22:06   A.   Most common treatment will be oral medication:

22:07        Viagra, Cialis.  There are second and third line

22:08        medications, if we need them.

22:09   Q.   Okay.  And based on what you saw, that was working

22:10        for Officer Desrosiers prior to this incident?

22:11   A.   Yes.

| 23:06 - 28:03 | **Cahn, David 2025-06-25** | 00:07:07 | **DavidCahn-edite dfortrial.4** |
|---|---|---|---|

23:06        Had this trauma not happened to Officer

23:07        Desrosiers's penis, what, if anything, would you have

23:08        expected the outcome to be in terms of him continuing to use

23:09        sildenafil?

23:10        MS. DEVINE:  And I would object on undisclosed

23:11        opinions but not on the phrasing of the question.

23:12        MR. HURD:  Go ahead.  You can answer.

23:13        BY THE WITNESS:

23:14   A.   I would expect that his erectile dysfunction would

23:15        be well treated, uh, for a long period of time with that

23:16        medication.

23:17   Q.   When somebody is treating erectile dysfunction with a

23:18        medication like sildenafil and then suffers a trauma, what,

23:19        if anything, could, um, impede the sildenafil from

23:20        continuing to work?

23:21   A.   Well, there's many, there's many things because, you

23:22        know, as everybody has seen on, uh, seen on advertisements,

23:23        sildenafil is supposed to work or tadalafil or any of

23:24        these medications are supposed to work with appropriate

23:25        stimulation, appropriate sexual stimulation.

24:01        So you need nerves that work; right?  So in

24:02        Mr. Desrosiers's case, um, with both nerve dysfunction,

24:03        neuropathy, numbness, pain, that's going to inhibit

24:04        sildenafil from working.

24:05        Second is that when you take, uh, sildenafil, it

24:06        works via the nitric oxide pathway and causes some openings,

24:07        some dilation we call it, of the blood vessels; and if the

24:08        blood vessels are damaged, that's not going to work.

24:09        Additionally, when you have a bullet to the

24:10        corpora, you'll have fibrosis.  Fibrosis means scarring.

24:11        And if that area can't open up and fill with blood, then you

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 24:12 | can't have an erection in that regard either. | |
| | 24:13 | So there's multiple reasons from this bullet | |
| | 24:14 | injury that his erections won't work even with sildenafil. | |
| | 24:15 | Q. Let's talk about your opinions about Officer | |
| | 24:16 | Desrosiers's, um, injury. | |
| | 24:17 | What is your opinion? | |
| | 24:18 | A. So my opinion is that the injury to the penis, | |
| | 24:19 | specifically the degloving injury, the injury to the corpora | |
| | 24:20 | bodies, the glands, the testicular injury, uh, the rupture, | |
| | 24:21 | the removal of most of the testicle was caused directly by | |
| | 24:22 | the penetrating bullet trauma. | |
| | 24:23 | The long term ramifications of that, which are | |
| | 24:24 | worsening of some very mild erectile dysfunction, pain, | |
| | 24:25 | numbness, associated psychological effects from the trauma, | |
| | 25:01 | uh, are going to be longstanding. | |
| | 25:02 | The scarring will be permanent. | |
| | 25:03 | Um, the erectile dysfunction will likely be | |
| | 25:04 | permanent as well. | |
| | 25:05 | Um, and I think that from a urologic perspective, | |
| | 25:06 | the prognosis of this will be challenging and, and will | |
| | 25:07 | require constant care, um, monitoring, really multidisciplinary | |
| | 25:08 | care from both pain management, psychiatric or psychology, | |
| | 25:09 | urology, um, and potentially endocrinology, orthopedics as | |
| | 25:10 | well. | |
| | 25:11 | Q. Would you say you are optimistic or negative about | |
| | 25:12 | Officer Desrosiers's, uh, prognosis? | |
| | 25:13 | A. From a urologic perspective, uh, I am, uh, | |
| | 25:14 | pessimistic regarding the erectile recovery, um, the long | |
| | 25:15 | term pain control in the penis and scrotum. | |
| | 25:16 | Q. Have all the opinions you've just been given to us | |
| | 25:17 | been stated to a reasonable degree of medical certainty. | |
| | 25:18 | A. Yes. | |
| | 25:19 | Q. Let me take a step back briefly. | |
| | 25:20 | You mentioned seeing Officer Desrosiers through | |
| | 25:21 | a telehealth visit.  Um, what exactly is a telehealth visit? | |
| | 25:22 | A. So a telehealth visit utilizes both audio and video | |
| | 25:23 | to discuss, in my case, urologic needs, urologic issues that | |
| | 25:24 | go on with patients. | |
| | 25:25 | Q. Is that the kind of thing that is done by Zoom, you | |
| | 26:01 | see each other and talk to each other in realtime? | |
| | 26:02 | A. All the time. | |

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

26:03  Q.  Did you have a subsequent telehealth visit with
26:04      Office Desrosiers?
26:05  A.  Yes, I had a second one, uh, on December 13th, 2024.
26:06  Q.  Now, naturally with a telehealth visit, you don't
26:07      have the opportunity to physically touch the patient that
26:08      you are examining; right?
26:09  A.  Correct.
26:10  Q.  In this particular case, with your evaluation of
26:11      Officer Desrosiers, what, if anything, is lost by that?
26:12  A.  Nothing.
26:13  Q.  Did you actually see Office Desrosiers's, uh, penis
26:14      and scrotum through the technology you were using?
26:15  A.  Yes.
26:16  Q.  Did you actually see his scarring?
26:17  A.  I did.
26:18  Q.  Um, describe that scarring for us.  Where is it
26:19      located?
26:20  A.  So the scarring is primarily located in the penile
26:21      shaft on the right side as well as the glands, and he has
26:22      got some scarring in the scrotum as well.
26:23      The glands, which we looked at on the picture
26:24      before, looks asymmetric, so the left and the right side
26:25      look very different.
27:01  Q.  Do you have any opinion about the permanency of that
27:02      scarring and disfigurement on his penis and glands?
27:03  A.  Yes, I do.  It's permanent.
27:04  Q.  Do you have any opinion about whether Officer
27:05      Desrosiers will ever return to a normal healthy sexual life?
27:06  A.  From a urologic perspective, uh, he has met all the
27:07      recovery at this point that he can get.
27:08      Um, I think that dealing with the chronic pain
27:09      cycle will be challenging, and that will severely impact the
27:10      ability to go through second and third line treatments for
27:11      the erections.  Um, they are certainly limited with what he
27:12      has been through.
27:13  Q.  Just as a matter of some housekeeping, um, prior to
27:14      today you prepared a report; correct?
27:15  A.  Yes.
27:16      MR. HURD:  Let me show you what has been
27:17      premarked as Exhibit, Plaintiffs' Exhibit 250, just for your
27:18      screen.

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 27:19   * * * (Plaintiffs' Exhibit 250 was received into | | |
| | 27:20      evidence.) | | |
| | 27:21      BY MR. HURD: | | |
| | 27:22   Q. Is this a copy of that report? | | |
| | 27:23   A. Yes, it is. | | |
| | 27:24      MR. HURD: I've marked this for identification | | |
| | 27:25      purposes only. | | |
| | 28:01      With that, Doctor, I have no further questions | | |
| | 28:02      for you right now, but Ms. Devine may. | | |
| | 28:03      MS. DEVINE: Thank you very much. | | |
| 28:11 - 33:17 | **Cahn, David 2025-06-25** | 00:06:39 | **DavidCahn-edite** |
| | 28:11   Q. Good afternoon, Dr. Cahn. | | **dfortrial.5** |
| | 28:12   A. Good afternoon. | | |
| | 28:13   Q. My name is Alaina Devine. I'm one of the lawyers for | | |
| | 28:14      Sig Sauer in this case and I just have a few questions for | | |
| | 28:15      you. | | |
| | 28:16      You, Dr. Cahn, are an expert consultant hired by | | |
| | 28:17      the plaintiffs in this case; correct? | | |
| | 28:18   A. Yes. | | |
| | 28:19   Q. And you have not provided any medical treatment to | | |
| | 28:20      Mr. Desrosiers; correct? | | |
| | 28:21   A. Correct. | | |
| | 28:22   Q. And I think you went through this already on direct | | |
| | 28:23      examination, but you've never actually physically met in | | |
| | 28:24      person with Mr. Desrosiers; correct? | | |
| | 28:25   A. Correct. | | |
| | 29:01   Q. So in connection with your work in this case, you | | |
| | 29:02      didn't conduct any physical evaluation of Mr. Desrosiers; | | |
| | 29:03      correct? | | |
| | 29:04   A. We did via telehealth. | | |
| | 29:05   Q. An in-person hands-on physical evaluation of him; | | |
| | 29:06      correct? | | |
| | 29:07   A. Yes. | | |
| | 29:08   Q. Okay. And up until -- today is June 25th, 2025. Up | | |
| | 29:09      until about a week ago, you had never reviewed any prior | | |
| | 29:10      medical records for Mr. Desrosiers, including his prior | | |
| | 29:11      medical records related to his erectile dysfunction; | | |
| | 29:12      correct? | | |
| | 29:13   A. Um, the additional records that I was given, uh, were | | |
| | 29:14      mainly endocrinology records regarding the hypogonadism. | | |

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

29:15   Q.   Okay.  Were you ever provided with his records for
29:16         his prior erectile dysfunction?
29:17   A.   Um, subsequent to, uh, writing this report.
29:18   Q.   You discussed briefly on direct exam Mr. Desrosiers's
29:19         acute, um, injuries as a result of the discharge.  You would
29:20         agree with me that he healed from those injuries without
29:21         complications; correct?
29:22   A.   Yes.
29:23   Q.   You would agree with me that he was medically cleared
29:24         from Urology at Mass General Hospital in June of 2020;
29:25         correct?
30:01   A.   Yes.
30:02   Q.   And you would agree with me, Dr. Cahn, that since
30:03         June of 2020, Mr. Desrosiers has not sought any further
30:04         urological treatment or care; correct?
30:05   A.   Yes; and I think that the reason that men in general
30:06         don't seek additional care is because erectile dysfunction
30:07         is a very complex thing that is often underreported and
30:08         underappreciated in the male population.  There are studies
30:09         that show that, you know, 40 to 50 percent of men suffer
30:10         with erectile dysfunction but likely it's way more.
30:11   Q.   Despite that, you see patients in your practice on a
30:12         daily basis for erectile dysfunction; correct?
30:13   A.   Yes.
30:14   Q.   Okay.  And the prognosis of men especially of Mr.
30:15         Desrosiers's age with erectile dysfunction is generally
30:16         pretty good; correct?
30:17   A.   Uh, without genital trauma, yes, very good.
30:18   Q.   And you have certainly treated patients that have
30:19         genital trauma for erectile dysfunction and had positive
30:20         outcomes; correct?
30:21   A.   Yes.
30:22   Q.   You did go through this a bit on direct, but you
30:23         would agree with me, Dr. Cahn, that erectile dysfunction
30:24         increases with age; correct?
30:25   A.   Yes.
31:01   Q.   And the same thing with hypogonadism; correct?
31:02   A.   Yes.
31:03   Q.   And can you describe for the jury what hypogonadism
31:04         is, please?
31:05   A.   Hypogonadism is low testosterone and its symptoms

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

31:06  associated with that.

31:07  Q.  You treat patients regularly, um, for hypogonadism

31:08  and the prognosis is good; correct?

31:09  A.  Yes.

31:10  Q.  You also discussed, um, neuropathy.  Do you recall

31:11  that testimony on direct exam?

31:12  A.  Yes.

31:13  Q.  And neuropathy is another condition that you've seen

31:14  or you regularly see in your current clinical practice;

31:15  correct?

31:16  A.  All the time, yes.

31:17  Q.  Okay.  And neuropathy is something that can be

31:18  treated; correct?

31:19  A.  Yes.

31:20  Q.  You've testified that you met with Mr. Desrosiers

31:21  twice, once in January of 2024 and then once in December of

31:22  2024; correct?

31:23  A.  Yes.

31:24  Q.  Both of those were by telehealth; correct?

31:25  A.  Yes.

32:01  Q.  And when you met with Mr. Desrosiers for the first

32:02  time in January 2024, he actually told you he had no history

32:03  of erectile dysfunction; correct?

32:04  A.  Yes.

32:05  Q.  And, in fact, you wrote in your report that prior to

32:06  his injury, he had no significant erectile dysfunction and

32:07  would have sexual activity approximately twice per week with

32:08  his spouse; correct?

32:09  A.  Yes.

32:10  Q.  And you later found out that that was not actually

32:11  true; correct?

32:12  A.  I believe that even mild erectile dysfunction -- mild

32:13  treated erectile dysfunction is certainly, you know, not

32:14  inhibiting sexual activity, um, you know, if they're able to

32:15  obtain and maintain an erection.

32:16  Q.  Well, have you seen the records of Mr. Desrosiers's

32:17  prior erectile dysfunction where he reports that since

32:18  January of 2018 for the rear -- year prior, his erectile

32:19  dysfunction had been causing strain on his marriage,

32:20  difficulty to obtain erection with no sex drive?  Have you

32:21  seen that record?

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

32:22　A.　I did, yes.

32:23　Q.　That was not something Mr. Desrosiers disclosed to

32:24　　　you during your first meeting with him; correct?

32:25　A.　Correct.

33:01　Q.　Okay. And between January of 2024 and December of

33:02　　　2024, did Mr. Desrosiers ever contact you to fix that

33:03　　　misstatement?

33:04　A.　He did not.

33:05　Q.　Okay. And it was only after you, um, read the

33:06　　　report from Dr. Mourtzinos that you then had the

33:07　　　conversation with Mr. Desrosiers about his prior erectile

33:08　　　dysfunction; correct?

33:09　A.　Yes.

33:10　Q.　Okay. And that's because Mr. Desrosiers disclosed

33:11　　　to Dr. Mourtzinos during his physical evaluation of him his

33:12　　　prior erectile dysfunction; correct?

33:13　A.　Yes.

33:14　Q.　Dr. Cahn, you have testified about some trauma to the

33:15　　　penile shaft, um, and some of the tissues there. You are

33:16　　　aware that in the MGH operative report, they found there was

33:17　　　no deep tissue injury; correct?

| 36:10 - 41:21 | **Cahn, David 2025-06-25** | 00:07:35 | **DavidCahn-edite dfortrial.6** |

36:10　Q.　Dr. Cahn, I'm showing you on the screen here, um,

36:11　　　Exhibit 182 which is the Mass General, um, Hospital records.

36:12　A.　Yes, I see that.

36:13　Q.　Okay. And I'm going to draw your attention to the

36:14　　　last, um, page where there is discussion of, um, local

36:15　　　exploration of the penis.

36:16　　　Do you see this here at the bottom of the page?

36:17　A.　I do.

36:18　Q.　And it indicates there is no evidence of injury to

36:19　　　the deep tissue of the penis. Is that what that says?

36:20　A.　So what you are looking at --

36:21　Q.　I'm just asking you if that's what that says.

36:22　A.　So the wording is.

36:23　　　You're reading a trauma evaluation. This is

36:24　　　the secondary survey, and the operative report is much more

36:25　　　detailed about the depth of invasion because when you're

37:01　　　evaluating somebody in the trauma bay -- again, we talked

37:02　　　about the primary and secondary survey, ABCs in keeping

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| 37:03 | | somebody alive. |
| 37:04 | | This evaluation is not done by an urologist. |
| 37:05 | | This evaluation is done by the trauma team, not in the |
| 37:06 | | operating room, so the patient is awake, so you can't probe |
| 37:07 | | the penis to the same extent and can't evaluate the depth |
| 37:08 | | of injury like when somebody is under general anesthesia. |
| 37:09 | Q. | Sure.  You'd agree with me that the initial |
| 37:10 | | evaluation is that there was no evidence of injury to deep |
| 37:11 | | tissue of the penis; is that correct? |
| 37:12 | A. | That's correct.  That's what it says. |
| 37:13 | Q. | And certainly, um, Dr. Cahn, after the acute injury, |
| 37:14 | | Mr. Desrosiers was able to obtain an erection; correct? |
| 37:15 | A. | After the acute injury? |
| 37:16 | Q. | Yes. |
| 37:17 | A. | Uh, what he had said to me was that he had had so |
| 37:18 | | much pain that he has not been able to have an erection. |
| 37:19 | Q. | Would you disagree if there's indication in the |
| 37:20 | | records that he had pain with erection? |
| 37:21 | A. | So I think erectile dysfunction is both the ability |
| 37:22 | | to obtain and maintain an erection.  And if you have pain |
| 37:23 | | with attempting to get an erection and therefore unable to |
| 37:24 | | maintain an erection, that would also classify as erectile |
| 37:25 | | dysfunction. |
| 38:01 | Q. | Dr. Cahn, you indicated in your report and in your |
| 38:02 | | deposition that the penile pain that Mr. Desrosiers |
| 38:03 | | experiences is one of the primary inhibitors of his sexual |
| 38:04 | | functioning; correct? |
| 38:05 | A. | As I said before, there are multiple reasons that |
| 38:06 | | Office Desrosiers has erectile dysfunction since his trauma. |
| 38:07 | Q. | Right. |
| 38:08 | A. | Pain is one of those. |
| 38:09 | Q. | Well, you testified at your deposition that his |
| 38:10 | | limitation on sexual activity stems largely from his chronic |
| 38:11 | | pain; correct? |
| 38:12 | A. | Yes, I did. |
| 38:13 | Q. | Okay.  And you indicate pain is one of the primary |
| 38:14 | | reasons why you believe his erectile dysfunction cannot be |
| 38:15 | | adequately treated; correct? |
| 38:16 | A. | One of the reasons, yes. |
| 38:17 | Q. | And you indicate that his -- he indicated to you that |
| 38:18 | | he can't even be touched in those regions, his penis or his |

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

38:19    scrotum, without pain; correct?

38:20  A.  Correct.

38:21  Q.  And that's not something you were able to confirm

38:22    through palpating in a physical examination; correct?

38:23  A.  Yes.

38:24  Q.  You also indicate that, um, pain impacted his

38:25    activities of daily living, including walking; correct?

39:01  A.  That's what's he said, yes.

39:02  Q.  But you didn't observe Mr. Desrosiers walking;

39:03    correct?

39:04  A.  I did not observe him walking.

39:05  Q.  Okay.  And did you review any of his physical therapy

39:06    records indicating his current level of functioning?

39:07  A.  Um, I previously did review his, his physical therapy

39:08    records, yes.

39:09  Q.  With respect to, um, any future treatment for, um,

39:10    Mr. Desrosiers, you have the opinion, excuse me, that Mr.

39:11    Desrosiers would have benefitted from continuing to receive

39:12    treatment from urologic -- for his urological injuries;

39:13    correct?

39:14  A.  I think that that includes penile and scrotal pain

39:15    control.  Urologists deal with that all the time as well.  I

39:16    think that's an option.

39:17    But I think, again, urologic health and

39:18    long-term meeting with urologists, uh, to help both from a

39:19    urinary and sexual perspective helps every patient.

39:20  Q.  Right.  In fact, you recommend that Mr. Desrosiers

39:21    see a urologist every 6 to 12 months; correct?

39:22  A.  So that was based upon -- the every six months --

39:23    every 12 months I think is appropriate at this point for Mr.

39:24    Desrosiers.

39:25  Q.  Mr. Desrosiers, as we sit here in 2025, has not

40:01    sought any urological treatment since 2020; correct?  For

40:02    five years?

40:03  A.  Correct.

40:04  Q.  There is multiple treatment options that you've

40:05    discussed in your report and your deposition previously that

40:06    Mr. Desrosiers could seek out for his erectile dysfunction;

40:07    correct?

40:08  A.  He could.

40:09  Q.  And he has not attempted any of those; correct?

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 40:10 | A. | Correct. | | |
| | 40:11 | Q. | And what are some of those treatment options? | | |
| | 40:12 | A. | So treatment options, second line therapy after | | |
| | 40:13 | | medication include injectable intra-cavernosal injections, | | |
| | 40:14 | | so that's where patient's put a needle directly into the | | |
| | 40:15 | | corpora cavernosum which Officer Desrosiers had injured to | | |
| | 40:16 | | inject a combination of medications that can give a patient | | |
| | 40:17 | | an erection. | | |
| | 40:18 | | There is a additional, uh, suppository that can | | |
| | 40:19 | | be given through the urethra that can get absorbed that can | | |
| | 40:20 | | help with an erection. | | |
| | 40:21 | | And then lastly, there is an implant, both | | |
| | 40:22 | | inflatable and malleable, that is a surgical implant that | | |
| | 40:23 | | is, again, placed directly into the corpora bodies. | | |
| | 40:24 | Q. | And Mr. Desrosiers could also seek treatment for his | | |
| | 40:25 | | hypogonadism; correct? | | |
| | 41:01 | A. | He could.  He could. | | |
| | 41:02 | Q. | And that, that could have a secondary effect of | | |
| | 41:03 | | improving stress and anxiety; correct? | | |
| | 41:04 | A. | Yes. | | |
| | 41:05 | Q. | And it could improve sleeping, um, sexual desire, | | |
| | 41:06 | | libido; correct? | | |
| | 41:07 | A. | Yes. | | |
| | 41:08 | Q. | And it's true that Mr. Desrosiers has not -- had not | | |
| | 41:09 | | sought any treatment for his hypogonadism; correct? | | |
| | 41:10 | A. | Correct. | | |
| | 41:11 | Q. | And those are treatment options that are available to | | |
| | 41:12 | | him? | | |
| | 41:13 | A. | Yes. | | |
| | 41:14 | Q. | Dr. Cahn, um, Attorney Hurd went through some of | | |
| | 41:15 | | your, um, fees in this case.  Is it true that you've been | | |
| | 41:16 | | compensated approximately $16,000 for your work in this | | |
| | 41:17 | | case before your testimony today? | | |
| | 41:18 | A. | That's correct. | | |
| | 41:19 | | MS. DEVINE:  I have nothing further. | | |
| | 41:20 | | MR. HURD:  Very brief redirect. | | |
| | 41:21 | | REDIRECT EXAMINATION | | |
| 42:08 - 43:14 | **Cahn, David 2025-06-25** | | | 00:01:39 | **DavidCahn-edite dfortrial.7** |
| | 42:08 | Q. | Dr. Cahn, you were shown Plaintiffs' -- an excerpt of | | |
| | 42:09 | | Plaintiffs' Exhibit 182. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

42:10    MR. HURD: And let me pop that on the screen

42:11    briefly.

42:12    BY MR. HURD:

42:13  Q.  Do you recall seeing this a moment ago when

42:14    Ms. Devine was questioning you?

42:15  A.  Yes.

42:16  Q.  Okay. And what was it that was asked about, this

42:17    record?

42:18  A.  I was asked regarding the depth of invasion, uh, that

42:19    was assessed on the secondary survey as compared to the

42:20    depth of invasion in the operative report.

42:21  Q.  Okay. So in the -- what was the depth of invasion

42:22    initially reported in what I'm showing you right now?

42:23  A.  Uh, if you scroll down a little bit further towards

42:24    the secondary survey. So the primary survey is what we

42:25    talked about, the ABCs, that's how you keep patients alive.

43:01    The secondary is to try to identify any other injuries that

43:02    potentially need treatments.

43:03    So if you scroll down a little bit more to the

43:04    genitalia. On the initial trauma evaluation, they noticed a

43:05    degloving injury, which we talked about before, but that is

43:06    a traumatic removal of the skin and soft tissue, um, of the

43:07    shaft of his penis.

43:08    They did not -- on the second line, they did not

43:09    think that there was injury to the deep tissue of the penis,

43:10    um, on their secondary survey, but that was, uh, incorrect

43:11    when they looked at the operative report.

43:12  Q.  Okay. Let's take a look at that. Is that something

43:13    that you saw prior to issuing your opinions?

43:14  A.  Yes.

| 43:24 - 45:20 | **Cahn, David 2025-06-25** | 00:02:24 | **DavidCahn-edite dfortrial.8** |

43:24  Q.  Let me show you another excerpt of Plaintiffs'

43:25    Exhibit 182.

44:01    Have you seen this before?

44:02  A.  Yes.

44:03  Q.  What is this?

44:04  A.  This is the Operative Report from October 10th.

44:05  Q.  Okay. What did this reveal to you in comparison to

44:06    the report we looked at a moment ago?

44:07  A.  So again, this operative report is much more

**DavidCahn-editedfortrial**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 44:08 | detailed, a significantly more detailed exam, um, better | | |
| | 44:09 | understanding of the injury to Officer Desrosiers. | | |
| | 44:10 | Q. And what does it reveal about the depth of the | | |
| | 44:11 | penetrating injury? | | |
| | 44:12 | A. So that this was an extremely deep injury.  So if you | | |
| | 44:13 | look down the top of where you're highlighting. | | |
| | 44:14 | So the injury was deeper right into the corpora | | |
| | 44:15 | cavernosum.  That's -- where they say the "right corpus," | | |
| | 44:16 | that is the term urologists use for corpora cavernosum as | | |
| | 44:17 | well as the injury to the glands. | | |
| | 44:18 | The injury was so deep that they performed a | | |
| | 44:19 | cystoscopy, which you can see a little bit lower down. | | |
| | 44:20 | Cystoscopy is a flexible telescope inside the urethra.  The | | |
| | 44:21 | urethra is the tube that carries the urine from the bladder | | |
| | 44:22 | out through the penis.  And that is the center of the | | |
| | 44:23 | doughnut hole, you can think of it. | | |
| | 44:24 | And if the injury is so deep that they're | | |
| | 44:25 | evaluating the urethra, of course this is a deep injury. | | |
| | 45:01 | You can't just have a skin and soft tissue injury that is | | |
| | 45:02 | not deep if you're not evaluating, you know, all of these | | |
| | 45:03 | structures. | | |
| | 45:04 | So, again, the corpora cavernosum was injured. | | |
| | 45:05 | The surrounding tissue, the fibrous tissue on | | |
| | 45:06 | top of that was injured. | | |
| | 45:07 | And then to the testicle, the seminiferous | | |
| | 45:08 | tubules, which are the -- the most inner structure of the | | |
| | 45:09 | testicle was actually falling out, and it was dusty because | | |
| | 45:10 | it has no blood supply which was injured by the bullet. | | |
| | 45:11 | So, again, the testicle portion had to be -- | | |
| | 45:12 | portion of it had to be removed.  The seminiferous tubules, | | |
| | 45:13 | a portion of those were removed.  Active bleeding had to be | | |
| | 45:14 | controlled; and then a portion of the testicle was able to | | |
| | 45:15 | be salvaged. | | |
| | 45:16 | Q. Again, doctor, have all your opinions been stated to | | |
| | 45:17 | a reasonable degree of medical certainty? | | |
| | 45:18 | A. Yes. | | |
| | 45:19 | MR. HURD:  I have no further questions. | | |
| | 45:20 | MS. DEVINE:  Nothing further. | | |

Our Designations                                                    00:43:49

**TOTAL RUN TIME**                                    **00:43:49**