# EXHIBIT K

Transcribed Trial Testimony of Aaron Roth that was video recorded and played for the Jury

# AaronRoth

## Designation List Report

**Roth, Aaron**  2023-02-02

| Our Designations | 00:23:59 |
|---|---|
| **TOTAL RUN TIME** | **00:23:59** |



ID: AaronRoth

| | | | |
|---|---|---|---|
| | **AaronRoth** | | |
| DESIGNATION | SOURCE | DURATION | ID |
| 4:17 - 4:20 | **Roth, Aaron 2023-02-02** | 00:00:06 | **AaronRoth.1** |
| | 4:17    WHEREUPON, | | |
| | 4:18    AARON ROTH | | |
| | 4:19    was called as a witness and, after having been first duly | | |
| | 4:20    sworn, was deposed and testified as follows: | | |
| 6:04 - 14:02 | **Roth, Aaron 2023-02-02** | 00:12:31 | **AaronRoth.2** |
| | 6:04    Q.  What was your job on January 2, 2021? | | |
| | 6:05    A.  I was a Milwaukee Police Officer. | | |
| | 6:06    Q.  How long had you been a Milwaukee police officer | | |
| | 6:07    at that point? | | |
| | 6:08    A.  At that time it was about two and a half going on | | |
| | 6:09    three years. | | |
| | 6:10    Q.  So you joined around 2018/2019? | | |
| | 6:11    A.  Correct. | | |
| | 6:12    Q.  When you first joined the MPD, being the | | |
| | 6:13    Milwaukee Police Department, what sidearm were you issued? | | |
| | 6:14    A.  We were issued the Sig Sauer P320. | | |
| | 6:15    Q.  So you had a P320 your entire time with the | | |
| | 6:16    Milwaukee PD? | | |
| | 6:17    A.  Yes. | | |
| | 6:18    Q.  Prior to January 2, 2021, had you ever had any | | |
| | 6:19    issues with your P320? | | |
| | 6:20    A.  I had not. | | |
| | 6:21    Q.  How would you carry your P320 when you were on | | |
| | 6:22    duty? | | |
| | 6:23    A.  In my issued duty belt holster. | | |
| | 6:24    Q.  Do you know what type of holster it was, what | | |
| | 6:25    brand? | | |
| | 7:01    A.  I don't recall, no. | | |
| | 7:02    Q.  Okay.  Would you have an optic on your P320? | | |
| | 7:03    A.  We did not, no. | | |
| | 7:04    Q.  So it was just a plain gun? | | |
| | 7:05    A.  Plain gun with iron sights, yes. | | |
| | 7:06    Q.  No safety? | | |
| | 7:07    A.  No safety. | | |
| | 7:08    Q.  When I say "safety," just to clarify, I mean like | | |
| | 7:09    an external safety of some kind to prevent the trigger from | | |
| | 7:10    being pulled. | | |
| | 7:11    A.  Correct. | | |
| | 7:12    (Exhibit A was marked for identification.) | | |

| | | |
|---|---|---|
| 7:13 | | BY MR. CEISLER: |
| 7:14 | Q. | Okay. I'm going to show you a video, so I'm |
| 7:15 | | going to pull that up first. And my screen never wants to |
| 7:16 | | share when it's a video, but I think I've got it figured |
| 7:17 | | out. |
| 7:18 | | Can you see this? |
| 7:19 | A. | Yes. |
| 7:20 | Q. | Do you see in the bottom left it says, "D5 |
| 7:21 | | Northeast Parking 2:29 p.m., 1/2/21"? |
| 7:22 | A. | Yes. |
| 7:23 | Q. | I'm going to play the first two minutes of this |
| 7:24 | | video. I just want you to watch it, and then I'm going to |
| 7:25 | | ask you about specific points in it, okay? |
| 8:01 | A. | Okay. |
| 8:02 | Q. | For the record, this is the first two minutes of |
| 8:03 | | about an 8 minute and 23-second video. |
| 8:04 | A. | Okay. |
| 8:05 | Q. | Stopping the video at two minutes. |
| 8:06 | | Mr. Roth, have you seen this video before? |
| 8:07 | A. | I have, yes. |
| 8:08 | Q. | What does this video depict generally? |
| 8:09 | A. | That we're parking a vehicle. I was in the rear |
| 8:10 | | passenger seat. When I exited, my firearm discharged. |
| 8:11 | Q. | Does this video fairly and accurately depict that |
| 8:12 | | incident as you recall it? |
| 8:13 | A. | Yes. |
| 8:14 | Q. | Does this video in any way depict something |
| 8:15 | | different in your recollection of the events? |
| 8:16 | A. | No. |
| 8:17 | Q. | Do you have any reason to question the |
| 8:18 | | authenticity of this video? |
| 8:19 | A. | No. |
| 8:20 | Q. | So now I'm going to take it back to -- |
| 8:21 | | We're going to take it second by second, kind of |
| 8:22 | | chunk by chunk. |
| 8:23 | | So I'm going to go from 1:06, then I'm going to |
| 8:24 | | stop it at 1:15. |
| 8:25 | | So from 1:06 to 1:15, what do you see -- what's |
| 9:01 | | happening? |
| 9:02 | A. | We were returning from doing surveillance. |
| 9:03 | Q. | Who is "we"? |

| DESIGNATION | SOURCE | | | DURATION | ID |
|---|---|---|---|---|---|
| | 9:04 | A. | The driver is Travis Resczynski. | | |
| | 9:05 | Q. | Sorry. Can you spell that, please? | | |
| | 9:06 | A. | First name T-r-a-v-i-s. Last name | | |
| | 9:07 | | R-e-s-c-z-y-n-s-k-i, I believe. That could be off. | | |
| | 9:08 | | Steven Suvaka, who is the front passenger, | | |
| | 9:09 | | S-t-e-v-e-n S-u-v-a-k-a, and then the driver side passenger | | |
| | 9:10 | | -- rear passenger, Zachary Ramion, Z-a-c-h-a-r-y | | |
| | 9:11 | | R-a-m-i-o-n, and then myself, again, the rear passenger. | | |
| | 9:12 | | We had parked. Officer Suvaka and Ramion exited | | |
| | 9:13 | | the vehicle, as they had to use the restroom or some sort or | | |
| | 9:14 | | something inside the district station. | | |
| | 9:15 | Q. | I'll have to stop you there because I think | | |
| | 9:16 | | you're moving past 1:15, if that's okay. So I'm going to | | |
| | 9:17 | | take this in chunks. | | |
| | 9:18 | | So just to I make sure I have your recollection | | |
| | 9:19 | | correct, there are four officers in this vehicle. You're | | |
| | 9:20 | | the one in the rear passenger side. And you've just | | |
| | 9:21 | | returned from a surveillance. | | |
| | 9:22 | | Is that correct? | | |
| | 9:23 | A. | Yeah. | | |
| | 9:24 | Q. | You're in what looks like a red Nissan; is that | | |
| | 9:25 | | correct? | | |
| | 10:01 | A. | Yep. | | |
| | 10:02 | Q. | Whose red Nissan was that? | | |
| | 10:03 | A. | The Police Department's. | | |
| | 10:04 | Q. | Is that a vehicle you would often use for | | |
| | 10:05 | | surveillance? | | |
| | 10:06 | A. | Yes. | | |
| | 10:07 | Q. | Okay. So let's take the next 10 to 15 seconds. | | |
| | 10:08 | | So I'm going to take it from 1:15 to 1:22. | | |
| | 10:09 | | So the officers from, looks like the front | | |
| | 10:10 | | drivers' side, so the driver's seat, and the front passenger | | |
| | 10:11 | | seat have gotten out of the car. | | |
| | 10:12 | | Does that sound like an accurate depiction of | | |
| | 10:13 | | what's happening? | | |
| | 10:14 | A. | So it's actually the rear driver seat that exited | | |
| | 10:15 | | on the left side of the vehicle in this frame. | | |
| | 10:16 | Q. | Got it. | | |
| | 10:17 | A. | The right side was the front passenger. | | |
| | 10:18 | Q. | There you go, okay. | | |
| | 10:19 | | So from 1:22 for about the next 10 seconds, I'll | | |

| | | | | |
| --- | --- | --- | --- | --- |
| | 10:20 | | show you this, and then tell me what's happening. | |
| | 10:21 | | Okay. So what happened in those 10 seconds? | |
| | 10:22 | A. | The -- | |
| | 10:23 | | I opened my door, and I was beginning to exit | |
| | 10:24 | | with the video camera in one hand or my bag in one hand, and | |
| | 10:25 | | then I believe I had any cellphone or some other object in | |
| | 11:01 | | my other hand. The driver of the vehicle also begins to | |
| | 11:02 | | exit the vehicle. | |
| | 11:03 | | When I go to stand up out of the vehicle, the | |
| | 11:04 | | firearm in my holster discharges and flips out of my | |
| | 11:05 | | holster. When I stand all the way up, it flips onto the | |
| | 11:06 | | ground. | |
| | 11:07 | Q. | Were your hands on the holster at the time the | |
| | 11:08 | | gun discharged? | |
| | 11:09 | A. | No. | |
| | 11:10 | Q. | There were objects in both of your hands? | |
| | 11:11 | A. | Correct. | |
| | 11:12 | Q. | How sure are you that your hands were not on the | |
| | 11:13 | | gun at the time it discharged? | |
| | 11:14 | A. | 100 percent. | |
| | 11:15 | Q. | Did you touch the trigger at the time the gun | |
| | 11:16 | | discharged? | |
| | 11:17 | A. | No. | |
| | 11:18 | Q. | All right. Now we're going to rewind it a little | |
| | 11:19 | | bit. | |
| | 11:20 | | So can you see the seconds at the bottom here? | |
| | 11:21 | A. | Yeah. | |
| | 11:22 | Q. | Can you see the counter? | |
| | 11:23 | | Keep an eye on that, and see if you can point to | |
| | 11:24 | | me what you believe is the moment of discharge. | |
| | 11:25 | | Or actually, you know what, you just tell me when | |
| | 12:01 | | to stop, and I'll stop it. Let's do that. | |
| | 12:02 | A. | Okay, now. | |
| | 12:03 | Q. | Okay. So approximately between 1:24 and 1:25 on | |
| | 12:04 | | Exhibit A is the moment of discharge. | |
| | 12:05 | | Where were you relative to the car at the time of | |
| | 12:06 | | discharge? | |
| | 12:07 | | Were you -- | |
| | 12:08 | | Were both feet out? | |
| | 12:09 | | Was one foot out. | |
| | 12:10 | | Tell me what your body position was. | |

| | | |
|---|---|---|
| 12:11 | A. | I know that I was leaning out of it. |
| 12:12 | | I don't know if both my feet exited the vehicle |
| 12:13 | | at that time.  I know that I was attempting to stand up |
| 12:14 | | after getting out of the car. |
| 12:15 | | I was bent over, as it shows in this frame, |
| 12:16 | | because the round discharged back into the seat right that I |
| 12:17 | | was sitting in. |
| 12:18 | Q. | Do you recall, in this sequence of events, when |
| 12:19 | | you took your seatbelt off? |
| 12:20 | A. | I do not believe I had my seatbelt on at all |
| 12:21 | | during transportation. |
| 12:22 | Q. | Would you ordinarily not wear your seatbelt |
| 12:23 | | during transportation? |
| 12:24 | A. | In this circumstance I did not, no. |
| 12:25 | Q. | Okay.  So you would have had -- |
| 13:01 | | The seatbelt would have been over your left |
| 13:02 | | shoulder; is that correct? |
| 13:03 | A. | It would have been over my right shoulder. |
| 13:04 | Q. | Oh, right shoulder, okay. |
| 13:05 | | So seatbelt's over your right shoulder. |
| 13:06 | | What hip is the holster on? |
| 13:07 | A. | On my right side. |
| 13:08 | Q. | Okay.  As you were stepping out of the car, did |
| 13:09 | | the seatbelt get caught in your holster? |
| 13:10 | A. | No. |
| 13:11 | Q. | How sure are you of that? |
| 13:12 | A. | 100 percent. |
| 13:13 | Q. | How are you sure of that? |
| 13:14 | A. | Because I did not wear my seatbelt, so the |
| 13:15 | | seatbelt was not attached to my body in any way. |
| 13:16 | Q. | Okay.  The seatbelt was over your right shoulder? |
| 13:17 | A. | Yes, but I was not using the seatbelt. |
| 13:18 | Q. | Watching the video now, do you see your seatbelt |
| 13:19 | | at all? |
| 13:20 | A. | I do not. |
| 13:21 | Q. | Looking back on it today, do you have any idea |
| 13:22 | | what caused your gun to go off? |
| 13:23 | A. | I do not. |
| 13:24 | Q. | Have you carried a P320 since this incident? |
| 13:25 | A. | I carried one after the incident, but now I left |
| 14:01 | | the State of Milwaukee Police Department, so I do not carry |

|  | 14:02 |  | one now. |  |  |
|---|---|---|---|---|---|
| 16:25 - 20:04 | **Roth, Aaron 2023-02-02** | | | 00:04:18 | **AaronRoth.3** |
|  | 16:25 | Q. | Okay. Did the holster have any sort of | | |
|  | 17:01 |  | retention? | | |
|  | 17:02 | A. | It's based on the screw retention. | | |
|  | 17:03 | Q. | Well, I guess what I mean by that, did it click | | |
|  | 17:04 |  | like when you go into -- | | |
|  | 17:05 |  | Did it like click and lock, or was there a hood | | |
|  | 17:06 |  | you put over it or anything like that? | | |
|  | 17:07 | A. | No. | | |
|  | 17:08 | Q. | Okay. So you just -- | | |
|  | 17:09 |  | There's no like button or anything like that, | | |
|  | 17:10 |  | that you pressed to let it out? | | |
|  | 17:11 | A. | There's no button release, no. | | |
|  | 17:12 | Q. | Did the spent shell casing eject? | | |
|  | 17:13 | A. | The spent shell casing was still in the firearm. | | |
|  | 17:14 | Q. | Okay. Was the trigger covered by the holster? | | |
|  | 17:15 | A. | Yes. | | |
|  | 17:16 | Q. | Fully? | | |
|  | 17:17 | A. | Yes. | | |
|  | 17:18 | Q. | Was there any way for your finger to get into the | | |
|  | 17:19 |  | trigger well? | | |
|  | 17:20 | A. | If you manipulated it enough. It would take | | |
|  | 17:21 |  | quite some effort to get your finger into the trigger guard. | | |
|  | 17:22 | Q. | Did the City of Milwaukee ever come to a | | |
|  | 17:23 |  | conclusion about what caused the gun to go off? | | |
|  | 17:24 | A. | They said that it was based on my clothing that I | | |
|  | 17:25 |  | wore that day, that my clothing pulled the trigger. | | |
|  | 18:01 | Q. | Do you think that's possible? | | |
|  | 18:02 | A. | No. | | |
|  | 18:03 | Q. | Why is that? | | |
|  | 18:04 | A. | Based on how the holster covers the trigger well | | |
|  | 18:05 |  | itself. I had tucked-in T-shirts, so they were not outside | | |
|  | 18:06 |  | of my waistband, and that's the holster I used was outside | | |
|  | 18:07 |  | the waistband. | | |
|  | 18:08 |  | I had a sweatshirt on that fits above the holster | | |
|  | 18:09 |  | or next to the holster and never entered the holster, and | | |
|  | 18:10 |  | that's the only piece of clothing that would have been able | | |
|  | 18:11 |  | to manipulate the trigger. | | |
|  | 18:12 | Q. | Was there an investigation into this incident? | | |

|  | 18:13 | A. | There was. |
|---|---|---|---|
|  | 18:14 |  | I don't know what came of it, other than they, |
|  | 18:15 |  | just word of mouth, that I was blamed for the incident. |
|  | 18:16 | Q. | Were you disciplined? |
|  | 18:17 | A. | I was not disciplined. |
|  | 18:18 | Q. | When you say you were "blamed for the incident," |
|  | 18:19 |  | it was blaming your clothing? |
|  | 18:20 | A. | Yes. |
|  | 18:21 | Q. | Did you ever see any sort of report that said |
|  | 18:22 |  | that, or is that just your understanding based on what |
|  | 18:23 |  | you've been told? |
|  | 18:24 | A. | It's my understanding based on what I've been |
|  | 18:25 |  | told. |
|  | 19:01 |  | There was no official document that I ever |
|  | 19:02 |  | received or was told about. |
|  | 19:03 | Q. | So I'm kind of skipping through 2 minutes |
|  | 19:04 |  | through, let's say, 4 minutes. |
|  | 19:05 |  | So I don't know if you can kind of see the |
|  | 19:06 |  | fast-forward there, but it looks like you're standing |
|  | 19:07 |  | outside of the vehicle. |
|  | 19:08 |  | What are you doing in this time frame? |
|  | 19:09 | A. | I'm kind of -- |
|  | 19:10 |  | I can feel the heat, so I was kind of checking my |
|  | 19:11 |  | pants. I had a small burn mark, a very, very faint burn |
|  | 19:12 |  | mark from the firearm discharging next to my leg. |
|  | 19:13 |  | Now I'm just kind of looking around for the |
|  | 19:14 |  | casing because I had not manipulated the firearm to check |
|  | 19:15 |  | for the casing. So I'm looking around trying to see if I |
|  | 19:16 |  | can find it, and I was unsuccessful. |
|  | 19:17 | Q. | Have you heard the term "stovepipe"? |
|  | 19:18 | A. | Yes. |
|  | 19:19 | Q. | Is that what happened here? |
|  | 19:20 | A. | So the casing was set in the firearm as it would |
|  | 19:21 |  | normally when it would fire. So the casing enters into -- |
|  | 19:22 |  | or excuse me. |
|  | 19:23 |  | The round was already in the chamber, and it |
|  | 19:24 |  | fired, but it just did not toss the casing out. There was |
|  | 19:25 |  | no other casing that entered. |
|  | 20:01 |  | So it was still in the chamber as it normally |
|  | 20:02 |  | would sit. |
|  | 20:03 | Q. | The shell casing? |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 20:04  A.  Right. | | |
| 23:07 - 24:06 | **Roth, Aaron 2023-02-02** | 00:01:01 | AaronRoth.4 |
| | 23:07  Q.  Okay.  Do you remember if there was any damage to | | |
| | 23:08      the holster? | | |
| | 23:09  A.  No damage to the holster because I had an open | | |
| | 23:10      bottom. | | |
| | 23:11  Q.  So it just shot right through the bottom? | | |
| | 23:12  A.  Correct, there wasn't -- | | |
| | 23:13      It was already an exposed bottom. | | |
| | 23:14  Q.  Did you continue using this holster after the | | |
| | 23:15      incident? | | |
| | 23:16  A.  I did not.  They took my holster as well. | | |
| | 23:17  Q.  Okay.  Do you know if there was an inspection | | |
| | 23:18      performed of the holster? | | |
| | 23:19  A.  They said that they did do an inspection for | | |
| | 23:20      gunpowder residue and things like that.  It sounds like they | | |
| | 23:21      did not locate any. | | |
| | 23:22  Q.  Okay.  When you say, "It sounds like they did not | | |
| | 23:23      locate any," what are you basing that off of? | | |
| | 23:24  A.  They told me that I falsified evidence and gave | | |
| | 23:25      them a different holster. | | |
| | 24:01  Q.  Okay.  So you were told you falsified evidence? | | |
| | 24:02  A.  Yes. | | |
| | 24:03  Q.  Did you falsify evidence? | | |
| | 24:04  A.  I did not. | | |
| | 24:05  Q.  Would you falsify evidence? | | |
| | 24:06  A.  No. | | |
| 25:10 - 26:14 | **Roth, Aaron 2023-02-02** | 00:01:38 | AaronRoth.5 |
| | 25:10      You testified today that you were not wearing | | |
| | 25:11      your seatbelt at all when you were returning to the station | | |
| | 25:12      that day just prior to the incident; is that right? | | |
| | 25:13  A.  Correct. | | |
| | 25:14  Q.  Okay.  And you mentioned you recall giving | | |
| | 25:15      testimony in another matter. | | |
| | 25:16      Have you ever seen that transcript of testimony? | | |
| | 25:17  A.  I have not. | | |
| | 25:18  Q.  Okay.  But you recall giving that testimony; | | |
| | 25:19      correct? | | |
| | 25:20  A.  Yes. | | |
| | 25:21  Q.  Do you recall when you provided that testimony? | | |

| AaronRoth | | | | |
|---|---|---|---|---|
| **DESIGNATION** | **SOURCE** | | **DURATION** | **ID** |
| | 25:22 | A. I do not. It was some time ago. | | |
| | 25:23 | Q. Okay. If I told you it was in September of 2021, | | |
| | 25:24 | would that sound accurate? | | |
| | 25:25 | A. Yeah, it was quite some time ago, but could fit | | |
| | 26:01 | that time frame. | | |
| | 26:02 | Q. Sure. | | |
| | 26:03 | Do you believe that your testimony or | | |
| | 26:04 | recollection of events in September of 2021 would be more | | |
| | 26:05 | accurate than your recollection today as we sit here now? | | |
| | 26:06 | A. I don't think it would be -- | | |
| | 26:07 | I remember the incident today like I did in | | |
| | 26:08 | September, so I guess no in that case. | | |
| | 26:09 | Q. Okay. Back in September you testified -- of 2021 | | |
| | 26:10 | you testified that you were wearing your seatbelt that day | | |
| | 26:11 | and that you had unbuckled just prior to the car turning off | | |
| | 26:12 | in the parking lot. | | |
| | 26:13 | Do you recall that? | | |
| | 26:14 | A. I do not recall that. | | |
| 27:09 - 29:13 | **Roth, Aaron 2023-02-02** | | 00:03:22 | **AaronRoth.6** |
| | 27:09 | Q. All right. So I'm going to take you to pages 10 | | |
| | 27:10 | to 11 of the transcript. | | |
| | 27:11 | So right here on line 20 you can see you were | | |
| | 27:12 | asked, "Were you buckled? Did you have your seatbelt | | |
| | 27:13 | buckled at the time that you were in the vehicle?" | | |
| | 27:14 | And you answered, "I took the seatbelt off right | | |
| | 27:15 | before I was -- as I was going to get out." | | |
| | 27:16 | "Question: When did you unbuckle your seatbelt | | |
| | 27:17 | specifically?" | | |
| | 27:18 | "Answer: Before the car was parked." | | |
| | 27:19 | Do you see that? | | |
| | 27:20 | A. Yes. | | |
| | 27:21 | Q. Do you have any reason to believe that the | | |
| | 27:22 | testimony you gave that day was not accurate? | | |
| | 27:23 | A. Other than I didn't wear my seatbelt -- | | |
| | 27:24 | I don't know why I would have said that. | | |
| | 27:25 | -- but no. | | |
| | 28:01 | Q. And it went on to say, "Question: Did you gather | | |
| | 28:02 | your belongings before or after you unbuckled your | | |
| | 28:03 | seatbelt?" | | |
| | 28:04 | And you answered, "After." | | |

| | | | | |
|---|---|---|---|---|
| | 28:05 | | And then you were asked, "So if I'm understanding | |
| | 28:06 | | correctly, before the car was parked, you unbuckled your | |
| | 28:07 | | seatbelt, and then you began to gather the belongings that | |
| | 28:08 | | you had in the car with you?" | |
| | 28:09 | | And you answered, "Correct." | |
| | 28:10 | | Do you believe all that testimony that you | |
| | 28:11 | | provided in September of 2021 was inaccurate? | |
| | 28:12 | A. | Yeah, only in the sense of I don't know why I | |
| | 28:13 | | said I wore my seatbelt. I only would wear my seatbelt when | |
| | 28:14 | | I'm actively getting into a pursuit so I have access to my | |
| | 28:15 | | firearm. | |
| | 28:16 | Q. | Is it possible that you -- your memory has | |
| | 28:17 | | changed since you provided this testimony in September of | |
| | 28:18 | | 2021 as to whether you were wearing your seatbelt that day | |
| | 28:19 | | or not? | |
| | 28:20 | A. | It is possible. | |
| | 28:21 | Q. | All right. I believe you also testified that you | |
| | 28:22 | | did not have any attachments on your pistol. | |
| | 28:23 | | Do you recall whether you had a light on your | |
| | 28:24 | | pistol? | |
| | 28:25 | A. | Yes, I did have a light on my pistol. | |
| | 29:01 | Q. | Okay. And the holster that you were using, was | |
| | 29:02 | | that a light-bearing holster? | |
| | 29:03 | A. | Yes. | |
| | 29:04 | Q. | And do you recall -- | |
| | 29:05 | | Let me stop the share here. | |
| | 29:06 | | Do you recall seeing warnings from the holster | |
| | 29:07 | | manufacturer about items being able to get into that | |
| | 29:08 | | weight-bearing holster? | |
| | 29:09 | A. | I do not recall. | |
| | 29:10 | Q. | If you testified that you had seen those warnings | |
| | 29:11 | | back when you were deposed in September 2021, would you have | |
| | 29:12 | | any reason to dispute that? | |
| | 29:13 | A. | No. | |
| 43:05 - 43:11 | **Roth, Aaron 2023-02-02** | | 00:00:17 | **AaronRoth.7** |
| | 43:05 | | Oh, I think you stated that you own a P365; | |
| | 43:06 | | right? | |
| | 43:07 | A. | Correct. Yes. | |
| | 43:08 | Q. | Okay. Does that P365, is that a personal weapon? | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 43:09   A.  Yeah. | | |
| | 43:10   Q.  Does it have a manual safety? | | |
| | 43:11   A.  It does not. | | |
| 44:01 - 44:15 | **Roth, Aaron 2023-02-02** | 00:00:45 | **AaronRoth.8** |
| | 44:01   Q.  All right.  If you were aware that the P365 was | | |
| | 44:02        available with a manual safety, would you have purchased one | | |
| | 44:03        with a manual safety, or would you still have purchased one | | |
| | 44:04        without? | | |
| | 44:05   A.  I would have purchased one without. | | |
| | 44:06   Q.  And why is that? | | |
| | 44:07   A.  I guess at this point in my career it's what I'm | | |
| | 44:08        used to.  It's what I'm comfortable with. | | |
| | 44:09   Q.  Is that a personal preference? | | |
| | 44:10   A.  Yeah. | | |
| | 44:11   Q.  How long have you been a police officer? | | |
| | 44:12   A.  At this moment, four and a half years, just over. | | |
| | 44:13   Q.  Have you ever carried a pistol for a police | | |
| | 44:14        department that had a manual safety? | | |
| | 44:15   A.  No. | | |

| | | | |
|---|---|---|---|
| | Our Designations | 00:23:59 | |
| | **TOTAL RUN TIME** | **00:23:59** | |