# EXHIBIT L

Transcribed Trial Testimony of Romy Tota that was video recorded and played for the Jury

# RomyTota-editedfortrial

Designation List Report

**Tota, Romy**                                    **2025-06-30**

| Our Designations | 01:12:07 |
|---|---|
| **TOTAL RUN TIME** | **01:12:07** |



| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 4:16 - 4:19 | **Tota, Romy 2025-06-30** | 00:00:07 | **RomyTota-edited fortrial.9** |

| | |
|---|---|
| 4:16 | . . . . .ROMY TOTA, Ed.D., was called |
| 4:17 | as a witness, and after having been duly sworn |
| 4:18 | remotely, according to the law, was examined and |
| 4:19 | testified as follows: |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 4:24 - 29:09 | **Tota, Romy 2025-06-30** | 00:32:05 | **RomyTota-edited fortrial.10** |

| | | |
|---|---|---|
| 4:24 | Q. | Good morning, Doctor.  Could you |
| 4:25 | | please introduce yourself to the jury? |
| 5:01 | A. | Good morning.  My name is Dr. Romy |
| 5:02 | | Tota and I am a vocational rehabilitation consultant |
| 5:03 | | and also a vocational expert. |
| 5:04 | Q. | What is a vocational rehabilitation |
| 5:05 | | consultant and vocational expert?  What do you do in |
| 5:06 | | that field? |
| 5:07 | A. | So what we do is evaluate the impact |
| 5:08 | | of some incident, whether it was an injury or |
| 5:09 | | accident of some sort, on a person's ability to earn |
| 5:10 | | an income following this incident. |
| 5:11 | Q. | And did you perform that type of |
| 5:12 | | evaluation here for Jacques Desrosiers? |
| 5:13 | A. | Yes, I did. |
| 5:14 | Q. | Okay.  We'll get into your opinions a |
| 5:15 | | bit later.  But as part of your analysis, did you |
| 5:16 | | look at whether Mr. Desrosiers could return to work |
| 5:17 | | as a police officer? |
| 5:18 | A. | Yes.  That is a factor that I |
| 5:19 | | analyzed. |
| 5:20 | Q. | And did you also evaluate to the |
| 5:21 | | extent he cannot return as a police officer whether |
| 5:22 | | Mr. Desrosiers would be a realistic candidate for |
| 5:23 | | other jobs? |
| 5:24 | A. | Yes, I did. |
| 5:25 | Q. | Okay.  Before we get into those |
| 6:01 | | opinions, I'd like the jury to learn a little bit |
| 6:02 | | more about yourself, who you are and what you do. |
| 6:03 | | Can you tell the jury about your |
| 6:04 | | background?  You can start with your education. |
| 6:05 | A. | Sure.  So in order to do the work I |
| 6:06 | | do, everybody generally has a background in |
| 6:07 | | counseling psychology or rehabilitation psychology |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

6:08 or a related field.

6:09 So I have three degrees in counseling

6:10 psychology. I have my Bachelor's degree from

6:11 Albright College. After a few years, I continued my

6:12 education at Temple University and received a

6:13 Master's degree in counseling psychology.

6:14 Then about 15 years later, I went back

6:15 for my doctorate. So I now have a doctorate degree,

6:16 it's an Ed.D. It's a doctorate in education and

6:17 it's in the field of counseling psychology. To

6:18 complement -- is it okay if I go ahead?

6:19 Q. Yeah, please.

6:20 A. Okay. To complement my education, of

6:21 course, I have a related work history.

6:22 So after I obtained my Master's degree

6:23 from Temple, I did my first job in vocational

6:24 rehabilitation and I was hired by a private company.

6:25 And what we did is we helped people, injured workers

7:01 who were out on Workers' Compensation, and we helped

7:02 them return to the workforce. That entailed

7:03 performing these evaluations to understand

7:04 somebody's work potential including their education

7:05 and work background and then also aiding them in

7:06 job-seeking skills, finding jobs, interviewing for

7:07 jobs, and hopefully returning to the workforce. So

7:08 I did that type of work for about five years.

7:09 I also worked in private mental health

7:10 counseling where I handled a lot of different types

7:11 of psychiatric disorders: depression, anxiety,

7:12 stress. And, ultimately, I returned to the field of

7:13 vocational rehabilitation in 2010 where I started

7:14 really focusing more on forensic type evaluations,

7:15 cases that had gone to court, with personal injury.

7:16 Q. Let me stop you there and thank you

7:17 for all of that.

7:18 So some doctors can be board certified

7:19 in what they do. Do you have a board certification?

7:20 A. Yes. So vocational experts also have

7:21 a board certification and it's through the ABVE.

7:22 That's the American Board of Vocational Experts.

7:23 And I have been board certified since 2020 to be a

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 7:24 | board certified vocational expert. | | |
| | 7:25 | And since that time , I've also -- | | |
| | 8:01 | aside from being a certified member of the ABVE, I'm | | |
| | 8:02 | on the board of directors and I'm currently the | | |
| | 8:03 | president-elect just indicative of my sincere | | |
| | 8:04 | involvement in this field and doing this type of | | |
| | 8:05 | work to the best of one's ability. | | |
| | 8:06 | Q. And that group, the American Board of | | |
| | 8:07 | Vocational Experts, it might be obvious from the | | |
| | 8:08 | name, but is that a collection of vocational experts | | |
| | 8:09 | from around the country? | | |
| | 8:10 | A. From around the country, yes. We're | | |
| | 8:11 | nationwide. We're a small group, but we are | | |
| | 8:12 | individuals who really want to make sure that we're | | |
| | 8:13 | performing at the top of what our field requires. | | |
| | 8:14 | Q. When you say it's a small group, can | | |
| | 8:15 | you give me an approximation for how many members do | | |
| | 8:16 | what you do throughout America as part of that | | |
| | 8:17 | group? | | |
| | 8:18 | A. So as part of our group, I believe | | |
| | 8:19 | there's currently 390 active individuals who are | | |
| | 8:20 | certified or otherwise affiliated with the American | | |
| | 8:21 | Board of Vocational Experts. | | |
| | 8:22 | Q. And you said you will be president of | | |
| | 8:23 | the organization when? | | |
| | 8:24 | A. So my presidency would start in two | | |
| | 8:25 | years from now. | | |
| | 9:01 | Q. Okay. Do you also teach in the field? | | |
| | 9:02 | A. So I teach in the field in the respect | | |
| | 9:03 | that I do offer occasionally some CEU credit hours | | |
| | 9:04 | where I'll sponsor a short program for that. | | |
| | 9:05 | I have taught at Grand Canyon | | |
| | 9:06 | University in the past, but mostly in the field of | | |
| | 9:07 | counseling psychology. But most of my teaching now | | |
| | 9:08 | is limited to CEU hours, maybe offered through ABVE. | | |
| | 9:09 | Q. Does that mean that you are providing | | |
| | 9:10 | presentations that other vocational experts attend? | | |
| | 9:11 | A. Correct. | | |
| | 9:12 | Q. Now I want to just separate what you | | |
| | 9:13 | did in the '90s and what you do today. | | |
| | 9:14 | I understand for some period of time, | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| 9:15 | | you became a mother and you were a full-time mom. |
| 9:16 | | Right? |
| 9:17 | A. | Right. So I raised a family in |
| 9:18 | | between too. |
| 9:19 | Q. | Okay. So let's talk about this Stage |
| 9:20 | | 1. That would be you actually evaluating people who |
| 9:21 | | had been injured to see if they can be placed |
| 9:22 | | somewhere? |
| 9:23 | A. | Right. So it would be what you'd call |
| 9:24 | | the hands-on work. Working directly with the |
| 9:25 | | individual, following the evaluation to help them |
| 10:01 | | find alternative work, providing them with job |
| 10:02 | | leads, providing them with interviewing skills, and |
| 10:03 | | really working towards re-entering people into the |
| 10:04 | | workforce. |
| 10:05 | Q. | And how does that differ from what you |
| 10:06 | | do now? |
| 10:07 | A. | So now, my focus is more evaluative. |
| 10:08 | | So I still do the same type of evaluations, maybe in |
| 10:09 | | a little bit more detail now. |
| 10:10 | | I still perform vocational testing, |
| 10:11 | | but my services end with the evaluation. I no |
| 10:12 | | longer am actively attempting to place people into |
| 10:13 | | the workforce. I'm only requested to provide an |
| 10:14 | | evaluation. |
| 10:15 | Q. | Do attorneys from time to time call |
| 10:16 | | you to request that you do an evaluation for an |
| 10:17 | | individual? |
| 10:18 | A. | Yes, quite often. |
| 10:19 | Q. | And we represent Mr. Desrosiers. He's |
| 10:20 | | considered a plaintiff in this case. |
| 10:21 | | Have you been retained by plaintiff |
| 10:22 | | attorneys to perform evaluations? |
| 10:23 | A. | Yes. I've been requested by both |
| 10:24 | | plaintiff attorneys and also defense attorneys, |
| 10:25 | | which I'm sure you're going to explain in a minute. |
| 11:01 | Q. | That was my next question. |
| 11:02 | | Attorneys like Ms. Devine who practice |
| 11:03 | | on the defense side, you've worked with and have |
| 11:04 | | been retained by defense lawyers? |
| 11:05 | A. | Yes. My caseload, I don't know if |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

11:06     it's good or bad, but it's generally 50/50. About

11:07     half of my cases I've been hired from plaintiff

11:08     attorneys and the other half from defense attorneys.

11:09   Q.   Okay. Going back to when you were

11:10     actually placing people.

11:11     Can you give us some approximation of

11:12     how many people you were involved in determining

11:13     whether they could be placed back into the job

11:14     market?

11:15   A.   So it's been quite a while ago. So

11:16     but I did it over a period of five years and I think

11:17     we generally had ongoing caseloads of 30 or 40

11:18     individuals at a time.

11:19     So I have -- over those five years, I

11:20     have worked with hundreds of different individuals

11:21     from different backgrounds with different types of

11:22     injuries attempting to return them into the labor

11:23     market.

11:24   Q.   And how about what you do now? When

11:25     you do these forensic examinations, can you

12:01     approximate how many times you've done those?

12:02   A.   So I think I have done close to 500 or

12:03     perhaps more different vocational evaluations. And

12:04     let me temper that a little bit by stating that that

12:05     work has been done since 2018. Even though I've

12:06     been working in the background as a vocational

12:07     expert, I had a lot of on-the-job training and

12:08     mentorship and preparing myself to be an expert,

12:09     right, and that takes some time and a number of

12:10     years.

12:11     But since 2018, I've been authoring my

12:12     own reports and providing my own expert opinions.

12:13     And, since that time, I've probably done close to

12:14     500 or a little over 500 different cases.

12:15   Q.   And before then, you were working with

12:16     another vocational expert?

12:17   A.   Yes. Before then, since 2010, I was

12:18     working with Ms. Rosalyn Pierce and she had been a

12:19     vocational expert for over 47 years. So she was my

12:20     mentor, my teacher, and I worked with her in

12:21     providing medical reviews, vocational research,

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

12:22     identifying and classifying jobs.

12:23     So even though I had been working at

12:24     it much longer in terms of authoring reports and

12:25     offering expert opinions, that began in 2018.

13:01    Q.   Is it fair to say that in all of your

13:02     work, placing, working under the mentorship of a

13:03     vocational expert, and, in fact, for the last seven

13:04     years being a vocational expert yourself, you have

13:05     been involved in evaluations of over a thousand

13:06     people who have either been placed or evaluated for

13:07     whether they can return to the job market?

13:08    A.   Yes.

13:09    Q.   Have you ever done something like that

13:10     for law enforcement, meaning evaluating or placing

13:11     someone who was a police officer?

13:12    A.   Yes. Back when I was actually doing

13:13     the rehabilitation work, I had worked with injured

13:14     police officers and I've also evaluated police

13:15     officers in the course of this type of evaluative

13:16     forensic work.

13:17    Q.   And in some of those situations, were

13:18     you able to find reasonable alternative employment

13:19     opportunities for those police officers?

13:20    A.   Yes. There are occasions where if a

13:21     police officer cannot go back to his pre-injury job

13:22     as a patrol officer, there are alternative maybe

13:23     lighter duty work that they can do and I have placed

13:24     prior police officers in other jobs. One that comes

13:25     to mind is a police officer became a dispatcher.

14:01    Q.   Okay.

14:02    A.   So there are sometimes alternative

14:03     types of employment available to those injured

14:04     workers.

14:05    Q.   And have there been times when you've

14:06     either worked with or evaluated police officers

14:07     where your determination is that they were unable to

14:08     find alternative employment?

14:09    A.   Yes. Unfortunately, that happens as

14:10     well where their injuries prohibit any type of

14:11     return to work.

14:12    Q.   Dr. Tota, do you believe that you are

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

14:13    competent and qualified and capable of providing

14:14    information to the jury about Mr. Desrosiers'

14:15    employability following this October 2019 incident?

14:16    A.   Yes. Not only do I believe I'm

14:17    competent and qualified, but obviously the board,

14:18    the certifying board, believes so too. So, yes, I'm

14:19    qualified to perform this type of evaluation.

14:20    Q.   Thank you.

14:21    ATTORNEY ZIMMERMAN: At this time, I

14:22    offer Dr. Tota as an expert in vocational

14:23    rehabilitation and evaluation and we'll pass the

14:24    questions along if Ms. Devine has any.

14:25    ATTORNEY DEVINE: I have no objection.

15:01    No questions either.

15:02    ATTORNEY ZIMMERMAN: All right. Thank

15:03    you.

15:04    - - DIRECT EXAMINATION - -

15:05    BY ATTORNEY ZIMMERMAN:

15:06    Q.   So, Dr. Tota, I want to start talking

15:07    about this case.

15:08    A.   Okay.

15:09    Q.   The incident was some time ago. I

15:10    just want to make sure that we're on the same page.

15:11    You did meet Mr. Desrosiers?

15:12    A.   I did meet Mr. Desrosiers and, yes,

15:13    the incident was some time ago. It was in 2019.

15:14    Q.   So how old was Mr. Desrosiers at the

15:15    time he was injured?

15:16    A.   At the time that he was injured in

15:17    2019, he was 57 years old.

15:18    Q.   You did an interview and assessment

15:19    last year?

15:20    A.   I did, almost a year ago to date.

15:21    We're about two weeks short. Yep.

15:22    Q.   Okay. And how old was he when you

15:23    performed your evaluation?

15:24    A.   He was 62 years old at that time.

15:25    Q.   If it's about a year ago --

16:01    A.   So he'd be --

16:02    Q.   -- 63 now?

16:03    A.   He'd be 63 now, yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

16:04  Q.  Okay.  So what did you do to perform
16:05      your evaluation in this case?
16:06  A.  Okay.  So I met Mr. Desrosiers
16:07      virtually, which is a common -- especially since the
16:08      pandemic, it's certainly become much more common to
16:09      do virtual interviews.  I use a HIPAA-compliant
16:10      platform that's typically used in counseling
16:11      sessions and I perform what we call a clinical
16:12      interview and that's my opportunity to gather data
16:13      from Mr. Desrosiers about his background.
16:14      Of course my questions would always be
16:15      geared towards somebody's ability to work.  So I
16:16      would ask him about his educational background, the
16:17      different jobs that he's had in the past.  I perform
16:18      vocational testing and we do talk about the medical
16:19      treatment and how he's feeling at the time of my
16:20      evaluation.  So it's an opportunity to gather
16:21      information.
16:22  Q.  Would it be fair to categorize your
16:23      evaluation into three categories: record review,
16:24      interview, and testing?
16:25  A.  Yes.  So we like to match our data
17:01      points.  So in addition to my interview and
17:02      administering vocational testings, we perform a
17:03      records review, which is generally medical records
17:04      to understand the nature of the injury and any
17:05      residual disability, employment records, and income
17:06      records are also important to understand what his
17:07      pre-injury earnings were.
17:08  Q.  And did you do all three of those in
17:09      this case, record review, interview, and testing of
17:10      Mr. Desrosiers?
17:11  A.  Yes, I did.
17:12  Q.  In terms of the records, we'll go
17:13      through the full list of injuries, but can you just
17:14      give a general understanding of what the injuries
17:15      were that Mr. Desrosiers sustained in this incident?
17:16  A.  Right.  So Mr. Desrosiers sustained a
17:17      gunshot wound to his penis, his scrotum, and into
17:18      his thigh.  So I reviewed medical records from
17:19      urologists, orthopedists, neurologists, and

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

17:20    psychologists and psychiatry.

17:21   Q.  Did you review any other records that

17:22    were not necessarily related to the incident or did

17:23    you learn anything else about Mr. Desrosiers'

17:24    medical history outside of this incident?

17:25   A.  Yes, because during his recovery from

18:01    his gunshot wound, he was also diagnosed with lung

18:02    cancer.

18:03   Q.  And do you have an understanding of

18:04    how the cancer has been treated and the current

18:05    prognosis?

18:06   A.  I don't recall offhand.  I believe he

18:07    did receive treatment and I don't remember that

18:08    there was any ongoing treatment since that time.

18:09    So my understanding would be that it

18:10    would be in remission at this point.

18:11   Q.  Okay.  In terms of the interview with

18:12    Mr. Desrosiers, I'm sure you don't time it with a

18:13    stopwatch, but can you give me an idea of generally

18:14    how long you do those interviews?

18:15   A.  Right.  So I generally allow two and a

18:16    half hours for these interviews.  It's an hour and a

18:17    half to collect the clinical data, the interview

18:18    portion, and then generally an hour for the

18:19    vocational testing.

18:20   Q.  Okay.  So that two and a half hours is

18:21    one-on-one for about 90 minutes and then Mr.

18:22    Desrosiers is doing actual tests for an hour?

18:23   A.  Correct.

18:24   Q.  Can you give just a general

18:25    understanding of Mr. Desrosiers' educational

19:01    history?

19:02   A.  Yes.  So what's important to know

19:03    about Mr. Desrosiers, that he is native of Haiti and

19:04    he received his high school education in Haiti and

19:05    actually dropped out of school in his 12th grade,

19:06    but then obtained a GED in 1984.

19:07    After obtaining his GED, he attended

19:08    the police academy for a six-month program and

19:09    became a police officer in 1996 and also joined the

19:10    policemen's union at that time.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

19:11 But Mr. Desrosiers was a big proponent

19:12 of education and he continued to educate himself.

19:13 And he graduated from Curry College, which is in

19:14 Milton, Massachusetts. He got a Bachelor's degree

19:15 in liberal arts and criminal justice.

19:16 And then he decided he would go to law

19:17 school and he actually completed law school and

19:18 graduated from the Massachusetts School of Law in

19:19 2012. However, he advised me that it was never his

19:20 intention to become a lawyer. So he never sat for

19:21 the law bar exam to become a lawyer, but he does

19:22 have that education.

19:23 Q. And how about his work history? I

19:24 know you said that he went to the police academy.

19:25 What did he do before the police

20:01 academy and tell me his career as a police officer.

20:02 A. So Mr. Desrosiers has been or had been

20:03 a police officer for over 24 years.

20:04 So once he graduated the police

20:05 academy, he worked since 1996 up until the date of

20:06 this incident in 2019 as a patrolman. He enjoyed

20:07 working in the community and he helped maintain the

20:08 law in the community of Cambridge where he was

20:09 employed.

20:10 Prior to becoming -- well, let me back

20:11 up a minute because over that extensive background

20:12 as a police officer, he had been sent out on special

20:13 assignments. He was a humanitarian. He went back

20:14 to Haiti and worked in Haiti to help them with their

20:15 police department.

20:16 He had received different

20:17 accommodations and also I believe that he was highly

20:18 regarded in his department for the work that he did.

20:19 Q. Based on your evaluation, did he seem

20:20 like a good police officer?

20:21 A. He had received positive -- positive

20:22 work feedback and write-ups and he enjoyed what he

20:23 did and I think he was very well-liked in his

20:24 department.

20:25 Q. Based on your observation and your

21:01 knowledge of his testing, did he seem like a bright

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

21:02  guy?

21:03  A.  He was a very bright guy.  I'm sure

21:04  we'll talk more in detail about the testing, but his

21:05  aptitude scores were high and his interest scores

21:06  were exactly that you would expect of a police

21:07  officer.  He had very high scores in the field of

21:08  protective industry and also humanitarian.

21:09  So I believe that the testing that he

21:10  performed shows a very accurate depiction of his

21:11  aptitudes for work and also his interests in work.

21:12  Q.  As part of the record interview, did

21:13  you actually review his wage history?

21:14  A.  Yes, I did.

21:15  Q.  And did you include that wage history

21:16  in your report?

21:17  A.  I do.  I include that because it's

21:18  important to understand what he was able to earn

21:19  prior to his injuries.

21:20  Q.  I said report for the first time.  Did

21:21  you actually write a report for this case?

21:22  A.  Yes, I did.

21:23  Q.  Okay.  It looks like it's about 14

21:24  pages including your evaluation and the documents

21:25  you reviewed?

22:01  A.  Yes.

22:02  Q.  I'm going to share my screen and show

22:03  a chart from your report.  We'll mark this as

22:04  Exhibit 701.

22:05  A.  Okay.

22:06  Q.  Can you see my screen?

22:07  A.  Yes, I can.

22:08  Q.  Can you identify what this chart

22:09  shows?

22:10  A.  Yes.  So that's actually on Page 4 of

22:11  my report and that is a chart that I put together to

22:12  illustrate someone's pre-injury earnings in a clear

22:13  and concise manner.

22:14  So you can see from the years 2012 to

22:15  2019 when his injury occurred, that it was in

22:16  October of 2019, what his earnings were as a police

22:17  officer.  You can see how it had increased over the

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

22:18    years.

22:19    Then obviously in 2019, there's a bit

22:20    of a decrease because he did not work the last two

22:21    months of the year.

22:22  Q.  Okay.  And why is this relevant for

22:23    you and what you do?

22:24  A.  Because that was his pre-injury

22:25    earning potential.  You can see that in 2017 and

23:01    2018, the two full years prior to this incident, he

23:02    was earning well above $160,000 a year.  In 2017, he

23:03    had earned $166,991.  So almost $167,000.

23:04    That is pre-injury earning potential

23:05    before this incident happened.  So it is important

23:06    to understand what he was capable of earning as

23:07    compared to what his residual earning potential may

23:08    be.

23:09  Q.  Mr. Desrosiers, was he married?

23:10  A.  Yes.  He was married and he had four

23:11    children.  I believe they're all considered adults

23:12    now because they're over the age of 18.  But at the

23:13    time of his gunshot, he had two twin children that

23:14    were 19 that he was putting through college at the

23:15    time.

23:16    So even though they're considered

23:17    adults, they're really still youngsters, 19, and

23:18    just heading off to college and still living at home

23:19    during the summers.

23:20  Q.  You talked about determining Mr.

23:21    Desrosiers' pre-incident work capacity and earnings

23:22    potential.  We'll talk about it in a moment.

23:23    Did you also look at Mr. Desrosiers'

23:24    post-incident work capacity and earning potential?

23:25  A.  Yes, I did.  So in order -- all right.

24:01    So this is the true analysis.  Right?  In order to

24:02    understand what someone's post-accident earning

24:03    potential is, there's a number of things that need

24:04    to be learned.  Right?

24:05    So in their educational level, what

24:06    their aptitudes are.  So the education level comes

24:07    from the clinical interview, the aptitudes come from

24:08    the testing.

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|

| | 24:09 | | We look at transferrable skills. | | |
| | 24:10 | | Skills that you can take from one job and use them | | |
| | 24:11 | | in another occupation. | | |
| | 24:12 | Q. | Let's talk about police officers. | | |
| | 24:13 | A. | Okay. | | |
| | 24:14 | Q. | What are the job qualifications or job | | |
| | 24:15 | | descriptions for a police officer and what he had to | | |
| | 24:16 | | do? | | |
| | 24:17 | A. | All right. So in order to perform our | | |
| | 24:18 | | job, I -- we obtain a description of the job from | | |
| | 24:19 | | the individual, but we also use our resources to | | |
| | 24:20 | | help classify that job because it's that | | |
| | 24:21 | | classification that then tells us our transferrable | | |
| | 24:22 | | skills and worker traits. | | |
| | 24:23 | | So he worked as a patrol officer on | | |
| | 24:24 | | the beat. He had an area that he was responsible | | |
| | 24:25 | | for patrolling. So he would maintain law and order. | | |
| | 25:01 | | He might have to apprehend somebody or arrest | | |
| | 25:02 | | somebody or come in on call for disturbances of the | | |
| | 25:03 | | peace or something like that. Right? So that's | | |
| | 25:04 | | what he did. He actually patrolled a specific | | |
| | 25:05 | | vicinity. | | |
| | 25:06 | | Police officers have what they call | | |
| | 25:07 | | some transferrable skills that are related to that | | |
| | 25:08 | | job. Those have to do with understanding laws and | | |
| | 25:09 | | rules about safety and how to enforce them, how to | | |
| | 25:10 | | organize and direct the work and then the work of | | |
| | 25:11 | | others, of course using weapons skillfully and also | | |
| | 25:12 | | the ability to use physical strength in emergent | | |
| | 25:13 | | situations. | | |
| | 25:14 | Q. | Let me ask about that. Are jobs | | |
| | 25:15 | | classified by the need for physical strength or | | |
| | 25:16 | | physical capabilities? | | |
| | 25:17 | A. | So jobs are classified in four major | | |
| | 25:18 | | categories: by their title, the name of the job, | | |
| | 25:19 | | the name of the occupation, the police officer. | | |
| | 25:20 | | Then they're given a code, right, an industry code | | |
| | 25:21 | | so that we can all refer to the same position and | | |
| | 25:22 | | then they're classified in terms of the strength | | |
| | 25:23 | | required to perform the job. | | |
| | 25:24 | Q. | How does that break down? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 25:25 | A. | Right?  So strength could be anywhere |
| | 26:01 | | from a sedentary job, which is one that's performed |
| | 26:02 | | primarily sitting with minimal standing or walking, |
| | 26:03 | | but negligible lifting.  Right?  Lifting and |
| | 26:04 | | carrying of under ten pounds all the way up to heavy |
| | 26:05 | | duty work, which is, you know, standing on your feet |
| | 26:06 | | all day, lots of climbing, bending, and lifting and |
| | 26:07 | | carrying up to 100 pounds. |
| | 26:08 | | So police work is considered medium |
| | 26:09 | | duty work.  So you're on your feet a majority of the |
| | 26:10 | | time and there is lifting requirements up to 50 |
| | 26:11 | | pounds. |
| | 26:12 | Q. | Is being a police officer considered |
| | 26:13 | | an unskilled or skilled job and what do you do to |
| | 26:14 | | evaluate that? |
| | 26:15 | A. | Right.  So being a police officer is |
| | 26:16 | | considered a skilled job.  So we use the Dictionary |
| | 26:17 | | of Occupational Titles.  That's the big book that |
| | 26:18 | | classifies all the different jobs available and |
| | 26:19 | | police work is considered skilled and we call it |
| | 26:20 | | Level 6. |
| | 26:21 | | So work is broken down into three |
| | 26:22 | | skill levels.  We have unskilled work that takes, |
| | 26:23 | | you know, anywhere from a quick description or |
| | 26:24 | | example of how to perform the work up to maybe three |
| | 26:25 | | months of doing the work to become fully trained and |
| | 27:01 | | efficient at your job. |
| | 27:02 | | So we have unskilled work, we have |
| | 27:03 | | semiskilled work, and then -- and those would be |
| | 27:04 | | Levels 3 and 4.  Then skilled work starts at Level 5 |
| | 27:05 | | and goes up to Level 9. |
| | 27:06 | Q. | And Mr. Desrosiers would be considered |
| | 27:07 | | a skilled worker? |
| | 27:08 | A. | He's a skilled worker and that |
| | 27:09 | | includes training time as well as experience time. |
| | 27:10 | Q. | Okay.  So Part 1 in terms of if Mr. |
| | 27:11 | | Desrosiers can go back to work, can he still be a |
| | 27:12 | | police officer? |
| | 27:13 | A. | So the answer to that is no. |
| | 27:14 | Q. | Why? |
| | 27:15 | A. | Well, two parts.  According in my |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

27:16    records review, he had undergone a fitness for duty

27:17    evaluation and it was determined that he was not fit

27:18    to return to work as a police officer.

27:19  Q.  After the incident?

27:20  A.  After the incident, yes.

27:21  Q.  You said there were a couple of

27:22    reasons.  Is that one of them?

27:23  A.  Well, that's one of them.  And so Part

27:24    2 is, you know, the rest of the review of the

27:25    medical records, you know, Mr. Desrosiers sustained

28:01    physical and psychological injuries that prohibit

28:02    him from working as a police officer.  So whether

28:03    it's for Cambridge or any other area, he cannot work

28:04    as a police officer.

28:05  Q.  Can you just give me some of the

28:06    examples and reasons for why Mr. Desrosiers can't go

28:07    back to the job that he had for 24 years?

28:08  A.  So he has a number of physical

28:09    reasons.  He has weakness of the leg, he has ongoing

28:10    pain, his knee buckles, he isn't able to run and do

28:11    quick turns.  He has psychological injuries where he

28:12    is overreactive.  He's anxious, he's depressed.  He

28:13    has symptoms of post-traumatic stress disorder, he's

28:14    easily irritated, he becomes overwhelmed.

28:15    These are all conditions that would

28:16    make police work impossible for him.

28:17  Q.  Has he had to use medications as a

28:18    result of the incident to your understanding?

28:19  A.  Yes, he's on medication.  He's

28:20    involved in pain management and these medications

28:21    may also have some side effects such as tiredness

28:22    that would affect his ability to be sharp and alert.

28:23  Q.  Is he also taking medication for

28:24    anxiety and depression?

28:25  A.  Yes.

29:01  Q.  Dr. Tota, there are a lot of different

29:02    injuries that Mr. Desrosiers sustained.

29:03    Did we look at a list together to help

29:04    illustrate for the jury those injuries?

29:05  A.  Yes.

29:06  Q.  And I'm going to share my screen.  Is

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 29:07 | this a list of the injuries and diagnoses and | | |
| | 29:08 | treatment that you reviewed and relied upon? | | |
| | 29:09 | A. Yes, that is. | | |
| 31:01 - 39:20 | **Tota, Romy 2025-06-30** | 00:12:46 | **RomyTota-edited** |
| | | | **fortrial.2** |
| | 31:01 | Q. Dr. Tota, I'll share that document | | |
| | 31:02 | with you. We'll mark it as 702 for demonstrative | | |
| | 31:03 | purposes only. | | |
| | 31:04 | Is this a document you looked at in | | |
| | 31:05 | trying to list and identify the injuries and | | |
| | 31:06 | diagnoses and treatment? | | |
| | 31:07 | A. Yes, it is. | | |
| | 31:08 | Q. Okay. Now I asked you if Mr. | | |
| | 31:09 | Desrosiers could return to work as a cop and you | | |
| | 31:10 | answered that question. | | |
| | 31:11 | In your opinion, would Mr. Desrosiers | | |
| | 31:12 | be able to find alternative employment in the | | |
| | 31:13 | workforce? | | |
| | 31:14 | A. So I did an analysis to see if there | | |
| | 31:15 | was any alternative work or other than working as a | | |
| | 31:16 | police officer that he could do and, unfortunately, | | |
| | 31:17 | that analysis did not produce any other occupation. | | |
| | 31:18 | So I found him to be totally vocationally disabled. | | |
| | 31:19 | Q. Was your opinion that he is totally | | |
| | 31:20 | vocational disabled based at least in part on the | | |
| | 31:21 | injuries and symptoms and diagnoses and treatment | | |
| | 31:22 | that are outlined here? | | |
| | 31:23 | A. Yes. | | |
| | 31:24 | Q. So tell us -- and I'm going to just | | |
| | 31:25 | minimize it a bit so it can all be on the page. | | |
| | 32:01 | Tell us, what about this information | | |
| | 32:02 | precludes Mr. Desrosiers from being able to work in | | |
| | 32:03 | other jobs? | | |
| | 32:04 | A. In other jobs, well, ongoing pain and | | |
| | 32:05 | muscle spasms. Depending on the job, if it's a job | | |
| | 32:06 | that requires walking or moving about, the fact that | | |
| | 32:07 | the knee buckles. Depending on the job, certainly | | |
| | 32:08 | the police officer job, the fact that he cannot run, | | |
| | 32:09 | that he cannot lift heavy objects. | | |
| | 32:10 | Then with regard to his psychological | | |
| | 32:11 | injuries, almost all of those, the anxiety, | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

32:12   depression, interrupted sleep with nightmares,

32:13   intrusive thoughts, socially withdrawn, difficulty

32:14   concentrating, feeling vulnerable in the community,

32:15   even being startled by loud noises, feeling unsafe

32:16   in public, difficulty managing his moods such as

32:17   feeling angry or being overreactive, all of those

32:18   psychological symptoms would impair an individual's

32:19   ability to effectively and efficiently work in a

32:20   job.

32:21   Q.   So when you rendered Mr. Desrosiers

32:22   disabled from the workforce, was it based upon his

32:23   physical injuries and diagnoses or his psychological

32:24   injuries and diagnoses?

32:25   A.   It was based on the combination of the

33:01   two, his physical injuries and his psychological

33:02   injuries.

33:03   Q.   Okay.  So it's one thing to look at a

33:04   list, but tell me what you did to satisfy yourself

33:05   as to whether or not he could find another job.

33:06   A.   Okay.  So the analysis of someone's

33:07   post-injury ability to work, with all of that

33:08   classification of the jobs that we did earlier on in

33:09   the assessment, there's a way to look for jobs based

33:10   on physical requirements.  So you can limit lifting

33:11   to a certain amount, you can limit the amount of

33:12   time standing or walking, you can also limit the

33:13   time bending or squatting or crawling.

33:14   But there's also psychological factors

33:15   that you can limit and that's why looking at those

33:16   transferable skills and some of those worker traits

33:17   is important because working effectively under

33:18   stress, I can separate any job that would require

33:19   that and that might be police officer, it might be

33:20   nurse, it might be paramedic, or EMT.  You can see

33:21   certainly in a sense certain jobs that would require

33:22   that.

33:23   So finding a job that met his physical

33:24   and psychological needs really resulted in no jobs

33:25   in the labor market.

34:01   Q.   What psychological diagnoses did he

34:02   have that factored into your assessment?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| 34:03 | A. | So he had anxiety, he had depression, |
| 34:04 | | he was diagnosed with post-traumatic stress disorder |
| 34:05 | | and another doctor diagnosed him with another |
| 34:06 | | stress-related disorder.  He had the nightmares, |
| 34:07 | | which is really a symptom and not a diagnosis. |
| 34:08 | | So we can talk about the different |
| 34:09 | | psychological symptoms, as well.  But in terms of |
| 34:10 | | diagnosis, it's anxiety, depression, PTSD, and other |
| 34:11 | | stress disorders. |
| 34:12 | Q. | When you were searching for jobs for |
| 34:13 | | Mr. Desrosiers, what were the most significant |
| 34:14 | | limiting factors for him, both from a physical and |
| 34:15 | | psychological standpoint? |
| 34:16 | A. | The limiting factors are his ability |
| 34:17 | | to stand, walk, and move and then his psychological |
| 34:18 | | factors. |
| 34:19 | Q. | You said "stand, walk, and move." Mr. |
| 34:20 | | Desrosiers would be in the courtroom standing and |
| 34:21 | | moving at times. |
| 34:22 | | How do you distinguish that versus |
| 34:23 | | standing, walking, and moving from what you're |
| 34:24 | | talking about? |
| 34:25 | A. | So there's the ability to sustain a |
| 35:01 | | job for an eight-hour day.  Right?  So his ability |
| 35:02 | | to stand, walk, and move as part of a job when he |
| 35:03 | | has pain, chronic pain, and a knee that buckles, |
| 35:04 | | that would limit his ability to engage in certain |
| 35:05 | | activities that may be required on the job. |
| 35:06 | Q. | How about for the psychological items? |
| 35:07 | | Were there limiting factors that you used in your |
| 35:08 | | job search for the psychological injuries and |
| 35:09 | | symptoms that he had? |
| 35:10 | A. | Yes.  So due to his symptoms, his |
| 35:11 | | psychological symptoms, and his social isolation, |
| 35:12 | | one of the probably more limiting factors was |
| 35:13 | | working around others.  So when you search for jobs |
| 35:14 | | that allow someone to work in social isolation such |
| 35:15 | | as a truck driver, for instance, that becomes a |
| 35:16 | | limiting factor. |
| 35:17 | | That is important in Mr. Desrosiers' |
| 35:18 | | case because he has a lot of social stressors.  He |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

35:19  feels vulnerable in public, he likes to withdraw, he

35:20  feels better when he's withdrawn from the public, he

35:21  has -- feels vulnerable and fearful in situations,

35:22  public situations.

35:23  So in order to be successful on a job,

35:24  it is prudent to find a job that he could perform

35:25  and that wouldn't be interfered with in some way by

36:01  his symptoms and diagnosis. So those psychological

36:02  factors were very important to determine if there

36:03  was other suitable work he could engage in

36:04  confidently.

36:05  Q. How do the ethics of job placement

36:06  factor in?

36:07  A. So an ethical consideration for job

36:08  placement is not -- job placement isn't about

36:09  finding a job, any job. It's really -- the ethical

36:10  nature of that is finding a realistic position that

36:11  somebody could perform over an extended period of

36:12  time. Is this a job that he can get and is it a job

36:13  that he could sustain and maintain for the rest of

36:14  his work life?

36:15  Q. Talk about his age and how, if at all,

36:16  that factors into finding a new career.

36:17  A. So, remember, at the time of my

36:18  evaluation of him, he was 62 years old. So when we

36:19  look at individuals and how adaptable are they to

36:20  new careers we'll call it, right, to a big change in

36:21  their work expectation, the younger you are, the

36:22  more amenable and adaptable you are. The older you

36:23  are, the more difficult it becomes to change your

36:24  thinking or learn new skills.

36:25  He was already 62 years old at the

37:01  time that I interviewed him. So that means when I'm

37:02  looking at jobs for Mr. Desrosiers, I need something

37:03  that is similar. Either similar in industry or uses

37:04  similar transferrable skills, uses similar worker

37:05  traits. So that -- as you get older, that becomes

37:06  more and more limiting.

37:07  Q. In terms of Mr. Desrosiers' plan, did

37:08  he express to you whether he liked being a police

37:09  officer and would have continued being a police

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

37:10     officer had this not happened?

37:11   A.   Mr. Desrosiers was dedicated to being

37:12     a police officer. He was a patrol officer for his

37:13     entire 24-year career. He would have continued

37:14     being a police officer as long as they would have

37:15     let him.

37:16     So, clearly, through his retirement

37:17     and then who knows what he could have done. There

37:18     are post-retirement jobs that police officers take

37:19     after they retire from the force.

37:20   Q.   Did he indicate to you when he planned

37:21     to work until?

37:22   A.   So he had mentioned that he was hoping

37:23     to work until the age of 70 in some capacity.

37:24   Q.   Did you use the age of 70 in terms of

37:25     figuring out how many years he has lost in the job

38:01     market?

38:02   A.   So there's several ways to figure out

38:03     what someone's we call that work life expectancy.

38:04     It's how long will someone remain in the workforce.

38:05     I tend to use age 67 as the age of

38:06     retirement. By Social Security, that's when you're

38:07     entitled to 100 percent of your retirement benefits.

38:08     I use to the age of 67.

38:09     So in Mr. Desrosiers' case, that would

38:10     have been conservative as he said that he probably

38:11     would have liked to have worked to age 70.

38:12   Q.   Is there a mandatory retirement age in

38:13     Massachusetts?

38:14   A.   Yes. So apparently age 65 is the

38:15     mandatory age of retirement that you have to leave

38:16     the police force.

38:17   Q.   And how does that factor in? If

38:18     you're retiring at 65 and you want to work until 70

38:19     in that area, what options are available to someone

38:20     like Mr. Desrosiers if this incident didn't occur?

38:21   A.   Right. So many times, police officers

38:22     begin working in the private sector. They'll either

38:23     work for a private security company, they'll find

38:24     other detail in the protective industry, they might

38:25     work in schools.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 39:01 | | So there are other jobs that if | |
| | 39:02 | | somebody, you know, that requires some of those | |
| | 39:03 | | skills like an investigator, a private eye, right. | |
| | 39:04 | | So there are other jobs that retired police officers | |
| | 39:05 | | will do after retirement if they're motivated to | |
| | 39:06 | | continue working. | |
| | 39:07 | Q. | Dr. Tota, just to summarize, Mr. | |
| | 39:08 | | Desrosiers was 57 at the time of the incident. | |
| | 39:09 | A. | Yes. | |
| | 39:10 | Q. | From the time of the incident until | |
| | 39:11 | | his work life expectancy, please tell the jury your | |
| | 39:12 | | opinion. | |
| | 39:13 | A. | Right. So I counted from 57 to age | |
| | 39:14 | | 67, he had ten years of work life remaining | |
| | 39:15 | | minimally and an additional three if he was going to | |
| | 39:16 | | work up to the age of 70. | |
| | 39:17 | Q. | And as a result of the incident? | |
| | 39:18 | A. | As a result of the incident, his work | |
| | 39:19 | | life terminated at age 57 at the time of the | |
| | 39:20 | | accident. | |

| 40:06 - 42:02 | **Tota, Romy 2025-06-30** | | 00:02:40 | **RomyTota-edited fortrial.3** |
| | 40:06 | Q. | Tell me the importance of not only | |
| | 40:07 | | finding a job, but finding a job that someone can | |
| | 40:08 | | maintain for a period of time. | |
| | 40:09 | A. | Well, I think we've all seen incidents | |
| | 40:10 | | of short-term jobs. We see that with our children. | |
| | 40:11 | | They take a job and they don't last long. They find | |
| | 40:12 | | they don't like it, it's not suited to them, or they | |
| | 40:13 | | can't do it. That does not secure someone's | |
| | 40:14 | | financial future. That is not a viable employment. | |
| | 40:15 | | Finding employment for an individual | |
| | 40:16 | | that is gainful, that is going to allow them to have | |
| | 40:17 | | an earning over a period of time has to be a job | |
| | 40:18 | | that, A, they can get that meets their employability | |
| | 40:19 | | or requirements to get the job and it has to also | |
| | 40:20 | | meet the placeability, the fact that they will | |
| | 40:21 | | actually get hired for the job and that they can | |
| | 40:22 | | stay in that job. Otherwise, it's not really | |
| | 40:23 | | considered gainful employment. | |
| | 40:24 | Q. | Has Mr. Desrosiers tried to take any | |

| | | | | |
| --- | --- | --- | --- | --- |
| | 40:25 | | classes or learn new skills to try to get back into | |
| | 41:01 | | the job force? | |
| | 41:02 | A. | So he did tell me that he took a real | |
| | 41:03 | | estate course. | |
| | 41:04 | Q. | Is that an appropriate job considering | |
| | 41:05 | | his injuries and symptoms? | |
| | 41:06 | A. | I appreciate his ambition to do it. | |
| | 41:07 | | I'm not sure if he intended to actually work as a | |
| | 41:08 | | realtor. | |
| | 41:09 | | I don't think that being a realtor is | |
| | 41:10 | | going to be a job that meets the limitations of his | |
| | 41:11 | | physical demands or his psychological demands. This | |
| | 41:12 | | is a position that makes you work out in the | |
| | 41:13 | | community with people you don't know, could be under | |
| | 41:14 | | difficult circumstances, and real estate agent was | |
| | 41:15 | | not a position that identified itself as an | |
| | 41:16 | | appropriate alternative employment for Mr. | |
| | 41:17 | | Desrosiers. | |
| | 41:18 | Q. | Based on your observations, did Mr. | |
| | 41:19 | | Desrosiers present as someone who would have loved | |
| | 41:20 | | to continue working had this incident not occurred? | |
| | 41:21 | A. | I believe that had this incident not | |
| | 41:22 | | occurred, he would have continued in his job as | |
| | 41:23 | | patrol officer as long as they would let him do so. | |
| | 41:24 | Q. | Dr. Tota, you've given opinions today. | |
| | 41:25 | | Have all of the opinions that you've given been to a | |
| | 42:01 | | reasonable degree of vocational certainty? | |
| | 42:02 | A. | Yes, they have. | |
| 42:14 - 46:23 | **Tota, Romy 2025-06-30** | | 00:03:37 | **RomyTota-edited fortrial.4** |
| | 42:14 | | ATTORNEY ZIMMERMAN: Dr. Tota, those | |
| | 42:15 | | are all the questions I have. Thank you very much. | |
| | 42:16 | | THE WITNESS: Thank you. | |
| | 42:17 | | - - CROSS-EXAMINATION - - | |
| | 42:18 | | BY ATTORNEY DEVINE: | |
| | 42:19 | Q. | Good morning, Dr. Tota. | |
| | 42:20 | A. | Good morning. | |
| | 42:21 | Q. | My name is Alaina Devine. I'm one of | |
| | 42:22 | | the lawyers for Sig Sauer in this case. I'm going | |
| | 42:23 | | to ask you a few questions. | |
| | 42:24 | A. | Okay. | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

42:25 Q. You were hired in this case by the

43:01 plaintiff's attorneys. Correct?

43:02 A. Yes.

43:03 Q. And you charge approximately $4,100 to

43:04 conduct your vocational assessment. Correct?

43:05 A. Yes.

43:06 Q. And you charge $2,500 for deposition

43:07 and trial testimony that you're giving here today.

43:08 Correct?

43:09 A. Yes.

43:10 Q. And it's true that 100 percent of your

43:11 practice at this point is litigation related or

43:12 serving as an expert witness. Correct?

43:13 A. That is correct.

43:14 Q. And that's been the case at least

43:15 since 2018 by yourself and then since 2010 with

43:16 another vocational expert. Correct?

43:17 A. Yes.

43:18 Q. You stated that you conducted your

43:19 assessment of Mr. Desrosiers about a year ago

43:20 virtually. Correct?

43:21 A. Yes.

43:22 Q. You've never met Mr. Desrosiers in

43:23 person. Correct?

43:24 A. Not in person.

43:25 Q. And other than the assessment that you

44:01 completed about a year ago, you've never spoken with

44:02 him before or after that. Correct?

44:03 A. That's correct.

44:04 Q. You didn't speak to any of Mr.

44:05 Desrosiers' treating providers. Correct?

44:06 A. No, but I read medical records.

44:07 Q. But you didn't call and speak to any

44:08 of them. Correct?

44:09 A. That's correct.

44:10 Q. And you didn't speak to any of the

44:11 other consulting experts in this case that were

44:12 hired by the plaintiff's lawyers. Correct?

44:13 A. That's correct.

44:14 Q. That would include Dr. Romirowsky.

44:15 Correct?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

44:16   A.   Correct.

44:17   Q.   Dr. Von Keudell?

44:18   A.   Correct.

44:19   Q.   And in your vocational assessment that

44:20        you completed with Mr. Desrosiers, you explained to

44:21        him that no counseling relationship was implied or

44:22        intended.  Correct?

44:23   A.   Yes.

44:24   Q.   And you explained to him that no

44:25        actual job placement is implied or intended.

45:01        Correct?

45:02   A.   Correct.

45:03   Q.   And your evaluation, as you stated on

45:04        direct, was an interview of Mr. Desrosiers and then

45:05        administering some tests including an interest and

45:06        aptitude test.  Correct?

45:07   A.   Yes.

45:08   Q.   We went through some of this on

45:09        direct, but Mr. Desrosiers is a highly educated man.

45:10        Correct?

45:11   A.   Yes, he is.

45:12   Q.   He's trilingual.  Is that right?

45:13   A.   Yes.

45:14   Q.   He has a Bachelor's degree in liberal

45:15        arts and criminal justice?

45:16   A.   Yes.

45:17   Q.   You mentioned he has a law degree that

45:18        he completed in 2012?

45:19   A.   Yes.

45:20   Q.   He completed an online real estate

45:21        course in 2023 after his injury.  Correct?

45:22   A.   Yes, but he never took the real estate

45:23        exam.

45:24   Q.   Yes.

45:25   A.   But he did the course, yes.

46:01   Q.   Yes.  You also have indicated

46:02        previously that he likes to read.  Correct?

46:03   A.   Yeah.  In part of his spare time, he

46:04        likes to read.

46:05   Q.   Education is important to him.  Right?

46:06   A.   Yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 46:07 | Q. | And one of the activities that he's | | |
| | 46:08 | | undertaken post-injury is he likes to walk almost | | |
| | 46:09 | | every day to the library.  Is that correct? | | |
| | 46:10 | A. | Yes. | | |
| | 46:11 | Q. | And you stated on direct, he was a | | |
| | 46:12 | | police officer for more than 24 years.  Right? | | |
| | 46:13 | A. | Yes. | | |
| | 46:14 | Q. | Did you review Mr. Desrosiers' | | |
| | 46:15 | | employment file? | | |
| | 46:16 | A. | No, I did not have that. | | |
| | 46:17 | Q. | Okay.  That wasn't something provided | | |
| | 46:18 | | to you by the plaintiff's lawyers in this case. | | |
| | 46:19 | | Correct? | | |
| | 46:20 | A. | Correct. | | |
| | 46:21 | Q. | You're aware in Massachusetts, police | | |
| | 46:22 | | officers are eligible for their full pension after | | |
| | 46:23 | | 20 years of service? | | |

**47:08 - 47:22**  **Tota, Romy 2025-06-30**  00:00:36  **RomyTota-edited fortrial.5**

| | 47:08 | | THE WITNESS:  I don't recall, Alaina, | | |
| | 47:09 | | if I asked him that question.  I don't have my notes | | |
| | 47:10 | | from the interview.  I generally do ask about | | |
| | 47:11 | | pension. | | |
| | 47:12 | | At this point, I don't recall if he -- | | |
| | 47:13 | | if I asked him that and how he answered about | | |
| | 47:14 | | eligibility for a pension after 20 years. | | |
| | 47:15 | | BY ATTORNEY DEVINE: | | |
| | 47:16 | Q. | We talked a little bit about the | | |
| | 47:17 | | mandatory retirement age of 65 for police officers. | | |
| | 47:18 | | Correct? | | |
| | 47:19 | A. | Yes. | | |
| | 47:20 | Q. | It's not uncommon is it, Dr. Tota, for | | |
| | 47:21 | | police officers who are full pension eligible to | | |
| | 47:22 | | retire before the age of 65.  Correct? | | |

**48:03 - 62:12**  **Tota, Romy 2025-06-30**  00:15:38  **RomyTota-edited fortrial.6**

| | 48:03 | | THE WITNESS:  Okay.  That may be | | |
| | 48:04 | | someone's preference, but obviously not Mr. | | |
| | 48:05 | | Desrosiers' because if he could have been eligible | | |
| | 48:06 | | for a pension after 20 years, he was already in for | | |
| | 48:07 | | 24 years with the intent to work to age 70. | | |
| | 48:08 | | So even though some people may choose | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

48:09    that path, I don't see that that was his path.

48:10    BY ATTORNEY DEVINE:

48:11  Q.  We talked about transferrable skills

48:12    for Mr. Desrosiers.  Correct?

48:13  A.  Yes.

48:14  Q.  You would agree, Dr. Tota, that there

48:15    are a number of transferrable skills that Mr.

48:16    Desrosiers has post-injury from his work of more

48:17    than 24 years as a police officer.  Correct?

48:18  A.  Yes.

48:19  Q.  That would include knowing laws and

48:20    safety rules and ways to enforce them.  Correct?

48:21  A.  Yes.

48:22  Q.  That would include organizing and

48:23    planning the work of others.  Correct?

48:24  A.  Yes.

48:25  Q.  That would include collecting and

49:01    organizing evidence in some fashion.  Correct?

49:02  A.  Yes.

49:03  Q.  And that would include writing a clear

49:04    report.  Correct?

49:05  A.  Yes.

49:06  Q.  And I believe you already stated this

49:07    on direct, but many police officers go on to have

49:08    second careers whether it be a new career or

49:09    something in the related police field, but something

49:10    different.  Correct?

49:11  A.  Yes.  Some want to continue working

49:12    after they resign from the force.  They will find

49:13    other related -- typically somewhat related

49:14    occupations, yes.

49:15  Q.  You had Mr. Desrosiers complete an

49:16    interest and aptitude test.  Correct?

49:17  A.  Yes, called a career scope.

49:18  Q.  Thank you.  Could you describe for the

49:19    jury what that test is?

49:20  A.  Sure.  So it is a self-administered

49:21    computerized test.  It measures two different areas.

49:22    The first area is vocational interests and the test

49:23    will describe job duties and an individual just

49:24    indicates whether or not that activity sounds

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 49:25 | vocationally interesting to them. | |
| | 50:01 | How I usually address that with people | |
| | 50:02 | that have had some sort of injury, I tell them that | |
| | 50:03 | they're not supposed to think, oh, but I can't do | |
| | 50:04 | that or I don't know how to do that.  It's really | |
| | 50:05 | whether or not that activity sounds interesting, | |
| | 50:06 | like something you would like to do.  So they just | |
| | 50:07 | check whether it is something they would like or | |
| | 50:08 | dislike or they're not sure if they would like or | |
| | 50:09 | dislike. | |
| | 50:10 | After the interest inventory, there | |
| | 50:11 | are seven different aptitude tests.  An aptitude is | |
| | 50:12 | a skill.  It's something that you learned, you | |
| | 50:13 | learned it in school, you learned it on the job, you | |
| | 50:14 | learned it through the course of life.  It's things | |
| | 50:15 | that can be measured, it's word meaning, it's | |
| | 50:16 | mathematics, it's object identification, it's facial | |
| | 50:17 | relations, it's things like that. | |
| | 50:18 | Those are multiple choice tests and | |
| | 50:19 | there's only one correct answer.  So they work their | |
| | 50:20 | way through those seven different aptitude tests. | |
| | 50:21 | Q.  And Mr. Desrosiers took that test in | |
| | 50:22 | July 2024 post-injury.  Correct? | |
| | 50:23 | A.  Yes, he did. | |
| | 50:24 | Q.  I'm going to share my screen. | |
| | 50:25 | Dr. Tota, can you see what I have on | |
| | 51:01 | the screen?  This is Page 9 of your vocational | |
| | 51:02 | evaluation. | |
| | 51:03 | A.  Yes, I see that. | |
| | 51:04 | Q.  And this top part here, is this the | |
| | 51:05 | results of the aptitude test that Mr. Desrosiers | |
| | 51:06 | took in July of 2024? | |
| | 51:07 | A.  Yes, it is. | |
| | 51:08 | Q.  It's fair to say, Dr. Tota, that Mr. | |
| | 51:09 | Desrosiers in 2024 scored above average in most of | |
| | 51:10 | these categories.  Correct? | |
| | 51:11 | A.  Yeah.  Well, in half the categories, | |
| | 51:12 | he was above average.  In the other three, he was in | |
| | 51:13 | the high average. | |
| | 51:14 | Q.  Okay.  His lowest score was verbal | |
| | 51:15 | aptitude and that was 79th percentile.  Correct? | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

51:16  A.  Correct.

51:17  Q.  His general learning score was 80th

51:18      percentile.  Correct?

51:19  A.  Yes.

51:20  Q.  His spatial aptitude was 86th

51:21      percentile?

51:22  A.  Yes.

51:23  Q.  His numerical aptitude was 95th

51:24      percentile.  Correct?

51:25  A.  Yes.

52:01  Q.  His form perception was 99th

52:02      percentile.  Correct?

52:03  A.  Yes.

52:04  Q.  And his clerical perception was also

52:05      99th percentile.  Correct?

52:06  A.  Right.  Those are attention to detail

52:07      areas.  He did very well in those.

52:08  Q.  And you described based on these test

52:09      results that Mr. Desrosiers is a bright guy.  Right?

52:10  A.  Yes.

52:11  Q.  You've testified on direct that you

52:12      reviewed a number of medical records, physical

52:13      therapy records, mental health treatment records for

52:14      Mr. Desrosiers in connection with your work on this

52:15      case.  Correct?

52:16  A.  Yes.

52:17  Q.  Of those records you reviewed, you're

52:18      not aware of any statements by any of the providers,

52:19      evaluators, or in any of the records of those who

52:20      examined or treated Mr. Desrosiers that Mr.

52:21      Desrosiers has a mental disability that completely

52:22      prevents him from maintaining any employment.

52:23      Correct?

52:24  A.  So mental disability, are you talking

52:25      cognitive disability?  I did not see any indication

53:01      that he has a cognitive disability.

53:02      There is indication of a

53:03      psychological.  I don't know if you consider that

53:04      mental or emotional.  So I want to be clear about

53:05      the difference between that.

53:06  Q.  I would include in that question the

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

53:07     psychological disability. The issues you described,

53:08     the records you reviewed.

53:09    A.   Okay. I would say yes. There is

53:10     mention of psychological disability that affects his

53:11     ability to work.

53:12    Q.   My question, Dr. Tota, was have any of

53:13     these providers, experts, evaluators reached the

53:14     opinion based on the records you reviewed that

53:15     because of those psychological issues, he's

53:16     completely prevented from working?

53:17    A.   No, but that is not what they are

53:18     experts in. That is what I'm the expert in, is

53:19     deciding the impact of those psychological injuries

53:20     on someone's ability to work and I did that analysis

53:21     of considering those psychological injuries and how

53:22     that would affect his future ability to work and

53:23     what types of jobs he could get.

53:24     The medical providers tell me what the

53:25     disability is or what the injuries are and then it's

54:01     my responsibility to factor that in and how that

54:02     affects somebody's ability to work.

54:03    Q.   But none of those medical providers

54:04     have each reached that opinion. Correct? That's

54:05     just your opinion. Correct?

54:06    A.   Well, they're of the opinion that he

54:07     has these psychological injuries and then I have to

54:08     determine how that impacts his ability to work.

54:09    Q.   Dr. Tota, my question is has any of

54:10     those -- have any of those providers reached the

54:11     opinion that Mr. Desrosiers is unable to work

54:12     because of his psychological injuries?

54:13    A.   So I did not read that specifically,

54:14     that he was unable to work. They also don't try to

54:15     attempt to say what type of work, if any, that he

54:16     can do. They merely list the disability.

54:17    Q.   Thank you. I have the same question

54:18     with respect to Mr. Desrosiers' physical injuries.

54:19     Did you see anywhere in any of the

54:20     records a statement by any of the providers or

54:21     evaluators that Mr. Desrosiers was completely

54:22     prevented -- prevented from working due to his

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 54:23 | physical disability? | | |
| | 54:24 | A. No, with the same explanation. | | |
| | 54:25 | Q. Certainly you're not offering a | | |
| | 55:01 | medical opinion in this case that Mr. Desrosiers is | | |
| | 55:02 | completely prevented due to physical or | | |
| | 55:03 | psychological disability from maintaining any | | |
| | 55:04 | employment. Correct? | | |
| | 55:05 | A. That's correct. I did not offer a | | |
| | 55:06 | medical opinion. | | |
| | 55:07 | Q. You discussed on direct some | | |
| | 55:08 | medications that Mr. Desrosiers may be taking. | | |
| | 55:09 | You have certainly placed people who | | |
| | 55:10 | take medications for anxiety and depression in jobs. | | |
| | 55:11 | Correct? | | |
| | 55:12 | A. Yes. | | |
| | 55:13 | Q. You're aware, Dr. Tota, that Mr. | | |
| | 55:14 | Desrosiers elected to end his mental health | | |
| | 55:15 | treatment completely in June of 2022. Correct? | | |
| | 55:16 | A. I cannot state for certain, but I do | | |
| | 55:17 | believe he stopped with the services for a while | | |
| | 55:18 | because he had pretty much withdrawn from engaging | | |
| | 55:19 | in different activities and had sort of found a | | |
| | 55:20 | level of peace, I guess, by doing the things that he | | |
| | 55:21 | was doing. | | |
| | 55:22 | Q. Okay. And you have a psychology | | |
| | 55:23 | background. Correct? | | |
| | 55:24 | A. Yes. | | |
| | 55:25 | Q. And you're not offering any psychology | | |
| | 56:01 | opinions here today. Correct? | | |
| | 56:02 | A. No. | | |
| | 56:03 | Q. The last time Mr. Desrosiers engaged | | |
| | 56:04 | in any mental health treatment or psychological | | |
| | 56:05 | treatment was in June of 2022. Correct? | | |
| | 56:06 | A. Yes. | | |
| | 56:07 | Q. And he didn't engage in any mental | | |
| | 56:08 | health treatment or psychological treatment in 2023. | | |
| | 56:09 | Correct? | | |
| | 56:10 | A. Not that I'm aware of. | | |
| | 56:11 | Q. And not in 2024. Correct? | | |
| | 56:12 | A. Correct. | | |
| | 56:13 | Q. And not up until June of 2025. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

56:14      Correct?

56:15   A.   Right.  Not that I'm aware of.

56:16   Q.   Mr. Desrosiers also stopped physical

56:17      therapy in June of 2020.  Correct?

56:18   A.   Yes.

56:19   Q.   And as far as you're aware, Mr.

56:20      Desrosiers didn't engage in any physical therapy

56:21      treatment in 2021.  Correct?

56:22   A.   Correct.

56:23   Q.   And same thing in 2022.  Correct?

56:24   A.   Right.

56:25   Q.   And same in 2023.  Correct?

57:01   A.   As far as I know, correct.

57:02   Q.   And same in 2024.  Correct?

57:03   A.   Right.

57:04   Q.   And at least up until June of 2025.

57:05      Correct?

57:06   A.   Right.  That I'm aware of, yeah.

57:07   Q.   So the physical and psychological

57:08      issues that you identified and that your report

57:09      relies upon, Mr. Desrosiers is not currently seeking

57:10      any treatment for either of them.  Correct?

57:11   A.   So it appears that he's not seeking

57:12      any current treatment, but that doesn't necessarily

57:13      mean that his injuries, physical or psychological,

57:14      have resolved.  It's just that he's not actively

57:15      seeking treatment.

57:16   Q.   You learned from your review of some

57:17      of the treating records including Dr. Nunziato who

57:18      was Doctor -- excuse me, Mr. Desrosiers' former

57:19      treating psychologist that Mr. Desrosiers had

57:20      expressed that he wanted to return to work and that

57:21      he was stir-crazy at home.  Correct?

57:22   A.   I believe so.

57:23   Q.   The job search that you completed for

57:24      Mr. Desrosiers in this case was done on a computer

57:25      program.  Correct?

58:01   A.   Right.  It's partially on a computer

58:02      program and then of course you have to use your own

58:03      expert judgment in evaluating the outcomes of what a

58:04      computer program will tell you.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

58:05   Q.   And that computer program that you use

58:06      is SkillTRAN. Is that right?

58:07   A.   Right.

58:08   Q.   SkillTRAN is a program where you enter

58:09      certain criteria or search factors and the program

58:10      itself searches the Dictionary of Occupational

58:11      Titles. Correct?

58:12   A.   Right. It searches -- it searches all

58:13      occupations to meet the criteria that you put into

58:14      it.

58:15   Q.   And the Dictionary of Occupational

58:16      Titles, those are job types or job categories.

58:17      That's not actually searching the labor market.

58:18      Correct?

58:19   A.   So the Dictionary of Occupational

58:20      Titles are actual occupational jobs that are listed.

58:21      It's an old book, but it still lists -- it has over

58:22      12,000 different occupations.

58:23      So it's not searching his area. It's

58:24      not searching Cambridge or Massachusetts for open

58:25      jobs. It identifies jobs. Right? And it lets you

59:01      know what jobs meet your criteria.

59:02      So it's not a labor market search,

59:03      it's a search of suitable jobs.

59:04   Q.   And in order to search in SkillTRAN,

59:05      you chose which filters and which search criteria to

59:06      apply. Correct?

59:07   A.   That's right.

59:08   Q.   And the filters you applied for Mr.

59:09      Desrosiers were only sedentary to light work.

59:10      Correct?

59:11   A.   Correct.

59:12   Q.   Avoiding performing effectively under

59:13      stress. Correct?

59:14   A.   Right.

59:15   Q.   Avoiding dealing with people.

59:16      Correct?

59:17   A.   Right. The working in isolation, yes.

59:18   Q.   And must be a job where he is working

59:19      alone or apart in physical isolation from others.

59:20      Correct?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

59:21 A. That's that one. Yes.

59:22 Q. Okay. Working alone or in physical

59:23     isolation involves working in an environment that

59:24     regularly precludes face-to-face interpersonal

59:25     relations for extended periods of time. Correct?

60:01 A. Yes.

60:02 Q. And that's due to physical barriers or

60:03     distances involved. Correct?

60:04 A. Yes.

60:05 Q. And I believe you gave the example on

60:06     direct of a truck driver. Correct?

60:07 A. Yes.

60:08 Q. Dr. Tota, are you aware there's only

60:09     three jobs total in SkillTRAN that meet the criteria

60:10     for working alone or apart in physical isolation

60:11     from others?

60:12 A. So this conversation's been had and I

60:13     believe that there's at least three. I have not

60:14     verified if there's more than three. But I will

60:15     accept the fact that working in isolation definitely

60:16     limits the number of jobs, limits that whole circle

60:17     of jobs that someone may be qualified for. It is an

60:18     exclusionary criteria.

60:19 Q. That one filter alone before you apply

60:20     any other filters results in three jobs total.

60:21     Correct?

60:22 A. Yes.

60:23 Q. Do you know what the other two jobs

60:24     are that are in the 12,000 or so jobs in SkillTRAN

60:25     that meet that criteria?

61:01 A. I don't off the top of my head.

61:02 Q. The fact is, Dr. Tota, that the

61:03     limitations or filters that you applied greatly

61:04     restrained any potential jobs that could pop up for

61:05     Mr. Desrosiers. Correct?

61:06 A. That may be the case, yes.

61:07 Q. And after you applied those filters

61:08     and ran your searches, zero jobs popped up.

61:09     Correct?

61:10 A. That's correct.

61:11 Q. And after running that search in

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

61:12   SkillTRAN, you did not then conduct a manual search
61:13   of possible jobs for Mr. Desrosiers.  Correct?
61:14   A.  I'm not sure what you mean by manual.
61:15   Q.  Sure.  You didn't look at the labor
61:16   market in greater Boston for possible jobs for Mr.
61:17   Desrosiers.  Correct?
61:18   A.  Well, the same criteria would have to
61:19   apply to those jobs if I did a manual search.  And
61:20   if a computer-generated search shows me that there
61:21   are no options that meet his vocational background
61:22   and his transferrable skills and the limitations
61:23   placed on him, then, no, I did not decide to then
61:24   look into his job market and see what else there
61:25   might be.
62:01   Q.  SkillTRAN doesn't have work-from-home
62:02   jobs.  Correct?
62:03   A.  It doesn't identify a job specifically
62:04   as work from home, but of course that would require
62:05   clinical judgment to determine if a position is
62:06   available, you know, in office or remotely to be
62:07   performed at home.
62:08   Q.  And you didn't contact any employers
62:09   with job openings in the greater Boston area to ask
62:10   about Mr. Desrosiers or potential work-from-home
62:11   accommodations.  Correct?
62:12   A.  I did not do that, no.

| 62:22 - 65:10 | **Tota, Romy 2025-06-30** | 00:03:30 | **RomyTota-edited** |
| | | | **fortrial.7** |

62:22   ATTORNEY DEVINE:  I have no further
62:23   questions, Dr. Tota.  Thank you very much.
62:24   THE WITNESS:  Thank you.
62:25   - - REDIRECT EXAMINATION - -
63:01   BY ATTORNEY ZIMMERMAN:
63:02   Q.  Dr. Tota, I just have a few
63:03   follow-ups.
63:04   A.  Okay.
63:05   Q.  Why was it important for you to limit
63:06   potential jobs for Mr. Desrosiers with filters as it
63:07   was called?
63:08   A.  So that helps discern what's truly
63:09   available for someone given his conditions.  The

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

63:10     filters only exclude jobs that he would not be able

63:11     to perform whether it be physically or we also have

63:12     cognitive demands and you can do it through those

63:13     worker traits. That's why it's important to

63:14     identify them in the beginning that those are a way

63:15     to exclude jobs that based on the medical records he

63:16     should avoid certain situations.

63:17     So putting those filters on provides a

63:18     clear-cut way to see what jobs would be reasonable

63:19     for him to perform or not.

63:20   Q.   I'll show you again Exhibit 702, the

63:21     demonstrative.

63:22     Were some of these injuries and

63:23     symptoms that were identified the reasons for

63:24     needing to place certain filters on what jobs were

63:25     appropriate for Mr. Desrosiers?

64:01   A.   Yes. You know, that is merely a

64:02     listing of symptoms and injuries. Right? But also

64:03     in the medical records, the medical providers made

64:04     statements that, for instance, one of his

64:05     psychological providers said that he should avoid

64:06     any similar situations and that was, you know,

64:07     situations similar to police work in Cambridge.

64:08     So these -- so whether it's from that

64:09     list or whether it's from data that was gathered

64:10     from the medical records, you know, that's where

64:11     those filters and placing those filters come into

64:12     play because it was preempted by what medical

64:13     providers were stating about Mr. Desrosiers.

64:14   Q.   What were some of the injuries that

64:15     are listed here that made you believe it was

64:16     appropriate to put a filter of working in isolation?

64:17   A.   I'm just reading through the list

64:18     here.

64:19     The fact that he preferred to be

64:20     socially withdrawn, that he had a sense of

64:21     vulnerability in the public, that he felt unsafe in

64:22     public, that he was emotionally overreactive, that

64:23     he was easily irritated or angered.

64:24     These are situations that would not be

64:25     conducive of a position that involved working with

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|

| | 65:01 | the public. | | |
| | 65:02 | Q. Before this incident, did you have any | | |
| | 65:03 | evidence that he exhibited those symptoms? | | |
| | 65:04 | A. Before this incident, there was no | | |
| | 65:05 | evidence of any concerns or issues of that. The | | |
| | 65:06 | medical records pre-injury didn't discuss anything | | |
| | 65:07 | like that and certainly Mr. Desrosiers' | | |
| | 65:08 | effectiveness on the job did not allude to any | | |
| | 65:09 | problems working with the public. Quite the | | |
| | 65:10 | opposite. He enjoyed working in the public. | | |
| 66:08 - 67:07 | **Tota, Romy 2025-06-30** | | 00:01:07 | **RomyTota-edited** |
| | | | | **fortrial.8** |
| | 66:08 | Q. Dr. Tota, you were asked about the | | |
| | 66:09 | opinion of Mr. Desrosiers' medical providers. | | |
| | 66:10 | There was only one medical provider | | |
| | 66:11 | who determined whether or not Mr. Desrosiers could | | |
| | 66:12 | return to work as a police officer. Correct? | | |
| | 66:13 | A. Well, he did do a fitness to return to | | |
| | 66:14 | work evaluation for the police force and they found | | |
| | 66:15 | him to be unfit to return as a police officer. | | |
| | 66:16 | Q. Now did any of these providers go the | | |
| | 66:17 | other step or the next step and attempt to identify | | |
| | 66:18 | other jobs that Mr. Desrosiers could perform? | | |
| | 66:19 | A. That was never discussed in any of the | | |
| | 66:20 | medical reports nor would I expect it to be because | | |
| | 66:21 | that's really outside the purview of what a medical | | |
| | 66:22 | provider would do. | | |
| | 66:23 | What a medical provider would do is | | |
| | 66:24 | tell me with what residual limitations this | | |
| | 66:25 | individual was living. | | |
| | 67:01 | Q. Would those residual limitations, is | | |
| | 67:02 | that what you utilized to go the next step in | | |
| | 67:03 | forming your opinion? | | |
| | 67:04 | A. Correct. | | |
| | 67:05 | Q. Dr. Tota, I want to thank you for your | | |
| | 67:06 | time. | | |
| | 67:07 | A. Thank you. | | |

| Our Designations | 01:12:07 |
|---|---|
| **TOTAL RUN TIME** | **01:12:07** |