# EXHIBIT M

Transcribed Trial Testimony of Samuel Romirowsky that was video recorded and played for the Jury

# SamuelRomirowsky-editedfortrial

Designation List Report

**Romirowsky, Samuel**                    **2025-06-30**

| | |
|---|---|
| Our Designations | 01:07:52 |
| **TOTAL RUN TIME** | **01:07:52** |



| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| 5:24 - 29:20 | **Romirowsky, Samuel 2025-06-30** | 00:32:22 | **SamuelRomirowsky-editedfortrial.1** |

| | 5:24 | Whereupon, | |
| | 5:25 | SAMUEL ROMIROWSKY, PH.D., | |
| | 6:01 | called as a witness, having been first duly | |
| | 6:02 | sworn to tell the truth, the whole truth, and nothing | |
| | 6:03 | but the truth, testified as follows: | |
| | 6:04 | - - - | |
| | 6:05 | D I R E C T  E X A M I N A T I O N | |
| | 6:06 | - - - | |
| | 6:07 | BY MR. ZIMMERMAN: | |
| | 6:08 | Q. Hello, Dr. Romirowsky. Can you please | |
| | 6:09 | introduce yourself to the jury? | |
| | 6:10 | A. Of course. My name is Sam Romirowsky. | |
| | 6:11 | I'm a licensed psychologist. I've been in practice | |
| | 6:12 | for approximately 45 years, and I had the | |
| | 6:13 | opportunity in this case to evaluate | |
| | 6:14 | Mr. Desrosiers. | |
| | 6:15 | Q. You mentioned that you are a | |
| | 6:16 | psychologist. What does a psychologist do? | |
| | 6:17 | A. A psychologist specializes in human | |
| | 6:18 | behavior and based on past behavior and symptoms is | |
| | 6:19 | able to, to a reasonable degree, predict how people | |
| | 6:20 | will behave going forward. | |
| | 6:21 | Q. As a psychologist, do you from time to | |
| | 6:22 | time diagnose disorders? | |
| | 6:23 | A. Yes. | |
| | 6:24 | Q. And -- | |
| | 6:25 | A. Regularly. | |
| | 7:01 | Q. I'm sorry? | |
| | 7:02 | A. I'm sorry to interrupt. Regularly. | |
| | 7:03 | Q. Okay. Can you give some examples of | |
| | 7:04 | the types of diagnoses that psychologists can -- | |
| | 7:05 | can find? | |
| | 7:06 | A. Depending on what kinds of problems, | |
| | 7:07 | what kinds of symptoms a patient presents with or | |
| | 7:08 | wants help with, a psychologist might find that a | |
| | 7:09 | person has what's called a mood disorder. | |
| | 7:10 | In plain English, it means that they're | |
| | 7:11 | sad and that usually, if they have the symptoms | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 7:12 | that meet the criteria, shows that they have a | | |
| | 7:13 | depressive disorder, that they're suffering not | | |
| | 7:14 | just feeling sad or blue, like everybody does, but | | |
| | 7:15 | have other symptoms that make it reach the level of | | |
| | 7:16 | an actual psychiatric diagnosis called depression. | | |
| | 7:17 | Some of them might present feeling | | |
| | 7:18 | jittery, apprehensive, worried all the time, and | | |
| | 7:19 | unable to control their worry; that person might be | | |
| | 7:20 | suffering from what's called an anxiety disorder. | | |
| | 7:21 | So there's anxiety, there's depression, mood | | |
| | 7:22 | disorders. | | |
| | 7:23 | And there are thought disorders where | | |
| | 7:24 | people really can't distinguish what's reality from | | |
| | 7:25 | what's fantasy, and those are called psychotic | | |
| | 8:01 | disorders. | | |
| | 8:02 | So there's a whole spectrum of reasons | | |
| | 8:03 | why people might seek out a psychologist. | | |
| | 8:04 | Q. Doctor, were you retained by our office | | |
| | 8:05 | to perform a review of Mr. Desrosiers' medical | | |
| | 8:06 | records, perform an evaluation of him, and provide | | |
| | 8:07 | professional psychological opinions concerning his | | |
| | 8:08 | mental health? | | |
| | 8:09 | A. Yes, I was. | | |
| | 8:10 | Q. Before we get to Mr. Desrosiers, can | | |
| | 8:11 | you please tell the jury a little bit about | | |
| | 8:12 | yourself? And please start with your educational | | |
| | 8:13 | history. | | |
| | 8:14 | A. Sure. I received my undergraduate | | |
| | 8:15 | college education at Temple University here in | | |
| | 8:16 | Philadelphia and continued -- after receiving a | | |
| | 8:17 | Bachelor of Arts degree, I continued to receive a | | |
| | 8:18 | master's degree. | | |
| | 8:19 | I then continued my studies in | | |
| | 8:20 | psychology in New York at Columbia University where | | |
| | 8:21 | I received a master's degree and then continued to | | |
| | 8:22 | receive my doctorate, a Ph.D. degree. | | |
| | 8:23 | And as part of that doctoral program, I | | |
| | 8:24 | did an internship -- that's additional hands-on | | |
| | 8:25 | supervised training -- at the Veterans | | |
| | 9:01 | Administration Hospital in New Haven, Connecticut, | | |
| | 9:02 | and training at the Philadelphia Child Guidance | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 9:03 | Clinic in Philadelphia, and Moss Rehabilitation |
|---|---|---|
| | 9:04 | Hospital also in Philadelphia. |
| | 9:05 | I received my doctorate in 1978 and |
| | 9:06 | went on to get postdoctoral training in a specialty |
| | 9:07 | called neuropsychology, which is the study of the |
| | 9:08 | connection between brain -- which parts of your |
| | 9:09 | brain are controlling human behavior. |
| | 9:10 | I've been in private practice for the |
| | 9:11 | last 45 years. |
| | 9:12 | Q. Are you licensed in any particular |
| | 9:13 | states? |
| | 9:14 | A. I am. I'm licensed in the Commonwealth |
| | 9:15 | of Pennsylvania, as well as the state of Delaware. |
| | 9:16 | Q. Did you obtain any special |
| | 9:17 | certifications for your analysis for this case? |
| | 9:18 | A. I did have to become temporarily |
| | 9:19 | licensed in the state of Massachusetts, so I was |
| | 9:20 | able to practice and perform the evaluation, as the |
| | 9:21 | ethics of my profession requires. |
| | 9:22 | Q. So I understand that you essentially |
| | 9:23 | had your own clinical practice for several decades. |
| | 9:24 | Can you just walk us through what you did in that |
| | 9:25 | practice? |
| | 10:01 | A. Sure. So there are two components, two |
| | 10:02 | different kinds of practices that were incorporated |
| | 10:03 | into my overall general private practice. One part |
| | 10:04 | of my practice was treating patients. My practice |
| | 10:05 | was limited to people who are over five years old, |
| | 10:06 | extending all the way through seniors. |
| | 10:07 | That would be individuals, couples, |
| | 10:08 | families, so there were many combinations of |
| | 10:09 | reasons why people might present and seek |
| | 10:10 | treatment, and I was providing it. That's the |
| | 10:11 | clinical side of my practice. |
| | 10:12 | The forensic side of my practice was |
| | 10:13 | not about treatment but rather doing evaluations |
| | 10:14 | where I'm not -- I'm not providing any services to |
| | 10:15 | help the person. I'm just trying to get to the |
| | 10:16 | truth of what seems to be true about the way this |
| | 10:17 | person is functioning. Do they have a |
| | 10:18 | psychological disturbance? What caused the |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 10:19 | psychological disturbance and what treatment, if | | |
| | 10:20 | any, might they need in the future? | | |
| | 10:21 | Q. Is that what you did here, the forensic | | |
| | 10:22 | investigation? | | |
| | 10:23 | A. Yes. That's exactly what I did. | | |
| | 10:24 | Q. And I understand, obviously, in | | |
| | 10:25 | forensic investigations, lawyers like our firm, | | |
| | 11:01 | will hire you from time to time to perform an | | |
| | 11:02 | evaluation? | | |
| | 11:03 | A. Yes. | | |
| | 11:04 | Q. This is a civil case. Have you handled | | |
| | 11:05 | forensic investigations in a civil case before? | | |
| | 11:06 | A. I have. | | |
| | 11:07 | Q. Have you handled investigations in | | |
| | 11:08 | criminal cases before? | | |
| | 11:09 | A. I have. | | |
| | 11:10 | Q. How about in family court cases? | | |
| | 11:11 | A. Many times. | | |
| | 11:12 | Q. In terms of who hires you, do you hold | | |
| | 11:13 | yourself out to be hired by both plaintiff and | | |
| | 11:14 | defense attorneys? | | |
| | 11:15 | A. I do. | | |
| | 11:16 | Q. And have you worked for plaintiff and | | |
| | 11:17 | defense attorneys in providing evaluations? | | |
| | 11:18 | A. Yes. | | |
| | 11:19 | Q. Have you worked for the person who | | |
| | 11:20 | represents the injured person? | | |
| | 11:21 | A. Yes. | | |
| | 11:22 | Q. And have you worked for attorneys who | | |
| | 11:23 | are defending against claims by an injured person? | | |
| | 11:24 | A. Yes. | | |
| | 11:25 | Q. Between those two, do you tend to work | | |
| | 12:01 | more on the plaintiff's side or the defense side? | | |
| | 12:02 | A. I tend to work more frequently with the | | |
| | 12:03 | plaintiff's side, and that's because it's more | | |
| | 12:04 | frequent that the plaintiff's side is calling me, | | |
| | 12:05 | not that I have a preference for working for one | | |
| | 12:06 | side or the other. The phone rings more often from | | |
| | 12:07 | the plaintiff side. | | |
| | 12:08 | Q. We've been talking for the last couple | | |
| | 12:09 | of minutes about the forensic part of your | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

12:10     practice. Do you still treat patients in that

12:11     first part that you were mentioning?

12:12   A.   I don't. About, I don't know, three or

12:13     four years ago I made a decision based on

12:14     lifestyle, really at my age, that I was going to

12:15     cut back a little bit. So I stopped treating

12:16     patients, and now I'm exclusively doing forensic

12:17     evaluations, as you mentioned, for a variety of

12:18     courts, criminal court, civil litigation,

12:19     industrial accident boards, all variety of courts

12:20     that might have a psychological question.

12:21   Q.   And before committing yourself to doing

12:22     the forensic examinations, approximately how many

12:23     years did you spend actually treating patients?

12:24   A.   Approximately, 40 years.

12:25   Q.   And you've been retained to evaluate

13:01     whether individuals meet criterias for certain

13:02     disorders, as you discussed prior?

13:03   A.   Yes.

13:04   Q.   Do you have any examples of educational

13:05     or training experiences that have helped you assess

13:06     those disorders?

13:07   A.   Yes. Well, let me -- let me answer the

13:08     question this way: I've had lots of formal

13:09     trainings. One category of training are what are

13:10     called continuing education credits. There's a

13:11     requirement to stay licensed in the state of

13:12     Delaware and the Commonwealth of Pennsylvania that

13:13     anyone who wants to practice in the field has to

13:14     take a certain amount of education to stay current

13:15     in what's happening in our field, so I do 40 hours

13:16     of training every year.

13:17     In addition to that, I've been trained

13:18     for years both at the VA Hospital, specializing in

13:19     training for post-traumatic stress disorder, as

13:20     well as at Moss Rehabilitation Hospital,

13:21     specializing in the psychological aspects of

13:22     physical problems, as well as training at the

13:23     Philadelphia Child Guidance Clinic at Children's

13:24     Hospital here in Philadelphia for problems that

13:25     relate to children and their families.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

14:01    Q.   You mentioned that you still take

14:02       continuing education courses. Do you also review

14:03       literature within your field?

14:04    A.   Yes.

14:05    Q.   And we'll get to your opinions in this

14:06       case in a moment, but did you review any literature

14:07       specific to the issues in this case?

14:08    A.   I did.

14:09    Q.   And please tell us what you reviewed.

14:10    A.   The general category that I -- of

14:11       literature that I reviewed had to do with wanting

14:12       to get an understanding of what research has been

14:13       done on the way people tend to respond

14:14       psychologically to having experienced some kind of

14:15       a gunshot incident.

14:16       I referenced in my report -- we may get

14:17       to later -- articles from the Journal of the

14:18       American Psychlog- -- Medical Association, the

14:19       Annals of Surgery. There's a whole variety of

14:20       research.

14:21       Any time that I take on a case, I want

14:22       to understand what will inform me, how can I learn

14:23       from what research has already been conducted about

14:24       predicting how various people or groups of people

14:25       will respond to the very condition that I'm now

15:01       being asked to evaluate.

15:02    Q.   And, sir, are you a member of any

15:03       professional organizations in your field?

15:04    A.   I am.

15:05    Q.   Which ones?

15:06    A.   I'm a member of the American

15:07       Psychological Association, the Pennsylvania

15:08       Psychological Association, the Delaware

15:09       Psychological Association, the Philadelphia Society

15:10       of Clinical Psychologists, the National Register of

15:11       Health Service Providers in Psychology, the

15:12       Association of Family and Conciliation Courts, and

15:13       the American Board of Forensic Examiners.

15:14    Q.   Based upon your training and your

15:15       education and your experience, Dr. Romirowsky, do

15:16       you believe you can assist the jury in

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 15:17 | understanding what psychological injuries, if any, | | |
| | 15:18 | Mr. Desrosiers sustained as a result of this | | |
| | 15:19 | unintended discharge? | | |
| | 15:20 | A. I believe I can, and I will do my best | | |
| | 15:21 | to do just that. | | |
| | 15:22 | MR. ZIMMERMAN: At this time the | | |
| | 15:23 | plaintiffs offer Mr. -- Dr. Samuel Romirowsky | | |
| | 15:24 | as an expert in the field of psychology, and | | |
| | 15:25 | we offer the defense the opportunity to | | |
| | 16:01 | question Dr. Romirowsky's credentials. | | |
| | 16:02 | MS. DEVINE: No objection, and no | | |
| | 16:03 | questions at this time. | | |
| | 16:04 | BY MR. ZIMMERMAN: | | |
| | 16:05 | Q. Dr. Romirowsky, you have a report that | | |
| | 16:06 | you generated in this case? | | |
| | 16:07 | A. Yes. | | |
| | 16:08 | Q. And you have a copy of that with you? | | |
| | 16:09 | A. I do. | | |
| | 16:10 | Q. I'm going to ask you questions today. | | |
| | 16:11 | You can just answer them to the best of your | | |
| | 16:12 | ability. If you need to refer to your report, just | | |
| | 16:13 | let us know you're doing that, because I know | | |
| | 16:14 | there's a lot of information in there. Okay? | | |
| | 16:15 | A. Thank you. Yes. | | |
| | 16:16 | Q. Now, tell me what you do when you | | |
| | 16:17 | perform one of these evaluations. What do you look | | |
| | 16:18 | at? What do you do? | | |
| | 16:19 | A. So I want to get a comprehensive | | |
| | 16:20 | picture of who is this person that I'm evaluating. | | |
| | 16:21 | So, of course, I have the opportunity to interview | | |
| | 16:22 | the person and get background information that is | | |
| | 16:23 | general, their family, where did they grow up, what | | |
| | 16:24 | kind of education have they had, where have they | | |
| | 16:25 | worked; what, if any, medical problems did they | | |
| | 17:01 | experience prior to being injured; what, if any, | | |
| | 17:02 | psychological problems they have prior to being | | |
| | 17:03 | injured, have they sought any treatment to remedy | | |
| | 17:04 | their physical or emotional problems that resulted | | |
| | 17:05 | from the incident that I'm involved in evaluating. | | |
| | 17:06 | And then I want the opportunity -- so I | | |
| | 17:07 | don't just rely on what the person told me, I want | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

17:08 the opportunity to review any and all records,

17:09 medical records, whether they're medical or

17:10 psychiatric, that will help me understand not just

17:11 what the person's telling me, but what do the

17:12 medical records say.

17:13 And in an ideal world, I have greater

17:14 confidence in what the person's telling me if it's

17:15 backed up by what's in their medical records.

17:16 Q. And we'll get to it later, but is that

17:17 what happened here? Did what you find backup or

17:18 sync with the medical records?

17:19 A. Yes, totally.

17:20 Q. Now, in this case, can you just give us

17:21 a general overview of the background information

17:22 you obtained on Mr. Desrosiers?

17:23 A. Yes. I'm going to, with your

17:24 permission, look at my report.

17:25 Q. Sure.

18:01 A. So in interviewing Mr. Desrosiers, I

18:02 had the opportunity to get information about his

18:03 family and his social history and learned that he

18:04 was born and raised in Haiti and came to the United

18:05 States when he was approximately 22 years old.

18:06 Q. How about his educational background?

18:07 A. He went to high school. After getting

18:08 his high school diploma, he continued on to

18:09 college, and after college he went to law school

18:10 and then became employed with the -- he went to the

18:11 police academy to become a police officer.

18:12 Q. And do you have a general idea of how

18:13 long he was a police officer?

18:14 A. I believe he graduated from the police

18:15 academy in 1995, so ever since 1995.

18:16 Q. And when you say "ever since," this

18:17 incident was in 2019. Is it your understanding he

18:18 worked as a police officer from '95 until 2019?

18:19 A. Yes, that's my understanding.

18:20 Q. Do you have an understanding of whether

18:21 he's returned as a police officer since this

18:22 incident?

18:23 A. It's my understanding that he was

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| | 18:24 | evaluated for his fitness to return to work, and he |
| | 18:25 | was found to be unfit, meaning that he could never |
| | 19:01 | by the evaluation performed by that expert, that he |
| | 19:02 | was deemed unable to ever return to police work. |
| | 19:03 | Q.  Now, in terms of his family life, did |
| | 19:04 | you have an opportunity to gain information about |
| | 19:05 | not only who Mr. Desrosiers was but who his family |
| | 19:06 | was? |
| | 19:07 | A.  Yes.  He has a 37, now 39-year-old |
| | 19:08 | daughter from a prior relationship.  He's currently |
| | 19:09 | married.  He and Yolette, his wife, have three |
| | 19:10 | children.  The oldest is a daughter, and they have |
| | 19:11 | 24-year-old twin sons, now 26 years old. |
| | 19:12 | Q.  This incident was about seven years ago |
| | 19:13 | in twenty -- six years ago in 2019.  Fair to say |
| | 19:14 | that his younger twins would've been about 19 years |
| | 19:15 | old back then? |
| | 19:16 | A.  Yes. |
| | 19:17 | Q.  Okay.  And do you have an understanding |
| | 19:18 | of what they did during that time? |
| | 19:19 | A.  It's my understanding they were in |
| | 19:20 | college.  It's my further understanding that |
| | 19:21 | Mr. Desrosiers was supporting his twin sons and |
| | 19:22 | paying for their college. |
| | 19:23 | Q.  In terms of his work as a police |
| | 19:24 | officer, what evaluations did you make in terms of |
| | 19:25 | his pre-incident fitness to serve and the value and |
| | 20:01 | enjoyment he took from his job? |
| | 20:02 | A.  My understanding from my interview with |
| | 20:03 | Mr. Desrosiers is that the reason that he stayed a |
| | 20:04 | police officer from 1995 until 2019 was that he |
| | 20:05 | loved the work that he was doing. |
| | 20:06 | He even sought to find work in other |
| | 20:07 | police departments surrounding where he was living, |
| | 20:08 | hoping that he would find a police department that |
| | 20:09 | wasn't using the firearm that was involved in his |
| | 20:10 | own injury. |
| | 20:11 | He loved being a police officer.  Being |
| | 20:12 | a married, loving husband, being a father and being |
| | 20:13 | a police officer, I would say were the three |
| | 20:14 | essential components of his identity. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

20:15　Q.　Is that what stood out to you during
20:16　　　the interview?
20:17　A.　Yes.
20:18　Q.　And your interview was about a
20:19　　　year-and-a-half ago.  Do you actually have a memory
20:20　　　of that?
20:21　A.　A memory of the interview?
20:22　Q.　And the enjoyment that he had for his
20:23　　　not only family but his work-life?
20:24　A.　Yes.  He loved it.
20:25　Q.　Did he, to your knowledge, have any
21:01　　　psychological treatment before the incident?
21:02　A.　None that were reported to me, and none
21:03　　　that were found in records.
21:04　Q.　So in terms of the records, I'm going
21:05　　　to ask you about what physical injuries he
21:06　　　sustained and what psychological injuries he
21:07　　　sustained.
21:08　　　Before I do, do you treat physical
21:09　　　injuries in your capacity?
21:10　A.　Only if they relate to pain, but I'm
21:11　　　not a physician.  I don't treat physical injuries.
21:12　Q.　Is it still important for you to
21:13　　　understand the physical injuries in performing your
21:14　　　assessment?
21:15　A.　It is for a couple of reasons.  One is,
21:16　　　if I can understand what the physical injuries are,
21:17　　　I can understand what a reasonable person -- how a
21:18　　　reasonable person might react to having that kind
21:19　　　of injury.
21:20　　　While not everybody is the same, there
21:21　　　is an understanding of a baseline, a general
21:22　　　understanding that somebody who's been injured in a
21:23　　　certain way, a reasonable person would say, yeah,
21:24　　　makes sense that having that kind of injury, a
21:25　　　person might become -- fill in the blank --
22:01　　　depressed or anxious, frightened, et cetera, so --
22:02　Q.　Tell us --
22:03　A.　I'm sorry.
22:04　Q.　Sorry.  Tell us what you know about the
22:05　　　severity of the physical injuries that

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

22:06  Mr. Desrosiers suffered.

22:07  A.  My understanding is there was an

22:08  unintended discharge of his firearm, and he felt

22:09  intense burning in his groin area, found out later

22:10  that the SIG Sauer 320 that he was -- had in his

22:11  waistband had unintentionally discharged, and the

22:12  bullet went through his scrotum, his penis, his

22:13  left testicle, and entered and left his thigh above

22:14  his left knee.

22:15  Q.  Did Mr. Desrosiers report to you any of

22:16  the symptoms that he had as a result of the bullet

22:17  going through those body parts?

22:18  A.  You mean emotional symptoms or physical

22:19  symptoms?

22:20  Q.  Let's start with physical and then

22:21  we'll get to the emotional.

22:22  A.  I'm going to refer to my report again.

22:23  Q.  Sure.

22:24  A.  He was evaluated following the injury

22:25  at Massachusetts General Hospital Emergency

23:01  Department and then underwent surgery and was

23:02  admitted as an inpatient.  He required physical

23:03  therapy afterwards because he had difficulty

23:04  walking as a result of the injury sustained.

23:05  As I said earlier, he had no prior

23:06  history of any psychiatric problems, but after this

23:07  injury, he sought treatment from a psychologist who

23:08  diagnosed him with post-traumatic stress disorder

23:09  and treated him for approximately a year.

23:10  He also went to his primary care

23:11  physician who prescribed Celexa, which is often

23:12  used to treat depression and/or anxiety.

23:13  Q.  Dr. Romirowsky, in terms of the

23:14  physical injuries, there was a list -- there were

23:15  several symptoms that you had in your report.  We

23:16  put them in a list format, and I'm going to show

23:17  you a document that we'll mark as Exhibit 702.  I'm

23:18  going to publish it for demonstrative purposes.

23:19  (Exhibit 702 was marked for purposes of

23:20  identification.)

23:21  BY MR. ZIMMERMAN:

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

23:22 Q. And the top of this talks about the

23:23 physical injuries and symptoms. Can you please

23:24 read those quietly to yourself and let me know if

23:25 those are the symptoms that were identified in your

24:01 report?

24:02 A. You've identified ten symptoms, and

24:03 they're exactly the ones that I've identified in my

24:04 report.

24:05 Q. Now, in terms of the psychological

24:06 injuries and symptoms, you mentioned that following

24:07 the incident Dr. -- or Mr. Desrosiers consulted

24:08 with a psychologist.

24:09 Does this also identify the symptoms

24:10 and injuries from a psychological perspective that

24:11 you saw?

24:12 A. Yes.

24:13 Q. And just because there are several of

24:14 them, can you just go through them and identify

24:15 from a psychological standpoint what injuries and

24:16 symptoms Mr. Desrosiers presented?

24:17 A. In a combination of symptoms that were

24:18 referred to in his treatment with his treating

24:19 psychologist, as well as the symptoms that were

24:20 reported to me in my evaluation of Mr. Desrosiers,

24:21 he experienced anxiety, symptoms of depression,

24:22 reported having violent nightmares following the

24:23 injury.

24:24 He reported having unwanted thoughts

24:25 that intruded on his thinking, meaning they were

25:01 unwelcome and unpleasant for him.

25:02 He had impaired sleep multiple times a

25:03 week at that time.

25:04 He had the strange sensation of

25:05 smelling or tasting gunpowder, which was not

25:06 present. In other words, at the time of the

25:07 injury, he did taste and smell gunpowder, but long

25:08 after that, when I saw him four years later, he

25:09 still was having unwanted sensations from time to

25:10 time of smelling or tasting gunpowder.

25:11 Unfortunately, he experienced sexual

25:12 dysfunction and was no longer able to get erections

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 25:13 | after the injury, which led to loss of intimacy | | |
| | 25:14 | with his wife. | | |
| | 25:15 | He became socially withdrawn really in | | |
| | 25:16 | contrast to how he was before the injury, where he | | |
| | 25:17 | enjoyed the company of his colleagues and his | | |
| | 25:18 | friends and family. | | |
| | 25:19 | Following the accident, he preferred to | | |
| | 25:20 | be alone, spending most of his daytime taking walks | | |
| | 25:21 | or going to the library. | | |
| | 25:22 | He reported difficulty concentrating. | | |
| | 25:23 | Generally, did not like to be outside because of | | |
| | 25:24 | his difficulty walking and pain, he felt | | |
| | 25:25 | vulnerable. | | |
| | 26:01 | He became easily startled by loud | | |
| | 26:02 | noises, especially those that resembled a gunshot. | | |
| | 26:03 | He felt unsafe in public because of | | |
| | 26:04 | that vulnerability. | | |
| | 26:05 | He was angry about what happened and | | |
| | 26:06 | how this has dramatically changed his life, and | | |
| | 26:07 | that he found himself overreacting and sometimes | | |
| | 26:08 | having angry outbursts with very little | | |
| | 26:09 | provocation. | | |
| | 26:10 | Q. Did the interview complaints that | | |
| | 26:11 | Mr. Desrosiers had, were they consistent with what | | |
| | 26:12 | you saw in the medical records? | | |
| | 26:13 | A. Yes. | | |
| | 26:14 | Q. And in reviewing these injuries and | | |
| | 26:15 | symptoms, did you form any conclusions about any | | |
| | 26:16 | diagnoses that Mr. Desrosiers was left with as a | | |
| | 26:17 | result of this incident? | | |
| | 26:18 | A. Yes. | | |
| | 26:19 | Q. So walk us through the process before | | |
| | 26:20 | you get to the actual diagnoses.  How do you go | | |
| | 26:21 | about making a diagnosis?  Do you just kind of | | |
| | 26:22 | eye-it-up, or is there an actual process? | | |
| | 26:23 | A. Well, first, you have to understand | | |
| | 26:24 | that there is an objective standard that has been | | |
| | 26:25 | created for determining whether a person's symptoms | | |
| | 27:01 | reach the level of an actual diagnosis.  It's not | | |
| | 27:02 | up to Sam Romirowsky to decide whether he has a | | |
| | 27:03 | diagnosis.  There is a book, which is a catalog of | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

27:04    every single psychiatric diagnosis that exists.

27:05    That's called the DSM-5, the Diagnostic and

27:06    Statistical Manual, now in its 5th Edition.

27:07  Q.  In reviewing the DSM-5, based upon his

27:08    injuries and his symptoms, did you believe that he

27:09    qualified for a medical diagnosis or diagnoses?

27:10  A.  Yes.

27:11  Q.  How many did you find?

27:12  A.  I found that comparing the symptoms

27:13    that he was reporting or that were listed and

27:14    reflected in his medical records and comparing it

27:15    to the diagnostic criteria that are set forth in

27:16    that DSM-5, that he had two psychiatric disorders.

27:17  Q.  Walk us through each of them, please.

27:18  A.  So the first diagnosis is what I've

27:19    diagnosed and fits with the criteria in the DSM

27:20    called persistent depressive disorder.  So in plain

27:21    English, what's a persistent depressive disorder?

27:22    The person has a depressed mood not just for one

27:23    day but for most days.

27:24    It's not so debilitating that they're

27:25    curled up in bed and pull the blankets over their

28:01    head, but their mood is low.  Their energy is low.

28:02    They're easily fatigued.  They're not sleeping

28:03    well.  They have low self-esteem, difficulty

28:04    concentrating, and feeling pessimistic about their

28:05    future and angry about the way their life has

28:06    changed.

28:07    Those are the main features of that

28:08    particular diagnosis.

28:09  Q.  Okay.  And in your expert opinion, has

28:10    Mr. Desrosiers been dealing with that persistent

28:11    depressive disorder at or near -- since the time of

28:12    the incident?

28:13  A.  Well, I can tell you that from the time

28:14    of the incident until I saw him on December 13th of

28:15    2023, he was suffering from those symptoms.  I

28:16    don't know anything about how he's functioning

28:17    since the date that I evaluated him.

28:18  Q.  How about the second diagnosis that you

28:19    made?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

28:20   A.   So the second diagnosis is something

28:21       called other specified trauma or stress-related

28:22       disorder.  It's very, very similar to what's called

28:23       post-traumatic stress disorder.  In fact, his

28:24       treating psychologist diagnosed him with

28:25       post-traumatic stress disorder, and the

29:01       psychiatrist that evaluated him for his fitness to

29:02       return to work as a policeman also diagnosed him

29:03       with post-traumatic stress disorder.

29:04   Q.   How is your diagnosis different than

29:05       theirs?

29:06   A.   In order to have a diagnosis, you have

29:07       to meet 100 percent of the diagnostic criteria.  If

29:08       you're missing one, then you don't have that

29:09       diagnosis.  You have symptoms that resemble that

29:10       diagnosis, but you cannot say the person has that

29:11       diagnosis.

29:12       When I evaluated Mr. Desrosiers, I

29:13       thought that he had most of the symptoms --

29:14       actually, all of the symptoms of post-traumatic

29:15       stress disorder except for one particular symptom,

29:16       and because he was missing that symptom, in trying

29:17       to be as transparent and truthful as possible, I

29:18       diagnosed him with other trauma stress disorder,

29:19       which is akin to post-traumatic stress, absent one

29:20       particular symptom.

| 30:04 - 35:14 | **Romirowsky, Samuel 2025-06-30** | 00:07:10 | **SamuelRomirowsky-editedfortrial.2** |

30:04   Q.   You reviewed the treating records of

30:05       Dr. Annunziata?

30:06   A.   Yes.

30:07   Q.   And you reviewed the psychological

30:08       evaluation performed by Dr. Duran?

30:09   A.   Yes.

30:10   Q.   And you saw the findings that they made

30:11       in considering and coming to your conclusions in

30:12       this case?

30:13   A.   Yes.  In the records that I reviewed,

30:14       it identified that each of those doctors reached

30:15       the conclusion that Mr. Desrosiers had

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 30:16 | post-traumatic stress disorder, but neither of the | | |
| | 30:17 | doctors, which is their right, spelled out how they | | |
| | 30:18 | reached the conclusion and which particular | | |
| | 30:19 | symptoms confirmed that he had that particular | | |
| | 30:20 | diagnosis, so I was unable to compare my symptom | | |
| | 30:21 | list with their symptom list. | | |
| | 30:22 | In my estimation, he fell just short of | | |
| | 30:23 | having post-traumatic stress, but nearly all the | | |
| | 30:24 | same symptoms. | | |
| | 30:25 | Q. Tell us about the diagnosis you made on | | |
| | 31:01 | the other specified trauma and stress-related | | |
| | 31:02 | disorder. | | |
| | 31:03 | A. You're asking how did I reach that | | |
| | 31:04 | conclusion? | | |
| | 31:05 | Q. How did you reach that conclusion and | | |
| | 31:06 | what were the symptoms that led you to that | | |
| | 31:07 | conclusion? | | |
| | 31:08 | A. Oh, okay. Based on the interview and | | |
| | 31:09 | review of the records, first of all, he experienced | | |
| | 31:10 | a life-threatening experience. I think everyone | | |
| | 31:11 | would agree that when you get injured by a bullet, | | |
| | 31:12 | however that occurs, that that is considered in the | | |
| | 31:13 | experience of the person that's shot a | | |
| | 31:14 | life-threatening experience. | | |
| | 31:15 | Secondly, he has the experience even | | |
| | 31:16 | four years after the incident where the gun | | |
| | 31:17 | discharged, he had these recurrent, involuntary | | |
| | 31:18 | memories of being in pain, collapsing in the lobby | | |
| | 31:19 | of the police department, being taken to the | | |
| | 31:20 | emergency room, and nightmares that were violent in | | |
| | 31:21 | which he would experience and dream about being | | |
| | 31:22 | shot. | | |
| | 31:23 | Another symptom -- | | |
| | 31:24 | Q. Yeah. Please, continue. | | |
| | 31:25 | A. I was going to say another symptom | | |
| | 32:01 | that's part of the diagnosis, part of the | | |
| | 32:02 | requirement for the diagnosis is does the person do | | |
| | 32:03 | anything to avoid reminders? | | |
| | 32:04 | Well, in Mr. Desrosiers' case, he had | | |
| | 32:05 | stopped having contact with any of his fellow | | |
| | 32:06 | police officers because he didn't want to answer | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 32:07 | questions about how he's doing.  He wanted to avoid | |
| | 32:08 | that topic.  He didn't really want to think about | |
| | 32:09 | it.  And that fit with the criteria of avoiding | |
| | 32:10 | distressing reminders. | |
| | 32:11 | He had persistent feelings of sadness, | |
| | 32:12 | getting anxious and, as I said earlier, feeling | |
| | 32:13 | vulnerable, so vulnerable that he didn't really | |
| | 32:14 | want to go out in public because he felt that he | |
| | 32:15 | couldn't run, couldn't adequately protect himself | |
| | 32:16 | or protect his wife. | |
| | 32:17 | He became irritable.  He reported | |
| | 32:18 | difficulty concentrating and that he would startle | |
| | 32:19 | very easily, which one can readily understand, if | |
| | 32:20 | you've been shot, you're going to startle very | |
| | 32:21 | easily. | |
| | 32:22 | The other criteria is that the | |
| | 32:23 | symptoms, when you consider all of them together, | |
| | 32:24 | have caused significant impact on his either family | |
| | 32:25 | life, his social life, or his occupational life. | |
| | 33:01 | And in his case, the symptoms that he reported or | |
| | 33:02 | that were documented impacted all three of those | |
| | 33:03 | areas. | |
| | 33:04 | This is a guy who defined who he was by | |
| | 33:05 | being a husband, a father, and a police officer. | |
| | 33:06 | And the symptoms that he experienced impacted all | |
| | 33:07 | three of those areas in a negative way. | |
| | 33:08 | Q.  Is it common in your experience for | |
| | 33:09 | someone who suffers a physical injury, a sexual | |
| | 33:10 | dysfunction injury, and a psychological injury to | |
| | 33:11 | have that impact their self-identity? | |
| | 33:12 | A.  Sure.  I don't think it'll surprise | |
| | 33:13 | anybody on the jury to think about somebody getting | |
| | 33:14 | shot in their penis, in their scrotum, in their | |
| | 33:15 | testicle, not being able to get erections going | |
| | 33:16 | forward and that would affect their feeling of | |
| | 33:17 | being a man. | |
| | 33:18 | As being a police officer, in his case | |
| | 33:19 | was part of his identity of being a man, and he | |
| | 33:20 | lost that as a result of his physical injuries.  He | |
| | 33:21 | developed these psychological injuries. | |
| | 33:22 | Q.  Are there treatment options for | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 33:23 | individuals who have these diagnoses? | | |
| | 33:24 | A. Yes. | | |
| | 33:25 | Q. Did Mr. Desrosiers or has | | |
| | 34:01 | Mr. Desrosiers undertaken any of those treatment | | |
| | 34:02 | options? | | |
| | 34:03 | A. He has.  He sought psychological help | | |
| | 34:04 | from someone who, clearly -- reveal in the | | |
| | 34:05 | records -- understood the nature of trauma, was | | |
| | 34:06 | presenting and providing proper treatment, in my | | |
| | 34:07 | opinion, for Mr. Desrosiers. | | |
| | 34:08 | He was taking medication to help reduce | | |
| | 34:09 | his feelings of anxiety and depression.  He was | | |
| | 34:10 | doing whatever he could to feel better.  He wanted | | |
| | 34:11 | his old life back. | | |
| | 34:12 | Q. I know that -- do you treat with | | |
| | 34:13 | medications, you as a psychologist? | | |
| | 34:14 | A. No.  I collaborate with either a | | |
| | 34:15 | psychiatrist or the patient's family doctor, | | |
| | 34:16 | primary care physician, to get the proper care. | | |
| | 34:17 | Q. And tell me about the medication care | | |
| | 34:18 | that Mr. Desrosiers has received as a result of | | |
| | 34:19 | this incident for his mental, psychological | | |
| | 34:20 | injuries. | | |
| | 34:21 | A. So just to be technically accurate, for | | |
| | 34:22 | me to give an opinion about Celexa, which is the | | |
| | 34:23 | medication he was taking, it's out of my specialty | | |
| | 34:24 | area. | | |
| | 34:25 | Q. Rather than -- | | |
| | 35:01 | A. I'm aware -- I'm sorry. | | |
| | 35:02 | Q. Rather than giving an opinion about the | | |
| | 35:03 | medication, is that a medication that you | | |
| | 35:04 | understand is prescribed to people with these | | |
| | 35:05 | diagnoses? | | |
| | 35:06 | A. Yes.  Thank you. | | |
| | 35:07 | I was going to say in my experience | | |
| | 35:08 | I've collaborated with doctors for years and for | | |
| | 35:09 | decades where Celexa was a medication, among | | |
| | 35:10 | others, that was used to treat these same symptoms. | | |
| | 35:11 | Q. It may be obvious, but the | | |
| | 35:12 | psychological treatment with a psychologist, that | | |
| | 35:13 | costs money in order to attend those sessions? | | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 35:14 | A. Yes. | | |
| 36:03 - 36:15 | **Romirowsky, Samuel 2025-06-30** | | 00:00:32 | **SamuelRomirowsky-editedfortrial.3** |
| | 36:03 | Q. Sir, the question was whether the | | |
| | 36:04 | treatment for attending sessions with a | | |
| | 36:05 | psychologist, that costs money, does it not? | | |
| | 36:06 | A. Yes. Some part of it may or may not be | | |
| | 36:07 | covered by a person's health insurance. Even when | | |
| | 36:08 | they have health insurance that covers some part of | | |
| | 36:09 | the treatment, there's usually what's called a | | |
| | 36:10 | copay where they have to pay out of pocket some | | |
| | 36:11 | amount of money. | | |
| | 36:12 | Q. And the medications, regardless of who | | |
| | 36:13 | would be paying for it, those cost money as well | | |
| | 36:14 | for the treatment? | | |
| | 36:15 | A. Sure. | | |
| 36:22 - 39:08 | **Romirowsky, Samuel 2025-06-30** | | 00:03:05 | **SamuelRomirowsky-editedfortrial.4** |
| | 36:22 | Q. Doctor, you've given two diagnoses. If | | |
| | 36:23 | you could just repeat those for the last time so | | |
| | 36:24 | that the jury understands exactly what your | | |
| | 36:25 | findings were? | | |
| | 37:01 | A. So I found based on matching | | |
| | 37:02 | Mr. Desrosiers' symptoms that the criteria listed | | |
| | 37:03 | in the DSM-5, that book that sets forth the | | |
| | 37:04 | criteria that you have to have in order to say the | | |
| | 37:05 | person has a particular psychiatric disorder, I | | |
| | 37:06 | found that he suffered from two different | | |
| | 37:07 | disorders: The first, persistent depressive | | |
| | 37:08 | disorder; feeling sad, difficulty concentrating, | | |
| | 37:09 | and the list of symptoms that I identified earlier, | | |
| | 37:10 | and the second is other specified trauma and | | |
| | 37:11 | stress-related disorder. | | |
| | 37:12 | Q. I'll show you, sir, the end of the | | |
| | 37:13 | Exhibit 702 demonstrative. The diagnoses that you | | |
| | 37:14 | made are listed at the top? | | |
| | 37:15 | A. Yes. | | |
| | 37:16 | Q. And you reviewed the diagnoses made by | | |
| | 37:17 | the treating psychologist and psychological | | |
| | 37:18 | evaluation for fitness to return to work? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

37:19    A.   Yes.

37:20    Q.   You also --

37:21    A.   While -- while the names of the

37:22       diagnoses are different, they're essentially

37:23       99 percent overlapping with my diagnosis.  They're

37:24       both -- they're all stress and trauma-related

37:25       disorders.

38:01    Q.   You also reviewed the work evaluation

38:02       on whether or not Mr. Desrosiers was capable of

38:03       returning to police work?

38:04    A.   Yes.

38:05    Q.   And what was your review, or what did

38:06       your review find?

38:07    A.   He was -- he was -- it was found and

38:08       reported back to him that he could never return to

38:09       police work.

38:10    Q.   And do you recommend further

38:11       psychological treatment and counseling?

38:12    A.   I do.

38:13    Q.   And do you recommend further

38:14       consideration for the continued use of medication

38:15       for anxiety and depression?

38:16    A.   I do.  It's my -- it's my sense that by

38:17       the time he completed treatment with his treating

38:18       psychologist between the regular treatment he was

38:19       receiving, which was giving him good emotional

38:20       support and coping skills, and with the medication

38:21       that he was taking, that he was generally

38:22       functioning much better.

38:23       But since that time, I saw him more

38:24       than a year after he had stopped treatment.  It's

38:25       my sense that his symptoms returned, and I'm

39:01       recommending that he go back to treatment.

39:02    Q.   Doctor, have all of the opinions that

39:03       you've given today been based upon a reasonable

39:04       degree of psychological certainty?

39:05    A.   Yes.

39:06       MR. ZIMMERMAN:  I want to thank you for

39:07       your time, and we'll pass the questions

39:08       along.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 39:21 - 43:03 | **Romirowsky, Samuel 2025-06-30** | 00:02:54 | **SamuelRomirowsky-editedfortrial.5** |

| | | |
|---|---|---|
| 39:21 | Q. | Good afternoon, Dr. Romirowsky. |
| 39:22 | A. | Hi. |
| 39:23 | Q. | My name's Alaina Devine.  I'm one of |
| 39:24 | | the lawyers for SIG Sauer, and I have a few |
| 39:25 | | questions for you here today. |
| 40:01 | | You were hired in this case by the |
| 40:02 | | lawyers representing the plaintiffs, correct? |
| 40:03 | A. | Yes. |
| 40:04 | Q. | And you were paid $3,500 to speak to |
| 40:05 | | Mr. Desrosiers and complete your evaluation in this |
| 40:06 | | case, correct? |
| 40:07 | A. | Yes. |
| 40:08 | Q. | And it's true, is it not, that you've |
| 40:09 | | completed evaluations like this hundreds of times |
| 40:10 | | previously, correct? |
| 40:11 | A. | What do you mean when you say "like |
| 40:12 | | this"? |
| 40:13 | Q. | Sure.  Like the one you completed for |
| 40:14 | | Mr. Desrosiers. |
| 40:15 | A. | In the -- in the sense that they're |
| 40:16 | | forensic evaluations, yes. |
| 40:17 | Q. | Correct.  And you're paid generally |
| 40:18 | | each time that you complete those, correct? |
| 40:19 | A. | Sure. |
| 40:20 | Q. | And you charge $2,500 to testify at a |
| 40:21 | | deposition, correct? |
| 40:22 | A. | Yes. |
| 40:23 | Q. | And your current rate is $5,000 to |
| 40:24 | | testify at trial or to give a trial deposition like |
| 40:25 | | you are today, correct? |
| 41:01 | A. | Yes. |
| 41:02 | Q. | I think you explained this on direct, |
| 41:03 | | but 100 percent of your practice at this point is |
| 41:04 | | as an expert witness or consultant, correct? |
| 41:05 | A. | Yes. |
| 41:06 | Q. | And about 90 percent of the time it's |
| 41:07 | | on behalf of the plaintiff, correct? |
| 41:08 | A. | Yes. |
| 41:09 | Q. | And you've worked for this plaintiffs' |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

41:10    lawyer's firm before, correct?

41:11   A.  Yes.

41:12   Q.  Dr. Romirowsky, have you ever been the

41:13    subject of a disciplinary action by the State Board

41:14    of Psychology in Pennsylvania?

41:15   A.  Yes.

41:16   Q.  And in 2020 you entered into a consent

41:17    decree with the State Board of Psychology in

41:18    Pennsylvania for three separate violations of the

41:19    Professional Psychologist Practices Act, correct?

41:20   A.  Yes.

41:21   Q.  One of those was a violation of

41:22    Section 8(a)1 that you committed immoral or

41:23    unprofessional conduct by departing from the

41:24    standards of acceptable and prevailing

41:25    psychological practice by disseminating a patient's

42:01    personal information, correct?

42:02   A.  Yes.

42:03   Q.  And as a result of that consent decree,

42:04    you had a public reprimand entered against your

42:05    license, correct?

42:06   A.  Yes.

42:07   Q.  And you agreed to pay --

42:08   A.  To be clear, that reprimand does not

42:09    include anything about my ability -- does not

42:10    impact my ability to practice.

42:11   Q.  Okay.  And you agreed to pay a fine of

42:12    $10,000, correct?

42:13   A.  Yes.

42:14   Q.  And you were also ordered to attend and

42:15    complete 15 hours of remedial education on ethics,

42:16    correct?

42:17   A.  Yes.

42:18   Q.  You were also previously the subject of

42:19    a disciplinary action by the State Board of

42:20    Psychology in Pennsylvania in 1994, correct?

42:21   A.  I'm not sure which one that refers to.

42:22   Q.  Was this your first violation,

42:23    Dr. Romirowsky?

42:24   A.  I believe so.  2017.

42:25   Q.  Are you aware in the consent decree

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 43:01 | entered in 2020 that you signed it cites a prior | | |
| | 43:02 | disciplinary action by the Board in 1994? | | |
| | 43:03 | A. I don't recall that. | | |
| 44:10 - 57:14 | **Romirowsky, Samuel 2025-06-30** | 00:12:36 | SamuelRomirowsky-editedfortrial.6 |
| | 44:10 | A. I do. I don't remember the year, but I | | |
| | 44:11 | know the complaint. | | |
| | 44:12 | BY MS. DEVINE: | | |
| | 44:13 | Q. Okay. And at least as reflected here | | |
| | 44:14 | in that case, you admitted a violation of | | |
| | 44:15 | Section 8(a)11 and that you committed | | |
| | 44:16 | unprofessional conduct by failing to prepare a | | |
| | 44:17 | child custody evaluation in accordance with the | | |
| | 44:18 | standard of care and the Guidelines for Child | | |
| | 44:19 | Custody Evaluations of the American Psychological | | |
| | 44:20 | Association, correct? | | |
| | 44:21 | A. Yes. It had to do with using a term of | | |
| | 44:22 | art inappropriately in the language of my -- my | | |
| | 44:23 | child custody evaluation report. | | |
| | 44:24 | Q. You were also in that case ordered to | | |
| | 44:25 | pay a civil penalty, correct? | | |
| | 45:01 | A. Yes. | | |
| | 45:02 | Q. And you were also ordered to complete | | |
| | 45:03 | 30 hours of remedial education, correct? | | |
| | 45:04 | A. Yes. This is 20, 21 years ago. Yes. | | |
| | 45:05 | Q. The second one we talked about. The | | |
| | 45:06 | first one was from 2017, with the order entered in | | |
| | 45:07 | 2020, correct? | | |
| | 45:08 | A. Yes. | | |
| | 45:09 | Q. Your evaluation of Mr. Desrosiers in | | |
| | 45:10 | December of 2023, that took place over Zoom, | | |
| | 45:11 | correct? | | |
| | 45:12 | A. Yes. | | |
| | 45:13 | Q. And you were paid by the lawyers in | | |
| | 45:14 | this case to conduct that evaluation, correct? | | |
| | 45:15 | A. Yes. | | |
| | 45:16 | Q. And, in fact, you administered to | | |
| | 45:17 | Mr. Desrosiers a statement of non-confidentiality, | | |
| | 45:18 | including disclosing that you're evaluating his | | |
| | 45:19 | condition as it relates to his lawsuit, correct? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

45:20 A. Yes.

45:21 Q. You disclosed to him that you were not

45:22 providing him any treatment, correct?

45:23 A. Correct.

45:24 Q. You disclosed to him that there was no

45:25 doctor-patient relationship formed, correct?

46:01 A. Yes.

46:02 Q. And you disclosed to him that you would

46:03 release your findings to Mr. Desrosiers' attorneys,

46:04 correct?

46:05 A. Yes.

46:06 Q. And you spoke to Mr. Desrosiers in

46:07 December of 2023 for approximately two hours; is

46:08 that correct?

46:09 A. Yes.

46:10 Q. And is that the only time you've ever

46:11 spoken with him?

46:12 A. Yes.

46:13 Q. And you've never met with him in

46:14 person, correct?

46:15 A. Just by Zoom.

46:16 Q. You completed a mental status

46:17 examination of Mr. Desrosiers, correct?

46:18 A. Yes.

46:19 Q. And that would be sort of a snapshot of

46:20 a person's cognitive or emotional functioning at a

46:21 specific point in time, correct?

46:22 A. Yes.

46:23 Q. And at that time, at least according to

46:24 your report, Mr. Desrosiers was logical and

46:25 coherent, correct?

47:01 A. Yes.

47:02 Q. No evidence of disturbed thinking,

47:03 correct?

47:04 A. Correct.

47:05 Q. He had good eye contact, and he

47:06 remained fully engaged in your interview with him,

47:07 correct?

47:08 A. He did, yes.

47:09 Q. And you did not conduct any tests of

47:10 Mr. Desrosiers beyond a mental status examination

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

47:11      and your interview of him, correct?

47:12    A.   Correct.

47:13    Q.   You didn't conduct a Personality

47:14      Assessment Inventory, correct?

47:15    A.   Correct.

47:16    Q.   You didn't conduct a Trauma Symptom

47:17      Inventory, correct?

47:18    A.   No. I relied on my interview to gain

47:19      the same information.

47:20    Q.   And do psychologists in your field use

47:21      these tests commonly in diagnosing and treating

47:22      mental health conditions?

47:23    A.   If there's a question about diagnostic

47:24      clarity, sure, but otherwise, the information can

47:25      be gained in a variety of ways.

48:01    Q.   You conducted your interview of

48:02      Mr. Desrosiers and collected some background

48:03      information, learning that he had a bachelor's

48:04      degree in liberal arts and criminal justice,

48:05      correct?

48:06    A.   Yes.

48:07    Q.   A law degree that he completed in 2012,

48:08      correct?

48:09    A.   I'm looking at my report.

48:10    Q.   Sure.

48:11    A.   Yes.

48:12    Q.   You -- did you learn, Dr. Romirowsky,

48:13      that he's trilingual?

48:14    A.   I don't recall that specifically.

48:15    Q.   Sure. Did Mr. Desrosiers discuss with

48:16      you that in the fall of 2023 after his incident he

48:17      completed an online real estate course?

48:18    A.   Yes.

48:19    Q.   And Mr. Desrosiers discussed with you

48:20      that he was learning to play the guitar, correct?

48:21    A.   Yes.

48:22    Q.   And that he walks to the library almost

48:23      every day, correct?

48:24    A.   Correct.

48:25    Q.   You discussed in direct Mr. Desrosiers'

49:01      feelings of vulnerability, particularly around some

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

49:02     of his coworkers as well.

49:03     Is it fair to say Mr. Desrosiers

49:04     expressed a disinterest in meeting people that he

49:05     knew, including coworkers from his department?

49:06   A.   I would say it's more of an avoidance

49:07     than disinterest.

49:08   Q.   Sure. And that's in part because he

49:09     didn't want to talk about the incident, correct?

49:10   A.   That's right.

49:11   Q.   The last time Mr. Desrosiers sought

49:12     psychological treatment or any mental health

49:13     treatment from a provider was in June of 2022,

49:14     correct?

49:15   A.   I think it was August of 2022.

49:16   Q.   Okay. Not in 2023?

49:17   A.   Is there a record that you're directing

49:18     my attention to?

49:19   Q.   I'm asking you, Dr. Romirowsky, if

49:20     you're aware of any mental health or psychological

49:21     treatment that Mr. Desrosiers sought after the year

49:22     2022?

49:23   A.   I don't have the date of the vocational

49:24     fitness to return to work evaluation performed by

49:25     Dr. Jill Duran. That may have post dated the

50:01     treatment in 2022.

50:02   Q.   You didn't review that report yourself,

50:03     correct? That wasn't something that was provided

50:04     to you?

50:05   A.   Correct.

50:06   Q.   And I'll represent to you,

50:07     Dr. Romirowsky, that that report is dated from

50:08     2021.

50:09   A.   Oh, okay.

50:10   Q.   So back to the question at hand, are

50:11     you aware of any mental health or psychological

50:12     treatment sought by Mr. Desrosiers in 2023?

50:13   A.   No.

50:14   Q.   How about in 2024?

50:15   A.   No.

50:16   Q.   And how about in 2025, up until today,

50:17     at least as far as you know?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

50:18    A.   I haven't been provided with any --

50:19    Q.   Sure.

50:20    A.   -- documents, so I can only rely on

50:21       what I know, and I have not been provided with any

50:22       documentation that post dated my evaluation in

50:23       December of 2023.

50:24    Q.   Thank you.

50:25       The last provider, at least as far as

51:01       you know, that Mr. Desrosiers saw was

51:02       Dr. Annunziata, correct?

51:03    A.   Correct.

51:04    Q.   And Dr. Annunziata is a licensed

51:05       psychologist, correct?

51:06    A.   Yes.

51:07    Q.   And Mr. Desrosiers saw him

51:08       approximately two dozen times over a two-year

51:09       period; is that fair to say?

51:10    A.   Between -- my understanding is between

51:11       September of 2021 and August of 2022.

51:12    Q.   And it's true that Mr. Desrosiers

51:13       elected himself to end treatment in 2022, correct?

51:14    A.   I think it was a mutual decision with

51:15       his therapist.

51:16    Q.   Have you had an opportunity to review

51:17       those notes in preparation for your testimony

51:18       today, Dr. Romirowsky?

51:19    A.   No.

51:20    Q.   I've put on the screen Exhibit 186.

51:21       I'll represent to you this is the notes from

51:22       Dr. Annunziata, June 22nd, 2022.

51:23       Do you see that?

51:24       (Exhibit 186 was marked for purposes of

51:25       identification.)

52:01       MR. ZIMMERMAN: You're not showing the

52:02       date, Alaina.

52:03       MS. DEVINE: Oh.

52:04    A.   Yes.

52:05       BY MS. DEVINE:

52:06    Q.   Right here.

52:07    A.   Yes.

52:08    Q.   And I'll represent to you there are

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 52:09 | some dating issues in these records, I believe, but | |
| | 52:10 | this is the record where Dr. Annunziata indicates | |
| | 52:11 | that Mr. Desrosiers was electing to end treatment | |
| | 52:12 | at this juncture. | |
| | 52:13 | Do you see that? | |
| | 52:14 | A. Yes. | |
| | 52:15 | Q. And Dr. Romirowsky, under mental | |
| | 52:16 | status, Dr. Annunziata documented, at least at that | |
| | 52:17 | time in June of 2022, Mr. Desrosiers' mood and | |
| | 52:18 | affect. | |
| | 52:19 | Do you see that here? | |
| | 52:20 | A. Yes. | |
| | 52:21 | Q. And it indicates anxious, mild. | |
| | 52:22 | Correct? | |
| | 52:23 | A. Yes. | |
| | 52:24 | Q. Depressed, mild. Correct? | |
| | 52:25 | A. Yes. | |
| | 53:01 | Q. Anger, mild. Correct? | |
| | 53:02 | A. Yes. | |
| | 53:03 | Q. And in these notes here, Dr. Annunziata | |
| | 53:04 | indicates "Reported having nightmares once in a | |
| | 53:05 | while when thinking about Cambridge or the job. | |
| | 53:06 | But mostly he is fine." | |
| | 53:07 | Correct? | |
| | 53:08 | A. Yes. | |
| | 53:09 | Q. "Dreams are about getting shot or being | |
| | 53:10 | chased with a gun. Not as frequent, though." | |
| | 53:11 | Correct? | |
| | 53:12 | A. Yes. | |
| | 53:13 | Q. "Still staying away from Cambridge | |
| | 53:14 | completely." | |
| | 53:15 | Correct? | |
| | 53:16 | A. Yes. | |
| | 53:17 | Q. "Thinks nightmares will subside if he | |
| | 53:18 | stays away from Cambridge, the site of his | |
| | 53:19 | shooting." | |
| | 53:20 | Correct? | |
| | 53:21 | A. Yes. | |
| | 53:22 | Q. It further indicates, "He declined | |
| | 53:23 | another round of exposure therapy around shooting | |
| | 53:24 | in Cambridge, because the trauma does not really | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

53:25      impact his life if he stays away from Cambridge and

54:01      if he stays away from" -- his words -- "the

54:02      defective gun."

54:03      Correct?

54:04    A.   Yes.

54:05    Q.   And it also indicates, "Since the

54:06      trauma minimally impacts his psychological

54:07      functioning, he elected to end treatment at this

54:08      juncture."

54:09      Correct?

54:10    A.   Yes.

54:11    Q.   "He cautioned that he may pick up

54:12      treatment again if need be."

54:13      Correct?

54:14    A.   Yes.

54:15    Q.   Mr. Desrosiers had a relationship with

54:16      Dr. Annunziata that he was free to come back to him

54:17      and contact him if needed, correct?

54:18    A.   Yes.

54:19    Q.   And Mr. Desrosiers found therapy to be

54:20      helpful, correct?

54:21    A.   Yes.

54:22    Q.   In the therapy notes with

54:23      Dr. Annunziata and also in his primary care notes,

54:24      Mr. Desrosiers talked about other issues that

54:25      contributed to his anxiety and depression, in

55:01      addition to the subject incident, correct?

55:02    A.   Are you referring to a particular

55:03      record?

55:04    Q.   Sure.  I'm happy to put that up for

55:05      you.  This will be Exhibit 186 [sic].

55:06      (Exhibit 185 was marked for purposes of

55:07      identification.)

55:08      BY MS. DEVINE:

55:09    Q.   Can you see that on the screen,

55:10      Dr. Romirowsky?

55:11    A.   Yes.

55:12    Q.   And I'll represent to you this is dated

55:13      April 14th, 2021, at the top here.  It's a

55:14      telemedicine visit with his primary care physician.

55:15      Did you learn, Dr. Romirowsky, that

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

55:16      Mr. Desrosiers had been diagnosed with lung cancer

55:17      less than a year after his incident?

55:18    A.   Yes.

55:19    Q.   And he was specifically diagnosed in

55:20      September of 2020 with a malignant tumor of the

55:21      lung, correct?

55:22    A.   Yes.  I know he had surgery to remove a

55:23      lobe.

55:24    Q.   Yes.  Correct.

55:25      Didn't end up needing chemo, but there

56:01      was some talk about potentially having to have it

56:02      but didn't need it, correct?

56:03    A.   Yes, didn't need it.

56:04    Q.   And Mr. Desrosiers described his lung

56:05      cancer diagnosis to you as, quote, a very scary

56:06      event in his life, correct?

56:07    A.   Sure, yes.  Understandable.

56:08    Q.   And it was something that he needed to

56:09      be monitored for for a number of years after his

56:10      surgery, correct?

56:11    A.   Yes.

56:12    Q.   And I'll draw your attention now to

56:13      this record in front of you.  These are the Atrius

56:14      Health primary care records.  Under HPI/Current

56:15      Issues or Questions, and this is with respect to

56:16      PTSD.

56:17      It indicates:  Continues to follow with

56:18      outside behavioral health therapist, meeting

56:19      weekly.  He reports improvement, still significant

56:20      worry and anxiety related to carrying a gun and

56:21      returning to work.

56:22      And that's what -- consistent with what

56:23      he told you, correct?

56:24    A.   Yes.

56:25    Q.   It indicates here, "He has long felt

57:01      depression over the issue, compounded by his

57:02      relatively recent lung cancer diagnosis."

57:03      Correct?

57:04    A.   Yes.

57:05    Q.   "He is continuing to see a therapist

57:06      weekly, finds it beneficial as mentioned, intends

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

|  | 57:07 | to continue going forward." |  |  |
|  | 57:08 | Correct? |  |  |
|  | 57:09 | A. Yes. |  |  |
|  | 57:10 | Q. And that's consistent with the |  |  |
|  | 57:11 | testimony you just gave on direct that seeing the |  |  |
|  | 57:12 | therapist appeared to have mitigated some of his |  |  |
|  | 57:13 | symptoms, correct? |  |  |
|  | 57:14 | A. Yes. |  |  |

**58:12 - 62:07**     **Romirowsky, Samuel 2025-06-30**     **00:04:06**     **SamuelRomirowsky-editedfortrial.7**

| | 58:12 | Q. Dr. Romirowsky, a little bit further |
|---|---|---|
| | 58:13 | down, it states, "Though the lung cancer diagnosis |
| | 58:14 | did not cause depression or PTSD, the diagnosis was |
| | 58:15 | made after his gunshot wound and contributed to |
| | 58:16 | symptoms overall." |
| | 58:17 | Correct? |
| | 58:18 | A. So if I understand that correctly, that |
| | 58:19 | note is suggesting that the doctor felt that |
| | 58:20 | although he already had been diagnosed with cancer, |
| | 58:21 | he didn't get diagnosed with PTSD until after the |
| | 58:22 | gunshot. |
| | 58:23 | Q. The gunshot came first and then the |
| | 58:24 | cancer diagnosis, correct? |
| | 58:25 | A. Yes. Well, yes, that's true. Yes. |
| | 59:01 | Q. And in between these two highlighted |
| | 59:02 | paragraphs, it states, "After discussion, we agreed |
| | 59:03 | to" -- I'm going to butcher this, but is that |
| | 59:04 | Celexa there? |
| | 59:05 | A. That's citalopram. Yes. |
| | 59:06 | Q. Citalopram. Thank you. |
| | 59:07 | So at least as reflected in this notes |
| | 59:08 | -- in this section in the discussion of |
| | 59:09 | Mr. Desrosiers' psychological issues, this is |
| | 59:10 | approximately when the Celexa medication began, |
| | 59:11 | correct? |
| | 59:12 | A. Yes. |
| | 59:13 | Q. It's true, Dr. Romirowsky, that |
| | 59:14 | symptoms of depressive disorder are not always |
| | 59:15 | permanent, correct? |
| | 59:16 | A. Yes. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

59:17 Q. They can lessen over time, correct?

59:18 A. They can, yes, or they can worsen.

59:19 Q. And some -- I'm sorry.

59:20 A. They can go in either direction, lessen

59:21 or worsen.

59:22 Q. Sure. And in some -- some

59:23 circumstances, they could disappear completely,

59:24 correct?

59:25 A. Yes. That's the goal.

60:01 Q. And there's people with depressive

60:02 disorders that are able to obtain and maintain

60:03 employment, perhaps not at the police department

60:04 but otherwise, correct?

60:05 A. Yes.

60:06 Q. And in your meetings with

60:07 Mr. Desrosiers, at least according to the notes

60:08 that you took, he expressed a desire to want to

60:09 work, correct?

60:10 A. Yes.

60:11 Q. You went through this a little bit on

60:12 direct, but you wrote in your report, "It's highly

60:13 recommended that Mr. Desrosiers resume professional

60:14 psychological assistance to help him cope more

60:15 effectively with the symptoms that he's been

60:16 experiencing and mitigate the severity of those

60:17 symptoms."

60:18 Correct?

60:19 A. Yes.

60:20 Q. And you also recommended that

60:21 Mr. Desrosiers see a specialist for the evaluation

60:22 of the use of the Celexa or other medications,

60:23 correct?

60:24 A. Yes.

60:25 Q. And at least as you -- when you

61:01 interviewed Mr. Desrosiers in December of 2023,

61:02 Mr. Desrosiers had not done either of those for

61:03 almost two years, correct?

61:04 A. After I saw him, did you say?

61:05 Q. I said -- let me repeat the question.

61:06 I apologize.

61:07 At the time that you interviewed

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

61:08     Mr. Desrosiers, he hadn't sought treatment or

61:09     continued treatment or evaluation of the use of

61:10     medication in almost two years, correct?

61:11    A.   I believe he was still taking the

61:12     Celexa.

61:13    Q.   Okay. And you don't know what his

61:14     current status is in terms of his use of medication

61:15     or the resumption of professional psychological

61:16     assistance, correct?

61:17    A.   I don't know anything about him since I

61:18     evaluated him in December of 2023.

61:19    Q.   Okay. And it's possible with an

61:20     effective combination of psychological treatment

61:21     and medical treatment Mr. Desrosiers' symptoms

61:22     could be more waning over time as opposed to, say,

61:23     waxing and waning, correct?

61:24    A.   Yes.

61:25    Q.   Okay.

62:01    A.   And, in fact, it seems clear that at

62:02     the time that he discontinued treatment he was

62:03     doing better.

62:04     So my recommendation seemed logical to

62:05     me, at least, that if he would resume treatment and

62:06     continue to take appropriate medications that he

62:07     would again feel better.

| 62:20 - 64:08 | **Romirowsky, Samuel 2025-06-30** | 00:01:31 | **SamuelRomirowsky-editedfortrial.8** |

62:20     MS. DEVINE: I have no further

62:21     questions, Dr. Romirowsky. Thank you very

62:22     much.

62:23     THE WITNESS: You're welcome.

62:24     - - -

62:25     RE-DIRECT EXAMINATION

63:01     - - -

63:02     BY MR. ZIMMERMAN:

63:03    Q.   Dr. Romirowsky, I just have a few.

63:04     You were shown a record that identified

63:05     that in 2022 Mr. Desrosiers at that time was

63:06     experiencing minimal symptoms during the time where

63:07     he was receiving treatment and medications.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

63:08    Do you recall seeing that?

63:09  A.  Yes.

63:10  Q.  Why do you believe his symptoms were

63:11    minimal at that point?

63:12  A.  It would suggest to me that the

63:13    treatment was effective, that he was getting help

63:14    psychologically by the outpatient psychotherapy he

63:15    was getting from Dr. Annunziata and in combination

63:16    with medication that is designed to reduce his

63:17    anxiety and depression, and the combination seemed

63:18    effective.

63:19  Q.  Is that exactly why you recommended

63:20    that Mr. Desrosiers needs more treatment as a

63:21    result of these injuries?

63:22  A.  It is.  I don't know why he didn't do

63:23    it in the intervening time between when he stopped

63:24    and when I evaluated him; I just don't know.

63:25    But at that point that I saw him, I

64:01    suggested and recommended that he go back to

64:02    treatment, believing that he would again benefit

64:03    from it.

64:04  Q.  Doctor, you were asked about two

64:05    disciplinary complaints:  One from about 30 years

64:06    ago and one from about seven years ago.

64:07    Do you recall that?

64:08  A.  I sure do.

| 64:15 - 65:13 | **Romirowsky, Samuel 2025-06-30** | 00:01:09 | **SamuelRomirowsky-editedfortrial.12** |

64:15  Q.  Let me ask you.  What was the issue

64:16    from seven years ago?

64:17  A.  The issue from seven years ago was that

64:18    in the context of an arbitration, a dispute that I

64:19    was trying to get resolved between me and a former

64:20    litigant in a custody case, that the arbitrator,

64:21    not me, in fact, the arbitrator accidentally

64:22    released the address of the litigant, which was a

64:23    violation of his right to have his information

64:24    protected, and I took responsibility for it.

64:25    I argued that it should not have been

65:01    me because I didn't release the information, but

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 65:02 | that's where it landed. | | |
| | 65:03 | Q. And then the one from 30 years ago, you | | |
| | 65:04 | said was a result of an incorrect term in a report? | | |
| | 65:05 | A. Yes. | | |
| | 65:06 | Q. Okay. How many people have you either | | |
| | 65:07 | treated or evaluated over the course of your | | |
| | 65:08 | career? | | |
| | 65:09 | A. Thousands. | | |
| | 65:10 | Q. Okay. And there were two out of the | | |
| | 65:11 | thousands identified. Did either complaint impact | | |
| | 65:12 | your ability to practice in your field in any way? | | |
| | 65:13 | A. Not in any way. | | |

| 66:22 - 67:06 | **Romirowsky, Samuel 2025-06-30** | 00:00:24 | **SamuelRomirows ky-editedfortrial. 13** |
| | 66:22 | MR. ZIMMERMAN: Ms. Devine, could you | | |
| | 66:23 | pull up the cancer note? | | |
| | 66:24 | MS. DEVINE: Sure. | | |
| | 66:25 | | | |
| | 67:01 | BY MR. ZIMMERMAN: | | |
| | 67:02 | Q. Doctor -- | | |
| | 67:03 | MR. ZIMMERMAN: And for the record, | | |
| | 67:04 | this is -- what exhibit did you mark it as, | | |
| | 67:05 | Ms. Devine? | | |
| | 67:06 | MS. DEVINE: 185. | | |

| 68:05 - 69:03 | **Romirowsky, Samuel 2025-06-30** | 00:00:59 | **SamuelRomirows ky-editedfortrial. 10** |
| | 68:05 | Q. Doctor, I'm sorry to ask you this, but | | |
| | 68:06 | is it normal or abnormal for someone who is dealing | | |
| | 68:07 | with a cancer diagnosis to have feelings of | | |
| | 68:08 | depression over it? | | |
| | 68:09 | A. That's a common reaction to learning | | |
| | 68:10 | that diagnosis. | | |
| | 68:11 | Q. Is it normal or abnormal, in your | | |
| | 68:12 | experience, to have a cancer diagnosis be a scary | | |
| | 68:13 | event for someone? | | |
| | 68:14 | A. Very normal. | | |
| | 68:15 | Q. The highlighted portion on the screen | | |
| | 68:16 | indicates that the diagnosis of depression and | | |
| | 68:17 | stress disorder were not due to the cancer | | |
| | 68:18 | diagnosis but were the result of the unintended | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 68:19 | discharge? | | |
| | 68:20 | A. That's my understanding of the note. | | |
| | 68:21 | MR. ZIMMERMAN: Ms. Devine, you can | | |
| | 68:22 | take that down. Thank you. | | |
| | 68:23 | BY MR. ZIMMERMAN: | | |
| | 68:24 | Q. Finally, Dr. Romirowsky, you were asked | | |
| | 68:25 | about whether Mr. Desrosiers wanted to avoid | | |
| | 69:01 | talking about his injuries in the incident. | | |
| | 69:02 | Do you recall that? | | |
| | 69:03 | A. Yes. | | |

**69:23 - 70:24** | **Romirowsky, Samuel 2025-06-30** | 00:01:04 | **SamuelRomirowsky-editedfortrial.11**

| | 69:23 | Q. Yeah. You were asked about whether | | |
| | 69:24 | Mr. Desrosiers wanted to avoid talking about his | | |
| | 69:25 | injuries in the incident? | | |
| | 70:01 | A. Yes. | | |
| | 70:02 | Q. In your experience, is it common or | | |
| | 70:03 | uncommon for people who have suffered injuries to | | |
| | 70:04 | the most sensitive parts of their body to want to | | |
| | 70:05 | discuss them? | | |
| | 70:06 | A. It's very common that they do not want | | |
| | 70:07 | to discuss it. | | |
| | 70:08 | Q. And -- please, go ahead. | | |
| | 70:09 | A. No. I'm saying the baseline, meaning | | |
| | 70:10 | in the normal general population of people, it | | |
| | 70:11 | would be expected that people who suffer that kind | | |
| | 70:12 | of injury would not be comfortable talking about | | |
| | 70:13 | it. | | |
| | 70:14 | Q. And is it normal or abnormal, in your | | |
| | 70:15 | experience treating and evaluating people, for | | |
| | 70:16 | people who have suffered injuries to the most | | |
| | 70:17 | sensitive parts of their body to want to go back to | | |
| | 70:18 | the injury scene or not? | | |
| | 70:19 | A. It's common that they do not. It's | | |
| | 70:20 | common that they avoid the injury scene or anything | | |
| | 70:21 | that they associate with the injury scene. | | |
| | 70:22 | MR. ZIMMERMAN: Thank you, Doctor. | | |
| | 70:23 | Those are all the questions I have. | | |
| | 70:24 | THE WITNESS: You're welcome. | | |

| Our Designations | 01:07:52 |
|---|---|
| **TOTAL RUN TIME** | **01:07:52** |