# EXHIBIT N

Transcribed Trial Testimony of Andrew Verzilli that was video recorded and played for the Jury

# AndrewVerzilli-editedfortrial

## Designation List Report

**Verzilli, Andrew**                                        **2025-07-03**

| | |
|---|---|
| Our Designations | 00:39:32 |
| **TOTAL RUN TIME** | **00:39:32** |



| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 5:22 - 22:10 | **Verzilli, Andrew 2025-07-03** | 00:20:27 | **AndrewVerzilli-edited fortrial.1** |

| | |
|---|---|
| 5:22 | Whereupon, |
| 5:23 | ANDREW VERZILLI, |
| 5:24 | called as a witness, having been first duly sworn |
| 5:25 | to tell the truth, the whole truth, and nothing but |
| 6:01 | the truth, testified as follows: |
| 6:02 | - - - |
| 6:03 | D I R E C T  E X A M I N A T I O N |
| 6:04 | - - - |
| 6:05 | BY MR. ZIMMERMAN: |
| 6:06 | Q. Good morning, Mr. Verzilli. Can you |
| 6:07 | please introduce yourself to the jury? |
| 6:08 | A. Sure. My name is Andrew C. Verzilli. |
| 6:09 | V, as in Victor, E-R-Z-I-L-L-I. I'm an economist. |
| 6:10 | I'm located in Lansdale, Pennsylvania, which is a |
| 6:11 | suburb of Philadelphia. |
| 6:12 | Q. What do you do as an economist? |
| 6:13 | A. My work involves determining the |
| 6:14 | economic impact that events have on individuals. |
| 6:15 | I'm here today to talk about how an injury affects |
| 6:16 | someone's ability to earn income or their earning |
| 6:17 | capacity. |
| 6:18 | Other areas that I do work involve |
| 6:19 | catastrophic-injured individuals, wrongful death |
| 6:20 | matters, individuals that may need medical care |
| 6:21 | costs, employment matters, business disputes. So I |
| 6:22 | look at the economic impact that these events have. |
| 6:23 | Q. And we'll talk about your opinions in a |
| 6:24 | few minutes, but in this case, did you research and |
| 6:25 | identify Mr. Desrosiers' pre-injury earning |
| 7:01 | capacity, how much he could make before this |
| 7:02 | accident? |
| 7:03 | A. Yes. |
| 7:04 | Q. And did you research what he would have |
| 7:05 | been able to make after this accident had the |
| 7:06 | accident not occurred? |
| 7:07 | A. Yes. |
| 7:08 | Q. And did you research and identify a |
| 7:09 | work-life expectancy or how long Mr. Desrosiers |
| 7:10 | would have worked for? |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

7:11   A.  I did.

7:12   Q.  Before we get to your opinions, I

7:13       understand you're an economist, and I imagine you

7:14       went to school for that.  Can you please tell the

7:15       jury your schooling and education?

7:16   A.  I earned my bachelor's of science in

7:17       business from Drexel University, which is in

7:18       Philadelphia, that was in June of 1988.  I majored

7:19       in economics.

7:20       I then earned my master's in business

7:21       administration from La Salle University, which is

7:22       also in Philadelphia, and that was in December

7:23       of 1991, and at La Salle my concentration for my

7:24       master's was in finance.

7:25   Q.  How long have you been an economist?

8:01   A.  Since early '92, so 33 years now.

8:02   Q.  Have you taught in the field of

8:03       economics?

8:04   A.  Yes.  In the past, 1992 to 1999, I

8:05       taught -- so for about seven years I taught as a

8:06       member of Drexel's adjunct faculty, and an adjunct,

8:07       it was a part-time appointment.  I taught in the

8:08       evening college.  Most of the times I taught one

8:09       course a term, and I taught the two principles of

8:10       economics courses.

8:11   Q.  And have you been a member of any

8:12       professional societies related to economics?

8:13   A.  I'm a member of presently two:  One is

8:14       the National Association of Forensic Economics,

8:15       which is related to the application of economics in

8:16       this type of setting, and then the American

8:17       Economic Association.

8:18   Q.  Do you do this as a large part of your

8:19       business, look at cases and understand the economic

8:20       losses from an accident?

8:21   A.  Yes.

8:22   Q.  And have you been retained by plaintiff

8:23       firms, including my firm, to perform this economic

8:24       analysis on a wage loss or other losses?

8:25   A.  In terms of the percent of my work,

9:01       yes, it's -- it's generally been in the 95 percent

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 9:02 | of the retentions I get are for plaintiffs. | |
| | 9:03 | Q. Have you been retained by the defense | |
| | 9:04 | side in your career? | |
| | 9:05 | A. I have, and I have current cases, and | |
| | 9:06 | that's about 5 percent of my work. | |
| | 9:07 | MR. ZIMMERMAN: At this time I offer | |
| | 9:08 | Mr. Verzilli as an expert in vocational | |
| | 9:09 | economics, and, Ms. Devine, I'd allow you the | |
| | 9:10 | opportunity if you'd like to ask any | |
| | 9:11 | questions now or reserve. | |
| | 9:12 | MS. DEVINE: No questions. No | |
| | 9:13 | objection. | |
| | 9:14 | MR. ZIMMERMAN: Okay. | |
| | 9:15 | BY MR. ZIMMERMAN: | |
| | 9:16 | Q. So, Mr. Verzilli, let's get right into | |
| | 9:17 | it. What were you asked to do in this case? | |
| | 9:18 | A. I was asked to estimate the earning | |
| | 9:19 | capacity to Mr. Desrosiers as a result of the | |
| | 9:20 | injury he suffered in October of 2019. | |
| | 9:21 | Q. And is your testimony today going to be | |
| | 9:22 | limited just to the losses in wages that | |
| | 9:23 | Mr. Desrosiers sustained? | |
| | 9:24 | A. That is correct. Yes. | |
| | 9:25 | Q. Okay. So let's go through those. I | |
| | 10:01 | want to pull up a chart, and before I do, the first | |
| | 10:02 | thing that you looked at was the pre-injury earning | |
| | 10:03 | capacity of Mr. Desrosiers? | |
| | 10:04 | A. That's correct. And -- and that's | |
| | 10:05 | defined as had this not occurred, had this incident | |
| | 10:06 | not occurred when he was injured, what was his | |
| | 10:07 | earning capacity. | |
| | 10:08 | Q. Okay. And I understand you reviewed | |
| | 10:09 | certain documentation and information. What | |
| | 10:10 | documentation and information did you review in | |
| | 10:11 | coming to your opinions? | |
| | 10:12 | A. I had his W-2 forms from 2014 to '19. | |
| | 10:13 | I had Dr. Tota's vocational report, and I also had | |
| | 10:14 | the relevant collective bargaining agreement for | |
| | 10:15 | the Cambridge police and the City of Cambridge, | |
| | 10:16 | which determined the base salaries and the wage | |
| | 10:17 | increases and all the benefits, and that would be | |

| | | | |
|---|---|---|---|
| | 10:18 | the one that was in effect July '21 to June of '24. | |
| | 10:19 | Q. The jury will have heard Dr. Tota's | |
| | 10:20 | testimony before yours. Can you just tell the jury | |
| | 10:21 | what the difference is between what Romy Tota did | |
| | 10:22 | and what you did? | |
| | 10:23 | A. Sure. Economics is the study of the | |
| | 10:24 | production of income, so I looked at actually | |
| | 10:25 | estimating the loss of earning capacity. I'm not a | |
| | 11:01 | vocational expert. | |
| | 11:02 | Dr. Tota looked at Mr. Desrosiers' | |
| | 11:03 | pre-injury earnings and his work as a -- as a | |
| | 11:04 | police officer and then other relevant information | |
| | 11:05 | and determined can he go -- given the injuries, is | |
| | 11:06 | he able to go back to that job? If not, can he go | |
| | 11:07 | back to work, and if he could, what could do he? | |
| | 11:08 | That's the vocational issue. I'm not -- I have to | |
| | 11:09 | rely on her in that aspect. And -- | |
| | 11:10 | Q. And did you -- did you do that here? | |
| | 11:11 | A. I did. | |
| | 11:12 | Q. Okay. So -- and then you essentially | |
| | 11:13 | extrapolate the numbers from those opinions? | |
| | 11:14 | A. That's correct. | |
| | 11:15 | Q. So let's go through -- I'll mark this | |
| | 11:16 | as 703. This is a demonstrative of some of the | |
| | 11:17 | charts from your report. | |
| | 11:18 | (Exhibit 703 was marked for purposes of | |
| | 11:19 | identification.) | |
| | 11:20 | BY MR. ZIMMERMAN: | |
| | 11:21 | Q. The first thing I want to talk about is | |
| | 11:22 | pre-injury earning capacity. Can you just simplify | |
| | 11:23 | that? What does that mean? | |
| | 11:24 | A. Sure. Earning capacity is the income | |
| | 11:25 | you receive from work, given your age, education | |
| | 12:01 | and skills, talents and training, your employment | |
| | 12:02 | and earnings history, what does the economy say | |
| | 12:03 | about a specific occupation. It's the ability to | |
| | 12:04 | produce income. | |
| | 12:05 | And what that means is as an | |
| | 12:06 | individual, me or Mr. Desrosiers has what we call | |
| | 12:07 | human capital, and that has value in the labor | |
| | 12:08 | market, and his is as a police officer. Pre- -- | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

12:09       pre-injury means had this not occurred, what was

12:10       his earning potential as a police officer?

12:11  Q.  Would showing his earnings from 2014 to

12:12       2019 help in providing your opinions?

12:13  A.  Yes.

12:14  Q.  Okay.  So I'll show you, this is a

12:15       chart from your report, and if you could tell the

12:16       jury what the relevance of this chart is.

12:17  A.  Well, this shows what his earning --

12:18       his actual earnings were, which is capturing those

12:19       factors I just mentioned:  his education, his

12:20       experience, his skills, talents and training.

12:21       As a police officer, they go through

12:22       training, the nature of the job, and part of the

12:23       job includes overtime, so his actual earnings here

12:24       reflect what his earning capacity was.

12:25  Q.  And where do these numbers come from?

13:01  A.  His W-2 forms.

13:02  Q.  Okay.  Now, we see in 2019 that his

13:03       number is lower than 2018.  Why is that?

13:04  A.  Well, the injury happened in October,

13:05       so that would be the difference.

13:06  Q.  Okay.  And I see here there are a

13:07       couple of significant bumps in between certain

13:08       years.  Did you -- you said you looked at the

13:09       collective beginning agreement.

13:10       Can you identify why there were these

13:11       significant increases in Mr. Desrosiers' earnings

13:12       over these years?

13:13  A.  Well, part of it is just the normal

13:14       salary increases.  There's also what -- police

13:15       officers get a base salary, and then once they hit

13:16       the top of the pay scale, depending on the

13:17       department, sometimes it's four years or five

13:18       years, then they get what's called like longevity.

13:19       In the Cambridge department, it's

13:20       called a career award.  Meaning, we're going to

13:21       give you an additional -- it's not a bonus but an

13:22       increase in your salary to reflect the years you've

13:23       had on the -- on the -- in the department.  And

13:24       then there's overtime.  So that's the combination

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| 13:25 | | of all of that. And '17 and '18 would most likely |
| 14:01 | | be overtime and '19 as well would be the bigger |
| 14:02 | | increases. |
| 14:03 | Q. | Okay. Thank you. |
| 14:04 | | Now, this is the earnings that are |
| 14:05 | | pre-accident, correct? |
| 14:06 | A. | That's correct. |
| 14:07 | Q. | I'm going to show you another chart |
| 14:08 | | which identifies years 2020 through 2023, and can |
| 14:09 | | you tell me -- this is the second page, and it's a |
| 14:10 | | demonstrative from your report. |
| 14:11 | | Tell me what the significance of this |
| 14:12 | | is. |
| 14:13 | A. | Well, I estimated Mr. Desrosiers' |
| 14:14 | | earning -- pre-injury earning capacity based on the |
| 14:15 | | last full year, the $163,000 he earned in '18. And |
| 14:16 | | then this is just the increases in that earnings |
| 14:17 | | based on the increases in the collective bargaining |
| 14:18 | | agreement that I had. |
| 14:19 | | So we saw in 2020, in July, it went up |
| 14:20 | | 2 and-a-half percent, and then July '21 it was |
| 14:21 | | 1 percent. And as we increase those salaries, as |
| 14:22 | | of July of 2023, which was the last increase in the |
| 14:23 | | CBA, I increased his earnings from 163,860 each |
| 14:24 | | year, and as of July of '23, he would be earning |
| 14:25 | | $180,000 a year. |
| 15:01 | Q. | So this would be a projection of what |
| 15:02 | | he would have been earning after the accident under |
| 15:03 | | the same type of scale as his pre-accident? |
| 15:04 | A. | That's correct. |
| 15:05 | Q. | Now, in the collective bargaining |
| 15:06 | | agreement, did you learn whether or not |
| 15:07 | | Massachusetts has a mandatory retirement age for |
| 15:08 | | police officers? |
| 15:09 | A. | There is one. |
| 15:10 | Q. | What is that retirement age? |
| 15:11 | A. | It's age 65. |
| 15:12 | Q. | Now, did you review when Mr. Desrosiers |
| 15:13 | | intended to work until? |
| 15:14 | A. | My understanding is he wanted to work |
| 15:15 | | to age 70. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

15:16  Q.  Okay.  So that would've meant he

15:17      would've had to retire at 65 as a police officer

15:18      and find alternative employment?

15:19  A.  That's correct.

15:20  Q.  Now, in reviewing Dr. Tota's report and

15:21      opinions, did Dr. Tota accept the age 70 marker in

15:22      terms of the work-life expectancy of

15:23      Mr. Desrosiers, or did she use some other number?

15:24  A.  I recall she used age 67, and that

15:25      is -- age 67 is normal retirement age based on

16:01      Social Security, when you could collect your full

16:02      Social Security benefit.  But that -- again, we had

16:03      mandatory retirement as a police officer.

16:04      So as a police officer, we would be

16:05      bound by the mandatory retirement age.  Although,

16:06      as does occur, police officers can retire and then,

16:07      you know, become investigators or work in other

16:08      areas of law enforcement post retirement, but I did

16:09      not consider that.

16:10  Q.  So before we get to your consideration,

16:11      you reviewed Dr. Tota's report.

16:12      It's your understanding she did not

16:13      essentially give a work-life expectancy until 70.

16:14      She gave a work-life expectancy until 67, with 65

16:15      being the retirement age for a police officer and

16:16      then two years outside of the police force?

16:17  A.  That's -- that's what you would have to

16:18      assume.  That's correct.

16:19  Q.  So did you use that projection for your

16:20      economic opinions?

16:21  A.  No.  I limited it to age 65, the

16:22      mandatory retirement age as a police officer.

16:23  Q.  Why did you limit your numbers to age

16:24      65 when Mr. Desrosiers said he wanted to work until

16:25      70, and Dr. Tota said it would've been reasonable

17:01      for an average person to be working until 67?

17:02  A.  Well, one is to be conservative; two is

17:03      we have the mandatory retirement age; and three, I

17:04      would've had to make some assumptions about the

17:05      types of jobs he could've done post retirement from

17:06      Cambridge.  And at the time I did my report, I

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

17:07    didn't have that information.  So in order to be

17:08    conservative, I just relied on that mandatory

17:09    retirement age of 65.

17:10  Q.  Would you then consider -- and we'll

17:11    get into your numbers.  Would you consider your

17:12    numbers to essentially be the baseline of what

17:13    Mr. Desrosiers' loss of earnings is?

17:14  A.  Yes.

17:15  Q.  And would his loss of earnings be even

17:16    greater if he, in fact, did work past 65 in some

17:17    other capacity, other than a police officer?

17:18  A.  Yes.  If you assumed five more years of

17:19    work, I mean in a basic -- without getting into

17:20    present value, you would multiple that number by

17:21    five.  So, obviously, if you add additional

17:22    earnings, then it's going to be higher than -- than

17:23    what I did.

17:24  Q.  I'll show you the third chart from your

17:25    report, and can you just remind me when your report

18:01    was issued?

18:02  A.  August 8th, 2024.

18:03  Q.  So that was a court deadline that you

18:04    needed to provide this for.  And tell us what this

18:05    chart is and understanding we're now about 11

18:06    months later, if there's any significance to that.

18:07  A.  Sure.  This is the loss of

18:08    Mr. Desrosiers' earning capacity as a police

18:09    officer to his mandatory retirement age.  There's

18:10    two parts.  The top part of this chart involves

18:11    what we call the future, which would've been from

18:12    the time I did my report to age 65.  He was -- he

18:13    was just -- he turned 60 -- his birthday's

18:14    June 3rd, 1962, so he was 62, a little over 62

18:15    years of age when I did my report.  So the future

18:16    period was a little under three years.

18:17    And then on the bottom is the past and

18:18    that would've been from the date of the incident in

18:19    October, all the way through July of 2024.

18:20  Q.  There's also a Value of Benefits

18:21    section.  Can you tell us what that means?

18:22  A.  Sure.  Police officers, based on my

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

18:23    review of the contract, the two benefits, the main

18:24    one I considered was health insurance. The -- the

18:25    city provides health insurance. Now, the officer

19:01    has to pay 18 percent of the premium. So based on

19:02    that data, I was able to estimate what that value

19:03    would be.

19:04    He also had participation in the

19:05    pension plan, which was about 20 percent of

19:06    earnings, and the health was close to 11 percent,

19:07    but he also had expenses. So in part of his work,

19:08    he incurred expenses for his uniform and other

19:09    things that I -- I netted that out, so the net

19:10    benefit rate that I used was 26.3 percent of

19:11    earnings.

19:12    Q.   Okay. And because you did this report

19:13    and this chart about a year ago, tell us the

19:14    significance of that. Would some of the future now

19:15    be in past or vice versa?

19:16    A.   Yeah. So the future has to be in

19:17    what's called present value. Present value is just

19:18    a formula that takes future dollars and determine

19:19    what they're worth today. It's called the time

19:20    value of money.

19:21    So what I did was for the, roughly, 2.8

19:22    years I grew the $180,000 by 2 and-a-half percent,

19:23    which is reflected of the average growth in the

19:24    contract, and I looked at the labor market too. So

19:25    2 and-a-half percent was very reasonable.

20:01    Present value, you have to assume an

20:02    interest rate, so you take those future dollars and

20:03    you -- if you could invest the money, what would

20:04    you need today to provide for that? I used a

20:05    4 percent interest rate.

20:06    And when you do that math, the present

20:07    value of the $180,000 for a little under three

20:08    years is $482,000. You add the benefits. It's

20:09    about 127,000. And also, I assumed he's unable to

20:10    return to work. That gives us a future loss of

20:11    609,000.

20:12    The past would be what accrued up

20:13    to the date I did my report. So following those

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 20:14 | earnings we showed a little while ago, I just added | |
| | 20:15 | up those earnings from the time he was injured | |
| | 20:16 | through July, added the benefits, and that would be | |
| | 20:17 | about $1,037,000. | |
| | 20:18 | Now, you know, we're essentially coming | |
| | 20:19 | up on a year out.  So, essentially, what you would | |
| | 20:20 | do is increase the past lost earnings for the last | |
| | 20:21 | year and that reduces the future pre-injury, but | |
| | 20:22 | the overall total is going to be about the same. | |
| | 20:23 | So I didn't -- I didn't make that adjustment. | |
| | 20:24 | Q.  So when you say the total amount, I see | |
| | 20:25 | here $1,647,308.  And what does that number | |
| | 21:01 | represent? | |
| | 21:02 | A.  That is Mr. Desrosiers' past and future | |
| | 21:03 | loss of earning capacity, assuming that based on | |
| | 21:04 | Dr. Tota he was unable to return to work in any | |
| | 21:05 | capacity, and that will continue to his -- to the | |
| | 21:06 | mandatory retirement age. | |
| | 21:07 | Q.  So this would be from the date of the | |
| | 21:08 | incident until his mandatory retirement age; is | |
| | 21:09 | that correct? | |
| | 21:10 | A.  That's correct. | |
| | 21:11 | Q.  And that would be assuming, number one, | |
| | 21:12 | he does not find alternative employment and number | |
| | 21:13 | two, he does not work past 65 as he intended? | |
| | 21:14 | A.  That's correct. | |
| | 21:15 | Q.  And you mentioned this "present value" | |
| | 21:16 | term.  Why did you use that present value | |
| | 21:17 | terminology or methodology for your report? | |
| | 21:18 | A.  I have to in this instance.  It's part | |
| | 21:19 | of the -- when we look at economics in this type of | |
| | 21:20 | setting, there are times -- certain guidelines that | |
| | 21:21 | you have to follow, and here any future loss has to | |
| | 21:22 | be reduced to present value. | |
| | 21:23 | Q.  Okay.  Mr. Verzilli, to just summarize, | |
| | 21:24 | is it your professional opinion that Mr. Desrosiers | |
| | 21:25 | has sustained an economic loss from the date of the | |
| | 22:01 | accident until the date of 65 retirement age of | |
| | 22:02 | $1,647,000 and -- and change? | |
| | 22:03 | A.  Yes. | |
| | 22:04 | Q.  And do you hold your opinions in this | |

| | | | |
|---|---|---|---|
| | 22:05    case to a reasonable degree of vocational economic | | |
| | 22:06    certainty? | | |
| | 22:07    A.   I do. | | |
| | 22:08    MR. ZIMMERMAN: Mr. Verzilli, thank you | | |
| | 22:09    for your time. Ms. Devine may have some | | |
| | 22:10    questions. | | |
| 22:18 - 27:04 | **Verzilli, Andrew 2025-07-03** | 00:04:22 | **AndrewVerzilli-ed** |
| | 22:18    Q.   Good morning, Mr. Verzilli. | | **itedfortrial.2** |
| | 22:19    A.   Hi. | | |
| | 22:20    Q.   My name's Alaina Devine. I'm one of | | |
| | 22:21    the lawyers for SIG Sauer, and I just have a couple | | |
| | 22:22    questions for you. | | |
| | 22:23    You were hired by the plaintiffs' | | |
| | 22:24    lawyer in this case to conduct your economic | | |
| | 22:25    assessment, correct? | | |
| | 23:01    A.   That's correct. | | |
| | 23:02    Q.   And you charge to complete that work. | | |
| | 23:03    You charge $300 per hour to draft a report. Here | | |
| | 23:04    you spent ten hours for a total of $3,000, correct? | | |
| | 23:05    A.   That's correct. | | |
| | 23:06    Q.   You also charge $2,000 per day for any | | |
| | 23:07    trial testimony, correct? | | |
| | 23:08    A.   Yes, except that was if I came to the | | |
| | 23:09    trial. So I'm sitting here. I'm not -- I'm not | | |
| | 23:10    charging a -- I'm not charging $2,000 for this | | |
| | 23:11    because it's not -- it's, you know... | | |
| | 23:12    Q.   Is it an hourly rate instead? | | |
| | 23:13    A.   I probably will. | | |
| | 23:14    Q.   Sure. And you indicated you've been | | |
| | 23:15    doing expert work for many years since about 1992; | | |
| | 23:16    is that correct? | | |
| | 23:17    A.   That is correct. | | |
| | 23:18    Q.   You also indicated about 95 percent of | | |
| | 23:19    your cases are for the plaintiff, correct? | | |
| | 23:20    A.   That's correct. | | |
| | 23:21    Q.   And you've worked specifically with | | |
| | 23:22    this plaintiffs' lawyer's firm for about 20 years; | | |
| | 23:23    is that right? | | |
| | 23:24    A.   I -- yes, and there was a -- those | | |
| | 23:25    attorneys, some of them have passed away, but there | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 24:01 | was a firm before this firm that we had a few, but | | |
| | 24:02 | for this firm, yeah, about 20 years. | | |
| | 24:03 | Q. And you've estimated that you had about | | |
| | 24:04 | a hundred cases previously with this firm, correct? | | |
| | 24:05 | A. Yes. | | |
| | 24:06 | Q. You indicated at your deposition in | | |
| | 24:07 | this case that you had to do some research on some | | |
| | 24:08 | Massachusetts law and standards. | | |
| | 24:09 | It's fair to say most of your cases are | | |
| | 24:10 | in the Pennsylvania area, not in the Massachusetts | | |
| | 24:11 | area, correct? | | |
| | 24:12 | A. That is correct. | | |
| | 24:13 | Q. In connection with your work in this | | |
| | 24:14 | case, you never met or spoke with Mr. Desrosiers, | | |
| | 24:15 | correct? | | |
| | 24:16 | A. That's correct. | | |
| | 24:17 | Q. Not in person and not by Zoom, correct? | | |
| | 24:18 | A. I never interviewed him. I didn't talk | | |
| | 24:19 | to him in any -- I had no communication with him. | | |
| | 24:20 | Q. Okay. You relied pretty much | | |
| | 24:21 | exclusively on Dr. Tota's opinion that | | |
| | 24:22 | Mr. Desrosiers is unable to work in any capacity, | | |
| | 24:23 | correct? | | |
| | 24:24 | A. That is correct. | | |
| | 24:25 | Q. You don't know and you don't have an | | |
| | 25:01 | opinion about whether or not Mr. Desrosiers can | | |
| | 25:02 | actually work or not, correct? | | |
| | 25:03 | A. That's correct. I'm not a vocational | | |
| | 25:04 | expert. | | |
| | 25:05 | Q. And you didn't review any of his | | |
| | 25:06 | medical records or speak to any providers to verify | | |
| | 25:07 | the information contained in Dr. Tota's report, | | |
| | 25:08 | correct? | | |
| | 25:09 | A. Yes. I don't think I can talk to | | |
| | 25:10 | providers. I don't and I haven't. But I did not | | |
| | 25:11 | do that. | | |
| | 25:12 | Q. You also didn't calculate a loss of | | |
| | 25:13 | earning capacity for any alternative scenarios | | |
| | 25:14 | here, right? | | |
| | 25:15 | A. Can you clarify? | | |
| | 25:16 | Q. Sure. In your practice, is it common | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

25:17    for a vocational expert to provide more than one
25:18    scenario of potential vocational outcomes?
25:19  A.  It depends.  I mean, there are cases
25:20    where there's -- one vocational outcome is
25:21    disability, one is they can go back part-time.  It
25:22    really is a case-by-case basis.
25:23  Q.  And when you're provided more than one
25:24    scenario, sometimes you'll calculate for more than
25:25    one scenario, correct?
26:01  A.  Yeah.  I will follow -- again, I'm not
26:02    a vocational expert, and if there is another
26:03    alternative, I will undertake that.
26:04  Q.  And Dr. Tota, if she had provided you
26:05    with alternative scenarios and you were asked to
26:06    calculate a loss of earning capacity based on some
26:07    part-time or other employment for Mr. Desrosiers,
26:08    you would have done that, correct?
26:09  A.  I would have, yes.
26:10  Q.  And in that case, if there had been
26:11    part-time work or another employment opportunity
26:12    for Mr. Desrosiers that Dr. Tota had identified,
26:13    it's true, is it not, that his losses could have
26:14    been less or potentially nonexistent?
26:15  A.  Yeah.  I'll explain really simple.  At
26:16    that point, we're doing math.  So I subtracted zero
26:17    away.  If I subtract something, then that number is
26:18    going to be -- the total loss is going to be lower.
26:19    So whatever that amount is it will be lower.
26:20  Q.  And in reviewing Dr. Tota's report, you
26:21    saw her opinion that Mr. Desrosiers is unable to
26:22    work in any capacity based on her review of
26:23    Mr. Desrosiers' medical records and his physical
26:24    and psychological condition, correct?
26:25  A.  That's correct.
27:01  Q.  Okay.  And were you aware that
27:02    Mr. Desrosiers hadn't sought treatment for several
27:03    years for any of those conditions?
27:04  A.  No.

| 28:05 - 31:11 | **Verzilli, Andrew 2025-07-03** | 00:03:18 | **AndrewVerzilli-ed** |

28:05  Q.  Mr. Verzilli, you're aware that

itedfortrial.3

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

28:06    Dr. Tota's opinion that Mr. Desrosiers was unable

28:07    to work was based on her review of Mr. Desrosiers'

28:08    medical records related to his physical and

28:09    psychological conditions, correct?

28:10  A.  Yes.

28:11  Q.  And were you aware that Mr. Desrosiers

28:12    had not seen a urologist in more than five years?

28:13  A.  No.

28:14  Q.  Were you aware that Mr. Desrosiers had

28:15    not been to physical therapy in five years?

28:16  A.  No.

28:17  Q.  And were you aware that Mr. Desrosiers

28:18    has not seen a psychologist in three years?

28:19  A.  No.

28:20  Q.  Would you agree with me that if

28:21    Mr. Desrosiers had followed up on any of those

28:22    treatment options for his physical or psychological

28:23    conditions described in Dr. Tota's report and it

28:24    was then determined that he was able to return to

28:25    work, the losses would be less?

29:01  A.  If you assume he could've -- he could

29:02    go back to work in some other capacity, we're going

29:03    to subtract.  Whatever that number is, it's going

29:04    to reduce the total.  That's math.

29:05  Q.  In page -- in your report on page 4,

29:06    you define earning capacity, and I'll read exactly

29:07    what you have in the report.

29:08    "Earning capacity is defined as the

29:09    level of income that an individual may reasonably

29:10    be expected to receive from work, given the

29:11    individual's age, level of educational attainment,

29:12    particular skills and talents, actual earnings and

29:13    work history, intentions, and the supply and demand

29:14    conditions in the labor market relative to the

29:15    individual's realistic employment choices."

29:16    Is that an accurate reading of page 4

29:17    of your report and the definition of earning

29:18    capacity?

29:19  A.  Yes, and I think I kind of summarized

29:20    that earlier today.

29:21  Q.  Yes, you did.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

29:22    Did you learn in your review of

29:23    Dr. Tota's report that Mr. Desrosiers was a highly

29:24    educated man?

29:25  A.  Yes.  I thought I put his education in

30:01    there.  I may not have, but yeah, I -- whatever the

30:02    education was, I knew that.

30:03  Q.  Sure.  He had a bachelor's degree in

30:04    liberal arts and criminal justice, correct?

30:05  A.  That's correct.

30:06  Q.  A law degree that he received in 2012,

30:07    correct?

30:08  A.  That's correct.

30:09  Q.  And he also completed an online real

30:10    estate class in the fall of 2023 after his

30:11    incident, correct?

30:12  A.  I think so.  Yeah, I'll take your word

30:13    for that.

30:14  Q.  He had a 24-year work history with the

30:15    Cambridge Police Department, correct?

30:16  A.  Yeah.  He had been there since '95.

30:17  Q.  And you saw in Dr. Tota's report some

30:18    of the aptitude tests that she administered to

30:19    Mr. Desrosiers, and the results of those tests were

30:20    above average and in some cases the 99th percentile

30:21    in aptitudes, correct?

30:22  A.  Yeah.  I didn't look at it this

30:23    morning, but whatever is in the report, yes.

30:24  Q.  Okay.  And she also indicates in her

30:25    report that he had many transferrable skills as a

31:01    police officer, correct?

31:02  A.  Yes.

31:03  Q.  And at least as you've defined earning

31:04    capacity in your report, part of determining

31:05    earning capacity is looking at the actual labor

31:06    market conditions, correct?

31:07  A.  Yes.  And here how this relates to

31:08    Mr. Desrosiers is the CBA, is the labor -- I mean,

31:09    that's -- collective bargaining is a process to

31:10    determine wages between the union and -- and the

31:11    employer, and that is the labor market data.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 32:06 - 37:22 | Verzilli, Andrew 2025-07-03 | 00:06:46 | AndrewVerzilli-edited fortrial.4 |

32:06  Q.  Mr. Verzilli, you'd agree with me, at

32:07      least as you've defined earning capacity, that part

32:08      of looking at earning capacity is looking at

32:09      conditions in the labor market, correct?

32:10  A.  Yes, and I'll -- I'll clarify that.

32:11      What a job earns, what an occupation, what the --

32:12      if you go to the Bureau of Labor Statistics and

32:13      let's look at a average secretary in Boston.

32:14      That's an economic question.

32:15      The vocational expert identifies an

32:16      occupation that is suitable, given the limitations

32:17      and other vocational factors.  Once we know that

32:18      job, then it's an economic issue, and I would look

32:19      at the labor market.

32:20      Here Dr. Tota did not identify any jobs

32:21      that Mr. Desrosiers could do, so I didn't -- in

32:22      terms of his post injury, there was nothing for me.

32:23      I didn't go look in the labor market and say an

32:24      average private investigator -- or whatever that

32:25      job was -- would pay and then use that.

33:01      But I do that -- you know, I look at

33:02      the labor market on a daily basis.

33:03  Q.  Thank you.

33:04      As far as your calculations, you used I

33:05      believe Mr. Desrosiers' 2018 earnings to calculate

33:06      loss of earning capacity, correct?

33:07  A.  That's correct.

33:08  Q.  And you indicated on direct that his

33:09      earnings were based both on his base salary but

33:10      also on overtime pay or potentially detail pay,

33:11      correct?

33:12  A.  Right, as well as that -- I call it

33:13      longevity 'cause I see it more here.  I think it's

33:14      called the career award, whatever that -- there's a

33:15      term for it.  But for every year -- and depending

33:16      on what year you were in -- you got a percent.  I

33:17      think at the time of this, it was 11 percent, and

33:18      it would be 15 percent today.

33:19  Q.  Okay.  You just reviewed

33:20      Mr. Desrosiers' W-2s, correct, for -- for reviewing

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 33:21 | his actual income? | | |
| | 33:22 | A. That's correct. | | |
| | 33:23 | Q. So you didn't know when you looked at | | |
| | 33:24 | that the difference between his base salary, his | | |
| | 33:25 | overtime pay, his detail pay, or his career award | | |
| | 34:01 | increase, correct, other than what's in the | | |
| | 34:02 | collective bargaining agreement? | | |
| | 34:03 | A. I could get -- I could get an | | |
| | 34:04 | approximation, but I didn't have the -- I didn't | | |
| | 34:05 | have a pay statement that broke it all out. | | |
| | 34:06 | Q. Okay. You'd agree that how much | | |
| | 34:07 | overtime or detail somebody does in a given year | | |
| | 34:08 | varies based on how much they want to do, how much | | |
| | 34:09 | is available, and perhaps other factors, correct? | | |
| | 34:10 | A. That's correct. | | |
| | 34:11 | Q. And we looked at the prior year's -- | | |
| | 34:12 | last five years of Mr. Desrosiers' earnings, and | | |
| | 34:13 | you explained to the jury that prior to '17, 2017, | | |
| | 34:14 | Mr. Desrosiers' earnings were about $30,000 or so | | |
| | 34:15 | less, correct? | | |
| | 34:16 | A. Yes. Like, '16 it was 133,000. | | |
| | 34:17 | Q. Yeah. '15, it was 124,000, and 2014, | | |
| | 34:18 | it was also 124,000, correct? | | |
| | 34:19 | A. That's correct. | | |
| | 34:20 | Q. You didn't average out or try to factor | | |
| | 34:21 | those lower numbers into your calculations, | | |
| | 34:22 | correct? You just used the 2018 number? | | |
| | 34:23 | A. That's correct. Because I saw in '17 | | |
| | 34:24 | there was one -- almost 167-. It was down a little | | |
| | 34:25 | bit in '18, and the year he got hurt into October, | | |
| | 35:01 | he was almost at 157-. So those three years were | | |
| | 35:02 | showing significant -- above the other years, so | | |
| | 35:03 | that's -- that's why I did that. | | |
| | 35:04 | Q. And you -- sorry. | | |
| | 35:05 | A. I'm sorry. | | |
| | 35:06 | Q. My apologies. I didn't mean to | | |
| | 35:07 | interrupt you. | | |
| | 35:08 | A. It's okay. I'm done. | | |
| | 35:09 | Q. Okay. You explained on direct that | | |
| | 35:10 | some of that increase in pay was relative to his | | |
| | 35:11 | overtime, correct? | | |

35:12  A.  Sure.  Between '16 and '17, the
35:13      overtime increased, but then it kind of leveled
35:14      out.
35:15  Q.  Okay.  When you looked at the
35:16      collective bargaining agreement and applied the
35:17      increase that you did, did you also apply that
35:18      increase to any overtime or detail pay that may be
35:19      factored into his salary as reflected in his W-2?
35:20  A.  Well, what happens is the detail and
35:21      overtime pay is generally going to be a multiple of
35:22      the base salary, and you also have the career award
35:23      increased to 15 percent.  So I just took the
35:24      aggregate.
35:25      So, essentially, the overtime amount is
36:01      going to be a little bit lower now because the
36:02      career benefit went up from 11 percent to
36:03      15 percent, and I didn't break everything out.  But
36:04      in total, it's not really that significant of a
36:05      difference to do it my way.
36:06  Q.  And you're aware that Mr. Desrosiers
36:07      was out on leave from the time of the incident and
36:08      never returned to work, at least as of the time
36:09      that you did your calculations, correct?
36:10  A.  That's correct.
36:11  Q.  And you don't know what Mr. Desrosiers'
36:12      current employment status is, correct?
36:13  A.  I -- my understanding is he's not
36:14      working.
36:15  Q.  Do you know whether he's actually
36:16      retired from the Cambridge Police Department at
36:17      this point?
36:18  A.  I don't think he took a retirement yet,
36:19      but he's not in the labor market.
36:20  Q.  Okay.  So if Mr. Desrosiers is
36:21      presently retired, that's not information that you
36:22      have, correct?
36:23  A.  Yeah.  I don't recall if he -- I don't
36:24      recall if he officially retired or not.
36:25  Q.  Okay.  And you explained on direct that
37:01      you included in your calculations a loss of pension
37:02      benefits, I believe, at 20 percent; is that right?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

|  | 37:03 | A. | Yes.  And how I did it was for the |  |  |
|  | 37:04 |  | additional years, you get a higher pension.  So |  |  |
|  | 37:05 |  | from 19 to age 65, he already had a pens- -- he |  |  |
|  | 37:06 |  | already would've accrued some pension for the years |  |  |
|  | 37:07 |  | he had been there, the 24 years. |  |  |
|  | 37:08 |  | The question is what would've been the |  |  |
|  | 37:09 |  | increase in that pension, so I looked at it in that |  |  |
|  | 37:10 |  | respect. |  |  |
|  | 37:11 | Q. | Do you know, Mr. Verzilli, whether or |  |  |
|  | 37:12 |  | not Mr. Desrosiers is receiving creditable service |  |  |
|  | 37:13 |  | years while he's been out on leave since the |  |  |
|  | 37:14 |  | incident, towards his pension? |  |  |
|  | 37:15 | A. | I don't know.  I'm not aware. |  |  |
|  | 37:16 | Q. | And you didn't have his pension |  |  |
|  | 37:17 |  | statement to actually look at that?  That wasn't |  |  |
|  | 37:18 |  | something provided to you, correct? |  |  |
|  | 37:19 | A. | Yeah.  That's correct.  I didn't look |  |  |
|  | 37:20 |  | at it to see if, you know, if they're |  |  |
|  | 37:21 |  | increasing the -- I don't -- I don't know, as we |  |  |
|  | 37:22 |  | sit here. |  |  |

| 38:23 - 44:03 | **Verzilli, Andrew 2025-07-03** | | 00:04:39 | **AndrewVerzilli-editedfortrial.5** |

|  | 38:23 | Q. | Mr. Verzilli, if Mr. Desrosiers |  |  |
|  | 38:24 |  | actually suffered no loss to his pension benefits, |  |  |
|  | 38:25 |  | your inclusion of that in your calculation would |  |  |
|  | 39:01 |  | overstate the loss, correct? |  |  |
|  | 39:02 | A. | If you take out the pension |  |  |
|  | 39:03 |  | contribution, that's math, so yes. |  |  |
|  | 39:04 | Q. | And you're aware that police officers |  |  |
|  | 39:05 |  | in Massachusetts are pension eligible after 20 |  |  |
|  | 39:06 |  | years, correct? |  |  |
|  | 39:07 | A. | That is my understanding.  I -- I think |  |  |
|  | 39:08 |  | so, and they may have to be -- I don't even know if |  |  |
|  | 39:09 |  | they have to be an age, but I think 20 is the key. |  |  |
|  | 39:10 |  | MS. DEVINE:  We can go off the record. |  |  |
|  | 39:11 |  | I just want to check my notes. |  |  |
|  | 39:12 |  | THE VIDEOGRAPHER:  Off the record at |  |  |
|  | 39:13 |  | 10:38 a.m. |  |  |
|  | 39:14 |  | MS. DEVINE:  Okay.  We can go back on. |  |  |
|  | 39:15 |  | THE VIDEOGRAPHER:  Back on the record |  |  |
|  | 39:16 |  | at 10:39 a.m. |  |  |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 39:17 | MS. DEVINE: I have no further | |
| | 39:18 | questions. Thank you very much, | |
| | 39:19 | Mr. Verzilli. | |
| | 39:20 | - - - | |
| | 39:21 | RE-DIRECT EXAMINATION | |
| | 39:22 | - - - | |
| | 39:23 | BY MR. ZIMMERMAN: | |
| | 39:24 | Q. Mr. Verzilli, I just want to clarify | |
| | 39:25 | two things. I'm going to share my screen again | |
| | 40:01 | with the 703 charts. | |
| | 40:02 | Can you see my screen? | |
| | 40:03 | A. Yes. | |
| | 40:04 | Q. Okay. When you looked at pre-accident | |
| | 40:05 | earning capacity, is this the number that you | |
| | 40:06 | selected? | |
| | 40:07 | A. I did. | |
| | 40:08 | Q. Okay. You didn't select 166-, which | |
| | 40:09 | was his highest year to date? | |
| | 40:10 | A. That's correct. | |
| | 40:11 | Q. In 2019 the injury happened in October. | |
| | 40:12 | Do you have a calculator with you? | |
| | 40:13 | A. Yes. | |
| | 40:14 | Q. Can you just give me a rough estimate | |
| | 40:15 | of what his 2019 earnings would have been if it was | |
| | 40:16 | prorated out for the full year? | |
| | 40:17 | MS. DEVINE: I'm going to object to | |
| | 40:18 | this question. We can go off the record. | |
| | 40:19 | THE VIDEOGRAPHER: Off the record at | |
| | 40:20 | 10:40 a.m. | |
| | 40:21 | (Whereupon, the following proceedings | |
| | 40:22 | were held off the video record but on the | |
| | 40:23 | stenographic record.) | |
| | 40:24 | MS. DEVINE: I'm going to object to any | |
| | 40:25 | new opinions being calculated and reached and | |
| | 41:01 | offered at this time, as previously not | |
| | 41:02 | disclosed. | |
| | 41:03 | MR. ZIMMERMAN: And I'm not necessarily | |
| | 41:04 | asking him for a new opinion. He told the | |
| | 41:05 | jury what number he used, and in | |
| | 41:06 | cross-examination, there were questions | |
| | 41:07 | suggesting that that was inappropriate. | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

41:08    I'm asking him what the number would be

41:09    extrapolated for 2019 to confirm that he did

41:10    not, in fact, use that for his opinion.

41:11    MS. DEVINE:  Okay.  I still have the

41:12    same objection, but we can go back on the

41:13    record.

41:14    THE VIDEOGRAPHER:  Back on the record

41:15    at 10:40 a.m.

41:16    BY MR. ZIMMERMAN:

41:17  Q.  So, Mr. Verzilli, let me just clarify

41:18    the question.  $157,000 would have been what he

41:19    earned up until the date of his October 10th

41:20    incident, to your understanding?

41:21  A.  That's correct.

41:22  Q.  And October 10th, how far into the year

41:23    would that have been?

41:24  A.  It's about ten and-a-half months.

41:25  Q.  Okay.

42:01  A.  I mean, sorry.  Yeah, no.  Nine

42:02    and-a-half months.  I'm sorry.  It's -- it's

42:03    halfway into the tenth month, so nine and-a-half

42:04    months.

42:05  Q.  Okay.  So if you extrapolate that

42:06    amount, 157-, over the course of that year, what

42:07    would that number be, just math-wise?

42:08    MS. DEVINE:  Same objection.  We can

42:09    stay on.

42:10  A.  If -- in a simple way, even if you

42:11    assume that's for the full ten months, it would --

42:12    it would've exceeded $180,000.

42:13    BY MR. ZIMMERMAN:

42:14  Q.  Okay.  So you didn't use the $180,000

42:15    annual rate for 2019.  You didn't use the 2017 166-

42:16    rate.  You didn't use the rate from three, four, or

42:17    five years after the incident.  You used this 163-

42:18    number?

42:19    MS. DEVINE:  Same objection.

42:20  A.  That's correct.  I used the last full

42:21    year.

42:22    BY MR. ZIMMERMAN:

42:23  Q.  And would you consider that to be a

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 42:24 | conservative estimate of his pre-accident earnings? | |
| | 42:25 | A. Yes. And you really can't just average | |
| | 43:01 | the '14, '15, and '16 because you have to -- you | |
| | 43:02 | have to put them all in equivalent years. So I'd | |
| | 43:03 | have to take the 124- and look at the increase in | |
| | 43:04 | '15, '16, and '17 and do the same, so those figures | |
| | 43:05 | are going to come up. | |
| | 43:06 | And then if you're going to average, do | |
| | 43:07 | it that way, you should look at '19, and then that | |
| | 43:08 | was higher. I felt that those three years where | |
| | 43:09 | we're seeing that overtime was higher than it had | |
| | 43:10 | been in '14, '15, and '16, I felt that was a | |
| | 43:11 | reliable estimate. | |
| | 43:12 | Q. And there were some questions about | |
| | 43:13 | pension benefits. We're literally talking about a | |
| | 43:14 | portion of these $126,000 of benefits that were | |
| | 43:15 | identified? | |
| | 43:16 | A. Of the future, yes. | |
| | 43:17 | Q. Okay. And regardless of the nominal | |
| | 43:18 | amount in pension benefits, your opinion is that | |
| | 43:19 | his total economic loss from date of incident to | |
| | 43:20 | age 65 mandatory retirement would have been this | |
| | 43:21 | 1.647 number? | |
| | 43:22 | A. That's correct. | |
| | 43:23 | MR. ZIMMERMAN: All right, sir. Thank | |
| | 43:24 | you for your time. | |
| | 43:25 | THE WITNESS: Thank you, everyone. | |
| | 44:01 | THE VIDEOGRAPHER: Are there any more | |
| | 44:02 | questions? | |
| | 44:03 | MS. DEVINE: No further questions. | |

| Our Designations | 00:39:32 |
|---|---|
| **TOTAL RUN TIME** | **00:39:32** |