# EXHIBIT A

# ArthurMourtzinos

Trial Designations

**Mourtzinos, Arthur**  2025-06-13

| Defense Designations | 00:33:09 |
| Plaintiff Designations | 00:10:52 |
| **TOTAL RUN TIME** | **00:44:02** |



ID: ArthurMourtzinos

| 2025-06-13 | Mourtzinos, Arthur | Page 1 |
|---|---|---|

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | |
| 3 | |
| 4 | YOLETTE L. DESROSIERS, . |
| 5 | Plaintiffs, . |
| 6 | vs. . |
| 7 | SIG SAUER, INC., . |
| 8 | Defendant. . |
| 9 | |
| 10 | |
| 11 | VIDEOTAPED DEPOSITION OF |
| 12 | ARTHUR P. MOURTZINOS, M.D. |
| 13 | Taken by Defendant |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | Alec Ricker CER 2781 |
| 21 | |
| 22 | |
| 23 | Proceedings recorded by electronic sound recording; |
| 24 | |
| 25 | |

| 2025-06-13 | Mourtzinos, Arthur | Page 2 |
|---|---|---|

| | |
|---|---|
| 1 | APPEARANCES OF COUNSEL |
| 2 | |
| 3 | On behalf of Plaintiff: |
| 4 | RYAN D. HURD |
| 5 | One Liberty Place |
| 6 | 52nd Floor |
| 7 | (215) 608-5217 |
| 8 | |
| 9 | |
| 10 | CAMPBELL CONROY & O'NEIL, P.C. |
| 11 | Suite 300 |
| 12 | (617) 241-3000 |
| 13 | |
| 14 | Also Present: |
| 15 | David Woodford, Videographer |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| 2025-06-13 | Mourtzinos, Arthur | Page 3 |
|---|---|---|

| | |
|---|---|
| 1 | INDEX TO EXAMINATION |
| 2 | EXAMINATION OF ARTHUR P. MOURTZINOS, M.D.    PAGE |
| 3 | Examination by MS. DEVINE |
| 4 | Examination by MR. HURD            31 |
| 5 | Further Examination by MS. DEVINE         40 |
| 6 | |
| 7 | INDEX OF EXHIBITS |
| 8 | DEFENDANT'S    DESCRIPTION       PAGE |
| 9 | Exhibit 213   CV |
| 10 | Exhibit 246    Medical Records 6-2-2020   30 |
| 11 | Exhibit 248    Health Records       30 |
| 12 | |
| 13 | |
| 14 | (Exhibits 213, 246, and 248 were attached |
| 15 | to the original transcript.) |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| 2025-06-13 | Mourtzinos, Arthur | Page 4 |
|---|---|---|

| | |
|---|---|
| 1 | THE VIDEOGRAPHER:  This is Media Unit Number |
| 2 | 1 of the video-recorded deposition of Dr. Arthur |
| 3 | Mourtzinos.  This is in the matter of Jacques |
| 4 | Desrosiers and Yolette L. Desrosiers v. Sig Sauer, Inc. |
| 5 | It's being heard before the United States District |
| 6 | Court for the District of Massachusetts.  Civil action |
| 7 | number is 1:22-CV-11674-MJJ.  This deposition is taking |
| 8 | place at the office of Campbell Conroy & O'Neal, P.C., |
| 9 | 20 City Square, Boston, Massachusetts, on June 13th, |
| 10 | 2025, beginning at 10:21 a.m. |
| 11 | My name is David Woodford, legal video |
| 12 | specialist, and the court reporter is Alec Ricker, both |
| 13 | here from Esquire Deposition Solutions.  Will Counsel |
| 14 | present please introduce yourselves and your |
| 15 | affiliations and the witness will be sworn. |
| 16 | MR. HURD:  Ryan Hurd with Saltz Mongeluzzi |
| 17 | Bendesky on behalf of Plaintiff Jacques Desrosiers. |
| 18 | MS. DEVINE:  Alaina Devine of Campbell Conroy |
| 19 | & O'Neil on behalf of Sig Sauer. |
| 20 | THE REPORTER:  Thank you all very much. |
| 21 | Pursuant to the Federal Rules of Civil Procedure, I |
| 22 | will be capturing the verbatim record of today's |
| 23 | proceeding using electronic audio equipment, a |
| 24 | computer, and specialized recording software, which is |
| 25 | not form of stenography.  The witness is located in |

## Page 5

| | |
|---|---|
| 1 | Boston, Massachusetts and has confirmed their identity |
| 2 | with a driver's license issued by the Massachusetts |
| 3 | Department of Motor Vehicles. |
| 4 | Absent any objection at this time, Counsel |
| 5 | and the witness agree to my administration of the oath |
| 6 | to this witness and that the final transcript may be |
| 7 | used for all purposes allowed by the Federal Rules. |
| 8 | Hearing no objection, this shall constitute |
| 9 | agreement and stipulation of such, and I will now swear |
| 10 | in the witness. |
| 11 | Doctor, would you please raise your right |
| 12 | hand?  Thank you so much. |
| 13 | ARTHUR P. MOURTZINOS, M.D., having been first |
| 14 | duly sworn, testified as follows: |
| 15 | THE REPORTER:  Thank you so much.  Counsel, |
| 16 | take it away. |
| 17 | EXAMINATION |
| 18 | BY MS. DEVINE: |
| 19 | Q.  Good morning, Doctor. |
| 20 | A.  Good morning. |
| 21 | Q.  Could you please introduce yourself to the jury? |
| 22 | A.  My name is Dr. Arthur P. Mourtzinos. |
| 23 | Q.  Dr. Mourtzinos, are you a licensed physician? |
| 24 | A.  Yes, I am. |
| 25 | Q.  What is your specialty? |

## Page 6

| | |
|---|---|
| 1 | A.  My specialty is urologic surgery. |
| 2 | Q.  Could you explain to the jury what is encompassed |
| 3 | in the field of urologic surgery? |
| 4 | A.  So in the field of urologic -- the field of |
| 5 | urologic surgery encompasses any type of voiding |
| 6 | dysfunction, erectile dysfunction, cancer involving the |
| 7 | prostate, bladder, kidneys, testis, or any kind of |
| 8 | surgical procedure related to the genitourinary tract, |
| 9 | as well as the gonadal area. |
| 10 | MS. DEVINE:  Doctor, I've marked Exhibit 213 |
| 11 | here as your CV.  I'm going to place that in front of |
| 12 | you. |
| 13 | (Defendant's Exhibit 213 is marked for |
| 14 | identification.) |
| 15 | BY MS. DEVINE: |
| 16 | Q.  Could you please tell for the jury your educational |
| 17 | history? |
| 18 | A.  I completed my B.A. at Boston University in May of |
| 19 | 1995.  I completed my M.D. degree at Boston University |
| 20 | in May of 2019.  I also completed a master's in |
| 21 | business administration at Babson College in September |
| 22 | of 2013. |
| 23 | Q.  Could you explain where you're currently |
| 24 | practicing? |
| 25 | A.  Currently, I am practicing at Lahey Health & |

## Page 7

| | |
|---|---|
| 1 | Medical Center in Burlington, Massachusetts. |
| 2 | Q.  Do you hold any other positions or employment? |
| 3 | A.  I do go to satellite facilities at Parkland Medical |
| 4 | Center in New Hampshire.  And I also hold an associate |
| 5 | professorship at Tufts University School of Medicine in |
| 6 | UMass Chan Medical School. |
| 7 | Q.  And what subjects do you teach? |
| 8 | A.  I teach subjects related to urology and urologic |
| 9 | surgery. |
| 10 | Q.  Could you briefly summarize your professional |
| 11 | licensures and board certifications? |
| 12 | A.  I am currently licensed in the state of |
| 13 | Massachusetts and New Hampshire.  I was previously |
| 14 | licensed in the state of California during my |
| 15 | fellowship and currently have an inactive license.  I |
| 16 | am licensed -- I have -- I'm board-certified in the |
| 17 | field of urology, as well as in the subspecialty field |
| 18 | of female pelvic medicine and urologic reconstructive |
| 19 | surgery. |
| 20 | Q.  Dr. Mourtzinos, do you hold any leadership |
| 21 | positions? |
| 22 | A.  I do.  I'm just going to -- I mean, so I don't |
| 23 | forget them.  I am currently vice-chair of the Division |
| 24 | of Urology and have been for at least ten years.  I am |
| 25 | also vice-chair of the physician compensation plan at |

## Page 8

| | |
|---|---|
| 1 | Lahey, as well as the director of professional billing |
| 2 | and coding at Lahey Health & Medical Center. |
| 3 | Q.  And do you have an active clinical practice? |
| 4 | A.  I do. |
| 5 | Q.  What is your specialty in your clinical practice? |
| 6 | A.  My specialty is in urologic reconstructive surgery, |
| 7 | urinary continence, overactive bladder, and -- and |
| 8 | sexual dysfunction. |
| 9 | Q.  Your work in this case relates to you bringing your |
| 10 | expertise as a urologist to these issues; is that |
| 11 | correct? |
| 12 | A.  That's correct. |
| 13 | Q.  Doctor, I'm going to ask you about some of your |
| 14 | opinions in this case.  Without going through this |
| 15 | question every time, if you do offer an opinion in this |
| 16 | case under oath, that would be to a reasonable degree |
| 17 | of medical certainty; is that correct? |
| 18 | A.  That is correct. |
| 19 | Q.  In connection with your time as -- spent as a |
| 20 | consultant or expert, do you charge for that time? |
| 21 | A.  I do. |
| 22 | Q.  Okay.  And what is your hourly rate? |
| 23 | A.  My hourly rate is $650 per hour. |
| 24 | Q.  How many times have you testified in court before? |
| 25 | A.  I have testified, to the best of my knowledge, |

---

2025-06-13      Mourtzinos, Arthur      Page 9

```
1     three or four times in court and once or twice before a
2     tribunal.
3  Q. In your practice where you spend most of your time,
4     how do your referrals or patients come to you?
5  A. In my practice, I would say that approximately 60
6     to 65 percent of my referrals come from internal
7     medicine doctors within the Lahey Health system, and 30
8     to 35 percent of referrals come from urologists outside
9     of the Lahey Health & Medical system.
10 Q. And when you visit with patients, is that generally
11    in person, or do you ever utilize telehealth?
12 A. I visit patients overwhelmingly in person.  I like
13    to use telehealth for established patients or for
14    patients as an initial visit who are coming to see me
15    from overseas or who are completely incapacitated and,
16    unfortunately, cannot come to their appointments as
17    initial appointments.
18 Q. Do you have any other board certifications other
19    than in urology?
20 A. No.  I do not.
21 Q. Can you describe to the jury, please -- and I can
22    take your CV out of the way for you -- your experience
23    and practice with urological trauma?
24 A. I have been employed at Lahey Health & Medical
25    Center for 17 years -- 17 years and have -- we are a
```

---

2025-06-13      Mourtzinos, Arthur      Page 10

```
1     Level 1 trauma center and had extensive experience with
2     urologic trauma.  I also did deal with urologic trauma
3     in my residency as well as in my fellowship at UCLA
4     Medical Center in Los Angeles.
5  Q. In this case, Dr. Mourtzinos, what were you asked
6     to do?
7  A. In this case, I was asked to render opinion as to
8     whether Mr. Desrosiers's injuries prevent him from
9     participating in activities in his daily life.
10 Q. And what did you do, Dr. Mourtzinos, to carry out
11    that assignment?
12 A. In order to carry out that assignment, I reviewed
13    all of his medical records prior to his injury, as well
14    as after his injury.  And in addition, I performed -- I
15    -- in addition, I met the -- the patient at a hotel to
16    perform a history and physical examination.
17 Q. And as a result of your review of those medical
18    records and your evaluation of Mr. Desrosiers, did you
19    come to certain opinions in this case, that you hold to
20    a reasonable degree of medical certainty?
21 A. I did.
22 Q. And what are those opinions?
23 A. Those opinions are that based on my review of the
24    medical records, the -- and the history and physical
25    that I conducted, that none of his injuries prevent him
```

---

2025-06-13      Mourtzinos, Arthur      Page 11

```
1     from performing his daily activities and all of his
2     urologic conditions are readily treatable.
3  Q. Thank you, Dr. Mourtzinos.  I'm going to move
4     briefly to discussion of Mr. Desrosiers's acute
5     injuries as a result of the incident on October 10th,
6     2019.  Can you describe for the jury how Mr. Desrosiers
7     presented and the treatment he received as a result of
8     his incident?
9  A. So based on the operative record from the treating
10    urologist, he presented to the emergency room with a
11    degloving injury of his penis, as well as what appeared
12    to be a penetrating wound in his right hemiscrotum with
13    an exit wound and may have had some injury to the
14    testis.  He had radiographic imaging, including a
15    scrotal ultrasound, which confirmed a right testicular
16    rupture.
17 Q. Could you describe to the jury what type of
18    treatment he received as a result of those injuries?
19 A. He -- he was taken to the operating room by the
20    urologic team and underwent a debridement and repair of
21    his degloving injury where the nonviable skin of his
22    penis and his scrotum was removed and then brought
23    together, as well as a repair of his testicular
24    rupture.
25 Q. In your review of the records pertaining to Mr.
```

---

2025-06-13      Mourtzinos, Arthur      Page 12

```
1     Desrosiers's acute medical care, did Mr. Desrosiers
2     experience any complications in the treatment he
3     received?
4  A. He did not.
5  Q. And in your review of the medical records with
6     respect to Mr. Desrosiers's urological care in this
7     case, do you know the last time he sought treatment for
8     his urological issues?
9  A. I believe that the last time he saw a urologist was
10    approximately six to seven months after his initial
11    operative procedure following his injury.
12 Q. And would that have been, then, around the June
13    2020 time frame?
14 A. That's correct.
15 Q. Dr. Mourtzinos, you explained to the jury that part
16    of your work in this case was reviewing Mr.
17    Desrosiers's medical records.  Did that include some of
18    his prior medical records as well?
19 A. That's correct.
20 Q. And what, if anything, did you learn about Mr.
21    Desrosiers and any prior issues with respect to
22    erectile dysfunction that he may have had before the
23    incident?
24 A. Based on his old records, he first reported
25    erectile dysfunction in 2018 and stated that he had had
```

---

Defense Designations     Plaintiff Designations

## Page 13

| 2025-06-13 | Mourtzinos, Arthur | Page 13 |

1  it for at least a year prior to that time.
2  Q. What -- could you explain to the jury what erectile
3     dysfunction is?
4  A. So erectile dysfunction is the failure to either
5     achieve or maintain an erection satisfactory for
6     vaginal intercourse.
7  Q. And how is erectile dysfunction diagnosed?
8  A. Erectile dysfunction is generally diagnosed by a
9     thorough history and physical as well as, potentially,
10    some laboratory tests.
11 Q. Could you describe for the jury the primary causes
12    of erectile dysfunction?
13 A. The primary causes of erectile dysfunction are a
14    previous history of tobacco use, diabetes mellitus, as
15    well as age.
16 Q. And could you also explain to the jury how erectile
17    dysfunction is generally treated?
18 A. So erectile dysfunction is generally treated in
19    multiple ways. Conservatively, patients can either use
20    something known as a vacuum erection device. And there
21    are very good medical therapies as well for those
22    patients, including medications called
23    phosphodiesterase 5 inhibitors, such as sildenafil,
24    otherwise known as Viagra, Levitra, or Cialis. In
25    addition to oral therapies, there are therapies where

## Page 14

| 2025-06-13 | Mourtzinos, Arthur | Page 14 |

1     medications can be inserted into the urethral meatus or
2     the opening of the penis, known as MUSE, M-U-S-E.
3     For patients who don't choose those options,
4     there's also therapy where medication can be injected
5     into the base of the penis leading to an erection. And
6     in patients who fail all of these therapies, the last
7     remaining therapy would be to proceed with an -- with a
8     penile prosthesis where patients are able to inflate
9     and deflate their penis, simulating an erection.
10 Q. Dr. Mourtzinos, you described one of the primary
11    causes of erectile dysfunction as age. Can you expand
12    on that a bit?
13 A. So based on several studies in the literature,
14    generally speaking, 50 percent of patients over the age
15    of 50 have some form of erectile dysfunction.
16 Q. Are there other causes to erectile dysfunction,
17    psychological type of consequences?
18 A. In addition to organic causes, such as the ones I
19    mentioned with tobacco use, diabetes, and -- and heart
20    disease, there are also some psychosocial or
21    psychogenic problems that are -- that can be cause of
22    erectile dysfunction, such as -- such as, you know,
23    relationship issues between the patient and a
24    significant other, anxiety, depression, stress, that
25    can prevent erections from occurring.

## Page 15

| 2025-06-13 | Mourtzinos, Arthur | Page 15 |

1  Q. Generally speaking, what is the prognosis of men
2     similar to the age of Mr. Desrosiers who have been
3     diagnosed with a erectile dysfunction?
4  A. The prognosis is excellent.
5  Q. And is it true that most patients can be
6     successfully treated with the currently available
7     therapies?
8  A. Yes.
9  Q. I want to revisit -- we discussed Mr. Desrosiers's
10    prior erectile dysfunction, and I'd like to show you
11    Exhibit 248, which are Mr. Desrosiers's Atrius Health
12    records, and in particular, the record dated January
13    11th, 2018, so about a year and a half plus prior to
14    the incident.
15 A. Would you like me to show this up for the camera?
16 Q. I don't believe so. I think they'll take care of
17    that after.
18 A. Okay.
19 Q. Thank you.
20    Doctor Mourtzinos, I'd like to draw your attention
21    to the bottom paragraph on that page. Could you please
22    read that for the jury?
23 A. Yes. "Patients note -- patient notes, he has been
24    having ED issues for the last year, which is causing
25    strain between him and his wife. Period. Difficult to

## Page 16

| 2025-06-13 | Mourtzinos, Arthur | Page 16 |

1     obtain any erection with no sex drive."
2  Q. You had indicated for the jury that Mr. Desrosiers
3     had prior erectile dysfunction, then, at least as he
4     describes it, a year prior to when it was first
5     reported on January 11th, 2018; is that correct?
6  A. That is correct.
7  Q. And Mr. Desrosiers would be around 55 or 56 years
8     old at that time; is that correct?
9  A. I'm just going to look at his date of birth at that
10    time. That is correct.
11 Q. Okay. And how common is it for men of that age to
12    have erectile dysfunction in your practice?
13 A. Extremely common.
14 Q. Do you know, based on your review of Mr.
15    Desrosiers's prior records, how his erectile
16    dysfunction that was first reported in January of 2018
17    was treated?
18 A. Yes, I do.
19 Q. Okay. And how was that?
20 A. According to his old medical records, he was seen
21    by a urologist who performed some laboratory work and
22    prescribed him sildenafil, which is the generic form of
23    Viagra. According to the notes, he had taken 60
24    milligrams of sildenafil on several occasions with
25    success.

| 2025-06-13 | Mourtzinos, Arthur | Page 17 |
|---|---|---|

```
 1    Q.   Do you know, based on your review of the records,
 2         the last time that Mr. Desrosiers sought treatment for
 3         his erectile dysfunction?
 4    A.   Based on the review of the medical records, the
 5         last time that he had sought treatment for this was in
 6         July of 2018.
 7    Q.   Okay.  And that holds true through to the present
 8         day, correct?
 9    A.   That's correct.
10    Q.   I want to next ask you, Dr. Mourtzinos, about
11         hypogonadism.  Can you explain for the jury what that
12         is?
13    A.   Hypogonadism is defined as a low testosterone level
14         that involves the -- that involves two separate
15         testosterone levels drawn from the blood before 10:00
16         a.m. on separate occasions.
17    Q.   And how do patients who have hypogonadism present
18         for treatment?
19    A.   Generally speaking, patients complain of decreased
20         energy.  They complain of fatigue.  They can complain
21         of decreased sexual libido as well.  Excuse me.
22    Q.   How common is hypogonadism?  Is it fair to say it's
23         low testosterone?
24    A.   Correct.  So the layman's term of -- for
25         hypogonadism is low testosterone, and it's extremely
```

| 2025-06-13 | Mourtzinos, Arthur | Page 18 |
|---|---|---|

```
 1         prevalent.
 2    Q.   Okay.  Same thing, same -- similar question as the
 3         erectile dysfunction:  A male of Mr. Desrosiers's age
 4         in 2018 or in 2025, how common is that for a patient
 5         like that to develop?
 6    A.   It's -- it's -- typically, for somebody his age,
 7         somewhere between 40 to 70 percent of patients have low
 8         testosterone.
 9    Q.   Okay.  How is low testosterone treated?
10    A.   So low testosterone is treated with a multitude of
11         methods of testosterone supplementation that can
12         include medications given orally; intranasally or
13         through the nose; with a transdermal preparation, in
14         other words, where they rub testosterone onto a body
15         part, in particular the shoulder; a patch; or injection
16         therapy.
17    Q.   What is the prognosis for men of Mr. Desrosiers's
18         age with low testosterone?
19    A.   The prognosis is excellent as well.
20    Q.   Okay.  And is it fair to say that low testosterone
21         is responsive to treatment?
22    A.   Yes, it is.
23    Q.   Okay.  And do you regularly see patients in your
24         practice with low testosterone?
25    A.   Yes, I do.
```

| 2025-06-13 | Mourtzinos, Arthur | Page 19 |
|---|---|---|

```
 1    Q.   Doctor, I want to next discuss with you your
 2         evaluation of Mr. Desrosiers on August 22nd, 2024.
 3         Were you asked to meet and evaluate Mr. Desrosiers in
 4         connection with this case?
 5    A.   Yes, I was.
 6    Q.   Okay.  And where did you meet him?
 7    A.   So I met Mr. Desrosiers in the evening sometime at
 8         the Hampton Inn in Woburn, Massachusetts.
 9    Q.   And I indicated that was in August of 2024, at
10         least according to the records.  Does that comport with
11         your memory?
12    A.   That's correct.
13    Q.   Can you describe for the jury, step by step, the
14         purpose of your evaluation and exactly what you did?
15    A.   Sure.  The purpose of the evaluation was not only
16         to do a physical exam, but to obtain a patient's
17         history of his urologic condition.  So to go
18         step-by-step, we met in the hall.  He was already there
19         and was very pleasant, and we proceeded to go to an
20         exam -- well, not an exam room, I should say.
21         We proceeded to go to a conference room in a quiet
22         area around the corner where there was nobody else
23         there.  The doors were closed.  It was only the two of
24         us.  I then proceeded to do a history and a physical
25         exam over the course of the next half hour at that
```

| 2025-06-13 | Mourtzinos, Arthur | Page 20 |
|---|---|---|

```
 1         time.  And I asked him several questions and then
 2         performed a physical exam.
 3    Q.   When you say physical exam, Doctor, can you explain
 4         to the jury exactly what that entails?
 5    A.   Sure.  So a physical exam for me is -- I always
 6         start with a general assessment of the patient, and he
 7         was alert.  He was oriented.  He was very pleasant and
 8         very cooperative with all of my questions.
 9         I then proceeded to perform specifically a
10         genitourinary exam, which involves examination of the
11         penis; the urethra, which is the hole that we urinate
12         through; the scrotum, as well as the contents within
13         the scrotum, which include the testis and the spermatic
14         cord; and if necessary, a rectal examination.
15         What I found was that with respect to his penile
16         exam, he had some minimal decreased sensation to touch
17         along the right side of his penis.  There was a small
18         scar that was present from his surgical repair.  His
19         urethral meatus was open and normal.  There was no
20         tenderness whatsoever during the exam of the penis.
21         On examination of his scrotum -- excuse me --
22         again, he was noted to have a -- a scar there, which
23         was a little bit more difficult to see.  Scars can
24         generally be difficult to see in the scrotum.  He also
25         had some decreased sensation along the right side of
```

Defense Designations     Plaintiff Designations

**Page 21**

2025-06-13 — Mourtzinos, Arthur

1. his scrotum. Again, there was no tenderness
2. whatsoever.
3. His left testicle was normal in size and
4. appearance. There was no tenderness on the left side.
5. His right testicle was smaller than his left testicle,
6. but there was no tenderness to palpation or whatnot. I
7. did not feel any other abnormalities aside from the
8. size of his right testis.
9. I did not perform a rectal exam in this individual.
10. And that was the extent of my physical examination.
11. Q. Thank you, Dr. Mourtzinos. Did you observe any
12. disfigurement during your examination?
13. A. I did not.
14. Q. During your examination, was there any -- I think
15. you may have touched on this briefly -- neuropathy
16. described or experienced when you were conducting your
17. examination?
18. A. So when I was conducting my -- my history -- or
19. when I was conducting my examination, the only kind of
20. neuropathy was a decreased sensation to -- to light
21. touch along his right scrotum and along his penis. In
22. terms of the history itself, he described a periodic
23. scrotal pain that he assessed as a level 4 out of 10
24. that occurred periodically. He also reported that on
25. occasion, he would have some discomfort when he had a

**Page 22**

2025-06-13 — Mourtzinos, Arthur

1. full bladder that would be relieved instantly with
2. urination.
3. He reported no difficulty with urination prior to
4. the injury, and he reported no change in his urinary
5. function after the injury. He also reported that he
6. did have erectile dysfunction prior to the injury and
7. that he had had a progressive decline in sexual
8. activity due to his age.
9. Q. Let me stop you right there, Doctor.
10. A. Sure.
11. Q. Specific to the questions you asked him about his
12. current sexual function, can you describe for the jury
13. exactly what he told you?
14. A. So I asked him point blank, and I said, do any of
15. your -- does your sexual dysfunction or your periodic
16. discomfort prevent you from performing the activities
17. of your daily life? And he said, no.
18. Q. And would that includes sexual activity from your
19. perspective?
20. A. That's correct.
21. Q. Okay. And the neuropathy that you just described
22. for the jury, would that have any impact on the ability
23. to obtain an erection?
24. A. No, it would not.
25. Q. Did he otherwise describe any issues including pain

**Page 23**

2025-06-13 — Mourtzinos, Arthur

1. that may be impacting his sexual cycle?
2. A. He did not.
3. Q. Did you make any observations of Mr. Desrosiers
4. physically in terms of him walking, either coming to or
5. leaving the room or walking out to the parking lot?
6. A. Yes. I -- I did because I -- I try to observe
7. these things, and he -- when we walked to the exam room
8. together, he appeared to be walking normally and was
9. not grimacing in any discomfort. When we walked out of
10. the exam room together and walked out of the hotel, I
11. walked behind him and he walked a distance to his car
12. and was able to get into his car without any difficulty
13. and did not walk with a -- with a limp or appear to
14. have any difficulty whatsoever.
15. Q. Dr. Mourtzinos, you stated that Mr. Desrosiers made
16. a comment to you that he had a progressive decline in
17. his sexual activity given his age; is that correct?
18. A. That's correct.
19. Q. Did Mr. Desrosiers express to you that he had any
20. decline in his sexual activity as a result of the
21. incident?
22. A. He did not.
23. Q. Did Mr. Desrosiers express to you that he had a
24. decline in his sexual activity given his injuries as a
25. result of the incident?

**Page 24**

2025-06-13 — Mourtzinos, Arthur

1. A. He did not.
2. Q. Okay.
3. Dr. Mourtzinos, I am now going to show you Exhibit
4. 246, which is a page from the medical records of Mass
5. General Hospital, specifically, a note dated June 2nd
6. of 2020. I'll draw your attention to the bottom of the
7. page.
8. Dr. Mourtzinos, is Mass General Hospital where Mr.
9. Desrosiers treated for his urological acute injuries
10. and any follow-up?
11. A. That's correct.
12. Q. Okay. And could you please read for the jury the
13. note dated June 2nd, 2020, which is the last date in
14. time Mr. Desrosiers sought urological care for his
15. injuries as a result of the incident?
16. A. Yes.
17. Q. And what does that note say?
18. A. "Discussed with patient, comma, he's doing well
19. overall, period. Penis is healed very well, period.
20. No issues with urination, period. No blood in urine,
21. period. No dysuria, period. Overall doing well,
22. comma, still having some difficulty with his leg,
23. period. No urologic issues at this time, period.
24. Follow-up PRN, period."
25. Q. Based on that record and your experience, Dr.

## Page 25

2025-06-13 — Mourtzinos, Arthur

1   Mourtzinos, did Mr. Desrosiers present in June of 2020
2   with any urological issues?
3   A. No. He did not.
4   Q. Did Mr. Desrosiers present and report any pain, at
5   least according to these records, in either his penis
6   or his scrotum?
7   A. No. He did not.
8   Q. And according to these records, did Mr. Desrosiers
9   report anything to his doctor about any impact his
10  injuries may be having on his sexual functioning?
11  A. No. He did not.
12  Q. I can take that from you.
13  Dr. Mourtzinos, do you have an opinion whether
14  anything from a urological perspective that can't be
15  treated as a result of Mr. Desrosiers's injuries?
16  A. Yes, I have an opinion. And there is nothing based
17  on the report, my history and physical, that cannot be
18  readily treated.
19  Q. Okay. And what is the basis for that opinion? You
20  said your report, but could you expand on that a little
21  bit?
22  A. Sure. The basis of that opinion is based on his
23  medical records, my history and physical, as well as
24  the literature out there that -- the literature, as
25  well as my personal experience in treating patients

## Page 26

2025-06-13 — Mourtzinos, Arthur

1   with erectile dysfunction and low testosterone.
2   Q. And we spoke earlier about the number of available
3   treatment options there are for erectile dysfunction
4   and low testosterone. Are those all treatment
5   available that are available to -- excuse me --
6   treatment options that are available to Mr. Desrosiers,
7   even with his injuries?
8   A. Yes, they are.
9   Q. Okay. And based on your experience, Dr.
10  Mourtzinos, do you believe that if Mr. Desrosiers
11  elected to engage in those types of treatments and
12  therapies, they would be successful?
13  A. Yes, I do.
14  Q. Do you know whether Mr. Desrosiers has attempted to
15  engage in any of those treatments or therapies since
16  the incident?
17  A. Based on the records and my history and physical,
18  he has not.
19  Q. Do you have an opinion in this case about Mr.
20  Desrosiers's current level of sexual functioning?
21  A. Based on -- my opinion is that the patient has
22  preexisting erectile dysfunction that had been treated
23  adequately and, to the best of my knowledge, has not
24  sought further treatment for this erectile dysfunction
25  thereafter.

## Page 27

2025-06-13 — Mourtzinos, Arthur

1   Q. And again, is there anything about the injuries he
2   sustained, from your experience, that would impact the
3   success of that treatment on his erectile dysfunction?
4   A. No, there is not.
5   Q. Do you have an opinion, Dr. Mourtzinos, about
6   whether Mr. Desrosiers suffered any permanent
7   disfigurement as a result of the incident?
8   A. Yes, I do.
9   Q. Okay. And what is that opinion?
10  A. My opinion is that he did not suffer any permanent
11  disfigurement as a result of the injuries he sustained.
12  Q. And Dr. Mourtzinos, is that based on your physical
13  examination of Mr. Desrosiers?
14  A. Physical and history, correct.
15  Q. And Dr. Mourtzinos, do you have an opinion about
16  Mr. Desrosiers's scrotal and penile pain, based on your
17  review of the records and examination?
18  A. Yes, I do.
19  Q. And what is that opinion?
20  A. My opinion is that his scrotal pain is minimal and
21  occurs periodically, but that it does not affect any
22  aspect of the daily activities of his life.
23  Q. You're aware in this case that Mr. Desrosiers has
24  retained his own urologist, Dr. Khan; is that correct?
25  A. That is correct.

## Page 28

2025-06-13 — Mourtzinos, Arthur

1   Q. And in connection with your work on this case, did
2   you have an opportunity to review Dr. Khan's opinions
3   and testimony?
4   A. I did.
5   Q. And do you have any -- do you agree with Dr. Khan's
6   opinion that Mr. Desrosiers's chronic genital pain
7   impacts his sexual level of functioning?
8   A. I do not.
9   Q. And why not?
10  A. I did not, in my history and physical assessment of
11  the patient --
12  MR. HURD: I'm sorry to interrupt you. Your
13  video just went out. And I don't know if it's just the
14  Zoom video or if it's the recording. There you go.
15  THE WITNESS: Where did you lose me?
16  MR. HURD: Hold on. I lost you about a
17  minute ago. It looked like your camera was moving all
18  over the place.
19  MS. DEVINE: Do you have -- can we go off the
20  record for a second?
21  THE VIDEOGRAPHER: Yeah.
22  MS. DEVINE: Okay.
23  THE VIDEOGRAPHER: We are now going off the
24  record. The time is 10:54 -- oh, sorry, 10:54 a.m.
25  Eastern Daylight Time.

## Page 29

2025-06-13    Mourtzinos, Arthur

1  (A recess was taken.)
2  THE VIDEOGRAPHER: This is the beginning of
3  Media 2. On the record 10:58 a.m.
4  BY MS. DEVINE:
5  Q. Dr. Mourtzinos, you're aware that the plaintiff in
6  this case, Mr. Desrosiers, has retained his own
7  urologist, Dr. Khan; is that correct?
8  A. Yes, I am.
9  Q. And in connection with your work in this case, did
10  you have an opportunity to review Dr. Khan's opinions
11  and testimony?
12  A. Yes, I did.
13  Q. Okay. And did you review Dr. Khan's opinion
14  specifically that Mr. Desrosiers's chronic genital pain
15  impacts his sexual functioning?
16  A. Yes, I did.
17  Q. Do you agree with that opinion?
18  A. I do not.
19  Q. And why not?
20  A. Based on my history, physical, I did not see any
21  evidence, either from a physical standpoint or in the
22  history, of any type of chronic pelvic, scrotal, or
23  penile pain that may be impacting his daily activities
24  in his life.
25  Q. And again, the injury to Mr. Desrosiers's penis and

## Page 30

2025-06-13    Mourtzinos, Arthur

1  scrotum does not limit any of the treatment options
2  available to him, correct?
3  A. Correct. They do not.
4  Q. And in fact, Dr. Khan, in his report, are you
5  familiar with his recommendation that Mr. Desrosiers
6  could seek treatment, if he so desired?
7  A. That's correct.
8  Q. And in your opinion, Dr. Mourtzinos, would
9  treatment help Mr. Desrosiers for his urological
10  issues?
11  A. Yes, it would.
12  MS. DEVINE: For the record, I would move to
13  qualify Dr. Mourtzinos as an expert in urology.
14  MR. HURD: No objection.
15  MS. DEVINE: If not already admitted, I would
16  also move to admit Exhibit 246, the Mass General
17  Hospital record for Mr. Desrosiers, as well as Exhibit
18  248, the Atrius Health records for Mr. Desrosiers.
19  (Defendant's Exhibit 246 and 248 are admitted
20  into the record.)
21  MR. HURD: To those we do object.
22  MS. DEVINE: Do you want to put an objection
23  on the record?
24  MR. HURD: Objection. Hearsay.
25  MS. DEVINE: No further questions.

## Page 31

2025-06-13    Mourtzinos, Arthur

1  MR. HURD: Can you hear me?
2  MS. DEVINE: Yes. Thank you.
3  MR. HURD: Okay.
4  MS. DEVINE: I have no further questions, Dr.
5  Mourtzinos, at this time. Thank you very much.
6  THE WITNESS: Thank you.
7  EXAMINATION
8  BY MR. HURD:
9  Q. Good morning, Dr. Mourtzinos. My name is Ryan
10  Hurd, and I'm one of the attorneys representing Jacques
11  Desrosiers.
12  A. Good morning, Attorney Hurd.
13  Q. You would agree that your assessment of Mr.
14  Desrosiers did not at all involve an assessment of his
15  psychological injury, correct?
16  A. That's correct.
17  Q. And you also did not evaluate him for the injury to
18  his thigh and how that has impacted his life, correct?
19  A. That's correct.
20  Q. Okay. So when you testified earlier that his
21  injury did not prevent him from carrying out any
22  activities of his daily life, you're speaking of just
23  the urological injury and the injury to his penis and
24  scrotum, correct?
25  A. That's correct.

## Page 32

2025-06-13    Mourtzinos, Arthur

1  Q. So let's talk about erectile dysfunction.
2  Commonly, it goes by ED, right?
3  A. Correct.
4  MR. HURD: I apologize. There was an arm in
5  front of the camera there.
6  BY MR. HURD:
7  Q. Would you agree that ED is not something -- not a
8  condition that works like a light switch where it's,
9  you know, on or off. It's something that's more of a
10  dimmer switch in terms of degrees?
11  A. I think there's varying degrees of ED. That's
12  correct.
13  Q. Okay. And you testified, I believe, that 50
14  percent of the guys over 50 years old have ED, right?
15  A. At least, typically.
16  Q. At least 50. Would you agree that at least some
17  portion of those guys can get some form of an erection?
18  It's just not satisfactory for them, so they go and
19  seek treatment or something like Viagra.
20  A. Correct.
21  Q. Okay. And this goes back to it being something
22  like a dimmer switch. It's not just on or off.
23  A. Correct.
24  Q. And in terms of the hypogonadism, low testosterone,
25  that's also something that is not a light switch. It's

---

2025-06-13 — Mourtzinos, Arthur — Page 33

1  something that, you know, people suffer from in
2  degrees --
3  A. Correct.
4  Q. -- right? Okay. Now, would you agree that
5  treatment that's available for these conditions, for ED
6  and low testosterone, that can be successful without
7  any injury to the anatomy?
8  A. Correct.
9  Q. You would also agree that when there's injury to
10 the underlying anatomy that's necessary to maintain an
11 erection or even to achieve an erection, that's
12 something that could inhibit the treatment that's
13 available.
14 A. Correct.
15 Q. So let's talk about Jacques Desrosiers's injury
16 specifically. Do you have your report there?
17 A. Yes, I do.
18 Q. So you -- you reviewed the emergency room records
19 and the surgical records, right?
20 A. Correct.
21 Q. An assumption that you commonly will rely on when
22 assessing a patient because you weren't initially there
23 to see the person firsthand, so you've got to rely on
24 these records, right?
25 A. Correct.

---

2025-06-13 — Mourtzinos, Arthur — Page 34

1  Q. Okay. So I'm going to take you to the third page
2  of your report. You would agree that you reviewed the
3  urology records and that the urology service was
4  consulted and Mr. Desrosiers was taken to the operating
5  room for emergent exploration and repair, right?
6  A. Correct.
7  Q. What does emergent mean? Is that emergency?
8  A. Emergent, by technical definition, means that the
9  patient is taken typically to the operating room within
10 four hours of an injury, ideally.
11 Q. And you'd want that for a serious injury like
12 Officer Desrosiers's?
13 A. Correct.
14 MS. DEVINE: Objection. Ryan, can I ask --
15 sorry. We can go off the record for a second if you
16 want or we can deal with it now. Are you impeaching
17 him with his report? Are you moving to admit it?
18 THE REPORTER: I'm -- I'm sorry to cut in.
19 MS. DEVINE: You can stay on the record.
20 Sorry.
21 MR. HURD: Well, I'm -- yeah, and we don't
22 have to go off the record for this. I am using this
23 report just so we don't have to go through scores of
24 records because this is just a review of his records.
25 So I'm having him confirm his understanding of the

---

2025-06-13 — Mourtzinos, Arthur — Page 35

1  injury that was reported.
2  MS. DEVINE: Okay.
3  MR. HURD: Yeah. I'm not moving to admit
4  this. I'm not using it to impeach it. I'm just trying
5  to make this simple so we have the report there in
6  front of him, okay? Is that fair?
7  MS. DEVINE: Yes.
8  MR. HURD: Okay. All right. Let's -- let's
9  continue on.
10 BY MR. HURD:
11 Q. So you also agreed based on your review of the
12 records, that on examination he had an entry and exit
13 wound over his right scrotum lateral to the median
14 raphe and extensive partial degloving injury of the
15 penis, and I'll stop there.
16 A. Correct.
17 Q. What does -- what does it mean, the right scrotum
18 lateral to the median raphe. What part of the anatomy
19 is that?
20 A. So the -- it's the raphe. So the raphe is -- the
21 median raphe is the midline of the scrotum. So the
22 exit wound came in through the right side and out
23 through the right side. So it basically was confined
24 to the right side of the scrotum and wasn't confined to
25 the left side. The median raphe is the division. And

---

2025-06-13 — Mourtzinos, Arthur — Page 36

1  extensive partial degloving injury of the penis means
2  that the overlying skin of the penis was injured and
3  had been violated during the -- the -- from the gunshot
4  injury.
5  Q. For the gloving injury, that's a serious injury
6  where the skin and the underlying tissues are pulled
7  away from the deeper structures, like the muscle and
8  the connective tissue, [crosstalk] --
9  A. Right. Degloving only involves the skin, not the
10 muscle, not the deep layers.
11 Q. Okay. So it's like skin being torn off of a body
12 part like the glove coming off of your hand. That's
13 what they call it degloving.
14 A. That's correct.
15 Q. Okay. It continues that he had a larger defect
16 over the right lateral aspect of the penile shaft. And
17 there was one area where the injury appeared somewhat
18 deeper to the level of the right corpus. What's the
19 corpus?
20 A. So the corpus on the right side is the -- a part of
21 the erectile body of the penis.
22 Q. Okay. What does that mean, the erectile body?
23 A. So within the penis, you have the right and left
24 corporal bodies that are responsible for erection.
25 Q. Okay. And the corporal bodies are filled with

---

## Page 37

2025-06-13 — Mourtzinos, Arthur

1. arteries that fill up with blood to achieve and
2. maintain an erection, right?
3. A. That's correct.
4. Q. Okay. So according to his initial reports, he had
5. an injury that was deeper to the level of that right
6. corpus, that erectile body part, right?
7. A. Correct.
8. Q. He underwent scrotal exploration and repair of his
9. ruptured right testicle, correct?
10. A. Correct. Correct.
11. Q. What does that mean -- what does that mean to have
12. a ruptured right testicle?
13. A. So anatomically, the testicle has an external
14. covering called the tunica albuginea,
15. A-L-B-U-G-I-N-E-A. And the tunica is what keep the
16. content of the right testicle within the testicle. And
17. when there's a violation of the tunica, that is
18. considered a testicular rupture.
19. Q. Would you agree with me that there was an
20. ultrasound done, and that revealed the extent of that
21. right-testicle rupture. And there was testicular
22. contents in his scrotum.
23. A. Correct.
24. Q. So it's pretty severe damage to his right testicle;
25. would you agree?

## Page 38

2025-06-13 — Mourtzinos, Arthur

1. A. I think severe is relative, but I would say that
2. there was damage to the right testicle.
3. Q. Well, severe as relative to what? I'm not saying
4. that it was life-threatening, per se. But in terms of
5. the functioning of his right testicle, this was a
6. serious injury to his right testicle; was it not?
7. A. Correct.
8. Q. And in fact, he lost a portion of his right
9. testicle, correct?
10. A. Correct.
11. Q. Okay. So between the injury to the corporal body
12. that is a part that you need to have an erection and
13. the injury to his right testicle, which he lost part
14. of, these are the type of physical injuries to a
15. person's anatomy that on their own could cause ED; is
16. that fair?
17. A. In some cases, yes.
18. Q. And an injury like that to the testicle, that's
19. something that could contribute to low testosterone,
20. right? Because your testicles make testosterone.
21. A. Correct.
22. Q. So you would admit that the loss of a portion of
23. the right testicle could have contributed to the
24. diagnosis of hypogonadism, right?
25. A. Correct.

## Page 39

2025-06-13 — Mourtzinos, Arthur

1. Q. And you would admit that the injury to his penis
2. and the possible injury of a deeper portion of the
3. right corporal body could also have contributed to ED,
4. correct?
5. A. Correct.
6. Q. Okay. And with these injuries, you can't guarantee
7. that the treatment for ED or low testosterone that once
8. worked would continue to work; is that fair?
9. A. Disagree on that.
10. Q. Okay. So it's your opinion that despite the
11. physical injuries to the corporal portion of the
12. erectile body and his penis and the loss of a portion
13. of his right testicle, that the treatment that once
14. worked, the generic Viagra, that should work 100
15. percent, regardless?
16. A. I don't say -- I didn't say 100 percent, but
17. there's -- it could -- the dose of Viagra that he was
18. on was not the highest dose. He may require a higher
19. dose of one of the other therapies.
20. Q. As part of your evaluation, you didn't test that
21. theory out, right? You didn't give him a high dose of
22. Viagra and see if he could achieve an erection?
23. A. I'm not his treating physician, so that was not my
24. goal of when I went to his -- see him and examine him.
25. Q. So I understand that you've been retained by the

## Page 40

2025-06-13 — Mourtzinos, Arthur

1. law firm for Sig Sauer, and in connection, naturally,
2. you're going to be paid for your time, right?
3. A. Correct.
4. Q. Do you agree that not counting today's deposition
5. and the preparation for today's deposition, to date,
6. you have been paid or at least invoiced upwards of
7. $21,000?
8. A. That is correct.
9. Q. Have you been paid for today yet?
10. A. No, I have not.
11. MS. DEVINE: I object to that question.
12. BY MR. HURD:
13. Q. What is your -- what is your fee for participating
14. in today's deposition?
15. A. I believe it's -- off the top of my head, I
16. actually don't know, but it's somewhere 6- and $7,000.
17. MR. HURD: Okay. I don't have any further
18. questions. Thank you.
19. THE WITNESS: Thank you.
20. FURTHER EXAMINATION
21. BY MS. DEVINE:
22. Q. Dr. Mourtzinos, just a couple of follow-up
23. questions. As part of the acute treatment received at
24. Mass General Hospital, was there any probing done on
25. Mr. Desrosiers's penis in particular?

| 2025-06-13 | Mourtzinos, Arthur | Page 41 |
|---|---|---|

1  A. According to the operative report, yes.
2  Q. Okay. And what did that -- what was that, and what
3     did -- what did it reveal?
4  A. Based on the operative report, there was no repair
5     that was necessary to the potential deeper injury of
6     the right corporal body. And the only thing that was
7     done with respect to the penis was removal or
8     debridement, in doctor's term, of the skin that did not
9     appear viable with then closure of the skin that
10    appeared to be viable.
11 Q. Thank you, Dr. Mourtzinos. And certainly, you've
12    treated patients who have experienced trauma to their
13    penis or scrotum, correct?
14 A. Correct.
15 Q. And you've been able to successfully provide them
16    treatment, whether it be from resulting in erectile
17    dysfunction or low testosterone, correct?
18 A. Correct.
19 Q. And in fact, you've treated cancer patients,
20    including patients who may have lost a testicle as a
21    result of their treatment, correct?
22 A. Correct.
23 Q. Okay. And those patients can also successfully be
24    treated for erectile dysfunction and low testosterone,
25    correct?

| 2025-06-13 | Mourtzinos, Arthur | Page 42 |
|---|---|---|

1  A. Correct.
2  MS. DEVINE: Nothing further.
3  MR. HURD: Objection.
4  MS. DEVINE: I could reask that question.
5  MR. HURD: Yeah. I -- actually, I'd say --
6  MS. DEVINE: Sure.
7  MR. HURD: -- you want to redo those last
8  three and make them open-ended, and I won't be
9  objecting to them?
10 MS. DEVINE: Sure.
11 BY MS. DEVINE:
12 Q. Dr. Mourtzinos, have you treated -- we discussed
13    this earlier that you've treated a number of patients
14    with trauma to their penis and scrotum, correct?
15 A. Correct.
16 Q. And some of those --
17 MR. HURD: Objection.
18 BY MS. DEVINE:
19 Q. -- have any of those patients --
20 MS. DEVINE: What's the objection? Sorry.
21 MR. HURD: You're leading him.
22 MS. DEVINE: If he's treated any patients
23    with trauma to their penis and scrotum?
24 MR. HURD: You're -- you're telling him he
25    had. You're saying, you've treated these people with

| 2025-06-13 | Mourtzinos, Arthur | Page 43 |
|---|---|---|

1  this trauma, correct.
2  MS. DEVINE: I'm not sure how to ask that
3  more -- okay. Sure.
4  MR. HURD: Have you -- have you treated --
5  MS. DEVINE: That's what I thought I asked,
6  but I can ask it again.
7  BY MS. DEVINE:
8  Q. Dr. Mourtzinos, have you treated any patients with
9     trauma to their penis or scrotum?
10 A. Yes, I have.
11 Q. And could you describe for the jury what the
12    success rate of treatment with -- strike that.
13    What is the -- strike that. Give me a second.
14    And have any of those patients successfully been
15    treated for any erectile dysfunction or low
16    testosterone that may have resulted from that trauma?
17 A. Yes, they have.
18 Q. Have you treated cancer patients, for example, who
19    may have had a testicle removed as a result of their
20    treatment?
21 A. Yes, I have.
22 Q. Have you successfully provided treatment from any
23    resulting low testosterone or ED?
24 A. Yes, I have.
25 MS. DEVINE: Nothing further.

| 2025-06-13 | Mourtzinos, Arthur | Page 44 |
|---|---|---|

1  MR. HURD: I don't have any further
2  questions.
3  THE REPORTER: I would love to take some
4  transcript orders really quick. Ms. -- Ms. Devine,
5  would you like to order a transcript today?
6  MS. DEVINE: Yes.
7  THE REPORTER: Is electronic PDF all right?
8  MS. DEVINE: Yes.
9  THE REPORTER: Fantastic. Mr. Hurd, would
10 you like to order a copy?
11 MR. HURD: Yes, I would.
12 THE REPORTER: Is electronic PDF okay for you
13 as well?
14 MR. HURD: Yes, it is.
15 THE REPORTER: Fantastic. Thank you so much.
16 MR. HURD: Thank you all.
17 THE VIDEOGRAPHER: This is the end of the
18 [crosstalk] --
19 MR. HURD: Thank you, Doctor. Have a great
20 weekend.
21 THE WITNESS: Thank you, Ryan. Stay well.
22 MS. DEVINE: Thanks, Ryan.
23 THE REPORTER: -- deposition of --
24 MR. HURD: Thanks, Alaina. Talk to you
25 later.

| 2025-06-13 | Mourtzinos, Arthur | Page 45 |
|---|---|---|

1  THE REPORTER: -- Dr. Arthur Mourtzinos. Off
2  the record 11:15 a.m.
3  THE VIDEOGRAPHER: We are now going off the
4  record. The time is 11:15 a.m. Eastern Daylight Time.
5  (The deposition concluded at 11:15 a.m.)

| 2025-06-13 | Mourtzinos, Arthur | Page 46 |
|---|---|---|

1  CERTIFICATE OF REPORTER
2
3  I, Alec Ricker, a Digital Reporter and Notary
4  Public within and for the Commonwealth of
5  Massachusetts, do hereby certify:
6  That the foregoing witness whose examination
7  is hereinbefore set forth was duly sworn and that said
8  testimony was accurately captured with annotations by
9  me during the proceeding.
10  I further certify that I am not related to
11  any of the parties to this action by blood, marriage,
12  or employ and that I have no interest in the outcome of
13  this matter, financial or otherwise.
14  IN WITNESS THEREOF, I have hereunto set my
15  hand this 24th day of June, 2024.
16
17  _____
18  Alec Ricker
19  Commission Expires: October 18, 2030

| 2025-06-13 | Mourtzinos, Arthur | Page 47 |
|---|---|---|

1  CERTIFICATE OF TRANSCRIPTIONIST
2
3  I, Tammy Bales, Certified Verbatim Reporter,
4  do hereby certify:
5  That the foregoing is a complete and true
6  transcription of the original digital audio recording
7  of the testimony and proceedings captured in the
8  above-entitled matter. As the transcriptionist, I have
9  reviewed and transcribed the entirety of the original
10  digital audio recording of the proceeding to ensure a
11  verbatim record to the best of my ability.
12  I further certify that I am neither attorney
13  for nor a relative or employee of any of the parties to
14  the action; further, that I am not a relative or