# EXHIBIT B

# David Counceller

## Trial Designations

**Counceller, David**                              **2025-05-23**
**Counceller, David**                              **2025-05-23**

Defense Designations                              00:12:49
Plaintiff Designations                            00:05:34
**TOTAL RUN TIME**                                **00:18:23**



| 2025-05-23 | Counceller, David | Page 1 |
|---|---|---|

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | |
| 3 | Civil action No: 1:23-cv-00327-JDL |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | for the State of Maine, via Zoom videoconference, |
| 18 | notice given. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| 2025-05-23 | Counceller, David | Page 2 |
|---|---|---|

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | LITTLETON JOYCE UGHETTA & KELLY LLP |
| 3 | 2460 N. Courtenay Pkwy, Suite 204 |
| 4 | 646-708-4844 |
| 5 | Attorney for Defendant Sig Sauer, Inc. |
| 6 | |
| 7 | BY: JEFFREY RUSSELL, ESQUIRE |
| 8 | Portland, ME 04101 |
| 9 | jrussell@verrill-law.com |
| 10 | |
| 11 | SALTZ, MONGELUZZI & BENDESKY, P.C. |
| 12 | One Liberty Place, 52nd Fl |
| 13 | Philadelphia, PA 19103 |
| 14 | shaaz@smbb.com |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| 2025-05-23 | Counceller, David | Page 3 |
|---|---|---|

| | |
|---|---|
| 1 | INDEX |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | EXHIBITS |
| 9 | |
| 10 | NONE |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| 2025-05-23 | Counceller, David | Page 4 |
|---|---|---|

| | |
|---|---|
| 1 | (This deposition was taken before Debra J. Fusco, |
| 2 | Notary Public, via Zoom videoconference, on May 23, |
| 3 | 2025, beginning at 1:10 p.m.) |
| 4 | VIDEOGRAPHER:  We are now on the record. |
| 5 | The time is 1:10 p.m. Eastern Time on May 23, 2025. |
| 6 | This begins the videoconference deposition of David |
| 7 | Counceller taken in the matter of David Alan Cole and |
| 8 | Kimberly Cole versus Sig Sauer, Incorporated.  The case |
| 9 | number is 1:23-cv-00327-JDL, and is filed in the United |
| 10 | States District Court for the District of Maine. |
| 11 | My name is George Ellis, I am your remote |
| 12 | videographer.  Our court reporter is Debra Fusco, and we |
| 13 | are representing Esquire Deposition Solutions. |
| 14 | Counsel, please state your name and who you |
| 15 | represent, after which the court reporter will swear in |
| 16 | the witness. |
| 17 | MS. DENNISON:  Kristen Dennison from |
| 18 | Littleton Joyce Ughetta & Kelly, and I represent Sig |
| 19 | Sauer, Inc. |
| 20 | MR. HAAZ:  Sam Haaz on behalf of David and |
| 21 | Kimberly Cole. |
| 22 | MR. RUSSELL:  I'm also here, Jeff Russell, |
| 23 | Verrill Dana, LLP on behalf of Sig Sauer. |
| 24 | MS. DENNISON:  Erica Esposito from Sig Sauer |
| 25 | is also present. |

1    (The deponent was administered the oath by the Notary
2    Public.)
3    DAVID COUNCELLER, after having been
4    duly sworn by the Notary Public,
5    was deposed and testified as
6    follows:
7    EXAMINATION
8    BY MS. DENNISON:
9    Q.  Good afternoon, Mr. Counceller.  My name is
10    Kristen Dennison.  I represent Sig Sauer in an action
11    that's been brought against it by David and Kimberly
12    Cole.  We are here today pursuant to a subpoena that my
13    office issued to you.  Is that your understanding?
14    A.  Yes, ma'am.
15    Q.  Okay.  And thank you for your appearance here
16    this morning.
17    Have you ever had your deposition taken before?
18    A.  Not like this.
19    Q.  Okay.  Let me give you a few brief instructions
20    before we begin.  We do have a court reporter
21    transcribing everything here today so I need to make
22    sure that all of your responses to my questions are
23    verbal.  In particular, I need an audible yes for a no
24    as opposed to a nod or a shake of the head.  If you
25    forget, don't worry about it, one of us will correct it

1    for the record to make sure everything is audible.
2    We can only have one person speaking at a time.
3    In the normal course of conversation, it is easy to
4    anticipate what my question is and begin your response
5    before I have finished my full question.  For purposes
6    of the record today, I would ask that you allow me to
7    completely finish my question before you begin your
8    response, and I will allow you to completely finish your
9    response before I begin my next question, okay?
10    A.  Okay.
11    Q.  Great.  We are going to try to be as quick as we
12    can today with you.  That said, if you need a break at
13    any point in time, please let us know that, and we'll be
14    happy to accommodate you.
15    A.  Well, I would really like to go put my ear plugs
16    in at the moment.
17    Q.  If you want to do that, you can step away and
18    go put your earplugs in, that's fine.
19    A.  I think I will because this is kind of new to me
20    and I'm -- I need to sharpen up my hearing here real
21    quick so I'll be right back.
22    MS. DENNISON:  Let's go off the record a
23    moment.
24    VIDEOGRAPHER:  Going off the record, the
25    time is 1:13.

1    (OFF RECORD)
2    VIDEOGRAPHER:  Back on the record.  The time
3    is 1:14.
4    MS. DENNISON:  Okay.
5    BY MS. DENNISON:
6    Q.  Mr. Counceller, can you hear -- can you hear
7    everything okay now?
8    A.  Yes.
9    Q.  Great.  So I'm going to ask you some questions
10    about an unintentional discharge that I understand you
11    experienced a little over 10 years ago, and I need to
12    have you answer my questions truthfully and honestly to
13    the best of your recollection, okay?
14    A.  Yes, ma'am.
15    Q.  Great.  If you don't hear my question, please let
16    me know that, and I will repeat it.  If you don't
17    understand my question, which is quite possible, please
18    let me know that, and I will be happy to rephrase it,
19    okay?
20    A.  Okay.
21    Q.  If you answer one my questions, I am going to
22    assume that you heard my question, that you understood
23    my question, and that you answered it truthfully and
24    honestly to the best of your recollection; is that fair?
25    A.  Sure, yup.

1    Q.  Okay, great.  And the oath that you took today is
2    the same as if you were testifying in a court of law.
3    Do you understand that?
4    A.  Yes.
5    Q.  Great.  Mr. Counceller, are you taking any
6    medications that would prevent you from testifying
7    truthfully and honestly to the best of your
8    recollection?
9    A.  No.
10    Q.  All right.  Did you review any documents to
11    prepare for your deposition here today?
12    A.  No.
13    Q.  Can you please state your full name?
14    A.  David Joe, is J-O-E, Counceller,
15    C-O-U-N-C-E-L-L-E-R.
16    Q.  Where are you currently located, Mr. Counceller?
17    A.  Connersville, Indiana.
18    Q.  Have you ever been known by any other names?
19    A.  No.
20    Q.  Do you reside in Connersville, Indiana?
21    A.  Yes.
22    Q.  Mr. Counceller, have you experienced an
23    unintended discharge with a Glock pistol?
24    A.  Yes.
25    Q.  When did you experience an unintended discharge

1    with a Glock pistol?
2    A. It was in January, 2014.
3    Q. What kind of Glock was involved?
4    A. It was a Glock 23.
5    Q. Was that your Glock 23?
6    A. It was an issued weapon by my police department.
7    Q. What police department?
8    A. Connersville City Police Department.
9    Q. How long have you carried that Glock 23?
10    A. Oh, several years. I was a -- I was the chief of
11    police at the time, and we had carried Glock -- Glocks.
12    The -- the -- the Glock 23 was a little shorter model
13    than the 22 that the original officers would carry.
14    Q. As chief of police -- was that for Connersville
15    Police Department?
16    A. Yes, it was.
17    Q. As chief of police for the Connersville Police
18    Department, did you select the Glock 23 pistol?
19    A. No. It's -- it was done several years -- that
20    was like our -- I think that was our second issue. I
21    think the first time we were issued back in '99,
22    something like that. Then we carried -- I got the
23    Generation 2, then we went to the Generation 3. And
24    since then, they go to 4 and 5.
25    Q. All Glocks?

1    A. On the Glocks.
2    Q. Okay, great. And the Glock 23 pistol that you
3    were carrying in January of 2014, did that have a little
4    blade or -- in the trigger?
5    MR. HAAZ: Objection --
6    A. Yes, we call it a dog ear.
7    BY MS. DENNISON:
8    Q. You called it a dog --
9    A. If you'd like -- if you would like, ma'am, I
10    could probably pull it up and show it to you.
11    Q. Do you still have that pistol?
12    A. I don't have that one, but I have another one, a
13    Generation 4, which is the same thing, just a newer
14    model. It's the same dog ear, same trigger, everything.
15    Q. Okay. All right. And in January of 2014, can
16    you tell me the circumstances surrounding your
17    unintended discharge?
18    A. Well, I had stopped into a local gun shop here in
19    Connersville, and the owner of the place is a friend of
20    mine, and there was another Glock, it was a 380, a
21    little bit smaller, and it was like a newer version.
22    And I was looking at it, and I pulled my weapon out,
23    carefully, and I was comparing the size, basically, for
24    being carried for undercover or just plainclothes to
25    where it's concealed, and I was comparing it with this

1    -- with mine. And afterwards, I handed the weapon back,
2    the weapon I was looking at, I handed it back to the
3    owner of the gun shop. And I went to holster my weapon
4    again in my holster, and I noticed when I put it in
5    there, it was a little snug more so, but I had a jacket
6    on, a heavy jacket. And when -- I should say I had a
7    jacket, but it seemed like I had -- I had a fleece
8    jacket and -- on underneath the coat. Anyway, so when I
9    went to pull up my fleece to -- to hide the weapon, I
10    had a -- my drawstring -- I had a drawstring that was
11    hanging down on my right side, and I'm right-handed, and
12    it's a right-handed holster. Somehow it got into that
13    trigger guard. And when I went and pulled my jacket
14    with my right hand, on my right side, I went to pull it
15    up to -- to -- to put my jacket over the weapon, the
16    drawstring was in there and -- and it was caught in
17    there. And when I pulled up with that jacket with that
18    drawstring, it discharged. And there was a video that I
19    had -- did with Channel 6 news out of Indianapolis, and
20    I believe -- I was really just concerned about people
21    with clothing and carrying weapons. It happens -- this
22    happens a lot of (sic) police officers, and I imagine
23    it's happened with other people also. I don't know, but
24    I know that the reporter did a -- did a investigation on
25    that, and at the time he -- he had roughly around a

1    thousand incidents, that's what he told me, involving
2    something similar with drawstrings. So, any way, it --
3    it grazed -- grazed my upper leg right underneath my
4    right leg and buttocks and -- and it -- just a graze.
5    And so -- but did -- did catch me off guard and I -- you
6    know, the Glock is a good weapon, but it's a very
7    dangerous weapon because they -- that little -- little
8    dog ear and that trigger right there is -- they want to
9    call it a safety. It's not a safety, it's an activation
10    switch because it's not gonna go off until something or
11    a finger or something else is there, and it has to pull
12    it flush with the trigger itself, then it will
13    discharge. There's not any other safety -- safety
14    features with the Glock other than that, either with
15    being closed with no weapon -- no rounds in it or -- or
16    it's jacked open with no rounds in it. But that's the
17    only safety feature it has, and I'm not real -- I never
18    was real sure about that.
19    MR. HAAZ: I'm going to just object and move
20    to strike all the parts of the answer that relate to
21    hearsay, and particularly with what the reporter said
22    and, you know, what he doesn't have personal knowledge
23    of.
24    And, sir, there may be objections from time
25    to time. They're just for Ms. Dennison and I to make a

1  record, that's all they are. So now that that's on the
2  record, I turn the question back over to Kristen and
3  apologize for any interruption.
4  BY MS. DENNISON:
5  Q. Thank you, Mr. Councceller. I'm going to ask you
6  a few questions to break that down a little bit, okay?
7  A. Sure.
8  Q. Let's start with, what kind of holster were you
9  using at the time?
10 A. It was a leather holster. It didn't have a
11 strap. It just sat as -- as kind of like -- it was a
12 warn leather. I mean it's a -- fit comfortable and
13 everything, but it was just really sitting down in -- in
14 the holster itself, and it was leather.
15 Q. Okay. The holster -- do you remember the brand
16 of the holster?
17 A. I got it -- I got it upstairs. I can --
18 Q. You have the actual holster upstairs?
19 A. Yes.
20 Q. Would you -- would you mind getting that, and
21 then we can take a --
22 A. Sure.
23 MS. DENNISON: All right. Let's go off the
24 record for a moment.
25 THE WITNESS: Be right back.

1  VIDEOGRAPHER: Off the record. The time is
2  1:24.
3  (OFF RECORD)
4  VIDEOGRAPHER: Back on the record. The time
5  is 1:25.
6  BY MS. DENNISON:
7  Q. Okay, Mr. Councceller, while we went off the
8  record, you went and retrieved the holster that you were
9  wearing on the day of the unintended discharge. Can you
10 put that holster up to the camera, to the video feed, so
11 that we can see it?
12 A. Yes, (indicating). As you see, it's a black
13 leather. It's open here at the top and the -- I'm half
14 blind too. Anyway --
15 THE WITNESS: Honey?
16 UNIDENTIFIED ATTENDEE: Yes.
17 THE WITNESS: Can you read that -- the make
18 of this holster? You might want to turn a light on or
19 something.
20 UNIDENTIFIED ATTENDEE: Glock.
21 THE WITNESS: No, that's -- that's a Glock.
22 UNIDENTIFIED ATTENDEE: Masters's --
23 Masters's Holder (sic).
24 THE WITNESS: It's a what?
25 UNIDENTIFIED ATTENDEE: Glock The Masters's

1  Holder (sic).
2  THE WITNESS: Masters's Holder (sic).
3  UNIDENTIFIED ATTENDEE: 17, 22, 31.
4  THE WITNESS: Okay.
5  UNIDENTIFIED ATTENDEE: It's a Glock holder
6  (sic).
7  A. I'll -- that's -- I don't know if you can see
8  that or not, but that's the make of it.
9  BY MS. DENNISON:
10 Q. Okay. And so that is a Glock --
11 A. Glock --
12 Q. Glock Masters's Holster?
13 A. Yes.
14 Q. 17, 22, 31?
15 UNIDENTIFIED ATTENDEE: 77.
16 A. I think it was 77 she said.
17 BY MS. DENNISON:
18 Q. Oh, 77, 33 -- or 77, 22, 31.
19 UNIDENTIFIED ATTENDEE: Yeah.
20 BY MS. DENNISON:
21 Q. And --
22 A. Yeah.
23 Q. Great. And, for the record, who is she? Is
24 that your wife?
25 A. My fiancee. Her name is Shannon.

1  Q. Thank you. All right, okay. So, Mr. Councceller,
2  that was the holster. I'm going to ask you about the
3  information you gave about -- you said you told you about
4  a thousand instances of similar issues with drawstrings.
5  My question for you is, who is the "he" to which you
6  were referring?
7  UNIDENTIFIED ATTENDEE: Rafael Sanchez.
8  A. Rafael San -- Sanchez.
9  BY MS. DENNISON:
10 Q. And who is Rafael Sanchez?
11 A. He is a reporter for -- was a reporter for
12 Channel 6 news. He's on a -- another network up in
13 Indianapolis also now. I think it's -- I don't know
14 what the -- I don't know what it is right now.
15 UNIDENTIFIED ATTENDEE: He's an
16 investigative reporter. He's --
17 THE WITNESS: He's what?
18 UNIDENTIFIED ATTENDEE: He's an
19 investigative --
20 A. He's an investigative reporter with --
21 THE WITNESS: Who's he with now?
22 UNIDENTIFIED ATTENDEE: WRTV ABC.
23 A. WR --
24 MR. HAAZ: Kristen, I'm going to object to
25 any assistance with his testimony.

1    MS. DENNISON:  Yeah.
2    MR. HAAZ:  Mr. Counceller, I understand you
3    haven't done this before, but the rules don't allow for
4    you to consult with others or have side conversations so
5    --
6    THE WITNESS:  Okay.
7    MR. HAAZ:  You're just going to have to
8    testify to the best of your recollection.
9    MS. DENNISON:  Yeah, and it's okay.  If you
10   don't -- and I'm not sure --
11   BY MS. DENNISON:
12   Q.   I think I forgot this instruction, Mr.
13   Counceller, so that's on me.  But if you don't know the
14   answer to a question, please just tell me that -- that
15   you don't know, and that's fine, okay?
16   A.   Okay.
17   Q.   Thank you so much.  All right.  So -- so Rafael
18   Sanchez told you that he knew of a thousand instances of
19   similar issues; is that what you testified to?
20   MR. HAAZ:  Objection.
21   A.   That's what he told me, you know, back then, and
22   I don't think he contacted with everyone that -- that --
23   but he did get ahold of some that have had dis --
24   accidental discharges.
25   BY MS. DENNISON:

1    Q.   And when he told you that he was aware of a
2    thousand instances of similar issues, what -- did you
3    have an understanding as to what he meant by "similar
4    issues"?
5    MR. HAAZ:  Object to form.
6    BY MS. DENNISON:
7    Q.   You can answer.
8    A.   I can answer?
9    Q.   Yes, you may answer.
10   A.   Just that -- I'm not too sure -- I'm not too
11   sure.  I know he interviewed a few people that's had
12   similar situations like mine, but I don't know who they
13   were, all this type of thing or anything else.  He just
14   did an investigation, and I don't know where he come up
15   with a thousand either.
16   Q.   Do you have any information as to whether those
17   thousand instances involved Glock pistols or a variety
18   of pistols or something else?
19   MR. HAAZ:  Object to form.
20   BY MS. DENNISON:
21   Q.   You can answer.
22   A.   Several were Glocks, and then I think he told me
23   one was a Sig.
24   Q.   Okay.
25   A.   But I don't know the circumstances of it.

1    Q.   Okay.  And you can ignore both of us if we say
2    objection to form, you can just ignore us and answer the
3    question.  I'm sure I might do the same when Mr. Haaz
4    asks you some questions.  Again, that's just to --
5    that's just for us to deal with later, but you don't
6    have to worry about it, okay?
7    A.   Okay.
8    Q.   Thanks.  All right, so -- all right, so I'm going
9    to go ahead and I'm going to show you what I believe is
10   the Channel 6 news report.  So I'm going to go ahead and
11   -- well, let me ask you first:  Did you see the Channel
12   6 news report about your incident?
13   A.   Yes.
14   Q.   Okay.  I'm going to go ahead and play the video.
15   MS. DENNISON:  I'm going to play the whole
16   video, Sam, and I understand that there will be some
17   hearsay played in here that you will have an objection
18   to.  You can note that now, or you can note it later,
19   okay?
20   MR. HAAZ:  Yeah, to the extent that the
21   video will be played or any portion of this video will
22   be played at trial, I mean we'd object to the entire
23   video coming in.
24   MS. DENNISON:  Understood.  So for now, I'm
25   just going to play the Channel 6 news video because I'll

1    have some questions for you on that, but I want to
2    confirm that this is what you saw; okay, Mr. Counceller?
3    THE WITNESS:  Sure.
4    (Whereupon, a video is being played.)
5    MR. HAAZ:  Kristen?  Kristen.
6    (Whereupon, a video is being played.)
7    VIDEOGRAPHER:  Excuse me?
8    MR. HAAZ:  Kristen?
9    MS. DENNISON:  Yes.
10   MR. HAAZ:  I can't see the video.  Can
11   anyone else not see it?
12   MS. DENNISON:  Oh, my God.
13   VIDEOGRAPHER:  No.
14   MS. DENNISON:  I forgot to share it.  How
15   about I share it.
16   Thank you, Sam.  Thank you for interrupting
17   before I went any further with that.
18   Let me share the video.  I got ahead of
19   myself, and we'll start over.  I'm going to start from
20   the beginning.  My apologies.  Can you all see it now?
21   THE WITNESS:  Yes.
22   (Whereupon, a video is being played.)
23   MS. DENNISON:  Okay.
24   BY MS. DENNISON:
25   Q.   Mr. Counceller, is that the ABC News report that

| | |
|---|---|
| 2025-05-23 **Counceller, David** Page 21 | 2025-05-23 **Counceller, David** Page 22 |

**Page 21**

1  you recall previously seeing?

2  A.  Yes.

3  Q.  Okay.  And that was reported by Rafael Sanchez,

4      that's what you were referencing a little bit ago; is

5      that correct?

6  A.  Yes.

7  Q.  Okay.  There were some other individuals

8      mentioned in that news report.  Did you ever speak with

9      any of the other individuals that reported having a

10     discharge with a drawstring from their jacket?

11 A.  No.

12 Q.  Okay.  Have you ever spoken with anybody else who

13     experienced an accidental discharge that you believed

14     was similar to yours?

15 A.  No.

16     MR. HAAZ:  Object to form.

17     BY MS. DENNISON:

18 Q.  Okay.  Have you ever seen any other accidental

19     discharges besides yours?

20 A.  On a video one time, something similar happened

21     on a range with an individual, but I don't remember

22     anything about where it happened or who it was or

23     anything else.

24 Q.  There was a reference within the news report to

25     another accidental discharge from 1999.  Had you had

**Page 22**

1  another accidental discharge in 1999?

2  A.  I did, yes.

3  Q.  What weapon was involved with that accidental

4      discharge in 1999?

5  A.  It was a 380 called a Grendel.  It's a -- it's --

6      it's another -- well, that was totally my fault.  The

7      gun was defective, the retaining pin that would hold up

8      the receiver to the lower part of the receiver kept --

9      every time you'd shoot it, it would work its way out.

10     And so my son had it for a while, and he told me it was

11     defective and what it was doing, and so I said okay.  So

12     I put it in a box, and he was -- I was gonna take it, at

13     the time, to a local gunsmith and have him look at it.

14     Well, it's -- the characteristics of that gun was that

15     you have to open it up, and you didn't have a magazine

16     that went up through the bottom of the handle.  You

17     opened it up, and then you fed it down into the handle.

18     And when you let it go, it automatically would put one

19     up -- put a round up into the barrel, up to what we call

20     the pipe.  Well, when my son gave it to me, it was in

21     two pieces with the pin.  And -- and like I said, I was

22     doing some laundry one night, and I come across that

23     box, and I looked at that gun.  I said, yeah, I need to

24     take it up to the local gunsmith and get it fixed.  So I

25     see that the handle was separated from the upper

| | |
|---|---|
| 2025-05-23 **Counceller, David** Page 23 | 2025-05-23 **Counceller, David** Page 24 |

**Page 23**

1  receiver and -- the slide -- and I put all -- I unloaded

2  it where the handle is.  Because, like I said, you fed

3  it down at the -- in the bottom, you didn't have a

4  magazine.  So I flipped all them rounds out of it.  I

5  went to put it back together and when I did, I -- if I

6  can put my hand up here, I had it here like this, and I

7  went to pull it together to put this pin in to hold it

8  -- to hold it together to show the gunsmiths how -- what

9  -- what the malfunction was on it.  And in my

10 carelessness of not thinking -- and, like I said, if you

11 lo -- load it and you let it go forward, it

12 automatically -- one goes up into the barrel.  I didn't

13 drop that barrel out and see if there was a round up in

14 that barrel.  And when I shoved it together like this,

15 it -- it went back and hit the firing pin, and

16 discharged in my hand.  And I don't know if you can see

17 it or not, but it -- it's right here, it's -- that's an

18 exit wound, and that was -- or, excuse me, that was the

19 entrance wound, this is the ex -- ex -- exit wound.

20 And -- and, yeah, that was -- and I knew right after it

21 happened, I -- that was carelessness on my part.  I

22 should have -- I should have dropped that barrel down

23 because that was the -- that's the way the gun was

24 designed, and it's nobody's fault but my own.

25 Q.  Okay.  And in the video, did you see a

**Page 24**

1  depiction -- in the ABC video that we just played, did

2  you see a depiction of your accidental discharge from

3  2014 with the Glock?

4      MR. HAAZ:  Object to form.

5  A.  Yes.  You're asking me about -- about the

6      video?

7      BY MS. DENNISON:

8  Q.  Yes.

9  A.  Yeah.

10 Q.  And if I share my screen right now, I have the

11     video freeze framed here.  Is this you on the -- on the

12     right side of the counter with the hat on?

13 A.  Yup, that's me.

14 Q.  And this was the gun shop that you were in at the

15     time?

16 A.  Yes.

17 Q.  Okay.  And I'm going to go a little bit further

18     with it to where the discharge was, and then I'm going

19     to just put it on without sound.  So I'm going to share it

20     -- my screen again.  And on the screen, is this the --

21     is this the gun shop that you were in, Wolf's Gun Shop?

22 A.  Yes.

23     (Whereupon, a video is being played.)

24 Q.  Okay.  This video that's playing right now, do

25     you know the video that just played moving up into the

1 gun shop, was that video that you had taken or that

2 somebody else had taken?

3 A. That was what Ra -- the cameraman from Rafael

4 Sanchez.  His cameraman, I think, shot that.

5 Q. Okay.

6 If you could notice, I'm in -- I'm in uniform

7 there.

8 Q. Okay.  And this -- this portion of video where

9 you're walking into the gun shop, was that a video taken

10 on the day of the incident or at some other time?

11 A. No, that was after the fact.

12 Q. Okay.

13 A. When he was doing the story.

14 Q. So I'm going to keep playing right now.

15 (Whereupon, a video is being played.)

16 Q. Now, I've just stopped this video at 34 seconds.

17 Is this video of you on the day of the accident?

18 A. Yes.

19 Q. Do you know where this video was taken from?

20 A. That -- that was a security camera that Mr. Wolf,

21 the owner of the gun shop, had.

22 Q. Okay.  I'm going to go ahead --

23 (Whereupon, a video is being played.)

24 Q. Right here, is he -- are you -- let me strike

25 that.  Right here, what we see on the camera, is there a

1 firearm that's being exchanged between the two of you?

2 A. Yes, he was showing me this other gun that I

3 asked to look at.

4 Q. Okay.  I'm going to keep playing it.

5 (Whereupon, a video is being played.)

6 Q. So is this you looking at that other gun?

7 A. Yes.

8 Q. All right.  And now we have gone to another video

9 that is not the video of your incident for a little bit.

10 I'm going to stop it again and start playing it at

11 47 seconds.

12 (Whereupon, a video is being played.)

13 Q. Is that you again in this video?

14 A. Yes.

15 Q. And are you looking at that weapon from the store

16 that you wanted to take a look at?

17 A. Yes.

18 Q. Okay.  I'm going to hit play.

19 (Whereupon, a video is being played.)

20 Q. Now, I just stopped it at 51 seconds.  Do you

21 know what you were doing right there?

22 A. Yes.

23 Q. What were you doing?

24 A. I'm pulling out my weapon to compare it with the

25 other one.

1 Q. Okay.  And then right now, are you putting that

2 back into your holster?

3 A. Yes.

4 Q. And that was the holster that you showed us a

5 moment ago?

6 A. Yes.

7 Q. That was an outside the waistband holster?

8 A. Yes.

9 Q. Okay.  So you had it clipped on your right hip?

10 A. Yes.

11 (Whereupon, a video is being played.)

12 Q. And then what are you doing right there?

13 A. I'm -- I got my jacket, and I'm pulling it upward

14 to put it -- to conceal it.

15 (Whereupon, a video is being played.)

16 Q. Okay.  And what just happened right there?  I've

17 stopped it at 1 minute and 3 seconds into the video.

18 What just happened?

19 A. I felt like when -- when I -- when I put it in my

20 holster, it didn't go in real smoothly, like I had some

21 kind of resistance.

22 Q. Okay.  And then what happened?

23 A. Well, then after I -- I felt like it was in

24 there, then I went to pull up on my jacket and -- to

25 conceal it, and it -- and then it discharged as my hand

1 was there pulling up on the jacket.

2 Q. Okay.  Now, there were portions of this video in

3 which there were statements made by you.  Do you recall

4 seeing that?

5 A. Pardon?

6 Q. Well, before I get to that, let me ask you, the

7 portions of the video that I just showed you depicting

8 your discharge incident, are those true and accurate

9 representations of what happened when your Glock 23

10 discharged when you were putting it into your holster in

11 January of 2014?

12 MR. HAAZ:  Object to form.

13 BY MS. DENNISON:

14 Q. You can answer.

15 A. Yes.

16 Q. Okay.  I'm going to stop sharing for a moment.

17 Now, you gave an interview as well; is that

18 correct?

19 A. (No response.)

20 Q. To Rafael Sanchez?

21 A. Yes.

22 Q. Why did you give an interview to Rafael Sanchez

23 of this incident?

24 A. I -- I had a concern like the other officer in

25 that one video.  Of course I didn't see that video until

1    later but -- until this -- this program came out, but I
2    had a concern about if someone gets a -- something stuck
3    in their trigger guard, whether it be a drawstring or
4    keys or whatever people might carry and if something can
5    worm their way into a trigger guard and maybe -- they
6    might be in Walmart or someplace bending over to pick up
7    a can of oil off the bottom shelf or something and they
8    move or something. And then if something like that
9    happened, if something was in there and it discharged
10    and the barrel was pointing backwards or something when
11    -- when you're bent over or something like that, just an
12    awareness thing to let people know that certain guns,
13    the way they're designed and everything, they can be
14    dangerous. And -- and Glocks -- and I -- and I -- I
15    like Glock, they're good shooters and everything else,
16    but there's something you need to know about them, and
17    they're -- they're -- they're (sic) got a dangerous
18    trigger guard there -- excuse me, a trigger that -- that
19    that activation switch, slash, safety is there, and if
20    it gets pushed down somehow with not your finger but
21    with anything else and it gets flush, then you could
22    accidently have it discharge, and it was my concern for
23    the public.
24    Q.  So in your instance as you were holstering that
25    gun and an object other than your finger got into that

1    trigger guard area, that blade or tab trigger on the
2    Glock did not prevent your gun from discharging; is that
3    correct?
4    A.  Yes.
5    MR. HAAZ:  Object to form.
6    BY MS. DENNISON:
7    Q.  I've got to ask that again because you said "yes"
8    over his "object to form."  So I'm just going to ask you
9    one more time, if you could just pause and let Mr. Haaz
10    do his object to form, and then do your answer.
11    MR. HAAZ:  I'll tell you what.  I'll just
12    note my objection now, and you can ask him.
13    MS. DENNISON:  Thanks, Sam.
14    BY MS. DENNISON:
15    Q.  Okay.  So during this discharge incident that we
16    just saw, that tabbed trigger on the Glock pistol did
17    not prevent a foreign object from discharging your
18    pistol when your finger wasn't on the trigger; is that
19    correct?
20    A.  Yes.
21    Q.  Now, you were chief of police at the time of this
22    incident.  How long had you been in law enforcement?
23    A.  I come on in June of 1980.
24    Q.  So in 2014, you were -- in January of 2014, you
25    were approaching 34 years of service with law

1    enforcement?
2    A.  Yes.
3    Q.  Were you with Connersville Police Department that
4    entire 34 years?
5    A.  Yes.  I spent four years in the military police
6    back in the 70s.
7    Q.  Four years?
8    A.  Yes.
9    Q.  What branch?
10    A.  United States Army.
11    Q.  Thank you for your service.
12    What had you carried in your four years in
13    military police?
14    A.  A 1911 .45, and they were -- they were purc --
15    they were Colts and Ithacas and Remingtons.  The
16    government -- all the 1911s were all -- all the same
17    everything except they had several manufacturers that
18    made them, but they were all interchangeable in parts.
19    MS. DENNISON:  All right.  Those are all the
20    questions I have for you, sir.  Mr. Haaz will have some
21    questions for you as well, so I'll turn it over to him.
22    EXAMINATION
23    BY MR. HAAZ:
24    Q.  Mr. Counceller, could you hold up that holster
25    again so I could see the -- the indent on the leather?

1    A.  (Complying.)
2    Q.  Thanks very much.  And so there are three
3    numbers.  It looks to me like, and you'll correct me if
4    I'm wrong, that that holster indicates it's designed for
5    three Glock models, there are three numbers after Glock,
6    right?
7    A.  Yes.
8    MS. DENNISON:  Objection to form.
9    BY MR. HAAZ:
10    Q.  Okay.  And what are the numbers?
11    A.  Well, technically that is the same -- same frame
12    as -- a lot of the Glocks are the same.  The calibers
13    wouldn't be --
14    Q.  Sir, I'm just asking what are the three numbers
15    that are written on the holster.
16    A.  Well, I'm having a little trouble looking at them
17    so just give me -- bear with me because I --
18    Q.  Take your time.
19    A.  I -- I can't make 'em out, sir.  I'm looking at
20    them with a magnifying glass -- what's -- what's -- I'm
21    somebody else has got better eyesight than I got.
22    Okay, 7 -- 77, 22 and a 31.  That must be the model
23    numbers.  I'm familiar with the 22.
24    Q.  Okay.  So just so I understand, it's -- that
25    holster says Glock, and then the numbers are 77 and then

1    --
2    A.  It's correction to 17 --
3    Q.  Okay, so --
4    A.  -- 22 and 31.
5    Q.  All right.  So --
6    A.  The 17 is a 9 millimeter, but it's the same
7       frame.  And also, just to clear it here, the 22 is -- is
8       the longer version of the 23.  The 17 is a -- is --
9       these are like for 9 millimeters and 40s.  So the 22 and
10      23 is -- the .40 caliber difference there, they're .40
11      cal.  Then the 9 millimeter is 17 and a 19.  And so
12      they're the same frame and all this.  There's -- also
13      another number is 31, and 31 I don't know -- it -- it's
14      the same frame, but it could be a different length of
15      the barrel or whatever.  I don't -- I'm not sure.
16   Q.  Sure, okay.  And so just so I understand, the
17      numbers that are stamped on the holster you were using
18      that day under the word "Glock" are 17, 22 and 31?
19   A.  Yes.
20   Q.  And on the date of the incident, you were not
21      carrying a Glock 17, a Glock 22 or a Glock 31?
22   A.  No.
23   Q.  How long has Connersville PD carried Glock
24      pistols for?
25   A.  They started carrying them, I think, about '99,

1    1999.
2    Q.  And you're still with Connersville Police
3       Department?
4    A.  No, sir.  I've been retired for 10 years.
5    Q.  Congratulations.  So from '99 until about 2014,
6       were you aware of any other unintended discharges with
7       Glocks from trigger contact by a foreign object like
8       yours?
9    A.  No.
10   Q.  Prior to 1999, what did Connersville PD carry?
11   A.  Berettas, 92FS.
12   Q.  And am I correct that the Beretta 92 had a manual
13      safety?
14   MS. DENNISON: Objection to form.  You can
15      answer.
16   BY MR. HAAZ:
17   Q.  Let me rephrase the question because there's an
18      objection.
19      What safeties did the Beretta 92 have, if any?
20   A.  They had like five different safety features.
21      They had a -- a lock that would -- would disconnect the
22      trigger totally, and then you could flip the -- flip the
23      back lever and it would -- it would go back into a fire
24      position.  You could carry it unloaded -- of course if
25      it's loaded, it could -- have it that way, or you can

1       have the hammer down -- it's a double action, a total
2       different feature.  And they say safety features, just
3       like the 1911 in the Army back in the day, they talk
4       about, you know, being -- being open, cocked open,
5       that's a safety feature.  Down with nothing in it is a
6       safety feature.  For instance -- hold on just a second.
7       They're -- they're just a lot safer gun, and so was the
8       .45.  They didn't have the little -- little dog ear or
9       the little trigger in the trigger, so to speak.
10   Q.  And why is it your opinion that the Beretta was a
11      safer gun than the Glock?
12   A.  Because of the safety features it had.
13   Q.  Okay.  And did the Glock have fewer safety
14      futures than the Beretta?
15   A.  Yes.
16   Q.  And is that because the Glock did not have a
17      manual safety that would prevent the trigger from
18      pulling?
19   MS. DENNISON: Objection to form.
20   A.  True, that -- that's -- that's -- yeah, it --
21      they're tot -- two different guns, totally, with the --
22      the whole thing is totally different.
23   BY MR. HAAZ:
24   Q.  All right.  And if you had had a pistol on the
25      date of the incident that had a manual safety and it was

1       engaged, do you believe your unintended discharge would
2       have happened?
3    A.  No.
4    MS. DENNISON: Object to form.
5    BY MR. HAAZ:
6    Q.  Would it have been safer if your Glock pistol had
7       an external manual safety?
8    A.  Possibly.
9    Q.  If it were engaged?
10   A.  Yes.
11   Q.  I want to talk briefly about the -- the incident
12      itself.  At the -- on the date of the incident, this was
13      January 18th of 2014, were you still working at
14      Connersville Police Department or were you retired?
15   A.  What -- could you give that date again?
16   Q.  Sure.  It looks like from the security camera,
17      the date of this incident was January 18th of 2014.
18   A.  Okay.
19   Q.  On that day, were you still employed with the
20      Connersville Police Department?
21   A.  Yes, I was the police chief.
22   Q.  And how long after that did you retire?
23   A.  I retired in the end of 2015.
24   Q.  Okay.  So were you on duty at the time of this
25      incident?

---

1   A. No.
2   Q. All right. Were you carrying your duty weapon?
3   A. Yes.
4   Q. And was the holster you were using that day your
5      duty holster or personal holster?
6   A. Personal holster.
7   Q. All right, so that wasn't issued by the
8      Connersville Police Department?
9   A. No.
10  Q. Where did you buy it?
11  A. Honestly, I think I bought it at -- at a place
12     called Jenkins. It's a -- in Indianapolis. It's a
13     police supply store, and it was a used -- they used to
14     have a big table of used leather or camo pouches or
15     handcuff pouches. Just whole -- a lot of -- a lot of
16     leather and some -- some plastic stuff that -- I think I
17     bought it up there at -- a one-time use.
18  Q. All right. So fair to say that the holster you
19     were using on the date of the incident was not purchased
20     from Glock or anything associated with a Glock store or
21     --
22  A. No, no.
23     MS. DENNISON: Objection to form.
24     BY MR. HAAZ:
25  Q. And is it your understanding that the stamping on

---

1     your leather holster relates to what are the approved
2     Glock models for that holster?
3     MS. DENNISON: Objection to form.
4   A. Yes.
5     BY MR. HAAZ:
6   Q. Did you see anything on the holster that, in any
7     way, suggested that Glock had manufactured that holster?
8   A. No, I doubt it.
9     MS. DENNISON: Objection. Sorry, we're sort
10     of speaking over each other, my apologies. I'm going to
11     try to get my objections in faster. If you could just
12     take like a quick breath before you begin your answer,
13     we can get a clean record, Mr. Counceller. I don't want
14     to step over you.
15     BY MR. HAAZ:
16  Q. You indicated that when -- and I can pull up part
17     of the video, and I'll share my screen so we can go
18     through it.
19     All right. So I'm at about -- if I look at my
20     notes, I think the security camera video starts at about
21     51 seconds so I'm going to start there and play a little
22     bit.
23     (Whereupon, a video is being played.)
24  Q. All right. So about 54 seconds, you've taken
25     out your Glock 23, and it's in your right hand; would

---

1     you agree?
2   A. Yes.
3   Q. All right. And then about 56 seconds, you
4     re-holster your Glock 23, right?
5   A. Yes.
6   Q. And you previously testified that when you
7     re-holstered it, you felt resistance?
8   A. Yes.
9   Q. What do you mean?
10  A. It just didn't -- I didn't know if I had my
11     jacket -- you know, that there was -- sliding down on
12     the side. It just -- it wasn't -- just moving in there
13     real slow and so I just -- then it -- then it went, it
14     went in. And so that's when I -- you know, after that,
15     I went to pull my jacket up and put it underneath my
16     jacket again, and that's when it discharged.
17  Q. When you felt that resistance, it doesn't appear
18     on the video that you kind of did a check to see what
19     that resistance might be; is that -- is that correct?
20  A. Well, I thought I did. You might have to run it
21     -- I'm not too sure, but I -- I didn't -- I don't -- you
22     know, I'm just -- what I'm seeing on the video and what
23     I'm recalling is I -- I -- I didn't really like turn
24     around and look, but I can just feel that where -- where
25     it went in finally, and I didn't have no idea there was

---

1     a drawstring in there with it.
2   Q. All right. So is it -- is it your belief and
3     understanding that when you re-holstered your Glock 23
4     around the 54 second mark there, that the drawstring was
5     through your trigger guard at that point?
6   A. I would -- probably. That was my resistance,
7     probably.
8   Q. Okay. And so you believe that when you
9     re-holstered your gun there in the video, that the
10     drawstring went through, and that would have been the
11     resistance that you felt?
12  A. That's what I felt like, yeah.
13     MS. DENNISON: Objection to form.
14  A. That's -- after I pulled it out and then looked
15     at it and kind of compared the size of this other one I
16     was looking at, then I went -- holstered it back. It
17     was a little rough. And I remember -- just like I said,
18     I was back on my side here and I -- you know, sliding in
19     and then it -- then it just went in place. And so --
20     then I got my jacket to pull it over the sides, and
21     that's when it discharged.
22     BY MR. HAAZ:
23  Q. All right. I'm gonna play another part of the
24     video. It's loading up here. Just give me a sec. All
25     right. I'm going to play the video, and then I'm going

---

---

1   to ask you some questions about it. And I'm starting at
2   1:50.
3   (Whereupon, a video is being played.)
4   Q. All right. I am now pausing it at about 2:06.
5   MS. DENNISON: Objection to hearsay in the
6   video.
7   MR. HAAZ: Well, we'll talk about that.
8   BY MR. HAAZ:
9   Q. Who was speaking in the segment of the video I
10   just played?
11   MS. DENNISON: Objection to form. You can
12   answer.
13   A. Are you talking -- are you talking about who was
14   speaking?
15   BY MR. HAAZ:
16   Q. Yeah, and I'll go back. I think it started at
17   about 1:52. There's a little demonstration here.
18   A. Yeah, that was me.
19   (Whereupon, a video is being played.)
20   Q. And that's the section of the video I was talking
21   about. Who is speaking?
22   A. Me.
23   **Q. All right. And was that you giving a**
24   **demonstration about how the dog ear or the tab works?**
25   **A. Yes.**

---

1   **Q. All right. And how does it work?**
2   **A. The way it worked?**
3   **Q. Yeah.**
4   **A. Well, it's, like I said, if you got this -- I got**
5   **another -- I got another Glock right here, I can show**
6   **you.**
7   **Q. Sure.**
8   **A. This is it, this is the same model. I -- I still**
9   **own the other one, but it's locked up right at the**
10   **moment. But as you see (indicating) -- okay, I don't**
11   **know if I can -- do you see that little -- I call it a**
12   **dog ear, right here (indicating).**
13   **Q. Yup.**
14   **A. Okay? And now, like I said on that video -- let**
15   **me get this so I can see 'em here. I'm squeezing down**
16   **right here on this side. It's -- it's not -- it's not**
17   **going to go off, you know, with -- like I'm pulling**
18   **right now, until something or your finger or something**
19   **gets in there and then (indicating) --**
20   **Q. Understood. And so you said -- is it your**
21   **understanding that the drawstring would have gotten**
22   **through your trigger guard and also pulled the dog ear**
23   **in the middle of your trigger?**
24   **A. If -- when I pulled my jacket up is when it**
25   **discharged.**

---

1   Q. All right.
2   A. And if you see on the -- on the video, I went
3   away from my hand, and I'm grabbing my jacket to pull it
4   up and over, and that's when it discharged. My hand
5   wasn't down there in the trigger guard, it was -- it was
6   on the jacket.
7   Q. Right. Now, you believe that the Glock is less
8   safe, because it doesn't have a manual safety and only
9   has the dog ear safety, than a 1911 or the Beretta that
10   you previously had; is that right?
11   A. Yes.
12   Q. All right. But that dog ear safety isn't a
13   safety on the outside of the gun, right?
14   MS. DENNISON: Objection to form.
15   A. Yes.
16   BY MR. HAAZ:
17   **Q. All right. And if there is lateral pressure**
18   **applied to the sides of the trigger that doesn't touch**
19   **that dog ear safety --**
20   **A. No.**
21   **Q. -- the trigger will not fire, will it?**
22   **A. No.**
23   Q. All right. So is that dog ear safety better than
24   having no dog ear safety at all on that trigger?
25   MS. DENNISON: Objection to form. You can

---

1   answer.
2   A. I -- I think it's -- I think it's dangerous to be
3   -- because there's not much of a safety feature there.
4   I mean, you know, accidents happen, and -- and -- that's
5   just -- I just -- that's my personal opinion. And it's
6   just not -- it's just not from what happened. When I
7   first saw a Glock back in the 80s, I didn't care for
8   that -- that type of a setup. But, you know, when we --
9   the law departments were going to the Sigs and the .40
10   calibers. And -- and so, you know, when you're in Rome,
11   you do as Romans, so I had to choose my weapon so --
12   but, you know, they're a good shooting gun. And I -- I
13   mean they're durable and you can throw them in the mud
14   and pick them up and start shooting them. I mean
15   it's -- they're a real durable, good gun, but they can
16   be dangerous, just like any other gun. And you got --
17   and me -- me being a -- yeah, this is my second time
18   around, in a sense, and I was always self-conscious
19   about weapons, you know? I've been around weapons all
20   my life, and in the service and everything else, and --
21   and I've been to a lot of farm schools and sniper school
22   and everything else. And then -- then something like
23   this happens and it -- it does make you feel like a fool
24   because you let your guard down, you're not paying
25   attention. In this situation, obviously, yeah, it's an

---

1    accident and -- and -- but that's what caught me off
2    guard, you know? My first little incident, you know, I
3    knew that -- what ha -- what happened. I screwed up,
4    and I shouldn't have -- I should have made sure that --
5    was no bullet in the barrel. But on this one here, it
6    just -- it just like -- and I found out the other police
7    officers and -- and -- had similar situations like this,
8    and it is embarrassing. And it's -- and, yeah, I don't
9    like the design of it, but you know what you're
10    carrying. And since that time, even when I was on the
11    police department, I wouldn't even carry one up the pipe
12    until I was on -- if I was on duty, it would be one
13    thing. And, of course, my duty leather was a lot more
14    -- it had like three or four different safety features
15    on the -- on the holster itself verse -- not just
16    talking about the gun, but for carrying and then drawing
17    and everything. But -- but this is something that, when
18    I was -- even today, if I'm carrying an automatic, I
19    won't keep one up the pipe. And -- and if -- and then
20    other officers will argue and think, well, you're losing
21    seconds there. Well, you're losing -- might lose a
22    couple seconds to jack one in the pipe, but at the same
23    time, you're thinking about what you're doing too. And
24    so when I carry an automatic anymore (sic) -- I don't
25    carry one up the pipe until I feel like I need it, and

1    then I'll jack one in there.
2    BY MR. HAAZ:
3    Q. Were you required to carry a loaded pistol when
4    you were on duty as a police officer?
5    A. Yes.
6    Q. All right. You previously testified that one of
7    the reasons you went to the news and were interviewed is
8    essentially you wanted to alert others and make sure
9    this didn't happen to others; is that fair?
10    A. Yes, and that's -- that's just not police
11    officers. Anybody -- we got a lot of -- it's getting
12    more so than it was back in the day, but a lot of people
13    are carrying their weapons, you know, for personal
14    safety. And I just wanted to get out there and -- and
15    let people know that what you're carrying, you've gotta
16    be familiar with. Don't just, I bought a gun and never
17    shot it and never got any special training for it, and
18    knew about the weapons you were carrying and the safety
19    futures and this type of thing. So it's an awareness
20    thing is what I was trying to -- trying to go with.
21    And, you know, I wasn't looking for no sympathy for me,
22    you know, for what happened to me. It just -- it's just
23    a deal where I wanted to make the public aware. If
24    you're carrying a weapon, you need to know that weapon,
25    and you need to have some training and be conscious of

1    where it is and if it's loaded and so be it, you know?
2    Q. Understood. And part of the reason you went on,
3    you said, was to essentially warn others that keys or
4    other items could actuate their trigger if their gun is
5    holstered, right?
6    A. Did you say -- I'm -- keys?
7    Q. Yeah. I thought you said keys or other items
8    could actuate a trigger when the gun is holstered.
9    A. Are you talking about car keys or something?
10    Q. Yeah.
11    A. Yeah. I had an officer -- one of my officers
12    stopped in the office a while -- a while back. I mean
13    shortly after this happened and this came about and
14    everything else, and he had -- he had his keys down
15    there by his holster, his house keys and his car keys or
16    whatever. And one of the keys somehow had got into his
17    holster, in the trigger guard area, and he caught it and
18    -- and --
19    Q. What do you mean, "he caught it"?
20    A. Pardon?
21    Q. What do you mean, "he caught it"?
22    A. He -- he -- he realized that his keys were around
23    there in his holster, and -- or one of them was
24    protruding someplace on there, and he come to me and
25    told me. He said that -- that he's not gonna carry his

1    keys anymore on that side of his holster. A lot of
2    times you used to have these key holders on the side of
3    your holster -- or belt, I should say.
4    Q. And so that anecdote you were just telling us,
5    there was no unintended discharge?
6    A. No, no, there wasn't, but he -- this officer told
7    me that it scared him.
8    Q. All right. And what kind of gun was he carrying,
9    if you remember?
10    A. He was -- I think he was carrying a model 22.
11    Same thing but 23 is just a little shorter.
12    Q. A Glock?
13    A. Pardon?
14    Q. Is that a Glock?
15    A. Yeah.
16    Q. And so in the example you just said, and in the
17    demonstration you gave before, if a key had contacted
18    the trigger and not actuated the dog ear, just like you
19    showed us, the Glock trigger would not pull --
20    A. Uh-huh.
21    Q. -- rearward and fire; is that right?
22    MS. DENNISON: Objection to form.
23    (Whereupon, the court reporter asked for
24    clarification.)
25    BY MR. HAAZ:

1   Q. Would not pull rearward and fire?
2   A. No. She put -- that -- that little dog ear has
3      got to come down flush with that -- that trigger.
4   Q. Okay.
5      MR. HAAZ: I don't have any other questions.
6      Thank you very much, Mr. Counceller.
7      THE WITNESS: Okay.
8      RE-EXAMINATION
9      BY MS. DENNISON:
10  Q. I have just a couple of brief follow-ups, Mr.
11     Counceller, if you could just bear with me for just a
12     moment.
13     I believe you indicated earlier that you wanted
14     to make the public aware that you need to know what
15     you're carrying. Do you recall that?
16  A. Yes.
17  Q. And what did you mean by that?
18  A. Well, like I said, a lot of people go buy a gun,
19     and they think that they just point it and shoot it,
20     pull the trigger, you know? They don't know any
21     characteristics -- characteristics about their gun, and
22     they need to be trained with it and know the -- the --
23     everything about it. And -- and, you know, like I said,
24     like we were talking about the Beretta. The Beretta is
25     double action. But you take the .45 automatic that I

1   carried in the Army, it's -- it's not a double action.
2   You gotta have one up the -- you have to jack and then
3   -- and have the trigger back or whatever. Every gun's
4   got a little different char -- characteristics. Now, at
5   -- since the -- this time or before, a lot of gun
6   manufacturers -- you know, and I've -- we never carried
7   any Sigs, but I owned several Sigs, and they were a
8   pretty safe gun. And the Sig I owned -- or the two I
9   owned, it never had any type of dog ear type of trigger.
10  They were -- they were similar to the Beretta and the
11  safety features and everything else and the 1911. So --
12  but a lot of manufacturers today are using them dog ears
13  on different new model guns and everything else.
14  Ironically, I purchased a weapon not too long ago, and
15  one thing I noticed about it, it had -- it had a little
16  dog ear on it, but also it had a palm safe (sic). So
17  that's when you -- for instance they have -- back here
18  on a lot of -- like the 1911, for instance, they -- the
19  purchase (sic) -- the gun I purchased has a -- a little
20  thing that you gotta -- when you come down here and put
21  your palm down here like this, it's -- it will push
22  down, and that's a safety feature. So you had the
23  safety feature or the activation safety fea -- feature
24  here, with the same type of a dog ear here. But also it
25  won't pull -- it won't pull. And ironically -- and I

1   dry fired them all. I would dry fire it just to make
2   sure, but I did that, and checked that, that was fine,
3   up here on this, and I checked this without putting that
4   here, and it wouldn't fire (indicating). So they copied
5   that off of Colt, and it's -- it's the one that comes up
6   like this. And when you go like that down, there's two
7   -- that's two safety features, and I was kind of
8   impressed with that. So, you know -- and I don't know
9   if -- what Sig makes today or anything else. The ones I
10  had, they're -- they were out, you know, 20 years ago or
11  -- or before. And so -- but a lot of manufacturers,
12  they -- they make them. But -- you know, with the dog
13  ear now. And -- KelTec and some others. And -- and
14  it's just -- like -- like people need to know where the
15  safety is on them, how to shoot them, when to shoot and
16  all this kind of stuff but it's -- and it's just a whole
17  -- things to learn about a gun. Just -- you don't go,
18  just purchase and throw it in your purse or where it --
19  in your pants or a holster and -- well, I don't know how
20  to shoot it, but I got one. So I'm just trying to make
21  a point here, it's people really need to know if they're
22  gonna have something like that, they need to get
23  educated with it.
24  Q. Thank you, sir. I just have a couple more
25  questions.

1   Do you agree that a gun is designed to discharge
2   when the trigger is pulled?
3      MR. HAAZ: Object to form.
4   A. Do I think a gun should discharge when you pull
5   the trigger?
6      BY MS. DENNISON:
7   Q. Yes.
8   A. Yes.
9   Q. Okay. And in your time in law enforcement, would
10  it be a problem for you if you needed to pull the
11  trigger, and the gun did not fire?
12  A. Yeah, definitely.
13  Q. Do you have an expectation that if the trigger is
14  pulled on one of your guns, that the gun will discharge?
15  A. As long as there's one up the -- one up the pipe,
16  yeah.
17  Q. And that was a good clarification. Do you have
18  an expectation that if there is a round in the chamber
19  of a gun and the trigger is pulled, that it will
20  discharge?
21     MR. HAAZ: Object to form.
22  A. If it doesn't -- sorry. If it doesn't fire, then
23  there's something wrong with the weapon.
24     BY MS. DENNISON:
25  Q. And that would be a problem, right?

1  A. Yeah. Another thing I haven't mentioned, and
2  it's something to think about too, is because Glock and
3  others, they don't have -- they don't have back here a
4  hammer, and a lot of -- and just like I talked about the
5  .45 in the Army and the Beretta, they have hammers, so
6  you see where the hammer is. This -- these -- these
7  hammers -- there's no hammer back here, it's all
8  internal. So you really don't know if the thing has got
9  one on the trigger or one ready to fire if you don't
10  have one up the pipe or whatever, but you know -- don't
11  know where that -- that hammer is, you know? There's a
12  -- a little pin on some of them that you could see it,
13  it's a little more flush, you know, in the back, but
14  there's just so many different ways and so many guns out
15  here that they have hammers that are exposed and some
16  don't. And so it's -- yeah, you're -- you're -- you got
17  a -- excuse me. If you are carrying a weapon, then you
18  need to know what you're carrying and everything. And
19  you pull the trigger because your life's in danger and
20  everything else, your expectation is that gun's gonna
21  discharge and fire and supposedly hit who you're
22  shooting.
23  Q. Did you ever --
24  A. Um --
25  Q. Apologies, sorry.

1  A. Go ahead.
2  Q. Did you ever do any training of any officers on
3  shooting?
4  A. Yes.
5  Q. And did you train any of the officers about how
6  to properly place their finger on the trigger of a Glock
7  to ensure that they push in that -- what you call the
8  dog ear or the tab trigger?
9  A. Well, yeah. Usually if -- if you're in the
10  training mode -- today, okay, they try to keep your
11  finger off the trigger as you're seeing right here. So
12  if there -- if that finger's coming down, it can come
13  down like this (indicating). So usually when they go
14  in, they usually try to keep their -- their fingers up
15  -- upward, you know, like this, instead of going in like
16  this. And, all of a sudden, you trip on an old carpet
17  or something, and, you know, it -- you just got -- you
18  keep the -- keep the finger off the trigger if you're
19  like searching a building or something like this, you
20  know? And -- but you can see that you can move it real
21  quick in -- inward. Yeah, it's -- it's just like I
22  said, it's a lot to learn, and just a lot to remember.
23  And you do, you gotta be subconsciously, you know,
24  thinking about it, what you're carrying, especially if
25  you're in a situation. And I have been fortunately --

1  was involved in a police shooting back in 2001. And --
2  but it wasn't with a hand -- it wasn't with a handgun, I
3  was using a shotgun. But, ah -- but -- it -- it's
4  something that you -- it comes with your training and --
5  and -- your training with police officers, they
6  shoot so many times a year, and just get familiar with
7  what you got and everything else. Just --
8  Q. Would you agree that it could be an issue for
9  somebody if they had a gun with a dog ear or a tab
10  trigger, and they needed to fire their weapon, and they
11  did not fire it because they did not properly place
12  their finger on the trigger and disengage that tab?
13  MR. HAAZ: Object to form.
14  A. I -- I don't think -- I don't -- I don't know of
15  anybody -- or of an incidence that -- that -- you know,
16  happened, you know, if that's answering your question.
17  BY MS. DENNISON:
18  Q. Sure. Is it your understanding that the dog ear
19  or tab trigger on the Glock is designed to be easily
20  disengaged when the trigger is pulled?
21  MR. HAAZ: Object to form.
22  A. Well, I don't think -- if you're putting your
23  finger on that trigger and you're -- and you're coming
24  down on it, it's gonna -- you know, it's gonna -- that
25  dog ear's gonna go straight down in -- that weapon's

1  gonna discharge unless, like I said, there's a defective
2  part in the gun or something.
3  BY MS. DENNISON:
4  Q. Right. I mean --
5  A. That's --
6  Q. Sorry. Were you finished?
7  A. Sure.
8  Q. Okay, sorry. I did not mean to step over you.
9  So -- all right. So are you saying you don't
10  have any knowledge of anybody who was unable to or
11  misplaced their finger on that trigger and did not get
12  that trigger pulled back when they wanted to?
13  A. Not to my knowledge, no.
14  Q. And alternatively, are you aware of any
15  situations where that dog ear or tab trigger on the
16  Glock pistol prevented a gun from discharging
17  accidentally when something contacted the trigger?
18  A. Not -- not to my knowledge if that's what you're
19  -- I think I know what you're asking. I mean it's
20  pretty cut and dry. It's gonna discharge, I mean,
21  unless, like I said, it's defective, but I don't -- I
22  don't -- are you trying to say that it would fire
23  without the dog ear being down?
24  A. No, no. Let me -- let me be clear, all right?
25  Are you aware of any circumstances where something

---

2025-05-23     **Counceller, David**     Page 57

1    contacted only the side of a Glock trigger and did not
2    pull the trigger in an accidental circumstance?
3    MR. HAAZ: Object to form.
4    A. I don't think -- no.
5    BY MS. DENNISON:
6    Q. Do you understand?
7    A. I think I know what you're trying to say.
8    Q. All right.
9    A. You're saying that -- that the gun would
10    discharge without the dog ear being down?
11    Q. No. Let me ask it this way, and let me make it
12    really clear. Do you have any information that that dog
13    ear on the Glock prevents an accidental discharge when
14    something contacts the trigger and pulls it rearward?
15    MR. HAAZ: Object to form.
16    A. I don't, no. I don't think so.
17    BY MS. DENNISON:
18    Q. Okay.
19    A. I mean -- I mean you're -- you're -- I'm trying
20    to understand what you're saying. I'm -- I'm -- if you
21    -- are you telling me that like it wouldn't fire, like I
22    said, or -- or -- or it does fire when -- when I didn't
23    -- once you push it on the side, for instance?
24    Q. Right. Are you aware of any circumstances where
25    somebody accidently had the trigger contacted on the

---

2025-05-23     **Counceller, David**     Page 58

1    side on a Glock, and that dog ear wasn't pressed and, as
2    a result, it prevented that gun from discharging in that
3    accidental circumstance?
4    A. No, no. Sometimes you have to draw me a picture,
5    but no.
6    Q. Okay.
7    MS. DENNISON: Those are all my questions.
8    Thank you, sir.
9    RE-EXAMINATION
10    BY MR. HAAZ:
11    Q. Just to follow up on that briefly, Ms. Dennison
12    was just asking if you knew of any instance of a -- an
13    object contacting the side of a trigger and preventing
14    the trigger from discharging. Do you remember that?
15    A. Go ahead, yeah.
16    Q. Yeah. And you said you actually knew of an
17    instance of a -- of a fellow officer who was carrying a
18    Glock and realized that his keys were getting into the
19    trigger guard, but that the gun didn't discharge, right?
20    A. Yeah, he --
21    MS. DENNISON: Object to form.
22    A. It didn't -- it didn't -- I don't think it -- I
23    don't think it went that far. He was -- told me that
24    his key, one key, was like in the trigger guard, but I
25    don't think he hit the trigger or nothing like that. He

---

2025-05-23     **Counceller, David**     Page 59

1    just got kind of like spooked by the -- his key was
2    over, close to that trigger guard or inside of it. But
3    it never touched the trigger or anything else.
4    BY MR. HAAZ:
5    Q. And do you have any personal knowledge of whether
6    that key touched the trigger or didn't touch the
7    trigger?
8    MS. DENNISON: Objection to form.
9    A. For him?
10    BY MR. HAAZ:
11    Q. Yeah.
12    A. No. He was just telling me about it and that's
13    all, but it's pretty -- pretty cut and dry. It wasn't
14    really elaborated on, so to speak.
15    Q. All right. I just want to clear a few things up.
16    **Am I correct that, to your knowledge and understanding,**
17    **you know of no instance where somebody tried to pull a**
18    **Glock trigger and was unable to due to the presence of**
19    **the tab or the dog ear?**
20    **A. No.**
21    **Q. I'm correct that you don't know if that ever**
22    **happened?**
23    **A. No. Not to my knowledge, no.**
24    Q. You had two unintended discharges. One was in
25    1999, and the other in 2014?

---

2025-05-23     **Counceller, David**     Page 60

1    A. Yes.
2    Q. You chalked up the 1999 one to your own
3    carelessness, right?
4    A. Yes, yeah.
5    Q. Do you own a P320?
6    A. No.
7    Q. A Sig Sauer P320?
8    A. What is it?
9    Q. A Sig Sauer P320.
10    A. No.
11    Q. Do you know anything about that gun?
12    A. Not right off, no.
13    Q. All right. Do you know whether it's a
14    striker-fired or a hammer-fired gun?
15    A. I don't. I don't know -- I've only owned two --
16    owned two. I'm trying to remember what the models was
17    (sic) -- what they -- they were -- the regular -- they
18    were just -- the older Sigs, like back in the 90s, early
19    90s, and I had a couple of them. One was a
20    9 millimeter, and one was the .40, and it basically had
21    the same characteristics. And they had -- they were a
22    pretty safe gun as far as the safety futures, and they
23    didn't have no -- they didn't have any dog ears, so to
24    speak. So what -- what they've been out here now --
25    like I said, everybody's been putting them dog ears on

---

| 2025-05-23 | **Counceller, David** | Page 61 |
|---|---|---|

1  -- on everything.  And -- and like the one I bought the
2  other day has one, but it has another safety feature too
3  so --
4  Q.  And what kind of gun is that, the one you bought
5     the other day --
6  A.  It was a Springfield.
7  Q.  XD?
8  A.  Springfield Armory.
9  Q.  Okay.  And was that a striker-fired gun with no
10    hammer?
11 A.  Yeah.
12 Q.  And did you -- do you know -- so the gun you just
13    bought, the Springfield, had a grip safety and a dog ear
14    tab trigger?
15 A.  Yeah.
16 Q.  All right.  Did you know the P320 is a
17    striker-fired gun, it doesn't have a grip safety, and is
18    offered without -- I'm sorry, is a striker-fired gun
19    that is offered without a manual safety --
20    MS. DENNISON:  Objection to form.
21    BY MR. HAAZ:
22 Q.  -- and has no dog ear or tab trigger?
23    MS. DENNISON:  Objection to form.
24 A.  Some -- something similar to a Glock?
25    BY MR. HAAZ:

| 2025-05-23 | **Counceller, David** | Page 62 |
|---|---|---|

1  Q.  A Glock without the tab trigger.
2     MS. DENNISON:  Objection to form.
3  A.  Well, I'm not familiar with -- with what weapon
4     you're talking about so I haven't even -- I mean, like I
5     said, they've got so many, and I'm really -- anymore,
6     I'm -- I'm more of a revolver guy.  I went back, because
7     we started out with revolvers and -- and to this day, I
8     carry a revolver --
9     BY MR. HAAZ:
10 Q.  Understood.
11 A.  I mean for my personal safety, but I do have
12    automatics.  And I -- and the one I purchased, I -- I
13    wouldn't even carry it until I took it to the range and
14    shot it, and I haven't took it to the range and shot it
15    yet and -- so I haven't -- I can't really speak for it
16    either.
17    MR. HAAZ:  Okay.  Mr. Counceller, I don't
18    have any other questions.  Thanks for your time.  I
19    appreciate it.
20    MS. DENNISON:  Thank you, Mr. Counceller.
21    THE WITNESS:  No problem.
22    VIDEOGRAPHER:  All right, one moment.
23    This now concludes the videoconference
24    deposition of David Counceller.
25    Counsel, will it be the same orders as the

| 2025-05-23 | **Counceller, David** | Page 63 |
|---|---|---|

1  first deposition?
2  MS. DENNISON:  It will be for me.
3  MR. HAAZ:  Yes.
4  VIDEOGRAPHER:  Okay.  And do you want to
5  advise of read or waive?
6  MS. DENNISON:  Mr. Counceller, you have the
7  opportunity to either -- read and sign the transcript
8  from this deposition.  So you can get a printed-out copy
9  of the transcript from it, you can review it for
10 accuracy, you can submit an errata sheet if there is
11 anything incorrect, or you can just sign that it is
12 good, or you can waive that right and not read the
13 transcript.
14 THE WITNESS:  I just -- if you need me to
15 sign something, fine, but I waive anything.  I don't --
16 you know -- I mean this isn't -- you -- you've -- you've
17 brought me on here to ask me questions about a Glock and
18 the incidents I've had and, you know, I have no dog in
19 this fight, so to speak, you know?  And so there's -- it
20 doesn't really make any difference to me.
21 MS. DENNISON:  So this is totally up to you.
22 We don't need anything from you, so this is up to you.
23 It's your option.  So if you want to read it, make sure
24 it's all accurate and sign it, you can.  If you don't
25 want to do that, then you can say that you waive that.

| 2025-05-23 | **Counceller, David** | Page 64 |
|---|---|---|

1  THE WITNESS:  I waive that.
2  VIDEOGRAPHER:  All right, one moment.
3  We are now going off the record on May 23,
4  2025 at 2:38 p.m. Eastern Time.
5  (Whereupon, the above-named deposition was concluded at

| 2025-05-23 | Counceller, David | Page 1 |

```
 1     IN THE UNITED STATES DISTRICT COURT
 2
 3     Civil action No: 1:23-cv-00327-JDL
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17     for the State of Maine, via Zoom videoconference,
18     notice given.
19
20
21
22
23
24
25
```

| 2025-05-23 | Counceller, David | Page 2 |

```
 1     APPEARANCES:
 2     LITTLETON JOYCE UGHETTA & KELLY LLP
 3     2460 N. Courtenay Pkwy, Suite 204
 4     646-708-4844
 5     Attorney for Defendant Sig Sauer, Inc.
 6
 7     BY: JEFFREY RUSSELL, ESQUIRE
 8     Portland, ME 04101
 9     jrussell@verrill-law.com
10
11     SALTZ, MONGELUZZI & BENDESKY, P.C.
12     One Liberty Place, 52nd Fl
13     Philadelphia, PA 19103
14     shaaz@smbb.com
15
16
17
18
19
20
21
22
23
24
25
```

| 2025-05-23 | Counceller, David | Page 3 |

```
 1     INDEX
 2
 3
 4
 5
 6
 7
 8     EXHIBITS
 9
10     NONE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| 2025-05-23 | Counceller, David | Page 4 |

```
 1     (This deposition was taken before Debra J. Fusco,
 2     Notary Public, via Zoom videoconference, on May 23,
 3     2025, beginning at 1:10 p.m.)
 4     VIDEOGRAPHER:  We are now on the record.
 5     The time is 1:10 p.m. Eastern Time on May 23, 2025.
 6     This begins the videoconference deposition of David
 7     Counceller taken in the matter of David Alan Cole and
 8     Kimberly Cole versus Sig Sauer, Incorporated.  The case
 9     number is 1:23-cv-00327-JDL, and is filed in the United
10     States District Court for the District of Maine.
11     My name is George Ellis, I am your remote
12     videographer.  Our court reporter is Debra Fusco, and we
13     are representing Esquire Deposition Solutions.
14     Counsel, please state your name and who you
15     represent, after which the court reporter will swear in
16     the witness.
17     MS. DENNISON:  Kristen Dennison from
18     Littleton Joyce Ughetta & Kelly, and I represent Sig
19     Sauer, Inc.
20     MR. HAAZ:  Sam Haaz on behalf of David and
21     Kimberly Cole.
22     MR. RUSSELL:  I'm also here, Jeff Russell,
23     Verrill Dana, LLP on behalf of Sig Sauer.
24     MS. DENNISON:  Erica Esposito from Sig Sauer
25     is also present.
```

| 2025-05-23 | Counceller, David | Page 5 |

1  (The deponent was administered the oath by the Notary
2  Public.)
3  DAVID COUNCELLER, after having been
4  duly sworn by the Notary Public,
5  was deposed and testified as
6  follows:
7  EXAMINATION
8  BY MS. DENNISON:
9  Q.  Good afternoon, Mr. Counceller.  My name is
10  Kristen Dennison.  I represent Sig Sauer in an action
11  that's been brought against it by David and Kimberly
12  Cole.  We are here today pursuant to a subpoena that my
13  office issued to you.  Is that your understanding?
14  A.  Yes, ma'am.
15  Q.  Okay.  And thank you for your appearance here
16  this morning.
17  Have you ever had your deposition taken before?
18  A.  Not like this.
19  Q.  Okay.  Let me give you a few brief instructions
20  before we begin.  We do have a court reporter
21  transcribing everything here today so I need to make
22  sure that all of your responses to my questions are
23  verbal.  In particular, I need an audible yes for a no
24  as opposed to a nod or a shake of the head.  If you
25  forget, don't worry about it, one of us will correct it

| 2025-05-23 | Counceller, David | Page 6 |

1  for the record to make sure everything is audible.
2  We can only have one person speaking at a time.
3  In the normal course of conversation, it is easy to
4  anticipate what my question is and begin your response
5  before I have finished my full question.  For purposes
6  of the record today, I would ask that you allow me to
7  completely finish my question before you begin your
8  response, and I will allow you to completely finish your
9  response before I begin my next question, okay?
10  A.  Okay.
11  Q.  Great.  We are going to try to be as quick as we
12  can today with you.  That said, if you need a break at
13  any point in time, please let us know that, and we'll be
14  happy to accommodate you.
15  A.  Well, I would really like to go put my ear plugs
16  in at the moment.
17  Q.  If you want to do that, you can step away and
18  go put your earplugs in, that's fine.
19  A.  I think I will because this is kind of new to me
20  and I'm -- I need to sharpen up my hearing here real
21  quick so I'll be right back.
22  MS. DENNISON:  Let's go off the record a
23  moment.
24  VIDEOGRAPHER:  Going off the record, the
25  time is 1:13.

| 2025-05-23 | Counceller, David | Page 7 |

1  (OFF RECORD)
2  VIDEOGRAPHER:  Back on the record.  The time
3  is 1:14.
4  MS. DENNISON:  Okay.
5  BY MS. DENNISON:
6  Q.  Mr. Counceller, can you hear -- can you hear
7  everything okay now?
8  A.  Yes.
9  Q.  Great.  So I'm going to ask you some questions
10  about an unintentional discharge that I understand you
11  experienced a little over 10 years ago, and I need to
12  have you answer my questions truthfully and honestly to
13  the best of your recollection, okay?
14  A.  Yes, ma'am.
15  Q.  Great.  If you don't hear my question, please let
16  me know that, and I will repeat it.  If you don't
17  understand my question, which is quite possible, please
18  let me know that, and I will be happy to rephrase it,
19  okay?
20  A.  Okay.
21  Q.  If you answer one my questions, I am going to
22  assume that you heard my question, that you understood
23  my question, and that you answered it truthfully and
24  honestly to the best of your recollection; is that fair?
25  A.  Sure, yup.

| 2025-05-23 | Counceller, David | Page 8 |

1  Q.  Okay, great.  And the oath that you took today is
2  the same as if you were testifying in a court of law.
3  Do you understand that?
4  A.  Yes.
5  Q.  Great.  Mr. Counceller, are you taking any
6  medications that would prevent you from testifying
7  truthfully and honestly to the best of your
8  recollection?
9  A.  No.
10  Q.  All right.  Did you review any documents to
11  prepare for your deposition here today?
12  A.  No.
13  Q.  Can you please state your full name?
14  A.  David Joe, is J-O-E, Counceller,
15  C-O-U-N-C-E-L-L-E-R.
16  Q.  Where are you currently located, Mr. Counceller?
17  A.  Connersville, Indiana.
18  Q.  Have you ever been known by any other names?
19  A.  No.
20  Q.  Do you reside in Connersville, Indiana?
21  A.  Yes.
22  **Q.  Mr. Counceller, have you experienced an**
23  **unintended discharge with a Glock pistol?**
24  **A.  Yes.**
25  **Q.  When did you experience an unintended discharge**

1   with a Glock pistol?
2   A. It was in January, 2014.
3   Q. What kind of Glock was involved?
4   A. It was a Glock 23.
5   Q. Was that your Glock 23?
6   A. It was an issued weapon by my police department.
7   Q. What police department?
8   A. Connersville City Police Department.
9   Q. How long have you carried that Glock 23?
10   A. Oh, several years. I was a -- I was the chief of
11   police at the time, and we had carried Glock -- Glocks.
12   The -- the -- the Glock 23 was a little shorter model
13   than the 22 that the original officers would carry.
14   Q. As chief of police -- was that for Connersville
15   Police Department?
16   A. Yes, it was.
17   Q. As chief of police for the Connersville Police
18   Department, did you select the Glock 23 pistol?
19   A. No. It's -- it was done several years -- that
20   was our -- I think that was our second issue. I
21   think the first time we were issued back in '99,
22   something like that. Then we carried -- I got the
23   Generation 2, then we went to the Generation 3. And
24   since then, they go to 4 and 5.
25   Q. All Glocks?

1   A. On the Glocks.
2   Q. Okay, great. And the Glock 23 pistol that you
3   were carrying in January of 2014, did that have a little
4   blade or -- in the trigger?
5   MR. HAAZ: Objection --
6   A. Yes, we call it a little dog ear.
7   BY MS. DENNISON:
8   Q. You called it a dog --
9   A. If you'd like -- if you would like, ma'am, I
10   could probably pull it up and show it to you.
11   Q. Do you still have that pistol?
12   A. I don't have that one, but I have another one, a
13   Generation 4, which is the same thing, just a newer
14   model. It's the same dog ear, same trigger, everything.
15   Q. Okay. All right. And in January of 2014, can
16   you tell me the circumstances surrounding your
17   unintended discharge?
18   A. Well, I had stopped into a local gun shop here in
19   Connersville, and the owner of the place is a friend of
20   mine, and there was another Glock, it was a 380, a
21   little bit smaller, and it was like a newer version.
22   And I was looking at it, and I pulled my weapon out,
23   carefully, and I was comparing the size, basically, for
24   being carried for undercover or just plainclothes to
25   where it's concealed, and I was comparing it with this

1   -- with mine. And afterwards, I handed the weapon back,
2   the weapon I was looking at, I handed it back to the
3   owner of the gun shop. And I went to holster my weapon
4   again in my holster, and I noticed when I put it in
5   there, it was a little snug more so, but I had a jacket
6   on, a heavy jacket. And when -- I should say I had a
7   jacket, but it seemed like I had -- I had a fleece
8   jacket and -- on underneath the coat. Anyway, so when I
9   went to pull up my fleece to -- to hide the weapon, I
10   had a -- my drawstring -- I had a drawstring that was
11   hanging down on my right side, and I'm right-handed, and
12   it's a right-handed holster. Somehow it got into that
13   trigger guard. And when I went and pulled my jacket
14   with my right hand, on my right side, I went to pull it
15   up to -- to -- to put my jacket over the weapon, the
16   drawstring was in there and -- and it was caught in
17   there. And when I pulled up with that jacket with that
18   drawstring, it discharged. And there was a video that I
19   had -- did with Channel 6 news out of Indianapolis, and
20   I believe -- I was really just concerned about people
21   with clothing and carrying weapons. It happens -- this
22   happens a lot of (sic) police officers, and I imagine
23   it's happened with other people also. I don't know, but
24   I know that the reporter did a -- did a investigation on
25   that, and at the time he -- he had roughly around a

1   thousand incidents, that's what he told me, involving
2   something similar with drawstrings. So, any way, it --
3   it grazed -- grazed my upper leg right underneath my
4   right leg and buttocks and -- and it -- just a graze.
5   And so -- but did -- did catch me off guard and I -- you
6   know, the Glock is a good weapon, but it's a very
7   dangerous weapon because they -- that little -- little
8   dog ear and that trigger right there is -- they want to
9   call it a safety. It's not a safety, it's an activation
10   switch because it's not gonna go off until something or
11   a finger or something else is there, and it has to pull
12   it flush with the trigger itself, then it will
13   discharge. There's not any other safety -- safety
14   features with the Glock other than that, either with
15   being closed with no weapon -- no rounds in it or -- or
16   it's jacked open with no rounds in it. But that's the
17   only safety feature it has, and I'm not real -- I never
18   was real sure about that.
19   MR. HAAZ: I'm going to just object and move
20   to strike all the parts of the answer that relate to
21   hearsay, and particularly with what the reporter said
22   and, you know, what he doesn't have personal knowledge
23   of.
24   And, sir, there may be objections from time
25   to time. They're just for Ms. Dennison and I to make a

1    record, that's all they are. So now that that's on the
2    record, I turn the question back over to Kristen and
3    apologize for any interruption.
4    BY MS. DENNISON:
5    Q. Thank you, Mr. Counceller. I'm going to ask you
6    a few questions to break that down a little bit, okay?
7    A. Sure.
8    **Q. Let's start with, what kind of holster were you**
9    **using at the time?**
10   **A. It was a leather holster. It didn't have a**
11   **strap. It just sat as -- kind of like -- it was a**
12   **warn leather. I mean it's a -- fit comfortable and**
13   **everything, but it was just really sitting down in -- in**
14   **the holster itself, and it was leather.**
15   Q. Okay. The holster -- do you remember the brand
16   of the holster?
17   A. I got it -- I got it upstairs. I can --
18   Q. You have the actual holster upstairs?
19   A. Yes.
20   Q. Would you -- would you mind getting that, and
21   then we can take a --
22   A. Sure.
23   MS. DENNISON: All right. Let's go off the
24   record for a moment.
25   THE WITNESS: Be right back.

1    VIDEOGRAPHER: Off the record. The time is
2    1:24.
3    (OFF RECORD)
4    VIDEOGRAPHER: Back on the record. The time
5    is 1:25.
6    BY MS. DENNISON:
7    Q. Okay, Mr. Counceller, while we went off the
8    record, you went and retrieved the holster that you were
9    wearing on the day of the unintended discharge. Can you
10   put that holster up to the camera, to the video feed, so
11   that we can see it?
12   A. Yes, (indicating). As you see, it's a black
13   leather. It's open here at the top and the -- I'm half
14   blind too. Anyway --
15   THE WITNESS: Honey?
16   UNIDENTIFIED ATTENDEE: Yes.
17   THE WITNESS: Can you read that -- the make
18   of this holster? You might want to turn a light on or
19   something.
20   UNIDENTIFIED ATTENDEE: Glock.
21   THE WITNESS: No, that's -- that's a Glock.
22   UNIDENTIFIED ATTENDEE: Masters's --
23   Masters's Holder (sic).
24   THE WITNESS: It's a what?
25   UNIDENTIFIED ATTENDEE: Glock The Masters's

1    Holder (sic).
2    THE WITNESS: Masters's Holder (sic).
3    UNIDENTIFIED ATTENDEE: 17, 22, 31.
4    THE WITNESS: Okay.
5    UNIDENTIFIED ATTENDEE: It's a Glock holder
6    (sic).
7    A. I'll -- that's -- I don't know if you can see
8    that or not, but that's the make of it.
9    BY MS. DENNISON:
10   Q. Okay. And so that is a Glock --
11   A. Glock --
12   Q. Glock Masters's Holster?
13   A. Yes.
14   Q. 17, 22, 31?
15   UNIDENTIFIED ATTENDEE: 77.
16   A. I think it was 77 she said.
17   BY MS. DENNISON:
18   Q. Oh, 77, 33 -- or 77, 22, 31.
19   UNIDENTIFIED ATTENDEE: Yeah.
20   BY MS. DENNISON:
21   Q. And --
22   A. Yeah.
23   Q. Great. And, for the record, who is she? Is
24   that your wife?
25   A. My fiancee. Her name is Shannon.

1    Q. Thank you. All right, okay. So, Mr. Counceller,
2    that was the holster. I'm going to ask you about the
3    information you gave about -- you said you told you about
4    a thousand instances of similar issues with drawstrings.
5    My question for you is, who is the "he" to which you
6    were referring?
7    UNIDENTIFIED ATTENDEE: Rafael Sanchez.
8    A. Rafael San -- Sanchez.
9    BY MS. DENNISON:
10   Q. And who is Rafael Sanchez?
11   A. He is a reporter for -- was a reporter for
12   Channel 6 news. He's on a -- another network up in
13   Indianapolis also now. I think it's -- I don't know
14   what the -- I don't know what it is right now.
15   UNIDENTIFIED ATTENDEE: He's an
16   investigative reporter. He's --
17   THE WITNESS: He's what?
18   UNIDENTIFIED ATTENDEE: He's an
19   investigative --
20   A. He's an investigative reporter with --
21   THE WITNESS: Who's he with now?
22   UNIDENTIFIED ATTENDEE: WRTV ABC.
23   A. WR --
24   MR. HAAZ: Kristen, I'm going to object to
25   any assistance with his testimony.

---

**2025-05-23**     **Counceller, David**     Page 17

1 MS. DENNISON: Yeah.
2 MR. HAAZ: Mr. Counceller, I understand you
3 haven't done this before, but the rules don't allow for
4 you to consult with others or have side conversations so
5 --
6 THE WITNESS: Okay.
7 MR. HAAZ: You're just going to have to
8 testify to the best of your recollection.
9 MS. DENNISON: Yeah, and it's okay. If you
10 don't -- and I'm not sure --
11 BY MS. DENNISON:
12 Q. I think I forgot this instruction, Mr.
13 Counceller, so that's on me. But if you don't know the
14 answer to a question, please just tell me that -- that
15 you don't know, and that's fine, okay?
16 A. Okay.
17 Q. Thank you so much. All right. So -- so Rafael
18 Sanchez told you that he knew of a thousand instances of
19 similar issues; is that what you testified to?
20 MR. HAAZ: Objection.
21 A. That's what he told me, you know, back then, and
22 I don't think he contacted with everyone that -- that --
23 but he did get ahold of some that have had dis --
24 accidental discharges.
25 BY MS. DENNISON:

---

**2025-05-23**     **Counceller, David**     Page 18

1 Q. And when he told you that he was aware of a
2 thousand instances of similar issues, what -- did you
3 have an understanding as to what he meant by "similar
4 issues"?
5 MR. HAAZ: Object to form.
6 BY MS. DENNISON:
7 Q. You can answer.
8 A. I can answer?
9 Q. Yes, you may answer.
10 A. Just that -- I'm not too sure -- I'm not too
11 sure. I know he interviewed a few people that's had
12 similar situations like mine, but I don't know who they
13 were, all this type of thing or anything else. He just
14 did an investigation, and I don't know where he come up
15 with a thousand either.
16 Q. Do you have any information as to whether those
17 thousand instances involved Glock pistols or a variety
18 of pistols or something else?
19 MR. HAAZ: Object to form.
20 BY MS. DENNISON:
21 Q. You can answer.
22 A. Several were Glocks, and then I think he told me
23 one was a Sig.
24 Q. Okay.
25 A. But I don't know the circumstances of it.

---

**2025-05-23**     **Counceller, David**     Page 19

1 Q. Okay. And you can ignore both of us if we say
2 objection to form, you can just ignore us and answer the
3 question. I'm sure I might do the same when Mr. Haaz
4 asks you some questions. Again, that's just to --
5 that's just for us to deal with later, but you don't
6 have to worry about it, okay?
7 A. Okay.
8 Q. Thanks. All right, so -- all right, so I'm going
9 to go ahead and I'm going to show you what I believe is
10 the Channel 6 news report. So I'm going to go ahead and
11 -- well, let me ask you first: Did you see the Channel
12 6 news report about your incident?
13 A. Yes.
14 Q. Okay. I'm going to go ahead and play the video.
15 MS. DENNISON: I'm going to play the whole
16 video, Sam, and I understand that there will be some
17 hearsay played in here that you will have an objection
18 to. You can note that now, or you can note it later,
19 okay?
20 MR. HAAZ: Yeah, to the extent that the
21 video will be played or any portion of this video will
22 be played at trial, I mean we'd object to the entire
23 video coming in.
24 MS. DENNISON: Understood. So for now, I'm
25 just going to play the Channel 6 news video because I'll

---

**2025-05-23**     **Counceller, David**     Page 20

1 have some questions for you on that, but I want to
2 confirm that this is what you saw; okay, Mr. Counceller?
3 THE WITNESS: Sure.
4 (Whereupon, a video is being played.)
5 MR. HAAZ: Kristen? Kristen.
6 (Whereupon, a video is being played.)
7 VIDEOGRAPHER: Excuse me?
8 MR. HAAZ: Kristen?
9 MS. DENNISON: Yes.
10 MR. HAAZ: I can't see the video. Can
11 anyone else not see it?
12 MS. DENNISON: Oh, my God.
13 VIDEOGRAPHER: No.
14 MS. DENNISON: I forgot to share it. How
15 about I share it.
16 Thank you, Sam. Thank you for interrupting
17 before I went any further with that.
18 Let me share the video. I got ahead of
19 myself, and we'll start over. I'm going to start from
20 the beginning. My apologies. Can you all see it now?
21 THE WITNESS: Yes.
22 (Whereupon, a video is being played.)
23 MS. DENNISON: Okay.
24 BY MS. DENNISON:
25 Q. Mr. Counceller, is that the ABC News report that

---

| | |
|---|---|
| 2025-05-23     **Counceller, David**     Page 21 | 2025-05-23     **Counceller, David**     Page 22 |

**Page 21**

1    you recall previously seeing?
2    A.  Yes.
3    Q.  Okay.  And that was reported by Rafael Sanchez,
4    that's what you were referencing a little bit ago; is
5    that correct?
6    A.  Yes.
7    Q.  Okay.  There were some other individuals
8    mentioned in that news report.  Did you ever speak with
9    any of the other individuals that reported having a
10    discharge with a drawstring from their jacket?
11    A.  No.
12    Q.  Okay.  Have you ever spoken with anybody else who
13    experienced an accidental discharge that you believed
14    was similar to yours?
15    A.  No.
16    MR. HAAZ:  Object to form.
17    BY MS. DENNISON:
18    Q.  Okay.  Have you ever seen any other accidental
19    discharges besides yours?
20    A.  On a video one time, something similar happened
21    on a range with an individual, but I don't remember
22    anything about where it happened or who it was or
23    anything else.
24    Q.  There was a reference within the news report to
25    another accidental discharge from 1999.  Had you had

**Page 22**

1    another accidental discharge in 1999?
2    A.  I did, yes.
3    Q.  What weapon was involved with that accidental
4    discharge in 1999?
5    A.  It was a 380 called a Grendel.  It's a -- it's --
6    it's another -- well, that was totally my fault.  The
7    gun was defective, the retaining pin that would hold up
8    the receiver to the lower part of the receiver kept --
9    every time you'd shoot it, it would work its way out.
10    And so my son had it for a while, and he told me it was
11    defective and what it was doing, and so I said okay.  So
12    I put it in a box, and he was -- I was gonna take it, at
13    the time, to a local gunsmith and have him look at it.
14    Well, it's -- the characteristics of that gun was that
15    you have to open it up, and you didn't have a magazine
16    that went up through the bottom of the handle.  You
17    opened it up, and then you fed it down into the handle.
18    And when you let it go, it automatically would put one
19    up -- put a round into the barrel, up to what we call
20    the pipe.  Well, when my son gave it to me, it was in
21    two pieces with the pin.  And -- and like I said, I was
22    doing some laundry one night, and I come across that
23    box, and I looked at that gun.  I said, yeah, I need to
24    take it up to the local gunsmith and get it fixed.  So I
25    see that the handle was separated from the upper

| | |
|---|---|
| 2025-05-23     **Counceller, David**     Page 23 | 2025-05-23     **Counceller, David**     Page 24 |

**Page 23**

1    receiver and -- the slide -- and I put all -- I unloaded
2    it where the handle is.  Because, like I said, you fed
3    it down at the -- in the bottom, you didn't have a
4    magazine.  So I flipped all them rounds out of it.  I
5    went to put it back together and when I did, I -- if I
6    can put my hand up here, I had it here like this, and I
7    went to pull it together to put this pin in to hold it
8    -- to hold it together to show the gunsmiths how -- what
9    -- what the malfunction was on it.  And in my
10    carelessness of not thinking -- and, like I said, if you
11    lo -- load it and you let it go forward, it
12    automatically -- one goes up into the barrel.  I didn't
13    drop that barrel out and see if there was a round up in
14    that barrel.  And when I shoved it together like this,
15    it -- it went back and hit the firing pin, and
16    discharged in my hand.  And I don't know if you can see
17    it or not, but it -- it's right here, it's -- that's an
18    exit wound, and that was -- or, excuse me, that was the
19    entrance wound, this is the ex -- ex -- exit wound.
20    And -- and, yeah, that was -- and I knew right after it
21    happened, I -- that was carelessness on my part.  I
22    should have -- I should have dropped that barrel down
23    because that was the -- that's the way the gun was
24    designed, and it's nobody's fault but my own.
25    Q.  Okay.  And in the video, did you see a

**Page 24**

1    depiction -- in the ABC video that we just played, did
2    you see a depiction of your accidental discharge from
3    2014 with the Glock?
4    MR. HAAZ:  Object to form.
5    A.  Yes.  Yes.  You're asking me about -- about the
6    video?
7    BY MS. DENNISON:
8    Q.  Yes.
9    A.  Yeah.
10    Q.  And if I share my screen right now, I have the
11    video freeze framed here.  Is this you on the -- on the
12    right side of the counter with the hat on?
13    A.  Yup, that's me.
14    Q.  And this was the gun shop that you were in at the
15    time?
16    A.  Yes.
17    Q.  Okay.  And I'm going to go a little bit further
18    with it to where the discharge was, and I'm going to
19    just put it on without sound.  So I'm going to share it
20    -- my screen again.  And on the screen, is this the --
21    is this the gun shop that you were in, Wolf's Gun Shop?
22    A.  Yes.
23    (Whereupon, a video is being played.)
24    Q.  Okay.  This video that's playing right now, do
25    you know the video that just played moving up into the

1    gun shop, was that video that you had taken or that
2    somebody else had taken?
3    A.   That was what Ra -- the cameraman from Rafael
4    Sanchez.  His cameraman, I think, shot that.
5    Q.   Okay.
6    Q.   If you could notice, I'm in -- I'm in uniform
7    there.
8    Q.   Okay.  And this -- this portion of video where
9    you're walking into the gun shop, was that a video taken
10   on the day of the incident or at some other time?
11   A.   No, that was after the fact.
12   Q.   Okay.
13   A.   When he was doing the story.
14   Q.   So I'm going to keep playing right now.
15   (Whereupon, a video is being played.)
16   Q.   Now, I've just stopped this video at 34 seconds.
17   Is this video of you on the day of the accident?
18   A.   Yes.
19   Q.   Do you know where this video was taken from?
20   A.   That -- that was a security camera that Mr. Wolf,
21   the owner of the gun shop, had.
22   Q.   Okay.  I'm going to go ahead --
23   (Whereupon, a video is being played.)
24   Q.   Right here, is he -- are you -- let me strike
25   that.  Right here, what we see on the camera, is there a

1    firearm that's being exchanged between the two of you?
2    A.   Yes, he was showing me this other gun that I
3    asked to look at.
4    Q.   Okay.  I'm going to keep playing it.
5    (Whereupon, a video is being played.)
6    Q.   So is this you looking at that other gun?
7    A.   Yes.
8    Q.   All right.  And now we have gone to another video
9    that is not the video of your incident for a little bit.
10   I'm going to stop it again and start playing it at
11   47 seconds.
12   (Whereupon, a video is being played.)
13   Q.   Is that you again in this video?
14   A.   Yes.
15   Q.   And are you looking at that weapon from the store
16   that you wanted to take a look at?
17   A.   Yes.
18   Q.   Okay.  I'm going to hit play.
19   (Whereupon, a video is being played.)
20   Q.   Now, I just stopped it at 51 seconds.  Do you
21   know what you were doing right there?
22   A.   Yes.
23   Q.   What were you doing?
24   A.   I'm pulling out my weapon to compare it with the
25   other one.

1    Q.   Okay.  And then right now, are you putting that
2    back into your holster?
3    A.   Yes.
4    Q.   And that was the holster that you showed us a
5    moment ago?
6    A.   Yes.
7    Q.   That was an outside the waistband holster?
8    A.   Yes.
9    Q.   Okay.  So you had it clipped on your right hip?
10   A.   Yes.
11   (Whereupon, a video is being played.)
12   Q.   And then what are you doing right there?
13   A.   I'm -- I got my jacket, and I'm pulling it upward
14   to put it -- to conceal it.
15   (Whereupon, a video is being played.)
16   Q.   Okay.  And what just happened right there?  I've
17   stopped it at 1 minute and 3 seconds into the video.
18   What just happened?
19   A.   I felt like when -- when I -- when I put it in my
20   holster, it didn't go in real smoothly, like I had some
21   kind of resistance.
22   Q.   Okay.  And then what happened?
23   A.   Well, then after I -- I felt like it was in
24   there, then I went to pull up on my jacket and -- to
25   conceal it, and it -- and then it discharged as my hand

1    was there pulling up on the jacket.
2    Q.   Okay.  Now, there were portions of this video in
3    which there were statements made by you.  Do you recall
4    seeing that?
5    A.   Pardon?
6    Q.   Well, before I get to that, let me ask you, the
7    portions of the video that I just showed you depicting
8    your discharge incident, are those true and accurate
9    representations of what happened when your Glock 23
10   discharged when you were putting it into your holster in
11   January of 2014?
12   MR. HAAZ:  Object to form.
13   BY MS. DENNISON:
14   Q.   You can answer.
15   A.   Yes.
16   Q.   Okay.  I'm going to stop sharing for a moment.
17   Now, you gave an interview as well; is that
18   correct?
19   A.   (No response.)
20   Q.   To Rafael Sanchez?
21   A.   Yes.
22   Q.   Why did you give an interview to Rafael Sanchez
23   of this incident?
24   A.   I -- I had a concern like the other officer in
25   that one video.  Of course I didn't see that video until

1    later but -- until this -- this program came out, but I
2    had a concern about if someone gets a -- something stuck
3    in their trigger guard, whether it be a drawstring or
4    keys or whatever people might carry and if something can
5    worm their way into a trigger guard and maybe -- they
6    might be in Walmart or someplace bending over to pick up
7    a can of oil off the bottom shelf or something and they
8    move or something.  And then if something like that
9    happened, if something was in there and it discharged
10   and the barrel was pointing backwards or something when
11   -- when you're bent over or something like that, just an
12   awareness thing to let people know that certain guns,
13   the way they're designed and everything, they can be
14   dangerous.  And -- and Glocks -- and I -- and I -- I
15   like Glock, they're good shooters and everything else,
16   but there's something you need to know about them, and
17   they're -- they're -- they're (sic) got a dangerous
18   trigger guard there -- excuse me, a trigger that -- that
19   that activation switch, slash, safety is there, and if
20   it gets pushed down somehow with not your finger but
21   with anything else and it gets flush, then you could
22   accidently have it discharge, and it was my concern for
23   the public.
24   Q.  So in your instance as you were holstering that
25   gun and an object other than your finger got into that

1    trigger guard area, that blade or tab trigger on the
2    Glock did not prevent your gun from discharging; is that
3    correct?
4    A.  Yes.
5    MR. HAAZ:  Object to form.
6    BY MS. DENNISON:
7    Q.  I've got to ask that again because you said "yes"
8    over his "object to form."  So I'm just going to ask you
9    one more time, if you could just pause and let Mr. Haaz
10   do his object to form, and then do your answer.
11   MR. HAAZ:  I'll tell you what.  I'll just
12   note my objection now, and you can ask him.
13   MS. DENNISON:  Thanks, Sam.
14   BY MS. DENNISON:
15   Q.  Okay.  So during this discharge incident that we
16   just saw, that tabbed trigger on the Glock pistol did
17   not prevent a foreign object from discharging your
18   pistol when your finger wasn't on the trigger; is that
19   correct?
20   A.  Yes.
21   Q.  Now, you were chief of police at the time of this
22   incident.  How long had you been in law enforcement?
23   A.  I come on in June of 1980.
24   Q.  So in 2014, you were -- in January of 2014, you
25   were approaching 34 years of service with law

1    enforcement?
2    A.  Yes.
3    Q.  Were you with Connersville Police Department that
4    entire 34 years?
5    A.  Yes.  I spent four years in the military police
6    back in the 70s.
7    Q.  Four years?
8    A.  Yes.
9    Q.  What branch?
10   A.  United States Army.
11   Q.  Thank you for your service.
12   What had you carried in your four years in
13   military police?
14   A.  A 1911 .45, and they were -- they were purc --
15   they were Colts and Ithacas and Remingtons.  The
16   government -- all the 1911s were all -- all the same
17   everything except they had several manufacturers that
18   made them, but they were all interchangeable in parts.
19   MS. DENNISON: All right.  Those are all the
20   questions I have for you, sir.  Mr. Haaz will have some
21   questions for you as well, so I'll turn it over to him.
22   EXAMINATION
23   BY MR. HAAZ:
24   Q.  Mr. Counceller, could you hold up that holster
25   again so I could see the -- the indent on the leather?

1    A.  (Complying.)
2    Q.  Thanks very much.  And so there are three
3    numbers.  It looks to me like, and you'll correct me if
4    I'm wrong, that that holster indicates it's designed for
5    three Glock models, there are three numbers after Glock,
6    right?
7    A.  Yes.
8    MS. DENNISON: Objection to form.
9    BY MR. HAAZ:
10   Q.  Okay.  And what are the numbers?
11   A.  Well, technically that is the same -- same frame
12   as -- as a lot of the Glocks are the same.  The calibers
13   wouldn't be --
14   Q.  Sir, I'm just asking what are the three numbers
15   that are written on the holster.
16   A.  Well, I'm having a little trouble looking at them
17   so just give me -- bear with me because I --
18   Q.  Take your time.
19   A.  I -- I can't make 'em out, sir.  I'm looking at
20   them with a magnifying glass -- what's -- what's -- I'm
21   somebody else has got better eyesight than I got.
22   Okay, 7 -- 77, 22 and a 31.  That must be the model
23   numbers.  I'm familiar with the 22.
24   Q.  Okay.  So just so I understand, it's -- that
25   holster says Glock, and then the numbers are 77 then

## Page 33

```
 1              --
 2    A.  It's correction to 17 --
 3    Q.  Okay, so --
 4    A.  -- 22 and 31.
 5    Q.  All right.  So --
 6    A.  The 17 is a 9 millimeter, but it's the same
 7         frame.  And also, just to clear it here, the 22 is -- is
 8         the longer version of the 23.  The 17 is a -- is --
 9         these are like for 9 millimeters and 40s.  So the 22 and
10         23 is -- the .40 caliber difference there, they're .40
11         cal.  Then the 9 millimeter is 17 and a 19.  And so
12         they're the same frame and all this.  There's -- also
13         another number is 31, and 31 I don't know -- it -- it's
14         the same frame, but it could be a different length of
15         the barrel or whatever.  I don't -- I'm not sure.
16    Q.  Sure, okay.  And so just so I understand, the
17         numbers that are stamped on the holster you were using
18         that day under the word "Glock" are 17, 22 and 31?
19    A.  Yes.
20    Q.  And on the date of the incident, you were not
21         carrying a Glock 17, a Glock 22 or a Glock 31?
22    A.  No.
23    Q.  How long has Connersville PD carried Glock
24         pistols for?
25    A.  They started carrying them, I think, about '99,
```

## Page 34

```
 1         1999.
 2    Q.  And you're still with Connersville Police
 3         Department?
 4    A.  No, sir.  I've been retired for 10 years.
 5    Q.  Congratulations.  So from '99 until about 2014,
 6         were you aware of any other unintended discharges with
 7         Glocks from trigger contact by a foreign object like
 8         yours?
 9    A.  No.
10    Q.  Prior to 1999, what did Connersville PD carry?
11    A.  Berettas, 92FS.
12    Q.  And am I correct that the Beretta 92 had a manual
13         safety?
14    MS. DENNISON:  Objection to form.  You can
15         answer.
16    BY MR. HAAZ:
17    Q.  Let me rephrase the question because there's an
18         objection.
19         What safeties did the Beretta 92 have, if any?
20    A.  They had like five different safety features.
21         They had a -- a lock that would -- would disconnect the
22         trigger totally, and then you could flip the -- flip the
23         back lever and it would -- it would go back into a fire
24         position.  You could carry it unloaded -- of course if
25         it's loaded, it could -- have it that way, or you can
```

## Page 35

```
 1         have the hammer down -- it's a double action, a total
 2         different feature.  And they say safety features, just
 3         like the 1911 in the Army back in the day, they talk
 4         about, you know, being -- being open, cocked open,
 5         that's a safety feature.  Down with nothing in it is a
 6         safety feature.  For instance -- hold on just a second.
 7         They're -- they're just a lot safer gun, and so was the
 8         .45.  They didn't have the little -- little dog ear or
 9         the little trigger in the trigger, so to speak.
10    Q.  And why is it your opinion that the Beretta was a
11         safer gun than the Glock?
12    A.  Because of the safety features it had.
13    Q.  Okay.  And did the Glock have fewer safety
14         futures than the Beretta?
15    A.  Yes.
16    Q.  And is that because the Glock did not have a
17         manual safety that would prevent the trigger from
18         pulling?
19    MS. DENNISON:  Objection to form.
20    A.  True, that -- that's -- that's -- yeah, it --
21         they're tot -- two different guns, totally, with the --
22         the whole thing is totally different.
23    BY MR. HAAZ:
24    Q.  All right.  And if you had had a pistol on the
25         date of the incident that had a manual safety and it was
```

## Page 36

```
 1         engaged, do you believe your unintended discharge would
 2         have happened?
 3    A.  No.
 4    MS. DENNISON:  Object to form.
 5    BY MR. HAAZ:
 6    Q.  Would it have been safer if your Glock pistol had
 7         an external manual safety?
 8    A.  Possibly.
 9    Q.  If it were engaged?
10    A.  Yes.
11    Q.  I want to talk briefly about the -- the incident
12         itself.  At the -- on the date of the incident, this was
13         January 18th of 2014, were you still working at
14         Connersville Police Department or were you retired?
15    A.  What -- could you give that date again?
16    Q.  Sure.  It looks like from the security camera,
17         the date of this incident was January 18th of 2014.
18    A.  Okay.
19    Q.  On that day, were you still employed with the
20         Connersville Police Department?
21    A.  Yes, I was the police chief.
22    Q.  And how long after that did you retire?
23    A.  I retired in the end of 2015.
24    Q.  Okay.  So were you on duty at the time of this
25         incident?
```

| | |
|---|---|
| 2025-05-23 **Counceller, David** Page 37 | 2025-05-23 **Counceller, David** Page 38 |

**Page 37**

1  A.  No.

2  Q.  All right.  Were you carrying your duty weapon?

3  A.  Yes.

4  Q.  And was the holster you were using that day your

5      duty holster or personal holster?

6  A.  Personal holster.

7  Q.  All right, so that wasn't issued by the

8      Connersville Police Department?

9  A.  No.

10 Q.  Where did you buy it?

11 A.  Honestly, I think I bought it at -- at a place

12     called Jenkins.  It's a -- in Indianapolis.  It's a

13     police supply store, and it was a used -- they used to

14     have a big table of used leather or camo pouches or

15     handcuff pouches.  Just whole -- a lot of -- a lot of

16     leather and some -- some plastic stuff that -- I think I

17     bought it up there at -- a one-time use.

18 Q.  All right.  So fair to say that the holster you

19     were using on the date of the incident was not purchased

20     from Glock or anything associated with a Glock store or

21     --

22 A.  No, no.

23     MS. DENNISON:  Objection to form.

24     BY MR. HAAZ:

25 Q.  And is it your understanding that the stamping on

**Page 38**

1      your leather holster relates to what are the approved

2      Glock models for that holster?

3      MS. DENNISON:  Objection to form.

4  A.  Yes.

5      BY MR. HAAZ:

6  Q.  Did you see anything on the holster that, in any

7      way, suggested that Glock had manufactured that holster?

8  A.  No, I doubt it.

9      MS. DENNISON:  Objection.  Sorry, we're sort

10     of speaking over each other, my apologies.  I'm going to

11     try to get my objections in faster.  If you could just

12     take like a quick breath before you begin your answer,

13     we can get a clean record, Mr. Counceller.  I don't want

14     to step over you.

15     BY MR. HAAZ:

16 Q.  You indicated that when -- and I can pull up part

17     of the video, and I'll share my screen so we can go

18     through it.

19     All right.  So I'm at about -- if I look at my

20     notes, I think the security camera video starts at about

21     51 seconds so I'm going to start there and play a little

22     bit.

23     (Whereupon, a video is being played.)

24 Q.  All right.  So at about 54 seconds, you've taken

25     out your Glock 23, and it's in your right hand; would

| |
|---|
| 2025-05-23 **Counceller, David** Page 39 |

**Page 39**

1      you agree?

2  A.  Yes.

3  Q.  All right.  And then about 56 seconds, you

4      re-holster your Glock 23, right?

5  A.  Yes.

6  Q.  And you previously testified that when you

7      re-holstered it, you felt resistance?

8  A.  Yes.

9  Q.  What do you mean?

10 A.  It just didn't -- I didn't know if I had my

11     jacket -- you know, that there was -- sliding down on

12     the side.  It just -- it wasn't -- just moving in there

13     real slow and so I just -- then it -- then it went, it

14     went in.  And so that's when I -- you know, after that,

15     I went to pull my jacket up and put it underneath my

16     jacket again, and that's when it discharged.

17 Q.  When you felt that resistance, it doesn't appear

18     on the video that you kind of did a check to see what

19     that resistance might be; is that -- is that correct?

20 A.  Well, I thought I did.  You might have to run it