# KrisJacob

## Trial Designations

**Jacob, Kris**  2025-04-23

| Defense Designations | 00:16:11 |
| Plaintiff Designations | 00:12:32 |
| **TOTAL RUN TIME** | **00:28:43** |



ID: KrisJacob

1  IN THE UNITED STATES DISTRICT COURT
2
3  Civil action No: 1:23-cv-00327-JDL
4
5
6
7
8
9
10
11
12
13
14
15
16
17  for the State of Maine, via Zoom videoconference,
18  Time, pursuant to notice given.
19
20
21
22
23
24
25

1  APPEARANCES:
2  LITTLETON JOYCE UGHETTA & KELLY LLP
3  2460 N. Courtenay Pkwy, Suite 204
4  646-708-4844
5  Attorney for Defendant Sig Sauer, Inc.
6
7  BY: BRETT R. LELAND, ESQUIRE
8  Portland, ME 04101
9  bleland@verrill-law.com
10
11  SALTZ, MONGELUZZI & BENDESKY, P.C.
12  One Liberty Place, 52nd Fl
13  Philadelphia, PA 19103
14  shaaz@smbb.com
15
16
17
18
19
20
21
22
23
24
25

1  INDEX
2
3
4
5
6
7
8
9  Page
10  Exhibit 2  Glock Instruction Manual    45
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  (This deposition was taken before Debra J. Fusco,
2  Notary Public, via Zoom videoconference, on May 23,
3  2025, beginning at 8:30 a.m. Mountain Time)
4  VIDEOGRAPHER:  We are now on the record.
5  The time is 8:30 a.m. Mountain Time on May 23, 2025.
6  This begins the videoconference deposition of Kris Jacob
7  taken in the matter of David Alan Cole and Kimberly Cole
8  versus Sig Sauer, Incorporated.  The case number is
9  1:23-cv-00327-JDL, and is filed in the United States
10  District Court for the District of Maine.
11  My name is George Ellis, I'm your remote
12  videographer.  Our court reporter is Debra Fusco, and we
13  are representing Esquire Deposition Solutions.
14  Counsel, please state your name and who you
15  represent, after which the court reporter will swear in
16  the witness.
17  MS. DENNISON:  Kristen Dennison from
18  Littleton Joyce Ughetta & Kelly.  I represent Sig Sauer,
19  Inc.
20  MR. HAAZ:  Sam Haaz on behalf of David and
21  Kimberly Cole.
22  (The deponent was administered the oath by the Notary
23  Public.)
24  KRIS JACOB, after having been duly
25  sworn by the Notary Public, was

### Page 5

2025-04-23 — Jacob, Kris

1  deposed and testified as follows:
2  EXAMINATION
3  BY MS. DENNISON:
4  Q. Good morning, Mr. Jacob. My name is Kristen
5     Dennison. I represent Sig Sauer in an action that has
6     been brought against it by the Coles. I thank you for
7     appearing this morning. You are here pursuant to a
8     subpoena issued by my office; is that correct?
9  A. Yes.
10 Q. I'm going to give you a few ground rules. To
11    start, have you ever had your deposition taken before?
12 A. Yes.
13 Q. How many times?
14 A. Once to the best of my recollection.
15 Q. Okay. All of your responses to my questions must
16    be verbal because we do have a court reporter here
17    transcribing everything that's being said. In
18    particular, an audible yes or no as opposed to a nod or
19    shake of the head. If you forget, don't worry about it.
20    Between Sam and I, we'll remind you to give an audible
21    response, but we do need responses to be verbal. Also,
22    because we have a court reporter transcribing
23    everything, we have to speak -- only one person can
24    speak at a time. In the normal course of conversation,
25    you might anticipate where I'm going with one of my

### Page 6

2025-04-23 — Jacob, Kris

1  questions, and you might want to start your response
2  before I finish. But to allow an accurate and complete
3  transcription of the proceedings here today, I'd ask
4  that you allow me to completely finish my question
5  before you begin your response. And I will, in turn,
6  allow you to completely finish your response before I
7  begin my next question, okay?
8  A. Okay.
9  Q. We're going to try to be fairly quick here this
10    morning, but if you need a break at any point in time,
11    please let me know, I will be happy to accommodate you.
12    I'm going to ask you a series of questions. If
13    you don't hear or understand my question, please let me
14    know, and I will be happy to repeat it, okay?
15 A. Okay.
16 Q. If you answer my question, I'm going to assume
17    that you heard it, that you understood it, and that
18    you're answering truthfully and honestly to the best of
19    your recollection; is that fair?
20 A. It is.
21 Q. If you don't understand my question, as I said,
22    please -- please let me know. I'll -- I will also
23    rephrase my question if you don't understand it.
24    The oath that you've taken is the same as if you
25    were testifying in a court of law. So please just

### Page 7

2025-04-23 — Jacob, Kris

1  answer the questions as best as you can, and we'll get
2  through this as quickly as we can.
3  Are you taking any medications that would prevent
4  you from testifying truthfully and honestly today?
5  A. No.
6  Q. Did you review any materials to prepare for your
7     deposition here today?
8  A. Yes.
9  Q. What did you review?
10 A. I watched one YouTube video to figure out what
11    the case was all about, but that was it.
12 Q. Okay. And when you say you "watched one YouTube
13    video to figure out what the case was all about," do you
14    mean the Cole versus Sig Sauer case?
15 A. Yes.
16 Q. And what was that YouTube video that you watched?
17 A. It looked like the press conference early on in
18    the process.
19 Q. Okay. So a press conference, was that a press
20    conference where the Coles were speaking?
21 A. Yes.
22 Q. Did you review anything else to prepare for your
23    deposition here today?
24 A. Nothing other than the subpoena.
25 Q. Okay. Do you have any documents or materials

### Page 8

2025-04-23 — Jacob, Kris

1  pertaining to an accidental discharge that you had with
2  one of your weapons? I'm sorry, with a weapon?
3  A. I do. They will likely be somewhat difficult to
4     dig up, but it was some time ago.
5  Q. Sure. What materials do you have that relate to
6     the accidental discharge that you experienced?
7  A. Medical reports, a police report, a video of the
8     event itself that was captured on security cameras.
9  Q. And you said that you had a video that was
10    captured on security cameras. What security cameras
11    captured a video?
12 A. There -- it was in a retail training center in
13    Gardnerville, Nevada, and the ATF requirements require
14    you to have videotape in your retail space. So it was
15    an Amazon product of some kind, but I -- I can't
16    remember the name of the camera.
17 Q. Okay. Was that -- what was the name of that
18    retail space?
19 A. Bullseye Nevada.
20 Q. Did you own that space?
21 A. I did -- well, I rented it.
22 Q. Did you purchase the surveillance video or the
23    surveillance equipment that captured the video of your
24    incident?
25 A. The company did on my behalf, yes.

## Page 9

| | |
|---|---|
| 1 | Q. And the video that you have, is that something |
| 2 | that you downloaded from that surveillance video? |
| 3 | A. I didn't. I was in the hospital at the time. |
| 4 | One of my employees downloaded it. |
| 5 | Q. And have you seen that video? |
| 6 | A. I have. |
| 7 | Q. Does that video that you have seen accurately |
| 8 | depict the circumstances surrounding your accidental |
| 9 | discharge? |
| 10 | A. It does. |
| 11 | **Q. Stepping back a moment, can you state your full** |
| 12 | **name for the record, please?** |
| 13 | **A. Kris William Jacob.** |
| 14 | Q. Have you ever been known by any other names? |
| 15 | A. I have not. |
| 16 | Q. Where do you currently reside? |
| 17 | A. I'm living in Montana. |
| 18 | Q. How long have you been in Montana? |
| 19 | A. Almost five years. |
| 20 | Q. Prior to Montana, where did you reside? |
| 21 | A. Reno, Nevada. |
| 22 | Q. So the accidental discharge that you experienced, |
| 23 | what weapon discharged to cause that unintended |
| 24 | discharge? |
| 25 | MR. HAAZ: Object to form. You can answer. |

## Page 10

| | |
|---|---|
| 1 | A. Sorry, I missed that. What was that? |
| 2 | MR. HAAZ: Sorry. So Kristen and I may |
| 3 | object from time to time. |
| 4 | THE WITNESS: Oh. |
| 5 | MR. HAAZ: That's not going to stop you from |
| 6 | answering the question, and we're not, in any way, |
| 7 | suggesting that you shouldn't answer the question. |
| 8 | THE WITNESS: Okay. |
| 9 | MR. HAAZ: It's more of an objection as to |
| 10 | how the other lawyer asked the question. |
| 11 | THE WITNESS: Understood. |
| 12 | MR. HAAZ: And so we're just doing that to |
| 13 | preserve issues for a later date. And so apologies for |
| 14 | the interruption, just wanted to clarify that. |
| 15 | And so, Kristen, I'll just note my |
| 16 | objection, and you can ask the question again. |
| 17 | MS. DENNISON: Yeah, actually I'm going to |
| 18 | -- I'm just going to go to something else before I ask |
| 19 | that question. |
| 20 | BY MS. DENNISON: |
| 21 | **Q. So I am going to play a video for you, Mr. Jacob,** |
| 22 | **and I apologize for having to play this video for you.** |
| 23 | **I'm -- I'm sure this is not your favorite event, but I'm** |
| 24 | **going to play this, and I'm going to ask you to let me** |
| 25 | **know if this is a video captured by the surveillance** |

## Page 11

| | |
|---|---|
| 1 | **equipment that you had in that retail space in Nevada.** |
| 2 | (Whereupon, a video is being played.) |
| 3 | Q. Can you see the video? |
| 4 | A. I can. |
| 5 | **Q. Okay. Mr. Jacob, is the portion of that video** |
| 6 | **that I just played, is that video that was captured by** |
| 7 | **your surveillance equipment in -- at -- at Bullseye** |
| 8 | **Nevada?** |
| 9 | **A. Yes.** |
| 10 | **Q. Okay. We'll go back to that in just a moment.** |
| 11 | **Can you tell me what that video depicts?** |
| 12 | **A. It depicts me walking across the room from the** |
| 13 | **desk to retrieve something from the floor, leaning over** |
| 14 | **with, as you can see in the video, both hands in front** |
| 15 | **of me, and attempting to pick it up, and then having a** |
| 16 | **certainly unintended, certainly accidental discharge of** |
| 17 | **the firearm that was on my person.** |
| 18 | Q. Okay. Now, I'm going to go back through it, and |
| 19 | I'm going to just stop in a couple of locations, and I'm |
| 20 | just going to ask you some questions. So let me hit |
| 21 | play on this again. I'm sharing my screen. |
| 22 | (Whereupon, a video is being played.) |
| 23 | **Q. So I'm going to stop it right here. This** |
| 24 | **gentleman here on the left in the gray shirt and dark** |
| 25 | **pants; is that you?** |

## Page 12

| | |
|---|---|
| 1 | **A. It is.** |
| 2 | **Q. Okay. Do you have a firearm in your hands?** |
| 3 | **A. It's a little hard to tell, given the size of the** |
| 4 | **video, but it appears that I do, yes.** |
| 5 | **Q. Okay. Do you recall what type of firearm that** |
| 6 | **was?** |
| 7 | **A. It was a Glock 43 Subcompact.** |
| 8 | **Q. That Glock 43 Subcompact, did that have a trigger** |
| 9 | **that had a blade in the center or a tab?** |
| 10 | **A. Yes.** |
| 11 | Q. Now, it appears in this video, if I play it -- |
| 12 | (Whereupon, a video is being played.) |
| 13 | Q. -- that you were putting that pistol -- well, can |
| 14 | **you tell me -- strike that question. What are you doing** |
| 15 | **with the pistol there in that portion of the video that** |
| 16 | **I just played?** |
| 17 | **A. It was placed into a Kydex holster that was** |
| 18 | **attached to my belt.** |
| 19 | **Q. Was that an Inside The Waistband holster?** |
| 20 | **A. It was.** |
| 21 | **Q. Do you recall what the make and model of that** |
| 22 | **holster was?** |
| 23 | **A. It was a Haley Strategic Incog holster.** |
| 24 | **Q. Do you still have that holster?** |
| 25 | **A. I don't believe that I do.** |

### Page 13

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | | (Whereupon, a video is being played.) |
| 3 | Q. | So at this portion of the video, you put the |
| 4 | | Glock 43 Subcompact pistol with the tab trigger into an |
| 5 | | Inside The Waistband Haley Strategic Incog holster; is |
| 6 | | that correct? |
| 7 | A. | Correct. |
| 8 | | (Whereupon, a video is being played.) |
| 9 | Q. | Now, here you take your hands off the gun. Was |
| 10 | | that Glock pistol fully seated in that holster at this |
| 11 | | moment in time? |
| 12 | | MR. HAAZ: Object to form. You can answer. |
| 13 | A. | It was. |
| 14 | | BY MS. DENNISON: |
| 15 | Q. | And how do you know that? |
| 16 | A. | Typically Kydex holster (sic) -- Kydex holsters |
| 17 | | have a tension portion to them, and that tension portion |
| 18 | | engaged when the holster went into -- or when the |
| 19 | | firearm went into the holster. |
| 20 | Q. | And how did you know that that engaged when the |
| 21 | | firearm went into the holster? |
| 22 | A. | It clicks. |
| 23 | Q. | Okay. And so was that an audible click that you |
| 24 | | heard? |
| 25 | | MR. HAAZ: Object to form. |

### Page 14

| | | |
|---|---|---|
| 1 | A. | You feel it and you hear it. It depends on how |
| 2 | | tight the -- the tension is. |
| 3 | | BY MS. DENNISON: |
| 4 | Q. | Okay. And do you have a recollection, as you sit |
| 5 | | here today, that you heard and/or felt a click when you |
| 6 | | put the Glock 43 pistol into that Kydex holster? |
| 7 | | MR. HAAZ: Object to form. |
| 8 | A. | I do. |
| 9 | | BY MS. DENNISON: |
| 10 | Q. | So I'm going to continue to play the video for |
| 11 | | another moment. |
| 12 | | (Whereupon, a video is being played.) |
| 13 | Q. | And what are you doing right here where I've |
| 14 | | stopped the video? |
| 15 | A. | So I'm leaning over to pick up a -- what's |
| 16 | | referred to in the industry as a snap cap which is an |
| 17 | | inert round that was used in the demonstration. |
| 18 | Q. | Okay. |
| 19 | | (Whereupon, a video is being played.) |
| 20 | Q. | And what -- I just stopped the video again. What |
| 21 | | just happened here? |
| 22 | A. | The firearm discharged in the holster inside my |
| 23 | | pants. |
| 24 | Q. | Were your hands on the pistol? |
| 25 | A. | No. |

### Page 15

| | | |
|---|---|---|
| 1 | | MR. HAAZ: Object to form. |
| 2 | | BY MS. DENNISON: |
| 3 | Q. | Let me ask that again. |
| 4 | | MS. DENNISON: And could you just pause so |
| 5 | | that you can get the object to form? I want a -- I want |
| 6 | | a clean answer so I can't have you both speaking over |
| 7 | | each other. |
| 8 | | BY MS. DENNISON: |
| 9 | Q. | So, Mr. Jacob, at the time that that firearm |
| 10 | | discharged, at the time that that Glock 43 pistol with |
| 11 | | the tab trigger discharged, were your hands on or near |
| 12 | | that pistol? |
| 13 | | MR. HAAZ: Object to form. Can you answer. |
| 14 | A. | They were not. |
| 15 | | (Whereupon, a video is being played.) |
| 16 | | BY MS. DENNISON: |
| 17 | Q. | Okay. And I'm going to stop it right there. Did |
| 18 | | a -- and I'll stop sharing the screen. |
| 19 | | Did a bullet discharge from that Glock 43 pistol |
| 20 | | and strike you? |
| 21 | A. | It did. |
| 22 | Q. | Were you injured from that event? |
| 23 | A. | I was. |
| 24 | Q. | Sir, did you ever find out what happened to cause |
| 25 | | that Glock 43 pistol to discharge? |

### Page 16

| | | |
|---|---|---|
| 1 | A. | Not definitively. It was sent to the lab to be |
| 2 | | tested at the request of my attorney, but to the best of |
| 3 | | my knowledge, I never received a full report of what the |
| 4 | | technical details were surrounding the problem. |
| 5 | Q. | Were you ever told that the pistol discharged |
| 6 | | because the trigger was actuated? |
| 7 | | MR. HAAZ: Object to form. |
| 8 | A. | I -- I'm sure that that was speculated about |
| 9 | | quite a bit, but I don't know that anybody in a |
| 10 | | technical capacity ever shared that detail with me. |
| 11 | | BY MS. DENNISON: |
| 12 | Q. | Okay. As we sit here today, do you have any idea |
| 13 | | why your pistol discharged? |
| 14 | A. | I have several theories but I'm -- while being |
| 15 | | somebody who was employed in the industry for many years |
| 16 | | and had a tremendous amount of experience and was, in |
| 17 | | fact, a Glock armorer, but it would be -- you know, I -- |
| 18 | | I don't consider myself a technical ex -- expert on the |
| 19 | | architecture or mechanics of firearms, despite all my |
| 20 | | experience, so it would probably be imprudent for me to |
| 21 | | speculate about what actually happened. |
| 22 | Q. | Were you ever told that part of your undershirt |
| 23 | | got into the holster and the trigger area and actuated |
| 24 | | your trigger? |
| 25 | | MR. HAAZ: Object to form. |

| 2025-04-23 | Jacob, Kris | Page 17 |
|---|---|---|

1   A.   That was a part of the grand speculation that
2        occurred post the event, but having watched the video on
3        multiple occasions, you can ob -- very obviously see the
4        T-shirt being bloused in front of the holster which is
5        common in concealed carry techniques so I don't believe
6        that's possible.
7        BY MS. DENNISON:
8   Q.   What were you wearing that day?
9   A.   I had a gray T-shirt and a pair of motorcycle
10       pants on.
11  Q.   Were you wearing anything under the gray T-shirt?
12  A.   I don't recall. It's possible I had an
13       undershirt on.
14  Q.   Okay. Did you ever see any damage to the
15       clothing that you were wearing after this discharge?
16  A.   I did. The -- all of the clothing was, I think,
17       bagged up. The only apparent damage that I saw was the
18       bullet hole in the back of the motorcycle pants.
19  Q.   Okay. Did you ever see any damage to the shirt
20       that you were wearing?
21  A.   I did not.
22  Q.   Okay. And as we sit here today, you don't recall
23       one way or the other whether you were wearing an
24       undershirt?
25  A.   It's probable that I was, but I don't recall the

| 2025-04-23 | Jacob, Kris | Page 18 |
|---|---|---|

1        specifics of it, given the time frame when it happened.
2   Q.   Okay. And when did this discharge happen?
3   A.   Oh, gosh. June of 2018, I believe.
4   Q.   All right. You indicated that you were a Glock
5        armorer; is that correct?
6   A.   Yes.
7   Q.   And when did you become a Glock armorer?
8   A.   I can look up the records, but my recollection is
9        2010, probably.
10  Q.   Okay. Can you just tell us a little bit about
11       your firearm experience, just broad strokes?
12  A.   Sure. So I worked in the technology industry for
13       many years, and then invested in and ultimately ended up
14       taking over a training and retail business in firearms.
15       We had three locations, two in Northern California and
16       one in Nevada. We ended up consolidating all three of
17       those into the training center in Nevada. I had spent
18       15 years or so training with various instructors and
19       becoming certified as an instructor myself, and believed
20       very strongly that we had a hardware and software
21       problem in the firearms industry. We had a lot of
22       hardware and not enough software, and people's skill
23       sets with their tools were not up to the standard that
24       they should be if they were intending to use them for
25       the things that they were saying they were intending to

| 2025-04-23 | Jacob, Kris | Page 19 |
|---|---|---|

1        use them. So I spent a decade, while I was working in
2        the tech industry, and a decade working in the firearms
3        industry learning everything I possibly could from every
4        instructor and technical expert I could possibly find.
5   Q.   What do you mean that you saw hardware and
6        software issues in the industry?
7   A.   As a general -- as a generality, my feeling was
8        if you are going to carry a firearm for personal
9        defense, you should have a wide and deep skill set in
10       how to use it properly and safely. That was -- that was
11       the core of our business. We also trained federal,
12       state and local law enforcement, military transition
13       folks who were going from military service out to a
14       federal agency to do various security roles, and we --
15       we sold the firearms and accessories that went with that
16       training business as well.
17  Q.   For how long, what period of time did you have
18       Bullseye Nevada Training Center?
19  A.   We opened, I believe, in 2010. The -- the
20       California acquisition happened earlier than that,
21       probably 2009. So the Nevada location got opened after
22       the -- the California locations which were already
23       there.
24  Q.   For how long did you have Bullseye Nevada
25       Training Center?

| 2025-04-23 | Jacob, Kris | Page 20 |
|---|---|---|

1   A.   A decade.
2   Q.   Did you have that through 2020?
3   A.   No. So I take that back. It would have been
4        from 2010 'til 2018.
5   Q.   Okay.
6   A.   I don't have the exact dates in front of me but
7        --
8   Q.   That's fine. I don't need the exact dates.
9        Did you provide training? Were you a firearms
10       instructor?
11  A.   I was.
12  Q.   For how long were you a firearms instructor?
13  A.   Virtually the entire time I was there. We
14       employed a number of instructors, both local folks,
15       experts from the Marine Mountain Warfare Center in
16       Pickel Meadows, California, as well as law enforcement
17       experts. We also brought in instructors from the
18       outside. So if we thought somebody was a -- an
19       excellent low light instructor, we would go find whoever
20       that person was who wrote all the books on low light
21       encounters and had done all the research, and we would
22       bring those folks in to train our instructors.
23  Q.   Okay. Did you ever provide any instruction on
24       holsters or proper holster usage to the individuals who
25       came in through your facility?

**Page 21**

1  A. Iron --
2     MR. HAAZ: Object to form.
3  A. Ironically, I did.
4     BY MS. DENNISON:
5  Q. And what was the instruction that you provided?
6  A. Well, the first instruction is have a proper
7     holster that is stable and secure because many people
8     who choose to carry concealed firearms also make other
9     choices collateral to that, one of which is how they
10    carry it. So if -- and we also -- I was certified as a
11    Nevada CCW instructor statewide so we taught the CCW
12    course. And oftentimes folks who came into that class
13    would either not have a holster at all, or not know how
14    to choose the proper holster, where to carry it and how
15    to use it, so we did spend a fair amount of time on that
16    topic.
17 Q. Okay. Can you give a broad overview of what you
18    would instruct on how to select a proper holster for
19    somebody's weapon?
20 A. Sure. Well, it has to securely hold the firearm.
21    Oftentimes armed encounters or physical encounters of
22    any kind occur with some dynamic movement. Therefore,
23    the holster has to securely hold the firearm. The
24    holster should also cover the trigger and the trigger
25    guard so that nothing can get into it from the outside.

**Page 22**

1     This comes up with folks who want to carry in purses and
2     briefcases and things like that, and we often point it
3     out to them that lipstick and pencils and pens look a
4     whole lot like a finger to a trigger. So the -- any
5     holster that's chosen for any carry position or any
6     modality is -- has to cover the trigger and the trigger
7     guard.
8  Q. Have you seen other accidental discharges or
9     unintended discharges with weapons during the course of
10    your career?
11 A. I hadn't been directly exposed to them. I've --
12    I had heard of them. Subsequent to my event, I did talk
13    to at least one person who had a similar discharge. He
14    was a federal agent who was exiting a vehicle and the
15    firearm got caught on the bolster of his vehicle as he
16    was starting a chase, and it discharged.
17 Q. Who was that, that you spoke with?
18 A. I honestly don't recall his name. He was
19    referred to me by a friend of mine who is in the private
20    investigation business. And given the terms of his
21    discussions with the third parties that he got into
22    discussions with, he -- he was fairly reticent to talk
23    to me. I'm aware of the -- I'm aware of the event, in
24    other words, but I'm not read up on the details of it.
25 Q. Do you know around when that incident occurred?

**Page 23**

1  A. It was prior to the -- to mine.
2  Q. Do you know what weapon he was carrying?
3  A. If memory serves, it was a Glock 17.
4  Q. Do you know if it was holstered at the time of
5     that discharge?
6  A. My understanding is that it was.
7  Q. Do you know what type of holster he was using
8     with the Glock 17?
9  A. I do not. I will, as a generality, say that
10    having worked in law enforcement and with a lot of
11    federal agencies, the high likelihood it was -- is that
12    it was made by Safariland.
13 Q. Why do you say that?
14 A. Because almost every holster that's issued to law
15    enforcement and federal law enforcement is made by
16    Safariland.
17 Q. And you said -- I believe you said this
18    individual was in his vehicle; is that what you said?
19 A. That's my understanding, yes.
20 Q. And you said that the -- your understanding was
21    the firearm -- firearm made contact with something as he
22    was getting out of the vehicle; is that what you said?
23    MR. HAAZ: Object to form.
24 A. That's my understanding. As I said, it was a
25    fairly brief, cautious conversation between the two of

**Page 24**

1     us via a referral from a friend of mine. I was just
2     trying to figure out what was going on, and if it had
3     ever happened before.
4     BY MS. DENNISON:
5  Q. And by, "if it had ever happened before," do you
6     mean discharge of a Glock in a holster?
7     MR. HAAZ: Object to form.
8  A. I do, or any -- any firearm in a holster -- our
9     -- our industry as a whole, I think, takes the position
10    that a firearm in the holster with a chamber in the
11    round is safe, and that was what we taught. We taught
12    it in the Nevada CCW course, we taught it in all of our
13    advanced courses, and our understanding, as a group of
14    instructors in the firearms industry, was that holstered
15    firearms do not discharge.
16    BY MS. DENNISON:
17 Q. After your incident, has your view changed on
18    whether holstered firearms with a round in the chamber
19    are safe?
20    MR. HAAZ: Object to form.
21 A. It has, and I left the business not too long
22    after that, after being unable to work for six to
23    eight months while I was recovering, and subsequently
24    sold the business. But if I had the opportunity to
25    teach a firearms class today -- and certainly during my

1  time as a sworn part of the Sanders County Sheriff's
2  Office, I explained to people, because of my experience,
3  that even if firearms are in holsters, they are
4  mechanical devices, and they should not be placed in a
5  position where they are covering some part of the human
6  body. So not such a big problem in duty gear, but for
7  off-duty carry, my instruction to my team, which was a
8  third of the sheriff's office, and my advice to the rest
9  of the team who didn't report to me was, if you're gonna
10  carry concealed, don't carry where that firearm is
11  covering a part of your anatomy, if it's loaded.
12  BY MS. DENNISON:
13  Q. And by not covering a part of your anatomy, do
14  you mean that the muzzle is not pointed towards a part
15  of your body?
16  A. That's correct.
17  Q. What is the name of the PI that referred you to
18  this other individual?
19  A. I will look that up. Hang on one second. His
20  name is Matt Ramsey.
21  Q. And where is he located?
22  A. He's in Northern California, San Rafael.
23  Q. Does he have a business?
24  (Whereupon, the court reporter asked for
25  clarification.)

1  A. San Rafael, California.
2  Q. Does he have a business?
3  A. He does.
4  Q. What is his business name?
5  A. It's changed over time. I don't think he's doing
6  PI work anymore. He's running a bail bonds business at
7  the moment. I haven't been in contact with him in a
8  while so I couldn't say what the current name of the
9  business is.
10  Q. Okay. What is the name of the business that he
11  had at the time that you contacted him?
12  A. I don't have a record of that. I just -- I have
13  him in my contacts as a personal friend, not as a
14  business associate, so I don't have records of his
15  business name.
16  Q. Okay. All right. Are you aware of any other
17  discharge incidents of a firearm in a holster?
18  A. I'm not. As you might imagine, post this event
19  and its physical and psychological outcome, I lost
20  interest in researching firearm discharges.
21  Q. Okay.
22  MS. DENNISON: Mr. Jacob, those are all of
23  the questions that I have. I'm sorry to make you go
24  through this again, and I do apologize for what you have
25  gone through.

1  Mr. Haaz will likely have some questions for
2  you now.
3  THE WITNESS: Okay.
4  VIDEOGRAPHER: Mr. Haaz, we cannot hear you.
5  Let me take us off the record for a moment.
6  Going off the record, the time is 9:06.
7  (OFF RECORD)
8  VIDEOGRAPHER: Back on the record, the time
9  is 9:11.
10  EXAMINATION
11  BY MR. HAAZ:
12  Q. Mr. Jacob, my name is Sam Haaz. I represent
13  David and Kimberly Cole, and thank you for taking the
14  time to be with us today. We're at this deposition
15  because Sig Sauer issued you a subpoena; is that right?
16  A. That's correct.
17  Q. And when did you first receive that subpoena?
18  A. Several days ago. It was -- I can tell you
19  exactly. It was the 20th, Tuesday.
20  Q. May 20th was when you received that subpoena?
21  A. That's correct.
22  Q. And has there been any communications with Ms.
23  Dennison or her law firm with you prior to today's
24  deposition?
25  A. Yes. I called Ms. Dennison to confirm

1  everything. I had no idea what the case or the subpoena
2  was about, but thought it prudent to find out prior to
3  the discussion.
4  Q. Okay. And when was that?
5  A. To the best of my recollection, Wednesday the
6  21st.
7  Q. So two days ago?
8  A. Yes.
9  Q. Okay. And how did you have Ms. Dennison's
10  number?
11  A. It's on the paperwork.
12  Q. Okay. And how long of a call was it?
13  A. It was brief. I asked a couple of questions, I
14  requested that she send me the Zoom link electronically
15  so that it was slightly easier than typing it in, and --
16  and then the phone call was over.
17  Q. All right. Did you ask any questions about the
18  substance of the case or the reason that you were
19  subpoenaed?
20  A. I asked -- I speculated that it seemed like it
21  had been going on for some time, and asked a question
22  why I was being subpoenaed, and she explained that it
23  was an outcome of the event that happened back in 2018.
24  Q. The discharge incident that we saw?
25  A. Yes.

| 2025-04-23 | Jacob, Kris | Page 29 |
|---|---|---|

1  Q. Okay. Do you remember if you asked any other
2     questions or Ms. Dennison gave any other answers?
3  A. No. As I said, it was a fairly brief call so it
4     didn't turn into a long discussion. I was at work at
5     the time so it was necessarily brief.
6  Q. All right. Where do you currently work?
7  A. I work for Farm Bureau Financial Services in
8     Libby, Montana.
9     (Whereupon, the court reporter asked for
10    clarification.)
11 A. Farm Bureau Financial Services in Libby, Montana.
12    It's an insurance company.
13 Q. So at the time of this incident, you were working
14    in Nevada at -- at Bullseye Nevada; is that right?
15 A. That's correct.
16 Q. And now you live in Montana?
17 A. Yes.
18 Q. Did you ask Ms. Dennison how -- how she located
19    you?
20 A. I didn't.
21 Q. The pistol involved in the discharge incident we
22    saw, you said that was a Glock 43. Is that a subcompact
23    gun?
24 A. It is.
25 Q. And what does that mean?

| 2025-04-23 | Jacob, Kris | Page 30 |
|---|---|---|

1  A. That just means it's smaller than a midsized gun.
2     So like vehicles, guns are classified in the retail part
3     of the industry as full-size, mid-size and subcompact.
4  Q. How long had you owned that Glock 43?
5  A. I didn't own it. It was not my firearm. It
6     belonged to one of the other employees.
7  Q. Do you know how long that other employee had
8     owned that gun?
9  A. I would have to dig into the records, but I would
10    speculate less than a year. It was a fairly new model
11    for them.
12 Q. Do you know whether that gun had any malfunctions
13    previously?
14 A. Not to the --
15    MS. DENNISON: Objection to form.
16 A. Not to the best of my recollection. I -- not --
17    and not when I was using it, no.
18    BY MR. HAAZ:
19 Q. Okay. Had you -- had you used that gun before?
20 A. I had on the range.
21 Q. All right. About how many times?
22 A. Well, I was on the range seven days a week for
23    many years, but in that case, because it was newer, I
24    would say at least a dozen -- I would say at least a
25    dozen times.

| 2025-04-23 | Jacob, Kris | Page 31 |
|---|---|---|

1  Q. Okay. Did you own a Glock 43?
2  A. I did not.
3  Q. Did you own other Glock handguns?
4  A. I did.
5  Q. All right. And what did you own?
6  A. I owned a Glock 19, I owned a Glock 23 which was
7     chambered in .40 caliber. I think those were the only
8     two.
9  Q. Did you ever have any issues with those guns or
10    any unintended discharges with those guns, I should say?
11 A. No, I did not.
12 Q. Because you did not own the Glock 43 that was
13    involved in your unintended discharge, did you also not
14    own the Inside the Waistband holster you were using at
15    the time?
16 A. No, that I ow --
17    MS. DENNISON: Object to form.
18 A. That I owned.
19    BY MR. HAAZ:
20 Q. **Okay. And so if you didn't own a Glock 43, was**
21    **that Haley Strategic Incog holster designed for a**
22    **different gun?**
23 A. **No, it was designed for the 43. We carried that**
24    **line of holsters at our store, and I personally know the**
25    **people who built it, so we were fairly confident that**

| 2025-04-23 | Jacob, Kris | Page 32 |
|---|---|---|

1     **the holster was stable, safe and secure. I am**
2     **left-handed, as you can probably see in the video. So**
3     **in order to carry the gun, I had to have a left-handed**
4     **Kydex holster in which to carry it.**
5  Q. **All right. So you didn't own the Glock 43 subcom**
6     **-- subcompact, but you did own the Glock 43 holster that**
7     **you were using on the date of the incident?**
8  A. **That's correct.**
9  Q. **You said that you believed the Glock 43 was fully**
10    **seated in the holster, right?**
11 A. **Yes.**
12 Q. **And that's based upon a tension that would engage**
13    **the gun in the holster?**
14    MS. DENNISON: Objection to form.
15 A. **That's correct.**
16    BY MR. HAAZ:
17 Q. Was there any retention or button that you would
18    have to push that would have to be disengaged to remove
19    the gun from the holster?
20 A. No.
21 Q. So this was a friction holster?
22 A. Correct, which is quite common --
23    (Whereupon, the court reporter asked for
24    clarification.)
25 A. Which is quite common outside of law enforcement.

Defense Designations   Plaintiff Designations

9 / 16

## Page 33

| | |
|---|---|
| 1 | In law enforcement and military applications, there are |
| 2 | multiple steps to releasing the firearm from the |
| 3 | holster. In consumer applications, they're almost |
| 4 | nonexistent. |
| 5 | Q. For your other two Glocks that you own, did you |
| 6 | have any retention holsters? |
| 7 | A. Yes. |
| 8 | Q. And are those generally considered to be more |
| 9 | secure than a friction holster? |
| 10 | A. It depends on what you mean by secure. They |
| 11 | definitely -- the firearm does not come out of the |
| 12 | holster as quickly or as easily in a full retention |
| 13 | holster which has two or three other steps to release |
| 14 | it. |
| 15 | Q. That -- that's how I meant it. |
| 16 | A. Okay. And that's primarily what are used in law |
| 17 | enforcement and military applications. |
| 18 | Q. After your discharge incident, what steps did you |
| 19 | take to figure out how the discharge occurred? |
| 20 | A. It was some time before that start of the process |
| 21 | started because I was in the hospital. But once I got |
| 22 | out, I hired a lawyer who hired an expert who analyzed |
| 23 | the firearm in a lab to try and sort that out. |
| 24 | Q. All right. Were you present for that? |
| 25 | A. I was not. |

## Page 34

| | |
|---|---|
| 1 | Q. You indicated that despite the fact that you're |
| 2 | an armorer and familiar with guns, you're not an expert |
| 3 | in the mechanics of firearms? |
| 4 | A. To the extent that I can or could, when I did |
| 5 | this for a living, work on them, I was considered an |
| 6 | expert. But in terms of technical minutia of |
| 7 | manufacturing and designing firearms, I obviously don't |
| 8 | work in that part of the industry and have never worked |
| 9 | in that part of the industry. |
| 10 | Q. Okay. You said that there was some speculation |
| 11 | that your shirt got into the holster at the time that |
| 12 | you holstered the gun and caused a discharge. Do you |
| 13 | remember talking about that? |
| 14 | A. I do. |
| 15 | Q. And do you dispute that? |
| 16 | A. I do. |
| 17 | Q. Okay. And why do you dispute that? |
| 18 | A. I think it's clear from the video that there was |
| 19 | not a shirt in the holster because the shirt was bloused |
| 20 | outside the holster. It's also clear from the video |
| 21 | that my hands were nowhere near the firearm at the time |
| 22 | when it discharged. And I should point out, very |
| 23 | popular firearms carry with them -- very adamant -- both |
| 24 | proponents and detractors. So the speculation I |
| 25 | referred to earlier was as an outcome of the video that |

## Page 35

| | |
|---|---|
| 1 | you saw earlier today being leaked on the internet, and |
| 2 | about everyone and their cousin commenting on how it |
| 3 | happened, without having the benefit of being physically |
| 4 | present in the room when it occurred. |
| 5 | Q. Well, you were physically present in the room |
| 6 | when this occurred so -- |
| 7 | A. I was. |
| 8 | Q. And so you have the benefit of knowledge that |
| 9 | people speculating just from watching the video don't. |
| 10 | So can you just tell us, in your own words, what you |
| 11 | believe happened? |
| 12 | A. I believe it malfunctioned. I believe that it |
| 13 | was in the holster and something occurred. I wish I |
| 14 | could go back and see what. It doesn't seem likely or |
| 15 | probable to me that some third party foreign object |
| 16 | entered into the equation. The gun was holstered. Our |
| 17 | perspective as instructors, as an industry, was that |
| 18 | holstered firearms are safe. So I had every |
| 19 | expectation, when I leaned over, that that was gonna be |
| 20 | the case. Now, I will say the -- one of the rules of |
| 21 | safety for the firearms industry is never point a gun at |
| 22 | something you don't intend to destroy, and appendix |
| 23 | holsters violate that rule. So having to do it over |
| 24 | again, and I have since I worked in law enforcement for |
| 25 | several years after this event, that never happened |

## Page 36

| | |
|---|---|
| 1 | again. But I can imagine a variety of different |
| 2 | scenarios mechanically where it could happen. |
| 3 | Striker-fired firearms have a striker that's under |
| 4 | spring pressure a hundred percent of the time, unless |
| 5 | it's forward and has already struck the primer. So I |
| 6 | honestly, to this day, do not know what actually |
| 7 | happened. The technical examination and the legal |
| 8 | process sort of came to a halt at some point, and |
| 9 | looking to move on with my life and not dwell on an |
| 10 | event that was already painful enough, I moved on. |
| 11 | Q. But as the person who actually had the gun in |
| 12 | their appendix carry holster and experienced this |
| 13 | discharge, you believe that the gun malfunctioned? |
| 14 | MS. DENNISON: Objection to form. |
| 15 | A. I believe that. It's, like I said, speculation |
| 16 | on my part because I'm not a mechanical design expert, |
| 17 | but that's the only -- you know, you eliminate all of |
| 18 | the possibilities, and what you're left with is the |
| 19 | likely answer, was my conclusion so -- |
| 20 | BY MR. HAAZ: |
| 21 | Q. Have you -- was there any part of your shirt that |
| 22 | was in your holster at the time that you holstered your |
| 23 | Glock 43? |
| 24 | A. No. I mean not based on my recollection, nor |
| 25 | based on the footage where you can clearly see me move |

| 2025-04-23 | Jacob, Kris | Page 37 |
|---|---|---|

1  **the shirt away from my body, and it falls over the gun**
2  **in the holster which is, as I've mentioned, very common**
3  **in concealed carry. You have to have a concealment**
4  **garment. Otherwise, your firearm is not concealed. So**
5  **if you have done that exercise or that movement**
6  **thousands and thousands and thousands of times as a**
7  **student and an instructor, you never holster your gun**
8  **without blousing the shirt over it.**
9  MR. HAAZ: Kristen, I don't have the benefit
10 of having the video up as an exhibit. Would you mind
11 playing it and stopping it short of the discharge? I
12 don't want to have Mr. Jacob have to see that part of it
13 again.
14 MS. DENNISON: Yeah.
15 BY MR. HAAZ:
16 Q. But I am interested to see, Mr. Jacob, what you
17 describe as your shirt being bloused in front of the
18 holster, demonstrating that your shirt could not have
19 been in the holster.
20 (Whereupon, a video is being played.)
21 MR. HAAZ: If we could just back that up,
22 Kristen, and I just want to play that part again.
23 (Whereupon, a video is being played.)
24 BY MR. HAAZ:
25 Q. All right. So Mr. --

| 2025-04-23 | Jacob, Kris | Page 38 |
|---|---|---|

1  MR. HAAZ: Pause it there, Kristen. Thank
2  you.
3  BY MR. HAAZ:
4  **Q. Mr. Jacob, did you see when you lifted up your**
5  **gray shirt? Could you tell if there was an undershirt**
6  **between your gray shirt and your body?**
7  **A. Well, I -- I can't. Not -- not from this**
8  **distance. The camera was in the upper right-hand corner**
9  **of the room so it could pick up the entire retail space**
10 **so I -- I can't see it. And honestly, it was seven or**
11 **eight years ago so I -- it's --**
12 **Q. I think it may be -- if the video just gets**
13 **backed up just a few more seconds.**
14 **(Whereupon, a video is being played.)**
15 **A. It does look like there's a spandex T-shirt**
16 **underneath.**
17 **Q. And when you say "spandex T-shirt," what do you**
18 **mean?**
19 **A. So I taught in the desert 10 to 12 hours a day,**
20 **seven days a week. So I often wore Under Armour spandex**
21 **T-shirts underneath my cover garment because it was a**
22 **hundred plus degrees most days. So I have them, I wear**
23 **them frequently, and if I was wearing an undershirt that**
24 **day, that's probably what it was. And they are skin**
25 **tight, by the way.**

| 2025-04-23 | Jacob, Kris | Page 39 |
|---|---|---|

1  **Q. And would that have been -- when you say, "skin**
2  **tight," would that have been tight against your body?**
3  **A. Tight against my body and underneath my**
4  **underwear.**
5  **Q. All right. Underneath your underwear?**
6  **A. Because it's the only way to keep them from**
7  **riding up.**
8  **Q. All right. So from what I understand, just based**
9  **upon this image, you would have had a white spandex**
10 **shirt that's tight against your body, underwear over**
11 **that, and then pants over the underwear, and a gray**
12 **T-shirt; is that fair?**
13 **A. That sounds right.**
14 Q. Okay. And then where would your appendix carry
15 holster be located in that equation? Would it have been
16 between your underwear and your pants?
17 A. No. So the appendix holster is inside the
18 pants -- thus the name Inside the Waistband holster --
19 clipped to the belt, and then the -- really the only
20 part that's exposed is the -- is the top of the holster.
21 Q. All right. So when you're lifting up your shirt
22 here -- and this is at seven seconds in the video --
23 what are you doing with your gun in your left hand?
24 A. So with my finger straight and off the trigger,
25 I'm placing the gun into the holster so that it is

| 2025-04-23 | Jacob, Kris | Page 40 |
|---|---|---|

1  securely snapped in so that it can't fall out if I need
2  to run or chase or something like that.
3  **Q. All right. Is there any chance that the gray**
4  **shirt that you're lifting up away in the holster would**
5  **somehow be in the holster in this frame at**
6  **seven seconds?**
7  MS. DENNISON: Objection to form.
8  **A. Well, I think if you run the video forward,**
9  **you'll see that that's clearly not the case.**
10 BY MR. HAAZ:
11 **Q. Well, I'm just asking about this frame at**
12 **seven seconds.**
13 **A. Oh. At that point, the shirt is above the**
14 **firearm itself, and held in my right hand. So, no,**
15 **there's no way for the shirt in that position to get**
16 **caught in the trigger. And if it had, the discharge**
17 **would have occurred prior to me leaning over and picking**
18 **something up off the ground.**
19 Q. All right.
20 MR. HAAZ: And, Kristen, could you play the
21 next second or two, please?
22 (Whereupon, a video is being played.)
23 MS. DENNISON: Do you want me to keep going?
24 MR. HAAZ: Yes, please.
25 (Whereupon, a video is being played.)

## Page 41

| | |
|---|---|
| 1 | MR. HAAZ: All right. Pause it here, |
| 2 | please. |
| 3 | BY MR. HAAZ: |
| 4 | Q. Okay, what did you just do with your shirt at 18 |
| 5 | and 19 seconds? |
| 6 | A. That is a standard movement that anybody who |
| 7 | carries concealed, either appendix or anyplace else, |
| 8 | will do habitually which is blouse the shirt away from |
| 9 | the body to make sure that it's not anywhere near the |
| 10 | gun. |
| 11 | Q. All right. And so just so I'm clear, the only |
| 12 | shirts that you had on that day were the white spandex |
| 13 | shirt and the gray shirt? |
| 14 | A. That's correct. |
| 15 | Q. Okay. And when you say bloused in front of your |
| 16 | body, just what exactly do you mean? |
| 17 | A. So having had a concealed weapons permit in the |
| 18 | State of California for a while, one of the problems is |
| 19 | that either law enforcement or civilians see that you're |
| 20 | wearing a gun and call it in. That's a problem because |
| 21 | it's supposed to be concealed. So blousing is a |
| 22 | technique to be absolutely sure before you move on to |
| 23 | the next step of your day, that that clothing item, |
| 24 | which is designed to conceal the firearm from the |
| 25 | general public, is covered. Otherwise, it's not |

## Page 42

| | |
|---|---|
| 1 | concealed. |
| 2 | Q. All right. And is that what you did at 18 or |
| 3 | 19 seconds into this video? |
| 4 | A. That's exactly it. |
| 5 | Q. Did you know -- do you know of anything else that |
| 6 | could have got in your holster besides the gray shirt or |
| 7 | the spandex shirt that you were wearing? |
| 8 | A. I've given it a fair amount of thought, as you |
| 9 | might imagine, and I can't imagine anything else that |
| 10 | could have gotten caught in -- in the holster. |
| 11 | Q. Okay. And was there any damage to the gray shirt |
| 12 | after the unintended discharge? |
| 13 | A. Not to the best of my knowledge, no. |
| 14 | Q. Was there any damage to the white shirt after the |
| 15 | unintended discharge? |
| 16 | MS. DENNISON: Objection to form. |
| 17 | A. No. It was above -- above the line of where the |
| 18 | holster stopped. |
| 19 | BY MR. HAAZ: |
| 20 | Q. All right. |
| 21 | MR. HAAZ: Kristen, you can take it down. |
| 22 | I'm going to move on. Thank you. |
| 23 | MS. DENNISON: Give me a second. I gotta |
| 24 | remember how to stop sharing. |
| 25 | BY MR. HAAZ: |

## Page 43

| | |
|---|---|
| 1 | Q. How long were you a Glock armorer for? |
| 2 | A. Five or six years, I think. It recently expired |
| 3 | so it could have been -- could have been longer. I |
| 4 | didn't pay much attention to it because, for obvious |
| 5 | reasons, I wasn't working on Glocks. |
| 6 | Q. Have you ever heard of the term, finger placement |
| 7 | hazard? |
| 8 | A. No. |
| 9 | Q. Did you own Glocks and shoot Glocks prior to |
| 10 | becoming a Glock armorer? |
| 11 | A. Yes. |
| 12 | Q. How long have you shot Glocks for? |
| 13 | A. I'd say probably at least since 2007. |
| 14 | Q. All right. So as of today, that would be about |
| 15 | 16 years? |
| 16 | A. Sounds correct. |
| 17 | Q. And I am cautious to ask because I don't know if |
| 18 | you can even estimate, but over that 16 years, how many |
| 19 | rounds would you say you shot through a Glock firearm? |
| 20 | A. Give or take a few, probably a hundred thousand. |
| 21 | Q. All right. Have you ever tried to pull the |
| 22 | trigger of a Glock firearm and not been able to engage |
| 23 | the tap? |
| 24 | A. Huh. I -- I -- I have seen many catastrophic |
| 25 | malfunctions on the range. I don't recall whether or |

## Page 44

| | |
|---|---|
| 1 | not they had -- our primary concern, when those things |
| 2 | occur, is to safely handle -- handle the firearm to make |
| 3 | sure nothing else occurs if it's not working properly. |
| 4 | Q. Maybe I -- maybe I asked a bad question. |
| 5 | A. Okay. |
| 6 | Q. You under -- do you understand what I'm talking |
| 7 | about when I'm talking about the tab on the Glock |
| 8 | trigger? |
| 9 | A. I am. It's part of the safe action trigger. I |
| 10 | am very familiar with it. |
| 11 | Q. All right. And you understand -- do you |
| 12 | understand that the trigger will not move rearward and |
| 13 | the gun will not discharge unless the tab is actuated? |
| 14 | MS. DENNISON: Objection to form. |
| 15 | A. That's my understanding, and that does seem to be |
| 16 | the design. |
| 17 | BY MR. HAAZ: |
| 18 | Q. And have you ever tried to pull the trigger over |
| 19 | those hundred thousand rounds and -- let me strike that |
| 20 | and try to ask this a better way. |
| 21 | Do you have any recollection of any incident |
| 22 | where you tried to pull a Glock trigger and did not |
| 23 | engage the tab? |
| 24 | A. Not to the best of my recollection, no. |
| 25 | Q. I'm going to share my screen in a minute. As a |

## Page 45

2025-04-23 — Jacob, Kris

```
1    Glock armorer, would you review the Glock instructions
2    for use or the owner's manuals from time to time?
3  A. Yes.
4  Q. And would you have to be trained on those manuals
5    and how to safely use the gun?
6    MS. DENNISON: Objection to form.
7  A. Yes.  So the armorers course itself is primarily
8    technical.  So these are the parts, these are how they
9    work together, here's how to diagnose and fix issues.
10   It's presumed -- because most of the Glock armorer
11   courses, as a percentage, occur in or adjacent to law
12   enforcement agencies as a very popular firearm that's
13   used in law enforcement, so I believe they presume --
14   there is no live fire component to any of the Glock
15   armorer courses, and I believe they presume that the
16   four commandments of firearm safety are gonna be
17   observed at all times when their armorers are working
18   with guns.
19   BY MR. HAAZ:
20 Q. I'm going to show you what I'll mark as
21   Exhibit 2.
22   MS. DENNISON: And, for the record, I
23   neglected to mark the video as Exhibit 1, but we'll mark
24   it as Exhibit 1, and this will be Exhibit 2.
25   (Exhibits 1 and 2 were marked.)
```

## Page 46

2025-04-23 — Jacob, Kris

```
1    BY MR. HAAZ:
2  Q. I'm going to show you what I'll mark as
3    Exhibit 2.  I shared my screen.  And this is a Glock
4    instructions for use manual.  I'll scroll up to the
5    first page so you see it.
6  A. I recognize that document.
7  Q. All right.  And if we scroll down to page -- I
8    think it's the top of page seven here, there's language
9    about a trigger safety; do you see that?
10 A. Uh-huh.
11 Q. I'd ask that you read it, and then I'll have some
12   questions about it.
13   MS. DENNISON: For the record, could we just
14   say -- can we just get the date on this manual?
15   MR. HAAZ: Yeah, it was 2023.  It looks like
16   September '23.
17   MS. DENNISON: Thank you.
18 A. Is there any way to make this slightly bigger?
19   BY MR. HAAZ:
20 Q. Sure.  I think so.
21 A. I'm sure you guys have big, giant screens in your
22   offices, but on my laptop, it's not readable.  Okay, "if
23   the trigger safety" -- yup, I -- I recall that
24   paragraph.
25 Q. All right.  And I'm gonna focus on the last
```

## Page 47

2025-04-23 — Jacob, Kris

```
1    sentence in the paragraph which reads, "the trigger
2    safety is designed to protect against firing if the
3    pistol is dropped, or if the pistol is subjected to
4    lateral pressure."  Is that what you were trained on as
5    a Glock armorer?
6  A. That is --
7    MS. DENNISON: Object to form.
8  A. -- part of the materials that are provided to
9    Glock armorers, yes.
10   BY MR. HAAZ:
11 Q. And do you believe that to be an accurate
12   statement?
13   MS. DENNISON: Objection to form.
14 A. I believe that the trigger safety is designed to
15   protect against firing.  I believe that's an accurate
16   statement.
17   BY MR. HAAZ:
18 Q. All right.
19 A. It's designed -- it's designed that way, yes.
20 Q. All right.  And the two types of firing
21   incidents, according to Glock in this document, are a
22   drop incident or a lateral pressure on the trigger
23   incident; do you agree?
24   MS. DENNISON: Objection to form.
25 A. That is -- that is the text, yes.
```

## Page 48

2025-04-23 — Jacob, Kris

```
1    BY MR. HAAZ:
2  Q. All right.  Have you ever tried to test whether a
3    tab in a Glock safe action trigger works properly?
4    MS. DENNISON: Objection to form.
5  A. We have -- in our classes, we have demonstrated
6    that, yes.
7    BY MR. HAAZ:
8  Q. And how do you demonstrate that?
9  A. With an unloaded firearm with the tab not
10   depressed, pressing the trigger to the rear and
11   observing that it stops instead of fully engaging.
12 Q. Okay.  And where on the trigger do you contact to
13   show that the tab trigger is working properly?
14 A. There are grooves or ribs in the trigger body
15   itself that are on either part of the smooth part of the
16   tab that you can hook your fingernail into and pull the
17   trigger to the rear, or attempt to.
18 Q. Okay.  And unless the tab is engaged, the trigger
19   will not pull; is that right?
20 A. That is the way it's designed, yes.
21 Q. All right.  Now, you previously testified that
22   based upon your experience, you no longer believe that a
23   gun that is holstered is necessarily safe because it's
24   in a holster?
25   MS. DENNISON: Object to form.
```

| 2025-04-23 | Jacob, Kris | Page 49 |
|---|---|---|

1  A. I believe that, in general, guns that are
2     holstered are safer than guns that are not holstered. I
3     also believe that their position, relative to the human
4     body, is quite important, and they shouldn't be pointed
5     at people's anatomy, unless you're intending to put a
6     hole in that piece of anatomy. And that's certainly not
7     the case with most people, unless it's directed at
8     somebody who's assaulting them. In short, my views on
9     holstered pistols as universally and perfectly safe have
10    changed.
11    BY MR. HAAZ:
12 Q. I want to talk briefly about this other incident
13    that you spoke of involving somebody who you remembered
14    telling you about an incident with a Glock 17 as they
15    got out of their vehicle. Do you remember when that
16    conversation took place?
17 A. It was probably a month after the event depicted
18    in the video.
19 Q. All right. You don't remember that person's
20    name?
21 A. I don't. I was recovering from a catastrophic
22    gunshot wound to the pelvis at that time, so my memory
23    of that period of time is somewhat cloudy.
24 Q. Understood. And you don't know anything about
25    the circumstances of that unintended discharge other

| 2025-04-23 | Jacob, Kris | Page 50 |
|---|---|---|

1     than what was said to you during that brief
2     conversation?
3  A. No. As I recall, my goal in the conversation was
4     to find out if something like that had ever happened
5     before. When I found out the answer was yes, then I
6     stopped asking questions.
7  Q. All right. Have you ever heard of Sig P320s
8     going off in individuals' holsters?
9     MS. DENNISON: Objection to form.
10 A. I've read news reports of them, but having been
11    the subject of news reports of various kinds online and
12    on national television, I can -- you know, I don't put a
13    tremendous amount of value in news reports. If they're
14    -- so I'll just leave it there.
15    BY MR. HAAZ:
16 Q. Okay.
17 A. Nothing other than what I read in the news. I
18    don't have any specific contact with events of that
19    nature.
20    MR. HAAZ: All right. I want to look at my
21    notes real quick, but I don't think I have any other
22    questions.
23    Mr. Jacob, thank you very much for your
24    time.
25    THE WITNESS: Of course.

| 2025-04-23 | Jacob, Kris | Page 51 |
|---|---|---|

1     MS. DENNISON: Mr. Jacob, I just have a
2     couple follow-up. I'm going to try to be as quick as
3     possible to get you out of here. And, again, thank you
4     very much for your time this morning. I'm sorry to keep
5     you so long.
6     RE-EXAMINATION
7     BY MS. DENNISON:
8  Q. You indicated, I believe, when Mr. Haaz was
9     asking you some questions, that you believe the trigger
10    safety in the Glock is designed to protect against
11    firing. Did I hear that right?
12 A. I -- I believe it's designed that way, and it
13    certainly states that in the instruction manual.
14 Q. Okay. Do you agree that a pistol is designed to
15    fire when the trigger is pulled?
16    MR. HAAZ: Object to form.
17 A. Yes.
18    BY MS. DENNISON:
19 Q. Do you believe that that tab trigger on the Glock
20    is designed in a manner that would interfere with the
21    gun firing when the trigger is pulled?
22    MR. HAAZ: Object to form.
23 A. I believe it's designed to do so. I -- I
24    couldn't speculate about whether or not it does so a
25    hundred percent of the time.

| 2025-04-23 | Jacob, Kris | Page 52 |
|---|---|---|

1     BY MS. DENNISON:
2  Q. Okay. You said that you had fired the Glock
3     pistol thousands of times; is that correct?
4  A. Yes.
5  Q. And when you pulled that trigger on the Glock
6     pistol, I believe that you testified it fired every
7     time; is that correct?
8  A. Unless there was a malfunction, yes.
9  Q. What type of malfunction would occur with the
10    Glock that would cause it not to fire when you pulled
11    the trigger?
12 A. Well, there are several. A failure to fire event
13    typically occurs in one of three ways. Either the
14    striker or the firing pin does not contact the primer
15    properly and it doesn't go off so you have a basic
16    failure to fire, the slide is out of battery so it has
17    something obstructing it like another shell casing that
18    didn't eject, or the type three malfunction which is
19    slightly more complicated is you have a case that's
20    jammed in the barrel and -- and a shell that's jammed in
21    the breech, and that is more complex to take apart. But
22    in all three of those scenarios, the gun won't fire.
23 Q. Okay. Have you ever had a scenario where the
24    tabbed trigger stuck or otherwise impeded your ability
25    to pull the trigger?

## Page 53

| | |
|---|---|
| 1 | MR. HAAZ: Object to form. You can answer. |
| 2 | A. I have, and it was -- in the two cases I can |
| 3 | recall, it was the outcome of a round detonating inside |
| 4 | the firearm and bending the trigger mechanism. |
| 5 | BY MS. DENNISON: |
| 6 | Q. And that prevented you from being able to pull |
| 7 | the trigger in those circumstances? |
| 8 | MR. HAAZ: Object to form. |
| 9 | A. It -- it mangled the internals of the gun so, |
| 10 | yeah, it was inoperable and frozen in an odd position, |
| 11 | the two times that I can recall it. |
| 12 | BY MS. DENNISON: |
| 13 | Q. But when you have pulled the trigger on your |
| 14 | Glock pistol, you never had a circumstance where that |
| 15 | tab trigger prevented the gun from firing? |
| 16 | A. If depressed, it -- the gun fires. The |
| 17 | reliability of those firearms is one of the reasons that |
| 18 | they're heavily consumed by the general population and |
| 19 | law enforcement and military units. |
| 20 | Q. And every time you've attempted to fire that |
| 21 | pistol, you've depressed the tab trigger; is that |
| 22 | correct? |
| 23 | A. That's correct. If my finger was properly placed |
| 24 | on the trigger, it should have depressed the tab, as |
| 25 | designed. And depressing the trigger to the rear should |

## Page 54

| | |
|---|---|
| 1 | have caused the gun to go off. |
| 2 | Q. And if you wanted to fire that weapon and you |
| 3 | didn't properly place your finger on the trigger, could |
| 4 | that prevent you from discharging that weapon? |
| 5 | MR. HAAZ: Object to form. |
| 6 | A. It would, and that was why we did that |
| 7 | demonstration in the -- in the concealed carry classes |
| 8 | and in the advanced classes. Most people outside of the |
| 9 | industry don't have any idea what the design and |
| 10 | mechanics of their firearms are, and it's important that |
| 11 | they understand that. So by way of demonstrating that, |
| 12 | we could show how the -- how the firearm was designed to |
| 13 | function. |
| 14 | BY MS. DENNISON: |
| 15 | Q. Okay. Were you demonstrating how that tab |
| 16 | trigger functions so that you could show the individuals |
| 17 | in their class that they had to properly place their |
| 18 | finger on the trigger to be able to disengage the tab |
| 19 | and fire the weapon? |
| 20 | MR. HAAZ: Object to form. |
| 21 | A. That was part of it. The other part was that any |
| 22 | time you have a class full of 20 people with variable |
| 23 | experience with firearms, some who just bought them |
| 24 | recently and they're still sitting in the box, and some |
| 25 | who have been shooting all their lives, questions come |

## Page 55

| | |
|---|---|
| 1 | up. And one of the questions is -- and I won't be |
| 2 | specific, but X gun doesn't have a safety and, |
| 3 | therefore, it's not safe. That's one of the common |
| 4 | consumer questions that comes up in a CCW class. So as |
| 5 | a part of demonstrating how internal safeties versus |
| 6 | external safeties are applied in firearms, we frequently |
| 7 | did that demonstration. |
| 8 | BY MS. DENNISON: |
| 9 | Q. Okay. And that demonstration that you did, was |
| 10 | that -- were you explaining how an external safety or |
| 11 | how an internal safety functions on the Glock? |
| 12 | A. Internal. External safeties are somewhat |
| 13 | self-explanatory. |
| 14 | Q. Okay. I understand you're saying it's fairly |
| 15 | self-explanatory. Could you explain to me what an |
| 16 | external safety is? |
| 17 | A. External safeties are, as the name suggests, |
| 18 | external. So 1911s, which is a very old design, have |
| 19 | them. They're sometimes on one side of the gun, |
| 20 | sometimes on the other, but you physically press that up |
| 21 | or down in order to put the firearm in a condition to |
| 22 | fire or not to fire. And there have been many |
| 23 | variations of external safeties throughout the years, |
| 24 | but they all have one quality in common, and that's that |
| 25 | you can physically see and feel them on the outside of |

## Page 56

| | |
|---|---|
| 1 | the firearm. |
| 2 | Q. Is it your understanding that the industry |
| 3 | equates an external safety with a thumb or a finger |
| 4 | safety like you just described? |
| 5 | MR. HAAZ: Object to form. |
| 6 | A. That's my understanding. |
| 7 | BY MS. DENNISON: |
| 8 | Q. Okay. Now, you indicated, I believe, that after |
| 9 | your discharge event, you had an expert take a look at |
| 10 | the pistol; is that correct? |
| 11 | A. Yes. |
| 12 | Q. Did you ever bring a lawsuit arising out of the |
| 13 | incident that you had with the Glock? |
| 14 | A. I did not. |
| 15 | Q. Did you ever speak with that expert as to -- that |
| 16 | you hired as to what, if anything, he concluded was the |
| 17 | cause of your discharge? |
| 18 | A. Not directly, no. I spoke to -- I -- the |
| 19 | information that I got was through a third-party. And |
| 20 | as I think I said before, I have never seen the -- the |
| 21 | actual lab report. |
| 22 | Q. Okay. You talked about the undershirt that you |
| 23 | were wearing, and you asked if there was any evidence of |
| 24 | damage. When we spoke a little bit earlier this |
| 25 | morning, you could not recall whether you were wearing |

---

2025-04-23  Jacob, Kris  Page 57

1   an undershirt that day or not; do you recall that?
2   A. I do. And, again, this event occurred sometime
3   in the past. So looking at the video again, it -- it
4   seems apparent that I was wearing an undershirt. So
5   present recollection refreshed, counselor.
6   Q. You've been studying, Mr. Jacob. So as we sit
7   here today, do you have a specific recollection that
8   there was no damage to the undershirt you were wearing
9   today -- or that you were wearing that day?
10  MR. HAAZ: Object to form.
11  A. Again, history, but I -- I would be -- let me put
12  it this way. I would be very surprised if that shirt is
13  not in my drawer right now. And if it had a scorch mark
14  or a rip in it, it would not be in my drawer. I -- I
15  believe I still own all the T-shirts I owned in that
16  time frame which I'm not sure what that says about me,
17  but I believe it to be the case. And if it was damaged,
18  I wouldn't wear it.
19  BY MS. DENNISON:
20  Q. Okay. Do you have -- are you -- let me back up,
21  strike that. Are you certain that the undershirt that
22  you were wearing on the day of the incident is an
23  undershirt that you currently own and is in your drawer?
24  A. To the best of my recollection, I have not
25  disposed of any undershirts of that type in a long time.

---

2025-04-23  Jacob, Kris  Page 58

1   Q. Okay. If you were to see a lab report from your
2   incident that indicated that there were fragments of
3   your undershirt located and burned into the gun and/or
4   holster, would you -- would that change your thought on
5   that now?
6   A. Well, first I'll say, I would love to see that
7   report since I've never seen it before, and I was the
8   one who was involved in the incident. So if there is
9   such a report in existence, I would be fascinated by
10  whatever it says, and would be happy to adjust my
11  viewpoint based on that document.
12  Q. Okay. All right.
13  MS. DENNISON: Mr. Jacob, thank you, sir,
14  for your time. I don't have any further questions for
15  you.
16  THE WITNESS: Okay.
17  MR. HAAZ: I don't have any questions
18  either.
19  Mr. Jacob, thank you very much. I'm sorry
20  you had to deal with this and had to watch the videos
21  again and relive it, but we're very appreciative of your
22  time.
23  THE WITNESS: My pleasure.
24  VIDEOGRAPHER: One moment, I'll take us off
25  the record.

---

2025-04-23  Jacob, Kris  Page 59

1   This now concludes the videoconference
2   deposition of Kris Jacob.
3   At this time, we do ask all counsel to stay
4   connected briefly to provide the court reporter with
5   your transcript and video orders.
6   Ms. Dennison?
7   MS. DENNISON: I will take a synced copy of
8   the video, and I will take an e-Tran and TXT, please.
9   VIDEOGRAPHER: All right, Mr. Haaz?
10  MR. HAAZ: We'll take the video -- actually,
11  you know what? Let's hold off on the video. We'll take
12  a TXT and a mini PDF.
13  VIDEOGRAPHER: Okay, thank you.
14  MR. HAAZ: Actually, you know what -- yeah,
15  we'll -- I'll hold off on the video, and we'll follow
16  up.
17  Kristen --
18  VIDEOGRAPHER: Do you want me to take us off
19  the record, or do you want this on the record?
20  MR. HAAZ: No, we'll have this on the
21  record.
22  VIDEOGRAPHER: Okay.
23  MR. HAAZ: You referenced a report related
24  to Mr. Jacob's incident that's never been produced in
25  this case. Your expert talked at length about Mr.

---

2025-04-23  Jacob, Kris  Page 60

1   Jacob's incident in his -- in his report, Derek Watkins.
2   That -- to the best of my knowledge, that incident
3   report about Mr. Jacob's incident was not produced as
4   part of his file materials. Do you have it? And if you
5   have it, why haven't you produced it yet?
6   MS. DENNISON: I do not have it.
7   MR. HAAZ: Well, what were you referring to
8   when you talked about fragments of a T-shirt in a
9   holster?
10  MS. DENNISON: I heard it exists. I do not
11  have it.
12  MR. HAAZ: Okay.
13  VIDEOGRAPHER: Okay. Are we okay to go off
14  the record?
15  MS. DENNISON: Yes.
16  VIDEOGRAPHER: All right. We are now going
17  off the record on May 23, 2025 at -- and, I'm sorry, Mr.
18  Jacob turned off his camera, so I do not know what time
19  we are.
20  MS. DENNISON: It should be 10 a.m.
21  MR. HAAZ: 10 a.m.
22  VIDEOGRAPHER: 10 a.m. Mountain Time. Thank
23  you.
24  (Whereupon, the deposition was concluded at 10:00 a.m.)

# EXHIBIT C