# EXHIBIT E

```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3      JACQUES DESROSIERS, et al,       )
                                        )
4              Plaintiffs               )
                                        )
5          -VS-                         )  CA No. 22-11674-PBS
                                        )  Pages 8-1 - 8-132
6      SIG SAUER INC.,                  )
                                        )
7              Defendant                )

8

9                       **JURY TRIAL DAY EIGHT**

10              BEFORE THE HONORABLE PATTI B. SARIS
                     UNITED STATES DISTRICT JUDGE
11

12

13

14

15                               United States District Court
                                 1 Courthouse Way, Courtroom 19
16                               Boston, Massachusetts  02210
                                 July 24, 2025, 8:51 a.m.
17

18

19

20

21
                            LEE A. MARZILLI
22                       OFFICIAL COURT REPORTER
                       United States District Court
23                     1 Courthouse Way, Room 7200
                            Boston, MA  02210
24                        leemarz47@gmail.com

25
```

```
 1  A P P E A R A N C E S:

 2        RYAN D. HURD, ESQ. and SAMUEL A. HAAZ, ESQ.,
    Saltz Mongeluzzi Bendesky, P.C., One Liberty Place,
 3  1650 Market Street, 52nd Floor, Philadelphia, Pennsylvania,
    19103, for the Plaintiffs.
 4
          STEPHEN SEMENZA, ESQ., Law Offices of Stephen Semenza,
 5  100 Pier 4 Boulevard, Boston, Massachusetts, 02210, for the
    Plaintiffs.
 6
          JAMES M. CAMPBELL, ESQ. and ALAINA DEVINE, ESQ.,
 7  Campbell Conroy & O'Neil, P.C., 20 City Square, Suite 300,
    Boston, Massachusetts, 02129, for the Defendant.
 8
          KRISTEN E. DENNISON, ESQ., Littleton Joyce Ughetta &
 9  Kelly, LLP, 2460 North Courtenay Parkway, Suite 24, Merritt
    Island, Florida, 32953, for the Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2    WITNESS                  DIRECT    CROSS    REDIRECT    RECROSS

 3    MATTHEW TAYLOR

 4         By Ms. Dennison:       9
           By Mr. Hurd:                    59
 5         By Ms. Dennison:                          107

 6    ERIC WARREN

 7         By Ms. Dennison:      116

 8    VIDEO DEPOSITION OF DAVID COUNCELLER:   Page 115

 9

10

11    EXHIBITS            RECEIVED IN EVIDENCE

12    530                      11
      541-B                    13
13    531-C                    15
      537                      35
14    534                      53
      224, 225                 89
15    219                      89
      554                      115
16
```

1  Q.  No one's claimed that Officer Desrosiers was vibrating his
2  gun?
3  A.  I do not know that either.  My understanding is, he was
4  attempting to put the gun in the waistband of his pants and
5  moving it up and down.
6  Q.  So the claim here is the unintended actuation of a trigger
7  due to a side graze.  Would you agree that not a single one of
8  those tests that you spent 30 or 40 minutes talking about deal
9  with that?
10 A.  We did not do any testing dealing with trigger side pull.
11 Q.  Now, we know from the FMECA and other unintended
12 discharges that this is something that's foreseeable to happen,
13 right?
14 A.  If something depresses the trigger, then the gun is or
15 should fire as it's designed to do, so, yes, that is a hazard.
16 Q.  Okay, a simple question.  I'm going to ask for a simple
17 answer.  Was Sig Sauer aware of the risk of unintended
18 discharge by a person's finger or foreign object coming into
19 contact with the trigger?
20 A.  Yes, for any gun.
21 Q.  That's a serious risk, right?
22 A.  It certainly is.
23 Q.  That risk could be the difference between somebody coming
24 home and hugging their kid or not, right?
25 A.  That's why the severity level was listed as high on the

1  FMECA.
2  Q.   Now, from a design perspective, foreseeable accidents,
3  like somebody dropping a gun, is something that you try to
4  build into your product design and eliminate and make it safe
5  for, right?
6  A.   Yes, to the extent we can, yes.
7  Q.   And that's something you were trying to do with all those
8  testing you were talking about?
9  A.   Yes, to confirm that we had.
10  Q.   From the design perspective, it's foreseeable that
11  somebody could have an unintended discharge while disassembling
12  their gun, and that's something that you guys did design into
13  your product with the takedown process, right?
14  A.   Yes.  That was one of our primary objectives in the design
15  of this gun.
16  Q.   Now, from a design perspective, a foreseeable unintended
17  discharge like somebody actuating the trigger with a side
18  graze, that's not something that Sig Sauer did anything to try
19  to design out or guard against, right?
20  A.   We designed the pistol to function reliably when the
21  trigger is depressed, and that's where we have it.  The trigger
22  guard, which is this section of the gun, is wider than the
23  trigger, which is intended to help prevent things from snagging
24  on the trigger, but obviously it cannot completely eliminate
25  it.

1  a good test should be repeatable with a defined procedure, and
2  I'm imagining an infinite number of variations in the ways you
3  could unintentionally pull a trigger.
4  Q.   Well, there's an infinite number of ways you can drop a
5  gun and cause it to fire, and you guys picked six to test.  So
6  how about you pick six of those infinite numbers to accidentally
7  pull the trigger and see what it does with a tab versus the
8  P320?  Is that something you could do?
9           THE COURT:  Did you do that test?
10          THE WITNESS:  They did not do a test like that.
11 Q.   Does Sig Sauer continuously analyze a product once it's
12 out in the field?
13 A.   "Continuously analyze" is kind of a broad term, but we
14 certainly monitor and are aware of our product's performance
15 and do continuous conformance checks.
16 Q.   And when something's gone wrong with it, it's something
17 you want to know about, right?
18 A.   If there's some deficiency in the design where it's not
19 performing as intended, yes, absolutely.
20 Q.   You want to fix that immediately, right?
21 A.   As quickly as we can.
22 Q.   But you guys found out about the gun not being drop-safe
23 from the military in January or February of '17, right?
24 A.   That is correct.
25 Q.   Did you run down to the assembly line and hit the red

1   emergency stop button to stop production of those guns?
2   A.   We did not.
3   Q.   And not only did you continue to produce them, you
4   continued to sell them, right?
5   A.   That is correct.
6   Q.   You sold them all the way up until, what was it, August of
7   2017 before you told anybody about it?
8   A.   In August, 2017, we launched the voluntary upgrade
9   program, and prior to that, we were working on the design
10  process to improve the design to make the gun that already
11  passed all of the existing drop safety standards even safer.
12  Q.   Does the fact that you were working on a design fix make
13  it okay that you were selling a defective gun?
14           MS. DENNISON:   Objection, your Honor.
15  Q.   I'll rephrase it.   Does the fact that you were working on
16  a design fix make it okay that you were selling a gun that was
17  known to be a drop hazard or drop vulnerability?
18  A.   We were working on a design improvement and to address
19  that drop vulnerability, as I said, to make a safe gun safer.
20  Q.   You know, when I think of the word "improvement," I think
21  of making something better.   I'm not thinking about fixing a
22  problem.
23           THE COURT:   Just ask the question.
24           MR. HURD:   Sorry, your Honor.
25  Q.   Who came up with the term "voluntary upgrade"?